UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



JUDGE MARRERO

08-CV  2394

COMPLAINT

---

UNARCO MATERIAL HANDLING, INC.,

                                        Plaintiff,

                -against-

KINGWAY INCA CLYMER HOLDINGS, INC. and
AMERICAN CAPITAL STRATEGIES, Ltd.,

                                        Defendants.

---

MAR 0 7 2008

U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Unarco Material Handling, Inc., by it attorneys, alleges for its Complaint

as follows:

## PARTIES

1.      Plaintiff Unarco Material Handling, Inc. ("Unarco" or "Buyer") is a
privately held corporation organized and existing under the laws of the State of Tennessee, with
its principal place of business in Springfield, Tennessee.

2.      Defendant Kingway Inca Clymer Holdings, Inc. ("Kingway" or "Seller")
is a privately held corporation organized and existing under the laws of the State of Delaware.
Upon information and belief, Kingway's principal place of business is in Lewisville, Texas or
Bethesda, Maryland.  Upon information and belief, Kingway is a wholly-owned subsidiary of
Defendant American Capital Strategies, Ltd. ("American Capital").

3.      Defendant American Capital is a publicly traded corporation organized
and existing under the laws of the State of Delaware, with its principal place of business in
Bethesda, Maryland.

## JURISDICTION AND VENUE

4.    Jurisdiction is proper under 28 U.S.C. § 1332 because there is diversity of citizenship and the amount in controversy exceeds the sum of $75,000.

5.    Venue is proper under 28 U.S.C. § 1391(a)(3) because the Defendants expressly submitted to jurisdiction in this district.

## FACTS

6.    Pursuant to a Stock Purchase Agreement, dated March 9, 2007 (the "Agreement") (copy attached as Exhibit 1), Unarco purchased from Defendant Kingway all the outstanding equity interests in KIC Holdings, Inc ("KIC").

7.    American Capital unconditionally guaranteed certain of Kingway's obligations under the Agreement.

8.    Pursuant to Section 2.03 of the Agreement, at the closing, Unarco was obligated to pay Kingway the "Estimated Purchase Price" less an agreed upon "Escrow Amount." The Estimated Purchase Price was determined pursuant to a formula set forth in Section 2.01 of the Agreement. The purchase price paid at closing was termed "estimated," because it was based upon KIC's financial data as of the closing date, which the parties understood might not be accurate in all respects based upon subsequent information or investigation.

9.    Section 2.04 of the Agreement, entitled "Post-Closing Adjustment," provides a mechanism for the parties to adjust the purchase price paid by Unarco from "estimated" to "actual." Specifically, the Post-Closing Adjustment mechanism provides that within sixty days of the closing date Unarco will provide Kingway with a "Draft Computation" setting forth its calculation of the "Actual Purchase Price," as defined in the Agreement and based upon the then-available financial information. If the Estimated Purchase Price (paid at

closing) exceeded the Actual Purchase Price, Kingway was to reimburse Unarco the difference and vice versa.

10.     The Agreement provides that if Kingway disagreed with the Draft Computation then it was obligated, within forty-five days of receiving it, to provide Unarco with an "Objection Notice," setting forth its calculation of the Actual Purchase Price.

11.     The Agreement further provides that if the parties are unable to resolve their disagreement over the Actual Purchase Price within sixty days, they are obligated to jointly retain an accounting firm to resolve the dispute (the "Firm").  According to Section 2.04, "[t]he determination of the Firm shall be conclusive and binding upon the Buyer and the Seller."

12.     Pursuant to Section 2.04(b)(ii)

if the Actual Purchase Price [determined by the Firm] is less than the Estimated Purchase Price, then within five (5) business days after the determination [by the Firm] of the Actual Purchase Price, the Buyer shall pay to the Seller, by wire transfer or delivery of immediately available funds, an amount equal to such difference plus simple interest thereon, at an interest rate equal to 8%, from the Closing Date to the date of payment, computed on an annual basis using a 360-day year.

13.     Section 2.04 also provides that:

[u]ntil the Firm makes its determination, the costs and expenses of the Firm shall be borne equally by the Buyer .. and the Seller ... provided that, when the Firm makes its determination, any costs and expenses ... of the Firm that are allocable to the party whose determination of the Actual Purchase Price (at the time of submission of the respective determinations to the Firm for resolution pursuant to this paragraph) was closest to the Firm's determination of the same shall be paid or reimbursed by the other party.

14.     The closing took place on March 30, 2007.  On May 24, 2007, Unarco provided Kingway with its Draft Computation.  On July 9, 2007, Kingway provided Unarco with its Objection Notice.  The parties attempted to resolve their disagreement but were unsuccessful.

15.     Pursuant to Section 2.04 of the Agreement, by engagement letter dated October 5, 2007, the parties jointly retained PriceWaterhouseCoopers LLP ("PwC") to resolve their disagreement.

16.     The parties each made submissions to PwC, consisting of evidence, argument, and expert reports.

17.     On February 18, 2008, PwC issued its "Decision," dated as of February 12, 2008 (copy attached as Exhibit 2). PwC determined that the Actual Purchase Price was $2,808,691 and the Estimated Purchase Price was $5,571,379. PwC also determined that "the Buyer's calculation of the actual purchase price was closest to the final calculation and therefore Seller is responsible for reimbursing Buyer for fees and expenses paid to PwC in connection with this matter."

18.     By letter dated February 19, 2008, Kingway wrote to PwC requesting that it reconsider its determination that Kingway should reimburse Unarco for its share of PwC's fees and expenses. By correspondence dated February 26, 2008, PwC denied that request.

19.     Under Section 2.04 of the Agreement, Kingway is obligated to pay Unarco $2,762,688, plus interest at 8% from closing to the date of payment ($210,578, accrued to the date of this complaint), and the fees and expenses paid by Unarco to PwC (totaling $178,686), by no later than March 4, 2008.

20.     Kingway has not paid Unarco the amounts it is obligated to pay under Section 2.04 of the Agreement.

21.     Pursuant to Section 12.12 of the Agreement, American Capital unconditionally guaranteed Kingway's obligations under Section 2.04 of the Agreement. American Capital has not paid Unarco the amount owed by Kingway.

22.     Pursuant to Section 12.09 of the Agreement, the prevailing party in any litigation brought to enforce its rights under the Agreement is entitled to recover from the other party "all fees, costs and expenses, including, without limitation, reasonable attorneys fees and court costs."

### FIRST CAUSE OF ACTION
### (Breach Of Contract)

23.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

24.     The Agreement is a valid and enforceable contract.

25.     Unarco has substantially performed its obligations under the Agreement.

26.     Kingway has failed and refused to perform its obligations under the Agreement, to wit, to abide the post-closing adjustment dispute resolution process provided in Section 2.04 and to pay Unarco the amounts it was determined to owe as a result of that process.

27.     Kingway's breach of the Agreement has damaged Unarco in the amount of $3,151,952 plus interest accruing thereon.

28.     Kingway's breach of the Agreement has further damaged Unarco, in an amount yet to be determined, by virtue of Unarco being forced to expend legal fees to bring this action.  The parties specifically bargained for and negotiated an alternative dispute resolution process that was intended, in part, to save the parties the costs and expenses associated with litigation.  Kingway's failure and refusal to abide by that process has forced Unarco to incur the costs and expenses it specifically bargained to avoid.  Moreover, Section 12.09 of the Agreement expressly entitles Unarco to recover the attorneys fees and other expenses associated with this action.

## SECOND CAUSE OF ACTION
### (Guarantee by American Capital)

29.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

30.    American Capital unconditionally guaranteed Kingway's obligations to Unarco under Section 2.04(b)(ii) of the Agreement.

31.    Because Kingway has failed to pay Unarco the amounts owed to Unarco under Section 2.04(b)(ii) of the Agreement, American Capital is obligated to do so.

32.    American Capital has failed and refused to honor its guarantee of Kingway's obligations under Section 2.04(b)(ii) of the Agreement.

## PRAYER FOR RELIEF

**WHEREFORE**, Unarco demands judgment against Kingway and American Capital as follows:

(i)    A judgment against Kingway that it has breached the Agreement and an award of damages in favor of Unarco for that breach in the amount of $3,151,952, plus interest and the attorneys fees and expenses incurred by Unarco in this action, in an amount to be determined;

(ii)    A judgment against American Capital that it has breached the Agreement and an award of damages in favor of Unarco for that breach in the amount of $3,151,952, plus interest and the attorneys fees and expenses incurred by Unarco in this action, in an amount to be determined; and

(iii)    For such other and further relief as this Court deems just and proper.

Dated:    New York, New York
          March 7, 2008

CADWALADER, WICKERSHAM & TAFT LLP

By:    _____
       Howard R. Hawkins (HH-2787)
       Joshua R. Weiss (JW-9959)

One World Financial Center
New York, New York 10281
212.504.6225 (t)
212.504.6666 (f)
hhawkins@cwt.com
jweiss@cwt.com

*Attorneys for Plaintiff Unarco Material Handling, Inc.*

**SECURITIES PURCHASE AGREEMENT**

by and among

KINGWAY INCA CLYMER HOLDINGS INC.

KIC HOLDINGS INC.

UNARCO MATERIAL HANDLING, INC.

and

AMERICAN CAPITAL STRATEGIES, LTD.

Dated as of March 9, 2007

TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS ................................................................................1
    Section 1.01      Definitions.....................................................................1
    Section 1.02      Cross-References to Other Defined Terms ........................6

ARTICLE 2 PURCHASE AND SALE ................................................................7
    Section 2.01      Estimated Purchase Price ...............................................7
    Section 2.02      Purchase and Sale of the Shares......................................8
    Section 2.03      The Closing...................................................................8
    Section 2.04      Post-Closing Adjustment. ..............................................9
    Section 2.05      Conversions..................................................................10

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE COMPANY .....................11
    Section 3.01      Organization and Qualification.....................................11
    Section 3.02      Capitalization; Subsidiaries; Securities Owned ..............12
    Section 3.03      Authority of the Company. ...........................................12
    Section 3.04      Compliance with Laws..................................................13
    Section 3.05      Advisory and Other Fees...............................................13
    Section 3.06      Taxes ..........................................................................13
    Section 3.07      Officers and Directors; Books and Records.....................15
    Section 3.08      Litigation ....................................................................16
    Section 3.09      Financial Statements ....................................................16
    Section 3.10      Transactions with Affiliates ..........................................17
    Section 3.11      Real Properties ............................................................17
    Section 3.12      Absence of Material Adverse Effect................................18
    Section 3.13      Absence of Certain Changes ..........................................18
    Section 3.14      Tangible Personal Property............................................18
    Section 3.15      Intellectual Property ....................................................18
    Section 3.16      Contracts ....................................................................19
    Section 3.17      Insurance ....................................................................20
    Section 3.18      Permits .......................................................................20
    Section 3.19      Employee Benefit Plans ................................................20
    Section 3.20      Employees; Labor Matters ............................................21
    Section 3.21      Environmental Matters..................................................22
    Section 3.22      Employee Relations .....................................................23
    Section 3.23      Key Employees ............................................................23
    Section 3.24      Receivables..................................................................23
    Section 3.25      Inventories..................................................................24
    Section 3.26      Customers....................................................................24
    Section 3.27      No Other Representations and Warranties.......................24

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF THE SELLER .........................25
    Section 4.01      Organizational Authorization.......................................25
    Section 4.02      Governmental Authorization.........................................25

i

Section 4.03    Noncontravention...................................................................25
Section 4.04    Seller's Ownership of the Shares at the Closing Date .........................25
Section 4.05    No Other Representations and Warranties...............................................25

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF THE BUYER .........................26
Section 5.01    Existence and Power .................................................................26
Section 5.02    Organizational Authorization......................................................26
Section 5.03    Governmental Authorization........................................................26
Section 5.04    Noncontravention...................................................................26
Section 5.05    Financing..........................................................................26
Section 5.06    Purchase for Investment............................................................26
Section 5.07    Actions and Proceedings............................................................26
Section 5.08    Finder's Fees......................................................................27
Section 5.09    Solvency...........................................................................27
Section 5.10    Acknowledgment by the Buyer........................................................27
Section 5.11    No Reliance........................................................................28
Section 5.12    No Other Representations and Warranties.............................................28

ARTICLE 6 COVENANTS OF THE COMPANY AND THE SELLER ...............................28
Section 6.01    Conduct of the Company ............................................................28
Section 6.02    Access.............................................................................30
Section 6.03    Subsequent Actions.................................................................31

ARTICLE 7 COVENANTS OF THE BUYER..............................................................31
Section 7.01    Confidentiality....................................................................31
Section 7.02    Access.............................................................................31
Section 7.03    Notification.......................................................................31
Section 7.04    Director and Officer Liability, Indemnification and Insurance ...........31
Section 7.05    Employment and Benefit Arrangements................................................32
Section 7.06    Regulatory Filings.................................................................32
Section 7.07    Contact with Employees, Customers and Suppliers ...........................32
Section 7.08    Financial Assistance...............................................................33

ARTICLE 8 ADDITIONAL COVENANTS OF THE PARTIES ....................................33
Section 8.01    Reasonable Best Efforts; Further Assurances.......................................33
Section 8.02    Further Cooperation................................................................33
Section 8.03    Public Announcements ..............................................................34
Section 8.04    Tax Matters........................................................................34
Section 8.05    Disclosure Generally...............................................................35
Section 8.06    Conflicts and Privilege............................................................35
Section 8.07    Special Environmental Conditions...................................................36

ARTICLE 9 CONDITIONS TO CLOSING................................................................36
Section 9.01    Conditions to the Buyer's Obligations..............................................36
Section 9.02    Conditions to the Seller's Obligations .......................................37

011107.0108\393259.18

ARTICLE 10 TERMINATION ................................................................38
    Section 10.01    Termination ....................................................38
    Section 10.02    Effect of Termination ......................................39

ARTICLE 11 ADDITIONAL COVENANTS ......................................39
    Section 11.01    Survival Periods .............................................39
    Section 11.02    Indemnification ..............................................39
    Section 11.03    Limitation of Recourse ...................................44

ARTICLE 12 MISCELLANEOUS ........................................................45
    Section 12.01    Notices ..........................................................45
    Section 12.02    Amendments and Waivers ..............................46
    Section 12.03    Construction; Severability .............................46
    Section 12.04    Expenses ........................................................46
    Section 12.05    Successors and Assigns ..................................47
    Section 12.06    Governing Law ..............................................47
    Section 12.07    Jurisdiction ....................................................47
    Section 12.08    Waiver of Jury Trial ......................................47
    Section 12.09    Prevailing Party .............................................47
    Section 12.10    Counterparts; Third Party Beneficiaries ........48
    Section 12.11    Entire Agreement ..........................................48
    Section 12.12    American Capital Guarantee ..........................48

INDEX OF EXHIBITS

Exhibit A     Definition of Net Working Capital
Exhibit B     Form of Escrow Agreement

011107.0108\393259.18

# SECURITIES PURCHASE AGREEMENT

THIS SECURITIES PURCHASE AGREEMENT (this "Agreement") is made as of March 9, 2007, by and among Kingway Inca Clymer Holdings Inc., a Delaware corporation (the "Seller"), KIC Holdings, Inc., a Delaware corporation which prior to the Closing (as defined below) shall be converted into a Delaware limited liability company (the "Company"), Unarco Material Handling, Inc., a Tennessee corporation (the "Buyer"), and, solely for the purpose of Section 12.12 below, American Capital Strategies, Ltd., a Delaware corporation ("American Capital"). Unless otherwise provided, capitalized terms used herein are defined in Article 1 below.

WHEREAS, the Seller owns or will own prior to the Closing all of the outstanding equity interests (the "Shares") in the Company; and

WHEREAS, upon the terms and subject to the conditions set forth herein, at the Closing, the Buyer desires to acquire from the Seller, and the Seller desires to sell to the Buyer, the Shares.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.01  Definitions**.    The following terms, as used herein, have the following meanings:

"Affiliate" means (except as otherwise specifically defined herein), as to any Person, any other Person which, directly or indirectly, controls, or is controlled by, or is under common control with, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise. However, the term Affiliates shall not include any other entities in which American Capital or its Affiliates own equity or debt interests other than the Company and its Subsidiaries.

"Business Day" means any day other than a Saturday, Sunday or any day on which banks located in New York, New York are authorized or required to be closed for the conduct of regular banking business.

"Cash" means cash, cash equivalents and marketable securities.

"Cash Amount" means the bank balance of all Cash held by the Company or any Subsidiary as of the close of business on the Closing Date, before giving effect to the transactions contemplated hereby.

"Closing Management Bonuses" means bonuses, incentive compensation and other similar payments payable to any employee or director of the Company or any Subsidiary resulting from the Closing, including, without limitation, the amounts payable pursuant to the letter agreements referenced in items 3, 4 and 5 of Schedule 3.09(c) together with any payroll taxes or other amounts that may be payable by the Company or any Subsidiary as a result of the payment of any such bonus, incentive compensation and other similar payment.

"Code" means the Internal Revenue Code of 1986, as amended, and any reference to any particular Code section shall be interpreted to include any revision of or successor to that section regardless of how numbered or classified.

"Controlled Group Liability" means any and all liabilities (i) under Title IV of ERISA, (ii) under Section 302 of ERISA, (iii) under Sections 412 and 4971 of the Code, and (iv) as a result of a failure to comply with the continuation coverage requirements of Section 601 et seq. of ERISA and Section 4980B of the Code.

"Demand" means any demand, claim, action, cause of action, or assertion or other notice of potential obligation, liability or responsibility.

"Employee Benefit Plan" means "employee benefit plan" as such term is defined under Section 3(3) of ERISA and such other material, written employee benefit plans, programs, policies, practices, or other arrangements providing benefits to any current or former employee, officer or director or the Company or any Subsidiary or any beneficiary or dependent thereof that is sponsored or maintained by the Company or any Subsidiary or to which the Company or any Subsidiary contributes or is obligated to contribute, including, without limitation, any bonus, incentive, deferred compensation, vacation, insurance, stock purchase, stock option, equity or equity-based plan or award, severance, employment, change of control or fringe benefit plan, program or agreement.

"Environmental Liability" means a legal obligation based upon an Environmental Requirement.

"Extended Escrow Amount" means $3,000,000.00, as such amount may be (i) reduced from time to time by payments made to the Buyer in connection with indemnification hereunder for Losses resulting from a breach of the representations, warranties, covenants and agreements for matters covered by Sections 2.05, 3.06, 8.04 and 3.21 or (ii) increased by interest or other investment income payable upon such amount.

"Federal Income Tax" means any Tax imposed under Subtitle A of the Code.

"Final Determination" means (i) with respect to Federal Income Taxes, a "determination" as defined in Section 1313(a) of the Code or execution of an Internal Revenue Service Form 870 AD and, (ii) with respect to Taxes other than Federal Income Taxes, any final determination of liability in respect of a Tax that, under applicable law, is not subject to further appeal, review or modification through proceedings or otherwise (including the expiration of a statute of limitations or a period for the filing of claims for refunds, amended returns or appeals from adverse determinations).

2

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Indebtedness" means, with respect to any Person at any date, without duplication, all obligations of such Person under capitalized leases, for borrowed money or in respect of loans or advances and all accrued interest, guarantees, letters of credit, performance bonds, bid bonds or other sureties of any kind or nature issued by or on behalf of the Company, prepayment premiums or penalties and fees on the foregoing which would be payable if such obligations were paid in full as of such date.

"Indebtedness Payoff Amount" means the amount required to repay all outstanding Indebtedness of the Company and the Subsidiaries as of the Closing Date, before giving effect to the transactions contemplated hereby. Solely for the purpose of determining the Indebtedness Payoff Amount, Indebtedness shall not include any guarantees, letters of credit, performance bonds, bid bonds or other sureties of any kind or nature issued by or on behalf of the Company or any Subsidiary in connection with any customer contracts, proposals or otherwise.

"Initial Escrow Amount" means $1,000,000.00, as such amount may be (i) reduced from time to time by payments made to the Buyer in connection with indemnification hereunder for Losses resulting from a breach of the representations, warranties, covenants and agreements for matters other than those covered by Sections 2.05, 3.06, 8.04 and 3.21 or (ii) increased by interest or other investment income payable upon such amount.

"Inventories" means all inventory, merchandise, finished goods, raw materials, packaging, labels, supplies and other personal property maintained, stored or held by or for the Company or any Subsidiary at the Closing, and any prepaid deposits for any of the same.

"Knowledge" when used in the phrase "to the Knowledge of the Company" or similar phrases means, and shall be limited to, the actual knowledge of James Levine, Byron J. Daniels, Walter E. Cisowski, Fernando Heredia, Richard Edenfield and Greg Christy.

"Loss" means an actual loss, liability, damage, cost, interest, award, judgment, penalty, fine, assessment or expense (including reasonable legal fees and expenses, but excluding incidental, consequential or punitive damages or any liability for lost profits or the like).

"Material Adverse Effect" means an event, occurrence, change, condition or circumstance that has, or would reasonably be expected to have, a material adverse effect upon the financial condition or results of operations of the Company and the Subsidiaries on a consolidated basis; provided, that for purposes of this Agreement, a Material Adverse Effect shall not include the effect of (a) changes to the industry or markets in which the business of the Company or any Subsidiary operates that do not disproportionately affect the business of the Company or its Subsidiaries, (b) the announcement or disclosure of the transactions contemplated herein, (c) general economic, regulatory or political conditions or changes, (d) military action or any act of terrorism, (e) changes in law or GAAP after the date hereof, (f) compliance with the terms of this Agreement including, but not limited to, the Conversions, (g) actions reasonably taken to facilitate the sale of the Shares, (h) the failure of the Company or

011107.0108\393259.18

any Subsidiary to meet or achieve the results set forth in any internal projection, or (i) any matter set forth in the Schedules attached hereto if it is reasonably apparent that such matter could cause or contribute to the cause of a Material Adverse Effect. The Buyer acknowledges that there could be a disruption to the Company or any Subsidiary's business as a result of the execution of this Agreement, the announcement by the Buyer of its intention to purchase the Company or the announcement of the Seller of its intention to sell the Company, and the consummation of the transactions contemplated hereby, and the Buyer agrees that such disruptions do not and shall not constitute a Material Adverse Effect.

"Net Working Capital" shall have the meaning given to such term in Exhibit A attached hereto and shall be determined in accordance therewith.

"Net Working Capital Amount" means the Net Working Capital of the Company and the Subsidiaries as of the close of business on the Closing Date, before giving effect to the transactions contemplated hereby.

"Other Insured Liabilities" means liabilities unrelated to properties or assets customarily insured against by businesses with business operations similar to the Company's business operations as currently conducted.

