UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

UNARCO MATERIAL HANDLING, INC.,    :

    :    Case No. 08 CV 2394 (VM)

    Plaintiff,    :

    :

    - against -    :    **ANSWER AND**

    :    **COUNTERCLAIMS**

KINGWAY INCA CLYMER HOLDINGS, INC. and    :

AMERICAN CAPITAL STRATEGIES, Ltd.,    :    **Filed Electronically**

    :

    Defendants.    :

---------------------------------------------------------------x

Defendants Kingway Inca Clymer Holdings, Inc. ("Kingway" or "Seller") and American Capital Strategies, Ltd. ("American Capital") (collectively, "Defendants"), by their attorneys, for their Answer to the Complaint of Unarco Material Handling, Inc. ("Unarco," "Buyer," or "Plaintiff"), respond and allege as follows:

## ANSWER

1.    Admit the allegations contained in Paragraph 1 of the Complaint.

2.    Admit the allegations contained in the first sentence of Paragraph 2 of the Complaint. Deny the allegations contained in the second and third sentences of Paragraph 2 of the Complaint, except admit that American Capital owns an interest in Kingway and Kingway's principal place of business is in Lewisville, Texas.

3.    Admit the allegations contained in Paragraph 3 of the Complaint.

4.    Paragraph 4 of the Complaint sets forth legal conclusions that do not require a response.

5.    Paragraph 5 of the Complaint sets forth legal conclusions that do not require a response, except admit that the parties submitted to jurisdiction in this district

pursuant to Section 12.07 of the Securities Purchase Agreement, dated March 9, 2007 (the "Agreement").

6.     Admit the allegations contained in Paragraph 6 of the Complaint.

7.     Deny the allegations contained in Paragraph 7 of the Complaint, except admit that pursuant to Section 12.12 of the Agreement, American Capital guaranteed certain of Kingway's obligations subject to certain limitations, and respectfully refer the Court to the Agreement for the terms and definitions contained therein.

8.     Admit that pursuant to Section 2.02 of the Agreement, as of the closing date, Buyer was obligated to pay to Seller, the "Estimated Purchase Price" less the "Escrow Amount," and that pursuant to Section 2.01 of the Agreement, the Estimated Purchase Price was an amount determined by a fixed formula "using the Company's then available financial information." Defendants further admit that Section 2.04 of the Agreement provided for a post-closing adjustment mechanism which afforded the parties an opportunity to adjust the Estimated Purchase Price to correct for any changed events or facts that existed as of the closing date but were not reflected in the then-available financial data. Defendants otherwise deny the rest of the allegations contained in Paragraph 8 of the Complaint and respectfully refer the Court to the Agreement for the terms and definitions contained therein.

9.     Admit that Section 2.04 of the Agreement provided for a post-closing adjustment mechanism in which Buyer was required to submit its calculation of the "Actual Purchase Price" within sixty days of the closing (the "Draft Computation") and if Seller disagreed with Buyer's calculation, it had an opportunity to submit its objections and its own computation of the Actual Purchase Price to Buyer (the "Objection Notice").

The goal of the post-closing adjustment process was to "true up" the Estimated Purchase Price to the Actual Purchase Price in order to correct for and reflect any inadvertent mistakes or unknown information at the time of the closing that affected the calculation of the Estimated Purchase Price. An essential principle of this process was that the parties would calculate the Actual Purchase Price using GAAP applied consistently with Seller's historical accounting methods. The post-closing adjustment process was not a procedure whereby Buyer could challenge or change Seller's historical accounting methods. Defendants otherwise deny the rest of the allegations in Paragraph 9 of the Complaint and respectfully refer the Court to the Agreement for the terms and definitions contained therein.