"Permitted Liens" means any (i) Liens in respect of Taxes the validity of which are being contested in good faith by appropriate proceedings or Liens in respect of Taxes not yet due and payable or which can be paid currently with no penalty; in each case, for which adequate reserves have been maintained in accordance with GAAP, (ii) mechanics', carriers', workmen's, repairmen's, statutorily imposed or other like Liens arising or incurred in the ordinary course of business; (iii) Liens arising under original purchase price conditional sales contracts and equipment leases with third parties that are contracts entered into in connection with the Company or any Subsidiary; (iv) limitations on the rights of the Company or any Subsidiary under any Contract or Real Property Lease that are expressly set forth in such contract or lease; (v) survey exceptions, imperfections of title, Liens or other title matters affecting any tangible asset owned by the Company or any Subsidiary that would not materially and adversely affect the use of such asset by the Company or such Subsidiary; and (vi) with respect to each parcel of Owned Real Property or Leased Real Property, zoning, building codes and other land use Laws regulating the use or occupancy of such parcel of Owned Real Property or Leased Real Property or the activities conducted thereon that are imposed by any Governmental Authority having jurisdiction over such Owned Real Property or Leased Real Property and that would not materially and adversely affect the use of such parcel of Owned Real Property or Leased Real Property by the Company or any Subsidiary.

"Person" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision or any agency or instrumentality thereof.

"Pre-Closing Tax Period" means any taxable period (or portion thereof) ending on or before the close of business on the Closing Date.

4

"Pre-Closing Environmental Condition" means as of the Closing Date (i) the presence of Hazardous Materials in the soil, groundwater, surface water, or sediment at, on, under, or originating or migrating from the Real Property, and (ii) contamination of any building at the Real Property by Hazardous Materials.

"Real Property" means the Owned Real Property together with the Leased Real Properties.

"Receivables" means any and all accounts receivable, notes and other amounts receivable from third parties, including customers and employees, arising from the conduct of the business of the Company and its Subsidiaries before the Closing, whether or not in the ordinary course, together with any unpaid financing charges accrued thereon.

"Reference Balance Sheet" means the audited consolidated balance sheet of the Company and the Subsidiaries as of December 31, 2005 contained in the Audited Financial Statements.

"Remediate" and "Remediation" mean any actual or contemplated clean-up, removal action, remedial action, restoration, repair, response action, corrective action, monitoring, sampling and analysis, installation, reclamation, closure, post-closure or invasive investigation in connection with the suspected, threatened or actual Release of a Hazardous Material.

"Special Environmental Conditions" means the matters described in Schedule 11.02(k).

"Special Environmental Condition Losses" means Losses arising from the Special Environmental Conditions that are not paid by Seller pursuant to Section 8.07.

"Subsidiary" means any entity, the securities or other ownership interests of which having ordinary voting power to elect a majority of the board of directors, or other persons performing similar functions, are directly or indirectly owned by the Company.

"Target Net Working Capital Amount" means $3,900,000.00.

"Tax" means any federal, state, local or foreign income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, alternative minimum, estimated or other tax, assessment, duty, fee, levy or other governmental charge, including any interest, penalty or addition thereto.

"Tax Loss" means Losses arising from a breach of the representations and warranties for matters covered by Section 3.06 and the covenants and agreements set forth in Sections 2.05 and 8.04.

"Tax Returns" means any return, report, information return or other document (including schedules or any related or supporting information) filed or required to be filed with any Taxing Authority or other authority in connection with the determination, assessment or

5

collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Taxing Authority" means any governmental or regulatory authority, body or instrumentality exercising any authority to impose, regulate or administer the imposition of Taxes.

**Section 1.02   Cross-References to Other Defined Terms.**   Each term listed below is defined in the Section of this Agreement listed opposite such term:

| Term | Section |
|------|---------|
| Actual Purchase Price | Section 2.04(a) |
| Agreement | Preface |
| Allocation Schedule | Section 2.05(b) |
| American Capital | Preface |
| Approvals | Section 3.18 |
| Audited Financial Statements | Section 3.09(a)(i) |
| Basic Representations | Section 11.01 |
| Buyer | Preface |
| Buyer Indemnified Party | Section 11.02(a) |
| Buyer's Representatives | Section 7.01 |
| Closing | Section 2.03(a) |
| Closing Date | Section 2.03(a) |
| Company | Preface |
| Company Intellectual Property | Section 3.15 |
| Confidentiality Agreement | Section 7.01 |
| Contracts | Section 3.16 |
| Conversions | Section 9.01(f) |
| Current Customer | Section 3.26 |
| Deductible Losses | Section 11.02(a)(iv) |
| Draft Computation | Section 2.04(a) |
| Environmental Approval(s) | Section 3.21(e) |
| Environmental Requirement(s) | Section 3.21(e) |
| ERISA | Section 3.19(b) |
| Escrow Account | Section 2.03(b)(iii) |
| Escrow Agent | Section 2.03(b)(iii) |
| Escrow Agreement | Section 2.03(b)(iii) |
| Escrow Amount | Section 2.03(b)(iii) |
| Estimated Cash Amount | Section 2.01 |
| Estimated Indebtedness Payoff Amount | Section 2.01 |
| Estimated Net Working Capital Amount | Section 2.01 |
| Estimated Purchase Price | Section 2.01 |
| Extended Escrow Losses | Section 11.02(a) |
| Extended Survival Period | Section 11.01 |
| Financial Statements | Section 3.09(a)(ii) |

6

| **Term** | **Section** |
|---|---|
| Firm | Section 2.04(a) |
| Golder | Section 8.07 |
| Governmental Authority | Section 3.04 |
| Hazardous Material | Section 3.21(e) |
| Indemnitee | Section 11.02(e) |
| Indemnitors | Section 11.02(e) |
| Individual Shareholder(s) | Preface |
| Information Memorandum | Section 5.10(b) |
| Initial Escrow Losses | Section 11.02(a) |
| Initial Survival Period | Section 11.01 |
| Intellectual Property | Section 3.15 |
| Latest Balance Sheet | Section 3.09(a)(ii) |
| Laws | Section 3.04 |
| Leased Real Property; Leased Real Properties | Section 3.11(b) |
| Liens | Section 3.14 |
| Net Working Capital | Exhibit A |
| Objection Notice | Section 2.04(a) |
| Owned Real Property | Section 3.11(a) |
| PB | Section 2.03(a) |
| Real Property Lease; Real Property Leases | Section 3.11(b) |
| Release | Section 3.21(e) |
| Schedule; Schedules | Article 3 Preamble |
| Seller | Preface |
| Seller Transaction Expenses | Section 12.04 |
| Shares | Preface |
| Specific Verbal Notice | Section 3.26 |
| TCEQ | Section 11.02(k)(iii) |
| Texas Rack Plant Property | Section 11.02(k)(iii) |
| Third Party Claim | Section 11.02(e) |
| Tipping Basket Losses | Section 11.02(a)(iii) |
| Transaction Value | Section 2.01 |
| Transfer Taxes | Section 8.04(a) |
| Unaudited Financial Statements | Section 3.09(a)(ii) |
| Updated Schedules | Section 6.03 |

## ARTICLE 2
## PURCHASE AND SALE

      **Section 2.01    Estimated Purchase Price.**  Not later than three (3) Business Days before the Closing Date, the Company shall diligently and in good faith estimate, on a reasonable basis using the Company's then available financial information, the Cash Amount (such estimate is referred to as the "Estimated Cash Amount"), the Indebtedness Payoff Amount (such estimate is referred to as the "Estimated Indebtedness Payoff Amount"), and the Net Working Capital

7

Amount (such estimate is referred to as the "Estimated Net Working Capital Amount"), and deliver a statement thereof to the Buyer. The "Estimated Purchase Price" means an amount equal to (A) $40,000,000.00 (the "Transaction Value"), (B) plus the Estimated Cash Amount, (C) less the Estimated Indebtedness Payoff Amount, (D) less the Closing Management Bonuses, and (E) plus the excess of the Estimated Net Working Capital Amount over the Target Net Working Capital Amount or minus the excess of the Target Net Working Capital Amount over the Estimated Net Working Capital Amount.

**Section 2.02    Purchase and Sale of the Shares.** As of the Closing, upon the terms and subject to the conditions set forth in this Agreement, the Seller shall sell, assign, transfer and convey to the Buyer, and the Buyer shall purchase and acquire from Seller, the Shares. The Buyer shall pay to Seller at the Closing, by wire transfer of immediately available funds to the account(s) and in the amounts designated by the Seller, the Estimated Purchase Price less the Escrow Amount (as defined below).

**Section 2.03    The Closing.**

(a)    The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Patton Boggs LLP ("PB") in Dallas, Texas, at 10:00 a.m. on the first (1st) Business Day following full satisfaction or due waiver of all of the closing conditions set forth in Article 9 hereof (other than those to be satisfied at the Closing) or on such other date as is mutually agreeable to the Buyer and Seller. The date of the Closing is referred to herein as the "Closing Date."

(b)    Upon the terms and subject to the conditions set forth in this Agreement, the parties hereto shall consummate the following transactions as of the Closing:

(i)    the Seller shall deliver to the Buyer certificates representing the Shares, and stock powers, executed in blank, transferring the Shares to the Buyer;

(ii)    the Buyer shall deliver to the Seller, by wire transfer of immediately available funds to the account(s) and in the amounts designated by the Seller, the Estimated Purchase Price less the Escrow Amount;

(iii)    the Buyer shall deliver to PNC Bank N.A. (the "Escrow Agent"), by wire transfer of immediately available funds to the segregated, interest-bearing account designated by the Escrow Agent (the "Escrow Account"), cash in an amount equal to $4,000,000.00 (the "Escrow Amount"), pursuant to the terms and conditions of an Escrow Agreement, substantially in the form attached hereto as Exhibit B (the "Escrow Agreement");

(iv)    the Buyer shall pay on behalf of the Company or cause the Company to repay, all Indebtedness of the Company in accordance with the terms thereof;

(v)    the Company shall pay the Closing Management Bonuses through its normal payroll procedures with respect to employee bonus payments;

8

(vi)    the Seller shall deliver to the Buyer evidence reasonably satisfactory to the Buyer of the release of all Liens upon the Shares and the assets of the Company associated with the Indebtedness of the Company;

(vii)    the Buyer, the Company and the Seller shall make such other deliveries as are required by and in accordance with Article 9 hereof; and

(viii)    a certificate of non-foreign status pursuant to Treasury Regulations Section 1.1445-2(b)(2) from Seller and each Subsidiary of Seller that is transferring a "United States real property interest" within the meaning of Section 897 of the Code.

### Section 2.04    Post-Closing Adjustment.

(a)    Post-Closing Determination.  Within sixty (60) days after the Closing Date, the Buyer and its auditors shall prepare, and deliver to the Seller, (i) the Buyer's determinations of the Cash Amount, the Indebtedness Payoff Amount and the Net Working Capital Amount, and (ii) the Buyer's calculation of the Actual Purchase Price (as defined below) (collectively, the "Draft Computation").  The Buyer and its auditors will make available to the Seller and its auditors all records and work papers used in preparing the Draft Computation, and will prepare and deliver to the Seller a detailed breakdown of the calculations used to determine the amounts set forth in the Draft Computation.  If the Seller disagrees with any aspect of the Draft Computation, the Seller may, within forty-five (45) days after receipt of the Draft Computation, deliver a notice (an "Objection Notice") to the Buyer setting forth the Seller's determination of the Cash Amount, the Indebtedness Payoff Amount and/or the Net Working Capital Amount and the Seller's calculation of the Actual Purchase Price.  If the Seller does not deliver an Objection Notice to the Buyer within forty-five (45) days after receipt of the Draft Computation, then the parties hereto will be deemed to have agreed to the Draft Computation and such computation shall be deemed to be finally determined as set forth therein.  The Buyer and the Seller shall use reasonable efforts to resolve any disagreements as to the Draft Computation and the Objection Notice, but if they do not obtain a final resolution within sixty (60) days after the Buyer has received the Objection Notice, the Buyer and the Seller shall jointly retain PriceWaterhouseCoopers LLP (provided that no partner or person of similar rank and title resident in the Boston, Massachusetts office of PriceWaterhouseCoopers LLP shall provide services in connection with such retention) or such other accounting firm acceptable to Buyer and the Seller (the "Firm") to resolve any remaining disagreements.  The Buyer and the Seller shall direct the Firm to render a determination within thirty (30) days after its retention and the Buyer, the Seller and their respective agents shall cooperate with the Firm during its engagement.  The Firm may consider only those items and amounts in the Draft Computation or Objection Notice which the Buyer and the Seller are unable to resolve.  In resolving any disputed item, the Firm will act as an expert and not as an arbitrator in conducting its analysis, and may not assign a value to any item greater than the greatest value for such item claimed by either party or less than the smallest value for such item claimed by either party.  The Firm's determination shall be based solely on written submissions by the Buyer and the Seller (i.e., not on independent review) and on the definitions included herein.  The determination of the Firm shall be conclusive and binding upon the Buyer and the Seller.  Until the Firm makes its determination, the costs and expenses of the Firm shall be borne equally by the Buyer, on the one hand, and the Seller, on the other hand; provided that, when the Firm makes its determination, any costs and expenses

9

(including costs and expenses previously advanced) of the Firm that are allocable to the party whose determination of the Actual Purchase Price (at the time of submission of the respective determinations to the Firm for resolution pursuant to this paragraph) was closest to the Firm's determination of the same shall be paid or reimbursed by the other party.

The "Actual Purchase Price" means an amount equal to (A) the Transaction Value, (B) plus the Cash Amount, (C) less the Indebtedness Payoff Amount, (D) less the Closing Management Bonuses, and (E) plus the excess of the Net Working Capital Amount over the Target Net Working Capital Amount or minus the excess of the Target Net Working Capital Amount over the Net Working Capital Amount, in each case as finally determined pursuant to this Section 2.04.

      (b)    Post-Closing Adjustment.

         (i)    Payment by the Buyer - Actual Purchase Price.  If the Actual Purchase Price is greater than the Estimated Purchase Price, within five (5) Business Days after the final determination of the Actual Purchase Price, the Buyer shall pay to the Seller, by wire transfer or delivery of other immediately available funds, an amount equal to such difference plus simple interest thereon, at an interest rate equal to 8%, from the Closing Date to the date of payment, computed on an annual basis using a 360-day year.

         (ii)    Payment by the Seller - Actual Purchase Price.  If the Actual Purchase Price is less than the Estimated Purchase Price, then within five (5) Business Days after the determination of the Actual Purchase Price, the Seller shall pay to the Buyer, by wire transfer or delivery of other immediately available funds, an amount equal to such difference plus simple interest thereon, at an interest rate equal to 8%, from the Closing Date to the date of payment, computed on an annual basis using a 360-day year.

         (iii)    Dispute.  If, pursuant to this Section 2.04, there is a dispute as to the final determination of the Actual Purchase Price, the Buyer, on the one hand, and the Seller, on the other hand, shall promptly pay to the other, as appropriate, such amounts as are not in dispute, together with interest thereon at an interest rate equal to 8%, from the Closing Date to the date of payment, computed on an annual basis using a 360-day year, pending final determination of such dispute pursuant to this Section 2.04.

**Section 2.05  Conversions.**

      (a)    The Seller and the Buyer agree to treat the sales of the Shares in the Company as a sale of the assets of the Company and its Subsidiaries for federal, state, and local tax purposes, unless otherwise required by a Final Determination.

      (b)    The Buyer and the Seller agree that the Actual Purchase Price plus any assumed liabilities will be allocated among the acquired assets in a manner consistent with Section 1060 of the Code and the regulations promulgated thereunder.  The Buyer will complete a draft schedule (the "Allocation Schedule") allocating the Actual Purchase Price and assumed liabilities to the acquired assets and provide a copy to Seller at least sixty (60) days prior to the due date (including extensions) for filing any form with respect to the Allocation Schedule.  The Seller shall notify the Buyer within ten (10) Business Days after the receipt thereof if it considers

011107.0108\393259.18

the amount allocated to any assets to be inconsistent with Section 1060 of the Code and the regulations promulgated thereunder. The Seller and the Buyer shall attempt to resolve any disagreement in good faith. If the Seller and the Buyer fail to reach agreement as to an alternative allocation in the ten (10) Business Days following such notice, the dispute with respect to the Allocation Schedule shall be presented on the next Business Day to a nationally recognized independent accounting firm mutually chosen by the Buyer and the Seller, and if the Buyer and the Seller cannot agree, mutually chosen by their respective independent accounting firms, for a decision that shall be rendered within fifteen (15) Business Days thereafter. The independent accounting firm's review shall be limited to whether a disputed item has been prepared in accordance with Section 1060 of the Code and the regulations promulgated thereunder, and its decision shall be final and binding on all parties. The fees, costs and expenses incurred in connection therewith shall be shared in equal amounts by the Seller and the Buyer. The Buyer and the Seller shall exchange, complete and properly execute copies of Internal Revenue Service Form 8594, the required schedules related thereto, and any similar state, local and foreign forms and schedules, all of which have been prepared on a basis consistent with the Allocation Schedule, not later than thirty (30) days prior to the filing date. The Buyer and the Seller shall file, and cause their respective Affiliates to file, all Tax Returns and statements, forms and schedules in connection therewith in a manner consistent with the Allocation Schedule and shall take no position inconsistent therewith, unless, and then only to the extent, required to do so by a Final Determination.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to the Buyer as set forth in this Article 3, except as set forth in the corresponding sections or subsections of the Schedules accompanying this Agreement (each a "Schedule" and, collectively, the "Schedules") or in any other section or subsection of the Schedules if it is reasonably apparent that such disclosure would apply. Capitalized terms used in the Schedules and not otherwise defined therein shall have the meanings ascribed to such terms in this Agreement.

### Section 3.01    Organization and Qualification.

(a)    The Company and each of the Subsidiaries (as defined below) are duly organized, validly existing and, where applicable, in good standing under the laws of their respective jurisdictions of organization. The Company and each of its subsidiaries have full power and authority to own or lease their respective properties and to conduct their businesses in the manner and in the places where such properties are owned or leased and where such businesses are currently conducted, except where the failure to have such power and authority would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The copies of the Company's and the Subsidiaries' respective organizational documents, as each have been amended to date and heretofore made available to the Buyer and/or its agents, are complete and correct, and no amendments thereto are pending, except with respect to the Conversions.

(b)    The Company and each of the Subsidiaries are duly licensed and qualified to do business and in good standing in each jurisdiction in which the properties owned or leased

11

by it or the operation of its business makes such licensing or qualification to do business necessary, except where the failure to be so licensed or qualified would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 3.02    Capitalization; Subsidiaries; Securities Owned.    Schedule 3.02 sets forth, as of the Closing Date, all of the Shares.  As of the Closing Date, all of the Shares are owned by the Seller.  All of the Shares have been duly authorized, are validly issued, fully paid and nonassessable, and are not subject to, nor were they issued in violation of, any preemptive rights.  As of the Closing Date, the Company will be the sole owner, directly or indirectly, of 100% of the outstanding equity interests of each of the Subsidiaries set forth on Schedule 3.02. As of the Closing Date, the ownership and capitalization of each of the Subsidiaries will be as set forth on Schedule 3.02.  Other than the equity interests the Company owns in the Subsidiaries, the Company does not own any securities issued by any other business organization or Governmental Authority.  Except for this Agreement, as of the Closing Date, there are no outstanding or authorized options, warrants, rights, contracts, rights to subscribe, conversion rights or other agreements or commitments to which the Company or any Subsidiary is a party or which are binding upon the Company or any Subsidiary providing for the issuance, disposition or acquisition of any equity interests of the Company or any Subsidiary.

Section 3.03    Authority of the Company.

(a)    The Company has the full right, power and authority to enter into this Agreement and each agreement, document and instrument to be executed and delivered by it pursuant to or as contemplated by this Agreement and to carry out the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the performance of the Company's obligations hereunder have been duly authorized by all necessary action on the part of the Company.  This Agreement and each agreement, document and instrument to be executed and delivered by the Company pursuant to this Agreement constitute, or will when executed and delivered constitute, valid and binding obligations of the Company, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(b)    The execution, delivery and performance by the Company of this Agreement and each such agreement, document and instrument contemplated by this Agreement to which it is a party:

(i)    do not and will not violate any provision of the formation documents of the Company or the Subsidiaries;

(ii)    do not and will not violate any laws of the United States, Delaware or Texas, or any other jurisdiction applicable to the Company or any Subsidiary, or require the Company to obtain any material approval, consent or waiver of, or make any material filing with, any Person (governmental or otherwise) that has not been obtained or made; and

12

(iii)    do not and will not result in a breach of, constitute a default under, accelerate any obligation under, or give rise to a right of termination of any material indenture, loan or credit agreement, or any other material agreement, contract, instrument, mortgage, deed of trust, lien, lease, permit, authorization, order, writ, judgment, injunction, decree, determination or arbitration award, whether written or oral, to which the Company or any Subsidiary is a party or by which the property of the Company or any Subsidiary is bound, except as otherwise set forth on Schedule 3.03(b)(iii) hereto.

Section 3.04    Compliance with Laws.    Except as set forth on Schedule 3.04 hereto, to the Knowledge of the Company, the Company and each of the Subsidiaries are in compliance in all material respects with all applicable statutes, ordinances, orders, codes, rules, regulations and requirements ("Laws") promulgated by any federal, state, territory, municipal or other governmental authority (a "Governmental Authority") which are necessary for the operation of the business of the Company or such Subsidiary as conducted.

Section 3.05    Advisory and Other Fees.    Neither the Company nor any of the Subsidiaries has incurred or shall become liable for any advisory fee, broker's commission or finder's fee relating to or in connection with the transactions contemplated by this Agreement, other than advisory fees payable to Downer & Company, LLC, which fees shall be paid as provided in Section 12.04, and other than the Seller Transaction Expenses described in Section 12.04 hereto.

Section 3.06    Taxes.    Except as set forth on Schedule 3.06 hereto:

(a)    (i)    All United States federal income Tax Returns of or with respect to the Company and the Subsidiaries required by Law to be filed have been timely filed and all other material Tax Returns of or with respect to the Company and the Subsidiaries required by applicable federal, foreign, state, local or other Law to be filed have been filed.  All Tax Returns that have been filed are true, complete and correct in all material respects.

(ii)    All Taxes of or with respect to the Company and each of the Subsidiaries due and payable on or before the Closing Date have been timely paid or caused to be paid in full.  All Taxes of or with respect to the Company and each of the Subsidiaries that are due and payable after the Closing Date are adequately reserved for in accordance with GAAP on the books and records of the Company.  There are no liens for Taxes with respect to any of the assets or properties of the Company or any Subsidiary, other than statutory liens for Taxes not yet due for which adequate reserves have been maintained in accordance with GAAP.

(iii)    The Unaudited Financial Statements reflect an adequate reserve in accordance with GAAP for all Taxes payable by the Company and each Subsidiary for all taxable periods and portions thereof through the date of such financial statements.

(iv)    There has not been any audit of any Tax Return filed by or with respect to the Company or any Subsidiary for which the applicable statute of limitations

13

has not expired; no audit of any such Tax Return of or including the Company or any Subsidiary is in progress; and neither the Company nor any Subsidiary has been notified in writing, or, to the Knowledge of the Company, by verbal communication, by any Governmental Authority that any audit is contemplated or pending.  No written or, to the Knowledge of the Company, verbal claim has been made by any Governmental Authority in a jurisdiction where the Company or any Subsidiary does not file Tax Returns that the Company or such Subsidiary is or may be subject to taxation by that jurisdiction.