10.    Admit the allegations contained in Paragraph 10 of the Complaint.

11.    Deny the allegations contained in the first sentence of Paragraph 11 of the Complaint, except admit that pursuant to Section 2.04 of the Agreement, if the parties were unable to resolve their disagreements "as to the Draft Computation and the Objection Notice," they were obligated to jointly retain an accounting firm (the "Firm") to resolve "any remaining disagreements." Defendants further aver that the Firm's scope of authority in resolving the disagreement was strictly limited to the provisions of Section 2.04 of the Agreement; the Firm was not to consider any other disputes or alleged breaches of any of the representations and warranties in the Agreement, nor was it to conduct a GAAS audit of the Seller's historical accounting procedures. A further limitation on the Firm's role was that it could not conduct its own investigation but rather could only review the written submissions of the parties. Defendants admit that Plaintiff has accurately quoted portions of Section 2.04 of the Agreement in the second sentence

of Paragraph 11 of the Complaint. Defendants respectfully refer the Court to the Agreement for the terms and definitions contained therein.

12.    Admit that Plaintiff has accurately quoted from Section 2.04 of the Agreement in Paragraph 12 of the Complaint. Defendants respectfully refer the Court to the Agreement for the complete and accurate terms and definitions contained therein.

13.    Admit that Plaintiff has accurately quoted from Section 2.04 of the Agreement in Paragraph 13 of the Complaint. Defendants respectfully refer the Court to the Agreement for the complete and accurate terms and definitions contained therein.

14.    Admit the allegations contained in Paragraph 14 of the Complaint.

15.    Deny the allegations contained in Paragraph 15 of the Complaint, except admit that the parties jointly retained PriceWaterhouseCoopers ("PwC") by engagement letter dated October 5, 2007 (the "Engagement Letter") to "render a decision related to a number of disputed items" and that the "proceeding [would] be governed by Section 2.04 [of the Agreement]."

16.    Admit the allegations contained in Paragraph 16 of the Complaint, and further aver that, in its submissions, Seller identified those disputes that it believed were outside the scope of PwC's retention and repeatedly stated its position that PwC was not authorized to consider those particular disagreements as part of the post-closing adjustment process.

17.    Deny the allegations contained in Paragraph 17 of the Complaint, except admit that PwC issued a report entitled "Decision of PwC," dated February 12, 2008, in which it stated that the Actual Purchase Price was $2,808,691 and the Estimated Purchase

Price was $5,571,379.  Admit that Plaintiff has accurately quoted from PwC's report in the third sentence of Paragraph 17 of the Complaint.

18.    Deny the allegations contained in Paragraph 18 of the Complaint, except admit that by letter dated February 19, 2008, Kingway wrote to PwC to "request a corrected determination" due to various "inaccurate calculations" in PwC's report.  In its February 19, 2008 letter, Kingway also pointed out that PwC had incorrectly concluded the Seller was required to reimburse Buyer for the fees and expenses paid to PwC in connection with its work.  After further correspondence from the parties, PwC, by e-mail dated February 26, 2008, denied Kingway's request.

19.    Deny the allegations contained in Paragraph 19 of the Complaint.

20.    Deny the allegations contained in Paragraph 20 of the Complaint.

21.    Deny the allegations contained in Paragraph 21 of the Complaint, except admit that pursuant to Section 12.12 of the Agreement, American Capital guaranteed certain of Kingway's obligations subject to certain limitations, and respectfully refer the Court to the Agreement for the terms and definitions contained therein, and admit that American Capital has not paid anything to Unarco.

22.    Admit the allegations contained in Paragraph 22 of the Complaint and respectfully refer the Court to the Agreement for the complete and accurate terms and definitions contained therein.

### FIRST CAUSE OF ACTION
**(Breach of Contract)**

23.    Defendants repeat and reallege their answers to Paragraphs 1 through 22 of the Complaint as if fully set forth herein.

24.    Admit the allegations contained in Paragraph 24 of the Complaint.

5

25.     Deny the allegations contained in Paragraph 25 of the Complaint.

26.     Deny the allegations contained in Paragraph 26 of the Complaint.

27.     Deny the allegations contained in Paragraph 27 of the Complaint.

28.     Deny the allegations contained in Paragraph 28 of the Complaint.

**SECOND CAUSE OF ACTION**
**(Guarantee by American Capital)**

29.     Defendants repeat and reallege their answers to Paragraphs 1 through 28 of the Complaint as if fully set forth herein.