(b)     Neither the Company nor any Subsidiary is a party to, bound by or obligated under any agreement relating to allocating or sharing the payment of, or liability for, Taxes (including, without limitation, any advance pricing agreement, closing agreement or other agreement relating to Taxes with any Taxing Authority); nor do they have any liability for Taxes of any Person under Treasury Regulation § 1.1502-6 (or a similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise.  The Company and the Subsidiaries have never been (or in the case of Inca Metal Products Corporation, since September 24, 1999, have not been) a member of any combined, unitary, consolidated or other affiliated group within the meaning of Section 1504 of the Code or otherwise, of which any entity other than the Company or any of the Subsidiaries is or has been a member for federal, state, local, or foreign tax purposes.

(c)     No closing agreement pursuant to Section 7121 of the Code or any similar provision of any state, local or foreign law has been entered into by or with respect to the Company or any Subsidiary.  Neither the Company nor any Subsidiary has agreed to, or is required to make any adjustment for, any period after the Closing Date pursuant to Section 481(a) of the Code or for any other reason.  There is no application pending with any Taxing Authority requesting permission for any such change in any accounting method of the Company or any Subsidiary and the Internal Revenue Service has not proposed in writing any such adjustment or change in accounting method.

(d)     (i) No property of the Company or any Subsidiary is "tax exempt use property" within the meaning of Section 168(h) of the Code, (ii) neither the Company nor any Subsidiary is a party to any lease made pursuant to Section 168(f)(8) of the Internal Revenue Code of 1954, and (iii) none of the assets of the Company or any Subsidiary is subject to a lease under Section 7701(h) of the Code or under any predecessor section thereof.

(e)     There are no outstanding agreements or waivers extending, or having the effect of extending, the statutory period of limitation applicable to any Tax Returns required to be filed with respect to the Company or any Subsidiary and neither the Company nor any Subsidiary has requested any extension of time within which to file any Tax Return, which return has not yet been filed.  No power of attorney with respect to any Taxes has been executed or filed with any Taxing Authority by or on behalf of the Company or any Subsidiary.

(f)     The Company and each Subsidiary have complied in all respects with all applicable laws relating to the payment and withholding of all federal Taxes and state and local income and sales and use Taxes and all other material Taxes (including withholding pursuant to Sections 1441, 1442, 3121 and 3402 of the Code and any comparable provision of any state, local or foreign laws) and have, within the time and in the manner prescribed by applicable law,

14

withheld from and paid over to the proper Taxing Authorities all amounts required to be so withheld and paid over under such laws.

(g)    The Company has made available to Buyer for inspection (i) complete and correct copies of all federal Tax Returns and state and local income and sales and use Tax Returns and all other material Tax Returns of the Company and each Subsidiary filed since December 31, 2003 and (ii) complete and correct copies of all private letter rulings, revenue agent reports, information document requests, notices of proposed deficiencies, deficiency notices, protests, petitions, closing agreements, settlement agreements, pending ruling requests, and any similar documents, submitted by, received by or agreed to by or on behalf of the Company or any Subsidiary, and relating to Taxes since December 31, 2003 and, to the Knowledge of the Company, no private letter rulings, revenue agent reports, information document requests, notices of proposed deficiencies, deficiency notices, protests, petitions, closing agreements, settlement agreements, pending ruling requests, or any similar documents, have been submitted by, received by or agreed to by or on behalf of the Company or any Subsidiary before December 31, 2003.

(h)    Neither the Company nor any Subsidiary is a party to any "listed transaction" as defined in Treasury Regulation Section 1.6011-4(b)(2).

(i)    The Company has not been, at any time during the applicable time period set forth in Section 897(c)(1) of the Code, a United States real property holding company within the meaning of Section 897(c)(2) of the Code.

(j)    No Seller is a "foreign person" within the meaning of Section 1445 of the Code.

(k)    The Company is wholly owned by the Seller. Each of the Company's Subsidiaries is wholly owned by the Company or a Subsidiary of the Company. The Company and each of its Subsidiaries were converted at least one (1) Business Day prior to the Closing Date into Delaware or Texas limited liability companies. The Seller, the Company, the Subsidiaries and their Affiliates have not, and will not, file an election for the Company or any of its Subsidiaries to be treated as corporations for federal, state, or local Tax purposes. Subject in each case to a Final Determination, the Seller, the Company, its Subsidiaries, and their Affiliates have, and will, treat the conversion as liquidations for Tax purposes in accordance with Treasury Regulations Section 301.7701-3(g)(1)(iii), will treat the Company and its Subsidiaries as disregarded entities for federal Tax purposes and, to the extent not prohibited by law, for state and local Tax purposes from the date of such conversions, and therefore will treat the transactions contemplated hereby as a sale of the assets of the Company and its Subsidiaries for federal Tax purposes and, to the extent not prohibited by law, for state and local Tax purposes.

### Section 3.07    Officers and Directors; Books and Records

(a)    Schedule 3.07(a) hereto sets forth the name and title of each officer and director of the Company and each Subsidiary.

(b)    The copies of the records of the Company and the Subsidiaries, as made available by the Company to the Buyer and/or its agents, are true and complete copies of the originals of such documents.

Section 3.08    Litigation.    Schedule 3.08 hereto sets forth each continuing action, suit, investigation and other proceeding pending or, to the Company's Knowledge, each material action, suit, investigation and other proceeding threatened against the Company or any of the Subsidiaries, in either case at law or in equity, or before or by any Governmental Authority.

Section 3.09    Financial Statements.

(a)    The Company has delivered to the Buyer the following financial statements, attached as Schedule 3.09(a) hereto:

(i)    audited consolidated balance sheets of the Company and the Subsidiaries as of December 31, 2004 and December 31, 2005 and audited consolidated statements of operations, members' equity, and cash flows for the fiscal years then ended (collectively, the "Audited Financial Statements"); and

(ii)    unaudited consolidated balance sheet of the Company and the Subsidiaries as of December 31, 2006 (the "Latest Balance Sheet"), and the related statements of operations and cash flows for the twelve (12) months then ended (collectively, the "Unaudited Financial Statements" and, together with the Audited Financial Statements, the "Financial Statements").

(b)    The Audited Financial Statements have been prepared in accordance with GAAP applied consistently during the periods covered thereby, and present fairly in all material respects the financial condition of the relevant entities at the dates of said statements and the results of their operations and cash flows for the periods covered thereby.  The Unaudited Financial Statements have been prepared in accordance with GAAP applied consistently during the period covered thereby, and present fairly in all material respects the financial condition of the Company and the Subsidiaries at the date of such statements and the results of their operations and cash flows for the period covered thereby, except that they do not contain the materials and disclosures to be found in notes to financial statements prepared in accordance with GAAP.

(c)    Except as set forth on Schedule 3.09(c) hereto, neither the Company nor any Subsidiary has any liabilities that would be required to be reflected on a balance sheet prepared in accordance with GAAP, except for (i) the liabilities reflected or reserved against on the Latest Balance Sheet (including all notes thereto); (ii) liabilities incurred in the ordinary course of business since the date of the Latest Balance Sheet; and (iii) liabilities incurred in connection with the transactions contemplated hereby.

(d)    The information set forth on Schedule 3.09(d) regarding leases entered into by the Company and the Subsidiaries is true and correct in all material respects.

(e)    There are no letters of credit or performance bonds issued by or on behalf of the Company or any Subsidiary.

16

**Section 3.10 Transactions with Affiliates.** Except (i) for intra-company transactions amongst the Company and the Subsidiaries, (ii) as set forth on Schedule 3.10 hereto, and (iii) to the extent reflected in the Financial Statements, there have been no material transactions, contracts, understandings or agreements of any kind between the Company or any Subsidiary and any Person which is an Affiliate of the Company or such Subsidiary. As of the Closing, there shall be no amounts of any kind payable by the Company, or any other obligation of the Company outstanding, to the Seller or any of its Affiliates. Any transactions between the Company or any Subsidiary and any entities that American Capital or its Affiliates control other than the Company and its Subsidiaries are on terms not materially worse than terms that could be obtained by the Company or any Subsidiary in an arms-length transaction with a third party.

**Section 3.11 Real Properties.**

(a) The Company (or the Subsidiary listed thereon) has good and marketable title to the real properties set forth on Schedule 3.11(a) (the "Owned Real Property"), free and clear of Liens, except for Permitted Liens. Except as set forth on Schedule 3.11(a), no Owned Real Property is subject to any sales contract, option, right of first refusal or similar agreement or arrangement with any third party.

(b) Schedule 3.11(b) hereto sets forth each lease or other agreement under which the Company or any Subsidiary leases or has rights in any material real property (the "Real Property Leases" and, each individually, a "Real Property Lease"). True and complete copies of the Real Property Leases have been made available to the Buyer and/or its agents by the Company. Except as set forth on Schedule 3.11 hereto, the Company or a Subsidiary has a valid and subsisting leasehold interest in all the real property which is the subject of each of the respective Real Property Leases set forth on Schedule 3.11 hereto (individually, the "Leased Real Property" and, collectively, the "Leased Real Properties").

(c) To the Knowledge of the Company, no material permit, license or certificate of occupancy pertaining to the leasing or operation of any Owned Real Property or Leased Real Property, other than those which are transferable with such property, is required by any Governmental Authority.

(d) The Company and its Subsidiaries are in possession of each parcel of Real Property, and, except as set forth on Schedule 3.11(d), there are no contractual or legal restrictions except for Permitted Liens that preclude or restrict the ability to use the Real Property for the purposes for which it is currently being used, except for such restrictions as would not be material. Neither the Company nor any of its Subsidiaries has leased any material parcel or any material portion of any material parcel of Real Property to any other Person and no other Person has any rights to the use, occupancy or enjoyment thereof pursuant to any lease, license, occupancy or other agreement, nor has the Company or any Subsidiary assigned its interest under any Real Property Lease to any third party. There are no condemnation proceedings or eminent domain proceedings of any kind pending or, to the Knowledge of the Company, threatened against the Real Property. To the Knowledge of the Company, there are no material latent structural defects or material adverse physical conditions affecting structures on the Real Property or any of the facilities, buildings, structures, erections, improvements, fixtures, fixed assets and personalty of a permanent nature annexed, affixed or attached to, located on or

17

forming party of the Real Property. To the Knowledge of the Company, all improvements on the Real Property are wholly within the lot limits of such Real Property and no not encroach on any adjoining premises or Encumbrance benefiting such Real Property, and there are no encroachments on any Real Property or any easement or property right or benefit appurtenant thereto by any improvements located on any adjoining premises.

Section 3.12    **Absence of Material Adverse Effect.**    Except as set forth on Schedule 3.12 hereto, since the date of the Latest Balance Sheet, there has not been any Material Adverse Effect.

Section 3.13    **Absence of Certain Changes.**    Except as set forth on Schedule 3.13 hereto, or as contemplated by this Agreement, the Company has complied in all material respects with the covenants and restrictions set forth in Section 6.01 hereof to the same extent as if this Agreement had been executed on, and had been in effect since, the date of the Latest Balance Sheet.

Section 3.14    **Tangible Personal Property.**    Except as set forth on Schedule 3.14 hereto, (a) the Company or a Subsidiary has good title to all of the items of tangible personal property reflected on the Latest Balance Sheet, except as sold or disposed of subsequent to the date thereof in the ordinary course of business consistent with past practices, and (b) all such tangible personal property is owned free and clear of all liens, encumbrances, contracts and security interests (collectively, "Liens"), except for (i) Liens identified on Schedule 3.14 hereto, (ii) Liens which, individually or in the aggregate, do not materially detract from the value, or materially interfere with the present use, of the Company's aggregate tangible personal property, and (iii) Permitted Liens. Except as set forth on Schedule 3.14 hereto, to the Knowledge of the Company, the facilities, plants, machinery and equipment of the Company and the Subsidiaries, taken as a whole, are in good working order and condition, ordinary wear and tear excepted, and are fit for the purpose for which they are currently being used.

Section 3.15    **Intellectual Property.**    Schedule 3.15 hereto sets forth all patents, trademark registrations, service mark registrations, trade names, domain names, copyright registrations, and all applications for any of the foregoing, that are material to the business of the Company and its Subsidiaries as is currently conducted and that are or, within the last two (2) years, were owned by or licensed by the Company or any Subsidiary. Except as set forth on Schedule 3.15 hereto, neither the Company nor any Subsidiary has received any written notice of infringement of or conflict with asserted rights of others with respect to any know-how, trade secrets, patents, trademarks, trade names, brand names and copyrights that are owned or used by, or licensed to, the Company or any Subsidiary (the "Company Intellectual Property"). The Company or a Subsidiary is the exclusive owner of the entire right, title and interest in and to, or has a valid license to use, the Company Intellectual Property. To the Knowledge of the Company, none of the Company Intellectual Property has been adjudged invalid or unenforceable in whole or in any material part. To the Knowledge of the Company, the conduct of the business of the Company and its Subsidiaries as currently conducted does not infringe or misappropriate the Intellectual Property of any third party, and no claim has been asserted against the Company or any of its Subsidiaries alleging any of the following. To the Knowledge of the Company, no Company Intellectual Property is subject to any outstanding decree, order,

18

injunction, judgment or ruling restricting the use of such Company Intellectual Property or that would impair the validity or enforceability of such Company Intellectual Property.

        **Section 3.16   Contracts.** Except for contracts, commitments, plans, agreements and licenses listed on <u>Schedule 3.16</u> hereto (true and complete copies of which have been made available to the Buyer and/or its agents) (the "<u>Contracts</u>"), neither the Company nor any Subsidiary is a party to or subject to:

        (a)     any plan or contract providing for bonuses, stock, options, stock purchases, profit sharing, collective bargaining or the like or any contract or agreement with any labor union (other than the plans listed on <u>Schedule 3.19</u>);

        (b)     any employment contract or contract for services which requires the payment of more than $100,000 annually in total cash compensation which is not terminable on sixty (60) or fewer days notice by the Company or a Subsidiary without liability for any material penalty or severance payment;

        (c)     any contract or agreement for the purchase of any commodity, material or equipment in excess of $100,000 as of March 6, 2007;

        (d)     any other contracts or agreements creating any obligation of the Company or any Subsidiary of more than $100,000 annually with respect to any such contract;

        (e)     any contract or agreement requiring the purchase of all or substantially all of its requirements of a particular product from a supplier of more than $100,000 annually;

        (f)     any material contract or agreement which by its terms does not terminate or is not terminable by the Company or a Subsidiary within twelve (12) months after the date hereof;

        (g)     any material contract containing covenants explicitly limiting the freedom of the Company or any Subsidiary to compete in any line of business or with any Person;

        (h)     any contract or agreement for the purchase of any fixed asset for a price in excess of $100,000;

        (i)     any partnership, joint venture or other similar contract or agreement; or

        (j)     any material contract or agreement providing for the license of patents, trademarks, service marks, trade names or copyrights between the Company or any Subsidiary and any third party.

        All Contracts are valid and in full force and effect and constitute legal, valid and binding obligations of the Company or the applicable Subsidiary and, to the Knowledge of the Company, the other parties thereto, and are enforceable against the Company or such Subsidiary in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in

011107.0108\393259.18

a proceeding at law or in equity). Neither the Company nor any Subsidiary, nor, to the Knowledge of the Company, any other party thereto is in default in complying with any material provisions thereof, nor has the Company or any Subsidiary received written notice of any such default, and, to the Knowledge of the Company, no condition or event or facts exist which, with notice, lapse of time or both, would constitute a material default thereunder on the part of the Company or any Subsidiary.

Section 3.17 **Insurance**. All policies of insurance or fidelity bonds maintained by the Company or any Subsidiary are in full force and effect and, to the Knowledge of the Company, neither the Company nor any Subsidiary is in default with respect to its payment obligations under any such policies. Neither the Company nor any of its Subsidiaries has received any written notice of cancellation, material change in coverage or pending material change in the terms of any insurance policy. All material assets, properties and Other Insured Liabilities of the Company and its Subsidiaries are covered by valid and currently effective insurance policies or binders of insurance issued in favor of the Company or a Subsidiary thereof, in each case in such types and amounts and covering such risks as are, to the Knowledge of the Company, reasonable for the business operations of the Company and its Subsidiaries.

Section 3.18 **Permits**. Except as set forth on Schedule 3.18 hereto, (i) the Company and each of the Subsidiaries have obtained all material permits, registrations, licenses, franchises, certifications and other approvals (collectively, the "Approvals") from federal, state, foreign or local authorities necessary for the conduct of their business as presently conducted, (ii) all such Approvals are valid and in full force and effect and (iii) none of such Approvals is subject to termination by its terms as a result of the execution of this Agreement by the Company or by the consummation of the transactions contemplated by this Agreement.

Section 3.19 **Employee Benefit Plans**. All Employee Benefit Plans are listed on Schedule 3.19 hereto. Except as set forth on Schedule 3.19 hereto:

(a)    all Employee Benefit Plans have been made available to the Buyer and/or its agents;

(b)    to the Knowledge of the Company, all Employee Benefit Plans have been maintained, funded and administered in compliance in all material respects with all applicable Laws, including without limitation, the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and the Code and, in each case, the regulations thereunder;

(c)    no Employee Benefit Plan, or any trustee or administrator thereof nor any employee or any "fiduciary" has, to the Knowledge of the Company, engaged in any breach of fiduciary responsibility or any "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) to which Section 406 of ERISA or Section 4975 of the Code applies and which could subject any such Employee Benefit Plan or trustee or administration thereof, or any party dealing with any such Employee Benefit Plan, to a material tax or penalty imposed by Section 502(i) of ERISA or Section 4975 of the Code;

(d)    no Employee Benefit Plan is or has within the six years preceding the date of this Agreement been subject to Section 412 or 4971 of the Code or Section 302 or Title IV of

20

ERISA and no Controlled Group Liability has been incurred by the Company or any Subsidiary and no condition exists that could result in the Company or any Subsidiary incurring any Controlled Group Liability;

(e) neither the Company nor any Subsidiary has contributed to or had any obligation to contribute to any "multiemployer plan" within the meaning of Section 3(37) of ERISA;

(f) each Employee Benefit Plan intended to qualify under Section 401 of the Code has received a favorable determination letter from the Internal Revenue Service that such Employee Benefit Plan is a "qualified plan" under Section 401(a) of the Code; the related trusts are exempt from tax under Section 501(a) of the Code; and, to the Knowledge of the Company, no facts or circumstances exist that would be reasonably likely to jeopardize the qualification of such Employee Benefit Plan;

(g) with respect to the Employee Benefit Plans all required contributions have been made or properly accrued on the Financial Statements;

(h) neither the Company nor any of its Subsidiaries sponsors any Employee Benefit Plan that is a "defined benefit plan" (as defined in ERISA Section 3(35));

(i) neither the Company nor any Subsidiary has liability under any Employee Benefit Plan, or otherwise, to provide medical or death benefits (whether or not insured) with respect to current or former employees of the Company or any Subsidiaries beyond their termination of employment or beneficiary or dependent thereof (other than coverage mandated by law), and there are no reserve assets, surplus or prepaid premiums under any such Employee Benefit Plan;

(j) to the Knowledge of the Company, there are no pending, threatened or anticipated claims (other than routine claims for benefits), audits, investigations, or proceeding by, on behalf of or against any of the Employee Benefit Plans or any trusts related thereto which could reasonably be expected to result in any material liability of the Company or any Subsidiary;

neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will, other than pursuant to actions taken by the Buyer, result in (either alone or in conjunction with any other event) (i) result in or cause any material liability to any present or former employee or independent contractor, including, but not limited to, as a result of the Worker Adjustment Retraining and Notification Act, (ii) result in or cause any acceleration or vesting of, any payment, benefit or award under any Employee Benefit Plan, or (iii) result in any payment or benefit that will or may be made by the Company or any Subsidiary or other affiliate that will be characterized as an "excess parachute payment" within the meaning of Section 280G of the Code (the representation and warranty in this clause (iii) only is not qualified by the disclosure in Items 2, 3 and 4 under the heading "KIC Holdings" of Schedule 3.19).

**Section 3.20 Employees; Labor Matters.** Neither the Company nor any Subsidiary is delinquent in any material payments to any of their respective current or former

21

employees for any wages, salaries, commissions, bonuses, severance, termination pay or other direct compensation for any services performed for it to the date hereof or amounts required to be reimbursed to such current or former employees.  Except as set forth on Schedule 3.20 hereto, neither the Company nor any Subsidiary has any written policy, practice, plan or program of paying severance pay or any written form of severance compensation in connection with the termination of employment.  Except as set forth on Schedule 3.20 hereto, there are no material grievances, complaints or charges that have been filed against the Company or any Subsidiary under any dispute resolution procedure (including, but not limited to, any proceedings under any dispute resolution procedure under any collective bargaining agreement) that have not been dismissed.  Except as set forth on Schedule 3.20 hereto, no collective bargaining agreements are in effect or are currently being negotiated by the Company or any Subsidiary.  Neither the Company nor any Subsidiary has received written notice of pending or threatened changes with respect to (including, without limitation, resignation of) the senior management or key supervisory personnel of the Company or such Subsidiary.

**Section 3.21  Environmental Matters.**  Except as set forth on Schedule 3.21 hereto, to the Knowledge of the Company:

(a)    The Company and each of the Subsidiaries are in compliance with all applicable Environmental Requirements, except where failure to so comply would not reasonably be expected to have a Material Adverse Effect.

(b)    The Company and each of the Subsidiaries possess and are in compliance with all material Environmental Approvals necessary for the conduct of their business as presently conducted, except where failure to possess and comply with such Environmental Approvals would not reasonably be expected to have a Material Adverse Effect.

(c)    Neither the Company nor any Subsidiary has received written notice from a Governmental Authority or other third party asserting that the Company or such Subsidiary has failed in a material respect to comply with an Environmental Requirement or Environmental Approval, or that the Company or such Subsidiary is liable in a material respect for a material injury or material damages to a Person or property because of the Release or threatened Release of any Hazardous Materials, except where such failure to comply or such liability would not reasonably be expected to have a Material Adverse Effect.

(d)    The Company has made available to the Buyer material environmental reports that are in the possession of the Company or any of its Subsidiaries and that relate to the Company's or a Subsidiary's property, facility or operation.

(e)    As used in this Agreement:

(i)    "Environmental Requirement" means a Law concerning natural resources, Hazardous Materials, pollution, contamination, exposure of workers to Hazardous Materials, or other environmental matters.

(ii)    "Environmental Approval" means an Approval that is required pursuant to an Environmental Requirement.

22

(iii) "Hazardous Material" means (a) petroleum and petroleum products, radioactive materials, asbestos-containing materials, urea formaldehyde foam insulation, transformers or other equipment that contain polychlorinated biphenyls and radon gas, (b) any other chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "extremely hazardous wastes", "restricted hazardous wastes", "toxic substances", "toxic pollutants", "contaminants" or "pollutants", or words of similar import, under any applicable Environmental Requirement, and (c) any other chemical, material or substance that is regulated by any Environmental Requirement.

(iv) "Release" means disposing, discharging, injecting, spilling, leaking, leaching, dumping, emitting, escaping, emptying, seeping, placing and the like into or upon any land or water or air or otherwise entering the environment.

(f) Notwithstanding any implication to the contrary contained herein, this Section 3.21 and Section 3.08 constitute the sole and exclusive representations and warranties of the Company with respect to environmental matters (including Environmental Requirements and Environmental Approvals).