30.     Deny the allegations contained in Paragraph 30 of the Complaint, but admit that pursuant to Section 12.12 of the Agreement, American Capital guaranteed certain of Kingway's obligations subject to certain limitations, and respectfully refer the Court to the Agreement for the terms and definitions contained therein.

31.     Deny the allegations contained in Paragraph 31 of the Complaint.

32.     Deny the allegations contained in Paragraph 32 of the Complaint.

**FIRST AFFIRMATIVE DEFENSE**

33.     The Complaint fails to state any claim upon which relief can be granted.

**SECOND AFFIRMATIVE DEFENSE**

34.     Several of Plaintiff's claims are improperly stated as breaches of Section 2.04 of the Agreement; instead, these claims (described below) are actually claims for breaches of certain representations and warranties in the Agreement and are not properly considered under the post-closing adjustment procedure set forth under Section 2.04 of the Agreement.

35.     In its Draft Computation, Plaintiff originally alleged that Kingway should have included approximately $4.7 million in sales tax liabilities on its closing balance

6

sheet. In its report dated February 12, 2008, PwC stated that Kingway should have recorded an accrued sales tax liability in the amount of $1,387,355 as of the closing date. Because Plaintiff seeks to enforce PwC's conclusions in this action, it has apparently accepted PwC's conclusion and is now alleging that Kingway should have included $1,387,355 in sales tax liabilities on its closing balance sheet and that the Actual Purchase Price should be adjusted accordingly (the "Sales Tax Claim"). Specifically, Plaintiff alleges that Kingway should have included sales tax liabilities in connection with sales made in various states from 2004 to 2006. In making this claim, Plaintiff, among other things, completely disregards that Kingway had previously estimated its sales tax liabilities in accordance with GAAP.

36.     Pursuant to Section 3.06(a)(ii) of the Agreement, Kingway represented and warranted that "[a]ll Taxes of or with respect to the Company and each of the Subsidiaries due and payable on or before the Closing Date have been timely paid or caused to be paid in full." In Section 3.06(f), Kingway represented and warranted that it "and each Subsidiary have complied in all respects with all applicable laws relating to the payment and withholding of all … state and local income and sales and use Taxes…." The Sales Tax Claim falls squarely within these representations and warranties.

37.     Pursuant to Section 3.09(b) of the Agreement, Kingway represented and warranted that its annual and interim audited financial statements had all "been prepared in accordance with GAAP applied consistently…." The Sales Tax Claim also falls within this representation and warranty.

38.     In its February 12, 2008 report, PwC accepted Plaintiff's argument that Kingway should have included an additional liability of $343,639 on its closing balance

sheet for employee accrued vacation, and Plaintiff now seeks to adjust the Actual

Purchase Price by that amount (the "Vacation Accrual Claim"). According to Kingway's

vacation policy, employees could only take vacation after their vacation time had vested.

For example, after the first six months of an employee's service, the employee vested in

40 hours of vacation time, which had to be taken between the sixth and twelfth month of

service or the vacation time was lost. If the employee left Kingway's service before

completing six months of service, he was not entitled to any vacation time or pay because

it had not yet vested. A similar policy existed for subsequent periods of service.

Consistent with its vacation policy, Kingway accounted for employee vacation time on its

financial statements (as a liability) only when it vested. For example, Kingway accrued

the full 40 hours of employee vacation time once an employee had served the company

for six months and had therefore vested in 40 hours of vacation time; prior to that six

month mark, however, Kingway did not accrue vacation time for that employee. Plaintiff

now challenges this historical accounting practice and argues that under GAAP, Kingway

should have accrued future employee vacation time, even if it had not yet vested. In

other words, Plaintiff would have Kingway accrue an employee's vacation time if he had

only been working at Kingway for five months (ostensibly on a pro rata basis) even

though that employee was not entitled to take vacation until his sixth month anniversary

at the company. Because the Vacation Accrual Claim challenges whether Kingway

complied with GAAP in its past accounting for accrued vacation, it also falls squarely

under the representation and warranty in Section 3.09 of the Agreement.