Section 3.22  Employee Relations.  Except as set forth on Schedule 3.22, none of the employees of the Company or the Subsidiaries is represented by a union, and, to the Knowledge of the Company, no union organizing efforts have been conducted or are now being conducted.  Set forth on Schedule 3.22 hereto is a list of all material actions, suits and proceedings pending between the Company or any Subsidiary and any employees, former employees or prospective employees of the Company or such Subsidiary or involving other labor-related matters (including, without limitation, charges of employment discrimination or unfair labor practices).  Neither the Company nor any Subsidiary is in violation in any material respect of any provision of any Law promulgated by any Governmental Authority regarding the terms and conditions of employees, former employees or prospective employees or other labor-related matters, including, without limitation, Laws relating to discrimination, fair labor standards and occupational health and safety, wrongful discharge or violation of the personal rights of employees, former employees or prospective employees of the Company or any Subsidiary.

Section 3.23  Key Employees.  Schedule 3.23 lists the name, place of employment, the current annual salary rates, bonuses and deferred or contingent compensation, pension, accrued vacation, "golden parachute" paid or payable (in cash or otherwise) in 2006 and 2005 (except for accrued vacation which shall be as of December 31, 2006 only), the date of employment and a description of the position and job function of each current salaried employee or officer of the Company or any Subsidiary whose annual compensation exceeded (or, in 2007, is expected to exceed) $100,000.

Section 3.24  Receivables.  Schedule 3.24 contains an aged list of the Receivables as of March 6, 2007, showing separately those Receivables that as of such date had been outstanding for (a) 30 days or less, (b) 31 to 60 days, (c) 61 to 90 days, and (d) more than 90 days.  Except to the extent, if any, reserved for on the Unaudited Financial Statements, all Receivables reflected on the Unaudited Financial Statements will have arisen from, and the

Receivables existing as of the Closing will have arisen from, the sale of products or services to Persons not affiliated with the Company or its Subsidiaries and in the ordinary course of business consistent with past practice and, except as reserved against on the Unaudited Financial Statements, constitute or will constitute, as the case may be, valid claims of the Company or a Subsidiary, to the Knowledge of the Company, not subject to valid claims of setoff or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice. As of the date hereof, neither the Company nor any of its Subsidiaries have received written notice from any customer that it is unwilling or unable to pay any of the Receivables on Schedule 3.24. The Buyer acknowledges and agrees that this provision is not a guaranty that any of the Receivables are collectible or will be collected.

**Section 3.25 Inventories.** The Company or a Subsidiary has good and marketable title to the Inventories free and clear of all Liens other than Permitted Liens. Except as set forth on Schedule 3.25 hereto, the Inventories do not consist of, in any material amount, items that are obsolete, damaged or slow-moving, or items usable solely by a single customer who has notified the Company that such customer is not prepared to acquire such items. The Inventories do not consist of any items held on consignment. To the Knowledge of the Company, the Inventories are in good and merchantable condition in all material respects.

**Section 3.26 Customers.** Schedule 3.26 sets forth the names and addresses of the top ten (10) customers of the Company and its Subsidiaries (measured by aggregate revenue) during the year ended December 31, 2006 (each, a "Current Customer") and the amount for which each Current Customer was invoiced during such year. None of the Current Customers that procure products and services of the Company primarily through solicitations of competitive bids has given written notice or Specific Verbal Notice to the Company or any Subsidiary that the Company is no longer eligible to participate in bid solicitations by such Current Customer. None of the Current Customers that procure products and services of the Company primarily through direct purchases other than through solicitations of competitive bids has given written notice or Specific Verbal Notice to the Company or any Subsidiary that the Company is no longer eligible to provide products and services to such Current Customer or that such Current Customer has determined that it will significantly reduce its purchases of the Company's products and services during the year ending December 31, 2007. As used herein, "Specific Verbal Notice" means direct, specific and unambiguous verbal communication with James Levine, Byron J. Daniels, Walter E. Cisowski, Fernando Heredia, Richard Edenfield and Greg Christy. The Buyer acknowledges and agrees that this provision is not a guaranty or assurance that any Current Customer will solicit bids from the Company regarding the Company's products or services or will continue to purchase the Company's products or services in any amount or at all. As of March 7, 2007, the aggregate amount of orders received from the customers of the Company and the Subsidiaries for purchases of the products of the Company and the Subsidiaries that have not been fulfilled through delivery of products to such customers is not less than $12,436,000.

**Section 3.27 No Other Representations and Warranties.** EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE 3 (INCLUDING THE SCHEDULES), NEITHER THE COMPANY NOR ANY OF THE SUBSIDIARIES MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, AND THE COMPANY AND EACH SUBSIDIARY HEREBY DISCLAIM

24

ANY SUCH REPRESENTATION OR WARRANTY WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer that:

**Section 4.01  Organizational Authorization.**  The execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby are within Seller's organizational powers and have been duly authorized by all necessary action on the part of the Seller.  This Agreement constitutes a valid and binding agreement of Seller, enforceable against the Seller in accordance with its terms, except as enforceability may be limited by applicable equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws from time to time in effect affecting the enforcement of creditors' rights generally.

**Section 4.02  Governmental Authorization.**  The execution, delivery and performance by the Seller of this Agreement and the consummation of the transactions contemplated hereby require no material action by or in respect of, or material filing with, any governmental body, agency or official.

**Section 4.03  Noncontravention.**  The execution, delivery and performance by the Seller of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) violate its certificate or articles of incorporation or bylaws or other equivalent governing documents, (ii) assuming compliance with the matters referred to in <u>Section 4.02</u>, violate any material law, rule, regulations, judgment, injunction, order or decree applicable to the transactions contemplated hereby or (iii) require any material consent or other material action by any Person under, constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of the Seller under any provisions of any material agreement or other material instrument binding upon the Seller.

**Section 4.04  Seller's Ownership of the Shares at the Closing Date.**  As of the Closing Date, the Seller will own all of the Shares.  Upon transfer of the Shares to the Buyer at the Closing in accordance with this Agreement, the Buyer will own such Shares free and clear of all Liens other than those imposed by the actions of Buyer.

**Section 4.05  No Other Representations and Warranties.** EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS <u>ARTICLE 4</u>, THE SELLER MAKES NO EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, AND THE SELLER HEREBY DISCLAIMS ANY SUCH REPRESENTATION OR WARRANTY WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

011107.0108\393259.18

**ARTICLE 5**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the other parties hereto that:

**Section 5.01  Existence and Power.**  Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Tennessee and has all corporate powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

**Section 5.02  Organizational Authorization.**  The execution, delivery and performance by the Buyer of this Agreement and the consummation of the transactions contemplated hereby are within the corporate power of the Buyer and have been duly authorized by all necessary corporate action on the part of the Buyer.  This Agreement constitutes a valid and binding agreement of the Buyer, enforceable against the Buyer in accordance with its terms, except as enforceability may be limited by applicable equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws from time to time in effect affecting the enforcement of creditors' rights generally.

**Section 5.03  Governmental Authorization.**  The execution, delivery and performance by the Buyer of this Agreement and the consummation of the transactions contemplated hereby require no material action by or in respect of, or material filing with, any governmental body, agency or official.

**Section 5.04  Noncontravention.**  The execution, delivery and performance by the Buyer of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) violate the charter or bylaws of the Buyer, (ii) assuming compliance with the matters referred to in Section 5.03, violate any applicable material law, rule, regulation, judgment, injunction, order or decree or (iii) require any material consent or other material action by any Person under, constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of the Buyer under any provisions of any material agreement or other material instrument binding upon the Buyer.

**Section 5.05  Financing.**  The Buyer will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to fulfill its obligations hereunder and to make payment of all amounts to be paid by it hereunder on the Closing Date.

**Section 5.06  Purchase for Investment.**  The Buyer is purchasing the Shares for investment for its own account and not with a view to, or for sale in connection with, any distribution thereof.  The Buyer is an "accredited investor" and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Shares and is capable of bearing the economic risks of such investment.

**Section 5.07  Actions and Proceedings.**  There are no (i) outstanding judgments, orders, writs, injunctions or decrees of any court, governmental agency or arbitration tribunal against the Buyer or any of its Affiliates, which have or could have a material adverse effect on the ability of the Buyer to consummate the transactions contemplated hereby or (ii) actions, suits, claims or legal, administrative or arbitration proceedings or investigations pending or, to the

26

knowledge of the Buyer, threatened against the Buyer, which have or could have a material adverse effect on the ability of the Buyer to consummate the transactions contemplated hereby.

        **Section 5.08   Finder's Fees.**   There is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the Buyer who might be entitled to any fee or commission upon the consummation of the transactions contemplated by this Agreement.

        **Section 5.09   Solvency.**   Immediately after giving effect to the transactions contemplated by this Agreement, the Company will be able to pay its respective debts as they become due and will own property which has a fair saleable value greater than the amounts required to pay its respective debts (including a reasonable estimate of the amount of all contingent liabilities). Immediately after giving effect to the transactions contemplated by this Agreement, the Company will have adequate capital to carry on its respective business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of the Company.

        **Section 5.10   Acknowledgment by the Buyer.**

        (a)     The Buyer has conducted to its satisfaction, an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of the Company and, in making its determination to proceed with the transactions contemplated by this Agreement, the Buyer has relied on the results of its own independent investigation and verification and the representations and warranties of the Company and/or the Seller expressly and specifically set forth in this Agreement. Such representations and warranties by the Company and/or the Seller constitute the sole and exclusive representations and warranties of the Company and the Seller to the Buyer in connection with the transactions contemplated hereby, and the Buyer understands, acknowledges and agrees that all other representations and warranties of any kind or nature expressed or implied (including, without limitation, any relating to the future or historical financial condition, results of operations, assets or liabilities of the Company or the quality, quantity or condition of the assets of the Company) are specifically disclaimed by the Company and the Seller. Other than as expressly provided in this Agreement, the Company and the Seller do not make or provide, and the Buyer hereby waives, any warranty or representation, express or implied, as to the quality, merchantability, fitness for a particular purpose, conformity to samples, or condition of the Company's assets or any part thereto.

        (b)     In connection with the Buyer's investigation of the Company, the Buyer has received from or on behalf of the Company or the Seller certain projections, including projected statements of operating revenues and income from operations of the Company for the fiscal year ending December 31, 2006 and for subsequent fiscal years and certain business plan information for such fiscal year and succeeding fiscal years. The Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that the Buyer is familiar with such uncertainties, that the Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the

assumptions underlying such estimates, projections and forecasts), and that the Buyer shall have no claim against the Seller with respect thereto. Accordingly, neither the Company nor the Seller makes any representations or warranties whatsoever with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts). Other than as expressly provided in this Agreement, the Buyer agrees that neither the Seller nor any other Person will have or be subject to any liability to the Buyer resulting from the distribution to the Buyer, or the Buyer's use of, any information regarding the Company or its respective business, including the Confidential Information Memorandum prepared by Downer & Company, LLC (the "Information Memorandum"), and any information, document or material made available to the Buyer or its Affiliates in certain physical or on-line "data rooms," management presentations or any other form in expectation of the transactions contemplated by this Agreement.

Section 5.11  No Reliance.  The Buyer acknowledges and agrees that the representations and warranties made by the Company in this Agreement (as qualified by the disclosures in the Schedules) supersede, replace and nullify in every respect the data set forth in any other document, material or statement, whether written or oral, made available to the Buyer, and the Buyer shall be deemed to have not relied on any data contained in such data for any purpose whatsoever, including, without limitation, as a promise, projection, guaranty, representation, warranty or covenant.

Section 5.12  No Other Representations and Warranties.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE 5, THE BUYER MAKES NO EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, AND THE BUYER HEREBY DISCLAIMS ANY SUCH REPRESENTATION OR WARRANTY WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

### ARTICLE 6
### COVENANTS OF THE COMPANY AND THE SELLER

Section 6.01  Conduct of the Company.  During the period from the date of this Agreement and continuing until the Closing, the Company agrees that, except (i) as expressly contemplated or permitted by this Agreement or the Schedules (including the effects of the Conversions), (ii) as required by applicable law or regulation, or (iii) to the extent that the Buyer shall otherwise consent in writing, which consent shall not be unreasonably withheld, conditioned or delayed:

(a)  the Company and the Subsidiaries shall use reasonable efforts to carry on their respective business in the usual, regular and ordinary course in all material respects, in substantially the same manner as heretofore conducted, and shall use reasonable efforts to preserve intact its present lines of business, maintain its rights and franchises and preserve its relationships (contractual or otherwise) with customers, suppliers and others having business dealings with them (including, without limitation, through ordinary course renewals, negotiations with and amendments to such relationships) to the end that its ongoing business shall not be impaired in any material respect at the Closing; provided, however, that no action by the

28

Company or any Subsidiary with respect to matters specifically addressed by any other provision of this Section 6.01 shall be deemed a breach of this Section 6.01(a), unless such action would constitute a breach of one or more of such other provisions;

(b)    neither the Company nor any Subsidiary shall (i) enter into any new material line of business or (ii) incur or commit to any capital expenditures or any obligations or liabilities in connection with capital expenditures, except for capital expenditures and obligations or liabilities in connection therewith in an amount not to exceed $100,000 in the aggregate;

(c)    the Company shall not (i) declare or pay any dividends on or make other distributions in respect of any of its capital stock or other equity interests (except for dividends in Cash), (ii) split, combine or reclassify any of its capital stock or other equity interests or issue or authorize or propose the issuance of any other securities in respect of, in lieu of or in substitution for, shares of its capital stock or other equity interests, or (iii) repurchase, redeem or otherwise acquire any shares of its capital stock or other equity interests or any securities convertible into or exercisable for any shares of its capital stock or other equity interests (except for repurchases and redemptions paid in Cash);

(d)    neither the Company nor any Subsidiary shall issue, deliver or sell, or authorize or propose the issuance, delivery or sale of, any shares of their respective capital stock of any class or other equity interests, or any securities convertible into or exercisable for, or any rights, warrants or options to acquire, any such shares of their respective capital stock or other equity interests, or enter into any agreement with respect to any of the foregoing;

(e)    other than to the extent required to comply with its obligations hereunder or required by law, neither the Company nor any Subsidiary shall amend or propose to amend their certificate of incorporation or bylaws or equivalent formation documents;

(f)    neither the Company nor any Subsidiary shall acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial equity interest in or a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof or otherwise acquire or agree to acquire or in-license any assets or rights (other than the acquisition or in-license of assets used in the operations of the business of the Company or any Subsidiary in the ordinary course consistent with past practice); provided, however, that the foregoing shall not prohibit the creation of new direct or indirect Subsidiaries organized to conduct or continue activities otherwise permitted by this Agreement;

(g)    other than as may be required by or in conformance with applicable law or regulation in order to permit or facilitate the consummation of the transactions contemplated hereby or the transactions disclosed in the Schedules, neither the Company nor any Subsidiary shall sell, encumber or otherwise dispose of, or agree to sell, encumber or otherwise dispose of, any of its material assets other than in the ordinary course of business consistent with past practice;

(h)    neither the Company nor any Subsidiary shall (i) make any loans, advances or capital contributions to, or investments in, any other Person, other than pursuant to

29

any contract or other legal obligation of the Company as in effect as of the date hereof or in the ordinary course of business consistent with past practice or (ii) create, incur, assume or suffer to exist any indebtedness, issuances of debt securities, guarantees, loans or advances to the Company or any Subsidiary not in existence as of the date of this Agreement except (A) pursuant to the credit facilities, indentures (but not in excess of amounts authorized for issuance thereunder as of the date of this Agreement) and other arrangements in existence on the date of this Agreement, or (B) trade debt and commercial finance in the ordinary course of business consistent with past practice, in each case as such credit facilities, indentures and other arrangements and other existing indebtedness may be amended, extended, modified, refunded, renewed or refinanced after the date of this Agreement; provided that this provision shall not prohibit intra-company loans, etc., by and amongst the Company and the Subsidiaries;

(i)  other than as required by an existing contract or agreement as in effect on the date hereof and other than as described in Schedule 6.01(i), neither the Company nor any Subsidiary shall (A) increase the amount of cash compensation or bonus, fringe or other benefits of, or pay any discretionary bonus to, any current or former director or officer, (B) make any material increase in, or commitment to increase materially, any employee benefits, (C) adopt or make any commitment to adopt any material new Employee Benefit Plan or amend, modify, alter or make any material contribution, other than regularly scheduled contributions, to any Employee Benefit Plan, (D) increase, in any material manner, the severance or termination pay of any current or former director or officer of the Company of any Subsidiary, or (E) materially increase any stay bonus or retention bonus;

(j)  neither the Company nor any Subsidiary shall (A) change its fiscal year, (B) make any material Tax election (except in the ordinary course of business consistent with past practice or as otherwise required by applicable law or regulation) or (C) except as required by changes in GAAP or as required by applicable law or regulation, change its methods of accounting in effect as of the date hereof; and

(k)  other than in connection with any action expressly permitted by any other subsection of this Section 6.01 and except for any new contract awards, and any contract renewals, negotiations and amendments entered into in the ordinary course of business and consistent with past practice, neither the Company nor any Subsidiary shall (A) enter into or become bound by, or permit any of the assets owned or used by it to become bound by, any contract of the type required to be disclosed pursuant to Section 3.16 of this Agreement (other than in the ordinary course of business), or (B) prematurely terminate (other than in the ordinary course of business), or waive any material right or remedy under, any such contract.

Section 6.02  Access.  From the date hereof until the Closing Date, the Company will give the Buyer, its counsel, financial advisors, auditors and other authorized representatives reasonable access to the offices, properties, books and records of the Company and the Subsidiaries; provided that any such access (i) shall be during normal business hours on reasonable notice, (ii) shall not, except as otherwise agreed in writing by the Seller and the Company, include sampling or testing of soil, sediment, surface or ground water and/or building material, (iii) shall not be required where such access would be prohibited or otherwise limited by any applicable law or agreement and (iv) shall not otherwise unreasonably interfere with the conduct of the business of the Company or the Subsidiaries.

**Section 6.03    Subsequent Actions**.  On or before the Closing Date, the Company and the Seller shall disclose to the Buyer in writing any exceptions to or variances from the representations and warranties in Article 3 or Article 4 promptly upon discovery thereof, and such disclosure shall amend and supplement the appropriate Schedules (such updated schedules to be referred to herein collectively as the "Updated Schedules").    Except with respect to conditions to Closing or remedies of the Buyer set forth in Sections 9.01(a) and 11.02, the delivery of such Updated Schedules will be deemed to have notified the Buyer of such exception or variance, and cured any misrepresentation or breach of this Agreement that otherwise might have existed hereunder by reason of such exception or variance.

## ARTICLE 7
## COVENANTS OF THE BUYER

**Section 7.01    Confidentiality**.    Prior to the Closing Date and after any termination of this Agreement, the Buyer shall hold and shall cause its Affiliates, officers, directors, employees, accountants, counsel, consultants, advisors and agents (collectively, the "Buyer's Representatives") to hold, in confidence, all confidential documents and information concerning the Company furnished to the Buyer or the Buyer's Representatives in connection with the transactions contemplated by this Agreement in the manner specified in the Confidentiality Agreement, dated as of September 29, 2006, between Downer & Company, LLC and the Buyer, as amended from time to time (the "Confidentiality Agreement").

**Section 7.02    Access**.  From and after the Closing, the Buyer and the Company (and any Subsidiary) shall afford promptly to the Seller and its designees and representatives reasonable access to the books, records (including accountants' work papers) and employees of the Buyer and the Company (and any Subsidiary) to the extent necessary to permit the Seller to determine any matter relating to the Seller's rights and obligations hereunder or to any period ending on or before the Closing Date; provided that any such access by the Seller shall be during normal business hours on reasonable notice and shall not otherwise unreasonably interfere with the conduct of the business of the Buyer or the Company (or any Subsidiary).  Unless otherwise consented to in writing by the Seller, neither the Buyer nor the Company (or any Subsidiary) shall destroy, alter or otherwise dispose of any of the books and records of the Company (or any Subsidiary) for any period prior to the Closing Date until such time as the Survival Period, and any time period thereafter during which indemnification claims remain outstanding, has expired, without first offering to surrender to the Seller such books and records or any portion thereof which the Buyer or the Company (or any Subsidiary) may intend to destroy, alter or otherwise dispose of.

**Section 7.03    Notification**.  Prior to the Closing, upon discovery of any variances from the representations and warranties contained in this Agreement, the Buyer shall promptly notify the Company and the Seller of such variances.

**Section 7.04    Director and Officer Liability, Indemnification and Insurance**. For a period of six (6) years after the Closing Date, the Buyer shall not, and shall not permit the Company (or any Subsidiary) to amend, repeal or modify any provision in the Company's formation documents relating to the exculpation or indemnification of any current or former officer, manager, director or similar functionary (unless required by law), it being the intent of

31

the parties that the officers, managers, directors and similar functionaries of the Company (or the Subsidiaries) shall continue to be entitled to such exculpation and indemnification to the fullest extent of the law. If the Company or any Subsidiary or any of their respective successors or assigns (i) shall consolidate with or merge into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) shall transfer all or substantially all of its properties and assets to any Person, then, and in each such case, proper provisions shall be made so that the successors and assigns of the Company (or any Subsidiary) shall assume all of the obligations set forth in this Section. The provisions of this Section 7.04 are intended for the benefit of, and will be enforceable by, each current and former officer, director or similar functionary of the Company (or any Subsidiary) and his or her heirs and representatives, and are in addition to, and not in substitution for, any other rights to indemnification or contribution that any such person may have had by contract or otherwise.

**Section 7.05  Employment and Benefit Arrangements.**  From and after the Closing Date and for a period of at least six (6) months, the Buyer shall cause the Company and each Subsidiary to honor all employment, severance, termination, consulting, retirement and other compensation and benefit plans, arrangements and agreements to which the Company or such Subsidiary is a party, as such plans, arrangements and agreements are in effect on the date hereof. With respect to any Employee Benefit Plans in which any employees of the Company or any Subsidiary participate on or after the Closing, the Buyer shall cause the Company and each such Subsidiary to: (i) waive all pre-existing conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to such employees, except to the extent such pre-existing conditions, exclusions or waiting periods applied under the similar plan in effect immediately prior to the Closing; (ii) provide each such employee with credit for any co-payments and deductibles paid (to the same extent such credit was given for the year under the similar plan in effect immediately prior to the Closing) in satisfying any applicable deductible or out-of-pocket requirements; and (iii) recognize all continuous service of the Company's employees with the Company or any Subsidiary, as applicable, for all purposes (including, without limitation, for purposes of eligibility to participate, vesting credit and entitlement to benefits) under any Employee Benefit Plan in which such employees may be eligible to participate after the Closing; provided that the foregoing shall not apply to the extent it would result in a duplication of benefits. This Section 7.05 shall survive the Closing, is intended to benefit the Company, its Subsidiaries and the employees of the Company and its Subsidiaries, and shall be binding on all successors and assigns of the Buyer and the Company and its Subsidiaries.

**Section 7.06  Regulatory Filings.**  The Buyer shall, within five Business Days after the date hereof, make or cause to be made all filings and submissions required of the Buyer under any laws or regulations applicable to the Buyer for the consummation of the transactions contemplated herein. The Buyer shall be responsible for all filing fees under any such laws or regulations applicable to the Buyer.