    39.    The Sales Tax Claim and the Vacation Accrual Claim (collectively, the

"Representations and Warranties Claims") are not encompassed by the post-closing

adjustment procedure set forth in Section 2.04 of the Agreement because they do not involve mere adjustments to the closing balance sheet due to additional information that was unknown (or inadvertent mistakes that occurred) when Kingway calculated the Estimated Purchase Price at the closing.

40.     The Representations and Warranties Claims are indemnification claims. Pursuant to Section 11.02 of the Agreement, a party may seek indemnification for any alleged breaches of the representations and warranties made in the Agreement. Pursuant to Section 11.03 of the Agreement, the indemnification provisions provided for in Section 11.02 are the "sole and exclusive remedy for any Losses … with respect to any misrepresentation or inaccuracy in, or breach of, any representations or warranties" of the Agreement.

41.     Pursuant to Section 11.02(a) of the Agreement, Buyer's recovery for the Representations and Warranties Claims is limited to an amount not to exceed "the amount then remaining in the Escrow Amount," and pursuant to Section 11.03(a) of the Agreement, the amount remaining in the Escrow Account shall be Buyer's "sole and exclusive source of funds for payment of the indemnification provided by the Seller in Section 11.02(a)."

## THIRD AFFIRMATIVE DEFENSE

42.     The Representations and Warranties Claims were improperly considered by PwC because they were not post-closing adjustments and were therefore not within PwC's scope of retention. According to the Engagement Letter, PwC's review was "governed by Section 2.04" of the Agreement. PwC acted outside its contractual scope

of authority by reaching a conclusion on the Representations and Warranties Claims. Therefore, its conclusions as to these claims have no binding effect on the parties.

43.     Defendants have not waived the right to assert this defense because Kingway vigorously objected to PwC's consideration of the Representations and Warranties Claims, and repeatedly requested that PwC decline to reach any conclusion on these particular claims.

## FOURTH AFFIRMATIVE DEFENSE

44.     Plaintiff is estopped from asserting the Representations and Warranties Claims as a post-closing adjustment because Plaintiff had the opportunity to conduct due diligence with respect to the historical accounting practices of Kingway. According to Section 5.10 of the Agreement, Plaintiff acknowledged that it had "conducted to its satisfaction, an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of [Kingway]" and that Plaintiff relied on its investigation in its determination to proceed with the Agreement. Plaintiff is not now permitted to seek an adjustment to the purchase price by alleging improper accounting (under the guise of a post-closing adjustment dispute) when it was afforded an opportunity to review the books and records of Kingway before the closing of the Agreement (and indeed acknowledged its reliance on its own investigation therein).

## FIFTH AFFIRMATIVE DEFENSE

45.     The Sales Tax Claim is barred because it is not yet ripe for litigation. Plaintiff has asserted that Kingway should have accrued certain sales tax liabilities as of the closing date, yet to Defendants' knowledge, none of the states which Plaintiff has

alleged may seek sales tax from Kingway as of the closing date have audited Kingway or even made inquiries about any of the alleged sales tax liabilities to date. Indeed, as of the closing date, Kingway had no outstanding sales tax liabilities in these states. In essence, Plaintiff is seeking to adjust the purchase price based on its unsubstantiated guesses as to what might (and, in fact, is highly unlikely to) occur. For these reasons, these claims are not yet ripe for litigation.