**Section 7.07  Contact with Employees, Customers and Suppliers.**  Prior to the Closing, neither the Buyer nor any of the Buyer's Representatives shall contact or otherwise communicate with any customers or suppliers of the Company or any Subsidiary in connection with or regarding the transactions contemplated hereby, except to the extent approved in writing by the Seller, which approval shall not be unreasonably withheld. The Buyer and the Buyer's

011107.0108\393259.18

Representatives may communicate with James Levine, Byron J. Daniels and Walter E. Cisowski without the Seller's consent. The Buyer and the Buyer's Representatives may communicate with other employees of the Company and its Subsidiaries only with the approval of James Levine or Walter E. Cisowski, which approval shall not be unreasonably withheld; provided, however, that Buyer and the Buyer's Representatives may communicate with Fernando Heredia, Richard Edenfield and Greg Christy if (i) such communication is scheduled through James Levine or Walter E. Cisowski, who will schedule such communication at a reasonable time, (ii) James Levine or Walter E. Cisowski are present and able to participate in such communication, and (iii) such communication occurs during normal business hours and does not interfere with the business operations of the Company.

   **Section 7.08 Financial Assistance.**  The Buyer shall not take any action with respect to the assignment of this Agreement, the financing of the transactions contemplated by this Agreement or otherwise that would violate any applicable Laws in any jurisdiction where the Company or any Subsidiary is organized or branch offices are located.

**ARTICLE 8**
**ADDITIONAL COVENANTS OF THE PARTIES**

   **Section 8.01 Reasonable Best Efforts; Further Assurances.**  Subject to the terms and conditions of this Agreement, the Buyer and the Seller shall use their commercially reasonable best efforts to take, or cause to be taken, all actions necessary or desirable to cause the conditions set forth in Article 9 to be satisfied and the transactions contemplated by this Agreement to be consummated, in each case as promptly after the date hereof as practicable. Except as otherwise expressly set forth in this Agreement, neither the Seller nor the Company on the one hand, nor the Buyer on the other hand, shall have any obligation to pay any material amounts or incur any material liability or obligation to any third party as a condition or inducement for obtaining any consents described on Schedule 9.01(c). Each of the Seller, the Company and the Buyer agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement. From time to time, as and when requested by any party hereto and at such party's expense, any other party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement.

   **Section 8.02 Further Cooperation.**  Subject to Section 11.02(k)(iii), the Seller and the Buyer shall cooperate with each other (i) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained under any material contracts, in each case in connection with the consummation of the transactions contemplated by this Agreement, and (ii) in taking such actions or making any such filings, in furnishing information required in connection therewith and in seeking timely to obtain any such actions, consents, approvals or waivers.

33

**Section 8.03  Public Announcements.**  No press release or other public announcement related to this Agreement or the transactions contemplated herein shall be issued or made without the joint approval of the Buyer and the Seller, unless required by law (in the reasonable opinion of counsel), in which case the Buyer and the Seller shall have the right to review and comment on such public announcement prior to publication.

**Section 8.04  Tax Matters** All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement (the "Transfer Taxes") shall be split equally between the Seller and the Buyer when due, and the Buyer will file all necessary Tax Returns and other documentation with respect to all such Taxes and fees, and, if required by applicable law or regulation, the Seller will execute and deliver, and will cause its Affiliates to join in the execution and delivery of, any such Tax Returns and other documentation, and any associated costs shall be split equally between the Seller and the Buyer.  The Buyer shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for the Company and each Subsidiary for all periods ending prior to or including the Closing Date which are filed after the Closing Date. Seller and Buyer will cooperate to timely prepare any Tax Returns or other filings relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes.  Unless otherwise required by applicable law, Buyer will file all Tax Returns or other filings with respect to Transfer Taxes, and promptly following the filing thereof, Buyer will furnish to Seller a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax.  With respect to any such returns or filings required to be filed by Buyer, Seller will pay to Buyer 50% of the amount of the Transfer Taxes shown on such return or other filing not later than five (5) business days before the due date for payment of the Transfer Taxes.  If Seller is required to file any Tax Return or other filing with respect to Transfer Taxes, Buyer will prepare the return or filing and pay Seller 50% of the amount of the Transfer Taxes shown on such return or other filing not later than five (5) business days before the due date for payment of the Transfer Taxes, and promptly following the filing thereof, Seller will furnish to Buyer a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax.

(b)     After the date this Agreement is signed, the Sellers shall not, nor shall they allow the Company or any Subsidiary to make or change any election relating to Taxes, file any amended Tax Return, enter into any closing agreement relating to Taxes, settle or consent to any claim or assessment relating to Taxes or consent to any waiver of the statute of limitations for any such claim or assessment, in each case to the extent such action will have a detrimental effect on the Company, any Subsidiary or the Buyer.

(c)     Tax Return Filings.  Buyer shall, or shall cause the Company and each Subsidiary to, timely prepare and file with the relevant Taxing Authorities all Tax Returns of the Company and each Subsidiary for Pre-Closing Tax Periods and any taxable period that includes but does not end on the Closing Date, the due date for filing of which, determined taking into account extensions, is after the Closing Date; provided that Buyer shall furnish Seller with a copy of either a pro forma Tax Return for the Company, the Subsidiary, or a combination thereof or the actual Tax Return for the Company, the Subsidiary, or a combination thereof, in each case at the election of Buyer and limited to information regarding the Company and its Subsidiaries that are being acquired pursuant to this Agreement at least thirty (30) days before such Tax

34

Returns are due.  Seller shall, or shall cause the Company and each Subsidiary to, timely prepare and file with the relevant Taxing Authorities all Tax Returns for any taxable periods of the Company or the Subsidiary the due date for filing of which, determined taking into account extensions, is on or before the Closing Date; provided that Seller shall furnish Buyer with a copy of such Tax Returns at least thirty (30) days before such Tax Returns are due, and no such Tax Returns shall be filed with any Taxing Authority without Buyer's consent, which shall not be unreasonably withheld. Any Tax Returns described in this Section 8.04(c) shall be prepared on a basis consistent with applicable law and the past practices of the Company and each Subsidiary and in a manner that does not distort taxable income (e.g., by deferring income or accelerating deductions).

(d)    Cooperation.    The Sellers, the Company, and Buyer shall reasonably cooperate, and shall cause their respective Affiliates, officers, employees, agents, auditors and representatives reasonably to cooperate, in preparing and filing all Tax Returns, including maintaining and making available to each other all records necessary in connection with Taxes, and in resolving all disputes and audits with respect to all taxable periods relating to Taxes.

(e)    Tax Sharing Agreements.    The Sellers shall cause (i) any and all Tax sharing agreements between the Sellers or any of their Affiliates (other than the Company and the Subsidiaries), and (ii) the Company or any Subsidiary, to be terminated on or before the Closing Date.  After the Closing Date, no party shall have any rights or obligations under any such Tax sharing agreements.

**Section 8.05   Disclosure Generally.**  The Schedules have been arranged, for purposes of convenience only, as separately titled Schedules corresponding to the Sections of Article 3.  Any information set forth in any Schedule or incorporated in any Section of this Agreement shall be considered to have been set forth in each other Schedule to which it is reasonably apparent such disclosure would apply and shall be deemed to modify the representations and warranties in Article 3 whether or not such representations and warranties refer to such Schedule.  The specification of any dollar amount in the representations and warranties contained in this Agreement or the inclusion of any specific item in the Schedules is not intended to imply that such amounts, or higher or lower amounts, or the items so included or other items, are or are not required to be disclosed or are within or outside of the ordinary course of business, and neither party shall use the fact of the setting of such amounts or the fact of the inclusion of any such item in the Schedules in any dispute or controversy with any party as to whether any obligation, item or matter not described herein or included in a Schedule is or is not required to be disclosed (including, without limitation, whether such amounts are required to be disclosed as material) or in the ordinary course of business for the purposes of this Agreement.  The information contained in the Schedules is disclosed solely for the purposes of this Agreement, and no information contained therein shall be deemed to be an admission by any party hereto to any third party of any matter whatsoever, including of any violation of law or breach of any agreement.

**Section 8.06   Conflicts and Privilege.**  It is acknowledged by each of the parties hereto that the American Capital and the Company have retained Patton Boggs LLP to act as their counsel in connection with the transactions contemplated hereby and that Patton Boggs LLP has not acted as counsel for any other party in connection with the transactions

35

contemplated hereby and that none of the other parties has the status of a client of Patton Boggs LLP for conflict of interest or any other purposes as a result thereof. The Buyer hereby agrees that, in the event that a dispute arises after the Closing between the Buyer and the Seller, Patton Boggs LLP may represent American Capital in such dispute even though the interests of American Capital may be directly adverse to the Buyer or the Company, even though Patton Boggs LLP may have represented the Company in a matter substantially related to such dispute, or may be handling ongoing matters for the Buyer or the Company. Buyer further agrees that, as to all communications among Patton Boggs LLP, the Company, and the Seller that relate in any way to the transactions contemplated by this Agreement, the attorney-client privilege and the expectation of client confidence belongs to American Capital and may be controlled by American Capital and shall not pass to or be claimed by the Buyer or the Company. Notwithstanding the foregoing, in the event that a dispute arises between the Buyer, the Company and a third party other than a party to this Agreement after the Closing, the Company may assert the attorney-client privilege to prevent disclosure of confidential communications by Patton Boggs LLP to such third party; provided, however, that the Company may not waive such privilege without the prior written consent of Patton Boggs LLP.

**Section 8.07 Special Environmental Conditions.** Golder Associates Inc. ("Golder") has been retained to assist with the remediation of the Special Environmental Conditions. The Company will fully cooperate with Golder and the Seller to facilitate the efficient remediation of the Special Environmental Conditions. The Seller will pay all out-of-pocket costs and expenses of the Company, including any fees of Golder, in connection with the remediation of the Special Environmental Conditions.

## ARTICLE 9
## CONDITIONS TO CLOSING

**Section 9.01 Conditions to the Buyer's Obligations.** The obligations of the Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or the Buyer's waiver) of the following conditions as of the Closing Date:

(a) the representations and warranties of the Company and the Seller contained in Article 3 and Article 4 hereof will be true and correct in all material respects at and as of the time of the Closing (without taking into account additional qualifications of any representations and warranties of the Company or the Sellers set forth in any Updated Schedule delivered in accordance with Section 6.03 hereof, as if made on the Closing Date and the Closing Date were substituted for the date of this Agreement throughout such representations and warranties, except (i) to the extent that the failure of such representations and warranties to be true and correct has not caused a Material Adverse Effect, (ii) for changes contemplated by this Agreement, and (iii) for those representations and warranties that address matters as of any other particular date (in which case such representations and warranties shall have been true and correct as of such particular date, except to the extent that the failure of such representations and warranties to have been true and correct as of such particular date has not caused a Material Adverse Effect), it being understood that, for purposes of determining the accuracy of such representations and warranties, all "Material Adverse Effect" qualifications and other qualifications based on the word "material" or similar phrases contained in such representations and warranties shall be disregarded;

36

011107.0108\393259.18

(b) . the Company and the Seller shall have performed in all material respects all of the covenants and agreements required to be performed by them under this Agreement at or prior to the Closing;

(c) all consents which are set forth on <u>Schedule 9.01(c)</u> attached hereto shall have been obtained;

(d) all material governmental filings, consents, authorizations and approvals that are required for the consummation of the transactions contemplated hereby and set forth on <u>Schedule 9.01(d)</u> attached hereto shall have been made and obtained;

(e) no action or proceeding before any court or government body shall be pending wherein an unfavorable judgment, decree or order would prevent the performance of this Agreement or the consummation of any of the transactions contemplated hereby, declare unlawful the transactions contemplated by this Agreement or cause such transactions to be rescinded;

(f) the Company and each of its Subsidiaries shall have each been converted into Delaware or Texas limited liability companies at least (1) Business Day prior to the Closing Date (the "<u>Conversions</u>") and the representations and warranties in Section 3.06(k) shall be true and correct on the Closing Date;

(g) Seller shall have delivered to the Buyer a certificate, dated the Closing Date, stating that the Seller is the owner of 100% of the issued and outstanding equity interests of the Company; and

(h) the Company shall have delivered to the Buyer a certificate, dated the Closing Date, stating that the preconditions specified in <u>Sections 9.01(a)</u> and <u>9.01(b)</u>, as they relate to the Company, have been satisfied.

**Section 9.02  Conditions to the Seller's Obligations.** The obligation of the Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or the Seller's waiver) of the following conditions as of the Closing Date:

(a) The representations and warranties of the Buyer contained in <u>Article 5</u> hereof shall have been true and correct in all material respects as of the date of this Agreement and as of the Closing Date, except (i) for changes contemplated by this Agreement, and (ii) for those representations and warranties that address matters only as of the date of this Agreement or any other particular date (in which case such representations and warranties shall have been true and correct in all material respects as of such particular date), it being understood that, for purposes of determining the accuracy of such representations and warranties, all qualifications based on the word "material" or similar phrases contained in such representations and warranties shall be disregarded;

(b) the Buyer shall have performed in all material respects all of the covenants and agreements required to be performed by it under this Agreement at or prior to the Closing;

37

(c)     all consents which are set forth on Schedule 9.01(c) attached hereto shall have been obtained;

(d)     all material governmental filings, consents, authorizations and approvals that are required for the consummation of the transactions contemplated hereby and set forth on Schedule 9.01(d) attached hereto shall have been made and obtained;

(e)     no action or proceeding before any court or government body shall be pending wherein an unfavorable judgment, decree or order would prevent the performance of this Agreement or the consummation of any of the transactions contemplated hereby, declare unlawful the transactions contemplated by this Agreement or cause such transactions to be rescinded; and

(f)     the Buyer shall have delivered to the Seller a certificate of the Buyer, dated the Closing Date, stating that the preconditions specified in Sections 9.02(a) and 9.02(b), as they relate to the Buyer, have been satisfied.

## ARTICLE 10
## TERMINATION

**Section 10.01 Termination.**  This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of the Buyer and the Seller;

(b)     by the Buyer, if there has been a material breach by the Company or the Seller of any covenant or other agreement contained herein which has prevented the satisfaction of any condition to the obligations of the Buyer at the Closing and such breach has not been waived by the Buyer or cured by the Company or the Seller within ten (10) Business Days after the Company's or the Seller's receipt of written notice thereof from the Buyer;

(c)     by the Seller, if there has been a material breach by the Buyer of any covenant or other agreement contained herein which has prevented the satisfaction of any condition to the obligations of the Seller at the Closing and such breach has not been waived by the Seller or cured by the Buyer within ten (10) Business Days after the Buyer's receipt of written notice thereof from the Seller;

(d)     by the Buyer, if the transactions contemplated hereby have not been consummated on or before March 30, 2007; provided that the Buyer shall not be entitled to terminate this Agreement pursuant to this Section 10.01(d) if the Buyer's knowing or willful breach of this Agreement has prevented the consummation of the transactions contemplated hereby; or

(e)     by the Seller, if the transactions contemplated hereby have not been consummated on or before March 30, 2007; provided that the Seller shall not be entitled to terminate this Agreement pursuant to this Section 10.01(e) if the Company's or the Seller's knowing or willful breach of this Agreement has prevented the consummation of the transactions contemplated hereby.

The party desiring to terminate this Agreement pursuant to clauses (b), (c), (d) or (e) of this Section 10.01 shall give written notice of such termination to the other parties hereto.

Section 10.02 **Effect of Termination**. In the event this Agreement is terminated by either the Buyer or the Seller as provided in Section 10.01, the provisions of this Agreement shall immediately become void and of no further force and effect (other than Section 7.01 (Confidentiality), Section 7.07 (Contact with Employees, Customers and Suppliers), Section 8.03 (Public Announcements), this Section 10.02 and Article 12, each of which shall survive the termination of this Agreement), and there shall be no liability on the part of the Buyer, the Company or the Seller to any other party hereto, except for willful or knowing breaches of this Agreement prior to the time of such termination.

**ARTICLE 11**
**ADDITIONAL COVENANTS**

Section 11.01 **Survival Periods**. The representations, warranties, covenants and agreements set forth in this Agreement and in any certificates delivered at the Closing in connection with this Agreement should survive for a period beginning on the Closing Date and ending on the date that is eighteen (18) months after the Closing Date (the "Initial Survival Period"), and shall thereafter be of no further force or effect; provided that the representations, warranties, covenants and agreements set forth in Sections 2.05, 3.06, 8.04, 8.07 and 3.21 shall survive for a period beginning on the Closing Date and ending on the date that is five (5) years after the Closing Date (the "Extended Survival Period"); and provided further, that with respect to any covenant or agreement contained herein that expressly contemplates performance after the Initial Survival Period, the Initial Survival Period shall continue through the period of such contemplated performance; and provided further, that the representations and warranties set forth in Section 4.01 and 4.04 (together, the "Basic Representations") shall survive the Closing indefinitely.

Section 11.02 **Indemnification**.

(a)    Subject to the provisions of this Section 11.02 and Section 11.03 below, after the Closing, the Seller shall indemnify and hold harmless each of the Buyer, the Company and each Subsidiary (each a "Buyer Indemnified Party"), without duplication with respect to any Loss or any Buyer Indemnified Party, against any Loss which the Buyer suffers or will suffer as a result of any breach of the representations, warranties, covenants and agreements of the Company or the Seller set forth herein (without taking into account (1) any Updated Schedules delivered in accordance with Section 6.03 hereof and (2) with respect to the representations and warranties set forth in Section 3.06, items (1), (4) and (5) of Schedule 3.06) and as restated in any certificates delivered by or on behalf of the Company, any Subsidiary or the Seller at the Closing, subject to each of the following:

(i)    Each Buyer Indemnified Party's right to seek indemnification for breaches of the representations, warranties, covenants and agreements of the Company or the Seller other than the Basic Representations shall collectively be limited to an aggregate amount of Losses not to exceed the amount then remaining in the Escrow Account as provided herein.

39

(ii)    No Buyer Indemnified Party shall be entitled to seek indemnification with respect to any individual Loss, other than Special Environmental Condition Losses, Tax Losses or Losses resulting from a breach of the Basic Representations, unless such Loss is greater than $20,000.

(iii)    With respect to Losses arising other than from a breach of the representations and warranties for matters covered by Section 3.06 and Section 3.21, the covenants and agreements set forth in Sections 2.05, 8.04 and 8.07, and the indemnification set forth in Section 11.02(k) (collectively, the "Tipping Basket Losses"), no Buyer Indemnified Party shall be entitled to seek indemnification unless all Tipping Basket Losses exceed $500,000, in which case the Buyer Indemnified Party shall be entitled to indemnification for the amount of all Tipping Basket Losses.

(iv)    With respect to Losses arising from a breach of the representations and warranties for matters covered by Section 3.21 and the indemnification set forth in Section 11.02(k) (collectively, the "Deductible Losses"), no Buyer Indemnified Party shall be entitled to seek indemnification unless all Deductible Losses exceed $500,000, in which case the Buyer Indemnified Party shall be entitled to indemnification only for the amount of such excess.

(v)    With respect to Losses arising from Special Environmental Condition Losses, Tax Losses or Losses resulting from a breach of the Basic Representations, a Buyer Indemnified Party shall be entitled to seek indemnification without limitation under Sections 11.02(a)(ii), (iii) or (iv), above. For avoidance of doubt, Special Environmental Condition Losses and Tax Losses shall be subject to the limits on indemnification set forth in Section 11.02(a)(i) and (vi), hereof.

(vi)    All Losses arising from breaches of the representations and warranties for matters covered by Section 3.06 and Section 3.21, the covenants and agreements set forth in Sections 2.05, 8.04 and 8.07, and the indemnification set forth in Section 11.02(k) (any such Losses collectively, "Extended Escrow Losses") shall first be applied to the Extended Escrow Amount and then, to the extent they exceed the Extended Escrow Amount, to the Initial Escrow Amount.

(vii)    All Losses arising other than from breaches of the representations and warranties for matters covered by Section 3.06 and Section 3.21, the covenants and agreements set forth in Sections 2.05, 8.04 and 8.07, and the indemnification set forth in Section 11.02(k) (any such Losses collectively, "Initial Escrow Losses") shall first be applied to the Initial Escrow Amount and then, to the extent they exceed the Initial Escrow Amount, to the Extended Escrow Amount.

(viii)    No Buyer Indemnified Party shall be entitled to seek indemnification with respect to any Losses resulting from any breach of a representation or warranty, other than those set forth in Section 3.06(k), arising in connection with the Conversions. For avoidance of doubt, a Buyer Indemnified Party shall be entitled to indemnification with respect to any Losses resulting from a breach of the representations and warranties set forth in Section 3.06(k) arising in connection with the Conversions.

(b)     Immediately following the expiration of the Initial Survival Period, the Escrow Agent shall pay to the Seller out of the Escrow Account the excess, if any, of the Initial Escrow Amount over the Losses properly applied to the Initial Escrow Amount, net of the amount of any unresolved claim for Initial Escrow Losses asserted by the Buyer prior to the expiration of the Initial Survival Period, in accordance with the Escrow Agreement.  Following the expiration of the Initial Survival Period, the funds on deposit in the Escrow Account, if any, shall solely be available to satisfy amounts payable to a Buyer Indemnified Party in respect of claims for Extended Escrow Losses.  Immediately following the expiration of the Extended Survival Period, the Escrow Agent shall pay to the Seller out of the Escrow Account, the balance of any funds deposited therein, net of the amount of any unresolved claim for Extended Escrow Losses asserted by the Buyer prior to the expiration of the Extended Survival Period, in accordance with the Escrow Agreement.  Any remaining funds retained for any unresolved claims as set forth above, shall be paid to Seller immediately upon resolution of such claim.

(c)     Subject to the provisions of this Section 11.02 and Section 11.03 below, after the Closing the Buyer shall indemnify the Seller and hold it harmless against any Loss which the Seller suffers as a result of (i) any breach by any Buyer Indemnified Party of its covenants, representations and warranties set forth herein and as restated in any certificates delivered by the Buyer at the Closing or (ii) the operations of the Company (or any Subsidiary) following the Closing.

(d)     No Person shall be liable for any claim for indemnification under subsections (a) or (b) above unless written notice specifying in reasonable detail the nature of the claim for indemnification is delivered by the Person seeking indemnification to the Person from whom indemnification is sought within the time periods set forth in this Section 11.02(d), in which case the representation, warranty, covenant or agreement which is the subject of such claim shall survive, to the extent of such claim only, until such claim is resolved, whether or not the amount of the Losses resulting from such breach has been finally determined at the time the notice is given, if, but only if, such notice describes in reasonable detail the basis of such claim and, in the case of a claim made by reason of a Third Party Claim, is accompanied by a copy of any written notice received from the third party claimant.

(i)     With respect to Initial Escrow Losses other than those arising from a breach of the Basic Representations, indemnification must be sought prior to the expiration of the Initial Survival Period.

(ii)    With respect to Losses arising from a breach of the Basic Representations, indemnification may be sought at any time after the Closing.

(iii)   With respect to Extended Escrow Losses, indemnification must be sought prior to the expiration of the Extended Survival Period.