## SIXTH AFFIRMATIVE DEFENSE

46.    The Sales Tax Claim is barred because any judgment in Plaintiff's favor would result in a windfall to Plaintiff. It is unlikely that any of the states which Plaintiff alleges may seek sales tax from Kingway as of the closing date will actually seek and/or collect on any such taxes. Kingway's history with sales tax audits is revealing. In the three years prior to the closing, Kingway's three locations (in Georgia, Texas, and Ohio) were subject to only four sales and use tax audits. In November 2006, Louisiana assessed a sales and use tax liability in the amount of approximately $228,941, but Kingway contested that amount and it was reduced to approximately $4,000. Similarly, in 2005, Mississippi assessed a sales and use tax liability of $112,712 (including interest), and Kingway was able to recover $21,000 of that liability through back-billing its customers. Also in 2005, Illinois performed a sales tax audit of Kingway for the period of 2003 to 2004 and concluded that the company was not subject to any sales tax liability. Finally, in early 2007, Texas completed a sales tax audit and, to Kingway's knowledge, that audit did not result in any sales tax liability. These four audits resulted in a total assessment, net of back-billing to customers, of approximately $95,000, as opposed to the astronomical $1.4 million Sales Tax Claim now asserted by Plaintiff.

47.    In addition, in the highly unlikely event that Kingway is assessed by any given state for sales tax, Kingway would have the right to back-bill its customers whose purchase gave rise to the liability.  Indeed, it was Kingway's historical practice to attempt to collect certain of theses taxes and it was successful in doing so on at least one occasion, as evidenced by the Mississippi example above.

## SEVENTH AFFIRMATIVE DEFENSE

48.    Because Plaintiff has alleged a breach of the Agreement, all of Plaintiff's claims are indemnification claims pursuant to (i) Section 11.02 of the Agreement, which provides that any breach of the Agreement gives rise to a claim for indemnification, and (ii) Section 11.03 of the Agreement, which provides that the indemnification "provided by [Section 11.02] shall be the sole and exclusive remedy for any Losses of the Buyer … [arising from] any breach or failure in performance of any covenants or agreements made by the Company or the Seller" in the Agreement.

49.    Pursuant to Section 11.02(a) of the Agreement, Plaintiff's indemnification claims are "limited to an aggregate of Losses not to exceed the amount then remaining in the Escrow Amount," and pursuant to Section 11.03(a) of the Agreement, the amount remaining in the Escrow Account shall be Buyer's "sole and exclusive source of funds for payment of the indemnification provided by the Seller in Section 11.02(a)."

## EIGHTH AFFIRMATIVE DEFENSE

50.    Plaintiff's claims are barred for failure to give proper notice pursuant to Section 11.02(d) of the Agreement.  That provision states that "[n]o Person shall be liable for any claim for indemnification under subsection (a) or (b) unless written notice specifying in reasonable detail the nature of the claim for indemnification is delivered by

12

the Person seeking indemnification to the Person from whom indemnification is sought

... but only if, such notice describes in reasonable detail the basis of such claim ... ."

Plaintiff has not provided any such notice to Defendants.

## NINTH AFFIRMATIVE DEFENSE

51.    In the alternative, should the Court accept PwC's calculation of the Actual

Purchase Price, Plaintiff is not entitled to recover from Defendants the costs and expenses

incurred by PwC in connection with its post-closing adjustment work.  In its report dated

February 12, 2008, PwC mistakenly concluded that Kingway should reimburse Unarco

for any costs and expenses paid to PwC.  Section 2.04 of the Agreement provides that the

party whose calculation of the Actual Purchase Price "at the time of the submission of the

[parties'] respective determinations to the Firm" is closest to PwC's calculation of the

Actual Purchase Price shall be paid or reimbursed for the costs and expenses paid to PwC

by the other party.  Kingway's calculation of the Actual Purchase Price was closer to

PwC's calculation of the Actual Purchase Price than Unarco's calculation.  Accordingly,

Unarco and not Kingway is obligated to pay for PwC's costs and expenses.


## COUNTERCLAIMS

Defendant/Counterclaim Plaintiff Kingway, by its attorneys, for its

Counterclaim against Counterclaim Defendant Unarco, responds and alleges as follows:

## PARTIES

1.    Unarco is a privately held corporation organized and existing under the

laws of the State of Tennessee with its principal place of business in Springfield,

Tennessee.

2.      Kingway is a privately held corporation organized and existing under the laws of the State of Delaware with its principal place of business in Lewisville, Texas.