(e)     Promptly after the assertion by any third party of any claim (a "Third Party Claim") against any Person entitled to indemnification under this Section 11.02 (the "Indemnitee" such term to also include more than one Indemnitee) that results or may result in the incurrence by such Indemnitee of any Loss for which such Indemnitee would be entitled to indemnification pursuant to this Agreement, such Indemnitee shall promptly provide notice of

41

such Third Party Claim to the parties from whom such indemnification could be sought (the "Indemnitors"), provided that an Indemnitee's failure to provide such notice shall not reduce or otherwise impair such Indemnitee's right to indemnification hereunder except to the extent such failure to provide notice has materially prejudiced the Indemnitor.  Any Indemnitee shall have the right to employ separate counsel in any such Third Party Claim and to participate in the defense thereof, but the fees and expenses of such counsel shall not be an expense of the Indemnitor unless (i) the Indemnitor shall have failed, within a reasonable time after having been notified by the Indemnitee of the existence of such Third Party Claim as provided in the preceding sentence, to assume the defense of such Third Party Claim or (ii) if there exists or is reasonably likely to exist a conflict of interest that would make it inappropriate in the judgment of counsel to the Indemnitee for the same counsel to represent both the Indemnitee and the Indemnitor.  In no event will an Indemnitee consent to the entry of any judgment or enter into any settlement with respect to any Third Party Claim without the prior written consent of the Indemnitor.  In no event will an Indemnitor consent to the entry of any judgment or enter into any settlement with respect to any Third Party Claim without the prior written consent of the Indemnitee unless such settlement includes an absolute and unconditional release of the Indemnitee and does not contain any finding or admission of fault or culpability by the Indemnitee or otherwise materially adversely affect the rights of the Indemnitee.

(f)    The amount of any Loss subject to indemnification hereunder or of any claim therefor shall be calculated net of (i) any insurance proceeds (net of direct collection expenses) received by the Buyer or the Company on account of such Loss, and (ii) any indemnification proceeds received or receivable by the Buyer on account of such Loss pursuant to any third-party indemnification rights held by the Company or any Subsidiary.  The Buyer and the Company (and any Subsidiary) shall seek full recovery under all insurance policies and third-party indemnification agreements covering any Loss to the same extent as they would if such Loss were not subject to indemnification hereunder, and the Buyer and the Company (and any Subsidiary) shall not terminate or cancel any insurance policies in effect for periods prior to the Closing or terminate, modify or waive any third-party indemnification rights held by the Company or any Subsidiary.  In the event that an insurance or third-party indemnification recovery is made by the Buyer, the Company, any Subsidiary or any of their Affiliates with respect to any Loss for which any such Person has been indemnified hereunder, then a refund equal to the aggregate amount of the recovery (net of all direct collection expenses) shall be made promptly to the Seller.  The Indemnitors shall be subrogated to all rights of the Indemnitees in respect of any Losses indemnified by the Indemnitors.

(g)    In the event a potential Loss arises with respect to matters covered by Section 3.06 for which a claim for indemnification may arise pursuant this Section 11.02, Buyer shall give prompt notice to Seller of such potential Loss.  Buyer shall provide to Seller such information regarding such potential Loss as Seller shall reasonably request within five (5) Business Days of any such request by Seller.  Seller shall have thirty (30) days to review such information unless Buyer is required to respond to any Taxing Authority prior to such time; provided, however, that in no event shall Seller have less than five (5) Business Days to review such information.  After review of the requested information as set forth herein, Seller shall inform Buyer of the extent to which Seller agrees to provide indemnification to Buyer pursuant to this Agreement with respect to the potential Loss.  With respect to any potential Loss or part thereof for which Seller has communicated to Buyer that it will provide indemnification, Seller

42

shall have the right to participate in any proceedings with respect thereto and to consent to any settlement or payment with respect to the potential Loss, provided such consent may not be unreasonably withheld or delayed.

(h) Each Person entitled to indemnification hereunder shall take all reasonable steps to mitigate all losses, costs, expenses and damages after becoming aware of any event which could reasonably be expected to give rise to any losses, costs, expenses and damages that are indemnifiable or recoverable hereunder or in connection herewith.

(i) All indemnification payments made hereunder shall be treated by all parties as adjustments to the Actual Purchase Price.

(j) Notwithstanding anything to the contrary contained in this Section 11.02, there shall be no recovery for any Loss or alleged Loss by the Buyer under this Section 11.02, and the Loss shall not be included in meeting the stated thresholds hereunder, to the extent such item has been included in the calculation of the Net Working Capital Amount or the Indebtedness Payoff Amount as determined pursuant to Section 2.04 hereof.

(k) Seller will indemnify each Buyer Indemnified Party for Losses resulting from such Buyer Indemnified Party's Remediation of Pre-Closing Environmental Conditions to the extent such Remediation is reasonably necessary in order to (1) comply with Environmental Requirements or (2) resolve Third Party Claims for Environmental Liabilities. With respect to claims for indemnification pursuant to this Section 11.02(k) (and in addition to the other provisions of Sections 11.02):

(i) Seller's obligation to indemnify Buyer will be limited to those commercially reasonable costs and expenses actually incurred by Buyer for Remediation;

(ii) Seller will not be responsible for costs and expenses (A) incurred by Buyer, except to the extent required by an Environmental Requirement, in conducting investigations of conditions involving the Real Property, unless and only to the extent such investigations result in the discovery of a Pre-Closing Environmental Condition for which Remediation is reasonably necessary in order to comply with an Environmental Requirement, or (B) for Remediation to the extent such Remediation addresses conditions at the Real Property resulting from events (including Releases of Hazardous Materials) at the Real Property after the Closing Date; and

(iii) Buyer will: (A) keep Seller reasonably informed of Remediation activities (including letters, notices, investigations, studies, meetings and other communications with Governmental Authorities); (B) provide Seller and its advisors reasonable advance opportunity to review and comment, and consult with Seller, concerning the scope, and before and during the performance, of Remediation activities, and Buyer, the Company and its Subsidiaries shall, in good faith, reasonably consider Seller's and its advisors' comments and recommendations with respect thereto; (C) provide Seller and its advisors the opportunity to participate in any meetings or other direct communications with Governmental Authorities; and (D) provide to Seller reasonable access both to documents that are relevant to Remediation activities

43

(including providing upon receipt all reports, analyses, studies, test results and other similar information and materials) and to Real Property that is the subject of Remediation activities. Any decisions made concerning Remediation activities shall remain the sole discretion of the Buyer. In addition, Seller agrees to be bound by such reasonable confidentiality restrictions as Buyer may request with respect to any documents relevant to Remediation activities that Buyer provides to Seller pursuant to this Section 11.02(k)(iii). Subject to the foregoing, following the Closing the Company may undertake environmental sampling upon the Owned Real Property located at 501 East Purnell Street, Lewisville, Texas (the "Texas Rack Plant Property") in order to determine the extent to which any Pre-Closing Environmental Condition is required to be Remediated to comply with an Environmental Requirement. Following such sampling, the Company expects to communicate with the Texas Commission on Environmental Quality (the "TCEQ") and, in conjunction with the TCEQ, to develop and implement any measures required to Remediate any Pre-Closing Environmental Condition at the Texas Rack Plant Property, including any additional sampling that may be required. In order to address any Pre-Closing Environmental Condition of the Texas Rack Plant Property in conjunction with the TCEQ, the Company expects that it may be appropriate to submit to the TCEQ any prior sampling results, environmental reports and other documents prepared with respect to the Texas Rack Plant Property at any time prior to the Closing, and the Company fully reserves the right to do so.

### Section 11.03 Limitation of Recourse.

(a)     The indemnification provided by Section 11.02(a) and Section 11.02(k) shall be the sole and exclusive remedy for any Losses of the Buyer, the Company or any Subsidiary with respect to any misrepresentation or inaccuracy in, or breach of, any representations or warranties or any breach or failure in performance of any covenants or agreements made by the Company or the Seller in this Agreement or in any exhibit or schedules hereto or any certificate delivered hereunder (including expenses awarded pursuant to Section 12.09 hereof). Notwithstanding anything to the contrary herein, other than with respect to Losses arising from a breach of the Basic Representations, recovery from the Escrow Account, solely to the extent of the Escrow Amount pursuant to the terms of Section 11.02(a) and Section 11.02(j) and the Escrow Agreement constitute a Buyer Indemnified Party's sole and exclusive source of funds for payment of the indemnification provided by the Seller in Section 11.02(a) and Section 11.02(j) and for any other Losses or other claims relating to or arising from this Agreement or in connection with the transactions contemplated hereby or any exhibit, Schedule or certificate delivered hereunder (including expenses awarded pursuant to Section 12.09 hereof), and the Buyer Indemnified Parties shall have no recourse to or remedy against the Seller for any such indemnification or any other Loss.

(b)     No claim shall be brought or maintained by the Buyer, the Company or any Subsidiary or their respective successors or permitted assigns against any officer, director, employee (present or former) or Affiliate of any party hereto which is not otherwise expressly identified as a party hereto, and no recourse shall be brought or granted against any of them, by virtue of or based upon any alleged misrepresentation or inaccuracy in or breach of any of the representations, warranties or covenants of any party hereto set forth or contained in this Agreement or any exhibit or schedule hereto or any certificate delivered hereunder.

011107.0108\393259.18

## ARTICLE 12
## MISCELLANEOUS

**Section 12.01 Notices.** All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to the Company (after the Closing) or to the Buyer, then to:

> Unarco Material Handling, Inc.
> c/o The Renco Group, Inc.
> 30 Rockefeller Plaza
> New York, NY 10112
> Attn:  Gary Slater
> Fax:  (212) 541-6197

with copies to (which copies shall not constitute notice):

> Cadwalader, Wickersham & Taft LLP
> One World Financial Center
> New York, NY 10281
> Attn:  Mike Ryan
> Fax:  (212) 504-6666

or, if to the Company (before the Closing) or the Seller, then to:

> KIC Holdings, Inc.
> 501 E. Purnell Road
> Lewisville, TX 75057
> Attn:  Jim Levine
> Fax:  (972) 436-7901

with copies to (which copies shall not constitute notice):

> American Capital Strategies, Ltd.
> 505 Fifth Avenue, 26th Floor
> New York, NY 10017
> Attn:  Craig Moore
> Fax:  (212) 213-2060

and

> American Capital Strategies, Ltd.
> Two Bethesda Metro Center, 14th floor
> Bethesda, MD  20814
> Attn:  Compliance Officer
> Fax:  (301) 659-6714

45

and

> Patton Boggs LLP
> 2001 Ross Ave., Suite 3000
> Dallas, Texas 75201
> Attn:  Fred S. Stovall
> Fax:   (214) 758-1550

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received on a Business Day in the place of receipt prior to 5:00 p.m. in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

### Section 12.02 Amendments and Waivers.

(a)    Except as otherwise provided herein, any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)    No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

### Section 12.03 Construction; Severability.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any Person.  The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions hereof.  In the event a subject matter is addressed in more than one representation and warranty in Article 3, the Buyer shall be entitled to rely only on the most specific representation and warranty addressing such subject matter.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law or regulation, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law or regulation, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.  Unless otherwise indicated, references in this Agreement to $ or dollars are to U.S. dollars.

### Section 12.04 Expenses.  Except as otherwise provided herein, each party shall pay all of its own fees, costs and expenses (including, without limitation, fees, costs and expenses of legal counsel, investment bankers, brokers or other representatives and consultants and appraisal fees, costs and expenses) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of its obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby; provided that the Buyer shall pay any and all expenses relating to surveys, title insurance, and any other filings and consents required in connection with the transactions

46

contemplated by this Agreement. For the avoidance of doubt, any such cost or expense of the Company or any Subsidiary shall be borne by the Seller. Notwithstanding the foregoing, to the extent the Seller requests that the Company pay at or after the Closing any fees, costs or expenses for which the Seller is liable pursuant to this Section 12.04 ("Seller Transaction Expenses"), then such Seller Transaction Expenses shall be paid by the Company when due and there shall be a downward adjustment to the Net Working Capital Amount equal to the amount of such Seller Transaction Expenses to be paid by the Company at or after the Closing.

Section 12.05 Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto, except that following the Closing, the Seller may assign, delegate or otherwise transfer any of its rights to one or more of its Affiliates.

Section 12.06 Governing Law. All issues and questions concerning the construction, validity, interpretation and enforceability of this Agreement and the exhibits and schedules hereto shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

Section 12.07 Jurisdiction. Except as otherwise expressly provided in this Agreement, any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the United States District Court for the Southern District of New York or any New York state court sitting in New York County, New York, and each of the parties hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient form. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 12.01 shall be deemed effective service of process on such party.

Section 12.08 Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 12.09 Prevailing Party. If any litigation or other court action, arbitration or similar adjudicatory proceeding is commenced by any party hereto to enforce its rights under this Agreement against any other party, all fees, costs and expenses, including, without limitation, reasonable attorneys fees and court costs, incurred by the prevailing party in such litigation, action, arbitration or proceeding shall be reimbursed by the losing party; provided, that

47

if a party to such litigation, action, arbitration or proceeding prevails in part, and loses in part, the court, arbitrator or other adjudicator presiding over such litigation, action, arbitration or proceeding shall award a reimbursement of the fees, costs and expenses incurred by such party on an equitable basis.

Section 12.10 **Counterparts; Third Party Beneficiaries**. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto. Except as otherwise specifically set forth herein, no provision of this Agreement is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

Section 12.11 **Entire Agreement**. This Agreement and the documents referred to herein (including the Confidentiality Agreement) contain the complete agreement between the parties hereto and supersede any other prior understandings, agreements or representations by or between the parties, written or oral, which may have related to the subject matter hereof in any way.

Section 12.12 **American Capital Guarantee**.

(a)    American Capital hereby unconditionally and irrevocably guarantees the obligations of Seller under Section 11.02(a) hereof in connection with any amounts that may be payable to Buyer thereunder in connection with Losses arising from a breach of the Basic Representations to the extent that such Basic Representations relate to American Capital; provided, however, that American Capital's maximum liability under this Section 12.12(a) shall be limited to its pro rata share of the Actual Purchase Price based upon the number of Shares held by American Capital relative to the total number of Shares prior to the contribution of such Shares to the Seller in connection with the transactions contemplated by this Agreement.

(b)    American Capital hereby unconditionally and irrevocably guarantees the obligations of Seller under Section 2.04(b)(ii) hereof in connection with any amounts that may be payable to Buyer thereunder that are not paid by Seller as set forth herein; provided, however, that American Capital's maximum liability under this Section 12.12(b) shall be limited to $5,000,000; provided further, however, that the guarantee set forth in this Section 12.12(b) shall expire and be of no further force and effect five (5) Business Days after the amount (if any) required to be paid to Buyer pursuant to Section 2.04(b)(ii) is paid in full.

\*    \*    \*

011107.0108\393259.18

IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed either individually or by their respective authorized officers as of the day and year first above written.

**COMPANY:**

KIC HOLDINGS INC.

By: _____
Name: _____
Title: _____

**SELLER:**

KINGWAY INCA CLYMER HOLDINGS INC.

By: _____
Name: _____
Title: _____

**BUYER:**

UNARCO MATERIAL HANDLING, INC.

By: _____
Name: _____
Title: _____

**GUARANTOR:**

AMERICAN CAPITAL STRATEGIES, LTD., solely with respect to Section 12.12 hereof

By: _____
Name: _____
Title: _____

*Signature Page to Securities Purchase Agreement*

IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed either individually or by their respective authorized officers as of the day and year first above written.

**COMPANY:**

KIC HOLDINGS INC.

By:_____
Name:_____
Title:_____

**SELLER:**

KINGWAY INCA CLYMER HOLDINGS INC.

By:_____
Name:_____
Title:_____

**BUYER:**

UNARCO MATERIAL HANDLING, INC.

By: _____
Name: JOHN R. ENGEL, JR.
Title: VICE PRESIDENT

**GUARANTOR:**

AMERICAN CAPITAL STRATEGIES, LTD.,
solely with respect to Section 12.12 hereof

By:_____
Name:_____
Title:_____

*Signature Page to Securities Purchase Agreement*

IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed either individually or by their respective authorized officers as of the day and year first above written.

COMPANY:

KIC HOLDINGS INC.

By:_____
Name:_____
Title:_____

SELLER:

KINGWAY INCA CLYMER HOLDINGS INC.

By:_____
Name:_____
Title:_____

BUYER:

UNARCO MATERIAL HANDLING, INC.

By:_____
Name:_____
Title:_____

GUARANTOR:

AMERICAN CAPITAL STRATEGIES, LTD.,
solely with respect to Section 12.12 hereof

By:_____
Name:_ Craig Moore _____
Title:_ Senior Vice President _____

*Signature Page to Securities Purchase Agreement*

Exhibit A

Definition of Net Working Capital

For purposes of the Agreement, "Net Working Capital" means, without duplication and subject to the exclusions set forth below, the book value of the Company's and each Subsidiary's current assets minus the book value of the Company's and each Subsidiary's current liabilities; provided that the following items shall be excluded from (i.e., assigned a value of zero) for purposes of calculating Net Working Capital:

    (i)     Cash, and

    (ii)    Indebtedness.

Net Working Capital shall be determined on a consolidated basis in accordance with the accounting principles and methods used in the preparation of the Reference Balance Sheet and GAAP. Annex I attached to this Exhibit A sets forth an example calculation of Net Working Capital.

Illustrative Example of Calculation of Net Working Capital

   This illustrative example of the calculation of Net Working Capital is provided for purely illustrative purposes only and shall not be a representation, warranty, covenant or agreement that the amounts set forth below represent the actual financial condition or results of business operations of the Company or any Subsidiary.

| | |
|---|---:|
| Net Accounts Receivable | $14,595,000 |
| Net Inventory | 4,747,000 |
| Prepaid Expenses | 461,000 |
| **Total Current Assets** | **$19,803,000** |
| | |
| Accounts Payable-Trade | ($12,790,000) |
| Accrued Expenses & Other Liabilities | (2,373,000) |
| Unearned Revenue | (752,000) |
| **Total Current Liabilities** | **($15,915,000)** |
| | |
| **Example Net Working Capital Amount** | **$3,888,000** |

Form of Escrow Agreement

*See attached.*

# PRICEWATERHOUSECOOPERS 🅾

**PricewaterhouseCoopers LLP**
1301 K Street NW, Suite 800W
Washington DC 20005-3333
Telephone (202) 414 1000
Facsimile (202) 414 1301

February 12, 2008

**Private and Confidential**

Kingway Inca Clymer Holdings, Inc.           Unarco Material Handling, Inc.
c/o Mr. John Massaro                         c/o Mr. Paul Neal
Arnold & Porter LLP                          701 16th Avenue East
555 Twelfth Street, NW                       Springfield, TN 37172
Washington, DC 20004

Re: **Kingway Inca Clymer Holdings, Inc. and Unarco Material Handling, Inc. (the "Parties") - Post Closing Adjustment Dispute**

To the Parties:

Pursuant to our engagement letter dated October 5, 2007, we are providing the decision on the disputed items summarized in the Statements of Position submitted by the Parties as of October 23, 2007. These disputed items arose out of the Securities Purchase Agreement by and among Kingway Inca Clymer Holdings, Inc., KIC Holdings Inc., Unarco Material Handling, Inc., and American Capital Strategies, Ltd. dated as of March 9, 2007.

**Definition of Terms**

References to the Parties and the underlying transaction between the Parties will be made in the following manner:

- Kingway Inca Clymer Holdings, Inc. shall be referred to as the "Seller."
- Unarco Material Handling, Inc. shall be referred to as the "Buyer."
- Seller and Buyer shall be referred to collectively as the "Parties."
- The Securities Purchase Agreement by and among Kingway Inca Clymer Holdings, Inc., KIC Holdings Inc., Unarco Material Handling, Inc., and American Capital Strategies, Ltd. dated as of March 9, 2007 shall be referred to as the "Agreement."
- Capitalized terms not otherwise defined shall have the meaning set forth in the Agreement.

Our Services were performed and the decision was developed in accordance with our engagement letter dated October 5, 2007, subject to the terms and conditions included therein, and with Standards for Consulting Services established by the American Institute of Certified Public Accountants ("AICPA"). Accordingly, we are providing no attestation or other form of assurance with respect to our work, and we did not verify or audit any information provided to us.

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

# PRICEWATERHOUSE(COOPERS 🏢

Kingway Inca Clymer Holdings, Inc.
Unarco Material Handling, Inc.
February 12, 2008
Page 2

Our work was limited to the specific procedures and analysis described herein and was based only on the information made available through December 17, 2007. Accordingly, changes in circumstances after this date could affect the findings outlined in this Report.

This information has been prepared solely for the use and benefit of, and pursuant to a client relationship exclusively with, the Parties. PricewaterhouseCoopers LLP ("PwC") disclaims any contractual or other responsibility to others based on its use and, accordingly, this information may not be relied upon by anyone other than the Parties.

Our services did not include the provision of legal advice and PwC makes no representations regarding questions of legal interpretation.

**Summary of Decision**

The Actual Purchase Price is $2,808,691. As of October 23, 2007, the Buyer and the Seller submitted Actual Purchase Price amounts of $858,842 and $4,826,903, respectively. In accordance with Section 2.04 of the Agreement, the Buyer's calculation of the Actual Purchase Price was closest to the final calculation and therefore the Seller is responsible for reimbursing the Buyer for fees and expenses paid to PwC in connection with this matter.

The decisions made were based upon the information provided by the Parties via written submissions and our interpretations thereof. A summary narrative of the rationale supporting the decision is attached as Appendix A.

The decision has been prepared solely in connection with the Post Closing Adjustment Dispute between the Parties and is not intended for reliance in any other context.

There being no other matters to be addressed at this time, this correspondence concludes our performance in this matter. We thank you for allowing PwC to assist you in resolving this dispute.

Sincerely,

J. Christopher Porhecz
Partner

Attachment

**Kingway Inca Clymer Holdings, Inc.**
**and**
**Unarco Material Handling, Inc.**

**Appendix A**

**Decision of PwC**

**February 12, 2008**

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

**Background and Context**

PricewaterhouseCoopers LLP ("PwC"), through its partner J. Christopher Forhecz, was selected by the Parties to make a decision with respect to certain unresolved differences regarding the Actual Purchase Price as calculated by the Buyer in the Draft Computation and the Seller in the Objection Notice. The Post Closing Adjustment dispute arises under Section 2.04 of the Agreement dated as of March 9, 2007.

In conducting this effort, Mr. Forhecz, working with the assistance of PwC personnel, received information on the details of this dispute from the Parties. This information included thousands of pages of material submitted by the Parties. Mr. Forhecz and his team also requested additional information from the Parties. After having considered this material, Mr. Forhecz arrived at decisions on each of the items in dispute as indicated below.

**Summary of Unresolved Differences**

The Parties submitted their Statements of Position to PwC on October 23, 2007 describing their unresolved disagreements. Pursuant to Section 2.04 of the Agreement, and having read and analyzed the Parties' submissions, a determination has been made with respect to each of the seven disputed items which the Parties were unable to resolve. These disputed items included six items which affected the calculation of Net Working Capital as detailed below.

| | |
|---|---:|
| Allowance for Doubtful Accounts | $133,401 |
| Trade Show Expenses | 125,457 |
| Accrued Vacation | 343,639 |
| Petsmart Claim | 19,596 |
| WISE Installation | 28,000 |
| Accrued Sales Tax, Penalties and Interest | 3,317,608 |
| Total | $ 3,967,701[1] |

**Summary of Decision**

Consistent with the issues raised by the Buyer with respect to the Allowance for Doubtful Accounts, Trade Show Expenses, Accrued Vacation, and the WISE Installation accrual, a decision has been reached in favor of the Buyer.