## JURISDICTION AND VENUE

3.      Jurisdiction is proper under 28 U.S.C. § 1332 because there is diversity of citizenship and the amount in controversy exceeds the sum of $75,000.

4.      Jurisdiction is proper under 28 U.S.C. § 1367(a) because it is a compulsory counterclaim which is so related to the claims in this action that are within this Court's original jurisdiction that it forms part of the same case or controversy under Article III of the United States Constitution.

5.      Venue is proper under 28 U.S.C. § 1391(a)(3) because the parties submitted to jurisdiction in this district pursuant to Section 12.07 of the Securities Purchase Agreement, dated March 9, 2007 (the "Agreement").

## FACTUAL BACKGROUND

### The Agreement

6.      Pursuant to the Agreement, Buyer purchased from Seller all the outstanding equity interests in KIC Holdings, Inc.

7.      Pursuant to Section 2.02 of the Agreement, Buyer was obligated to pay Seller the "Estimated Purchase Price" less the "Escrow Amount" as of the closing date. Pursuant to Section 2.01 of the Agreement, the Estimated Purchase Price was an amount determined by a fixed formula "using the company's then available financial information."

8.      Both Buyer and Seller made representations and warranties in the Agreement.

14

9.    In Section 3.06(a)(ii), Seller represented and warranted that "[a]ll Taxes of or with respect to the Company and each of the Subsidiaries due and payable on or before the Closing Date have been timely paid or caused to be paid in full."

10.    In Section 3.06(f) of the Agreement, Seller represented and warranted that it "and each Subsidiary have complied in all respects with all applicable laws relating to the payment and withholding of all … state and local income and sales and use Taxes…."

11.    In Section 3.09(b) of the Agreement, Seller also represented and warranted that its annual and interim audited financial statements had all "been prepared in accordance with GAAP applied consistently…."

12.    Pursuant to Section 11.02 of the Agreement, Buyer has the right to seek indemnification from Seller for any alleged breaches of the representations and warranties of the Agreement. Section 11.03 of the Agreement provides that the indemnification provisions in Section 11.02 are the "sole and exclusive remedy for any Losses … with respect to any misrepresentation or inaccuracy in, or breach of, any representations or warranties" of the Agreement.  Accordingly, an indemnification claim is Buyer's exclusive remedy for any claim against Seller alleging a breach of any of its representations and warranties in the Agreement.

13.    Section 11.02(a) of the Agreement further provides that any damages arising from an indemnification claim are "limited to an aggregate amount of Losses not to exceed the amount then remaining in the Escrow Account … ."  Similarly, pursuant to Section 11.03(a) of the Agreement, the amount remaining in the Escrow Account shall be Buyer's "sole and exclusive source of funds for payment of the indemnification provided by the Seller in Section 11.02(a)."

15

14.    The Agreement also provides for a post-closing adjustment mechanism. Pursuant to Section 2.04 of the Agreement, Buyer was obligated to submit its calculation of the "Actual Purchase Price" within sixty days of the closing (the "Draft Computation") and if Seller disagreed with Buyer's calculation, it had an opportunity to submit its objections and its own computation of the Actual Purchase Price to Buyer (the "Objection Notice").  Like the Estimated Purchase Price, the Actual Purchase Price was determined based on a fixed formula as set forth in Section 2.04(a) of the Agreement.

15.    The goal of the post-closing adjustment process was to "true up" the Estimated Purchase Price to the Actual Purchase Price in order to correct for and reflect any inadvertent mistakes or unknown information at the time of the closing that affected the calculation of the Estimated Purchase Price.  The post-closing adjustment procedure was a streamlined procedure whereby the parties could quickly and efficiently resolve arithmetic or unintentional errors in the Estimated Purchase Price.  The post-closing adjustment process was not designed as an alternative remedy for Buyer to challenge or change Seller's historical accounting methods after the closing date or, more generally, to allege any claims for breach of contract or breaches of the representations or warranties in the Agreement.