---

[1] Note: The sum of the disputed items is $360 less than the difference between the Parties' calculations of the Actual Purchase Price because the Seller rounded the amount of the disputed Accrued Vacation item in its October 23, 2007 submission.

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

Consistent with the objection raised by the Seller with respect to the PetSmart Claim, a decision has been reached in favor of the Seller.

In addition, a liability for sales taxes and interest in the amount of $1,387,355 should be included in Accrued Expenses and Other Liabilities as of March 30, 2007.

With respect to the dispute regarding the Estimated Purchase Price, the Estimated Purchase Price has been determined to be $5,571,379.

Lastly, it has been determined that the Actual Purchase Price is $2,808,691. The following summarize our calculation of the Actual Purchase Price and information related thereto.

| | |
|---|---:|
| Net Accounts Receivable | $10,536,543 |
| Net Inventory | 5,406,822 |
| Prepaid Expenses | 377,025 |
| Total Current Assets | 16,320,390 |
| | |
| Accounts Payable | 11,814,481 |
| Accrued Expenses & Other Liabilities | 3,739,686 |
| Unearned Revenue | 109,146 |
| Total Current Liabilities | 15,663,313 |
| | |
| Actual Net Working Capital | $657,077 |
| | |
| | |
| Transaction Value | $40,000,000 |
| Plus Cash Amount | 67,573 |
| Less, Indebtedness Payoff Amount | 31,773,462 |
| Less, Closing Management Bonuses | 2,242,497 |
| Less, Excess of Target Net Working Capital over Actual Net Working Capital | 3,242,923 |
| Actual Purchase Price | $2,808,691 |

## Section 2.04 - The Post-Closing Adjustment Process

Section 2.04 of the Agreement contains the framework by which PwC is to assist the Parties in resolving any remaining disagreements that the Buyer and Seller are unable to resolve after submission of the Draft Computation and the Objection Notice. Section 2.04 states in part that "The Firm may consider only those items and amounts in the Draft Computation or Objection Notice which the Buyer and Seller are unable to resolve." PwC addressed the items that were submitted by the Parties where they were not in agreement.

PwC's role is defined as that of an expert and not as an arbitrator in conducting its analysis. The Parties selected PwC, through its partner, Mr. Forhecz, as the expert in this matter. Mr. Forhecz was assisted by other personnel within PwC as stated in our engagement letter.

Section 2.04 limits the expert to assigning a value to an item in dispute to no greater than the greatest value for such item claimed by either party or no less than the smallest value for

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

such item claimed by either party. The determinations made are in compliance with this provision.

The determinations made are based solely on written submissions by the Buyer and the Seller and on the definitions included in the Agreement. An independent review was not conducted and PwC makes no representation as to the accuracy or reliability of the information presented by the Buyer and Seller.

The Actual Purchase Price was determined based on the information provided by the Parties as adjusted for resolution of the items in dispute. The Actual Purchase Price is defined in Section 2.04 as follows:

> " 'The Actual Purchase Price' means an amount equal to (A) the Transaction Value, (B) plus the Cash Amount, (C) less the Indebtedness Payoff Amount, (D) less the Closing Management Bonuses, and (E) plus the excess of the Net Working Capital Amount over the Target Net Working Capital Amount or minus the excess of the Target Net Working Capital Amount over the Net Working Capital Amount, in each case as finally determined pursuant to this Section 2.04."

Until the Actual Purchase Price is determined, the costs and expenses of PwC are to be borne equally by the Buyer and the Seller. Upon final determination of the Actual Purchase Price, any costs and expenses (including costs and expenses previously advanced) of PwC that are allocable to the party whose determination of the Actual Purchase Price (at the time of submission of the respective determinations to PwC for resolution pursuant to Section 2.04 (a) of the Agreement) was closest to final determination of the same shall be paid or reimbursed by the other party.

**General Matters**

There are several general matters that are discussed below in order to avoid repeating such discussion for each relevant objection.

*Consistency v. GAAP*

The following definition of Net Working Capital is included in Exhibit A to the Agreement.

> "For purposes of the Agreement, 'Net Working Capital' means, without duplication and subject to the exclusions set forth below, the book value of the Company's and each Subsidiary's current assets minus the book value of the Company's and each Subsidiary's current liabilities; provided that the following items shall be excluded from (i.e., assigned a value of zero) for purposes of calculating Net Working Capital:
>
> (i) Cash, and
>
> (ii) Indebtedness.
>
> Net Working Capital shall be determined on a consolidated basis in accordance with the accounting principles and methods used in the preparation of the Reference Balance Sheet and GAAP."

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

Section 1.01 to the Agreement states "GAAP means United States generally accepted accounting principles, consistently applied."

Section 1.01 to the Agreement defines Reference Balance Sheet as "'Reference Balance Sheet' means the audited consolidated balance sheet of the Company and the Subsidiaries as of December 31, 2005 contained in the Audited Financial Statements."

Section 3.09 Financial Statements to the Agreement under 3.09(b) contains the following language concerning GAAP and consistency.

> "The Audited Financial Statements have been prepared in accordance with GAAP applied consistently during the periods covered thereby, and present fairly in all material respects the financial condition of the relevant entities at the dates of said statements and the results of their operations and cash flows for the periods covered thereby. The Unaudited Financial Statements have been prepared in accordance with GAAP applied consistently during the period covered thereby, and present fairly in all material respects the financial condition of the Company and the Subsidiaries at the date of such statements and the results of their operations and cash flows for the period covered thereby, except that they do not contain the materials and disclosures to be found in notes to financial statements prepared in accordance with GAAP."

The Parties agreed that the definition of GAAP under the Agreement is United States generally accepted accounting principles consistently applied. As stated above, the Reference Balance Sheet (which is the audited consolidated balance sheet as of December 31, 2005) has been prepared in accordance with GAAP consistently applied.

In situations where elements of Net Working Capital were not prepared in accordance with GAAP, Net Working Capital must be adjusted to comply with GAAP. The Agreement states that GAAP must be consistently applied to both the Reference Balance Sheet and the determination of Net Working Capital as of the Closing Date, March 30, 2007. The Agreement executed by the Parties does not state, however, that the accounting principles and procedures used in preparing the Reference Balance Sheet should be changed when determining any adjustments to Net Working Capital as of March 30, 2007. In evaluating whether any adjustments to Net Working Capital were required, we identified situations in which the treatment of an account in the computation of Net Working Capital appeared to not be in accordance with GAAP. In those situations, the required adjustment is based on a treatment for some accounts that differs from the treatment of the same accounts in the Reference Balance Sheet. While accounts that were recorded in accordance with GAAP in the Reference Balance Sheet must be recorded using the same accounting methods, policies, practices and principles in the determination of Net Working Capital, accounts that were not recorded in accordance with GAAP must be adjusted to reflect appropriate treatment under GAAP. The Parties agreed to use GAAP and GAAP has priority over consistency. Had the Parties agreed to only use the accounting principles and methods used in the preparation of the Reference Balance Sheet in the determination of Net Working Capital, they could have chosen to exclude the words "and GAAP" when agreeing to the criteria for determining Net Working Capital as of the Closing Date.

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

*Materiality*

The determination of whether the Draft Computation has been prepared in accordance with GAAP requires an evaluation of each objection along with an assessment of materiality.

FASB Statement of Financial Accounting Concepts No. 2 defines materiality as:

> "The magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or statement."

The evaluation of materiality involves consideration of both quantitative and qualitative matters.

In evaluating the Draft Computation and the Objection Notice, one of the most significant considerations is that potential misstatements are being evaluated in connection with a buy/sell agreement and that any adjustments granted result directly in a dollar for dollar adjustment to the purchase price. As a result, users of this special purpose computation could be expected to place a lower threshold on matters that may not be considered material for annual financial reporting purposes. Quantitatively, this is evidenced by the Buyer's and the Seller's objections which range from $19,596 to $3,317,608.

The determination was based on an analysis of the individual merits of each of the objections submitted by the Buyer and the Seller. We concluded that *all* of the objections should be addressed regardless of amount. Consequently, the Actual Purchase Price should be adjusted for the objections granted. In addition, we found no support within the Agreement that there was an agreed upon materiality test or exclusion for any possible adjustments. ·

*GAAP for Year End Reporting and Interim Reporting*

Interim versus year-end reporting is an issue that is often raised in buy/sell agreements. Because most companies apply more rigorous and in-depth closing procedures at year-end, the question arises as to what procedures will be used in closing the transaction when an audited year-end financial statement is used as the reference point in negotiating deal terms and the closing is at an interim date. Absent specific provisions in a buy/sell agreement, the financial information prepared at an interim date should follow the same principles and practices at year-end (also see discussion of Consistency v. GAAP above).

The period January 1, 2007 to March 30, 2007 is a discrete accounting period for purposes of this transaction. While March 30, 2007 is not a year end date for financial reporting purposes, *it is the final closing date for the buy/sell transaction resulting in an exchange of ownership interests for monetary consideration.*

An issue has been raised concerning the application of accounting guidance when the guidance contains specific language on non-applicability to interim financial information and refers to Accounting Principles Board Opinion 28 ("APB 28") *Interim Financial Reporting* as the appropriate guidance.

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

APB 28 paragraphs 9 and 10 provide guidance on the use of interim financial information and the relationship to annual financial information.

> "9. Interim financial information is essential to provide investors and others with timely information as to the progress of the enterprise. The usefulness of such information rests on the relationship that it has to the annual results of operations. Accordingly, the Board has concluded that each interim period should be viewed primarily as an integral part of an annual period.

> 10. In general, the results for each interim period should be based on the accounting principles and practices used by an enterprise in the preparation of the latest annual financial statements unless a change in an accounting practice or policy has been adopted in the current year (paragraphs 23-29). However, the Board has concluded that certain accounting principles and practices followed for annual reporting purposes may require modification at interim reporting dates so that the reported results for the interim period may better relate to the results of operations for the annual period. Paragraphs 12-20 set forth the modifications that are necessary or desirable at interim dates in accounting principles and practices followed for annual periods."

The additional paragraphs of ABP 28 referenced in paragraph 10 address the practical aspects of dealing with the complexities of determining and reporting interim financial information. However, the overarching principle is that the results for each interim period should be based on the accounting principles and practices used by an enterprise in the preparation of its latest annual financial statements. APB 28 provides for a reasonable basis of allocation of costs among periods. It does not provide justification for changing accounting principles and practices that are inconsistent with those used in the preparation of the annual financial statements absent a change in accounting principle during the interim period.

### Discussion of Disputed Items

*Accrued Sales Tax*

The Parties disagree over whether a liability for accrued sales tax should have been recorded as of March 30, 2007. The Buyer stated that the Company was required to file and remit sales and use taxes in accordance with state law under certain circumstances. The Seller stated that no amount of sales tax liability was probable and reasonably estimimable as of the Closing Date. The Parties have submitted a substantial amount of supporting documentation and analysis on this subject, including submissions by third party professionals experienced in analyzing sales and use tax matters.

The Buyer included an entry not previously recorded by Seller for "Accrued sales tax" in the amount of $4,732,213 in the Draft Computation. This amount represented Buyer's estimate of total sales tax due for all locations for the calendar years 2004 through 2006 in the amount of $3,863,693, plus an estimate of applicable interest in the amount of $624,770 and of professional fees to be paid to its accountants to perform sales tax voluntary disclosures in the amount of $243,750.

Buyer's estimate of total sales tax due as presented in its Draft Computation was based upon several assumptions, including but not limited to the following:

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

1.  The Company would perform voluntary disclosures in all states and that, accordingly, the liability period would be limited to a three-year "lookback" period and all penalties would be abated;

2.  Several customers were identified as distributors of the Company's products, which were likely to qualify for a resale exemption and, regardless of whether appropriate exemption documentation had been obtained from such customers, 85 percent of all sales to the identified customers were considered exempt;

3.  Sales to certain large customers, e.g., Wal-Mart, based on prior experience with those customers, were not considered to have a sales tax liability under the assumption that such customers self-assessed use tax and thereby satisfied the liability.

Buyer calculated an error rate for each location and state. The error rates were then applied to actual sales by state for each year. Buyer then applied simple interest calculations utilizing state tax interest rates obtained from readily available reference materials. Buyer revised its estimate of accrued sales tax liability to $3,317,608 in its October 23, 2007 Statement of Position.

The Seller objected to Buyer's estimated sales tax liability in its entirety and raised the following fundamental points:

1.  No amount of sales tax liability was probable and reasonably estimable as of March 30, 2007 ("Closing Date") as required by FAS 5 ("Accounting for Contingencies") and as a result of management's consideration of the facts, circumstances and Company history and experience no accrual is necessary.

2.  The Company has a right of subrogation (ability to "backbill") against customers for any sales tax liability ultimately determined to be due.

3.  The Buyer made a number of methodological errors in calculating the accrued sales tax liability, including the following:

    *   Buyer used a biased sample in its liability-projection methodology and misapplied that methodology when it failed to analyze Georgia location transactions for the first four months of 2006;

    *   Buyer failed to consider all customers that are distributors and Buyer should have exempted all sales to known distributors;

    *   Where it concluded transactions were taxable, Buyer failed to consider potential exemptions that could be claimed by a customer; or payment and satisfaction of the tax liability by the customer through self-assessment or audit;

    *   Buyer failed to conduct a proper study of certain high-dollar customers, including resale and use tax self assessment considerations;

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

- Buyer failed to consider and give credit for sales tax paid on tax returns filed with state jurisdictions;

- Buyer improperly included immaterial sales tax liability amounts;

- Buyer erroneously disallowed certain exemption documentation;

- Buyer's reliance entirely upon the Sales Tax Nexus and Sales Tax Liability Assessment performed by BDO Seidman, LLP ("BDO") is inappropriate to determine that nexus is established in all states, and that BDO's liability range was accurate, given that the report failed to incorporate other liability-reducing factors, including some of Seller's arguments above, and the analysis was incomplete, as BDO stated.

- Buyer incorrectly assumes that the Seller would be liable for the entire "lookback" period under a voluntary disclosure given that the "lookback" period would, based upon the current date, include periods subsequent to the Closing Date;

- Buyer's adjustments to its liability calculation that occurred subsequent to the 60-day deadline for the Draft Computation are improper under the Agreement terms and/or under general sales tax and accounting principles. Such adjustments include the addition of failure to file penalties to all liability amounts and the addition of liability associated with Wal-Mart transactions previously excluded under the assumption that Wal-Mart self-assessed tax;

- Buyer failed to consider the amnesty relief available in several states under the Streamlined Sales Tax program;

- Buyer erred in applying a 100 percent error rate to pre- and post- 2006 years' sales for states where there were no sales in 2006 and Buyer was, consequently, unable to compute an error rate through its chosen sampling procedures; and

- Buyer failed to give credit for tax paid by the Georgia location and the Texas location during Mississippi audits where the audit period ran through 2004.

PwC considered the material that was presented by the Parties and their respective points of view on the matters noted above.

Where sales tax has been collected from customers in trust for a state and not remitted, it is clear that the tax amount due constitutes a liability under GAAP. It is less clear that there is a liability when there is a question of whether sales tax is imposed upon a particular type of transaction (e.g., certain service transactions) or whether a transaction actually qualifies for the claimed exemption. These types of transactions may be appropriately classified as "uncertainties" under FAS 5 depending on the specific facts and circumstances. The application of whether a transaction creates a liability or a loss contingency under GAAP is not always readily determinable.

The Parties agree that the Company's sales should be treated as the sale of tangible personal property. The sale of tangible personal property is generally taxable in all states that impose a sales tax in the absence of an exemption claimed by the customer. In

This Information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

addition, a seller is generally required to collect documentation in support of exemptions claimed by a customer. In the absence of such documentation, the sales are generally presumed taxable by state taxing jurisdictions. Tax due is to be remitted on a voluntarily basis and is subject to further enforcement through audit. When determining the appropriate accounting treatment under GAAP, such an obligation should be considered without regard to audit detection risk.

Under the Company's facts and circumstances as presented by the Parties, an accrual for sales tax liability should be recorded as of the Closing Date. There are a number of ways that the Company can calculate an estimate for the accrued sales tax liability, including performing detailed analyses, projecting liability through sampling, utilizing reasonable assumptions supported by historical business activity, general business/industry considerations, state statutes and voluntary disclosure programs.

The following information addresses the major points raised by the Parties in their submissions:

1.  The Buyer performed sufficient diligence in support of its assumption that the Company had established nexus in states where sales were made. Based upon the nature of Company's business, including installation work, the existence of a direct sales force and Buyer's subsequent diligence including review of invoices for installation services performed and sales personnel expense reports, Buyer's nexus assumptions are reasonable. In support of this conclusion, Buyer has also submitted documentation that indicates that, beginning in late 2002 and 2003, the Company's sales force was restructured to cross-sell for the benefit of all Company's locations. Under general sales tax nexus principles, even though expense reports would indicate that sales personnel are being reimbursed by one location, state jurisdictions are likely to assert that the nexus-creating activities of a company's sales force are attributable to all company locations.

2.  An Adjustment to the Sales Tax Liability, including complete elimination of such liability, is not warranted under the Company's potential Rights of Subrogation. In our experience, upon failure to collect sales tax from customers at the time of sale and original invoicing, business considerations, including customer relationship concerns, generally control the determination of whether a business will attempt to backbill sales taxes at a point in time, years after the transactions have occurred. Companies rarely are successful in attempts to backbill customers for various commercial reasons. Seller's assertion that the Company engaged in a limited occurrence of backbilling, with limited results and with significant time and effort according to Buyer, does not provide a compelling justification for an expectation that the Company should or would engage in successful backbilling of tax.

3.  Buyer utilized a common, reasonable and generally accepted sampling methodology to estimate the liability amount. State taxing authorities often use block sampling to assess tax liabilities and typically will select only two to three monthly periods and project the results over a three to four year period. The sample selected by the Buyer is greater than the sample size likely employed by state auditors to estimate a liability. While block sampling is inherently biased because each transaction does not have an equal chance of being selected and tested at random, in our experience, block sampling does not generally produce unreasonable liability estimates for this

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

purpose.

4. Buyer initially treated 85% of the Company's sales to "known distributors" as exempt in its liability estimate calculations under the assumption that exemption documentation may not have been obtainable from all distributors. During the Post Closing Adjustment process Buyer and Seller agreed on certain additional customers being classified as distributors. All sales to such distributors have been treated as exempt for purposes of the liability calculation.

*There is apparently still disagreement with respect to whether customers labeled by Seller as "TPC Distributors" are in fact distributors. Buyer's inclusion of these remaining customers as exceptions in the error-rate calculation, where documentation supporting an exemption has not been provided, is reasonable for purposes of estimating sales tax liability.*

*The Parties have, through the post closing adjustment process, made adjustments to the estimate calculation involving issues of the sufficiency/validity of certain exemption documentation and no other adjustments on those grounds are necessary.*

5. Buyer's assumption and Seller's assertions that the liability estimate should be computed based upon the assumption that Wal-Mart self-assessed use tax on its taxable purchase transactions from the Company where the Company did not remit sales tax to the state was reasonable.

It is apparent that the Buyer and Seller both have considered historical experience with Wal-Mart as support for an assumption that the Company is not likely to be ultimately liable for tax on Wal-Mart transactions because it will either be able to establish that Wal-Mart satisfied the liability or Wal-Mart will reimburse the Company for the amount of tax. Accordingly, such an assumption is reasonable. Upon review of Buyer's recent detailed liability schedules, Buyer has, in some instances reversed the position of Wal-Mart transactions and, consequently, treated such transactions as errors. Buyer has not submitted sufficient justification for the reversal of its position pertaining to this assumption to warrant a revision to the estimate.

Buyer has adjusted its liability calculations to account for sales tax collected by the Company and paid to the various states with its return filings. It is apparent that a significant amount of the tax paid to the states by the Company relates, in some cases, to Wal-Mart transactions. Because all Wal-Mart transactions will effectively be treated as a non-error, under the self-assessment assumption, an adjustment decreasing the credit for taxes paid is necessary to eliminate the double counting of Wal-Mart transactions, as both a non-error and credit for tax already paid. In the absence of sufficient detail to determine the amount of tax paid specifically *attributable to Wal-Mart, the adjustment to the credit for taxes paid is made* proportionately, based upon the percentage of total Wal-Mart sales to total taxable sales including Wal-Mart on a location-by-location and state-by-state basis.

The Parties' have not provided sufficient support for applying the assumption attributable to Wal-Mart to any other customers. Accordingly, Buyer's consideration of certain transactions as taxable without consideration of whether such customers

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

have self-assessed is reasonable.

6. Buyer has appropriately applied credit for sales tax paid on returns. In its Draft Computation, Buyer did not account for taxes paid with previously filed sales tax returns. Subsequently, Buyer adjusted its calculation and provided appropriate credit for taxes paid. As explained in the preceding paragraphs, the amount of credit applied is revised to account for sales tax likely paid on transactions involving Wal-Mart.

7. Buyer's inclusion of all sales tax liability amounts, regardless of amount, was appropriate. Seller has not provided sufficient justification in its assertion that certain state-by-state liability amounts should be excluded on a materiality basis from the liability under GAAP to warrant an adjustment to the liability estimate on that basis.

8. For purposes of the liability estimate, the relevant "lookback" period under a Voluntary Disclosure or liability period, as the case may be, is reasonably determined under the assumption of Voluntary Disclosure, where possible, the Statute of Limitations ("SOL") period, in states where tax returns have been filed continuously for several years, or the beginning liability period indicated in Buyer's Draft Computation (2004) where it is apparent that the Company locations may not qualify in certain states for a Voluntary Disclosure or the relevant SOL does not apply.

In its Draft Computation, Buyer assumed a liability exposure period of three years comprised of 2004 through 2006. The assumption was based upon the Company's general ability to qualify for formal, state-administered Voluntary Disclosure programs. Three years is the general Statute of Limitations ("SOL") and Voluntary Disclosure "lookback" period in most states. Some states have slightly longer SOL and "lookback" periods, e.g., four years. The Parties' submissions identify Company locations and states where the Company may not qualify for a voluntary disclosure. In such instances, if a Company location was consistently filing returns, the appropriate state's SOL would operate to limit liability similar to the terms of a Voluntary Disclosure. Where no filings exist, liability can extend back several years unless otherwise limited in the state statutes. In such circumstances, it is appropriate and reasonable to compute the estimate starting with the 2004 liability period used by the Buyer in its Draft Computation.

Where a specific liability is limited to three years under either an assumption that a Voluntary Disclosure is possible where the program terms limit the "lookback" period to three years or based upon the operation of the SOL where returns have been filed consistently over several years, our analysis is computed starting with January 2005. Our analysis considers the economic substance of the transactions where there is an expectation that Buyer will proactively seek to remedy the liability. If a state's SOL is applicable or the Company qualifies for a Voluntary Disclosure and the appropriate "lookback" period is four years, our analysis is computed starting with January 2004. Where neither the SOL is applicable nor the Company qualifies for a Voluntary Disclosure, our analysis is computed starting with January 2004, the starting period contained in the Buyer's Draft Computation.