16.    Pursuant to Section 2.04 of the Agreement, if after using reasonable efforts within sixty days after Unarco received the Objection Notice, the parties were unable to "resolve [their] disagreements as to the Draft Computation and the Objection Notice," then the parties were to jointly retain an accounting firm (the "Firm") to resolve "any remaining disagreements."  The Firm's scope of authority in resolving the disagreement was strictly limited to the provisions of Section 2.04 of the Agreement; it

was not to consider any other disputes or alleged breaches of the representations and warranties in the Agreement. The Firm was to reach a conclusion "based solely on written submissions by the Buyer and Seller." The Firm's streamlined approach was in keeping with the goals of efficiency and expediency in the post-closing adjustment process.

### The Closing and the Ensuing Disputes

17.    The closing took place on March 30, 2007. On May 24, 2007, Unarco provided Kingway with its Draft Computation, and on July 9, 2007, Kingway provided Unarco with its Objection Notice. After unsuccessful attempts to resolve their disagreements, the parties retained PriceWaterhouseCoopers LLP ("PwC") pursuant to Section 2.04 of the Agreement.

18.    While several of the disputes were properly before PwC as post-closing adjustment disputes, Kingway objected to PwC's consideration of some of Unarco's claims because they fell outside the scope of Section 2.04 of the Agreement.

19.    Specifically, in its Draft Computation and its submissions to PwC, Unarco argued that Kingway should have included several million dollars in sales tax liabilities on its closing balance sheet and that the Actual Purchase Price should have been adjusted accordingly (the "Sales Tax Claim"). Unarco alleged that Kingway should have included sales tax liabilities in connection with sales made in various states from 2004 to 2006. In making this claim, Unarco, among other things, completely disregarded that Kingway had previously estimated its sales tax liabilities in accordance with GAAP.

17

20.    On its face, the Sales Tax Claim alleges breaches of Section 3.06 (the representation and warranty regarding taxes) and Section 3.09 (the representation and warranty regarding GAAP compliance in financial reporting) of the Agreement.

21.    Unarco also claimed that Kingway should have included an additional liability of $343,639 on its closing balance sheet for employee accrued vacation (the "Vacation Accrual Claim").  According to Kingway's vacation policy, employees could only take vacation after their vacation time had vested.  For example, after the first six months of an employee's service, the employee vested in 40 hours of vacation time, which had to be taken between the sixth and twelfth month of service or the vacation time was lost.  If the employee left Kingway's service before completing six months of service, he was not entitled to any vacation time or pay because it had not yet vested.  A similar policy existed for subsequent periods of service.  Consistent with its vacation policy, Kingway accounted for employee vacation time on its financial statements (as a liability) only when it vested.   For example, Kingway accrued the full 40 hours of employee vacation time once an employee had served the company for six months and had therefore vested in 40 hours of vacation time; prior to that six month mark, however, Kingway did not accrue vacation time for that employee.  Unarco, in its submissions to PwC, challenged this historical accounting practice and argued that under GAAP, Kingway should have accrued future employee vacation time, even if it had not yet vested.  In other words, Unarco would have Kingway accrue an employee's vacation time if he had only been working at Kingway for five months (ostensibly on a pro rata basis) even though that employee was not entitled to take vacation until his sixth month anniversary at the company.

22.    Like the Sales Tax Claim, the Vacation Accrual Claim challenges whether Kingway complied with GAAP in its past accounting practices, and it too falls squarely under the representation and warranty in Section 3.09 of the Agreement.

23.    In its submissions to PwC, Kingway specifically objected to PwC's consideration of the Sales Tax Claim and the Vacation Accrual Claim (collectively, the "Representations and Warranties Claims") because those claims were outside the scope of Section 2.04 of the Agreement, which was clearly not intended as a remedy for breaches of representations and warranties of the Agreement.

24.    On February 12, 2008, PwC issued a report entitled "Decision of PwC" in which it set forth its conclusions regarding the Actual Purchase Price, among other things. Without addressing Kingway's position that the Representations and Warranties Claims were outside the scope of its authority pursuant to the Agreement's post-closing adjustment mechanism, PwC reached conclusions on the Representations and Warranties Claims and adjusted the Actual Purchase Price.