Subsequent to issuing its Draft Computation, Buyer adjusted its liability calculation by extending the liability period in all instances back to 2003. Buyer has not submitted

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

sufficient justification for the reversal of its position pertaining to this assumption to warrant a revision to the estimate on this basis. Accordingly, no liability for the 2003 period is included in the liability calculation.

9.  Buyer's position that participation in the Streamlined Sales Tax Amnesty Program ("SST") should not be factored into the liability calculation is reasonable. Seller has correctly asserted that amnesty for all prior tax, penalty and interest is available in several states under the SST. The relevant states are Arkansas, Nevada, Ohio, Tennessee, Utah, and Washington. Based upon the Parties' submissions, we estimate that the potential benefit (tax and interest) associated with SST amnesty for the Georgia location, given all other considerations noted above, is $10,000, related almost entirely to the liability associated with transactions in Nevada. We further estimate that the potential benefit associated with SST amnesty for the Ohio location is $30,000, related almost entirely to the liability associated with transactions in Tennessee. Finally, we estimate that the potential sales tax benefit associated with SST amnesty for the Texas location is $70,000, related almost entirely to the liability associated with transactions in the state of Washington.

    Buyer is correct that there are costs associated with registering under the SST that must be considered. Such costs relate to administration costs associated with compliance and managing potential audits for all member states for a three-year period. Participation in SST should not increase the Company's liability. Historical liability, where amnesty is not available, is not impacted by participation in the SST. The collection of tax from customers would eliminate prospective liability. While Buyer is correct that the Company would not likely qualify for a Voluntary Disclosure in SST states if it first registered under the SST, the Company could secure Voluntary Disclosure Agreements from SST states before registering under the SST.

    Considering the above-mentioned compliance and other administrative costs of participating in the SST, which would be borne by the Buyer, and the relatively limited potential amnesty benefit, it is not reasonable to compute the liability based upon the assumption that the Company will register under the SST program.

10. The application of a 15% error rate to the Ohio Location's 2004, 2005 and 2007 sales in states where there were no 2006 sales is reasonable. In its liability estimate calculation for the Ohio Location, Buyer assumed a 100% error rate for states that had no 2006 sales (the sample period), but had sales in other years. Seller essentially asserts that, since no testing was done for the relevant states, the error rate for such states for 2004, 2005 and 2007 should be zero. We note that sales in these periods for the relevant states, are relatively insignificant. Given the existence of errors in many states, a reasonable error rate, in the absence of detailed testing, is the average error rate for the Ohio Location (taxable 2006 sales divided by total 2006 sales for states that impose a sales tax), or approximately 15 percent.

11. The inclusion of the Texas location's sales to Iron Mountain that were shipped to the State of Texas should be included in the Texas error rate calculation and eliminated from the Georgia and Illinois error rate calculations. Based upon the Parties' submissions, it is apparent that the Buyer erroneously included some of the Texas location's sales to Iron Mountain in the Georgia and Illinois error calculations. As asserted by the Seller, such sales should be part of the Texas calculation. Seller

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

asserted that sales tax was charged on invoices to Iron Mountain. Buyer has provided credit for sales taxes paid to Texas in its calculation. The credit for sales tax paid is subject to the adjustment discussed above pertaining to Wal-Mart.

12. An adjustment to the Mississippi error rates for 2004 Mississippi sales tax paid under audit is not necessary because of the application of the Voluntary Disclosure "lookback" period for the Ohio location and a zero error rate, i.e., no 2004 liability, for either the Georgia location or the Texas location. Our analysis does not include a 2004 liability associated with Mississippi sales for any of Company's locations as there is a zero error rate associated with the State of Mississippi for the Georgia and Texas locations, and there is a three-year Voluntary Disclosure "lookback" period in Ohio that begins with 2005.

13. The exclusion of failure to file penalties and anticipated expenses associated with performing Voluntary Disclosures from the estimated sales tax liability calculation is reasonable. The support for Buyer's Draft Computation shows that the estimated sales tax liability excluded the application of failure to file penalties under the assumption that the Company could pursue Voluntary Disclosures. State Voluntary Disclosure programs generally provide for the abatement of all failure to file and late filing penalties and this fact was noted by Buyer's accountants. Even where the Company is unable to participate in a Voluntary Disclosure program, negotiations with and formal requests submitted to the state both prior and subsequent to the disclosure of a sales tax liability may result in the abatement of penalties. Buyer has not submitted sufficient justification for the reversal, subsequent to the Draft Computation, of its position pertaining to the application of penalties to warrant a revision to the estimate on this basis. Accordingly, penalties are excluded from the liability calculation. Additionally, in its submissions subsequent to the Draft Computation, Buyer eliminated anticipated Voluntary Disclosure expenses from its liability calculations. Accordingly, such expenses are excluded from the liability calculation.

Decision:

An accrued sales tax liability in the amount of $1,387,355 should be recorded as of March 30, 2007.

*Accrued Vacation*

The Company had historically accrued a liability for vacation time when it vested. The Buyer proposed a post closing adjustment to record a liability in the amount of $343,639 for vacation time that was earned, but not yet vested. The Buyer stated that the Agreement requires Net Working Capital to be reported on a GAAP basis. The Buyer also stated that the appropriate GAAP for this matter is Financial Accounting Standard ("FAS") 43: Accounting for Compensated Absences.

The Seller stated that the Company's vacation policy provided for vesting of vacation benefits at the end of the period in which such benefits were earned and the Company historically recorded the liability for vacation benefits at the vesting date.

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

Seller stated that Buyer's assertion that the vacation accrual should have been recorded in accordance with FAS 43 should be rejected because:

1. Buyer would receive a windfall by changing the accounting policy after the closing date. The post closing adjustment process is intended to act as a way of truing up closing estimates.

2. Accruing vacation in accordance with FAS 43 is not required by GAAP because financial information prepared at the Closing Date would be considered interim financial information. FAS 43 does not address the allocation of costs of compensated absences to interim periods. APB 28 is applicable and costs can be expensed as incurred or allocated using estimates.

3. Buyer's estimate did not include an offset for reasonably estimable forfeitures and a change in ownership would result in significant forfeitures.

The relevant accounting guidance for recording compensated absences is FAS 43. Paragraph 6 of FAS 43 states that "An employer shall accrue a liability for employees' compensation for future absences if all of the following conditions are met:

a. The employer's obligation relating to employees' rights to receive compensation for future absences is attributable to employees' services already rendered.

b. The obligation relates to rights that vest or accumulate.

c. Payment of the compensation is probable, and

d. The amount can be reasonably estimated."

FAS 43, Paragraph 12 specifically addresses the question of whether a liability for compensated absences should be limited to those absences for which the right to receive compensation is vested and concludes that "...a liability for amounts to be paid as a result of employees' rights to compensated absences should be accrued, considering anticipated forfeitures, in the year in which earned."

As previously noted under the section entitled Consistency v. GAAP, accounts that were not recorded in accordance with GAAP must be adjusted to reflect appropriate treatment under GAAP. Also as noted under the section entitled GAAP for Year End Reporting and Interim Reporting, the Balance Sheet as of March 30, 2007 is not an interim financial statement for purposes of this transaction.

The Seller raises the point that the Buyer's computation does not include an estimate for anticipated forfeitures. The Buyer stated, in response to the Seller's criticism, that it considered estimated forfeitures and determined them to be immaterial as of the Closing Date based on the assertion by both Parties that "...the workforce was fairly stable as to the number, tenure, and pay rates of employees." However, the Seller also stated that "...In the context of a change in ownership such as this one, such an offset would be significant."

Although an estimate of forfeitures should be made when calculating the liability for compensated absences, neither Party provided an amount for estimated forfeitures. Section

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

2.04 requires the expert to make a determination without conducting an independent review. Since the Parties have not provided an estimate, the decision is based only on the information that has been provided.

Decision:

Based on the information provided by the Parties, the vacation accrual should be increased by $343,639.

*Allowance for Doubtful Accounts*

The Seller proposed that the accounts receivable allowance for doubtful accounts be reduced by $133,401 in the post closing period to be consistent with the accounting principles and methods used in the Reference Balance Sheet and GAAP. The Buyer stated that the allowance for doubtful accounts balance is reasonable on the closing balance sheet and that no adjustment should be made.

The Seller stated that the Company's historic accounting policy was not to increase its allowance for doubtful accounts for individual accounts receivable until some specific event such as a bankruptcy or a fee dispute occurred that necessitated an increase. The Seller stated that the historical policy is consistent with GAAP which prohibits general contingency reserves. Seller also noted that paragraph 23 of Financial Accounting Standard ("FAS") 5: Accounting for Contingencies states that "a creditor need not consider an insignificant delay or insignificant shortfall in amount of payments" as indicating that a loss is probable. The Seller states that the Company's judgment was that accounts receivable that were less than 90 days past due were not significantly delayed.

The total allowance for doubtful accounts as of the Closing Date was $204,240. Accounts receivable aged over 90 days totalled $70,839. The Seller stated that both the former COO and Collections Manager believe there was nothing about the amounts under 90 days old at the Closing Date which specifically identifies them as requiring an allowance. The Seller also stated that the allowance for doubtful accounts was overlooked in the period leading up to closing and should have been $133,401 lower as of the Closing Date.

The Seller noted that approximately $63,000 of receivables aged more than 90 days as of the Closing Date were those owed by one customer and that payment was received during the week of August 7, 2007.

The Buyer stated that it's review of specific Company accounts for collectibility, historical bad debt allowance ratios, credit memos and returns and allowances subsequent to the transaction date indicates that the Company recorded allowance for doubtful accounts is reasonable at 1.94% of total accounts receivable and is comparable with the allowance percentages for the past three calendar year-ends. The Allowance at December 31, 2004 was 1.72% of total accounts receivable, 1.51% at December 31, 2005 and 1.38% at December 31, 2006. The Buyer also noted that the allowance for doubtful accounts would be 0.66% of total accounts receivable if the Seller's use of only the over 90 day category amount of $70,839 was used as the allowance.

The Buyer noted that approximately $145,000 in credit memos were issued during the period March 30, 2007 through April 30, 2007 for items included in accounts receivable at March

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

30, 2007 and that Company management specifically identified another $23,000 of uncollectible amounts in the greater than 90 day aging category. The $145,000 in credit memos and the $23,000 in uncollectible receivables total $167,000 of the $204,000 allowance balance.

The Company's accounting policy for accounts receivable and the allowance for doubtful accounts is set forth in its 2005 audited financial statements (Footnotes to the Reference Balance Sheet) and states in part:

> "The Company reviews accounts receivable on a monthly basis to determine if any receivables will potentially be uncollectible in light of current economic conditions in the Company's market and the Company's historic loss trends. The Company includes any accounts receivable balances that are determined to be uncollectible, along with a general reserve, in the allowance for doubtful accounts."

FAS 5 paragraph 8 states that loss contingencies should be accrued when such losses are probable and reasonably estimable. FAS 5 paragraph 14 states that general or unspecified business risks do not meet the conditions for accrual and that no such accrual should be recorded for such risks. FAS 5 paragraph 22 contains specific guidance regarding accounts receivable and states that losses from uncollectible receivables shall be accrued when the conditions of paragraph 8 are met and that the conditions of paragraph 8 may be considered in relation to individual receivables or groups of similar types of receivables. In addition, paragraph 22 states that, if the conditions of paragraph 8 are met, accrual shall be made even though the particular receivables which are uncollectible may not be identifiable.

The accounts receivable allowance, as presented by both Parties, does not appear to be a general contingency reserve within the meaning of FAS 5. The footnote to the Reference Balance Sheet clearly disclosed the use of a general reserve for estimated uncollectible accounts in conjunction with the identification of specific accounts receivable that are determined to be uncollectible. Moreover, the guidance contained at paragraph 22 of FAS 5 clearly states that losses shall be accrued even though specifically uncollectible receivables are not identifiable.

Decision:

*An adjustment to the allowance for doubtful accounts balance at March 30, 2007 is not required.*

*Prepaid Trade Show Expenses*

The Parties do not agree on the accounting treatment for prepaid tradeshow expenses in the amount of $125,457. The Seller stated that the prepaid tradeshow expenses have future benefit and should be amortized over the 12 month period from January to December 2007. The remaining unamortized balance at March 30, 2007 is $125,457. The Buyer stated that the remaining $125,457 in unamortized tradeshow expenses were written off at March 30, 2007 in accordance with the Company's stated accounting policy for advertising costs.

The ProMat trade show is a biennial event sponsored by the Material Handling Industry of America. The Company attended the trade show in 2005 and in 2007. The expenses for the 2005 trade show were being amortized monthly over a two year period until the end of

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

2005 when the Company's auditors informed the Seller that the entire amount should be expensed in 2005. The Seller stated that the prepaid trade show expenses for 2007 were properly being amortized over a 12 month period beginning January 2007 when the trade show was held since the benefits associated with ProMat 2007 extend far beyond January 2007.

The Seller stated that Statement of Position 93-7 ("SOP 93-7"): Reporting on Advertising Costs is not applicable because the dispute relates to the accounting treatment of advertising expenses as of the Closing Date which the Seller stated is an interim period and SOP 93-7 states that it is not applicable to interim financial statements. The Seller also states that APB 28 is the applicable source of GAAP and that the deferral of advertising costs within a fiscal year is permitted by APB 28 paragraph 16(d).

The Buyer stated that the prepaid trade show expenses had been written off on the Closing Balance Sheet by Company management as of the transaction date. The Buyer also stated that the schedule of net working capital is not an interim financial statement and therefore APB 28 is not applicable to this matter and SOP 93-7 is the applicable GAAP guidance. The Buyer noted that the Company's stated policy for advertising expenses is to expense them when incurred.

The Company's accounting policy for advertising costs as described in the footnotes to the Reference Balance Sheet states that "The Company expenses advertising costs as incurred which totalled $432 and $233 for the years ended December 31, 2005 and 2004 respectively." [NOTE: amounts are in thousands.]

The relevant GAAP guidance on advertising costs is SOP 93-7. SOP 93-7 paragraph 26 states that the costs of advertising should be expensed either as incurred or the first time the advertising takes place except for direct-response advertising or expenses for advertising costs that are made subsequent to recognizing revenues related to those costs.

The facts presented by the Parties do not characterize the costs in question as "direct response advertising" inasmuch as the primary purpose of the costs does not appear to have been to elicit sales to customers who could be shown to have responded specifically to the advertising. The justification by the Seller in discussing the future economic benefits of the costs do not point to any specific sales of the Company's products, but rather speak generally to the publicity gained by the Company as a result of the trade show.

The Parties disagree as to whether SOP 93-7 or APB 28 is the authoritative guidance for the costs originally recorded as prepaid trade show expenses. The Buyer states that SOP 93-7 is the applicable guidance while the Seller states that it is not applicable because the pronouncement states at paragraph 6 that It "...does not apply to financial statements for interim periods." The Seller states the Closing Date is an interim period because the Company's fiscal year ends on December 31 and, therefore, APB 28 is the applicable guidance. The Buyer maintains that March 30, 2007 is not an interim period in that it is the closing date for the Company and the January 1 to March 30, 2007 results will not be included in the Buyer's results of operations.

Whether or not viewed as an interim period, the accounting for advertising costs should be consistent with SOP 93-7. APB 28 paragraph 15(a) states that:

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

"Costs and expenses other than product costs should be charged to income in interim periods as incurred, or be allocated among interim periods based on an estimate of time expired, benefit received or activity associated with the periods. **Procedures adopted for assigning specific cost and expense items to an interim period should be consistent with the bases followed by the company in reporting results of operations at annual reporting dates.** (Emphasis added). However, when a specific cost or expense item charged to expense for annual reporting purposes **benefits more than one interim period, the cost or expense item may be allocated to those interim periods."** (Emphasis added).

The Company's accounting policy for advertising costs as stated in the footnotes to the Reference Balance Sheet is to expense advertising costs as incurred. The Seller has not shown that the criteria for direct response advertising have been met. The prepaid advertising costs should have been expensed when the trade show occurred in January 2007 even if APB 28 were used as guidance.

Decision:

The prepaid trade show expenses of $125,457 should be expensed as of March 30, 2007.

*PetSmart Claim*

The Buyer stated that a liability in the amount of $19,596 was not recorded in the Company's financial records on the transaction date to account for defective products sold prior to the transaction date. The Seller stated that the products had been accepted by the customer as of the transaction date and a liability should not have been recorded as of March 30, 2007.

The Buyer initially estimated that it would be necessary to replace certain pallet racks and accessories for PetSmart due to a potential deficiency in their structural integrity. An initial accrual of $200,000 was estimated by management and included in the Draft Computation. The Buyer stated that the customer ultimately accepted the racks even though they did not meet specifications and that the $19,596 covered costs to replace wire decking that was incorrectly ordered by the Company.

The Seller stated that PetSmart accepted the product in accordance with applicable sales terms. The Seller also stated that FAS 5 is the applicable GAAP standard for this matter and that it was not probable that a liability had been incurred nor was the amount reasonably estimable at the Closing Date. Seller points out that Buyer's $200,000 estimate "proved wildly incorrect".

Based on submissions by the Parties, PetSmart did not file a formal claim, there is no written settlement agreement, and the Buyer recorded a $200,000 addition to the warranty reserve as of the date of the Draft Computation. The claim was settled for $19,596 after the Draft Computation was submitted and was based on replacement of wire decking as opposed to replacement of the pallet racks.

FAS 5 paragraph 8 states that "An estimated loss from a loss contingency (as defined in paragraph 1) shall be accrued by a charge to income if both of the following conditions are met:

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b. The amount of the loss can be reasonably estimated."

Based on the information submitted by the Parties, it is questionable as to whether sufficient information was available when the Draft Computation was submitted to make a determination that a loss was probable. It is also questionable whether the amount was reasonably estimable based on the settlement amount of $19,596 being 10% of the original amount claimed. In any event, the Buyer stated that this is a warranty claim. However, the adequacy of the reserve for warranty claims was not specifically disputed in the Draft Computation or in the Buyer's October 23, 2007 submission. The PetSmart claim is an item that ordinarily would be covered by the reserve for warranty claims.

Decision:

An additional accrual for the PetSmart claim should not have been made as of March 30, 2007.

*WISE Installation*

The Buyer stated that a liability for $28,000 was not recorded on the Closing Balance Sheet to account for additional work performed by an installer prior to the transaction date. The Seller stated that a final lien release and unconditional waiver was received from the installer prior to the transaction date and no liability should have been recorded as of March 30, 2007.

The Buyer has provided documentation that a claim was filed by WISE in the form of an invoice dated June 19, 2006 as well as a demand letter from WISE's attorney dated February 28, 2007. The Buyer has also provided email correspondence from Company employees dated August 2007 that supports Buyer's position that the Company orally requested the additional work prior to the transaction date.

FAS 5 paragraph 8 states that "An estimated loss from a loss contingency (as defined in paragraph 1) shall be accrued by a charge to income if both of the following conditions are met:

a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b. The amount of the loss can be reasonably estimated."

It is clear that a claim had been asserted by WISE as of March 30, 2007. It is also apparent that Company management orally requested the additional work notwithstanding the Company's policy of requiring written change orders. It appears that this loss contingency was probable and reasonably estimable.

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

Decision:

An accrual for a loss contingency in the amount of $28,000 should be recorded as of March 30, 2007.

*Estimated Purchase Price*

The Buyer stated that the Estimated Purchase Price on Buyer's Draft Computation is $5,571,379 and that the Estimated Purchase Price on Seller's Objection Notice is $3,175,972. The Buyer also stated that the difference between Buyer and Seller ($2,395,407) results from the fact that the Seller used the wrong Estimated Indebtedness Payoff Amount and the wrong amount of excess of Target Net Working Capital over Estimated Net Working Capital to Calculate the Estimated Purchase Price.

The Seller stated that it has followed the formula outlined in the Agreement and that the Buyer has used a formula of its own construction that has no support in the Agreement. Seller stated that the Estimated Purchase Price is simply a sum of defined terms and the purpose of the post-closing adjustment is to true up the Actual Purchase Price to the Estimated Purchase Price. The Seller also stated that the Estimated Purchase Price is whatever the Company states it is pursuant to section 2.01 - not some moving target to be debated after the fact.

Section 2.01 of the Agreement describes the process for establishing the Estimated Purchase Price as follows:

> "Not later than three (3) Business Days before the Closing Date, the Company shall diligently and in good faith estimate, on a reasonable basis using the Company's then available financial information, the Cash Amount (such estimate is referred to as the "Estimated Cash Amount"), the Indebtedness Payoff Amount (such estimate is referred to as the "Estimated Indebtedness Payoff Amount"), and the Net Working Capital Amount (such estimate is referred to as the "Estimated Net Working Capital Amount"), and deliver a statement thereof to the Buyer. The "Estimated Purchase Price" means an amount equal to (A) $40,000,000.00 (the "Transaction Value"), (B) plus the Estimated Cash Amount, (C) less the Estimated Indebtedness Payoff Amount, (D) less the Closing Management Bonuses, and (E) plus the excess of the Estimated Net Working Capital Amount over the Target Net Working Capital Amount or minus the excess of the Target Net Working Capital Amount over the Estimated Net Working Capital Amount."

Section 2.02 of the Agreement states in part that "The Buyer shall pay to the Seller at the Closing, by wire transfer of immediately available funds to the account(s) and in the amounts designated by the Seller, the Estimated Purchase Price less the Escrow Amount...".

It is clear from the information provided by the Parties that the Estimated Purchase Price determined by the Seller on March 27, 2007 was $3,175,972. It is also clear that the Seller's legal counsel, Patton Boggs, LLP, provided an updated amount to be paid at Closing on March 30, 2007 resulting in a revised Estimated Purchase Price of $5,571,379. The revisions included a reduction of the Indebtedness Payoff Amount from $33,659,516 to $31,773,462 and reduction in the amount of Target Net Working Capital less Estimated Net

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

Working Capital from $982,015 to $472,662 resulting in an increase of $2,395,407 to the Estimated Purchase Price.

Email correspondence from Patton Boggs, LLP to Buyer dated March 27, 2007 transmits the funds flow information used in the initial calculation of the Estimated Purchase Price. The email states in part that "the Company believes that there will be some difference between the estimated amounts and the actual amounts at closing" and that "The Company is providing the funds flow information to facilitate the closing on March 30, but the funds flow information is in draft form and you should not rely on the funds flow information as final or conclusive. The funds flow information remains subject to revision in all respects based on the Company's further review." Email correspondence from Patton Boggs, LLP to Buyer dated March 30, 2007 states in part "...I updated the funds flow spreadsheet in description of each corresponding entry, which is highlighted."

Section 2.02 of the Agreement requires the Buyer to pay the Estimated Purchase Price less the Escrow Amount in the amounts designated by Seller at Closing. There is no dispute between the Parties as to the actual amount paid by the Buyer at Closing which is based on an Estimated Purchase Price of $5,571,379 as designated by Seller.

Decision:

The Estimated Purchase Price is $5,571,379.

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.