25.    On March 7, 2008, Unarco filed a complaint in this district seeking to enforce PwC's conclusions regarding the Representations and Warranties Claims.

### FIRST COUNTERCLAIM
#### (Declaratory Judgment)

26.    Counterclaim Plaintiff repeats and realleges the allegations in paragraphs 1 through 25 as if fully set forth herein.

27.    An actual case or controversy exists between Counterclaim Plaintiff and Counterclaim Defendant concerning the rights and obligations of the parties with respect to the Agreement.

28. The Agreement is a valid and enforceable contract, and its provisions must be interpreted and enforced in accordance with its plain terms.

29. The plain terms of the Agreement provide that any claims arising from alleged breaches of representations and warranties of the Agreement shall be governed exclusively by the indemnification provisions in Sections 11.02 and 11.03 of the Agreement and that any damages arising from such indemnification claims are not to exceed the amount then remaining in the Escrow Account.

30. The Representations and Warranties Claims allege breaches of the representations and warranties made in Sections 3.06 and 3.09 of the Agreement.

31. Counterclaim Plaintiff therefore respectfully requests a declaration that the Representations and Warranties Claims fall within the exclusive indemnification remedy provided for in Sections 11.02 and 11.03 of the Agreement.

32. Counterclaim Plaintiff further respectfully requests a declaration that any damages arising from the Representations and Warranties Claims, if any, shall not exceed the amount then remaining in the Escrow Account, as provided for in Sections 11.02 and 11.03 of the Agreement.

## SECOND COUNTERCLAIM
### (PwC's Costs and Expenses)

33. Counterclaim Plaintiff repeats and realleges the allegations in paragraphs 1 through 32 as if fully set forth herein.

34. In the alternative, should the Court accept PwC's calculation of the Actual Purchase Price, Unarco is obligated to reimburse Kingway for PwC's costs and expenses.

35. Section 2.04 of the Agreement provides that the party whose calculation of the Actual Purchase Price "at the time of the submission of the [parties'] respective

determinations to the Firm" is closest to PwC's calculation of the Actual Purchase Price shall be paid or reimbursed for the costs and expenses paid to PwC by the other party.

36.     Kingway's calculation of the Actual Purchase Price was closer to PwC's calculation of the Actual Purchase Price than Unarco's calculation.  Accordingly, Unarco is obligated to reimburse Kingway $178,686 for PwC's costs and expenses, plus interest.

WHEREFORE, Defendants Kingway and American Capital respectfully request:

1) judgment dismissing all claims asserted against them with prejudice;

2) on the first counterclaim, a determination that the Representations and Warranties Claims fall within the exclusive indemnification remedy provided for in Sections 11.02 and 11.03 of the Agreement and that any damages arising from those claims shall not exceed the amount then remaining in the Escrow Account;

3) on the second counterclaim, in the alternative, should the Court accept PwC's calculation of the Actual Purchase Price, a judgment against Unarco that it is required to reimburse Kingway in the amount of $178,686 for costs and expenses paid to PwC, plus interest;

4) an award of costs, disbursements and attorneys' fees; and

5) such other and further relief as this Court deems just and proper.

Dated: New York, New York
       April 15, 2008

                              FRIEDMAN KAPLAN SEILER &
                              ADELMAN LLP

                              By: _____
                                  Scott M. Berman (SB-4023)
                                  1633 Broadway
                                  New York, New York 10019
                                  (212) 833-1100
                                  (212) 833-1250 (fax)

                              *Attorneys for Defendants Kingway Inca Clymer
                              Holdings, Inc. and American Capital Strategies,
                              Ltd.*

TO:

CADWALADER, WICKERSHAM & TAFT LLP
Howard R. Hawkins, Esq.
Joshua R. Weiss, Esq.
One World Financial Center
New York, New York  10281
Tel: (212) 504-6225
Fax: (212) 504-6666

*Attorneys for Plaintiff Unarco Material Handling, Inc.*