UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNARCO MATERIAL HANDLING, INC.,

                                        Plaintiff,

        -against-

KINGWAY INCA CLYMER HOLDINGS, INC. and
AMERICAN CAPITAL STRATEGIES, Ltd.,

                                        Defendants.

**Filed Electronically**

08 CV 2394 (VM)

**DECLARATION OF
PAUL NEAL IN SUPPORT
OF PLAINTIFF'S MOTION
TO CONFIRM A FINAL
ARBITRATION AWARD**

Pursuant to 28 U.S.C. § 1746, Paul Neal declares:

1.      I am a Vice President and the Chief Financial Officer of Plaintiff, Unarco

Material Handling, Inc. ("Unarco").  I make this declaration in support of Unarco's Motion to

Confirm a final arbitration award pursuant to sections 9 and 6 of the Federal Arbitration Act,

9 U.S.C. § 1 et seq. and Sections 7601 and 7510 of the New York Civil Practice Law and Rules.

2.      Pursuant to a Stock Purchase Agreement, dated March 9, 2007 (the

"Agreement") (a true and correct copy of which is attached as Exhibit 1), Unarco purchased from

Defendant Kingway Inca Clymer Holdings, Inc. ("Kingway") all the outstanding equity interests

in KIC Holdings, Inc. (the "Company").  Defendant American Capital Strategies, Ltd.

("American Capital") guaranteed certain of Defendant Kingway's obligations under the

Agreement.

3.      Pursuant to Section 2.03 of the Agreement, at the closing, Unarco was

obligated to pay Kingway the "Estimated Purchase Price" less an agreed upon "Escrow

Amount."  The Estimated Purchase Price was determined pursuant to a formula set forth in

Section 2.01 of the Agreement.  The purchase price paid at closing was termed "estimated,"

because it was based upon the Company's financial data as of the closing date, which the parties understood might not be accurate in all respects based upon subsequent information or investigation.

4.     Section 2.04 of the Agreement, entitled "Post-Closing Adjustment," provides a mechanism for the parties to adjust the purchase price paid by Unarco from "estimated" to "actual."   Specifically, the Post-Closing Adjustment mechanism provides that within sixty days of the closing date Unarco will provide Kingway with a "Draft Computation" setting forth its calculation of, among other things, the "Net Working Capital Amount" and based, in part on that amount, its calculation of the "Actual Purchase Price."

5.     The Agreement provides that if Kingway disagreed with the Draft Computation then it was obligated, within forty-five days of receiving it, to provide Unarco with an "Objection Notice," setting forth, among other things, its competing calculations of the Net Working Capital Amount and the Actual Purchase Price.

6.     Thereafter, the Buyer and Seller are to "use reasonable efforts to resolve any disagreements as to the Draft Computation and Objection Notice."   The Agreement further provides that if the parties are unable to resolve any "disagreements" between the Draft Computation and the Objection Notice, within sixty days, they are obligated to jointly retain an accounting firm to resolve those disagreements (the "Firm").   According to Section 2.04, the Firm's determinations with respect to those disagreements are "conclusive and binding upon the Buyer and the Seller."

7.     The closing took place on March 30, 2007.   On May 24, 2007, Unarco provided Kingway with its Draft Computation.   A true and correct copy of the Draft Computation is attached as Exhibit 2.   On July 9, 2007, Kingway provided Unarco with its Objection Notice.   A true and correct copy of the Objection Notice is attached as Exhibit 3.

8.      In the Draft Computation Unarco included in its calculation of Net Working Capital – which is the difference between current assets and current liabilities – certain liabilities of the Company for sales tax and accrued employee vacation, among others, that had not been included in the closing balance sheet or, therefore, in the calculation of Estimated Net Working Capital (upon which the calculation of the Estimated Purchase Price was based).

9.      In the Objection Notice Defendant Kingway omitted these liabilities from its calculation of Net Working Capital.  Accordingly, the Draft Computation and the Objection Notice disagreed over the calculation of Net Working Capital.

10.     The parties were unable to resolve this "disagreement." Accordingly, pursuant to Section 2.04 of the Agreement, by engagement letter dated October 5, 2007, the parties jointly retained PricewaterhouseCoopers LLP ("PwC") to resolve their disagreement.  A true and correct copy of the engagement letter is attached as Exhibit 4.  The parties agreed upon a schedule of submissions and, pursuant to that schedule, each made submissions to PwC, consisting of evidence, argument, and expert reports.[1]

11.     In a decision dated February 12, 2008 (the "PwC Decision") (a true and correct copy of which is attached as Exhibit 14), PwC determined that (i) the Actual Purchase Price was $2,808,691 and the Estimated Purchase Price was $5,571,379; and (ii) "the Buyer's calculation of the Actual Purchase Price was closest to the final calculation and therefore Seller

---

[1]  True and correct copies of the submissions are attached as follows: Buyer's Statement of Position (Exhibit 5); Seller's Statement of Position (Exhibit 6); Expert Report of Bruce H. Davis (on behalf of Seller) (Exhibit 7); Buyer's Supplemental Statement of Position (Exhibit 8); Expert Report of Dr. Will Yancey (on behalf of Buyer) (Exhibit 9); Seller's Reply Statement of Position (Exhibit 10); Buyer's Responses to PwC's Questions and Document Requests (Exhibit 11); Seller's Reponses to PwC's Questions and Document Requests (Exhibit 12); and Buyer's Supplemental Reply Submission (Exhibit 13).  Because the exhibits to these documents are voluminous, they have not been included.

is responsible for reimbursing the Buyer for fees and expenses paid to PwC in connection with this matter."

12.     Section 2.04(b)(ii) of the Agreement provides:

[i]f the Actual Purchase Price is less than the Estimated Purchase Price, then within five (5) Business Days after the final determination of the Actual Purchase Price, the Seller shall pay to the Buyer, by wire transfer or delivery of other immediately available funds, an amount equal to such difference plus simple interest thereon, at an interest rate equal to 8%, from the Closing Date to the date of payment, computed on an annual basis using a 360-day year.

13.     Section 2.04(a) of the SPA provides:

when the Firm makes its determination, any costs and expenses (including costs and expenses previously advanced) of the Firm that are allocable to the party whose determination of the Actual Purchase Price ... was closest to the Firm's determination of the same shall be paid or reimbursed by the other party.

14.     Thus, according to the PwC Decision, Kingway is obligated to pay Unarco **$2,941,374**, plus interest at 8% from the closing date to the date of payment.  This amount is calculated as follows:

- Estimated Purchase Price:     $5,571,379
  Actual Purchase Price:        -$2,808,691
                                        $2,762,688

- PwC's fees and expenses
  Paid to by Unarco             +$178,686
                                    **$2,941,374**

15.     By letter dated February 19, 2008, Defendant Kingway wrote to PwC requesting that it reconsider its determination that Defendant Kingway should reimburse Unarco for its share of PwC's fees and expenses.  By letter dated February 20, 2008, Unarco opposed that request.   By letter dated February 26, 2008, PwC denied Kingway's request for reconsideration (true and correct copies of the letters are attached as Exhibit 15).

16.     Kingway has not paid Unarco the amounts it is obligated to pay under the PwC Decision and Section 2.04 of the Agreement.

17.     Pursuant to Section 12.12 of the Agreement, American Capital unconditionally guaranteed Kingway's obligations under Section 2.04 of the Agreement. American Capital has not paid Unarco the amount owed by Kingway.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 14, 2008 in Orange Beach, Alabama.

_____
Paul Neal

**SECURITIES PURCHASE AGREEMENT**

by and among

KINGWAY INCA CLYMER HOLDINGS INC.

KIC HOLDINGS INC.

UNARCO MATERIAL HANDLING, INC.

and

AMERICAN CAPITAL STRATEGIES, LTD.

Dated as of March 9, 2007

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS.................................................................................1
    Section 1.01    Definitions.............................................................................1
    Section 1.02    Cross-References to Other Defined Terms .......................6

ARTICLE 2 PURCHASE AND SALE ...............................................................7
    Section 2.01    Estimated Purchase Price ...................................................7
    Section 2.02    Purchase and Sale of the Shares.........................................8
    Section 2.03    The Closing...........................................................................8
    Section 2.04    Post-Closing Adjustment. ...................................................9
    Section 2.05    Conversions........................................................................10

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE COMPANY ...................11
    Section 3.01    Organization and Qualification.........................................11
    Section 3.02    Capitalization; Subsidiaries; Securities Owned ..............12
    Section 3.03    Authority of the Company. ................................................12
    Section 3.04    Compliance with Laws......................................................13
    Section 3.05    Advisory and Other Fees...................................................13
    Section 3.06    Taxes..................................................................................13
    Section 3.07    Officers and Directors; Books and Records.....................15
    Section 3.08    Litigation...........................................................................16
    Section 3.09    Financial Statements .........................................................16
    Section 3.10    Transactions with Affiliates .............................................17
    Section 3.11    Real Properties ..................................................................17
    Section 3.12    Absence of Material Adverse Effect.................................18
    Section 3.13    Absence of Certain Changes .............................................18
    Section 3.14    Tangible Personal Property ...............................................18
    Section 3.15    Intellectual Property..........................................................18
    Section 3.16    Contracts............................................................................19
    Section 3.17    Insurance............................................................................20
    Section 3.18    Permits ...............................................................................20
    Section 3.19    Employee Benefit Plans.....................................................20
    Section 3.20    Employees; Labor Matters.................................................21
    Section 3.21    Environmental Matters.......................................................22
    Section 3.22    Employee Relations ..........................................................23
    Section 3.23    Key Employees..................................................................23
    Section 3.24    Receivables........................................................................23
    Section 3.25    Inventories.........................................................................24
    Section 3.26    Customers..........................................................................24
    Section 3.27    No Other Representations and Warranties.........................24

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF THE SELLER .........................25
    Section 4.01    Organizational Authorization............................................25
    Section 4.02    Governmental Authorization.............................................25

i

Section 4.03      Noncontravention..........................................................25
Section 4.04      Seller's Ownership of the Shares at the Closing Date ..........25
Section 4.05      No Other Representations and Warranties...........................25

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF THE BUYER ..........................26
Section 5.01      Existence and Power ......................................................26
Section 5.02      Organizational Authorization...........................................26
Section 5.03      Governmental Authorization............................................26
Section 5.04      Noncontravention..........................................................26
Section 5.05      Financing.....................................................................26
Section 5.06      Purchase for Investment .................................................26
Section 5.07      Actions and Proceedings ................................................26
Section 5.08      Finder's Fees ................................................................27
Section 5.09      Solvency......................................................................27
Section 5.10      Acknowledgment by the Buyer.........................................27
Section 5.11      No Reliance ..................................................................28
Section 5.12      No Other Representations and Warranties...........................28

ARTICLE 6 COVENANTS OF THE COMPANY AND THE SELLER ......................................28
Section 6.01      Conduct of the Company ................................................28
Section 6.02      Access ........................................................................30
Section 6.03      Subsequent Actions ......................................................31

ARTICLE 7 COVENANTS OF THE BUYER.........................................................31
Section 7.01      Confidentiality .............................................................31
Section 7.02      Access ........................................................................31
Section 7.03      Notification .................................................................31
Section 7.04      Director and Officer Liability, Indemnification and Insurance ..........31
Section 7.05      Employment and Benefit Arrangements..............................32
Section 7.06      Regulatory Filings.........................................................32
Section 7.07      Contact with Employees, Customers and Suppliers .............32
Section 7.08      Financial Assistance......................................................33

ARTICLE 8 ADDITIONAL COVENANTS OF THE PARTIES ...........................33
Section 8.01      Reasonable Best Efforts; Further Assurances......................33
Section 8.02      Further Cooperation ......................................................33
Section 8.03      Public Announcements ..................................................34
Section 8.04      Tax Matters .................................................................34
Section 8.05      Disclosure Generally.....................................................35
Section 8.06      Conflicts and Privilege...................................................35
Section 8.07      Special Environmental Conditions....................................36

ARTICLE 9 CONDITIONS TO CLOSING..........................................................36
Section 9.01      Conditions to the Buyer's Obligations................................36
Section 9.02      Conditions to the Seller's Obligations ...............................37

011107.0108\393259.18

ARTICLE 10 TERMINATION ................................................................38
    Section 10.01   Termination..............................................................38
    Section 10.02   Effect of Termination...............................................39

ARTICLE 11 ADDITIONAL COVENANTS..........................................39
    Section 11.01   Survival Periods .......................................................39
    Section 11.02   Indemnification .........................................................39
    Section 11.03   Limitation of Recourse.............................................44

ARTICLE 12 MISCELLANEOUS .......................................................45
    Section 12.01   Notices .....................................................................45
    Section 12.02   Amendments and Waivers ......................................46
    Section 12.03   Construction; Severability.......................................46
    Section 12.04   Expenses...................................................................46
    Section 12.05   Successors and Assigns ...........................................47
    Section 12.06   Governing Law ........................................................47
    Section 12.07   Jurisdiction..............................................................47
    Section 12.08   Waiver of Jury Trial................................................47
    Section 12.09   Prevailing Party.......................................................47
    Section 12.10   Counterparts; Third Party Beneficiaries ...............48
    Section 12.11   Entire Agreement ....................................................48
    Section 12.12   American Capital Guarantee....................................48

### INDEX OF EXHIBITS

Exhibit A    Definition of Net Working Capital
Exhibit B    Form of Escrow Agreement

# SECURITIES PURCHASE AGREEMENT

THIS SECURITIES PURCHASE AGREEMENT (this "Agreement") is made as of March 9, 2007, by and among Kingway Inca Clymer Holdings Inc., a Delaware corporation (the "Seller"), KIC Holdings, Inc., a Delaware corporation which prior to the Closing (as defined below) shall be converted into a Delaware limited liability company (the "Company"), Unarco Material Handling, Inc., a Tennessee corporation (the "Buyer"), and, solely for the purpose of Section 12.12 below, American Capital Strategies, Ltd., a Delaware corporation ("American Capital"). Unless otherwise provided, capitalized terms used herein are defined in Article 1 below.

WHEREAS, the Seller owns or will own prior to the Closing all of the outstanding equity interests (the "Shares") in the Company; and

WHEREAS, upon the terms and subject to the conditions set forth herein, at the Closing, the Buyer desires to acquire from the Seller, and the Seller desires to sell to the Buyer, the Shares.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.01  Definitions.**  The following terms, as used herein, have the following meanings:

"Affiliate" means (except as otherwise specifically defined herein), as to any Person, any other Person which, directly or indirectly, controls, or is controlled by, or is under common control with, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise. However, the term Affiliates shall not include any other entities in which American Capital or its Affiliates own equity or debt interests other than the Company and its Subsidiaries.

"Business Day" means any day other than a Saturday, Sunday or any day on which banks located in New York, New York are authorized or required to be closed for the conduct of regular banking business.

"Cash" means cash, cash equivalents and marketable securities.

"Cash Amount" means the bank balance of all Cash held by the Company or any Subsidiary as of the close of business on the Closing Date, before giving effect to the transactions contemplated hereby.

"Closing Management Bonuses" means bonuses, incentive compensation and other similar payments payable to any employee or director of the Company or any Subsidiary resulting from the Closing, including, without limitation, the amounts payable pursuant to the letter agreements referenced in items 3, 4 and 5 of Schedule 3.09(c) together with any payroll taxes or other amounts that may be payable by the Company or any Subsidiary as a result of the payment of any such bonus, incentive compensation and other similar payment.

"Code" means the Internal Revenue Code of 1986, as amended, and any reference to any particular Code section shall be interpreted to include any revision of or successor to that section regardless of how numbered or classified.

"Controlled Group Liability" means any and all liabilities (i) under Title IV of ERISA, (ii) under Section 302 of ERISA, (iii) under Sections 412 and 4971 of the Code, and (iv) as a result of a failure to comply with the continuation coverage requirements of Section 601 et seq. of ERISA and Section 4980B of the Code.

"Demand" means any demand, claim, action, cause of action, or assertion or other notice of potential obligation, liability or responsibility.

"Employee Benefit Plan" means "employee benefit plan" as such term is defined under Section 3(3) of ERISA and such other material, written employee benefit plans, programs, policies, practices, or other arrangements providing benefits to any current or former employee, officer or director or the Company or any Subsidiary or any beneficiary or dependent thereof that is sponsored or maintained by the Company or any Subsidiary or to which the Company or any Subsidiary contributes or is obligated to contribute, including, without limitation, any bonus, incentive, deferred compensation, vacation, insurance, stock purchase, stock option, equity or equity-based plan or award, severance, employment, change of control or fringe benefit plan, program or agreement.

"Environmental Liability" means a legal obligation based upon an Environmental Requirement.

"Extended Escrow Amount" means $3,000,000.00, as such amount may be (i) reduced from time to time by payments made to the Buyer in connection with indemnification hereunder for Losses resulting from a breach of the representations, warranties, covenants and agreements for matters covered by Sections 2.05, 3.06, 8.04 and 3.21 or (ii) increased by interest or other investment income payable upon such amount.

"Federal Income Tax" means any Tax imposed under Subtitle A of the Code.

"Final Determination" means (i) with respect to Federal Income Taxes, a "determination" as defined in Section 1313(a) of the Code or execution of an Internal Revenue Service Form 870 AD and, (ii) with respect to Taxes other than Federal Income Taxes, any final determination of liability in respect of a Tax that, under applicable law, is not subject to further appeal, review or modification through proceedings or otherwise (including the expiration of a statute of limitations or a period for the filing of claims for refunds, amended returns or appeals from adverse determinations).

2

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Indebtedness" means, with respect to any Person at any date, without duplication, all obligations of such Person under capitalized leases, for borrowed money or in respect of loans or advances and all accrued interest, guarantees, letters of credit, performance bonds, bid bonds or other sureties of any kind or nature issued by or on behalf of the Company, prepayment premiums or penalties and fees on the foregoing which would be payable if such obligations were paid in full as of such date.

"Indebtedness Payoff Amount" means the amount required to repay all outstanding Indebtedness of the Company and the Subsidiaries as of the Closing Date, before giving effect to the transactions contemplated hereby. Solely for the purpose of determining the Indebtedness Payoff Amount, Indebtedness shall not include any guarantees, letters of credit, performance bonds, bid bonds or other sureties of any kind or nature issued by or on behalf of the Company or any Subsidiary in connection with any customer contracts, proposals or otherwise.

"Initial Escrow Amount" means $1,000,000.00, as such amount may be (i) reduced from time to time by payments made to the Buyer in connection with indemnification hereunder for Losses resulting from a breach of the representations, warranties, covenants and agreements for matters other than those covered by Sections 2.05, 3.06, 8.04 and 3.21 or (ii) increased by interest or other investment income payable upon such amount.

"Inventories" means all inventory, merchandise, finished goods, raw materials, packaging, labels, supplies and other personal property maintained, stored or held by or for the Company or any Subsidiary at the Closing, and any prepaid deposits for any of the same.

"Knowledge" when used in the phrase "to the Knowledge of the Company" or similar phrases means, and shall be limited to, the actual knowledge of James Levine, Byron J. Daniels, Walter E. Cisowski, Fernando Heredia, Richard Edenfield and Greg Christy.

"Loss" means an actual loss, liability, damage, cost, interest, award, judgment, penalty, fine, assessment or expense (including reasonable legal fees and expenses, but excluding incidental, consequential or punitive damages or any liability for lost profits or the like).

"Material Adverse Effect" means an event, occurrence, change, condition or circumstance that has, or would reasonably be expected to have, a material adverse effect upon the financial condition or results of operations of the Company and the Subsidiaries on a consolidated basis; provided, that for purposes of this Agreement, a Material Adverse Effect shall not include the effect of (a) changes to the industry or markets in which the business of the Company or any Subsidiary operates that do not disproportionately affect the business of the Company or its Subsidiaries, (b) the announcement or disclosure of the transactions contemplated herein, (c) general economic, regulatory or political conditions or changes, (d) military action or any act of terrorism, (e) changes in law or GAAP after the date hereof, (f) compliance with the terms of this Agreement including, but not limited to, the Conversions, (g) actions reasonably taken to facilitate the sale of the Shares, (h) the failure of the Company or

3

any Subsidiary to meet or achieve the results set forth in any internal projection, or (i) any matter set forth in the Schedules attached hereto if it is reasonably apparent that such matter could cause or contribute to the cause of a Material Adverse Effect. The Buyer acknowledges that there could be a disruption to the Company or any Subsidiary's business as a result of the execution of this Agreement, the announcement by the Buyer of its intention to purchase the Company or the announcement of the Seller of its intention to sell the Company, and the consummation of the transactions contemplated hereby, and the Buyer agrees that such disruptions do not and shall not constitute a Material Adverse Effect.

"Net Working Capital" shall have the meaning given to such term in Exhibit A attached hereto and shall be determined in accordance therewith.

"Net Working Capital Amount" means the Net Working Capital of the Company and the Subsidiaries as of the close of business on the Closing Date, before giving effect to the transactions contemplated hereby.

"Other Insured Liabilities" means liabilities unrelated to properties or assets customarily insured against by businesses with business operations similar to the Company's business operations as currently conducted.

"Permitted Liens" means any (i) Liens in respect of Taxes the validity of which are being contested in good faith by appropriate proceedings or Liens in respect of Taxes not yet due and payable or which can be paid currently with no penalty; in each case, for which adequate reserves have been maintained in accordance with GAAP, (ii) mechanics', carriers', workmen's, repairmen's, statutorily imposed or other like Liens arising or incurred in the ordinary course of business; (iii) Liens arising under original purchase price conditional sales contracts and equipment leases with third parties that are contracts entered into in connection with the Company or any Subsidiary; (iv) limitations on the rights of the Company or any Subsidiary under any Contract or Real Property Lease that are expressly set forth in such contract or lease; (v) survey exceptions, imperfections of title, Liens or other title matters affecting any tangible asset owned by the Company or any Subsidiary that would not materially and adversely affect the use of such asset by the Company or such Subsidiary; and (vi) with respect to each parcel of Owned Real Property or Leased Real Property, zoning, building codes and other land use Laws regulating the use or occupancy of such parcel of Owned Real Property or Leased Real Property or the activities conducted thereon that are imposed by any Governmental Authority having jurisdiction over such Owned Real Property or Leased Real Property and that would not materially and adversely affect the use of such parcel of Owned Real Property or Leased Real Property by the Company or any Subsidiary.

"Person" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision or any agency or instrumentality thereof.

"Pre-Closing Tax Period" means any taxable period (or portion thereof) ending on or before the close of business on the Closing Date.

4

"Pre-Closing Environmental Condition" means as of the Closing Date (i) the presence of Hazardous Materials in the soil, groundwater, surface water, or sediment at, on, under, or originating or migrating from the Real Property, and (ii) contamination of any building at the Real Property by Hazardous Materials.

"Real Property" means the Owned Real Property together with the Leased Real Properties.

"Receivables" means any and all accounts receivable, notes and other amounts receivable from third parties, including customers and employees, arising from the conduct of the business of the Company and its Subsidiaries before the Closing, whether or not in the ordinary course, together with any unpaid financing charges accrued thereon.

"Reference Balance Sheet" means the audited consolidated balance sheet of the Company and the Subsidiaries as of December 31, 2005 contained in the Audited Financial Statements.

"Remediate" and "Remediation" mean any actual or contemplated clean-up, removal action, remedial action, restoration, repair, response action, corrective action, monitoring, sampling and analysis, installation, reclamation, closure, post-closure or invasive investigation in connection with the suspected, threatened or actual Release of a Hazardous Material.

"Special Environmental Conditions" means the matters described in Schedule 11.02(k).

"Special Environmental Condition Losses" means Losses arising from the Special Environmental Conditions that are not paid by Seller pursuant to Section 8.07.

"Subsidiary" means any entity, the securities or other ownership interests of which having ordinary voting power to elect a majority of the board of directors, or other persons performing similar functions, are directly or indirectly owned by the Company.

"Target Net Working Capital Amount" means $3,900,000.00.

"Tax" means any federal, state, local or foreign income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, alternative minimum, estimated or other tax, assessment, duty, fee, levy or other governmental charge, including any interest, penalty or addition thereto.

"Tax Loss" means Losses arising from a breach of the representations and warranties for matters covered by Section 3.06 and the covenants and agreements set forth in Sections 2.05 and 8.04.

"Tax Returns" means any return, report, information return or other document (including schedules or any related or supporting information) filed or required to be filed with any Taxing Authority or other authority in connection with the determination, assessment or

collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Taxing Authority" means any governmental or regulatory authority, body or instrumentality exercising any authority to impose, regulate or administer the imposition of Taxes.

**Section 1.02  Cross-References to Other Defined Terms.**  Each term listed below is defined in the Section of this Agreement listed opposite such term:

<table>
<tr><th>Term</th><th>Section</th></tr>
<tr><td>Actual Purchase Price</td><td>Section 2.04(a)</td></tr>
<tr><td>Agreement</td><td>Preface</td></tr>
<tr><td>Allocation Schedule</td><td>Section 2.05(b)</td></tr>
<tr><td>American Capital</td><td>Preface</td></tr>
<tr><td>Approvals</td><td>Section 3.18</td></tr>
<tr><td>Audited Financial Statements</td><td>Section 3.09(a)(i)</td></tr>
<tr><td>Basic Representations</td><td>Section 11.01</td></tr>
<tr><td>Buyer</td><td>Preface</td></tr>
<tr><td>Buyer Indemnified Party</td><td>Section 11.02(a)</td></tr>
<tr><td>Buyer's Representatives</td><td>Section 7.01</td></tr>
<tr><td>Closing</td><td>Section 2.03(a)</td></tr>
<tr><td>Closing Date</td><td>Section 2.03(a)</td></tr>
<tr><td>Company</td><td>Preface</td></tr>
<tr><td>Company Intellectual Property</td><td>Section 3.15</td></tr>
<tr><td>Confidentiality Agreement</td><td>Section 7.01</td></tr>
<tr><td>Contracts</td><td>Section 3.16</td></tr>
<tr><td>Conversions</td><td>Section 9.01(f)</td></tr>
<tr><td>Current Customer</td><td>Section 3.26</td></tr>
<tr><td>Deductible Losses</td><td>Section 11.02(a)(iv)</td></tr>
<tr><td>Draft Computation</td><td>Section 2.04(a)</td></tr>
<tr><td>Environmental Approval(s)</td><td>Section 3.21(e)</td></tr>
<tr><td>Environmental Requirement(s)</td><td>Section 3.21(e)</td></tr>
<tr><td>ERISA</td><td>Section 3.19(b)</td></tr>
<tr><td>Escrow Account</td><td>Section 2.03(b)(iii)</td></tr>
<tr><td>Escrow Agent</td><td>Section 2.03(b)(iii)</td></tr>
<tr><td>Escrow Agreement</td><td>Section 2.03(b)(iii)</td></tr>
<tr><td>Escrow Amount</td><td>Section 2.03(b)(iii)</td></tr>
<tr><td>Estimated Cash Amount</td><td>Section 2.01</td></tr>
<tr><td>Estimated Indebtedness Payoff Amount</td><td>Section 2.01</td></tr>
<tr><td>Estimated Net Working Capital Amount</td><td>Section 2.01</td></tr>
<tr><td>Estimated Purchase Price</td><td>Section 2.01</td></tr>
<tr><td>Extended Escrow Losses</td><td>Section 11.02(a)</td></tr>
<tr><td>Extended Survival Period</td><td>Section 11.01</td></tr>
<tr><td>Financial Statements</td><td>Section 3.09(a)(ii)</td></tr>
</table>

6

| **Term** | **Section** |
|---|---|
| Firm | Section 2.04(a) |
| Golder | Section 8.07 |
| Governmental Authority | Section 3.04 |
| Hazardous Material | Section 3.21(e) |
| Indemnitee | Section 11.02(e) |
| Indemnitors | Section 11.02(e) |
| Individual Shareholder(s) | Preface |
| Information Memorandum | Section 5.10(b) |
| Initial Escrow Losses | Section 11.02(a) |
| Initial Survival Period | Section 11.01 |
| Intellectual Property | Section 3.15 |
| Latest Balance Sheet | Section 3.09(a)(ii) |
| Laws | Section 3.04 |
| Leased Real Property; Leased Real Properties | Section 3.11(b) |
| Liens | Section 3.14 |
| Net Working Capital | Exhibit A |
| Objection Notice | Section 2.04(a) |
| Owned Real Property | Section 3.11(a) |
| PB | Section 2.03(a) |
| Real Property Lease; Real Property Leases | Section 3.11(b) |
| Release | Section 3.21(e) |
| Schedule; Schedules | Article 3 Preamble |
| Seller | Preface |
| Seller Transaction Expenses | Section 12.04 |
| Shares | Preface |
| Specific Verbal Notice | Section 3.26 |
| TCEQ | Section 11.02(k)(iii) |
| Texas Rack Plant Property | Section 11.02(k)(iii) |
| Third Party Claim | Section 11.02(e) |
| Tipping Basket Losses | Section 11.02(a)(iii) |
| Transaction Value | Section 2.01 |
| Transfer Taxes | Section 8.04(a) |
| Unaudited Financial Statements | Section 3.09(a)(ii) |
| Updated Schedules | Section 6.03 |

## ARTICLE 2
## PURCHASE AND SALE

     **Section 2.01    Estimated Purchase Price.**  Not later than three (3) Business Days before the Closing Date, the Company shall diligently and in good faith estimate, on a reasonable basis using the Company's then available financial information, the Cash Amount (such estimate is referred to as the "Estimated Cash Amount"), the Indebtedness Payoff Amount (such estimate is referred to as the "Estimated Indebtedness Payoff Amount"), and the Net Working Capital

Amount (such estimate is referred to as the "Estimated Net Working Capital Amount"), and deliver a statement thereof to the Buyer. The "Estimated Purchase Price" means an amount equal to (A) \$40,000,000.00 (the "Transaction Value"), (B) plus the Estimated Cash Amount, (C) less the Estimated Indebtedness Payoff Amount, (D) less the Closing Management Bonuses, and (E) plus the excess of the Estimated Net Working Capital Amount over the Target Net Working Capital Amount or minus the excess of the Target Net Working Capital Amount over the Estimated Net Working Capital Amount.

Section 2.02    Purchase and Sale of the Shares. As of the Closing, upon the terms and subject to the conditions set forth in this Agreement, the Seller shall sell, assign, transfer and convey to the Buyer, and the Buyer shall purchase and acquire from Seller, the Shares. The Buyer shall pay to Seller at the Closing, by wire transfer of immediately available funds to the account(s) and in the amounts designated by the Seller, the Estimated Purchase Price less the Escrow Amount (as defined below).

Section 2.03    The Closing.

(a)    The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Patton Boggs LLP ("PB") in Dallas, Texas, at 10:00 a.m. on the first (1st) Business Day following full satisfaction or due waiver of all of the closing conditions set forth in Article 9 hereof (other than those to be satisfied at the Closing) or on such other date as is mutually agreeable to the Buyer and Seller. The date of the Closing is referred to herein as the "Closing Date."

(b)    Upon the terms and subject to the conditions set forth in this Agreement, the parties hereto shall consummate the following transactions as of the Closing:

(i)    the Seller shall deliver to the Buyer certificates representing the Shares, and stock powers, executed in blank, transferring the Shares to the Buyer;

(ii)    the Buyer shall deliver to the Seller, by wire transfer of immediately available funds to the account(s) and in the amounts designated by the Seller, the Estimated Purchase Price less the Escrow Amount;

(iii)    the Buyer shall deliver to PNC Bank N.A. (the "Escrow Agent"), by wire transfer of immediately available funds to the segregated, interest-bearing account designated by the Escrow Agent (the "Escrow Account"), cash in an amount equal to \$4,000,000.00 (the "Escrow Amount"), pursuant to the terms and conditions of an Escrow Agreement, substantially in the form attached hereto as Exhibit B (the "Escrow Agreement");

(iv)    the Buyer shall pay on behalf of the Company or cause the Company to repay, all Indebtedness of the Company in accordance with the terms thereof;

(v)    the Company shall pay the Closing Management Bonuses through its normal payroll procedures with respect to employee bonus payments;

8

    (vi) the Seller shall deliver to the Buyer evidence reasonably satisfactory to the Buyer of the release of all Liens upon the Shares and the assets of the Company associated with the Indebtedness of the Company;

    (vii) the Buyer, the Company and the Seller shall make such other deliveries as are required by and in accordance with Article 9 hereof; and

    (viii) a certificate of non-foreign status pursuant to Treasury Regulations Section 1.1445-2(b)(2) from Seller and each Subsidiary of Seller that is transferring a "United States real property interest" within the meaning of Section 897 of the Code.

### Section 2.04 Post-Closing Adjustment.

    (a) <u>Post-Closing Determination</u>. Within sixty (60) days after the Closing Date, the Buyer and its auditors shall prepare, and deliver to the Seller, (i) the Buyer's determinations of the Cash Amount, the Indebtedness Payoff Amount and the Net Working Capital Amount, and (ii) the Buyer's calculation of the Actual Purchase Price (as defined below) (collectively, the "<u>Draft Computation</u>").  The Buyer and its auditors will make available to the Seller and its auditors all records and work papers used in preparing the Draft Computation, and will prepare and deliver to the Seller a detailed breakdown of the calculations used to determine the amounts set forth in the Draft Computation.  If the Seller disagrees with any aspect of the Draft Computation, the Seller may, within forty-five (45) days after receipt of the Draft Computation, deliver a notice (an "<u>Objection Notice</u>") to the Buyer setting forth the Seller's determination of the Cash Amount, the Indebtedness Payoff Amount and/or the Net Working Capital Amount and the Seller's calculation of the Actual Purchase Price.  If the Seller does not deliver an Objection Notice to the Buyer within forty-five (45) days after receipt of the Draft Computation, then the parties hereto will be deemed to have agreed to the Draft Computation and such computation shall be deemed to be finally determined as set forth therein.  The Buyer and the Seller shall use reasonable efforts to resolve any disagreements as to the Draft Computation and the Objection Notice, but if they do not obtain a final resolution within sixty (60) days after the Buyer has received the Objection Notice, the Buyer and the Seller shall jointly retain PriceWaterhouseCoopers LLP (provided that no partner or person of similar rank and title resident in the Boston, Massachusetts office of PriceWaterhouseCoopers LLP shall provide services in connection with such retention) or such other accounting firm acceptable to Buyer and the Seller (the "<u>Firm</u>") to resolve any remaining disagreements.  The Buyer and the Seller shall direct the Firm to render a determination within thirty (30) days after its retention and the Buyer, the Seller and their respective agents shall cooperate with the Firm during its engagement.  The Firm may consider only those items and amounts in the Draft Computation or Objection Notice which the Buyer and the Seller are unable to resolve.  In resolving any disputed item, the Firm will act as an expert and not as an arbitrator in conducting its analysis, and may not assign a value to any item greater than the greatest value for such item claimed by either party or less than the smallest value for such item claimed by either party.  The Firm's determination shall be based solely on written submissions by the Buyer and the Seller (i.e., not on independent review) and on the definitions included herein.  The determination of the Firm shall be conclusive and binding upon the Buyer and the Seller.  Until the Firm makes its determination, the costs and expenses of the Firm shall be borne equally by the Buyer, on the one hand, and the Seller, on the other hand; <u>provided that</u>, when the Firm makes its determination, any costs and expenses

9

(including costs and expenses previously advanced) of the Firm that are allocable to the party whose determination of the Actual Purchase Price (at the time of submission of the respective determinations to the Firm for resolution pursuant to this paragraph) was closest to the Firm's determination of the same shall be paid or reimbursed by the other party.

The "Actual Purchase Price" means an amount equal to (A) the Transaction Value, (B) plus the Cash Amount, (C) less the Indebtedness Payoff Amount, (D) less the Closing Management Bonuses, and (E) plus the excess of the Net Working Capital Amount over the Target Net Working Capital Amount or minus the excess of the Target Net Working Capital Amount over the Net Working Capital Amount, in each case as finally determined pursuant to this Section 2.04.

(b)    Post-Closing Adjustment.

(i)    Payment by the Buyer - Actual Purchase Price.    If the Actual Purchase Price is greater than the Estimated Purchase Price, within five (5) Business Days after the final determination of the Actual Purchase Price, the Buyer shall pay to the Seller, by wire transfer or delivery of other immediately available funds, an amount equal to such difference plus simple interest thereon, at an interest rate equal to 8%, from the Closing Date to the date of payment, computed on an annual basis using a 360-day year.

(ii)    Payment by the Seller - Actual Purchase Price.    If the Actual Purchase Price is less than the Estimated Purchase Price, then within five (5) Business Days after the determination of the Actual Purchase Price, the Seller shall pay to the Buyer, by wire transfer or delivery of other immediately available funds, an amount equal to such difference plus simple interest thereon, at an interest rate equal to 8%, from the Closing Date to the date of payment, computed on an annual basis using a 360-day year.

(iii)    Dispute.    If, pursuant to this Section 2.04, there is a dispute as to the final determination of the Actual Purchase Price, the Buyer, on the one hand, and the Seller, on the other hand, shall promptly pay to the other, as appropriate, such amounts as are not in dispute, together with interest thereon at an interest rate equal to 8%, from the Closing Date to the date of payment, computed on an annual basis using a 360-day year, pending final determination of such dispute pursuant to this Section 2.04.

**Section 2.05    Conversions.**

(a)    The Seller and the Buyer agree to treat the sales of the Shares in the Company as a sale of the assets of the Company and its Subsidiaries for federal, state, and local tax purposes, unless otherwise required by a Final Determination.

(b)    The Buyer and the Seller agree that the Actual Purchase Price plus any assumed liabilities will be allocated among the acquired assets in a manner consistent with Section 1060 of the Code and the regulations promulgated thereunder.  The Buyer will complete a draft schedule (the "Allocation Schedule") allocating the Actual Purchase Price and assumed liabilities to the acquired assets and provide a copy to Seller at least sixty (60) days prior to the due date (including extensions) for filing any form with respect to the Allocation Schedule.  The Seller shall notify the Buyer within ten (10) Business Days after the receipt thereof if it considers

the amount allocated to any assets to be inconsistent with Section 1060 of the Code and the regulations promulgated thereunder. The Seller and the Buyer shall attempt to resolve any disagreement in good faith. If the Seller and the Buyer fail to reach agreement as to an alternative allocation in the ten (10) Business Days following such notice, the dispute with respect to the Allocation Schedule shall be presented on the next Business Day to a nationally recognized independent accounting firm mutually chosen by the Buyer and the Seller, and if the Buyer and the Seller cannot agree, mutually chosen by their respective independent accounting firms, for a decision that shall be rendered within fifteen (15) Business Days thereafter. The independent accounting firm's review shall be limited to whether a disputed item has been prepared in accordance with Section 1060 of the Code and the regulations promulgated thereunder, and its decision shall be final and binding on all parties. The fees, costs and expenses incurred in connection therewith shall be shared in equal amounts by the Seller and the Buyer. The Buyer and the Seller shall exchange, complete and properly execute copies of Internal Revenue Service Form 8594, the required schedules related thereto, and any similar state, local and foreign forms and schedules, all of which have been prepared on a basis consistent with the Allocation Schedule, not later than thirty (30) days prior to the filing date. The Buyer and the Seller shall file, and cause their respective Affiliates to file, all Tax Returns and statements, forms and schedules in connection therewith in a manner consistent with the Allocation Schedule and shall take no position inconsistent therewith, unless, and then only to the extent, required to do so by a Final Determination.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to the Buyer as set forth in this Article 3, except as set forth in the corresponding sections or subsections of the Schedules accompanying this Agreement (each a "Schedule" and, collectively, the "Schedules") or in any other section or subsection of the Schedules if it is reasonably apparent that such disclosure would apply. Capitalized terms used in the Schedules and not otherwise defined therein shall have the meanings ascribed to such terms in this Agreement.

### Section 3.01    Organization and Qualification.

(a)    The Company and each of the Subsidiaries (as defined below) are duly organized, validly existing and, where applicable, in good standing under the laws of their respective jurisdictions of organization. The Company and each of its subsidiaries have full power and authority to own or lease their respective properties and to conduct their businesses in the manner and in the places where such properties are owned or leased and where such businesses are currently conducted, except where the failure to have such power and authority would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The copies of the Company's and the Subsidiaries' respective organizational documents, as each have been amended to date and heretofore made available to the Buyer and/or its agents, are complete and correct, and no amendments thereto are pending, except with respect to the Conversions.

(b)    The Company and each of the Subsidiaries are duly licensed and qualified to do business and in good standing in each jurisdiction in which the properties owned or leased

11

by it or the operation of its business makes such licensing or qualification to do business necessary, except where the failure to be so licensed or qualified would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 3.02   Capitalization; Subsidiaries; Securities Owned.**   Schedule 3.02 sets forth, as of the Closing Date, all of the Shares. As of the Closing Date, all of the Shares are owned by the Seller. All of the Shares have been duly authorized, are validly issued, fully paid and nonassessable, and are not subject to, nor were they issued in violation of, any preemptive rights. As of the Closing Date, the Company will be the sole owner, directly or indirectly, of 100% of the outstanding equity interests of each of the Subsidiaries set forth on Schedule 3.02. As of the Closing Date, the ownership and capitalization of each of the Subsidiaries will be as set forth on Schedule 3.02. Other than the equity interests the Company owns in the Subsidiaries, the Company does not own any securities issued by any other business organization or Governmental Authority. Except for this Agreement, as of the Closing Date, there are no outstanding or authorized options, warrants, rights, contracts, rights to subscribe, conversion rights or other agreements or commitments to which the Company or any Subsidiary is a party or which are binding upon the Company or any Subsidiary providing for the issuance, disposition or acquisition of any equity interests of the Company or any Subsidiary.

**Section 3.03   Authority of the Company.**

(a)     The Company has the full right, power and authority to enter into this Agreement and each agreement, document and instrument to be executed and delivered by it pursuant to or as contemplated by this Agreement and to carry out the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the performance of the Company's obligations hereunder have been duly authorized by all necessary action on the part of the Company. This Agreement and each agreement, document and instrument to be executed and delivered by the Company pursuant to this Agreement constitute, or will when executed and delivered constitute, valid and binding obligations of the Company, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(b)     The execution, delivery and performance by the Company of this Agreement and each such agreement, document and instrument contemplated by this Agreement to which it is a party:

(i)     do not and will not violate any provision of the formation documents of the Company or the Subsidiaries;

(ii)     do not and will not violate any laws of the United States, Delaware or Texas, or any other jurisdiction applicable to the Company or any Subsidiary, or require the Company to obtain any material approval, consent or waiver of, or make any material filing with, any Person (governmental or otherwise) that has not been obtained or made; and

12

(iii)     do not and will not result in a breach of, constitute a default under, accelerate any obligation under, or give rise to a right of termination of any material indenture, loan or credit agreement, or any other material agreement, contract, instrument, mortgage, deed of trust, lien, lease, permit, authorization, order, writ, judgment, injunction, decree, determination or arbitration award, whether written or oral, to which the Company or any Subsidiary is a party or by which the property of the Company or any Subsidiary is bound, except as otherwise set forth on Schedule 3.03(b)(iii) hereto.

Section 3.04   Compliance with Laws.   Except as set forth on Schedule 3.04 hereto, to the Knowledge of the Company, the Company and each of the Subsidiaries are in compliance in all material respects with all applicable statutes, ordinances, orders, codes, rules, regulations and requirements ("Laws") promulgated by any federal, state, territory, municipal or other governmental authority (a "Governmental Authority") which are necessary for the operation of the business of the Company or such Subsidiary as conducted.

Section 3.05   Advisory and Other Fees.   Neither the Company nor any of the Subsidiaries has incurred or shall become liable for any advisory fee, broker's commission or finder's fee relating to or in connection with the transactions contemplated by this Agreement, other than advisory fees payable to Downer & Company, LLC, which fees shall be paid as provided in Section 12.04, and other than the Seller Transaction Expenses described in Section 12.04 hereto.

Section 3.06   Taxes.   Except as set forth on Schedule 3.06 hereto:

(a)     (i)     All United States federal income Tax Returns of or with respect to the Company and the Subsidiaries required by Law to be filed have been timely filed and all other material Tax Returns of or with respect to the Company and the Subsidiaries required by applicable federal, foreign, state, local or other Law to be filed have been filed. All Tax Returns that have been filed are true, complete and correct in all material respects.

(ii)     All Taxes of or with respect to the Company and each of the Subsidiaries due and payable on or before the Closing Date have been timely paid or caused to be paid in full. All Taxes of or with respect to the Company and each of the Subsidiaries that are due and payable after the Closing Date are adequately reserved for in accordance with GAAP on the books and records of the Company. There are no liens for Taxes with respect to any of the assets or properties of the Company or any Subsidiary, other than statutory liens for Taxes not yet due for which adequate reserves have been maintained in accordance with GAAP.

(iii)     The Unaudited Financial Statements reflect an adequate reserve in accordance with GAAP for all Taxes payable by the Company and each Subsidiary for all taxable periods and portions thereof through the date of such financial statements.

(iv)     There has not been any audit of any Tax Return filed by or with respect to the Company or any Subsidiary for which the applicable statute of limitations

13

has not expired; no audit of any such Tax Return of or including the Company or any Subsidiary is in progress; and neither the Company nor any Subsidiary has been notified in writing, or, to the Knowledge of the Company, by verbal communication, by any Governmental Authority that any audit is contemplated or pending. No written or, to the Knowledge of the Company, verbal claim has been made by any Governmental Authority in a jurisdiction where the Company or any Subsidiary does not file Tax Returns that the Company or such Subsidiary is or may be subject to taxation by that jurisdiction.

(b)      Neither the Company nor any Subsidiary is a party to, bound by or obligated under any agreement relating to allocating or sharing the payment of, or liability for, Taxes (including, without limitation, any advance pricing agreement, closing agreement or other agreement relating to Taxes with any Taxing Authority); nor do they have any liability for Taxes of any Person under Treasury Regulation § 1.1502-6 (or a similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise.  The Company and the Subsidiaries have never been (or in the case of Inca Metal Products Corporation, since September 24, 1999, have not been) a member of any combined, unitary, consolidated or other affiliated group within the meaning of Section 1504 of the Code or otherwise, of which any entity other than the Company or any of the Subsidiaries is or has been a member for federal, state, local, or foreign tax purposes.

(c)      No closing agreement pursuant to Section 7121 of the Code or any similar provision of any state, local or foreign law has been entered into by or with respect to the Company or any Subsidiary.  Neither the Company nor any Subsidiary has agreed to, or is required to make any adjustment for, any period after the Closing Date pursuant to Section 481(a) of the Code or for any other reason.  There is no application pending with any Taxing Authority requesting permission for any such change in any accounting method of the Company or any Subsidiary and the Internal Revenue Service has not proposed in writing any such adjustment or change in accounting method.

(d)      (i) No property of the Company or any Subsidiary is "tax exempt use property" within the meaning of Section 168(h) of the Code, (ii) neither the Company nor any Subsidiary is a party to any lease made pursuant to Section 168(f)(8) of the Internal Revenue Code of 1954, and (iii) none of the assets of the Company or any Subsidiary is subject to a lease under Section 7701(h) of the Code or under any predecessor section thereof.

(e)      There are no outstanding agreements or waivers extending, or having the effect of extending, the statutory period of limitation applicable to any Tax Returns required to be filed with respect to the Company or any Subsidiary and neither the Company nor any Subsidiary has requested any extension of time within which to file any Tax Return, which return has not yet been filed.  No power of attorney with respect to any Taxes has been executed or filed with any Taxing Authority by or on behalf of the Company or any Subsidiary.

(f)      The Company and each Subsidiary have complied in all respects with all applicable laws relating to the payment and withholding of all federal Taxes and state and local income and sales and use Taxes and all other material Taxes (including withholding pursuant to Sections 1441, 1442, 3121 and 3402 of the Code and any comparable provision of any state, local or foreign laws) and have, within the time and in the manner prescribed by applicable law,

14

withheld from and paid over to the proper Taxing Authorities all amounts required to be so withheld and paid over under such laws.

(g)    The Company has made available to Buyer for inspection (i) complete and correct copies of all federal Tax Returns and state and local income and sales and use Tax Returns and all other material Tax Returns of the Company and each Subsidiary filed since December 31, 2003 and (ii) complete and correct copies of all private letter rulings, revenue agent reports, information document requests, notices of proposed deficiencies, deficiency notices, protests, petitions, closing agreements, settlement agreements, pending ruling requests, and any similar documents, submitted by, received by or agreed to by or on behalf of the Company or any Subsidiary, and relating to Taxes since December 31, 2003 and, to the Knowledge of the Company, no private letter rulings, revenue agent reports, information document requests, notices of proposed deficiencies, deficiency notices, protests, petitions, closing agreements, settlement agreements, pending ruling requests, or any similar documents, have been submitted by, received by or agreed to by or on behalf of the Company or any Subsidiary before December 31, 2003.

(h)    Neither the Company nor any Subsidiary is a party to any "listed transaction" as defined in Treasury Regulation Section 1.6011-4(b)(2).

(i)    The Company has not been, at any time during the applicable time period set forth in Section 897(c)(1) of the Code, a United States real property holding company within the meaning of Section 897(c)(2) of the Code.

(j)    No Seller is a "foreign person" within the meaning of Section 1445 of the Code.

(k)    The Company is wholly owned by the Seller.  Each of the Company's Subsidiaries is wholly owned by the Company or a Subsidiary of the Company.  The Company and each of its Subsidiaries were converted at least one (1) Business Day prior to the Closing Date into Delaware or Texas limited liability companies.  The Seller, the Company, the Subsidiaries and their Affiliates have not, and will not, file an election for the Company or any of its Subsidiaries to be treated as corporations for federal, state, or local Tax purposes.  Subject in each case to a Final Determination, the Seller, the Company, its Subsidiaries, and their Affiliates have, and will, treat the conversion as liquidations for Tax purposes in accordance with Treasury Regulations Section 301.7701-3(g)(1)(iii), will treat the Company and its Subsidiaries as disregarded entities for federal Tax purposes and, to the extent not prohibited by law, for state and local Tax purposes from the date of such conversions, and therefore will treat the transactions contemplated hereby as a sale of the assets of the Company and its Subsidiaries for federal Tax purposes and, to the extent not prohibited by law, for state and local Tax purposes.

### Section 3.07    Officers and Directors; Books and Records

(a)    Schedule 3.07(a) hereto sets forth the name and title of each officer and director of the Company and each Subsidiary.

15

(b)    The copies of the records of the Company and the Subsidiaries, as made available by the Company to the Buyer and/or its agents, are true and complete copies of the originals of such documents.

**Section 3.08    Litigation.**  Schedule 3.08 hereto sets forth each continuing action, suit, investigation and other proceeding pending or, to the Company's Knowledge, each material action, suit, investigation and other proceeding threatened against the Company or any of the Subsidiaries, in either case at law or in equity, or before or by any Governmental Authority.

**Section 3.09    Financial Statements.**

(a)    The Company has delivered to the Buyer the following financial statements, attached as Schedule 3.09(a) hereto:

(i)    audited consolidated balance sheets of the Company and the Subsidiaries as of December 31, 2004 and December 31, 2005 and audited consolidated statements of operations, members' equity, and cash flows for the fiscal years then ended (collectively, the "Audited Financial Statements"); and

(ii)    unaudited consolidated balance sheet of the Company and the Subsidiaries as of December 31, 2006 (the "Latest Balance Sheet"), and the related statements of operations and cash flows for the twelve (12) months then ended (collectively, the "Unaudited Financial Statements" and, together with the Audited Financial Statements, the "Financial Statements").

(b)    The Audited Financial Statements have been prepared in accordance with GAAP applied consistently during the periods covered thereby, and present fairly in all material respects the financial condition of the relevant entities at the dates of said statements and the results of their operations and cash flows for the periods covered thereby.  The Unaudited Financial Statements have been prepared in accordance with GAAP applied consistently during the period covered thereby, and present fairly in all material respects the financial condition of the Company and the Subsidiaries at the date of such statements and the results of their operations and cash flows for the period covered thereby, except that they do not contain the materials and disclosures to be found in notes to financial statements prepared in accordance with GAAP.

(c)    Except as set forth on Schedule 3.09(c) hereto, neither the Company nor any Subsidiary has any liabilities that would be required to be reflected on a balance sheet prepared in accordance with GAAP, except for (i) the liabilities reflected or reserved against on the Latest Balance Sheet (including all notes thereto); (ii) liabilities incurred in the ordinary course of business since the date of the Latest Balance Sheet; and (iii) liabilities incurred in connection with the transactions contemplated hereby.

(d)    The information set forth on Schedule 3.09(d) regarding leases entered into by the Company and the Subsidiaries is true and correct in all material respects.

(e)    There are no letters of credit or performance bonds issued by or on behalf of the Company or any Subsidiary.

**Section 3.10  Transactions with Affiliates.**  Except (i) for intra-company transactions amongst the Company and the Subsidiaries, (ii) as set forth on Schedule 3.10 hereto, and (iii) to the extent reflected in the Financial Statements, there have been no material transactions, contracts, understandings or agreements of any kind between the Company or any Subsidiary and any Person which is an Affiliate of the Company or such Subsidiary.  As of the Closing, there shall be no amounts of any kind payable by the Company, or any other obligation of the Company outstanding, to the Seller or any of its Affiliates.  Any transactions between the Company or any Subsidiary and any entities that American Capital or its Affiliates control other than the Company and its Subsidiaries are on terms not materially worse than terms that could be obtained by the Company or any Subsidiary in an arms-length transaction with a third party.

**Section 3.11  Real Properties.**

(a)  The Company (or the Subsidiary listed thereon) has good and marketable title to the real properties set forth on Schedule 3.11(a) (the "Owned Real Property"), free and clear of Liens, except for Permitted Liens.  Except as set forth on Schedule 3.11(a), no Owned Real Property is subject to any sales contract, option, right of first refusal or similar agreement or arrangement with any third party.

(b)  Schedule 3.11(b) hereto sets forth each lease or other agreement under which the Company or any Subsidiary leases or has rights in any material real property (the "Real Property Leases" and, each individually, a "Real Property Lease").  True and complete copies of the Real Property Leases have been made available to the Buyer and/or its agents by the Company.  Except as set forth on Schedule 3.11 hereto, the Company or a Subsidiary has a valid and subsisting leasehold interest in all the real property which is the subject of each of the respective Real Property Leases set forth on Schedule 3.11 hereto (individually, the "Leased Real Property" and, collectively, the "Leased Real Properties").

(c)  To the Knowledge of the Company, no material permit, license or certificate of occupancy pertaining to the leasing or operation of any Owned Real Property or Leased Real Property, other than those which are transferable with such property, is required by any Governmental Authority.

(d)  The Company and its Subsidiaries are in possession of each parcel of Real Property, and, except as set forth on Schedule 3.11(d), there are no contractual or legal restrictions except for Permitted Liens that preclude or restrict the ability to use the Real Property for the purposes for which it is currently being used, except for such restrictions as would not be material.  Neither the Company nor any of its Subsidiaries has leased any material parcel or any material portion of any material parcel of Real Property to any other Person and no other Person has any rights to the use, occupancy or enjoyment thereof pursuant to any lease, license, occupancy or other agreement, nor has the Company or any Subsidiary assigned its interest under any Real Property Lease to any third party.  There are no condemnation proceedings or eminent domain proceedings of any kind pending or, to the Knowledge of the Company, threatened against the Real Property.  To the Knowledge of the Company, there are no material latent structural defects or material adverse physical conditions affecting structures on the Real Property or any of the facilities, buildings, structures, erections, improvements, fixtures, fixed assets and personalty of a permanent nature annexed, affixed or attached to, located on or

17

forming party of the Real Property. To the Knowledge of the Company, all improvements on the Real Property are wholly within the lot limits of such Real Property and no not encroach on any adjoining premises or Encumbrance benefiting such Real Property, and there are no encroachments on any Real Property or any easement or property right or benefit appurtenant thereto by any improvements located on any adjoining premises.

Section 3.12    Absence of Material Adverse Effect.    Except as set forth on Schedule 3.12 hereto, since the date of the Latest Balance Sheet, there has not been any Material Adverse Effect.

Section 3.13    Absence of Certain Changes.    Except as set forth on Schedule 3.13 hereto, or as contemplated by this Agreement, the Company has complied in all material respects with the covenants and restrictions set forth in Section 6.01 hereof to the same extent as if this Agreement had been executed on, and had been in effect since, the date of the Latest Balance Sheet.

Section 3.14    Tangible Personal Property.    Except as set forth on Schedule 3.14 hereto, (a) the Company or a Subsidiary has good title to all of the items of tangible personal property reflected on the Latest Balance Sheet, except as sold or disposed of subsequent to the date thereof in the ordinary course of business consistent with past practices, and (b) all such tangible personal property is owned free and clear of all liens, encumbrances, contracts and security interests (collectively, "Liens"), except for (i) Liens identified on Schedule 3.14 hereto, (ii) Liens which, individually or in the aggregate, do not materially detract from the value, or materially interfere with the present use, of the Company's aggregate tangible personal property, and (iii) Permitted Liens. Except as set forth on Schedule 3.14 hereto, to the Knowledge of the Company, the facilities, plants, machinery and equipment of the Company and the Subsidiaries, taken as a whole, are in good working order and condition, ordinary wear and tear excepted, and are fit for the purpose for which they are currently being used.

Section 3.15    Intellectual Property.    Schedule 3.15 hereto sets forth all patents, trademark registrations, service mark registrations, trade names, domain names, copyright registrations, and all applications for any of the foregoing, that are material to the business of the Company and its Subsidiaries as is currently conducted and that are or, within the last two (2) years, were owned by or licensed by the Company or any Subsidiary. Except as set forth on Schedule 3.15 hereto, neither the Company nor any Subsidiary has received any written notice of infringement of or conflict with asserted rights of others with respect to any know-how, trade secrets, patents, trademarks, trade names, brand names and copyrights that are owned or used by, or licensed to, the Company or any Subsidiary (the "Company Intellectual Property"). The Company or a Subsidiary is the exclusive owner of the entire right, title and interest in and to, or has a valid license to use, the Company Intellectual Property. To the Knowledge of the Company, none of the Company Intellectual Property has been adjudged invalid or unenforceable in whole or in any material part. To the Knowledge of the Company, the conduct of the business of the Company and its Subsidiaries as currently conducted does not infringe or misappropriate the Intellectual Property of any third party, and no claim has been asserted against the Company or any of its Subsidiaries alleging any of the following. To the Knowledge of the Company, no Company Intellectual Property is subject to any outstanding decree, order,

18

injunction, judgment or ruling restricting the use of such Company Intellectual Property or that would impair the validity or enforceability of such Company Intellectual Property.

    **Section 3.16   Contracts.**  Except for contracts, commitments, plans, agreements and licenses listed on Schedule 3.16 hereto (true and complete copies of which have been made available to the Buyer and/or its agents) (the "Contracts"), neither the Company nor any Subsidiary is a party to or subject to:

    (a)     any plan or contract providing for bonuses, stock, options, stock purchases, profit sharing, collective bargaining or the like or any contract or agreement with any labor union (other than the plans listed on Schedule 3.19);

    (b)     any employment contract or contract for services which requires the payment of more than $100,000 annually in total cash compensation which is not terminable on sixty (60) or fewer days notice by the Company or a Subsidiary without liability for any material penalty or severance payment;

    (c)     any contract or agreement for the purchase of any commodity, material or equipment in excess of $100,000 as of March 6, 2007;

    (d)     any other contracts or agreements creating any obligation of the Company or any Subsidiary of more than $100,000 annually with respect to any such contract;

    (e)     any contract or agreement requiring the purchase of all or substantially all of its requirements of a particular product from a supplier of more than $100,000 annually;

    (f)     any material contract or agreement which by its terms does not terminate or is not terminable by the Company or a Subsidiary within twelve (12) months after the date hereof;

    (g)     any material contract containing covenants explicitly limiting the freedom of the Company or any Subsidiary to compete in any line of business or with any Person;

    (h)     any contract or agreement for the purchase of any fixed asset for a price in excess of $100,000;

    (i)     any partnership, joint venture or other similar contract or agreement; or

    (j)     any material contract or agreement providing for the license of patents, trademarks, service marks, trade names or copyrights between the Company or any Subsidiary and any third party.

    All Contracts are valid and in full force and effect and constitute legal, valid and binding obligations of the Company or the applicable Subsidiary and, to the Knowledge of the Company, the other parties thereto, and are enforceable against the Company or such Subsidiary in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in

a proceeding at law or in equity). Neither the Company nor any Subsidiary, nor, to the Knowledge of the Company, any other party thereto is in default in complying with any material provisions thereof, nor has the Company or any Subsidiary received written notice of any such default, and, to the Knowledge of the Company, no condition or event or facts exist which, with notice, lapse of time or both, would constitute a material default thereunder on the part of the Company or any Subsidiary.

> **Section 3.17    Insurance.**  All policies of insurance or fidelity bonds maintained by the Company or any Subsidiary are in full force and effect and, to the Knowledge of the Company, neither the Company nor any Subsidiary is in default with respect to its payment obligations under any such policies.  Neither the Company nor any of its Subsidiaries has received any written notice of cancellation, material change in coverage or pending material change in the terms of any insurance policy.  All material assets, properties and Other Insured Liabilities of the Company and its Subsidiaries are covered by valid and currently effective insurance policies or binders of insurance issued in favor of the Company or a Subsidiary thereof, in each case in such types and amounts and covering such risks as are, to the Knowledge of the Company, reasonable for the business operations of the Company and its Subsidiaries.

> **Section 3.18    Permits.**  Except as set forth on Schedule 3.18 hereto, (i) the Company and each of the Subsidiaries have obtained all material permits, registrations, licenses, franchises, certifications and other approvals (collectively, the "Approvals") from federal, state, foreign or local authorities necessary for the conduct of their business as presently conducted, (ii) all such Approvals are valid and in full force and effect and (iii) none of such Approvals is subject to termination by its terms as a result of the execution of this Agreement by the Company or by the consummation of the transactions contemplated by this Agreement.

> **Section 3.19    Employee Benefit Plans.**  All Employee Benefit Plans are listed on Schedule 3.19 hereto.  Except as set forth on Schedule 3.19 hereto:

> > (a)    all Employee Benefit Plans have been made available to the Buyer and/or its agents;

> > (b)    to the Knowledge of the Company, all Employee Benefit Plans have been maintained, funded and administered in compliance in all material respects with all applicable Laws, including without limitation, the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and the Code and, in each case, the regulations thereunder;

> > (c)    no Employee Benefit Plan, or any trustee or administrator thereof nor any employee or any "fiduciary" has, to the Knowledge of the Company, engaged in any breach of fiduciary responsibility or any "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) to which Section 406 of ERISA or Section 4975 of the Code applies and which could subject any such Employee Benefit Plan or trustee or administration thereof, or any party dealing with any such Employee Benefit Plan, to a material tax or penalty imposed by Section 502(i) of ERISA or Section 4975 of the Code;

> > (d)    no Employee Benefit Plan is or has within the six years preceding the date of this Agreement been subject to Section 412 or 4971 of the Code or Section 302 or Title IV of

20

ERISA and no Controlled Group Liability has been incurred by the Company or any Subsidiary and no condition exists that could result in the Company or any Subsidiary incurring any Controlled Group Liability;

      (e)    neither the Company nor any Subsidiary has contributed to or had any obligation to contribute to any "multiemployer plan" within the meaning of Section 3(37) of ERISA;

      (f)    each Employee Benefit Plan intended to qualify under Section 401 of the Code has received a favorable determination letter from the Internal Revenue Service that such Employee Benefit Plan is a "qualified plan" under Section 401(a) of the Code; the related trusts are exempt from tax under Section 501(a) of the Code; and, to the Knowledge of the Company, no facts or circumstances exist that would be reasonably likely to jeopardize the qualification of such Employee Benefit Plan;

      (g)    with respect to the Employee Benefit Plans all required contributions have been made or properly accrued on the Financial Statements;

      (h)    neither the Company nor any of its Subsidiaries sponsors any Employee Benefit Plan that is a "defined benefit plan" (as defined in ERISA Section 3(35));

      (i)    neither the Company nor any Subsidiary has liability under any Employee Benefit Plan, or otherwise, to provide medical or death benefits (whether or not insured) with respect to current or former employees of the Company or any Subsidiaries beyond their termination of employment or beneficiary or dependent thereof (other than coverage mandated by law), and there are no reserve assets, surplus or prepaid premiums under any such Employee Benefit Plan;

      (j)    to the Knowledge of the Company, there are no pending, threatened or anticipated claims (other than routine claims for benefits), audits, investigations, or proceeding by, on behalf of or against any of the Employee Benefit Plans or any trusts related thereto which could reasonably be expected to result in any material liability of the Company or any Subsidiary;

neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will, other than pursuant to actions taken by the Buyer, result in (either alone or in conjunction with any other event) (i) result in or cause any material liability to any present or former employee or independent contractor, including, but not limited to, as a result of the Worker Adjustment Retraining and Notification Act, (ii) result in or cause any acceleration or vesting of, any payment, benefit or award under any Employee Benefit Plan, or (iii) result in any payment or benefit that will or may be made by the Company or any Subsidiary or other affiliate that will be characterized as an "excess parachute payment" within the meaning of Section 280G of the Code (the representation and warranty in this clause (iii) only is not qualified by the disclosure in Items 2, 3 and 4 under the heading "KIC Holdings" of Schedule 3.19).

      **Section 3.20  Employees; Labor Matters.**    Neither the Company nor any Subsidiary is delinquent in any material payments to any of their respective current or former

employees for any wages, salaries, commissions, bonuses, severance, termination pay or other direct compensation for any services performed for it to the date hereof or amounts required to be reimbursed to such current or former employees. Except as set forth on Schedule 3.20 hereto, neither the Company nor any Subsidiary has any written policy, practice, plan or program of paying severance pay or any written form of severance compensation in connection with the termination of employment. Except as set forth on Schedule 3.20 hereto, there are no material grievances, complaints or charges that have been filed against the Company or any Subsidiary under any dispute resolution procedure (including, but not limited to, any proceedings under any dispute resolution procedure under any collective bargaining agreement) that have not been dismissed. Except as set forth on Schedule 3.20 hereto, no collective bargaining agreements are in effect or are currently being negotiated by the Company or any Subsidiary. Neither the Company nor any Subsidiary has received written notice of pending or threatened changes with respect to (including, without limitation, resignation of) the senior management or key supervisory personnel of the Company or such Subsidiary.

Section 3.21    Environmental Matters.    Except as set forth on Schedule 3.21 hereto, to the Knowledge of the Company:

(a)    The Company and each of the Subsidiaries are in compliance with all applicable Environmental Requirements, except where failure to so comply would not reasonably be expected to have a Material Adverse Effect.

(b)    The Company and each of the Subsidiaries possess and are in compliance with all material Environmental Approvals necessary for the conduct of their business as presently conducted, except where failure to possess and comply with such Environmental Approvals would not reasonably be expected to have a Material Adverse Effect.

(c)    Neither the Company nor any Subsidiary has received written notice from a Governmental Authority or other third party asserting that the Company or such Subsidiary has failed in a material respect to comply with an Environmental Requirement or Environmental Approval, or that the Company or such Subsidiary is liable in a material respect for a material injury or material damages to a Person or property because of the Release or threatened Release of any Hazardous Materials, except where such failure to comply or such liability would not reasonably be expected to have a Material Adverse Effect.

(d)    The Company has made available to the Buyer material environmental reports that are in the possession of the Company or any of its Subsidiaries and that relate to the Company's or a Subsidiary's property, facility or operation.

(e)    As used in this Agreement:

(i)    "Environmental Requirement" means a Law concerning natural resources, Hazardous Materials, pollution, contamination, exposure of workers to Hazardous Materials, or other environmental matters.

(ii)    "Environmental Approval" means an Approval that is required pursuant to an Environmental Requirement.

22

(iii)    "Hazardous Material" means (a) petroleum and petroleum products, radioactive materials, asbestos-containing materials, urea formaldehyde foam insulation, transformers or other equipment that contain polychlorinated biphenyls and radon gas, (b) any other chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "extremely hazardous wastes", "restricted hazardous wastes", "toxic substances", "toxic pollutants", "contaminants" or "pollutants", or words of similar import, under any applicable Environmental Requirement, and (c) any other chemical, material or substance that is regulated by any Environmental Requirement.

(iv)    "Release" means disposing, discharging, injecting, spilling, leaking, leaching, dumping, emitting, escaping, emptying, seeping, placing and the like into or upon any land or water or air or otherwise entering the environment.

(f)    Notwithstanding any implication to the contrary contained herein, this Section 3.21 and Section 3.08 constitute the sole and exclusive representations and warranties of the Company with respect to environmental matters (including Environmental Requirements and Environmental Approvals).

Section 3.22  Employee Relations.  Except as set forth on Schedule 3.22, none of the employees of the Company or the Subsidiaries is represented by a union, and, to the Knowledge of the Company, no union organizing efforts have been conducted or are now being conducted.  Set forth on Schedule 3.22 hereto is a list of all material actions, suits and proceedings pending between the Company or any Subsidiary and any employees, former employees or prospective employees of the Company or such Subsidiary or involving other labor-related matters (including, without limitation, charges of employment discrimination or unfair labor practices).  Neither the Company nor any Subsidiary is in violation in any material respect of any provision of any Law promulgated by any Governmental Authority regarding the terms and conditions of employees, former employees or prospective employees or other labor-related matters, including, without limitation, Laws relating to discrimination, fair labor standards and occupational health and safety, wrongful discharge or violation of the personal rights of employees, former employees or prospective employees of the Company or any Subsidiary.

Section 3.23  Key Employees.  Schedule 3.23 lists the name, place of employment, the current annual salary rates, bonuses and deferred or contingent compensation, pension, accrued vacation, "golden parachute" paid or payable (in cash or otherwise) in 2006 and 2005 (except for accrued vacation which shall be as of December 31, 2006 only), the date of employment and a description of the position and job function of each current salaried employee or officer of the Company or any Subsidiary whose annual compensation exceeded (or, in 2007, is expected to exceed) $100,000.

Section 3.24  Receivables.  Schedule 3.24 contains an aged list of the Receivables as of March 6, 2007, showing separately those Receivables that as of such date had been outstanding for (a) 30 days or less, (b) 31 to 60 days, (c) 61 to 90 days, and (d) more than 90 days.  Except to the extent, if any, reserved for on the Unaudited Financial Statements, all Receivables reflected on the Unaudited Financial Statements will have arisen from, and the

23

Receivables existing as of the Closing will have arisen from, the sale of products or services to Persons not affiliated with the Company or its Subsidiaries and in the ordinary course of business consistent with past practice and, except as reserved against on the Unaudited Financial Statements, constitute or will constitute, as the case may be, valid claims of the Company or a Subsidiary, to the Knowledge of the Company, not subject to valid claims of setoff or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice. As of the date hereof, neither the Company nor any of its Subsidiaries have received written notice from any customer that it is unwilling or unable to pay any of the Receivables on Schedule 3.24. The Buyer acknowledges and agrees that this provision is not a guaranty that any of the Receivables are collectible or will be collected.

Section 3.25 Inventories. The Company or a Subsidiary has good and marketable title to the Inventories free and clear of all Liens other than Permitted Liens. Except as set forth on Schedule 3.25 hereto, the Inventories do not consist of, in any material amount, items that are obsolete, damaged or slow-moving, or items usable solely by a single customer who has notified the Company that such customer is not prepared to acquire such items. The Inventories do not consist of any items held on consignment. To the Knowledge of the Company, the Inventories are in good and merchantable condition in all material respects.

Section 3.26 Customers. Schedule 3.26 sets forth the names and addresses of the top ten (10) customers of the Company and its Subsidiaries (measured by aggregate revenue) during the year ended December 31, 2006 (each, a "Current Customer") and the amount for which each Current Customer was invoiced during such year. None of the Current Customers that procure products and services of the Company primarily through solicitations of competitive bids has given written notice or Specific Verbal Notice to the Company or any Subsidiary that the Company is no longer eligible to participate in bid solicitations by such Current Customer. None of the Current Customers that procure products and services of the Company primarily through direct purchases other than through solicitations of competitive bids has given written notice or Specific Verbal Notice to the Company or any Subsidiary that the Company is no longer eligible to provide products and services to such Current Customer or that such Current Customer has determined that it will significantly reduce its purchases of the Company's products and services during the year ending December 31, 2007. As used herein, "Specific Verbal Notice" means direct, specific and unambiguous verbal communication with James Levine, Byron J. Daniels, Walter E. Cisowski, Fernando Heredia, Richard Edenfield and Greg Christy. The Buyer acknowledges and agrees that this provision is not a guaranty or assurance that any Current Customer will solicit bids from the Company regarding the Company's products or services or will continue to purchase the Company's products or services in any amount or at all. As of March 7, 2007, the aggregate amount of orders received from the customers of the Company and the Subsidiaries for purchases of the products of the Company and the Subsidiaries that have not been fulfilled through delivery of products to such customers is not less than $12,436,000.

Section 3.27 No Other Representations and Warranties. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE 3 (INCLUDING THE SCHEDULES), NEITHER THE COMPANY NOR ANY OF THE SUBSIDIARIES MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, AND THE COMPANY AND EACH SUBSIDIARY HEREBY DISCLAIM

ANY SUCH REPRESENTATION OR WARRANTY WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer that:

**Section 4.01  Organizational Authorization.**  The execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby are within Seller's organizational powers and have been duly authorized by all necessary action on the part of the Seller. This Agreement constitutes a valid and binding agreement of Seller, enforceable against the Seller in accordance with its terms, except as enforceability may be limited by applicable equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws from time to time in effect affecting the enforcement of creditors' rights generally.

**Section 4.02  Governmental Authorization.**  The execution, delivery and performance by the Seller of this Agreement and the consummation of the transactions contemplated hereby require no material action by or in respect of, or material filing with, any governmental body, agency or official.

**Section 4.03  Noncontravention.**  The execution, delivery and performance by the Seller of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) violate its certificate or articles of incorporation or bylaws or other equivalent governing documents, (ii) assuming compliance with the matters referred to in Section 4.02, violate any material law, rule, regulations, judgment, injunction, order or decree applicable to the transactions contemplated hereby or (iii) require any material consent or other material action by any Person under, constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of the Seller under any provisions of any material agreement or other material instrument binding upon the Seller.

**Section 4.04  Seller's Ownership of the Shares at the Closing Date.**  As of the Closing Date, the Seller will own all of the Shares. Upon transfer of the Shares to the Buyer at the Closing in accordance with this Agreement, the Buyer will own such Shares free and clear of all Liens other than those imposed by the actions of Buyer.

**Section 4.05  No Other Representations and Warranties.**  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE 4, THE SELLER MAKES NO EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, AND THE SELLER HEREBY DISCLAIMS ANY SUCH REPRESENTATION OR WARRANTY WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

011107.0108\393259.18

# ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the other parties hereto that:

**Section 5.01   Existence and Power.**  Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Tennessee and has all corporate powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

**Section 5.02   Organizational Authorization.**   The execution, delivery and performance by the Buyer of this Agreement and the consummation of the transactions contemplated hereby are within the corporate power of the Buyer and have been duly authorized by all necessary corporate action on the part of the Buyer.  This Agreement constitutes a valid and binding agreement of the Buyer, enforceable against the Buyer in accordance with its terms, except as enforceability may be limited by applicable equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws from time to time in effect affecting the enforcement of creditors' rights generally.

**Section 5.03   Governmental Authorization.**   The execution, delivery and performance by the Buyer of this Agreement and the consummation of the transactions contemplated hereby require no material action by or in respect of, or material filing with, any governmental body, agency or official.

**Section 5.04   Noncontravention.**  The execution, delivery and performance by the Buyer of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) violate the charter or bylaws of the Buyer, (ii) assuming compliance with the matters referred to in Section 5.03, violate any applicable material law, rule, regulation, judgment, injunction, order or decree or (iii) require any material consent or other material action by any Person under, constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of the Buyer under any provisions of any material agreement or other material instrument binding upon the Buyer.

**Section 5.05   Financing.**  The Buyer will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to fulfill its obligations hereunder and to make payment of all amounts to be paid by it hereunder on the Closing Date.

**Section 5.06   Purchase for Investment.**  The Buyer is purchasing the Shares for investment for its own account and not with a view to, or for sale in connection with, any distribution thereof.  The Buyer is an "accredited investor" and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Shares and is capable of bearing the economic risks of such investment.

**Section 5.07   Actions and Proceedings.**  There are no (i) outstanding judgments, orders, writs, injunctions or decrees of any court, governmental agency or arbitration tribunal against the Buyer or any of its Affiliates, which have or could have a material adverse effect on the ability of the Buyer to consummate the transactions contemplated hereby or (ii) actions, suits, claims or legal, administrative or arbitration proceedings or investigations pending or, to the

011107.0108\393259.18

knowledge of the Buyer, threatened against the Buyer, which have or could have a material adverse effect on the ability of the Buyer to consummate the transactions contemplated hereby.

**Section 5.08   Finder's Fees.**   There is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the Buyer who might be entitled to any fee or commission upon the consummation of the transactions contemplated by this Agreement.

**Section 5.09   Solvency.**   Immediately after giving effect to the transactions contemplated by this Agreement, the Company will be able to pay its respective debts as they become due and will own property which has a fair saleable value greater than the amounts required to pay its respective debts (including a reasonable estimate of the amount of all contingent liabilities). Immediately after giving effect to the transactions contemplated by this Agreement, the Company will have adequate capital to carry on its respective business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of the Company.

**Section 5.10   Acknowledgment by the Buyer.**

(a)   The Buyer has conducted to its satisfaction, an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of the Company and, in making its determination to proceed with the transactions contemplated by this Agreement, the Buyer has relied on the results of its own independent investigation and verification and the representations and warranties of the Company and/or the Seller expressly and specifically set forth in this Agreement. Such representations and warranties by the Company and/or the Seller constitute the sole and exclusive representations and warranties of the Company and the Seller to the Buyer in connection with the transactions contemplated hereby, and the Buyer understands, acknowledges and agrees that all other representations and warranties of any kind or nature expressed or implied (including, without limitation, any relating to the future or historical financial condition, results of operations, assets or liabilities of the Company or the quality, quantity or condition of the assets of the Company) are specifically disclaimed by the Company and the Seller. Other than as expressly provided in this Agreement, the Company and the Seller do not make or provide, and the Buyer hereby waives, any warranty or representation, express or implied, as to the quality, merchantability, fitness for a particular purpose, conformity to samples, or condition of the Company's assets or any part thereto.

(b)   In connection with the Buyer's investigation of the Company, the Buyer has received from or on behalf of the Company or the Seller certain projections, including projected statements of operating revenues and income from operations of the Company for the fiscal year ending December 31, 2006 and for subsequent fiscal years and certain business plan information for such fiscal year and succeeding fiscal years. The Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that the Buyer is familiar with such uncertainties, that the Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the

assumptions underlying such estimates, projections and forecasts), and that the Buyer shall have no claim against the Seller with respect thereto. Accordingly, neither the Company nor the Seller makes any representations or warranties whatsoever with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts). Other than as expressly provided in this Agreement, the Buyer agrees that neither the Seller nor any other Person will have or be subject to any liability to the Buyer resulting from the distribution to the Buyer, or the Buyer's use of, any information regarding the Company or its respective business, including the Confidential Information Memorandum prepared by Downer & Company, LLC (the "Information Memorandum"), and any information, document or material made available to the Buyer or its Affiliates in certain physical or on-line "data rooms," management presentations or any other form in expectation of the transactions contemplated by this Agreement.

Section 5.11  No Reliance.  The Buyer acknowledges and agrees that the representations and warranties made by the Company in this Agreement (as qualified by the disclosures in the Schedules) supersede, replace and nullify in every respect the data set forth in any other document, material or statement, whether written or oral, made available to the Buyer, and the Buyer shall be deemed to have not relied on any data contained in such data for any purpose whatsoever, including, without limitation, as a promise, projection, guaranty, representation, warranty or covenant.

Section 5.12  No Other Representations and Warranties.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE 5, THE BUYER MAKES NO EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, AND THE BUYER HEREBY DISCLAIMS ANY SUCH REPRESENTATION OR WARRANTY WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

## ARTICLE 6
## COVENANTS OF THE COMPANY AND THE SELLER

Section 6.01  Conduct of the Company.  During the period from the date of this Agreement and continuing until the Closing, the Company agrees that, except (i) as expressly contemplated or permitted by this Agreement or the Schedules (including the effects of the Conversions), (ii) as required by applicable law or regulation, or (iii) to the extent that the Buyer shall otherwise consent in writing, which consent shall not be unreasonably withheld, conditioned or delayed:

(a)  the Company and the Subsidiaries shall use reasonable efforts to carry on their respective business in the usual, regular and ordinary course in all material respects, in substantially the same manner as heretofore conducted, and shall use reasonable efforts to preserve intact its present lines of business, maintain its rights and franchises and preserve its relationships (contractual or otherwise) with customers, suppliers and others having business dealings with them (including, without limitation, through ordinary course renewals, negotiations with and amendments to such relationships) to the end that its ongoing business shall not be impaired in any material respect at the Closing; provided, however, that no action by the

011107.0108\393259.18

Company or any Subsidiary with respect to matters specifically addressed by any other provision of this Section 6.01 shall be deemed a breach of this Section 6.01(a), unless such action would constitute a breach of one or more of such other provisions;

(b)    neither the Company nor any Subsidiary shall (i) enter into any new material line of business or (ii) incur or commit to any capital expenditures or any obligations or liabilities in connection with capital expenditures, except for capital expenditures and obligations or liabilities in connection therewith in an amount not to exceed $100,000 in the aggregate;

(c)    the Company shall not (i) declare or pay any dividends on or make other distributions in respect of any of its capital stock or other equity interests (except for dividends in Cash), (ii) split, combine or reclassify any of its capital stock or other equity interests or issue or authorize or propose the issuance of any other securities in respect of, in lieu of or in substitution for, shares of its capital stock or other equity interests, or (iii) repurchase, redeem or otherwise acquire any shares of its capital stock or other equity interests or any securities convertible into or exercisable for any shares of its capital stock or other equity interests (except for repurchases and redemptions paid in Cash);

(d)    neither the Company nor any Subsidiary shall issue, deliver or sell, or authorize or propose the issuance, delivery or sale of, any shares of their respective capital stock of any class or other equity interests, or any securities convertible into or exercisable for, or any rights, warrants or options to acquire, any such shares of their respective capital stock or other equity interests, or enter into any agreement with respect to any of the foregoing;

(e)    other than to the extent required to comply with its obligations hereunder or required by law, neither the Company nor any Subsidiary shall amend or propose to amend their certificate of incorporation or bylaws or equivalent formation documents;

(f)    neither the Company nor any Subsidiary shall acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial equity interest in or a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof or otherwise acquire or agree to acquire or in-license any assets or rights (other than the acquisition or in-license of assets used in the operations of the business of the Company or any Subsidiary in the ordinary course consistent with past practice); provided, however, that the foregoing shall not prohibit the creation of new direct or indirect Subsidiaries organized to conduct or continue activities otherwise permitted by this Agreement;

(g)    other than as may be required by or in conformance with applicable law or regulation in order to permit or facilitate the consummation of the transactions contemplated hereby or the transactions disclosed in the Schedules, neither the Company nor any Subsidiary shall sell, encumber or otherwise dispose of, or agree to sell, encumber or otherwise dispose of, any of its material assets other than in the ordinary course of business consistent with past practice;

(h)    neither the Company nor any Subsidiary shall (i) make any loans, advances or capital contributions to, or investments in, any other Person, other than pursuant to

29

any contract or other legal obligation of the Company as in effect as of the date hereof or in the ordinary course of business consistent with past practice or (ii) create, incur, assume or suffer to exist any indebtedness, issuances of debt securities, guarantees, loans or advances to the Company or any Subsidiary not in existence as of the date of this Agreement except (A) pursuant to the credit facilities, indentures (but not in excess of amounts authorized for issuance thereunder as of the date of this Agreement) and other arrangements in existence on the date of this Agreement, or (B) trade debt and commercial finance in the ordinary course of business consistent with past practice, in each case as such credit facilities, indentures and other arrangements and other existing indebtedness may be amended, extended, modified, refunded, renewed or refinanced after the date of this Agreement; provided that this provision shall not prohibit intra-company loans, etc., by and amongst the Company and the Subsidiaries;

(i)    other than as required by an existing contract or agreement as in effect on the date hereof and other than as described in Schedule 6.01(i), neither the Company nor any Subsidiary shall (A) increase the amount of cash compensation or bonus, fringe or other benefits of, or pay any discretionary bonus to, any current or former director or officer, (B) make any material increase in, or commitment to increase materially, any employee benefits, (C) adopt or make any commitment to adopt any material new Employee Benefit Plan or amend, modify, alter or make any material contribution, other than regularly scheduled contributions, to any Employee Benefit Plan, (D) increase, in any material manner, the severance or termination pay of any current or former director or officer of the Company of any Subsidiary, or (E) materially increase any stay bonus or retention bonus;

(j)    neither the Company nor any Subsidiary shall (A) change its fiscal year, (B) make any material Tax election (except in the ordinary course of business consistent with past practice or as otherwise required by applicable law or regulation) or (C) except as required by changes in GAAP or as required by applicable law or regulation, change its methods of accounting in effect as of the date hereof; and

(k)    other than in connection with any action expressly permitted by any other subsection of this Section 6.01 and except for any new contract awards, and any contract renewals, negotiations and amendments entered into in the ordinary course of business and consistent with past practice, neither the Company nor any Subsidiary shall (A) enter into or become bound by, or permit any of the assets owned or used by it to become bound by, any contract of the type required to be disclosed pursuant to Section 3.16 of this Agreement (other than in the ordinary course of business), or (B) prematurely terminate (other than in the ordinary course of business), or waive any material right or remedy under, any such contract.

Section 6.02  Access.  From the date hereof until the Closing Date, the Company will give the Buyer, its counsel, financial advisors, auditors and other authorized representatives reasonable access to the offices, properties, books and records of the Company and the Subsidiaries; provided that any such access (i) shall be during normal business hours on reasonable notice, (ii) shall not, except as otherwise agreed in writing by the Seller and the Company, include sampling or testing of soil, sediment, surface or ground water and/or building material, (iii) shall not be required where such access would be prohibited or otherwise limited by any applicable law or agreement and (iv) shall not otherwise unreasonably interfere with the conduct of the business of the Company or the Subsidiaries.

30

**Section 6.03   Subsequent Actions.**  On or before the Closing Date, the Company and the Seller shall disclose to the Buyer in writing any exceptions to or variances from the representations and warranties in Article 3 or Article 4 promptly upon discovery thereof, and such disclosure shall amend and supplement the appropriate Schedules (such updated schedules to be referred to herein collectively as the "Updated Schedules").   Except with respect to conditions to Closing or remedies of the Buyer set forth in Sections 9.01(a) and 11.02, the delivery of such Updated Schedules will be deemed to have notified the Buyer of such exception or variance, and cured any misrepresentation or breach of this Agreement that otherwise might have existed hereunder by reason of such exception or variance.

**ARTICLE 7**
**COVENANTS OF THE BUYER**

**Section 7.01   Confidentiality.**   Prior to the Closing Date and after any termination of this Agreement, the Buyer shall hold and shall cause its Affiliates, officers, directors, employees, accountants, counsel, consultants, advisors and agents (collectively, the "Buyer's Representatives") to hold, in confidence, all confidential documents and information concerning the Company furnished to the Buyer or the Buyer's Representatives in connection with the transactions contemplated by this Agreement in the manner specified in the Confidentiality Agreement, dated as of September 29, 2006, between Downer & Company, LLC and the Buyer, as amended from time to time (the "Confidentiality Agreement").

**Section 7.02   Access.**   From and after the Closing, the Buyer and the Company (and any Subsidiary) shall afford promptly to the Seller and its designees and representatives reasonable access to the books, records (including accountants' work papers) and employees of the Buyer and the Company (and any Subsidiary) to the extent necessary to permit the Seller to determine any matter relating to the Seller's rights and obligations hereunder or to any period ending on or before the Closing Date; provided that any such access by the Seller shall be during normal business hours on reasonable notice and shall not otherwise unreasonably interfere with the conduct of the business of the Buyer or the Company (or any Subsidiary).  Unless otherwise consented to in writing by the Seller, neither the Buyer nor the Company (or any Subsidiary) shall destroy, alter or otherwise dispose of any of the books and records of the Company (or any Subsidiary) for any period prior to the Closing Date until such time as the Survival Period, and any time period thereafter during which indemnification claims remain outstanding, has expired, without first offering to surrender to the Seller such books and records or any portion thereof which the Buyer or the Company (or any Subsidiary) may intend to destroy, alter or otherwise dispose of.

**Section 7.03   Notification.**   Prior to the Closing, upon discovery of any variances from the representations and warranties contained in this Agreement, the Buyer shall promptly notify the Company and the Seller of such variances.

**Section 7.04   Director and Officer Liability, Indemnification and Insurance.**  For a period of six (6) years after the Closing Date, the Buyer shall not, and shall not permit the Company (or any Subsidiary) to amend, repeal or modify any provision in the Company's formation documents relating to the exculpation or indemnification of any current or former officer, manager, director or similar functionary (unless required by law), it being the intent of

31

the parties that the officers, managers, directors and similar functionaries of the Company (or the Subsidiaries) shall continue to be entitled to such exculpation and indemnification to the fullest extent of the law. If the Company or any Subsidiary or any of their respective successors or assigns (i) shall consolidate with or merge into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) shall transfer all or substantially all of its properties and assets to any Person, then, and in each such case, proper provisions shall be made so that the successors and assigns of the Company (or any Subsidiary) shall assume all of the obligations set forth in this Section. The provisions of this Section 7.04 are intended for the benefit of, and will be enforceable by, each current and former officer, director or similar functionary of the Company (or any Subsidiary) and his or her heirs and representatives, and are in addition to, and not in substitution for, any other rights to indemnification or contribution that any such person may have had by contract or otherwise.

Section 7.05 **Employment and Benefit Arrangements**. From and after the Closing Date and for a period of at least six (6) months, the Buyer shall cause the Company and each Subsidiary to honor all employment, severance, termination, consulting, retirement and other compensation and benefit plans, arrangements and agreements to which the Company or such Subsidiary is a party, as such plans, arrangements and agreements are in effect on the date hereof. With respect to any Employee Benefit Plans in which any employees of the Company or any Subsidiary participate on or after the Closing, the Buyer shall cause the Company and each such Subsidiary to: (i) waive all pre-existing conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to such employees, except to the extent such pre-existing conditions, exclusions or waiting periods applied under the similar plan in effect immediately prior to the Closing; (ii) provide each such employee with credit for any co-payments and deductibles paid (to the same extent such credit was given for the year under the similar plan in effect immediately prior to the Closing) in satisfying any applicable deductible or out-of-pocket requirements; and (iii) recognize all continuous service of the Company's employees with the Company or any Subsidiary, as applicable, for all purposes (including, without limitation, for purposes of eligibility to participate, vesting credit and entitlement to benefits) under any Employee Benefit Plan in which such employees may be eligible to participate after the Closing; provided that the foregoing shall not apply to the extent it would result in a duplication of benefits. This Section 7.05 shall survive the Closing, is intended to benefit the Company, its Subsidiaries and the employees of the Company and its Subsidiaries, and shall be binding on all successors and assigns of the Buyer and the Company and its Subsidiaries.

Section 7.06 **Regulatory Filings**. The Buyer shall, within five Business Days after the date hereof, make or cause to be made all filings and submissions required of the Buyer under any laws or regulations applicable to the Buyer for the consummation of the transactions contemplated herein. The Buyer shall be responsible for all filing fees under any such laws or regulations applicable to the Buyer.

Section 7.07 **Contact with Employees, Customers and Suppliers**. Prior to the Closing, neither the Buyer nor any of the Buyer's Representatives shall contact or otherwise communicate with any customers or suppliers of the Company or any Subsidiary in connection with or regarding the transactions contemplated hereby, except to the extent approved in writing by the Seller, which approval shall not be unreasonably withheld. The Buyer and the Buyer's

Representatives may communicate with James Levine, Byron J. Daniels and Walter E. Cisowski without the Seller's consent. The Buyer and the Buyer's Representatives may communicate with other employees of the Company and its Subsidiaries only with the approval of James Levine or Walter E. Cisowski, which approval shall not be unreasonably withheld; provided, however, that Buyer and the Buyer's Representatives may communicate with Fernando Heredia, Richard Edenfield and Greg Christy if (i) such communication is scheduled through James Levine or Walter E. Cisowski, who will schedule such communication at a reasonable time, (ii) James Levine or Walter E. Cisowski are present and able to participate in such communication, and (iii) such communication occurs during normal business hours and does not interfere with the business operations of the Company.

**Section 7.08    Financial Assistance.**  The Buyer shall not take any action with respect to the assignment of this Agreement, the financing of the transactions contemplated by this Agreement or otherwise that would violate any applicable Laws in any jurisdiction where the Company or any Subsidiary is organized or branch offices are located.

### ARTICLE 8
### ADDITIONAL COVENANTS OF THE PARTIES

**Section 8.01    Reasonable Best Efforts; Further Assurances.**  Subject to the terms and conditions of this Agreement, the Buyer and the Seller shall use their commercially reasonable best efforts to take, or cause to be taken, all actions necessary or desirable to cause the conditions set forth in Article 9 to be satisfied and the transactions contemplated by this Agreement to be consummated, in each case as promptly after the date hereof as practicable. Except as otherwise expressly set forth in this Agreement, neither the Seller nor the Company on the one hand, nor the Buyer on the other hand, shall have any obligation to pay any material amounts or incur any material liability or obligation to any third party as a condition or inducement for obtaining any consents described on Schedule 9.01(c). Each of the Seller, the Company and the Buyer agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement. From time to time, as and when requested by any party hereto and at such party's expense, any other party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement.

**Section 8.02    Further Cooperation.**  Subject to Section 11.02(k)(iii), the Seller and the Buyer shall cooperate with each other (i) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained under any material contracts, in each case in connection with the consummation of the transactions contemplated by this Agreement, and (ii) in taking such actions or making any such filings, in furnishing information required in connection therewith and in seeking timely to obtain any such actions, consents, approvals or waivers.

**Section 8.03 Public Announcements.**    No press release or other public announcement related to this Agreement or the transactions contemplated herein shall be issued or made without the joint approval of the Buyer and the Seller, unless required by law (in the reasonable opinion of counsel), in which case the Buyer and the Seller shall have the right to review and comment on such public announcement prior to publication.

**Section 8.04 Tax Matters.** All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement (the "Transfer Taxes") shall be split equally between the Seller and the Buyer when due, and the Buyer will file all necessary Tax Returns and other documentation with respect to all such Taxes and fees, and, if required by applicable law or regulation, the Seller will execute and deliver, and will cause its Affiliates to join in the execution and delivery of, any such Tax Returns and other documentation, and any associated costs shall be split equally between the Seller and the Buyer. The Buyer shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for the Company and each Subsidiary for all periods ending prior to or including the Closing Date which are filed after the Closing Date. Seller and Buyer will cooperate to timely prepare any Tax Returns or other filings relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes. Unless otherwise required by applicable law, Buyer will file all Tax Returns or other filings with respect to Transfer Taxes, and promptly following the filing thereof, Buyer will furnish to Seller a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax. With respect to any such returns or filings required to be filed by Buyer, Seller will pay to Buyer 50% of the amount of the Transfer Taxes shown on such return or other filing not later than five (5) business days before the due date for payment of the Transfer Taxes. If Seller is required to file any Tax Return or other filing with respect to Transfer Taxes, Buyer will prepare the return or filing and pay Seller 50% of the amount of the Transfer Taxes shown on such return or other filing not later than five (5) business days before the due date for payment of the Transfer Taxes, and promptly following the filing thereof, Seller will furnish to Buyer a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax.

(b)    After the date this Agreement is signed, the Sellers shall not, nor shall they allow the Company or any Subsidiary to make or change any election relating to Taxes, file any amended Tax Return, enter into any closing agreement relating to Taxes, settle or consent to any claim or assessment relating to Taxes or consent to any waiver of the statute of limitations for any such claim or assessment, in each case to the extent such action will have a detrimental effect on the Company, any Subsidiary or the Buyer.

(c)    Tax Return Filings.  Buyer shall, or shall cause the Company and each Subsidiary to, timely prepare and file with the relevant Taxing Authorities all Tax Returns of the Company and each Subsidiary for Pre-Closing Tax Periods and any taxable period that includes but does not end on the Closing Date, the due date for filing of which, determined taking into account extensions, is after the Closing Date; provided that Buyer shall furnish Seller with a copy of either a pro forma Tax Return for the Company, the Subsidiary, or a combination thereof or the actual Tax Return for the Company, the Subsidiary, or a combination thereof, in each case at the election of Buyer and limited to information regarding the Company and its Subsidiaries that are being acquired pursuant to this Agreement at least thirty (30) days before such Tax

34

Returns are due.  Seller shall, or shall cause the Company and each Subsidiary to, timely prepare and file with the relevant Taxing Authorities all Tax Returns for any taxable periods of the Company or the Subsidiary the due date for filing of which, determined taking into account extensions, is on or before the Closing Date; provided that Seller shall furnish Buyer with a copy of such Tax Returns at least thirty (30) days before such Tax Returns are due, and no such Tax Returns shall be filed with any Taxing Authority without Buyer's consent, which shall not be unreasonably withheld. Any Tax Returns described in this Section 8.04(c) shall be prepared on a basis consistent with applicable law and the past practices of the Company and each Subsidiary and in a manner that does not distort taxable income (e.g., by deferring income or accelerating deductions).

(d)    Cooperation.  The Sellers, the Company, and Buyer shall reasonably cooperate, and shall cause their respective Affiliates, officers, employees, agents, auditors and representatives reasonably to cooperate, in preparing and filing all Tax Returns, including maintaining and making available to each other all records necessary in connection with Taxes, and in resolving all disputes and audits with respect to all taxable periods relating to Taxes.

(e)    Tax Sharing Agreements.  The Sellers shall cause (i) any and all Tax sharing agreements between the Sellers or any of their Affiliates (other than the Company and the Subsidiaries), and (ii) the Company or any Subsidiary, to be terminated on or before the Closing Date.  After the Closing Date, no party shall have any rights or obligations under any such Tax sharing agreements.

**Section 8.05  Disclosure Generally.**  The Schedules have been arranged, for purposes of convenience only, as separately titled Schedules corresponding to the Sections of Article 3.  Any information set forth in any Schedule or incorporated in any Section of this Agreement shall be considered to have been set forth in each other Schedule to which it is reasonably apparent such disclosure would apply and shall be deemed to modify the representations and warranties in Article 3 whether or not such representations and warranties refer to such Schedule.  The specification of any dollar amount in the representations and warranties contained in this Agreement or the inclusion of any specific item in the Schedules is not intended to imply that such amounts, or higher or lower amounts, or the items so included or other items, are or are not required to be disclosed or are within or outside of the ordinary course of business, and neither party shall use the fact of the setting of such amounts or the fact of the inclusion of any such item in the Schedules in any dispute or controversy with any party as to whether any obligation, item or matter not described herein or included in a Schedule is or is not required to be disclosed (including, without limitation, whether such amounts are required to be disclosed as material) or in the ordinary course of business for the purposes of this Agreement. The information contained in the Schedules is disclosed solely for the purposes of this Agreement, and no information contained therein shall be deemed to be an admission by any party hereto to any third party of any matter whatsoever, including of any violation of law or breach of any agreement.

**Section 8.06  Conflicts and Privilege.**  It is acknowledged by each of the parties hereto that the American Capital and the Company have retained Patton Boggs LLP to act as their counsel in connection with the transactions contemplated hereby and that Patton Boggs LLP has not acted as counsel for any other party in connection with the transactions

011107.0108\393259.18

contemplated hereby and that none of the other parties has the status of a client of Patton Boggs LLP for conflict of interest or any other purposes as a result thereof. The Buyer hereby agrees that, in the event that a dispute arises after the Closing between the Buyer and the Seller, Patton Boggs LLP may represent American Capital in such dispute even though the interests of American Capital may be directly adverse to the Buyer or the Company, even though Patton Boggs LLP may have represented the Company in a matter substantially related to such dispute, or may be handling ongoing matters for the Buyer or the Company. Buyer further agrees that, as to all communications among Patton Boggs LLP, the Company, and the Seller that relate in any way to the transactions contemplated by this Agreement, the attorney-client privilege and the expectation of client confidence belongs to American Capital and may be controlled by American Capital and shall not pass to or be claimed by the Buyer or the Company. Notwithstanding the foregoing, in the event that a dispute arises between the Buyer, the Company and a third party other than a party to this Agreement after the Closing, the Company may assert the attorney-client privilege to prevent disclosure of confidential communications by Patton Boggs LLP to such third party; provided, however, that the Company may not waive such privilege without the prior written consent of Patton Boggs LLP.

**Section 8.07 Special Environmental Conditions.** Golder Associates Inc. ("Golder") has been retained to assist with the remediation of the Special Environmental Conditions. The Company will fully cooperate with Golder and the Seller to facilitate the efficient remediation of the Special Environmental Conditions. The Seller will pay all out-of-pocket costs and expenses of the Company, including any fees of Golder, in connection with the remediation of the Special Environmental Conditions.

## ARTICLE 9
## CONDITIONS TO CLOSING

**Section 9.01 Conditions to the Buyer's Obligations.** The obligations of the Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or the Buyer's waiver) of the following conditions as of the Closing Date:

(a)    the representations and warranties of the Company and the Seller contained in Article 3 and Article 4 hereof will be true and correct in all material respects at and as of the time of the Closing (without taking into account any additional qualifications of any representations and warranties of the Company or the Sellers set forth in any Updated Schedule delivered in accordance with Section 6.03 hereof, as if made on the Closing Date and the Closing Date were substituted for the date of this Agreement throughout such representations and warranties, except (i) to the extent that the failure of such representations and warranties to be true and correct has not caused a Material Adverse Effect, (ii) for changes contemplated by this Agreement, and (iii) for those representations and warranties that address matters as of any other particular date (in which case such representations and warranties shall have been true and correct as of such particular date, except to the extent that the failure of such representations and warranties to have been true and correct as of such particular date has not caused a Material Adverse Effect), it being understood that, for purposes of determining the accuracy of such representations and warranties, all "Material Adverse Effect" qualifications and other qualifications based on the word "material" or similar phrases contained in such representations and warranties shall be disregarded;

36

(b) the Company and the Seller shall have performed in all material respects all of the covenants and agreements required to be performed by them under this Agreement at or prior to the Closing;

(c) all consents which are set forth on Schedule 9.01(c) attached hereto shall have been obtained;

(d) all material governmental filings, consents, authorizations and approvals that are required for the consummation of the transactions contemplated hereby and set forth on Schedule 9.01(d) attached hereto shall have been made and obtained;

(e) no action or proceeding before any court or government body shall be pending wherein an unfavorable judgment, decree or order would prevent the performance of this Agreement or the consummation of any of the transactions contemplated hereby, declare unlawful the transactions contemplated by this Agreement or cause such transactions to be rescinded;

(f) the Company and each of its Subsidiaries shall have each been converted into Delaware or Texas limited liability companies at least (1) Business Day prior to the Closing Date (the "Conversions") and the representations and warranties in Section 3.06(k) shall be true and correct on the Closing Date;

(g) Seller shall have delivered to the Buyer a certificate, dated the Closing Date, stating that the Seller is the owner of 100% of the issued and outstanding equity interests of the Company; and

(h) the Company shall have delivered to the Buyer a certificate, dated the Closing Date, stating that the preconditions specified in Sections 9.01(a) and 9.01(b), as they relate to the Company, have been satisfied.

**Section 9.02 Conditions to the Seller's Obligations**. The obligation of the Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or the Seller's waiver) of the following conditions as of the Closing Date:

(a) The representations and warranties of the Buyer contained in Article 5 hereof shall have been true and correct in all material respects as of the date of this Agreement and as of the Closing Date, except (i) for changes contemplated by this Agreement, and (ii) for those representations and warranties that address matters only as of the date of this Agreement or any other particular date (in which case such representations and warranties shall have been true and correct in all material respects as of such particular date), it being understood that, for purposes of determining the accuracy of such representations and warranties, all qualifications based on the word "material" or similar phrases contained in such representations and warranties shall be disregarded;

(b) the Buyer shall have performed in all material respects all of the covenants and agreements required to be performed by it under this Agreement at or prior to the Closing;

37

(c)    all consents which are set forth on Schedule 9.01(c) attached hereto shall have been obtained;

(d)    all material governmental filings, consents, authorizations and approvals that are required for the consummation of the transactions contemplated hereby and set forth on Schedule 9.01(d) attached hereto shall have been made and obtained;

(e)    no action or proceeding before any court or government body shall be pending wherein an unfavorable judgment, decree or order would prevent the performance of this Agreement or the consummation of any of the transactions contemplated hereby, declare unlawful the transactions contemplated by this Agreement or cause such transactions to be rescinded; and

(f)    the Buyer shall have delivered to the Seller a certificate of the Buyer, dated the Closing Date, stating that the preconditions specified in Sections 9.02(a) and 9.02(b), as they relate to the Buyer, have been satisfied.

## ARTICLE 10
## TERMINATION

**Section 10.01 Termination.**  This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of the Buyer and the Seller;

(b)    by the Buyer, if there has been a material breach by the Company or the Seller of any covenant or other agreement contained herein which has prevented the satisfaction of any condition to the obligations of the Buyer at the Closing and such breach has not been waived by the Buyer or cured by the Company or the Seller within ten (10) Business Days after the Company's or the Seller's receipt of written notice thereof from the Buyer;

(c)    by the Seller, if there has been a material breach by the Buyer of any covenant or other agreement contained herein which has prevented the satisfaction of any condition to the obligations of the Seller at the Closing and such breach has not been waived by the Seller or cured by the Buyer within ten (10) Business Days after the Buyer's receipt of written notice thereof from the Seller;

(d)    by the Buyer, if the transactions contemplated hereby have not been consummated on or before March 30, 2007; provided that the Buyer shall not be entitled to terminate this Agreement pursuant to this Section 10.01(d) if the Buyer's knowing or willful breach of this Agreement has prevented the consummation of the transactions contemplated hereby; or

(e)    by the Seller, if the transactions contemplated hereby have not been consummated on or before March 30, 2007; provided that the Seller shall not be entitled to terminate this Agreement pursuant to this Section 10.01(e) if the Company's or the Seller's knowing or willful breach of this Agreement has prevented the consummation of the transactions contemplated hereby.

011107.0108\393259.18

The party desiring to terminate this Agreement pursuant to clauses (b), (c), (d) or (e) of this Section 10.01 shall give written notice of such termination to the other parties hereto.

Section 10.02 Effect of Termination. In the event this Agreement is terminated by either the Buyer or the Seller as provided in Section 10.01, the provisions of this Agreement shall immediately become void and of no further force and effect (other than Section 7.01 (Confidentiality), Section 7.07 (Contact with Employees, Customers and Suppliers), Section 8.03 (Public Announcements), this Section 10.02 and Article 12, each of which shall survive the termination of this Agreement), and there shall be no liability on the part of the Buyer, the Company or the Seller to any other party hereto, except for willful or knowing breaches of this Agreement prior to the time of such termination.

## ARTICLE 11
## ADDITIONAL COVENANTS

Section 11.01 Survival Periods. The representations, warranties, covenants and agreements set forth in this Agreement and in any certificates delivered at the Closing in connection with this Agreement shall survive for a period beginning on the Closing Date and ending on the date that is eighteen (18) months after the Closing Date (the "Initial Survival Period"), and shall thereafter be of no further force or effect; provided that the representations, warranties, covenants and agreements set forth in Sections 2.05, 3.06, 8.04, 8.07 and 3.21 shall survive for a period beginning on the Closing Date and ending on the date that is five (5) years after the Closing Date (the "Extended Survival Period"); and provided further, that with respect to any covenant or agreement contained herein that expressly contemplates performance after the Initial Survival Period, the Initial Survival Period shall continue through the period of such contemplated performance; and provided further, that the representations and warranties set forth in Section 4.01 and 4.04 (together, the "Basic Representations") shall survive the Closing indefinitely.

Section 11.02 Indemnification.

(a)    Subject to the provisions of this Section 11.02 and Section 11.03 below, after the Closing, the Seller shall indemnify and hold harmless each of the Buyer, the Company and each Subsidiary (each a "Buyer Indemnified Party"), without duplication with respect to any Loss or any Buyer Indemnified Party, against any Loss which the Buyer suffers or will suffer as a result of any breach of the representations, warranties, covenants and agreements of the Company or the Seller set forth herein (without taking into account (1) any Updated Schedules delivered in accordance with Section 6.03 hereof and (2) with respect to the representations and warranties set forth in Section 3.06, items (1), (4) and (5) of Schedule 3.06) and as restated in any certificates delivered by or on behalf of the Company, any Subsidiary or the Seller at the Closing, subject to each of the following:

(i)    Each Buyer Indemnified Party's right to seek indemnification for breaches of the representations, warranties, covenants and agreements of the Company or the Seller other than the Basic Representations shall collectively be limited to an aggregate amount of Losses not to exceed the amount then remaining in the Escrow Account as provided herein.

39

(ii)    No Buyer Indemnified Party shall be entitled to seek indemnification with respect to any individual Loss, other than Special Environmental Condition Losses, Tax Losses or Losses resulting from a breach of the Basic Representations, unless such Loss is greater than $20,000.

(iii)    With respect to Losses arising other than from a breach of the representations and warranties for matters covered by Section 3.06 and Section 3.21, the covenants and agreements set forth in Sections 2.05, 8.04 and 8.07, and the indemnification set forth in Section 11.02(k) (collectively, the "Tipping Basket Losses"), no Buyer Indemnified Party shall be entitled to seek indemnification unless all Tipping Basket Losses exceed $500,000, in which case the Buyer Indemnified Party shall be entitled to indemnification for the amount of all Tipping Basket Losses.

(iv)    With respect to Losses arising from a breach of the representations and warranties for matters covered by Section 3.21 and the indemnification set forth in Section 11.02(k) (collectively, the "Deductible Losses"), no Buyer Indemnified Party shall be entitled to seek indemnification unless all Deductible Losses exceed $500,000, in which case the Buyer Indemnified Party shall be entitled to indemnification only for the amount of such excess.

(v)    With respect to Losses arising from Special Environmental Condition Losses, Tax Losses or Losses resulting from a breach of the Basic Representations, a Buyer Indemnified Party shall be entitled to seek indemnification without limitation under Sections 11.02(a)(ii), (iii) or (iv), above.  For avoidance of doubt, Special Environmental Condition Losses and Tax Losses shall be subject to the limits on indemnification set forth in Section 11.02(a)(i) and (vi), hereof.

(vi)    All Losses arising from breaches of the representations and warranties for matters covered by Section 3.06 and Section 3.21, the covenants and agreements set forth in Sections 2.05, 8.04 and 8.07, and the indemnification set forth in Section 11.02(k) (any such Losses collectively, "Extended Escrow Losses") shall first be applied to the Extended Escrow Amount and then, to the extent they exceed the Extended Escrow Amount, to the Initial Escrow Amount.

(vii)    All Losses arising other than from breaches of the representations and warranties for matters covered by Section 3.06 and Section 3.21, the covenants and agreements set forth in Sections 2.05, 8.04 and 8.07, and the indemnification set forth in Section 11.02(k) (any such Losses collectively, "Initial Escrow Losses") shall first be applied to the Initial Escrow Amount and then, to the extent they exceed the Initial Escrow Amount, to the Extended Escrow Amount.

(viii)    No Buyer Indemnified Party shall be entitled to seek indemnification with respect to any Losses resulting from any breach of a representation or warranty, other than those set forth in Section 3.06(k), arising in connection with the Conversions.  For avoidance of doubt, a Buyer Indemnified Party shall be entitled to indemnification with respect to any Losses resulting from a breach of the representations and warranties set forth in Section 3.06(k) arising in connection with the Conversions.

40

(b)    Immediately following the expiration of the Initial Survival Period, the Escrow Agent shall pay to the Seller out of the Escrow Account the excess, if any, of the Initial Escrow Amount over the Losses properly applied to the Initial Escrow Amount, net of the amount of any unresolved claim for Initial Escrow Losses asserted by the Buyer prior to the expiration of the Initial Survival Period, in accordance with the Escrow Agreement. Following the expiration of the Initial Survival Period, the funds on deposit in the Escrow Account, if any, shall solely be available to satisfy amounts payable to a Buyer Indemnified Party in respect of claims for Extended Escrow Losses. Immediately following the expiration of the Extended Survival Period, the Escrow Agent shall pay to the Seller out of the Escrow Account, the balance of any funds deposited therein, net of the amount of any unresolved claim for Extended Escrow Losses asserted by the Buyer prior to the expiration of the Extended Survival Period, in accordance with the Escrow Agreement. Any remaining funds retained for any unresolved claims as set forth above, shall be paid to Seller immediately upon resolution of such claim.

(c)    Subject to the provisions of this <u>Section 11.02</u> and <u>Section 11.03</u> below, after the Closing the Buyer shall indemnify the Seller and hold it harmless against any Loss which the Seller suffers as a result of (i) any breach by any Buyer Indemnified Party of its covenants, representations and warranties set forth herein and as restated in any certificates delivered by the Buyer at the Closing or (ii) the operations of the Company (or any Subsidiary) following the Closing.

(d)    No Person shall be liable for any claim for indemnification under subsections (a) or (b) above unless written notice specifying in reasonable detail the nature of the claim for indemnification is delivered by the Person seeking indemnification to the Person from whom indemnification is sought within the time periods set forth in this <u>Section 11.02(d)</u>, in which case the representation, warranty, covenant or agreement which is the subject of such claim shall survive, to the extent of such claim only, until such claim is resolved, whether or not the amount of the Losses resulting from such breach has been finally determined at the time the notice is given, if, but only if, such notice describes in reasonable detail the basis of such claim and, in the case of a claim made by reason of a Third Party Claim, is accompanied by a copy of any written notice received from the third party claimant.

(i)    With respect to Initial Escrow Losses other than those arising from a breach of the Basic Representations, indemnification must be sought prior to the expiration of the Initial Survival Period.

(ii)    With respect to Losses arising from a breach of the Basic Representations, indemnification may be sought at any time after the Closing.

(iii)    With respect to Extended Escrow Losses, indemnification must be sought prior to the expiration of the Extended Survival Period.

(e)    Promptly after the assertion by any third party of any claim (a "<u>Third Party Claim</u>") against any Person entitled to indemnification under this <u>Section 11.02</u> (the "<u>Indemnitee</u>" such term to also include more than one Indemnitee) that results or may result in the incurrence by such Indemnitee of any Loss for which such Indemnitee would be entitled to indemnification pursuant to this Agreement, such Indemnitee shall promptly provide notice of

41

such Third Party Claim to the parties from whom such indemnification could be sought (the "Indemnitors"), provided that an Indemnitee's failure to provide such notice shall not reduce or otherwise impair such Indemnitee's right to indemnification hereunder except to the extent such failure to provide notice has materially prejudiced the Indemnitor. Any Indemnitee shall have the right to employ separate counsel in any such Third Party Claim and to participate in the defense thereof, but the fees and expenses of such counsel shall not be an expense of the Indemnitor unless (i) the Indemnitor shall have failed, within a reasonable time after having been notified by the Indemnitee of the existence of such Third Party Claim as provided in the preceding sentence, to assume the defense of such Third Party Claim or (ii) if there exists or is reasonably likely to exist a conflict of interest that would make it inappropriate in the judgment of counsel to the Indemnitee for the same counsel to represent both the Indemnitee and the Indemnitor. In no event will an Indemnitee consent to the entry of any judgment or enter into any settlement with respect to any Third Party Claim without the prior written consent of the Indemnitor. In no event will an Indemnitor consent to the entry of any judgment or enter into any settlement with respect to any Third Party Claim without the prior written consent of the Indemnitee unless such settlement includes an absolute and unconditional release of the Indemnitee and does not contain any finding or admission of fault or culpability by the Indemnitee or otherwise materially adversely affect the rights of the Indemnitee.

(f)    The amount of any Loss subject to indemnification hereunder or of any claim therefor shall be calculated net of (i) any insurance proceeds (net of direct collection expenses) received by the Buyer or the Company on account of such Loss, and (ii) any indemnification proceeds received or receivable by the Buyer on account of such Loss pursuant to any third-party indemnification rights held by the Company or any Subsidiary. The Buyer and the Company (and any Subsidiary) shall seek full recovery under all insurance policies and third-party indemnification agreements covering any Loss to the same extent as they would if such Loss were not subject to indemnification hereunder, and the Buyer and the Company (and any Subsidiary) shall not terminate or cancel any insurance policies in effect for periods prior to the Closing or terminate, modify or waive any third-party indemnification rights held by the Company or any Subsidiary. In the event that an insurance or third-party indemnification recovery is made by the Buyer, the Company, any Subsidiary or any of their Affiliates with respect to any Loss for which any such Person has been indemnified hereunder, then a refund equal to the aggregate amount of the recovery (net of all direct collection expenses) shall be made promptly to the Seller. The Indemnitors shall be subrogated to all rights of the Indemnitees in respect of any Losses indemnified by the Indemnitors.

(g)    In the event a potential Loss arises with respect to matters covered by Section 3.06 for which a claim for indemnification may arise pursuant this Section 11.02, Buyer shall give prompt notice to Seller of such potential Loss. Buyer shall provide to Seller such information regarding such potential Loss as Seller shall reasonably request within five (5) Business Days of any such request by Seller. Seller shall have thirty (30) days to review such information unless Buyer is required to respond to any Taxing Authority prior to such time; provided, however, that in no event shall Seller have less than five (5) Business Days to review such information. After review of the requested information as set forth herein, Seller shall inform Buyer of the extent to which Seller agrees to provide indemnification to Buyer pursuant to this Agreement with respect to the potential Loss. With respect to any potential Loss or part thereof for which Seller has communicated to Buyer that it will provide indemnification, Seller

42

shall have the right to participate in any proceedings with respect thereto and to consent to any settlement or payment with respect to the potential Loss, provided such consent may not be unreasonably withheld or delayed.

(h)　　Each Person entitled to indemnification hereunder shall take all reasonable steps to mitigate all losses, costs, expenses and damages after becoming aware of any event which could reasonably be expected to give rise to any losses, costs, expenses and damages that are indemnifiable or recoverable hereunder or in connection herewith.

(i)　　All indemnification payments made hereunder shall be treated by all parties as adjustments to the Actual Purchase Price.

(j)　　Notwithstanding anything to the contrary contained in this Section 11.02, there shall be no recovery for any Loss or alleged Loss by the Buyer under this Section 11.02, and the Loss shall not be included in meeting the stated thresholds hereunder, to the extent such item has been included in the calculation of the Net Working Capital Amount or the Indebtedness Payoff Amount as determined pursuant to Section 2.04 hereof.

(k)　　Seller will indemnify each Buyer Indemnified Party for Losses resulting from such Buyer Indemnified Party's Remediation of Pre-Closing Environmental Conditions to the extent such Remediation is reasonably necessary in order to (1) comply with Environmental Requirements or (2) resolve Third Party Claims for Environmental Liabilities. With respect to claims for indemnification pursuant to this Section 11.02(k) (and in addition to the other provisions of Sections 11.02):

(i)　　Seller's obligation to indemnify Buyer will be limited to those commercially reasonable costs and expenses actually incurred by Buyer for Remediation;

(ii)　　Seller will not be responsible for costs and expenses (A) incurred by Buyer, except to the extent required by an Environmental Requirement, in conducting investigations of conditions involving the Real Property, unless and only to the extent such investigations result in the discovery of a Pre-Closing Environmental Condition for which Remediation is reasonably necessary in order to comply with an Environmental Requirement, or (B) for Remediation to the extent such Remediation addresses conditions at the Real Property resulting from events (including Releases of Hazardous Materials) at the Real Property after the Closing Date; and

(iii)　　Buyer will: (A) keep Seller reasonably informed of Remediation activities (including letters, notices, investigations, studies, meetings and other communications with Governmental Authorities); (B) provide Seller and its advisors reasonable advance opportunity to review and comment, and consult with Seller, concerning the scope, and before and during the performance, of Remediation activities, and Buyer, the Company and its Subsidiaries shall, in good faith, reasonably consider Seller's and its advisors' comments and recommendations with respect thereto; (C) provide Seller and its advisors the opportunity to participate in any meetings or other direct communications with Governmental Authorities; and (D) provide to Seller reasonable access both to documents that are relevant to Remediation activities

43

(including providing upon receipt all reports, analyses, studies, test results and other similar information and materials) and to Real Property that is the subject of Remediation activities. Any decisions made concerning Remediation activities shall remain the sole discretion of the Buyer. In addition, Seller agrees to be bound by such reasonable confidentiality restrictions as Buyer may request with respect to any documents relevant to Remediation activities that Buyer provides to Seller pursuant to this Section 11.02(k)(iii). Subject to the foregoing, following the Closing the Company may undertake environmental sampling upon the Owned Real Property located at 501 East Purnell Street, Lewisville, Texas (the "Texas Rack Plant Property") in order to determine the extent to which any Pre-Closing Environmental Condition is required to be Remediated to comply with an Environmental Requirement. Following such sampling, the Company expects to communicate with the Texas Commission on Environmental Quality (the "TCEQ") and, in conjunction with the TCEQ, to develop and implement any measures required to Remediate any Pre-Closing Environmental Condition at the Texas Rack Plant Property, including any additional sampling that may be required. In order to address any Pre-Closing Environmental Condition of the Texas Rack Plant Property in conjunction with the TCEQ, the Company expects that it may be appropriate to submit to the TCEQ any prior sampling results, environmental reports and other documents prepared with respect to the Texas Rack Plant Property at any time prior to the Closing, and the Company fully reserves the right to do so.

### Section 11.03 Limitation of Recourse.

(a)    The indemnification provided by Section 11.02(a) and Section 11.02(k) shall be the sole and exclusive remedy for any Losses of the Buyer, the Company or any Subsidiary with respect to any misrepresentation or inaccuracy in, or breach of, any representations or warranties or any breach or failure in performance of any covenants or agreements made by the Company or the Seller in this Agreement or in any exhibit or schedules hereto or any certificate delivered hereunder (including expenses awarded pursuant to Section 12.09 hereof). Notwithstanding anything to the contrary herein, other than with respect to Losses arising from a breach of the Basic Representations, recovery from the Escrow Account, solely to the extent of the Escrow Amount pursuant to the terms of Section 11.02(a) and Section 11.02(j) and the Escrow Agreement constitute a Buyer Indemnified Party's sole and exclusive source of funds for payment of the indemnification provided by the Seller in Section 11.02(a) and Section 11.02(j) and for any other Losses or other claims relating to or arising from this Agreement or in connection with the transactions contemplated hereby or any exhibit, Schedule or certificate delivered hereunder (including expenses awarded pursuant to Section 12.09 hereof), and the Buyer Indemnified Parties shall have no recourse to or remedy against the Seller for any such indemnification or any other Loss.

(b)    No claim shall be brought or maintained by the Buyer, the Company or any Subsidiary or their respective successors or permitted assigns against any officer, director, employee (present or former) or Affiliate of any party hereto which is not otherwise expressly identified as a party hereto, and no recourse shall be brought or granted against any of them, by virtue of or based upon any alleged misrepresentation or inaccuracy in or breach of any of the representations, warranties or covenants of any party hereto set forth or contained in this Agreement or any exhibit or schedule hereto or any certificate delivered hereunder.

44

011107.0108\393259.18

**ARTICLE 12**
**MISCELLANEOUS**

**Section 12.01 Notices.**  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to the Company (after the Closing) or to the Buyer, then to:

> Unarco Material Handling, Inc.
> c/o The Renco Group, Inc.
> 30 Rockefeller Plaza
> New York, NY 10112
> Attn:   Gary Slater
> Fax:  (212) 541-6197

with copies to (which copies shall not constitute notice):

> Cadwalader, Wickersham & Taft LLP
> One World Financial Center
> New York, NY 10281
> Attn:   Mike Ryan
> Fax:   (212) 504-6666

or, if to the Company (before the Closing) or the Seller, then to:

> KIC Holdings, Inc.
> 501 E. Purnell Road
> Lewisville, TX 75057
> Attn:   Jim Levine
> Fax:   (972) 436-7901

with copies to (which copies shall not constitute notice):

> American Capital Strategies, Ltd.
> 505 Fifth Avenue, 26th Floor
> New York, NY 10017
> Attn:   Craig Moore
> Fax:   (212) 213-2060

and

> American Capital Strategies, Ltd.
> Two Bethesda Metro Center, 14th floor
> Bethesda, MD  20814
> Attn:   Compliance Officer
> Fax:   (301) 659-6714

45

011107.0108/393259.18

and

Patton Boggs LLP
2001 Ross Ave., Suite 3000
Dallas, Texas 75201
Attn:   Fred S. Stovall
Fax:    (214) 758-1550

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received on a Business Day in the place of receipt prior to 5:00 p.m. in the place of receipt.   Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

**Section 12.02 Amendments and Waivers.**

(a)    Except as otherwise provided herein, any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)    No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

**Section 12.03 Construction; Severability.**  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any Person.  The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions hereof.  In the event a subject matter is addressed in more than one representation and warranty in Article 3, the Buyer shall be entitled to rely only on the most specific representation and warranty addressing such subject matter.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law or regulation, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law or regulation, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. Unless otherwise indicated, references in this Agreement to $ or dollars are to U.S. dollars.

**Section 12.04 Expenses.**   Except as otherwise provided herein, each party shall pay all of its own fees, costs and expenses (including, without limitation, fees, costs and expenses of legal counsel, investment bankers, brokers or other representatives and consultants and appraisal fees, costs and expenses) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of its obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby; provided that the Buyer shall pay any and all expenses relating to surveys, title insurance, and any other filings and consents required in connection with the transactions

46

contemplated by this Agreement.  For the avoidance of doubt, any such cost or expense of the Company or any Subsidiary shall be borne by the Seller.  Notwithstanding the foregoing, to the extent the Seller requests that the Company pay at or after the Closing any fees, costs or expenses for which the Seller is liable pursuant to this Section 12.04 ("Seller Transaction Expenses"), then such Seller Transaction Expenses shall be paid by the Company when due and there shall be a downward adjustment to the Net Working Capital Amount equal to the amount of such Seller Transaction Expenses to be paid by the Company at or after the Closing.

Section 12.05 **Successors and Assigns.**  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto, except that following the Closing, the Seller may assign, delegate or otherwise transfer any of its rights to one or more of its Affiliates.

Section 12.06 **Governing Law.**    All issues and questions concerning the construction, validity, interpretation and enforceability of this Agreement and the exhibits and schedules hereto shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

Section 12.07 **Jurisdiction.**    Except as otherwise expressly provided in this Agreement, any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the United States District Court for the Southern District of New York or any New York state court sitting in New York County, New York, and each of the parties hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient form.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 12.01 shall be deemed effective service of process on such party.

Section 12.08 **Waiver of Jury Trial.**    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 12.09 **Prevailing Party.**  If any litigation or other court action, arbitration or similar adjudicatory proceeding is commenced by any party hereto to enforce its rights under this Agreement against any other party, all fees, costs and expenses, including, without limitation, reasonable attorneys fees and court costs, incurred by the prevailing party in such litigation, action, arbitration or proceeding shall be reimbursed by the losing party; provided, that

47

if a party to such litigation, action, arbitration or proceeding prevails in part, and loses in part, the court, arbitrator or other adjudicator presiding over such litigation, action, arbitration or proceeding shall award a reimbursement of the fees, costs and expenses incurred by such party on an equitable basis.

**Section 12.10 Counterparts; Third Party Beneficiaries.** This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto. Except as otherwise specifically set forth herein, no provision of this Agreement is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

**Section 12.11 Entire Agreement.** This Agreement and the documents referred to herein (including the Confidentiality Agreement) contain the complete agreement between the parties hereto and supersede any other prior understandings, agreements or representations by or between the parties, written or oral, which may have related to the subject matter hereof in any way.

**Section 12.12 American Capital Guarantee.**

(a)    American Capital hereby unconditionally and irrevocably guarantees the obligations of Seller under Section 11.02(a) hereof in connection with any amounts that may be payable to Buyer thereunder in connection with Losses arising from a breach of the Basic Representations to the extent that such Basic Representations relate to American Capital; provided, however, that American Capital's maximum liability under this Section 12.12(a) shall be limited to its pro rata share of the Actual Purchase Price based upon the number of Shares held by American Capital relative to the total number of Shares prior to the contribution of such Shares to the Seller in connection with the transactions contemplated by this Agreement.

(b)    American Capital hereby unconditionally and irrevocably guarantees the obligations of Seller under Section 2.04(b)(ii) hereof in connection with any amounts that may be payable to Buyer thereunder that are not paid by Seller as set forth herein; provided, however, that American Capital's maximum liability under this Section 12.12(b) shall be limited to $5,000,000; provided further, however, that the guarantee set forth in this Section 12.12(b) shall expire and be of no further force and effect five (5) Business Days after the amount (if any) required to be paid to Buyer pursuant to Section 2.04(b)(ii) is paid in full.

\*    \*    \*

IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed either individually or by their respective authorized officers as of the day and year first above written.

**COMPANY:**

KIC HOLDINGS INC.

By: _____
Name: _____
Title: _____

**SELLER:**

KINGWAY INCA CLYMER HOLDINGS INC.

By: _____
Name: _____
Title: _____

**BUYER:**

UNARCO MATERIAL HANDLING, INC.

By: _____
Name: _____
Title: _____

**GUARANTOR:**

AMERICAN CAPITAL STRATEGIES, LTD.,
solely with respect to Section 12.12 hereof

By: _____
Name: _____
Title: _____

*Signature Page to Securities Purchase Agreement*

IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed either individually or by their respective authorized officers as of the day and year first above written.

COMPANY:                          KIC HOLDINGS INC.

                                  By:_____
                                  Name:_____
                                  Title:_____


SELLER:                           KINGWAY INCA CLYMER HOLDINGS INC.

                                  By:_____
                                  Name:_____
                                  Title:_____


BUYER:                            UNARCO MATERIAL HANDLING, INC.

                                  By:_____
                                  Name: JOHN R. SIEGEL, JR.
                                  Title: VICE PRESIDENT


GUARANTOR:                        AMERICAN CAPITAL STRATEGIES, LTD.,
                                  solely with respect to Section 12.12 hereof

                                  By:_____
                                  Name:_____
                                  Title:_____


*Signature Page to Securities Purchase Agreement*

IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed either individually or by their respective authorized officers as of the day and year first above written.

COMPANY:

KIC HOLDINGS INC.

By:_____
Name:_____
Title:_____


SELLER:

KINGWAY INCA CLYMER HOLDINGS INC.

By:_____
Name:_____
Title:_____


BUYER:

UNARCO MATERIAL HANDLING, INC.

By:_____
Name:_____
Title:_____


GUARANTOR:

AMERICAN CAPITAL STRATEGIES, LTD.,
solely with respect to Section 12.12 hereof

By:_____
Name:_Craig MGeneral_____
Title:_Senior Vice President_____


*Signature Page to Securities Purchase Agreement*

<u>Exhibit A</u>

<u>Definition of Net Working Capital</u>

For purposes of the Agreement, "<u>Net Working Capital</u>" means, without duplication and subject to the exclusions set forth below, the book value of the Company's and each Subsidiary's current assets minus the book value of the Company's and each Subsidiary's current liabilities; provided that the following items shall be excluded from (i.e., assigned a value of zero) for purposes of calculating Net Working Capital:

    (i)    Cash, and

    (ii)   Indebtedness.

Net Working Capital shall be determined on a consolidated basis in accordance with the accounting principles and methods used in the preparation of the Reference Balance Sheet and GAAP.  <u>Annex I</u> attached to this <u>Exhibit A</u> sets forth an example calculation of Net Working Capital.

Annex I to Exhibit A

Illustrative Example of Calculation of Net Working Capital

    This illustrative example of the calculation of Net Working Capital is provided for purely illustrative purposes only and shall not be a representation, warranty, covenant or agreement that the amounts set forth below represent the actual financial condition or results of business operations of the Company or any Subsidiary.

| | |
|---|---:|
| Net Accounts Receivable | $14,595,000 |
| Net Inventory | 4,747,000 |
| Prepaid Expenses | 461,000 |
| **Total Current Assets** | **$19,803,000** |
| | |
| Accounts Payable-Trade | ($12,790,000) |
| Accrued Expenses & Other Liabilities | (2,373,000) |
| Unearned Revenue | (752,000) |
| **Total Current Liabilities** | **($15,915,000)** |
| | |
| **Example Net Working Capital Amount** | **$3,888,000** |

Form of Escrow Agreement

*See attached.*

UNARCO MATERIAL HANDLING, INC.
AND
KINGWAY INCA CLYMER HOLDINGS INC.

SCHEDULES REQUIRED BY
SECURITIES PURCHASE AGREEMENT
March 30, 2007

UNARCO MATERIAL HANDLING, INC.
AND
KINGWAY INCA CLYMER HOLDINGS INC.

SCHEDULES REQUIRED BY
SECURITIES PURCHASE AGREEMENT
March 30, 2007

## CONTENTS

REPORT OF INDEPENDENT ACCOUNTANTS ................................................................. 1

SCHEDULES REQUIRED BY SECURITIES PURCHASE AGREEMENT

SCHEDULE OF CASH AMOUNT ................................................................. 2

SCHEDULE OF INDEBTEDNESS PAYOFF AMOUNT ................................................................. 3

SCHEDULE OF NET WORKING CAPITAL AMOUNT ................................................................. 4

SCHEDULE OF ACTUAL PURCHASE PRICE ................................................................. 5

NOTES TO SCHEDULES ................................................................. 6



**Crowe Chizek and Company LLC**
Member Horwath International

## REPORT OF INDEPENDENT ACCOUNTANTS

We have compiled the accompanying schedule of the Cash Amount, schedule of the Indebtedness Payoff Amount, schedule of the Net Working Capital Amount and schedule of the Actual Purchase Price (collectively the "Schedules"), of KIC Holdings, Inc. as of March 30, 2007, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.

A compilation is limited to presenting financial information that is the representation of management. We have not audited or reviewed the accompanying Schedules and, accordingly, do not express an opinion or any other form of assurance on them.

The accompanying Schedules were prepared for the purpose of complying with Section 2.04 of the Securities Purchase Agreement between Kingway Inca Clymer Holdings Inc. and Unarco Material Handling, Inc., and are not necessarily presented in conformity with generally accepted accounting principles.

This report is intended for the information and use of the boards of directors and management of Kingway Inca Clymer Holdings Inc. and Unarco Material Handling, Inc. and should not be used for any other purpose.

*Crowe Chizek and Company LLC*

Crowe Chizek and Company LLC

Brentwood, Tennessee
May 24, 2007

1.

UNARCO MATERIAL HANDLING, INC.
AND
KINGWAY INCA CLYMER HOLDINGS INC.
SCHEDULE OF CASH AMOUNT
March 30, 2007

| | | |
|---|---|---:|
| Bank of America | $ | 65,492 |
| Cash on hand | | 2,081 |
| Total cash amount | $ | 67,573 |

See report of independent accountants and accompanying notes to schedules.

2.

UNARCO MATERIAL HANDLING, INC.
AND
KINGWAY INCA CLYMER HOLDINGS INC.
SCHEDULE OF INDEBTEDNESS PAYOFF AMOUNT
March 30, 2007

| | |
|---|---:|
| Bank of America | $ 19,310,275** |
| American Capital Strategies Ltd. | 12,018,301 |
| Colson Services Corp | 345,723 |
| Great American Leasing | 46,897 |
| Citi Capital (Ohio) | 19,314 |
| NMHG (Atlanta) | 19,404 |
| Amano Business Credit (Andes) | 7,816 |
| First Corp (Dallas) | 5,732 |
| | $ 31,773,462 |

** This payoff amount does not include $220,435 of funding error occurring on the date of closing for net checks clearing in excess of cash deposits. This amount has been included in the schedule of net working capital adjustment as additional accrued expenses and other liabilities.

See report of independent accountants and accompanying notes to schedules.

3.

UNARCO MATERIAL HANDLING, INC.
AND
KINGWAY INCA CLYMER HOLDINGS INC.
SCHEDULE OF NET WORKING CAPITAL AMOUNT
March 30, 2007

| | |
|---|---:|
| Accounts receivable, net | $  10,536,543 |
| Inventories, net | 5,406,822 |
| Prepaid expenses and other current assets | 377,025 |
|    Total current assets | 16,320,390 |
| | |
| Accounts payable | 11,814,481 |
| Accrued expenses and other liabilities | 2,591,932 |
| Accrued sales tax | 4,732,213 |
| Unearned revenue | 109,146 |
|    Total current liabilities | 19,246,772 |
| | |
| Net working capital amount | $   (2,927,382) |

See report of independent accountants and accompanying notes to schedules.

4.

UNARCO MATERIAL HANDLING, INC.
AND
KINGWAY INCA CLYMER HOLDINGS INC.
SCHEDULE OF ACTUAL PURCHASE PRICE
March 30, 2007

| | | |
|---|---:|---:|
| Transaction value | | $  40,000,000 |
| Plus, Cash amount | | 67,573 |
| Less, Indebtedness payoff amount | | (31,773,462) |
| Less, Closing management bonuses | | (2,242,497) |
| Plus, Net working capital amount | $   (2,927,382) | |
| Less, Targeted net working capital amount | (3,900,000) | (6,827,382) |
| | | |
| Actual Purchase Price (before escrowed funds and transaction fees) | | (775,768) |
| | | |
| Less: transaction fees of seller paid at closing | | (1,571,379) |
| Less: buyer's funds escrowed | | (4,000,000) |
| | | $   (6,347,147) |

Reconciliation of amount owed to buyer:

| | |
|---|---:|
| Targeted net working capital amount | $   3,900,000 |
| Reduction in target based upon estimated closing | (472,662) |
| Adjusted net working capital target | 3,427,338 |
| Actual net working capital amount | (2,927,382) |
| Net working capital adjustment | 6,354,720 |
| | |
| Estimated cash at closing | 60,000 |
| Actual cash at closing | (67,573) |
| Cash adjustment – amount owed by buyer | (7,573) |
| | |
| Total amount owed to buyer | $   6,347,147 |

See report of independent accountants and accompanying notes to schedules.

5.

UNARCO MATERIAL HANDLING, INC.
AND
KINGWAY INCA CLYMER HOLDINGS INC.
NOTES TO SCHEDULES
March 30, 2007

---

**NOTE 1 – BASIS OF PRESENTATION**

The schedule of the Cash Amount, schedule of the Indebtedness Payoff Amount, schedule of the Net Working Capital Amount and schedule of the Actual Purchase Price (collectively the "Schedules", of KIC Holdings, Inc. as of March 30, 2007, were prepared for the purpose of complying with Section 2.04 of the Securities Purchase Agreement between Kingway Inca Clymer Holdings Inc. and Unarco Material Handling, Inc. The definitions of the Schedules are contained in the Securities Purchase Agreement.

The amounts presented in the Schedules are in accordance with the Securities Purchase Agreement. These amounts are in accordance with generally accepted accounting principles, except for certain defined terms which are as follows: Transaction Value is defined as $40 million and Targeted Net Working Capital is defined as $3.9 million.



**UNARCO**

Unarco Material Handling, Inc.
701 16ᵗʰ Avenue East
Springfield, TN 37172

May 24, 2007

Kingway Inca Clymer Holdings Inc.
c/o American Capital Strategies, Ltd.
505 Fifth Avenue, 26ᵗʰ Floor
New York, NY 10017

.Attn: Craig Moore

Dear Mr. Moore,

Enclosed is the Draft Computation required in Section 2.04. If you have any questions you can call me directly at (615) 382-3376.

We look forward to working with you.

Kind regards,

Paul W. Neal
Chief Financial Officer

cc:     American Capital Strategies, Ltd. (Bethesda, MD)
        Patton Bogg LLP
        Cadwalader, Wickersham & Taft LLP
        The Renco Group, Inc.

# ARNOLD & PORTER LLP

202.942.5000
202.942.5999 Fax

555 Twelfth Street, NW
Washington, DC 20004-1206

July 9, 2007

**BY E-MAIL, FACSIMILE, AND U.S. MAIL**
Unarco Material Handling, Inc.
c/o The Renco Group, Inc.
30 Rockefeller Plaza
New York, NY 10112
Attn: Gary Slater
Fax: 212/541-6197

Unarco Material Handling, Inc.
701 16th Avenue East
Springfield, TN 37172
Attn: Paul W. Neal
e-mail: pneal@unarcorack.com

Re:    Securities Purchase Agreement by and among Kingway Inca Clymer Holdings
       Inc., KIC Holdings Inc., Unarco Material Handling, Inc. and American Capital
       Strategies, Ltd., Dated as of March 9, 2007 ("Agreement")

Dear Sirs:

Pursuant to Section 2.04 of the above-referenced Agreement, Kingway Inca
Clymer Holdings, Inc. ("Seller") hereby provides its Objection Notice in response to the
letter with attachments dated May 24, 2007, from Unarco Material Handling, Inc.
("Buyer"). This submission by Seller is without prejudice to, and shall not be deemed to
constitute a waiver of, any other rights of Seller under the Agreement or otherwise and
shall not be deemed to be a concession that the letter dated May 24, 2007 with
attachments meets any or all of the requirements set forth in the Agreement.

Because Buyer has not yet provided all of the information requested by Seller to
which Seller is entitled under the Agreement, Seller reserves its rights to further revise
and amend this submission upon the receipt of the additional contractually required
information and further investigation.

Seller notes further that there are a number of aspects of Buyer's May 24, 2007
letter and attachments with which it does not agree, in addition to the disagreements
implicit in the materials attached hereto. Among other things, Seller disagrees with the
formula and calculation methods used by Buyer on its "Schedule of Actual Purchase

Washington, DC    New York    London    Brussels    Los Angeles    Century City    Northern Virginia    Denver

# ARNOLD & PORTER LLP

Unarco Material Handling, Inc.
July 9, 2007
Page 2

Price" and with the figures included on that schedule. Also, the documents provided on May 24, 2007 do not comply with the requirements set forth in Section 2.04(a) and Annex I to Exhibit A to the Agreement. There is no requirement that Seller enumerate each of these additional items at this time and Seller does not purport to do so exhaustively here.

On a final note, Seller considers it entirely possible that, upon receipt of additional information relating to the items for which Seller believes Buyer has not yet provided full information, additional areas of agreement with Buyer may come to light. Seller is very interested in engaging in a dialogue and obtaining additional information in the hopes that the parties can reach a mutually agreeable resolution. Please do not hesitate to contact us if you share this view.

Sincerely,

John C. Massaro

cc:    Mike Ryan, Esq.
       (212) 504-6666

# ARNOLD & PORTER LLP

Unarco Material Handling, Inc.
July 9, 2007
Page 3

| | |
|---|---|
| **Cash Amount** | **$1,148,273** |
| **Indebtedness Payoff Amount** | **$31,773,462** |
| **Net Working Capital Amount** | **$3,030,510** |

| | |
|---|---|
| Net Accounts Receivable | $10,670,944 |
| Net Inventory | $ 5,406,822 |
| Prepaid Expenses | $   527,482 |
| Total Current Assets | $16,605,248 |
| Accounts Payable | $11,814,481 |
| Accrued Expenses & Other Liabilities | $ 1,760,257 |
| Unearned Revenue | $       0 |
| Total Current Liabilities | $13,574,738 |

**Actual Purchase Price[1]**    **$6,262,824**

| | |
|---|---|
| (A) Transaction Value | $ 40,000,000 |
| (B) *plus* Cash Amount | $  1,148,273 |
| (C) *less* Indebtedness Payoff Amount | ($ 31,773,462) |
| (D) *less* Closing Management Bonuses | ($  2,242,497) |
| (E) *plus/minus* Target Net Working Capital Amount as compared to Net Working Capital Amount | ($    869,490) |

## Additional Calculations

| | |
|---|---|
| Estimated Purchase Price | $3,175,971.60 |
| Difference between Actual Purchase Price and Estimated Purchase Price | $3,086,852.40 |
| Amount Owed Seller As Per Section 2.04(b) | $3,086,852.40 plus interest as specified in Section 2.04(b) |

---

[1] Buyer included a line item relating to Sales Tax in its calculation. The Agreement does not contemplate such a separate line item and based on the information received to date Seller disputes the entire amount included on substantive grounds in any event.

# PRICEWATERHOUSECOOPERS 🄿

**PricewaterhouseCoopers LLP**
1301 K St., N.W. Suite 800W
Washington DC 20005-3333
Telephone (202) 414 1310
chris.forhecz@us.pwc.com

October 5, 2007

Kingway Inca Clymer Holdings, Inc.
c/o Mr. John Massaro
Arnold & Porter LLP
555 Twelfth Street, NW
Washington , D.C. 20004

Unarco Material Handling, Inc.
c/o Mr. Paul Neal
701 16th Avenue East
Springfield, TN 37172

Dear Mr. Massaro and Mr. Neal:

This letter confirms that PricewaterhouseCoopers LLP ("we," "us" or "PwC") is pleased to be engaged through the partner named below, to serve as a neutral expert with regard to certain disputes between Kingway Inca Clymer Holdings, Inc. and Unarco Material Handling, Inc. (collectively, the "Parties" or "you"). The proceeding will be governed by **Section 2.04, Post Closing Adjustment, of the Securities Purchase Agreement** dated as of **March 9, 2007** by and among Kingway Inca Clymer Holdings Inc., KIC Holdings Inc., Unarco Material Handling, Inc. and American Capital Strategies, Ltd. (the "Agreement").

**Scope of Our Services**

You are engaging us to render a decision relating to a number of disputed items. Our services will hereinafter be referred to as the "Services".

Chris Forhecz will act as the Decisionmaker. He may consult from time to time with others in our firm in connection with this engagement, and may use PwC partners and employees to perform research, calculations or other work. Final responsibility and authority rests with Mr.Chris Forhecz.

We anticipate all work will proceed at our offices and will not require fieldwork or independent inquiry. While the Decisionmaker will apply his experience and knowledge in making his determination, the responsibility for demonstrating support for the Parties' positions rests with the Parties. The Decisionmaker will apply such independent knowledge as he possesses and deems relevant, but, as provided in the Agreement, his "determination shall be based solely on written submissions by the [Parties] (i.e., not on independent review) and on the definitions included [therein]." In making his determination, however, the Decisionmaker may consult relevant accounting literature and consult with other PwC professionals.

The Proceeding will follow the schedule set forth in Attachment I. All written submissions or other communications by each Party shall be sent to the Decisionmaker and the other Party at the same time and via the same mode of communication. All written communication shall be by overnight express delivery, facsimile or e-mail but not by regular mail. There shall be no ex parte communications with the Decisionmaker. It is acceptable for either Party, if necessary, to communicate via telephone with our administrative staff for scheduling or other ministerial purposes.

# PRICEWATERHOUSECOOPERS

If we deem appropriate, you authorize us to engage counsel acceptable to all parties, who has no relationship with either Party that could be reasonably deemed to present a conflict, to advise us as to our powers, obligations, rights, immunities and duties under the law and Agreement and, if needed, to assist us in interpreting the Agreement. Counsel's fees will be paid by us and charged to the Parties as expenses. We do not presently contemplate the need to engage counsel.

## Deliverables

We expect to provide you with a written report summarizing our decision (our "determination"). Our determination will be communicated to the Parties after all fees and expenses are collected. As provided in the Agreement, our determination will be "conclusive and binding" upon the Parties (including our determination of the allocation of our fees and expenses as between the Parties).

## Ownership and Use

We are providing these Services solely for the Parties' use and benefit and pursuant to a client relationship exclusively with each of you. We disclaim any contractual or other responsibility to others based upon these Services or upon any deliverables or advice we provide. Because our work is not intended to be relied upon by third parties, without our written consent you will not: provide our deliverables or advice to customers, lenders, underwriters, insurers, investors or anyone who has or may obtain a financial interest in you; publicly disclose anything we provide or publicly refer to PwC or the Services; or give assurance to others based upon the Services; excepting that the Parties may provide our deliverables to a Court and publicly refer to PwC and the Services, to the extent necessary, in connection with any subsequent litigation between the Parties in connection with or arising out of the disputed items that are the subject of this proceeding.

Each Party will own all tangible written material delivered to you under this engagement letter, except as follows: PwC will own its working papers and preexisting materials and any general skills, know-how, processes, or other intellectual property (including a non-client specific version of any deliverables) which may have been discovered or created by PwC as a result of its provision of the Services. Each Party will have a nonexclusive, non-transferable license to use such materials included in the deliverables for such party's own internal use as part of such deliverables.

## Our Responsibilities

We will perform the Services in accordance with the Standards for Consulting Services established by the American Institute of Certified Public Accountants. Accordingly, we will not provide an audit or attest opinion or other form of assurance, and we will not verify or audit any information provided to us.

## The Parties' Responsibilities

We expect that you will each provide accurate and complete information and reasonable assistance, and we will perform the engagement on that basis.

The Parties agree that our determination will be final and binding on them.

Notwithstanding any other provision of this agreement to the contrary, either Party may, within five days of the rendering of our determination, call to the Decisionmaker's attention any patent arithmetic inaccuracy in the determination. No substantive evidence or pleading shall accompany such notice and any such evidence or pleading shall be ignored. The Decisionmaker shall weigh such notice as he deems appropriate and notify the Parties of his resolution. At that time, or upon the elapsing of five days following the rendering of our determination in the absence of such notice, the determination (or the revised determination if a patent arithmetic inaccuracy has been corrected) will become final and binding upon the Parties.

# PRICEWATERHOUSE COOPERS ⟨k⟩

**Conflicts of Interest**

We have performed an internal search for potential conflicts of interest based on the names of the Parties and the other interested parties you have identified: Unarco Material Handling, Inc., Renco, Inc., Kingway Inca Clymer Holdings, Inc., KIC Holdings Inc., American Capital Strategies, Ltd., and are aware of no situations that, in our view, constitute a conflict of interest or would influence our decisions as a Decisionmaker. We are not responsible for monitoring possible conflicts arising during the course of this engagement. PwC is a large firm, and it is possible that PwC partners or employees not associated with this engagement may have financial or personal relationships with a Party or its personnel. If so, these relationships will not touch upon the independent judgment of the partner serving as the Decisionmaker and you expressly waive any claim or right arising from any such relationship.

While we do not believe that the following represent a conflict of interest, we are disclosing that PwC has had and continues to have client service relationships / engagements with American Capital Strategies, Ltd. and related entities. These include an arbitration matter involving Arnold & Porter LLP. Also, PwC has had and continues to have client service relationships / engagements with entities related to Renco. None of these engagements involve Kingway Inca Clymer Holdings Inc., KIC Holdings Inc. or Unarco Material Handling Inc.

The Parties agree that during the term of this Agreement, PwC shall not be precluded from accepting engagements to provide services to any other entity, including but not limited to either Party or their counsel, provided that neither the partner serving as the Decisionmaker nor any of our personnel working on this engagement will participate in any other engagement for either Party during the term of this Agreement.

We reserve the right to resign as Decisionmaker at any time if conflicts of interest arise or become known to the partner serving as Decisionmaker that, in his judgment, would affect his independent judgment or otherwise preclude us from being able to complete this engagement.

You each confirm that you have undertaken your own review of any relationships with PwC and are aware of no situation that, in your view, constitutes a conflict of interest.

**Fees and Expenses**

Each Party will be responsible to PwC for one-half of all of our fees and expenses. Responsibility for payment of fees and expenses as between the Parties, shall be governed by Section 2.04 of the Agreement and the allocation thereof as between the Parties shall be performed by PwC and included in our determination. Our fees are based on the time required by our professionals to complete the engagement and will be billed at the following hourly rates by staff classification, if applicable:

| | |
|---|---|
| Partner | $795 |
| Managing Director | $595 |
| Director | $545 |
| Manager | $395 |
| Senior Associate | $335 |
| Associate | $210 |
| Administrative | $95 |

Individual hourly rates vary according to the experience and skill required. Hourly rates may be revised from time to time, and the adjusted rates will be reflected in billings.

# PRICEWATERHOUSE COOPERS 🏛

Each Party shall pay a non refundable retainer of $10,000 to be applied to our final bill for the Services. The retainer is not intended to be an estimate for the total cost of the work to be performed. Our fee is based on the time required by our professionals to complete the engagement.

We also will bill you for our reasonable out-of-pocket expenses and our internal per ticket charges for booking travel. Invoices are due within 15 days of the invoice date. If we began performing the Services before this engagement letter was signed, this letter will be considered effective as of the date we began providing the Services.

Our determination will be communicated to the Parties after all fees and expenses are collected.

Should there be litigation with respect to the Proceedings and any PwC partner, principal or employee is called to testify or otherwise required to provide services by a Party or the Court, PwC will be compensated by the Parties based on those individuals' then-standard billing rates and expenses incurred. The Parties agree that those fees and expenses shall be paid one-half by each Party, although neither Party waives any right of action against the other for recovery of all or a portion of its half from the other.

## Termination and Dispute Resolution

PwC or the Parties (collectively only, by joint notice) may terminate the Services by giving notice to that effect to the other parties.

This engagement letter and any dispute relating to the Services will be governed by and construed, interpreted and enforced in accordance with the laws of the State of New York, without giving effect to any provisions relating to conflict of laws that would require the laws of another jurisdiction to apply.

## Limitations and Immunities

The Parties agree that PwC, its partners and personnel shall be accorded the full immunities, privileges, powers and rights of an arbitrator, and each party expressly agrees to release PwC from any claim arising from the Services.

## Other Matters

No party to this letter may assign or transfer this engagement letter, or any rights, obligations, claims or proceeds from claims arising under it, without the prior written consent of the other parties, and any assignment without such consent shall be ineffective. You each agree that PwC may use your name in experience citations and recruiting materials. This engagement letter supersedes any prior understandings, proposals or agreements with respect to the Services, and any changes must be agreed to in writing.

*   *   *   *   *

(4)

# PRICEWATERHOUSECOOPERS 🏷

We are pleased to have the opportunity to provide services to Kingway Inca Clymer Holdings, Inc. and Unarco Material Handling, Inc.. If you have any questions about the contents of this letter, please discuss them with Chris Forhecz at (202) 414-1310. If the Services and terms outlined in this letter are acceptable, please sign one copy of this letter in the space provided and return it to the undersigned.

Very truly yours,

PricewaterhouseCoopers LLP

By: _____

J. Christopher Forhecz
Partner

Date: _10/5/07_____


ACKNOWLEDGED AND AGREED:

**Kingway Inca Clymer Holdings, Inc.**

Signature of client official: _____

Please print name: _____C. T. MOORE_____

Title: _____DIRECTOR_____

Date: _____10/19/07_____


ACKNOWLEDGED AND AGREED:

**Unarco Material Handling, Inc.**

Signature of client official: _____

Please print name: _____

Title: _____

Date: _____

(5)

# PRICEWATERHOUSECOOPERS 🅿

We are pleased to have the opportunity to provide services to Kingway Inca Clymer Holdings, Inc. and Unarco Material Handling, Inc.. If you have any questions about the contents of this letter, please discuss them with Chris Forhecz at (202) 414-1310. If the Services and terms outlined in this letter are acceptable, please sign one copy of this letter in the space provided and return it to the undersigned.

Very truly yours,

PricewaterhouseCoopers LLP

By: _Chris Forhecz_____
J. Christopher Forhecz
Partner

Date: _10/5/07_____


ACKNOWLEDGED AND AGREED:

**Kingway Inca Clymer Holdings, Inc.**

Signature of client official: _____

Please print name: _____

Title: _____

Date: _____


ACKNOWLEDGED AND AGREED:

**Unarco Material Handling, Inc.**

Signature of client official: _Paul Neal_____

Please print name: _PAUL NEAL_____

Title: _VICE PRESIDENT_____

Date: _10/8/07_____

(5)



**Attachment I**

**Proceeding between Kingway Inca Clymer Holdings, Inc. and Unarco Material Handling, Inc.**

**Dates upon which written submissions are due \***

| <u>Date</u> | <u>Submissions/Communications</u> |
|---|---|
| 1. October 5, 2007 | Conference call to establish/finalize procedures |
| 2. October 23, 2007 | Complainant's Statement of Position |
| 3. October 23, 2007 | Respondent's Statement of Position |
| 4. November 6, 2007 | Complainant's Reply to Respondent's Statement of Position |
| 5. November 6, 2007 | Respondent's Response to Complainant's reply |
| 6. November 16, 2007 | Decisionmaker's interrogatories/document requests, if any, to the Parties |
| 7. November 30, 2007 | Parties' answers to the decisionmaker's interrogatories/document requests |
| 8. December 14, 2007 | Decision Letter \*\* |

\*  Written submissions are due to be received by the Decisionmaker and the other Party on the dates noted above.  All submissions sent to the Decisionmaker should be sent to the other Party via the same mode of communication, e.g., overnight express mail or facsimile (not regular mail).

\*\*  If the Decisionmaker determines a need to issue additional interrogatories/document requests, the Parties will be so notified and the Decision letter may be issued at a later date mutually agreed upon by the Parties or, in the absence of such mutuality, by order of the Decisionmaker. Nothing in this statement obligates the Decisionmaker to act beyond the scope described in the accompanying Engagement Letter.

# C A D W A L A D E R

Cadwalader, Wickersham & Taft LLP
New York  London  Charlotte  Washington  Beijing

One World Financial Center, New York, NY 10281
Tel 212 504 6000  Fax 212 504 6666
www.cadwalader.com

October 23, 2007

**VIA E-MAIL CFORHECZ@US.PWC.COM**
**VIA FEDEX**

J. Christopher Forhecz
Partner
PricewaterhouseCoopers LLP
1301 K. Street NW
Washington, DC 20005

Dear Mr. Forhecz:

We represent Unarco Material Handling, Inc ("Unarco" or "Buyer"). Pursuant to an engagement letter dated October 5, 2007, Buyer and Kingway Inca Clymer Holdings, Inc. ("Seller" and together with Buyer, the "Parties") have retained PricewaterhouseCoopers LLP to resolve certain disputes arising between them over a post-closing adjustment in connection with an acquisition by Unarco of KIC Holdings, Inc. Enclosed is Unarco's Statement of Position.

Pursuant to a Securities Purchase Agreement by and among Buyer, Seller and American Capital Strategies, Inc., dated March 9, 2007 (the "SPA") (*see* Appendix C),[1] Unarco purchased all of the outstanding equity interests in KIC Holdings, Inc and its subsidiaries (the "Company"). In accordance with the SPA, as of the Transaction Date, March 30, 2007, Unarco paid an "Estimated Purchase Price." The Estimated Purchase Price was calculated based upon the Company's financial information available immediately prior to closing. In order to reconcile the Estimated Purchase Price with the Actual Purchase Price, *i.e.,* one that is based upon the Company's *actual* financial information at closing, Section 2.04 of the SPA provides for a "Post-Closing Adjustment," which effectively provides that if it is determined that the Actual Purchase Price is less than the Estimated Purchase Price, Seller will pay Buyer the difference, and vice versa.

Section 2.04 establishes a procedure to determine the need for and extent of any Post-Closing Adjustment. First, the Buyer is required to prepare and deliver to the Seller, within sixty days of closing, a "Draft Computation," containing its determinations of the actual Cash Amount,

---

[1] Unless separately defined, all capitalized terms in this letter and in Unarco's Statement of Position, have the same meanings ascribed to those terms in the SPA.

# C A D W A L A D E R

J. Christopher Forhecz
October 23, 2007

Indebtedness Payoff Amount and Net Working Capital Amount as of the Transaction Date, and its calculation, based, in part, on the above, of the Actual Purchase Price.  If the Seller disagrees with any aspect of the Draft Computation, the Seller may, within forty-five days after receipt of the Draft Computation deliver an "Objection Notice" to the Buyer setting forth Seller's competing determinations of the actual Cash Amount, Indebtedness Payoff Amount and Net Working Capital Amount as of the Transaction Date, and its calculation, based, in part, on those items, of the Actual Purchase Price.  If the Buyer and Seller cannot resolve the differences between the Draft Computation and the Objection Notice, the SPA provides that they should retain an independent accounting firm to resolve the differences.

On or about May 24, 2007, Buyer provided seller with its Draft Computation (Appendix A).  To prepare the Draft Computation, Buyer retained Crowe, Chizek & Co., who reviewed workpapers, schedules and source documentation.  The schedule of net working capital contained in the Draft Computation was prepared in accordance with Generally Accepted Accounting Principles (GAAP).  Buyer calculated an Estimated Purchase Price of $5,571,379, an Actual Purchase Price of ($775,768) and, based on those amounts, calculated that, pursuant to Section 2.04(b)(ii), Buyer was owed $6,347,147.  Based upon subsequent events and further analysis, Buyer revised certain inputs to the Draft Computation.  According to Buyer's Revised Draft Computation, the Estimated Purchase Price is $5,571,379, the Actual Purchase Price is $858,842, and the amount it is owed from Seller is $4,712,537.

On or about July 9, 2007, Seller provided Buyer with its Objection Notice (Appendix B).  Seller calculated an Actual Purchase Price of $6,262,824 and an Estimated Purchase Price of $3,175,971.60 and, based on those amounts, Seller claimed that, pursuant to Section 2.04(b)(i), it was owed $3,086,852.40 from Buyer.  Based on a comparison of the Draft Computation and the Objection Notice, the difference in the Parties' calculations of the net amount of the Post – Closing Adjustment, results from three principal differences: (i) in the Parties' determinations of the Cash Amount, (ii) in the Parties' calculations of five components of Net Working Capital, including, (a) Accounts Receivable, (b) Prepaid Expenses, (c) Accrued Expenses and Other Liabilities, (d) Unearned Revenue and (e) Accrued Sales Tax Liability, and (iii) in the Parties' calculations of the Estimated Purchase Price, as defined, and paid to or for the benefit of Seller at closing.

Specifically, Seller proposes adjustments to the Cash Amount and to Net Working Capital for Accounts Receivable, Prepaid Expenses and Unearned Revenue, all of which are either unsupported as a matter of fact or are inconsistent with GAAP.  For example, Seller proposes to adjust Prepaid Expenses by capitalizing items that, according to the Company's records, do not exist, and to adjust the Cash Amount by adding back to cash the amount of outstanding

# CADWALADER

J. Christopher Forhecz
October 23, 2007

checks written in respect of accounts payable, without making a balancing entry to accounts payable.

In contrast, Buyer has identified six separate liabilities, including accrued sales taxes, that existed as of the Transaction Date but were erroneously omitted from the Closing Balance Sheet and has provided documents evidencing the existence and amount of each.

The enclosed submission contains a description of each disputed item, the Parties' respective positions on those items and, where applicable, facts or accounting literature supporting Buyer's position. As set forth in the submission, according to Section 2.04(b)(ii) of the SPA, Seller owes Buyer $4,712,537, plus interest at 8% from March 30, 2007 to the date of payment.

Very truly yours,

Joshua R. Weiss

Enclosures

cc:    John C. Massaro, Esq.
       Edward J. Mizerek

**POST-CLOSING ADJUSTMENT DISPUTE
IN CONNECTION WITH THE ACQUISITION OF KIC HOLDINGS, INC., BY
UNARCO MATERIAL HANDLING, INC.**

**STATEMENT OF POSITION AND SUPPORTING DOCUMENTATION
SUBMITTED BY
UNARCO MATERIAL HANDLING, INC.**

**OCTOBER 23, 2007**

## Table of Contents

I.  **Calculation of Actual Purchase Price And Net Working Capital**

II. **Disputed Items**

    a.  **Cash Amount**

    b.  **Net Working Capital Amount**

        i.  *Accrued Sales Tax*

        ii. *Unearned Revenue*

        iii. *Accounts Receivable*

        iv. *Prepaid Expenses*

        v.  *Accrued Expenses And Other Liabilities*

    c.  **Estimated Purchase Price**

III. **Conclusion**

**Exhibits:**

1.  **Computation of Actual Purchase Price Amount of KIC Holdings, Inc.**
2.  **Computation of Net Working Capital Amount of KIC Holdings, Inc.**
3.  **KIC Holdings, Inc. Closing Balance Sheet**
4.  **KIC Holdings, Inc. Cash Summary as of March 30, 2007**
5.  **Summary of Estimated Sales/Use Tax, Interest and Penalties**
6.  **Documents to Support Unearned Revenue Amount**
7.  **Documents to Support Accounts Receivable Amount**
8.  **Documents to Support Prepaid Expenses Amount**
9.  **Documents to Support Accrued Vacation Liability**
10. **Documents to Support Pet Smart Claim Liability**
11. **Documents to Support Revolver Account Liability**
12. **Documents to Support Wise Installation Claim Liability**
13. **Email and Spreadsheet Dated March 27, 2007 Containing Seller's Pre-Closing Estimated Cash Amount, Estimated Indebtedness Payoff Amount and Estimated Net Working Capital Amount (Flow of Funds and Sources and Uses).**
14. **Email and Spreadsheet Dated March 30, 2007 Containing Seller's Pre-Closing Revised Estimated Cash Amount, Estimated Indebtedness Payoff Amount and Estimated Net Working Capital Amount (Flow of Funds Schedule)**
15. **Reconciliation of Estimated Purchase Price**
16. **Buyer's Calculation of Net Post Closing Adjustment and Buyer's Reconciliation of Differences In Calculation of Net Post Closing Adjustment.**

## Table of Contents

**Appendix:**

A.    **Buyer's Draft Computation**
B.    **Seller's Objection Notice**
C.    **The Securities Purchase Agreement**
D.    **Sales Tax Liability Analysis, as prepared by BDO Siedman**
E.    **Transaction Closing Statement and Sources and Uses of Funds**
F.    **AICPA Statement of Position (SOP) 37**
G.    **FAS 43 Accounting For Compensated Absences**
H.    **Company Vacation Policy**
I.    **Company Consolidated Trial Balance**
J.    **Trial Balances by Company**
K.    **Spreadsheet Re Sales Tax Calculation**
L.    **Spreadsheet Re Accrued Vacation Liability Analysis**

## I.     Calculation of Actual Purchase Price and Net Working Capital

As demonstrated in Exhibit 1, the Actual Purchase Price calculated by Buyer, according to Section 2.04 of the SPA, is **$858,842**.[1]  The Actual Purchase Price calculated by Seller on the Objection Notice is **$6,262,824**.  As demonstrated in Exhibit 2, the Net Working Capital Amount calculated by Buyer, according to Exhibit A to the SPA, is **($1,292,772)**.  The Net Working Capital Amount calculated by Seller on the Objection Notice is **$3,030,510**.  As set forth in the following pages, the difference in Actual Purchase Price between Buyer and Seller (**$5,403,982**) results from differences in the Parties' respective determinations of the Cash Amount and calculations of Net Working Capital.

The Opening Balance Sheet Workpaper attached as Exhibit 3 details the Company's Closing Balance Sheet, the adjustments required by GAAP to working capital accounts, and Buyer's final adjusted Net Working Capital.  The Parties' respective calculations of Actual Purchase Price and Net Working Capital, and a reconciliation of both, are set forth in Exhibits 1 and 2, respectively.

Since the preparation of the Draft Computation, events have caused Buyer to revise the amounts of Accrued Expenses and Other Liabilities and Accrued Sales Taxes.  These revisions are reflected in column **(B)** of the Computation of the Net Working Capital Amount (Exhibit 2) (and are more fully explained in the following individual account discussions).  In columns **(C)**, **(D)**, and **(E)**, the Buyer's revised calculation of Net Working Capital is reconciled to the Seller's calculation of Net Working Capital, as set forth in Seller's Objection Notice (See Appendix B).

Set forth in the following pages (2-11) are detailed descriptions of each of the disputed items with respect to the calculation of the Actual Purchase Price, including the component calculation of Net Working Capital.

---

[1]  Section 2.04 of the SPA provides that "Actual Purchase Price means an amount equal to (A) the Transaction Value, (B) plus the Cash Amount, (C) less the Indebtedness Payoff Amount, (D) less the Closing Management Bonuses, and (E) plus the excess of the Net Working Capital Amount over the Target Net Working Capital Amount or minus the excess of the Target Net Working Capital Amount over the Net Working Capital Amount."

# EXHIBIT 1

**Unarco Material Handling, Inc.**                                      Unarco Submission
**Computation of Actual Purchase Price Amount of KIC Holdings, Inc.**        Exhibit 1
**March 30 2007**

|  |  | Buyer | Differences |  | Seller |
|---|---|---|---|---|---|
| Transaction Value |  | $   40,000,000 |  |  | $   40,000,000 |
| Plus Cash amount |  | 67,573 | $   (1,080,700) | (1) | 1,148,273 |
| Less, indebtedness payoff |  | (31,773,462) |  |  | (31,773,462) |
| Less, Closing management bonuses |  | (2,242,497) |  |  | (2,242,497) |
| Less, net working capital adjustment based on : |  |  |  |  |  |
| Net working capital as computed by Buyer | $ (1,292,772) |  |  |  |  |
| Targeted net working capital | (3,900,000) | (5,192,772) | (5,192,772) | (2) | - |
|  |  | - | - |  | - |
| Net working capital as computed by Seller | 3,030,510 | - | - |  | - |
| Targeted net working capital | (3,900,000) | - | 869,490 | (2) | (869,490) |
| (4)   **Actual Purchase Price, as defined** |  | 858,842 | (5,403,982) |  | 6,262,824 |
| **Less: Estimated Purchase Price, as defined** |  | (5,571,379) | (2,395,407) | (3) | (3,175,972) |
| **Net Amount (owed to buyer) due from buyer** |  | $   (4,712,537) | $   (7,799,389) |  | $   3,086,852 |

<u>**Schedule of Differences: (See Individual Tabs for explanation)**</u>

(1) Represents outstanding checks in a specific controlled disbursement account (See Disputed Item: Cash).

(2) See explanation for net working capital adjustments (Exhibit 2). The sum of these amounts is
    **$4,323,282** which agrees to differences between Buyer's and Seller's computations of net working capital.

(3) Disputed estimated purchase price ( See Disputed Item: Calculation of Estimated Purchase Price)

(4) As defined per Section 2.04 of securities purchase agreeemnt  (See Appendix C)

# EXHIBIT 2

Unarco Submission
Exhibit 2
p. 1

Unarco Material Handling, Inc.
Computation of Net Working Capital Amount of KIC Holdings, Inc.
March 30 2007

| | (A) Buyer's Initial Calculation of Net Working Capital | Buyer's Proposed Revisions | (C) Buyer's Revised Calculation of Net Working Capital | (D) Differences | | (E) Seller's Calculation of Net Working Capital | |
|---|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | | |
| Accounts receivable, net | $ 10,536,543 | | $ 10,536,543 | (134,401) | (1) | $ 10,670,944 | |
| Inventories, net | 5,406,822 | | 5,406,822 | - | | 5,406,822 | |
| Prepaid expenses | 377,025 | | 377,025 | (150,457) | (2) | 527,482 | |
| | 16,320,390 | | 16,320,390 | (284,858) | | 16,605,248 | |
| **Current Liabilities** | | | | | | | |
| Accounts payable | 11,814,481 | | 11,814,481 | - | | 11,814,481 | |
| Accrued expenses and other liabilities | 2,591,932 (B) | (220,005) | 2,371,927 | 611,670 | (3) | 1,760,257 | |
| Accrued sales tax | 4,732,213 (B) | (1,414,605) | 3,317,608 | 3,317,608 | (4) | - | |
| Unearned revenue | 109,146 | | 109,146 | 109,146 | (5) | - | |
| | 19,247,772 | | 17,613,162 | 4,038,424 | | 13,574,738 | |
| **Net Working Capital, as defined** | (2,927,382) | | (1,292,772) | (4,323,282) | | 3,030,510 | |

Unarco Submission
Exhibit 2
p. 2

**Unarco Material Handling, Inc.**
**Computation of Net Working Capital Amount of KIC Holdings, Inc.**
**March 30 2007**

**Legend of Source Documents:**
(A) Initial computation of net working capital as reported by Buyer (Appendix A)
(B) Revisions submitted by Buyer based on subsequent events occurring to revise management's estimate of certain liabilities
    See specific tabs disclosing accrued sales tax and accrued expenses and other liabilities
(C) Revised computation of net working capital submitted by Buyer
(D) Net working capital disputed amounts based on Objection Notice submitted by Seller (Appendix B)
(E) Computation of net working Capital as reported by Seller in objection notice. (See Appendix B)

**Schedule of Differences: (See Individual Tabs for explanation)**
(1) Represents differences in allowance for doubtful accounts
(2) Represents Seller proposed capitalization of prepaid trade show expenses and tools and dies
(3) Represents various accruals disputed by Seller as follows:

| | Buyer | Difference | Seller |
|---|---|---|---|
| Accrued vacation | 757,458 | 343,639 | 413,819 |
| Petsmart Claim | 19,596 | 19,596 | - |
| Revolver Liability at Transaction Date | 220,435 | 220,435 | - |
| OSHA penalty | 5,400 | - | 5,400 |
| WISE installation | 28,000 | 28,000 | - |
| | 1,030,889 | 611,670 | 419,219 |

(4) Accrued sales taxes, penalties and interest
(5) Unearned revenue / customer deposits for products shipped subsequent to March 30, 2007

# EXHIBIT 3

Unarco Submission
Exhibit 3

KIC Holdings, Inc.
**Closing Balance Sheet**
March 30, 2007

PREDECESSOR COMPANY

| | Company Prepared Closing Balance Sheet | | Closing Adjustments Required by GAAP | | Company Adjusted Closing Balance Sheet | | Buyer's Initial Calculation of Net Working Capital | Buyer's Proposed Revisions | Buyer's Final Calculation of Net Working Capital |
|---|---|---|---|---|---|---|---|---|---|
| **Assets:** | | | | | | | | | |
| Cash | $ | 67,573 | $ | - | $ | 67,573 | | | |
| Accounts recievable | | 10,536,543 | | - | | 10,536,543 | 10,536,543 | | 10,536,543 |
| WIP | | 5,406,822 | | - | | 5,406,822 | 5,406,822 | | 5,406,822 |
| Other Current Assets | | 377,025 | | - | | 377,025 | 377,025 | | 377,025 |
| Fixed Assets | | 23,352,424 | | - | | 23,352,424 | | | |
| Acc. Depreciation | | (11,895,247) | | - | | (11,895,247) | | | |
| Deposits | | 12 | | - | | 12 | | | |
| Debt costs | | - | | - | | - | | | |
| Investment in subsidiary | | - | | - | | - | | | |
| Separately identified intangibles | | - | | - | | - | | | |
| Goodwill (before allocation) | | - | | - | | - | | | |
| **Total assets** | $ | 27,845,152 | $ | - | $ | 27,845,152 | $ 16,320,390 | $ - | $ 16,320,390 |
| | | | | | | | | | |
| **Liabilities:** | | | | | | | | | |
| Accounts payable | | 12,255,730 | 2 | - | | 11,814,481 | 11,814,481 | | 11,814,481 |
| Accrued liabilities | | 1,739,407 | 1,3,4,5, 6, 7, 8, 9 | (441,249) | | 7,103,710 | 7,103,710 | (1,634,610) | 5,469,100 |
| LOC | | 8,491,387 | | 5,364,303 | | 8,491,387 | 220,435 | | 220,435 |
| Accrued interest payable | | 10,082,663 | | - | | 10,082,663 | | | - |
| Deferred Revenue | | 109,146 | | - | | 109,146 | 109,146 | | 109,146 |
| Note Payable | | 55,633,605 | | - | | 55,633,605 | | | |
| New Long term debt | | - | | - | | - | | | |
| **Total liabilities** | | 88,311,938 | | | | 93,234,992 | | | |
| **Equity:** | | | | | | | | | |
| Common Stock/Paid-in Capital | | - | | - | | - | | | |
| Warrants | | - | | - | | - | | | |
| Retained Earnings | | (60,466,786) | 1,2,3,4,5, 6, 7, 8,9 | (4,923,054) | | (65,389,840) | | | |
| **Total shareholders' equity** | | (60,466,786) | | (4,923,054) | | (65,389,840) | | | |
| **Total liabilities & equity** | $ | 27,845,152 | $ | - | $ | 27,845,152 | $ 19,247,772 | $ (1,634,610) | $ 17,613,162 |
| | | | | | | | | | $ (1,292,772) |

**II(a).    Disputed Item: *Cash Amount***

**Dispute:**       ***The Cash Amount Recorded On The Company's Closing Balance Sheet Is Correct. Seller Proposes An Upward Post-Closing Adjustment Of $1,080,700.***

The Cash Amount on the Closing Balance Sheet and the Draft Computation is **$67,573**. The Cash Amount on Seller's Objection Notice is **$1,148,273**, which reflects a proposed upward post-closing adjustment of **$1,080,700**. This amount represents the amount of outstanding checks written against the Company's line of credit as of the Transaction Date for valid payments to vendor accounts payable. In the Closing Balance Sheet, the outstanding checks (i.e., "checks written in excess of cash in bank") have been re-classified as a liability in accordance with GAAP and included as accounts payable. In the Seller's Objection Notice, it appears that Seller has added these outstanding checks to the Cash Amount with no corresponding entry to accounts payable or other liabilities.

Buyer verified all cash balances for all entities and locations through a review of account statements and information provided by the Company regarding outstanding checks and tested for cutoff accuracy. Attached as Exhibit 4 is a Cash Summary, reflecting the Company's account balances and outstanding checks written against those accounts as of the Transaction Date.

# EXHIBIT 4

Unarco Submission
Exhibit 4

## Cash Summary of KIC Holdings, Inc.
### March 30, 2007

| | Bank of America INCA Metal Products Inc FBO FCC-CLA Acct #3756424746 G/L Acct# 1000 | Bank of America INCA Metal Products Inc MASTER OPERATING Acct #3756424759 G/L Acct# 1020 | Bank of America KIC HOLDING INC Acct #3299120149 G/L Acct# 1040 | N/A Petty Cash | Total |
|---|---|---|---|---|---|
| Bank Balance | $ 65,491.75 BS | $ - BS | $ - BS1 | $ - | $ 65,491.75 |
| Confirmed Balance | - | - | - | - | - |
| Difference | $ 65,491.75 | $ - | $ - | $ - | $ 65,491.75 |
| Bank Balance | $ 65,491.75 | $ - | $ - | $ - | $ 65,491.75 |
| O/S Checks: Dallas | - | - | (446,282.37) OS | - | (446,282.37) |
| Ohio | - | - | (135,095.67) OS | - | (135,095.67) |
| Atlanta | - | - | (400,141.01) OS | - | (400,141.01) |
| Andes | - | - | (53,836.11) OS | - | (53,836.11) |
| Corp | - | - | (45,344.63) OS | - | (45,344.63) |
| Deposits in Transit | - | - | | | |
| Other Reconciling Items | - | - | | 2,081.00 | 2,081.00 |
| Book Balance | $ 65,491.75 | $ - | $ (1,080,699.79) | $ 2,081.00 | $ (1,013,127.04) |
| Reconciled Balance | $ 65,491.75 | $ - | $ (1,080,699.79) | $ 2,081.00 | $ (1,013,127.04) |
| Balance per G/L | 65,491.75 TB | - | (1,080,699.79) TB | 2,081.00 TB | (1,013,127.04) |
| Difference | $ - | $ - | $ - | $ - | $ - |

Shown as:
Cash                67,572.75
Included in AP     (1,080,699.79)
                   (1,013,127.04)

| | LAST CHECK | FIRST CHECK |
|---|---|---|
| OHIO TPA | 82596 | 82597 |
| CORPORATE AP | 108145 | 108146 |
| ATLANTA TPA | 164941 | 164942 |
| ANDES TPA | 507265 | 507266 |
| CORPORATE TPA | 701027 | 701028 |
| ATLANTA AP | 211233 | 211234 |
| OHIO AP | 401466 | 401467 |
| DALLAS AP | 802458 | 802459 |
| MANUAL PAYROLL | 1938 | 1939 |

Tickmark Legend
TB Agrees to Trial Balance.
BS Agrees to subsequent bank statement.
BS1 Agreed to 3/30/07 bank statement because subsequent bank statement was not available.
OS Agreed to outstanding check list w/o/e.

NOTE: Selected all checks on the "Previous Day Detail with Text Report," as of 4/2/07, over $10,000 and agreed to the outstanding check list w/o/e.

**II(b)(i).**        **Disputed Item: Net Working Capital,** *Accrued Sales Tax*

**Dispute:**        ***The Company's Closing Balance Sheet Erroneously Omitted $3,317,608 Of
Accrued State Sales Tax Liabilities That Existed As Of The Transaction Date.
Seller Disputes The Amount And/Or Existence Of These Liabilities.***

**Overview:**  Prior to the Transaction Date (and continuing thereafter), the Company engaged in
sales in various states throughout the country.  Accordingly, in states that have a sales and/or use
tax, the Company, in accordance with state law, was required to file returns and remit sales and
use taxes under certain circumstances.  An independent sales tax liability analysis prepared prior
to the Transaction Date for Kingway and its subsidiaries by BDO Seidman LLP (at the request of
Seller) concluded that Inca Metal Products, Corp (Inca Metal) and Clymer Acquisition, Inc.
(Clymer) had sales tax nexus in states in which installation services were performed (copy
attached as Appendix D).  In addition, that analysis concluded that sales tax nexus could also
result from travel into states by independent sales representatives or sales personnel employed by
either company.  The analysis estimated the tax liability Inca Metal and Clymer to range from
$271,356 to $11,716,750, including interest but exclusive of potential penalties.

Accordingly, Buyer engaged Crowe Chizek & Co. LLC ("Crowe") to determine the extent of the
Company's state sales and use tax liability.  Crowe conducted interviews with Unarco and
Company personnel to determine the extent of the Company's activities in each state.  Crowe
concluded that, at a minimum, each state where the Company installed products would find that
it should have registered to collect sales and use tax.  Crowe then calculated the sales and use tax
liability associated with those installations.  To do so, Crowe employed a block sampling method
commonly used by states to determine sales and use tax liabilities.  After further discussion with
Company personnel, and obtaining additional documentation, Crowe revised the amount of the
estimated tax liability using the same sampling methodology.  The estimated liability for sales
tax includes penalties and interest accrued up to the Transaction Date.  Crowe's estimate
assumes that Buyer will pursue and obtain Voluntary Disclosure Agreements ("VDAs") with the
taxing authorities in the states where liability exists.

**Process:**  While states will utilize either a block, statistical or full detailed audit process,
considering both the time and complexity of the issues in this project, Crowe determined that a
block sample would be the most effective and efficient process.  In the block audit process,
Crowe analyzed all Company invoices for a given period of time (the "sample period") that are
representative of the general sales practices of the Company to determine the percentage of
taxable sales made by the Company during that period for which sales tax should have been, but
was not, collected.  Crowe then applied this "error percentage" to the remaining periods to
estimate the tax liability.

Crowe obtained sales invoice detail from the Company for 2006 (the Georgia location submitted
only invoice detail for May through December 2006), all exemption certificates on file with the
Company, and a list of all known distributor (or resale) customers.  Based on its experience,
Crowe assumed that each state where liability exists, will conclude that all transactions that
involved the transfer of tangible personal property are taxable, unless the purchaser can provide
an exemption certificate or other documentation demonstrating that the sale was otherwise
nontaxable.

In Crowe's experience, most states allow delinquent taxpayers to enter into Voluntary Disclosure Agreements ("VDAs"), pursuant to which a state will agree to limit the "look-back" period for assessment. Thus, based on the assumption that Unarco would successfully negotiate a VDA in each state where it is liable for sales tax, Crowe has limited the scope of its calculation of sales tax liability to a period of three or four years prior to the acquisition date, the expected "look-back" period under the VDAs.

Based on all of the information provided by the Company, Crowe calculated an error percentage for 2006 by dividing the total taxable transactions for which the Company did not collect tax (reduced by credit for sales or use tax collected) by the total sales for 2006. Crowe applied the error percentage to the Company's total sales by state for the limited "look-back" periods discussed above, creating a taxable sales base for each period. Crowe multiplied the taxable base by the applicable state sales tax rate and an average of any local sales or use tax rates, to determine the tax liability for each jurisdiction. Interest and penalty calculations also were applied to reflect each state's rate.

For all transactions in the sample where either a properly completed exemption certificate was provided, or personnel from the Company location that made the sale had identified the customer as a distributor/reseller, the transactions were considered exempt and no liability was calculated. Additionally, if the Company location provided information obtained from a customer supporting that the customer had self-assessed the transactional tax due, Crowe considered those invoices as nontaxable.

Crowe submitted to Seller's representatives spreadsheets detailing the transactions that it concluded were taxable. Subsequently, the Company provided sales tax returns showing all sales and use tax collected. Crowe then revised the spreadsheet to include credit for sales tax collected by the Company during the sample period.

**Conclusion:** The Company had an obligation to collect sales or use taxes in multiple state and local jurisdictions (*see* Appendix K). The liability for the unpaid sales taxes including interest and penalties exists due to the Company's failure to file returns regardless of whether the Company has been notified of a pending audit. The procedures utilized in the calculations reflect those accepted by state taxing authorities. As detailed in the attached summary of sales and use tax liability spreadsheet (Exhibit 5), based on the procedures performed, total sales tax liability of at least $3,317,608 existed as of the Transaction Date. Workpapers supporting the summary of sales and use tax liability spreadsheet are included in Appendix K.

# EXHIBIT 5

Unarco Submission
Exhibit 5

Summary of Estimated Sales/Use Tax, Interest, and Penalty
March 30, 2007

| Division Name | Year | Sales or Use Tax Estimate* | Interest | Penalty | Total Due |
|---|---|---|---|---|---|
| Kingway - Ohio | 2003 | 54,771.55 | 13,059.31 | 16,391.96 | 84,222.82 |
| Kingway - Ohio | 2004 | 74,842.45 | 17,151.95 | 27,034.90 | 119,029.30 |
| Kingway - Ohio | 2005 | 117,588.85 | 17,103.64 | 47,158.74 | 181,851.23 |
| Kingway - Ohio | 2006 | 106,869.61 | 6,957.62 | 32,049.49 | 145,876.72 |
| Kingway - Ohio | 2007 | 27,241.64 | 333.32 | 8,861.86 | 36,436.82 |
| Kingway - Ohio Total | | 381,314.10 | 54,605.84 | 131,496.95 | 567,416.89 |
| Kingway - Texas | 2003 | 9,061.74 | 1,715.63 | 2,418.90 | 13,196.27 |
| Kingway - Texas | 2004 | 155,903.86 | 31,725.38 | 54,605.16 | 242,234.40 |
| Kingway - Texas | 2005 | 282,258.98 | 24,296.36 | 105,231.48 | 411,786.82 |
| Kingway - Texas | 2006 | 231,979.20 | 14,744.01 | 85,837.18 | 332,560.39 |
| Kingway - Texas | 2007 | 21,580.08 | 279.09 | 4,883.71 | 26,742.88 |
| Kingway - Texas Total | | 700,783.86 | 72,760.47 | 252,976.43 | 1,026,520.76 |
| Kingway - Georgia | 2003 | 45,168.78 | 9,086.69 | 9,318.58 | 63,574.05 |
| Kingway - Georgia | 2004 | 354,014.09 | 84,018.33 | 137,764.92 | 575,797.34 |
| Kingway - Georgia | 2005 | 265,681.29 | 44,532.86 | 109,724.35 | 419,938.50 |
| Kingway - Georgia | 2006 | 366,392.28 | 27,858.15 | 143,802.58 | 538,053.01 |
| Kingway - Georgia | 2007 | 85,335.04 | 1,211.71 | 39,761.07 | 126,307.82 |
| Kingway - Georgia Total | | 1,116,591.48 | 166,707.74 | 440,371.50 | 1,723,670.72 |
| Grand Total | | 2,198,689.44 | 294,074.05 | 824,844.88 | 3,317,608.37 |

* All calculations are based upon the sales data provided by the Company.  The calculation of the estimated amount due is amended to include additional documentation received by the Company, including exemption certificates, customer documentation of tax paid and credit for taxes collected and remitted by the Company.

**II(b)(ii).**      **Disputed Item: Net Working Capital,** *Unearned Revenue*

**Dispute:**      ***The Amount Of Unearned Revenue Recorded On The Company's Closing Balance Sheet Is Correct.    Seller Proposes A Downward, Post-Closing Adjustment Of $109,146.***

The Unearned Revenue amount on the Closing Balance Sheet and on Buyer's Draft Computation is **$109,146.** The Unearned Revenue amount on Seller's Objection Notice is **$0**, which reflects a proposed downward, post-closing adjustment of **$109,146.** The deferred liability for unearned revenue on the Closing Balance sheet was in respect of a customer deposit received on March 26, 2007, from Efficient Storage Solutions.

The products ordered, in respect of which the deposit was made, were shipped after the Transaction Date. In accordance with GAAP (i.e., "matching concepts"), deferred revenue is recognized and recorded as income when a sale is complete and the corresponding cost of the revenue is recorded as an expense. Here, the sale was complete upon shipment of the final product and no cost of sale was accrued prior to the Transaction Date. Accordingly, it is not proper to recognize the revenue from this sale prior to the Transaction Date. Documentation to support both the receipt of the deposit prior to the Transaction Date and the shipping of the product subsequent to the Transaction Date is annexed as Exhibit 6.[2]

---

[2] Exhibit 6 includes (i) invoices, bills of lading and packing slips for the products ordered by and shipped to Efficient Storage Solutions ("ESS"), demonstrating that the products were not shipped until May '07 (after the Transaction Date), (ii) a page from the Company's general ledger showing the entry of the $109,145.70 deposit received from ESS as unearned revenue, and (iii) pages from Company's accounts receivable deposit report and check register showing the receipt of the deposit from ESS on March 26, 2007.

# EXHIBIT 6

Unarco Submission
Exhibit 6
P. 1

501 E. Purnell Road
Lewisville, TX  75057
Phone: 972-436-5581
 Fax: 972-436-7901

Remit Payments To:
Kingway
P.O. Box 99631
Chicago, IL 60696

05-04-07    76013        1

32610      2005-1

EFFICIENT STORAGE SOL
7218 DYE DRIVE
DALLAS, TX 75248

GLAZERS WHOLESALE DIST.
3831 MUELLER ROAD
ST. CHARLES, MO 63301

| 17687-1 | 10 | | BEDROCK (THIRD) | | | | PROGRESS BILL'G |
|---|---|---|---|---|---|---|---|

Waybill: 17687-1
HOLD FOR DELIVERY WEEK OF
5/7/7 (LB 4/26/7)

| | | | | | | |
|---|---|---|---|---|---|---|
| 2 | 117721-74 CF31T 44 178-222 HC 96 96 FRAME (STEEL BLUE) | 24 | 0 | 24 | 135.20 | 3,244.80 |
| 4 | 1305544-75 SCB 445W 96 BEAM (STEEL ORANGE) | 4480 | 1422 | 700 | 22.00 | 15,400.00 |
| 7 | 170089-74 A311 10 FRAME SPACER TIE (STEEL BLUE) | 927 | 87 | 210 | 1.99 | 417.90 |
| 9 | 1306025-75 REP42 44 2T S ROW END PROTECTOR (STEEL ORANGE) | 228 | 145 | 83 | 13.55 | 1,124.65 |
| 1 | 117720-74 CF31T 44 288 HC 96 96 FRAME (STEEL BLUE) | 808 | 541 | 30 | 170.70 | 5,121.00 |
| 15 | BP160507-60 BASEPLATE 16GA X 5.0 X 7.0 W/4 HOLES 5/8 DIA | 1650 | 460 | 1190 | 1.00 | 1,190.00 |

Total List                                          26,498.35

Total Net Payable                                   26,498.35

 **KINGWAY**

RECEIVED: Subject to the "Common Carrier Rate Agreement" or the Contract between the Shipper and Carrier in effect on the date of shipment, the property described below in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as shown below. This Bill of Lading is not subject to any tariffs or classifications whether individually determined or filed with any federal or sate regulatory agency, except as specifically agreed to in writing by shipper and the carrier.

Date:    05-04-07
Shipper: Kingway (TX)
         501 E. Purnell Road
         Lewisville, TX 75057

Consignee:  GLAZERS WHOLESALE DIST.
            3831 MUELLER ROAD
            ST. CHARLES, MO 63301
            USA

**Billing Instructions:**

☐ **COLLECT** or **BILL TO CONSIGNEE:** The shipment is to be delivered to consignee without recourse on the consignor.

☒☒ **BILL TO THIRD PARTY**
☒☒  EFFICIENT STORAGE
    7218 Dye Drive
    Dallas, TX 75248

☐ **PREPAID**

| Customer ID | PO Number | Shipment ID |
|---|---|---|
| 32610 | 2005-1 | 17687-1 |
| Customer Name | Carrier | FOB |
| EFFICIENT STORAGE SOL | BEDROCK | LEWISVILLE, TX |

### SHIPPER'S BILL OF LADING
Not Negotiable

| Qty | HM | Net Wt | Unit | Item Description | Class | Gross Wt |
|---|---|---|---|---|---|---|
| 1,047 | | 606.69 | EA | HOLD FOR DELIVERY WEEK OF 5/7/7 (LB 4/26/7) STRUCTURAL | 65 | 43,943 |
| 1,190 | | 0.59 | EA | MI RACK | | 702 |

INPUT
MAY -7 2007
LB

As.s _tb_

Do not print

MAY 0 7 2007
INPUT
KL

_____ If this line is checked, this shipment contains materials considered hazardous by the Department of Transportation. By accepting it, you certify 1) you have a copy of the Emergency Response Guidebook and 2) your vehicle is properly placarded. Hazmat Emergency Response Number: CHEM-TEL (800) 255 - 3924

Carrier's Liability is for actual loss unless otherwise agreed in Common Carrier Rate Agreement, or stated below. The agreed or declared value of the property is herby specifically stated by the shipper to be not exceeding $_____ per pound. Kingway Inc., Shipper per

I hereby declare that the contents of this consignment are fully and accurately described above by proper shipping name and are classified, packaged, marked, labeled and are in all respects in proper condition for transport by highway according to applicable international and national government regulations.

| Total Gross Weight | 44,645 |
|---|---|
| No. of Pallets/Bundles | 0 / 0 |

I certify that I am in compliance with all federal, state and local regulations and that the load has been properly secured in my vehicle.

Accepted, in good order and condition by:

Driver Signature

Date:_____

Uncro Submission
Exhibit 6
p. 3

```
04 May.2007                    Kingway (TX)                    Page    1
17:39:05              Picking List for Shipment 17687-1         SHIP.R1
```



Ship Date: 05-04-07                 Ship To: GLAZERS WHOLESALE DIST.
Ship Via.: BW TPB                            3831 MUELLER ROAD
Waybill#.:                                   ST. CHARLES, MO 63301
Staging..:                                   USA

| Line.. | Part/Description........ | Invloc | Ship.Qty. | Pick.Qty. | Ext.Wgt... |
|--------|---------------------------|--------|-----------|-----------|------------|
| 2 | 117721-74<br>CF31T 44 178-222 HC 96 96<br>FRAME (STEEL BLUE) | 41F | 24.00 | _____ | 5,740# |



| 4 | 1305544-75<br>SCB 445W 96 BEAM (STEEL<br>ORANGE) | 41F | 700.00 | _____ | 26,838# |



| 7 | 170089-74<br>A311 10 FRAME SPACER TIE<br>(STEEL BLUE) | 41F | 210.00 | _____ | 531# |



| 9 | 1306025-75<br>REP42 44 2T S ROW END<br>PROTECTOR (STEEL ORANGE) | 41F | 83.00 | _____ | 1,619# |



Shared Submission
Exhibit 6
p. 4

04 May 2007                          Kingway (TX)                          Page    2
17:39:05                   Picking List for Shipment 17687-1                    SHIP.R1



1    117720-74                    41F            30.00    _____          9,215#
     CF31T 44 288 HC 96 96
     FRAME (STEEL BLUE)



15   BP160507-60                  41F          1190.00    _____            702#
     BASEPLATE 16GA X 5.0 X
     7.0 W/4 HOLES 5/8 DIA





                                            Total Weight:      44,645#

Beard Submission
Exhibit 6
p. 5

501 E. Purnell Road
Lewisville, TX  75057
Phone: 972-436-5581
  Fax: 972-436-7901

Remit Payments To:
Kinqway
P.O. Box 99631
Chicago, IL 60696

05-07-07     76074          1

32610      2005-1

EFFICIENT STORAGE SOL
7218 DYE DRIVE
DALLAS, TX 75248

GLAZERS WHOLESALE DIST.
3831 MUELLER ROAD
ST. CHARLES, MO 63301

17687-2              10              17687-2 (THIRD)          PROGRESS BILL'G

Waybill: 17687-2
HOLD FOR DELIVERY WEEK OF
5/7/7 (LB 4/26/7)

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | 117720-74 CF31T 44 288 HC 96 96 FRAME (STEEL BLUE) | 808 | 388 | 57 | 170.70 | 9,729.90 |
| 3 | 1305617-75 SCB 445W 48 BEAM (STEEL ORANGE) | 48 | 0 | 48 | 12.35 | 592.80 |
| 4 | 1305544-75 SCB 445W 96 BEAM (STEEL ORANGE) | 4480 | 652 | 420 | 22.00 | 9,240.00 |
| 5 | 1305543-75 SCB 567WP 144 BEAM (STEEL ORANGE) | 120 | 0 | 116 | 47.50 | 5,510.00 |
| 6 | 170447-75 A1515W 44 PALLET SUPPORT ( STEEL ORANGE) | 60 | 0 | 60 | 2.71 | 162.60 |
| 7 | 170089-74 A311 10 FRAME SPACER TIE (STEEL BLUE) | 927 | 87 | 210 | 1.99 | 417.90 |
| 8 | 170068-74 A311 24 FRAME SPACER TIE (STEEL BLUE) | 72 | 36 | 36 | 2.70 | 97.20 |

Total List                                                    25,750.40

Total Net Payable                                             25,750.40

INPUT

MAY 1 4 2007

LB

 **KINGWAY**

RECEIVED: Subject to the "Common Carrier Rate Agreement" or the Contract between the Shipper and Carrier in effect on the date of shipment, the property described below in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as shown below. This Bill of Lading is not subject to any tariffs or classifications whether individually determined or filed with any federal or state regulatory agency, except as specifically agreed to in writing by shipper and the carrier.

**Date:** 05-07-07
**Shipper:** Kingway (TX)
501 E. Purnell Road
Lewisville, TX  75057

**Consignee:** GLAZERS WHOLESALE DIST.
3831 MUELLER ROAD
ST. CHARLES, MO 63301
USA
ATTN: JEFF

**Billing Instructions:**

☐ **COLLECT** or **BILL TO CONSIGNEE:** The shipment is to be delivered to consignee without recourse on the consignor.

☒ **BILL TO THIRD PARTY**
EFFICIENT STORAGE
7218 DYE DRIVE
DALLAS, TX  75248

☐ **PREPAID**

| Customer ID | PO Number | Shipment ID |
|---|---|---|
| 32610 | 2005-1 | 17687-2 |

| Customer Name | Carrier | FOB |
|---|---|---|
| EFFICIENT STORAGE SOL | 17687-2 | LEWISVILLE, TX |

## SHIPPER'S BILL OF LADING
Not Negotiable

| Qty | HM | Net Wt | Unit | Item Description | Class | Gross Wt |
|---|---|---|---|---|---|---|
| 947 |  | 460.07 | EA | HOLD FOR DELIVERY WEEK OF 5/7/7 (LB 4/26/7) STRUCTURAL<br><br>********** SHIPPING CONTACT INFO **********<br>*                               *<br>* JEFF                       *<br>* 214-534-2443             *<br>*                               *<br>*********************************** | 65 | 45,176 |

INPUT
MAY - 8 2007
As is M&B
Do not print

MAY 0 8 2007
INPUT
KL

_____ If this line is checked, this shipment contains materials considered hazardous by the Department of Transportation. By accepting it, you certify 1) you have a copy of the Emergency Response Guidebook and 2) your vehicle is properly placarded. Hazmat Emergency Response Number: CHEM-TEL (800) 255 - 3924

**Total Gross Weight**         45,176

**No. of Pallets/Bundles**       0 / 0

Carrier's Liability is for actual loss unless otherwise agreed in Common Carrier Rate Agreement, or stated below. The agreed or declared value of the property is herby specifically stated by the shipper to be not exceeding $_____ per pound. Kingway Inc., Shipper per

I hereby declare that the contents of this consignment are fully and accurately described above by proper shipping name and are classified, packaged, marked, labeled and are in all respects in proper condition for transport by highway according to applicable international and national government regulations

I certify that I am in compliance with all federal, state and local regulations and that the load has been properly secured in my vehicle.

Accepted, in good order and condition by:

_Glenn Sutherland_

Driver Signature

Date: _____

Case 6 Submission
Exhibit 6
p. 7

```
07 May 2007                    Kingway (TX)                        Page    1
18:19:28              Picking List for Shipment 17687-2            SHIP.R1
```



Ship Date: 05-07-07                Ship To: GLAZERS WHOLESALE DIST.
Ship Via.: BW TPB                           3831 MUELLER ROAD
Waybill#.:                                  ST. CHARLES, MO 63301
Staging..:                                  USA
                                            ATTN: JEFF

| Line.. | Part/Description......... | Invloc | Ship.Qty. | Pick.Qty. | Ext.Wgt... |
|--------|---------------------------|--------|-----------|-----------|------------|
| 1 | 117720-74 CF31T 44 288 HC 96 96 FRAME (STEEL BLUE) | 41F | 57.00 | _____ | 17,508# |





| | | | | | |
|--------|---------------------------|--------|-----------|-----------|------------|
| 3 | 1305617-75 SCB 445W 48 BEAM (STEEL ORANGE) | 41F | 48.00 | _____ | 968# |







| | | | | | |
|--------|---------------------------|--------|-----------|-----------|------------|
| 4 | 1305544-75 SCB 445W 96 BEAM (STEEL ORANGE) | 41F | 420.00 | _____ | 16,103# |





| | | | | | |
|--------|---------------------------|--------|-----------|-----------|------------|
| 5 | 1305543-75 SCB 567WP 144 BEAM (STEEL ORANGE) | 41F | 116.00 | _____ | 9,631# |



Case 1:08-cv-02394-VM    Document 16-7    Filed 05/14/2008    Page 22 of 53

Grand Submission
Exhibit 6
p. 8



6   170447-75              41F        60.00    _____        290#
    A1515W 44 PALLET SUPPORT
    ( STEEL ORANGE)



7   170089-74              41F       210.00    _____        531#
    A311 10 FRAME SPACER TIE
    (STEEL BLUE)

8   170068-74              41F        36.00    _____        145#
    A311 24 FRAME SPACER TIE
    (STEEL BLUE)

                              Total Weight:    45,176#

Jerram Submission
Exhibit 6
p. 9

501 E. Purnell Road
Lewisville, TX  75057
Phone: 972-436-5581
  Fax: 972-436-7901

Remit Payments To:
Kinqway
P.O. Box 99631
Chicago, IL 60696

05-08-07    76110         1

32610      2005-1

EFFICIENT STORAGE SOL
7218 DYE DRIVE
DALLAS, TX 75248

GLAZERS WHOLESALE DIST.
3831 MUELLER ROAD
ST. CHARLES, MO 63301

| 17687-3 | 10 | BEDROCK (THIRD) | | | | PROGRESS BILL'G |
|---|---|---|---|---|---|---|

Waybill: 17687-3
HOLD FOR DELIVERY WEEK OF
5/7/7 (LB 4/26/7)

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | 117720-74 | 808 | 541 | 60 | 170.70 | 10,242.00 |
| | CF31T 44 288 HC 96 96 | | | | | |
| | FRAME (STEEL BLUE) | | | | | |
| 4 | 1305544-75 | 4480 | 1422 | 700 | 22.00 | 15,400.00 |
| | SCB 445W 96 BEAM (STEEL | | | | | |
| | ORANGE) | | | | | |

Total List                                    25,642.00

Total Net Payable                             **25,642.00**


# KINGWAY

RECEIVED: Subject to the "Common Carrier Rate Agreement" or the Contract between the Shipper and Carrier in effect on the date of shipment, the property described below in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as shown below. This Bill of Lading is not subject to any tariffs or classifications whether individually determined or filed with any federal or sate regulatory agency, except as specifically agreed to in writing by shipper and the carrier.

**Date:** 05-08-07
**Shipper:** Kingway (TX)
501 E. Purnell Road
Lewisville, TX 75057

**Consignee:** GLAZERS WHOLESALE DIST.
3831 MUELLER ROAD
ST. CHARLES, MO 63301
USA
ATTN: JEFF

## Billing Instructions:

☐ **COLLECT** or **BILL TO CONSIGNEE:** The shipment is to be delivered to consignee without recourse on the consignor.

☒ **BILL TO THIRD PARTY**
EFFICIENT STORAGE
7218 DYE DRIVE
DALLAS, TX 75248

☐ **PREPAID**

| Customer ID | PO Number | Shipment ID |
|---|---|---|
| 32610 | 2005-1 | 17687-3 |
| **Customer Name** | **Carrier** | **FOB** |
| EFFICIENT STORAGE SOL | BEDROCK | LEWISVILLE, TX |

## SHIPPER'S BILL OF LADING
Not Negotiable

| Qty | HM | Net Wt | Unit | Item Description | Class | Gross Wt |
|---|---|---|---|---|---|---|
| 760 | | 345.49 | EA | HOLD FOR DELIVERY WEEK OF 5/7/7 (LB 4/26/7) STRUCTURAL | 65 | 45,267 |
| | | | | ********** SHIPPING CONTACT INFO ********** | | |
| | | | | * * | | |
| | | | | * JEFF * | | |
| | | | | * 214-534-2443 * | | |
| | | | | *********************************** | | |

INPUT
MAY -9 2007
LB

As is

MAY 0 9 2007
INPUT
KL

Do not Print

_____ If this line is checked, this shipment contains materials considered hazardous by the Department of Transportation. By accepting it, you certify 1) you have a copy of the Emergency Response Guidebook and 2) your vehicle is properly placarded. Hazmat Emergency Response Number: CHEM-TEL (800) 255 - 3924

Carrier's Liability is for actual loss unless otherwise agreed in Common Carrier Rate Agreement, or stated below. The agreed or declared value of the property is herby specifically stated by the shipper to be not exceeding $_____ per pound. Kingway Inc., Shipper per
_____

I hereby declare that the contents of this consignment are fully and accurately described above by proper shipping name and are classified, packaged, marked, labeled and are in all respects in proper condition for transport by highway according to applicable international and national government regulations

Marc

**Total Gross Weight** 45,267
**No. of Pallets/Bundles** 0 / 0

I certify that I am in compliance with all federal, state and local regulations and that the load has been properly secured in my vehicle.

Accepted, in good order and condition by:

Driver Signature _____

Date: _____

Glazers Submission
Exhibit 6
p. 11

```
08 May 2007                    Kingway (TX)                      Page    1
19:03:25              Picking List for Shipment 17687-3          SHIP.R1
```



```
Ship Date: 05-08-07               Ship To: GLAZERS WHOLESALE DIST.
Ship Via.: BW TPB                          3831 MUELLER ROAD
Waybill#.:                                 ST. CHARLES, MO 63301
Staging..:                                 USA
                                           ATTN: JEFF


Line..  Part/Description........  Invloc    Ship.Qty.   Pick.Qty.   Ext.Wgt...

   1    117720-74                  41F         60.00    _____      18,429#
        CF31T 44 288 HC 96 96
        FRAME (STEEL BLUE)
```





```
   4    1305544-75                 41F        700.00    _____      26,838#
        SCB 445W 96 BEAM (STEEL
        ORANGE)
```





```
                                        Total Weight:     45,267#
```

Unarco Submission
Exhibit 6
p. 12

501 E. Purnell Road
Lewisville, TX  75057
Phone: 972-436-5581
   Fax: 972-436-7901

Remit Payments To:
Kinqway
P.O. Box 99631
Chicago, IL 60696

05-09-07     76146          1

32610     2005-1

EFFICIENT STORAGE SOL
7218 DYE DRIVE
DALLAS, TX 75248

GLAZERS WHOLESALE DIST.
3831 MUELLER ROAD
ST. CHARLES, MO 63301

17687-4          10          BEDROCK /BRUNTON (THIRD)     PROGRESS BILL'G

Waybill: 17687-4
HOLD FOR DELIVERY WEEK OF
5/7/7 (LB 4/26/7)

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | 117720-74 CF31T 44 288 HC 96 96 FRAME (STEEL BLUE) | 808 | 388 | 60 | 170.70 | 10,242.00 |
| 4 | 1305544-75 SCB 445W 96 BEAM (STEEL ORANGE) | 4480 | 652 | 577 | 22.00 | 12,694.00 |
| 7 | 170089-74 A311 10 FRAME SPACER TIE (STEEL BLUE) | 927 | 87 | 420 | 1.99 | 835.80 |

Total List                                                        23,771.80

Total Net Payable                                                 23,771.80

INPUT
MAY 1 4 2007
LB

Brasco Submission
Exhibit 6
p. 13

 **KINGWAY**

RECEIVED: Subject to the "Common Carrier Rate Agreement" or the Contract between the Shipper and Carrier in effect on the date of shipment, the property described below in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as shown below. This Bill of Lading is not subject to any tariffs or classifications whether individually determined or filed with any federal or sate regulatory agency, except as specifically agreed to in writing by shipper and the carrier.

**Date:** 05-09-07
**Shipper:** Kingway (TX)
501 E. Purnell Road
Lewisville, TX 75057

**Consignee:** GLAZERS WHOLESALE DIST.
3831 MUELLER ROAD
ST. CHARLES, MO 63301
USA
ATTN: JEFF

**Billing Instructions:**

☐ **COLLECT or BILL TO CONSIGNEE:** The shipment is to be delivered to consignee without recourse on the consignor.

☒ **BILL TO THIRD PARTY**

EFFICIENT STORAGE
7218 DYE DRIVE
DALLAS, TX 75248

☐ **PREPAID**

| Customer ID | PO Number | Shipment ID |
|---|---|---|
| 32610 | 2005-1 | 17687-4 |

| Customer Name | Carrier | FOB |
|---|---|---|
| EFFICIENT STORAGE SOL | BEDROCK /BRUNTON | LEWISVILLE, TX |

## SHIPPER'S BILL OF LADING
Not Negotiable

| Qty | HM | Net Wt | Unit | Item Description | Class | Gross Wt |
|---|---|---|---|---|---|---|
| 1,057 | | 348.02 | EA | HOLD FOR DELIVERY WEEK OF 5/7/7 (LB 4/26/7) STRUCTURAL<br><br>\*\*\*\*\*\*\*\*\*\* SHIPPING CONTACT INFO \*\*\*\*\*\*\*\*\*\*\*<br>\* \*<br>\* JEFF \*<br>\* 214-534-2443 \*<br>\* \*<br>\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* | 65 | 41,614 |

**INPUT**
**MAY 1 0 2007**
**LB**       As is
             Do not print

**MAY 1 0 2007**
**INPUT KL**

_____ If this line is checked, this shipment contains materials considered hazardous by the Department of Transportation. By accepting it, you certify 1) you have a copy of the Emergency Response Guidebook and 2) your vehicle is properly placarded. Hazmat Emergency Response Number: CHEM-TEL (800) 255 - 3924

Carrier's Liability is for actual loss unless otherwise agreed in Common Carrier Rate Agreement, or stated below. The agreed or declared value of the property is herby specifically stated by the shipper to be not exceeding $_____ per pound. Kingway Inc., Shipper per

I hereby declare that the contents of this consignment are fully and accurately described above by proper shipping name and are classified, packaged, marked, labeled and are in all respects in proper condition for transport by highway according to applicable international and national government regulations.

_Signature_

**Total Gross Weight** 41,614

**No. of Pallets/Bundles** 0 / 0

I certify that I am in compliance with all federal, state and local regulations and that the load has been properly secured in my vehicle.

Accepted, in good order and condition by:

_Driver Signature_

Date: 5/9/07

Unarco Submission
Exhibit 6
p. 14

```
09 May 2007                    Kingway (TX)                     Page    1
10:59:46             Picking List for Shipment 17687-4          SHIP.R1
```



```
Ship Date: 05-09-07            Ship To: GLAZERS WHOLESALE DIST.
Ship Via.: BW TPB                       3831 MUELLER ROAD
Waybill#.:                              ST. CHARLES, MO 63301
Staging..:                              USA
                                        ATTN: JEFF
```

| Line.. | Part/Description........ | Invloc | Ship.Qty. | Pick.Qty. | Ext.Wgt... |
|--------|--------------------------|--------|-----------|-----------|------------|
| 1 | 117720-74<br>CF31T 44 288 HC 96 96<br>FRAME (STEEL BLUE) | 41F | 60.00 | _____ | 18,429# |
| 4 | 1305544-75<br>SCB 445W 96 BEAM (STEEL<br>ORANGE) | 41F | 577.00 | _____ | 22,122# |
| 7 | 170089-74<br>A311 10 FRAME SPACER TIE<br>(STEEL BLUE) | 41F | 420.00 | _____ | 1,063# |









```
                                        Total Weight:    41,614#
```

Jnaarb Submission
Exhibit 6
p. 15

|  |  |  |
|---|---|---|
| 05-10-07 | 76188 | 1 |

501 E. Purnell Road
Lewisville, TX  75057
Phone: 972-436-5581
   Fax: 972-436-7901

Remit Payments To:
Kinqway
P.O. Box 99631          32610      2005-1
Chicago, IL 60696

EFFICIENT STORAGE SOL
7218 DYE DRIVE
DALLAS, TX 75248

GLAZERS WHOLESALE DIST.
3831 MUELLER ROAD
ST. CHARLES, MO 63301

| 17687-5 | 10 | BEDROCK/WOOD (THIRD) | PROGRESS BILL'G |
|---|---|---|---|

Waybill: 17687-5
HOLD FOR DELIVERY WEEK OF
5/7/7 (LB 4/26/7)

| | | | | | |
|---|---|---|---|---|---|
| 1 | 117720-74<br>CF31T 44 288 HC 96 96<br>FRAME (STEEL BLUE) | 808 | 388 | 60 | 170.70 | 10,242.00 |
| 4 | 1305544-75<br>SCB 445W 96 BEAM (STEEL<br>ORANGE) | 4480 | 652 | 119 | 22.00 | 2,618.00 |

Total List                                              12,860.00

Total Net Payable                                       12,860.00

INPUT

MAY 1 4 2007

LB

Hearst Submission
Exhibit 6
p. 16


# KINGWAY

RECEIVED: Subject to the "Common Carrier Rate Agreement" or the Contract between the Shipper and Carrier in effect on the date of shipment, the property described below in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as shown below. This Bill of Lading is not subject to any tariffs or classifications whether individually determined or filed with any federal or sate regulatory agency, except as specifically agreed to in writing by shipper and the carrier.

**Date:** 05-10-07
**Shipper:** Kingway (TX)
501 E. Purnell Road
Lewisville, TX 75057

**Consignee:** GLAZERS WHOLESALE DIST.
3831 MUELLER ROAD
ST. CHARLES, MO 63301
USA
ATTN: JEFF

**Billing Instructions:**

☐ **COLLECT** or BILL TO CONSIGNEE: The shipment is to be delivered to consignee without recourse on the consignor.

☒☒ **BILL TO THIRD PARTY**
EFFICIENT STORAGE
7218 DYE DRIVE
DALLAS, TX 75248

☐ **PREPAID**

| Customer ID | PO Number | Shipment ID |
|---|---|---|
| 32610 | 2005-1 | 17687-5 |

| Customer Name | Carrier | FOB |
|---|---|---|
| EFFICIENT STORAGE SOL | BEDROCK/WOOD | LEWISVILLE, TX |

## SHIPPER'S BILL OF LADING
Not Negotiable

| Qty | HM | Net Wt | Unit | Item Description | Class | Gross Wt |
|---|---|---|---|---|---|---|
| 179 | | 345.49 | EA | HOLD FOR DELIVERY WEEK OF 5/7/7 (LB 4/26/7) STRUCTURAL | 65 | 22,991 |
| | | | | ********** SHIPPING CONTACT INFO ********** | | |
| | | | | * | | |
| | | | | * JEFF * | | |
| | | | | * 214-534-2443 * | | |
| | | | | * | | |
| | | | | ********************************************* | | |

INPUT
MAY 11 2007    As is 1b

LB
Do not print

MAY 11 2007
INPUT
KL

____ If this line is checked, this shipment contains materials considered hazardous by the Department of Transportation. By accepting it, you certify 1) you have a copy of the Emergency Response Guidebook and 2) your vehicle is properly placarded. Hazmat Emergency Response Number: CHEM-TEL (800) 255 - 3924

Carrier's Liability is for actual loss unless otherwise agreed in Common Carrier Rate Agreement, or stated below. The agreed or declared value of the property is herby specifically stated by the shipper to be not exceeding $_____ per pound. Kingway Inc., Shipper per

I hereby declare that the contents of this consignment are fully and accurately described above by proper shipping name and are classified, packaged, marked, labeled and are in all respects in proper condition for transport by highway according to applicable international and national government regulations.

_signature_

| Total Gross Weight | 22,991 |
|---|---|
| No. of Pallets/Bundles | 0 / 0 |

I certify that I am in compliance with all federal, state and local regulations and that the load has been properly secured in my vehicle.

Accepted, in good order and condition by:

_signature_
Driver Signature

Date: 5/10/07

Gerard Submission
Exhibit 6
p. 17

```
10 May 2007                    Kingway (TX)                        Page    1
13:09:00           Picking List for Shipment 17687-5             SHIP.R1
```



```
Ship Date: 05-10-07              Ship To: GLAZERS WHOLESALE DIST.
Ship Via.: BW TPB                        3831 MUELLER ROAD
Waybill#.:                               ST. CHARLES, MO 63301
Staging..:                               USA
                                         ATTN: JEFF
```

| Line.. | Part/Description........ | Invloc | Ship.Qty. | Pick.Qty. | Ext.Wgt... |
|---|---|---|---|---|---|
| 1 | 117720-74 | 41F | 60.00 | _____ | 18,429# |
|  | CF31T 44 288 HC 96 96 |  |  |  |  |
|  | FRAME (STEEL BLUE) |  |  |  |  |



| Line.. | Part/Description........ | Invloc | Ship.Qty. | Pick.Qty. | Ext.Wgt... |
|---|---|---|---|---|---|
| 4 | 1305544-75 | 41F | 119.00 | _____ | 4,562# |
|  | SCB 445W 96 BEAM (STEEL |  |  |  |  |
|  | ORANGE) |  |  |  |  |

```
                                         Total Weight:    22,991#
```

Quarterly Submission
Exhibit 6
p. 18

```
03 Aug 2007                      Unarco Material Handling                    Page    1
14:05:19                    Detailed General Ledger Report                   GLBAL.R2
                                   Period 3 2007
                                  (January 2007)

Account#.... Description............. Tr#... Tr.date. Jrnl Debit.Amount.. Credit.Amt.... Balance.......

  10030-100    PETTY CASH                                                              1,500.00

  11000-100    A/R TRADE ACCOUNTS                                                  3,650,749.72

  11005-100    UNBILLED ACCTS. RECEIVABE                                             884,936.12

  11020-100    A/R EMPLOYEES                                                            524.52

  11050-100    ALLOWANCE DOUBTFUL ACCOUN                                           -140,949.34

  11080-100    A/R MISCELLANEOUS                                                    157,459.48

  12000-100    FINISHED GOODS                                                       824,954.62

  12100-100    WIP - FABRICATED PARTS                                               217,595.34

  12400-100    INV-RAW MATERIAL                                                   1,064,577.97

  12601-100    INV-RESERVE                                                           -2,292.92

  12603-100    INVENTORY REVAL RESERVE                                               20,974.39

  12605-100    INV-OVERHEAD                                                         447,765.00

  16000-400    LAND - MCX                                                         1,183,000.00

  16010-400    BUILDING IMPROVEMENTS-MCX                                            243,301.97

  16020-400    BUILDINGS - MCX                                                    1,815,698.03

  16030-400    DATA PROCESSING EQUIP-MCX                                             67,475.48

  16040-400    FURNITURE & FIXTURES -MCX                                             62,360.91

  16050-400    DIES, JIGS, & FIX. - MCX                                             325,189.37

  16060-400    MACHINERY & TOOLS - MCX                                              804,335.08

  16070-400    AUTOMOTIVE EQUIPMENT -MCX                                                452.53

  16090-400    CONSTRUCTION IN PROGESS                                               96,054.91

  19380-300    INTERDIVISION - UNARCO                                            -6,558,474.50

  20000-100    A/P VENDORS                                                       -4,550,569.86

  20011-100    UNEARNED REVENUE                                                    -109,145.70

  21010-400    ACCRUED SALARIES & WAGES                                             -92,488.16

  21020-100    ACCRUED VACATION                                                    -115,682.57

  21060-100    ACCRUED SALES COMMISSIONS                                            -40,211.14
```

General Submission
Exhibit 6
p. 19

```
03 Aug 2007                    Unarco Material Handling                    Page    1
14:02:57                        A/R Deposit Report                         CASH.R2
                              Cash Account 10000-100
                               Posted on 03-26-07
                               For All Company Codes


  Check#...   Cash#.   Cust......   Customer.Name...........   Check.Amount.

     Maint    30750      22083    KINGWAY - OHIO                      0.00
      7466    30755       6801    ADVANTAGE ASSOCIATES INC          104.72
    115543    30756      13673    BASTIAN MATERIAL HANDLING         484.56
      3291    30757      20789    CAPITAL MATERIAL HANDLING         467.31
     26540    30758      36296    FLEXION/LA                       3701.22
    116372    30759      43435    HANDLING SYSTEMS INC            67820.75
      4299    30760      59520    MATERIAL STORAGE SYSTEMS          410.00
     59164    30761      93788    STORAGE EQUIPMENT CO             1381.37
    365154    30762      96600    TUESDAY MORNING CORP.             763.16
   2006698    30763     108480    WAREHOUSE EQUIPMENT INC          1160.44
                                                                 109145.70
     25162    30766      19972    C & S USED EQUIP CO INC         13447.72
      6939    30777                                              21327.18
                                                                =============

                                                                 220214.13
```

| Account Number...... | Cust Number | Cust.Name Cash.Notes.............. | Source.Doc Check.Number... | Record Date.... | Arreg ID...... | Arreg Date.... | Arreg Amount....... | Procedure Name.. | Record ID....... | Post Date.... |
|---|---|---|---|---|---|---|---|---|---|---|
| 10000-100 | 78550 | PROGRESSIVE SOLUTIONS | 183723 | 03-23-07 | 52156 | 03-23-07 | 370.37 | CASH.E | 30722 | 04-02-07 |
| 10000-100 | 3997 | TWINLODE CORP | 25023 | 03-23-07 | 52158 | 03-23-07 | 649.00 | CASH.E | 30723 | 04-02-07 |
| 10000-100 | | Qwest-Refund | 430067030 | 03-23-07 | 52160 | 03-23-07 | 230.55 | CASH.E3 | 30724 | 04-02-07 |
| 10000-100 | | Western Auction-Wal-Mart | 13790 | 03-23-07 | 52162 | 03-23-07 | 293.58 | CASH.E3 | 30725 | 04-02-07 |
| 10000-100 | | Texas Comptroller of Publ | 113586539 | 03-23-07 | 52164 | 03-23-07 | 309.66 | CASH.E3 | 30726 | 04-02-07 |
| 10000-100 | 6801 | ADVANTAGE ASSOCIATES INC | 7466 | 03-26-07 | 52354 | 03-26-07 | 104.72 | CASH.E | 30755 | 04-02-07 |
| 10000-100 | 13673 | BASTIAN MATERIAL HANDLING | 115543 | 03-26-07 | 52356 | 03-26-07 | 484.56 | CASH.E | 30756 | 04-02-07 |
| 10000-100 | 20789 | CAPITAL MATERIAL HANDLING | 3291 | 03-26-07 | 52358 | 03-26-07 | 467.31 | CASH.E | 30757 | 04-02-07 |
| 10000-100 | 36296 | FLEXION/LA | 26540 | 03-26-07 | 52360 | 03-26-07 | 3701.22 | CASH.E | 30758 | 04-02-07 |
| 10000-100 | 43435 | HANDLING SYSTEMS INC | 116372 | 03-26-07 | 52363 | 03-26-07 | 67820.75 | CASH.E | 30759 | 04-02-07 |
| 10000-100 | 59520 | MATERIAL STORAGE SYSTEMS | 4299 | 03-26-07 | 52365 | 03-26-07 | 410.00 | CASH.E | 30760 | 04-02-07 |
| 10000-100 | 93788 | STORAGE EQUIPMENT CO | 59164 | 03-26-07 | 52367 | 03-26-07 | 1381.37 | CASH.E | 30761 | 04-02-07 |
| 10000-100 | 96600 | TUESDAY MORNING CORP. | 365154 | 03-26-07 | 52369 | 03-26-07 | 763.16 | CASH.E | 30762 | 04-02-07 |
| 10000-100 | 108480 | WAREHOUSE EQUIPMENT INC | 2006698 | 03-26-07 | 52371 | 03-26-07 | 1160.44 | CASH.E | 30763 | 04-02-07 |
| 10000-100 | ~~Storage Solutio~~ | ~~Efficient Storage Solutio~~ | 1391 | 03-26-07 | 52373 | 03-26-07 | 109145.70 | CASH.E3 | 30764 | 04-02-07 |
| 10000-100 | 19972 | C & S USED EQUIP CO INC | 25162 | 03-26-07 | 52377 | 03-26-07 | 13447.72 | CASH.E | 30766 | 04-02-07 |
| 10000-100 | | The Merchant's Company-Co | 6939 | 03-26-07 | 52400 | 03-26-07 | 21327.18 | CASH.E3 | 30777 | 04-02-07 |
| 10000-100 | 1379 | BOSTON RACK | 7281 | 03-27-07 | 52538 | 03-27-07 | 83140.57 | CASH.E | 30790 | 04-02-07 |
| 10000-100 | 66255 | NAUMANN/HOBBS MATL HDLG | 121310 | 03-27-07 | 52540 | 03-27-07 | 144446.52 | CASH.E | 30791 | 04-02-07 |
| 10000-100 | 95155 | SUMMIT MATERIAL HANDING | 1883 | 03-27-07 | 52542 | 03-27-07 | 35065.17 | CASH.E | 30792 | 04-02-07 |
| 10000-100 | 3997 | TWINLODE CORP | 2515 | 03-27-07 | 52544 | 03-27-07 | 124741.66 | CASH.E | 30793 | 04-02-07 |
| 10000-100 | 15681 | BRANDT & HILL INC. | 8870 | 03-28-07 | 52711 | 03-28-07 | 1306.50 | CASH.E | 30821 | 04-02-07 |
| 10000-100 | 35101 | F E BENNETT CO | 3683 | 03-28-07 | 52713 | 03-28-07 | 1676.68 | CASH.E | 30822 | 04-02-07 |
| 10000-100 | 36285 | FLEXION CASTERS & MTRL HD | 14044 | 03-28-07 | 52715 | 03-28-07 | 196.00 | CASH.E | 30823 | 04-02-07 |
| 10000-100 | 45265 | INDUSTRIAL EQUI SOLUTIONS | 9302 | 03-28-07 | 52717 | 03-28-07 | 22336.32 | CASH.E | 30824 | 04-02-07 |
| 10000-100 | 58898 | MALIN INTERGRATED | 140583 | 03-28-07 | 52720 | 03-28-07 | 45342.10 | CASH.E | 30825 | 04-02-07 |
| 10000-100 | 60850 | MIDDLE TENNESSEE CONVEYOR | 15545 | 03-28-07 | 52722 | 03-28-07 | 22119.95 | CASH.E | 30826 | 04-02-07 |
| 10000-100 | 93850 | STORAGE EQUIP & PALLET CO | 17131 | 03-28-07 | 52724 | 03-28-07 | 9987.90 | CASH.E | 30827 | 04-02-07 |
| 10000-100 | 15681 | BRANDT & HILL INC. | 8868 | 03-29-07 | 52781 | 03-29-07 | 3631.56 | CASH.E | 30838 | 04-02-07 |
| 10000-100 | 5402 | ALLIED MATERIAL HANDLING | 7854 | 03-29-07 | 52783 | 03-29-07 | 5418.87 | CASH.E | 30839 | 04-02-07 |
| 10000-100 | 52699 | RED RIVER RACK COMPANY | 3729 | 03-29-07 | 52785 | 03-29-07 | 16172.74 | CASH.E | 30840 | 04-02-07 |
| 10000-100 | 976 | BASTIAN MATERIAL HANDLING | 115745 | 03-30-07 | 53081 | 03-30-07 | 520.00 | CASH.E | 30851 | 04-02-07 |
| 10000-100 | 15759 | BRIGGS EQUIPMENT | 543102 | 03-30-07 | 53083 | 03-30-07 | 507.65 | CASH.E | 30852 | 04-02-07 |
| 10000-100 | 3701 | GRAFCO, INC. | 40680 | 03-30-07 | 53085 | 03-30-07 | 283.44 | CASH.E | 30853 | 04-02-07 |
| | | | | | | | ------------- | | | |
| 10000-100 Total | | FLEET LOCKBOX | | | | | 3123620.45 | | | |
| 11000-100 | 93788 | STORAGE EQUIPMENT CO | 16835-1 | 03-01-07 | 50033 | 03-01-07 | 1116.52 | SHIP.CP1 | 16835-1 | 04-02-07 |
| 11000-100 | 31870 | DREYER'S GRAND ICE CREAM | 16901-5 | 03-01-07 | 50037 | 03-01-07 | 12295.71 | SHIP.CP1 | 16901-5 | 04-02-07 |
| 11000-100 | 2515 | CROWN LIFT TRUCKS | 17053-3 | 03-01-07 | 50040 | 03-01-07 | 3858.37 | SHIP.CP1 | 17053-3 | 04-02-07 |
| 11000-100 | 60850 | MIDDLE TENNESSEE CONVEYOR | 17317-1 | 03-01-07 | 50043 | 03-01-07 | 683.70 | SHIP.CP1 | 17317-1 | 04-02-07 |
| 11000-100 | 60850 | MIDDLE TENNESSEE CONVEYOR | 17318-1 | 03-01-07 | 50045 | 03-01-07 | 1245.61 | SHIP.CP1 | 17318-1 | 04-02-07 |
| 11000-100 | 60850 | MIDDLE TENNESSEE CONVEYOR | 17337-1 | 03-01-07 | 50048 | 03-01-07 | 212.00 | SHIP.CP1 | 17337-1 | 04-02-07 |
| 11000-100 | 60850 | MIDDLE TENNESSEE CONVEYOR | 17338-1 | 03-01-07 | 50052 | 03-01-07 | 167.80 | SHIP.CP1 | 17338-1 | 04-02-07 |
| 11000-100 | 60850 | MIDDLE TENNESSEE CONVEYOR | 17339-1 | 03-01-07 | 50055 | 03-01-07 | 530.00 | SHIP.CP1 | 17339-1 | 04-02-07 |
| 11000-100 | 60850 | MIDDLE TENNESSEE CONVEYOR | 17340-1 | 03-01-07 | 50058 | 03-01-07 | 1001.70 | SHIP.CP1 | 17340-1 | 04-02-07 |
| 11000-100 | 60850 | MIDDLE TENNESSEE CONVEYOR | 17471-1 | 03-01-07 | 50062 | 03-01-07 | 8.14 | SHIP.CP1 | 17471-1 | 04-02-07 |
| 11000-100 | 91850 | SOUTHWEST MATLS HDLG CO | 17575-1 | 03-01-07 | 50064 | 03-01-07 | 720.54 | SHIP.CP1 | 17575-1 | 04-02-07 |
| 11000-100 | 6639 | ASSET REDISTRIBUTION | 26898 | 03-01-07 | 50067 | 03-01-07 | -4706.04 | CASH.E | 30372 | 04-02-07 |
| 11000-100 | 13975 | BEACON INDUSTRIAL SYSTEMS | 5994 | 03-01-07 | 50069 | 03-01-07 | -2656.28 | CASH.E | 30373 | 04-02-07 |
| 11000-100 | 1379 | BOSTON RACK | 7115 | 03-01-07 | 50071 | 03-01-07 | -50935.60 | CASH.E | 30374 | 04-02-07 |

**II(b)(iii).**        **Disputed Item:  Net Working Capital:** *Accounts Receivable (Net Of Allowance For Doubtful Accounts)*

**Dispute:**        ***The Accounts Receivable Amount Recorded On The Closing Balance Sheet Is Correct.  Seller Proposes An Upward, Post-Closing Adjustment Of $134,401, Based Upon A Proposed Revision To The Company's Original Estimate Of The Allowance For Doubtful Accounts.***

The Accounts Receivable Amount on the Closing Balance Sheet and Buyer's Draft Computation is **$10,536,543**, which included an allowance, as a percentage of accounts receivable, for doubtful accounts of 2.13% (*see* Exhibit 7, p. 2).  The Accounts Receivable amount on Seller's Objection Notice is **$10,670,944**, which reflects a proposed upward, post-closing adjustment of **$134,401**.  Buyer understands that Seller's proposed adjustment results from a proposed downward revision to the Company's original allowance for doubtful accounts.

According to Buyer's review of specific Company accounts for collectibility, historical bad debt allowance ratios, credit memos and returns and allowances subsequent to the Transaction Date the Company-recorded allowance for doubtful accounts is reasonable and compares with the allowance percentages for the past three calendar year-ends.  Attached as Exhibit 7 is an aging analysis of the Company's Accounts Receivable, an Accounts Receivable Lead Sheet and an analysis of Accounts Receivable over 90 days old.

# EXHIBIT 7

Kingway Acquisition
Analysis of Allowance for Doubtful Accounts
March 30, 2007

CC judgmentally selected customers' invoices to test for appropriate recording of revenue and accounts receivables. The items selected were spread across each location, and covered approximately 27% - 65% of each location's AR balance. We first tested subsequent receipts of the items selected for testing. If the invoice was subsequently paid, we examined the check/remittance advice from the lockbox. For invoices not subsequently collected, we examined the invoice, bill of lading, purchase order, packing slip and/or subcontractor application for payment, as applicable. No material exceptions were noted.

We then analyzed the allowance for doubtful accounts in total ($204,240), which is approximately 2% of gross accounts receivable. We first examined items greater than 90 days outstanding and discussed with appropriate personnel, the collectibility of the receivable. Of the $87k outstanding greater than 90 days, $10k was subsequently collected and another $70k represents retainage receivable related to subcontractor payments. We also examined subsequent credit memos issued, product returns, etc. for additional analysis of the reserve. From March 30, 2007 through the April 30, 2007, the Company issued approximately $145k in credits for items included as accounts receivable at March 30, 2007. Also, as noted on the greater than 90 day analysis, management specifically identified $23k of amounts that are uncollectible. Considering one month of subsequent credits ($145k) and the uncollectible amounts, this accounts for a total of $167k of the $204k allowance.

Based on the results of our testing and analysis, we conclude that management's estimate of the allowance is reasonably stated at March 30, 2007.

Unarco/Kingway Acquisition
AR Aging excluding credit balances
March 31, 2007

Purpose: Analytically test the valuation assertion at the acquisition date 03/31/07.

Scope: Analytically test the balances in A/R.

Procedures: Review the A/R composition, by aging category, at 03/31/07. Analytically review allowance as a % of AR at 03/31/07.

AR Aging:

| | 0-30 | 30-60 | 60-90 | >90 | Total | |
|---|---|---|---|---|---|---|
| Atlanta 03/31/07 | 2,352,169 | 2,151,811 | 21,621 | 63,469 | 4,589,070 | |
| Atlanta % of Total | 51% | 47% | 0% | 1% | 100% | |
| Dallas 03/31/07 | 1,977,067 | 1,644,805 | 27,725 | 1,152 | 3,650,750 | |
| Dallas % of Total | 54% | 45% | 1% | 0% | 100% | |
| Ohio 03/31/07 | 823,059 | 221,594 | 7,961 | 2,500 | 1,055,114 | |
| Ohio % of Total | 78% | 21% | 1% | 0% | 100% | |
| Andes 03/31/07 | 215,680 | 66,799 | 11,064 | 3,718 | 297,262 | |
| Andes % of Total | 73% | 22% | 4% | 1% | 100% | |
| Total AR 03/31/07 | 5,367,976 | 4,085,009 | 68,371 | 70,839 | 9,592,195 | Lead |

| | | |
|---|---|---|
| PBC F/S | Total AR 12/31/06 | 14,799,077 |
| PY F/S | Total AR 12/31/05 | 15,548,000 |
| PY F/S | Total AR 12/31/04 | 16,174,000 |

Accounts receivable is aged based on invoice date. Invoices are due net 30.

| | Total | % of AR |
|---|---|---|
| Atlanta Allowance | 33,146 | 0.72% |
| Dallas Allowance | 140,949 | 3.86% |
| Ohio Allowance | 18,145 | 1.72% |
| Andes Allowance | 12,000 | 4.04% |
| Total Allowance | 204,240 | 2.13% |

| | | Total | % of AR |
|---|---|---|---|
| PBC F/S | Total Allowance 12/31/06 | 204,000 | 1.38% |
| PY F/S | Total Allowance 12/31/05 | 234,000 | 1.51% |
| PY F/S | Total Allowance 12/31/04 | 279,000 | 1.72% |

Unarco Material Handling, Inc.
Trade Accounts Receivable of KIC Holdings, Inc.
As of March 30, 2007

| Account Description | Atlanta | Dallas | Ohio | Andes | Corporate | Consolidated AR Aging |
|---|---|---|---|---|---|---|
| Accounts Receivable Trade | 4,589,070 | 3,650,750 | 1,055,114 | 297,262 | - | 9,592,195 |
| Unbilled Accounts Receivable | | 884,936 | | | | 884,936 |
| Allowance | (33,146) | (140,949) | (18,145) | (12,000) | | (204,240) |
| Total - Trade AR | 4,555,924 | 4,394,737 | 1,036,969 | 285,262 | - | 10,272,891 |
| | | | | | | |
| Miscellaneous AR | | | | | | |
| Medical claims | | | | | 11,517 | 11,517 |
| Workman Comp | | | | | 32,477 | 32,477 |
| Credit Cards | | | | | 5,677 | 5,677 |
| Employees | | | | | 8,271 | 8,796 |
| Scrap Sales | 35,269 | | | | | 35,269 |
| Other | - | 157,459 | 7,415 | 842 | 4,200 | 169,916 |
| Total - Miscellaneous AR | 35,269 | 157,984 | 7,415 | 842 | 62,142 | 263,652 |
| | | | | | | |
| Grand Total | 4,591,193 | 4,552,721 | 1,044,384 | 286,104 | 62,142 | 10,536,543 |

Unarco Submission
Exhibit 7
p. 4

Unarco Material Handling, Inc.
KIC Holdings, Inc. - AR Invoices over 90 days old
as fo March 30, 2007

| Location | Cust No | Customer Name | Invoice Number | Date | Invoice Amt | Check Amount | Over 90 Day | Comments |
|---|---|---|---|---|---|---|---|---|
| Atlanta | 79120 | % FORTNA INC | 64986 | 12/12/2006 | 234,307.00 | 210,876.30 | 23,430.70 | Customer withhold a 10% retainage on each invoice |
| Atlanta | 79120 | % FORTNA INC | 65093 | 12/12/2006 | 234,307.00 | 210,876.30 | 23,430.70 | Customer withhold a 10% retainage on each invoice |
| Atlanta | 79120 | % FORTNA INC | 66314 | 12/21/2006 | 234,307.00 | 210,876.30 | 23,430.70 | Customer withhold a 10% retainage on each invoice |
| Atlanta | 7550 | U S FORKLIFT Service Inc. | 64958 | 12/12/2006 | 1,606.76 | 400.00 | 606.76 | Last paid $300.00 on 4/04 promised to pay balance on4/20. |
| Dallas | 14810 | Boston Rack | 74319 | 12/5/2006 | 108.90 | | 108.90 | Sent email regarding invoice for freight 4/23 waiting to hear back on status. |
| Dallas | 26554 | Crown Lift Trucks | 73988 | 11/14/2006 | 708.32 | | 708.32 | Special paint charge still under dispute with dealer. |
| Dallas | 26554 | Crown Lift Trucks | 74267 | 11/30/2006 | 538.49 | | 538.49 | Paid 4/16. |
| Dallas | 26554 | Crown Lift Trucks | 74288 | 11/30/2006 | 258.79 | | 258.79 | Paid 4/16. |
| Dallas | 26554 | Crown Lift Trucks | 67550 | 12/28/2006 | 538.49 | | 538.49 | Paid 4/16. |
| Dallas | 26554 | Crown Lift Trucks | 67551 | 12/28/2006 | 258.79 | | 258.79 | Paid 4/16. |
| Dallas | 52875 | Knapp Logistics | 72295 | 7/25/2006 | 12,685.00 | 9,625.00 | 3,000.00 | Paid through collsion agency 4/16 remaining balance of $1,000.00 is the fee, need to be adjusted. |
| Ohio | CK903 | GREAT LAKES AG SUPPLY | 10411 | 5/17/2006 | 15,143.86 | | 2,500.00 | Paid In full 04-13-07. |
| Andes | 149 | American Prefab Structure | 45648 | 12/12/2006 | | | 1,426.03 | Collectible - Relaxed invoice again |
| Andes | 124 | Bailey Tool and Mfg Co. | 45338 | 11/20/2006 | | | 818.25 | Paid 4/9/07 |
| Andes | 124 | Bailey Tool and Mfg Co. | 45407 | 11/27/2006 | | | 790.30 | Paid 4/9/07 |
| Andes | 124 | Bailey Tool and Mfg Co. | 45411 | 11/27/2006 | | | 727.07 | Paid 4/9/07 |
| Andes | 124 | Bailey Tool and Mfg Co. | 45417 | 11/27/2006 | | | 453.40 | Paid 4/9/07 |
| Andes | 124 | Bailey Tool and Mfg Co. | 45418 | 11/27/2006 | | | 432.05 | Paid 4/9/07 |
| Andes | 124 | Bailey Tool and Mfg Co. | 45603 | 12/7/2006 | | | 344.22 | Paid 4/9/07 |
| Andes | 124 | Bailey Tool and Mfg Co. | 45604 | 12/7/2006 | | | 659.32 | Paid 4/9/07 |
| Andes | 124 | Bailey Tool and Mfg Co. | 45737 | 12/15/2006 | | | 758.38 | Paid 4/9/07 |
| Andes | 124 | Bailey Tool and Mfg Co. | 45884 | 12/22/2006 | | | 250.00 | Paid 4/9/07 |
| Andes | 259 | Lawson Steel Inc. | 45408P | 11/27/2006 | | | 19.26 | Credited |
| Andes | 396 | Studs Unlimited, LLC | 45502 | 11/30/2006 | | | 300.71 | Paid 4/12/07 |
| Andes | 396 | Studs Unlimited, LLC | 45503 | 11/30/2006 | | | 472.89 | Paid 4/12/07 |
| Andes | 396 | Studs Unlimited, LLC | 45504 | 11/30/2006 | | | 232.21 | Paid 4/12/07 |
| Andes | 396 | Studs Unlimited, LLC | 45505 | 11/30/2006 | | | 253.41 | Paid 4/12/07 |
| Andes | 144 | Texstar Steel Co. | 44975 | 10/31/2006 | | | 19.23 | Credited |
| Andes | 114 | I.S. Steel Corp. | 44409 | 9/29/2006 | | | 29.21 | Collectible - Payment has been made |
| Andes | 287 | Willbanks Metals, Inc. | 04793P | 10/25/2006 | | | 51.39 | Credited |

86,847.97
(70,292.10) Retainage
(10,357.19) Subsequently paid
6,198.68 Actual Bad Debt > 90 days at 3-30-07
17,780.00 AR Misc Bad Debt - see wp H010-OBS
23,978.68 TOTAL BAD DEBT

**II(b)(iv).       Disputed Item: Net Working Capital, *Prepaid Expenses***

**Dispute:**       *The Amount Of Prepaid Expenses Recorded On The Company's Closing Balance Sheet Is Correct.   Seller Proposes An Upward, Post-Closing Adjustment Of $150,457, Based Upon Its Determination To Capitalize Two Additional Items That Were Not Capitalized By The Company On The Closing Balance Sheet.*

The Prepaid Expenses amount on the Closing Balance Sheet and Buyer's Draft Computation is **$377,025.**   The Prepaid Expenses amount on Seller's Objection Notice is **$527,482,** which reflects a proposed upward post-closing adjustment of **$150,457.**   Buyer understands that this proposed adjustment results from the fact that Seller now proposes to capitalize two items that the Company did not capitalize on the Closing Balance Sheet or wrote off prior to preparation of the Closing Balance Sheet: (a) Prepaid Trade Show Expense (approximately $125,000) and (b) Tools and Dies (approximately $25,000).

1. **Trade Show Expenses:**  Buyer understands that Seller proposes to make an adjustment to capitalize approximately $125,000 of additional prepaid expenses incurred in connection with a bi-annual trade show.   The trade show occurred prior to the Transaction Date. According to GAAP, these expenses are required to be expensed at the time of and/or completion of the trade show.   Specifically, according to AICPA Statement of Position (SOP) 93-7, paragraph 26, the costs of advertising should be expensed either at the time they are incurred or the first time the advertising takes place (Appendix F).   The only exception, which is not applicable here, is where the costs meet the economic rules of "future benefit," defined by GAAP, such as in the case of "direct response advertising" or "cooperative advertising."

2. **Tools and Dies:**  Buyer understands that Seller proposes to make an adjustment to capitalize approximately $25,000 of additional costs of various tools, dies, and supply type items that it believes were purchased prior to the Transaction Date, which costs it proposes to expense over three months, the estimated life of the items.   The Prepaid Expenses on the Closing Balance Sheet (Exhibit 3) included prepaid expenses of $58,704 for tools and dies at March 31, 2007, and the Company provided support for these expenses (*see* Exhibit 8).   That support contains no mention of the tools and dies Seller claims were purchased prior to the Transaction Date and which it proposes to capitalize now.

# EXHIBIT 8

**Kingway - Atlanta**
**Tools, Punches & Dies**

**1-00-1617-00**

**12 month amortization**

| DESCRIPTION | ADDITIONS | JE# | DR/(CR)<br>March-07 | 3/31/2007<br>G/L BALANCE | |
|---|---|---|---|---|---|
| Porter Precision Products po 42863 Mo $463.05 mo. Total 5,556.54 | | | $ (463.05) | $ 1,173.84 | |
| Mid State Tooling PO 43353 Mo $593.33 /mo. Total 7,120.00 | | | $ (593.33) | $ 0.04 | |
| Mid State Tooling Total $25833 2541.64/mo. | | | $ (2,541.61) | $ 5,083.49 | |
| Porter Precision Mo $1,212.37 mo. Total 14,548.49 | | | $ (1,212.37) | $ 2,424.79 | |
| Porter Precision Products inv #2352 Mo $254.10 mo. Total 3,049.15 | | | $ (254.10) | $ 762.25 | |
| Mid State Tooling  Total $6,000    500.00/mo. | | | $ (500.00) | $ 1,500.00 | |
| Porter Precision Mo $279.22 mo. Total  3,350.65 | | | $ (279.22) | $ 1,116.89 | |
| Thermatool po 43164-1, 43833-1 Power Triode 19,842.08   1,653.51.mo | | | $ (1,653.51) | $ 8,267.51 | |
| Mid State Tooling  44062-1,2  5558.00  463.17/mo | | | $ (463.17) | $ 2,315.81 | |
| Antwerp Tool & Dye Engine  po 44144-1  13,000   1,083.33/mo | | | $ (1,083.33) | $ 5,416.69 | |
| Porter Precision Mo $283.07 mo. Total 3,396.80 | | | $ (283.07) | $ 1,415.31 | |
| Mid State Tooling po 44350  Total $4,591    382.58/mo. | | | $ (382.58) | $ 2,295.52 | |
| Porter Precision po 44334  Total $3,228.94    269.08/mo. | | | $ (269.08) | $ 1,614.46 | |
| Mid State Tooling  po 44475  Total $2,064   172.00/mo. | | | $ (172.00) | $ 1,204.00 | |
| B&B Tool    po 44877  Total $2,540   211.67/mo. | | | $ (211.67) | $ 1,693.32 | |
| 10/06  B&B Tool  po 44294  Rumble Welder drawings and bronze tooling | | | $ (205.83) | $ 1,646.68 | |
| Atco Tool & Die tooling  3,900.00   325/mo | | | $ (325.00) | $ 2,600.00 | |
| Mid State Tooling   $3,000   250.00/mo. | | | $ (250.00) | $ 2,000.00 | |
| Mid State Tooling PO 43353  Mo $890.00./mo. Total 10,680.00 | | | $ (890.00) | $ - | |
| Porter Precision po 44837  Total $3,516.72       1172.24/mo. (3 mos.) | | | $ (1,172.24) | $ 1,172.24 | 3 months |
| B&B Tool  po 45042   Total $ 2,600.00  $216.67/mo. | | | $ (216.67) | $ 2,166.66 | |
| Mid State Tooling PO 44716  Mo $1000.00./mo. Total 3,000.00  (3 mos.) | | | $ (1,000.00) | $ 1,000.00 | 3 months |
| Atco Tool & Die tooling  po 44971 $3,228.00   1,076/mo (3 mos.) | | | $ (1,076.00) | $ 1,076.00 | 3 months |
| Antwerp Tool & Dye Engine  po 45040  4,234.00   352.83/mo | | | $ (352.83) | $ 3,881.17 | |
| Mid State Tooling PO 45239  Mo $4,503.00./mo. Total 375.25 | | | $ (375.25) | $ 4,127.75 | |
| Mid State Tooling PO 44719  Mo $3,000.00./mo. Total 250.00 | | | $ (250.00) | $ 2,750.00 | |
| **TOTAL** | $     - | | $ (16,475.91) | $ 58,704.42 | |

**Journal Entry**
1-00-5200-00  $   16,475.91
1-00-1617-00  $ (16,475.91)

complete

**II(b)(v).**   **Disputed Item:Net Working Capital,** *Accrued Expenses and Other Liabilities*

**Dispute:**   ***The Company's Closing Balance Sheet Erroneously Omitted $611,670 Of Liabilities That Existed As Of The Transaction Date (Exclusive Of Sales Tax Liability). Seller Disputes The Amount And/Or Existence Of These Liabilities.***

The amount of Accrued Expenses and Other Liabilities on the Draft Computation (as revised) is **$2,371,927**. The amount of Accrued Expenses and Other Liabilities on the Objection Notice is **$1,760,257**, representing a difference between Buyer and Seller of **$611,670**. The difference results from five liabilities that existed as of the Transaction Date but were erroneously omitted from the Closing Balance Sheet. In order to present the Net Working Capital Amount in accordance with GAAP, these additional accruals are required. However, based upon developments subsequent to the preparation of the Draft Computation, the Buyer and Seller now agree on the amount of one of those liabilities (OSHA Penalty) and another (the Petsmart Claim) has been substantially reduced.

The disputed items (other than the OSHA violations) are:[3]

|  | Buyer | Difference | Seller |
|---|---|---|---|
|  | $ | $ | $ |
| Accrued vacation | 757,458 | 343,639 | 413,819 |
| Petsmart Claim | 19,596 | 19,596 | - |
| Revolver Account Liability At Transaction Date | 220,435 | 220,435 | - |
| OSHA penalty | 5,400 | agreed | 5,400 |
| WISE installation | 28,000 | 28,000 | - |
|  | $ | $ | $ |
|  | 1,030,889 | 611,670 | 419,219 |

1. **Accrued vacation:** Based upon application of Statement of Financial Accounting Standards (SFAS) No. 43, Accounting for Compensated Absences (*see* Appendix G), to the Company's vacation policy, an additional liability existed as of the Transaction Date in the amount of **$343,639** for accrued vacation. SFAS 43, paragraph 12 states that "….a liability for amounts to be paid as a result of employees' right to compensated absences should be accrued in the year in which earned." For example, if new employees receive vested rights to two-weeks paid vacation at the beginning of their second year of employment with no pro rata payment in the event of termination during the first year, the two weeks' vacation would be considered to be earned by work performed in the first year and an accrual for vacation pay would be required for new employees during their first year of service. The Company's vacation policy mirrors this example (*see* Appendix H). Prior to the Transaction Date, the Company did not recognize compensated absences

---

[3] An additional liability of $3,317,608 of accrued sales tax has been recorded as a separate line item and is documented in Section II(b)(i).

in accordance with SFAS 43. Accordingly, because the SPA requires Net Working Capital to be reported on a GAAP basis (*see* SPA, Exhibit A), this liability must be included in the calculation of Net Working Capital as the vested portion of the vacation policy is a liability to Buyer at the Transaction Date. Attached as Exhibit 9 is an analysis of the liability for accrued vacation as of March 30, 2007, in accordance with SFAS 43. Workpapers supporting the accrued vacation liability analysis are included as Appendix L.

2. **Petsmart Claim:**  As a result of defective products sold and delivered prior to the Transaction Date, an additional liability, which has since been settled for **$19,596**, existed as of the Transaction Date. This liability was not recorded by the Company on the Closing Balance Sheet. Prior to the Transaction Date, the Company manufactured selective pallet rack bays for Petsmart. Subsequent to the Transaction Date, the Company became aware of a potential deficiency in the structural integrity of certain of these pallet racks and accessories and therefore recorded an initial contingency of $200,000, based on management's estimate of the cost to replace. Subsequent to the original calculation of Net Working Capital in the Draft Computation, the Buyer reached an agreement with Petsmart to resolve this issue at a cost of $19,596. Accordingly, Buyer is no longer seeking the inclusion of a $200,000 liability on the Closing Balance Sheet, but only the inclusion of a $19,596 liability. Documentation of the final settlement amount with Petsmart, and payment of that amount, is attached as Exhibit 10.

3. **Revolver Account Liability At Transaction Date:**  As a result of continued activity in the Company's revolving credit account, after the balance was paid off with proceeds of the sale, an additional liability of **$220,435** existed as of the Transaction Date. Specifically, on the Transaction Date, after the account balance was paid off, checks in the amount of $463,914 cleared the account and the account received deposits/remittances in the amount of $243,479. A net balance of $220,435 was thus outstanding on the revolver at end of business on March 30, 2007. This amount was not included in the Company indebtedness that was paid with Buyer's funds at closing. Buyer paid this amount via wire transfer on April 3, 2007. Documentation to support this liability, including banks statements, are attached as Exhibit 11.

4. **OSHA Penalty:**  As a result of penalties imposed on the Company by the United States Occupational Safety and Health Administration (OSHA), for violations of OSHA regulations that occurred prior to the Transaction Date, an additional liability of **$5,400** existed as of the Transaction Date. When Buyer prepared the Draft Computation it understood that OSHA had visited the Company's Ohio location in February 2007 and found 6 serious violations of OSHA regulations, for which the penalty is $7,500 per violation. Accordingly, Buyer accrued a liability of $45,000 (6 x $7,500). Subsequently, the Buyer resolved the violations at a total cost of $5,400. Accordingly, Buyer is no longer seeking the addition of a $45,000 liability, but only the addition of a $5,400 liability, which amount is not disputed by Seller.

5. **WISE Installation:**  As a result of work performed on behalf of the Company by a contract installation vendor prior to the Transaction Date, for which work that vendor was not paid, an additional liability, which has since been settled for **$28,000**, existed as of the Transaction Date. This liability was not recorded by the Company on the Closing Balance Sheet. Prior to the Transaction Date, the Company was contacted by WISE

Installation, Inc, seeking payment for installation work it performed for the Company, prior to the Transaction Date, at Wal-Mart in Pottsville, PA, based on the Company's earlier representation that it would pay for such work. Subsequent to the Transaction Date Buyer agreed to pay (and paid) the installer $28,000. Documentation of payment to WISE Installation, Inc. is attached as Exhibit 12.

# EXHIBIT 9

Unarco Material Handling, Inc.
March 31.2007
Accrued Vacation Lead for KIC Holdings, Inc.

*Per Current Accounting by The Company*

| Tab | Amount | |
|---|---|---|
| Union Vacation | 96,892.87 | VCT |
| Andes Vacation | 18,719.71 | VCT |
| Corporate Vacation | 136,260.83 | VCT |
| NonUnion Vacation | 36,227.18 | VCT |
| Atlanta | 104,635.01 | VCT |
| Ohio | 38,520.53 | VCT |
| CC Total | 431,256.13 | |
| Per Vacation Cost tab | 413,818.65 | |
| Difference | 17,437.47 | |

VCT – Ties to Vacation Cost Tab

*Unaccrued per FAS 43*

| Tab | Amount |
|---|---|
| Union Vacation | 61,661.26 |
| Andes Vacation | 21,063.53 |
| Corporate Vacation | 60,626.25 |
| NonUnion Vacation | 27,168.06 |
| Atlanta | 113,255.61 |
| Ohio | 42,427.15 |
| CC Total | 326,201.86 |

| OTAL CC CALC ACCRUED VACATIO | 757,457.99 |
|---|---|
| TOTAL PER VACATION COST TAB | 413,818.65 |
| **ERROR** | **343,639.33** |

JE
DR  Vacation Expense        343,639.33
   CR   Accrued Vacation              343,639.33

Testing:
CC judgementally selected 20 employees to trace their current pay rate to the PBC payroll reports for the period ended March 30, 2007. The amount of unused vacation was reviewed analytically based on the schedules attached. No system reports calculates the unused portion of vacation.

CC Calculation Explanation:

In order to determine amount of vacation earned but not yet vested, CC first identified the number of hours of vacation that would be earned on an employee's next anniversary date by subtracting FYE date from hire date and rounding up to the next year. CC then determined the percentage of the year completed based on hire or seniority date and multiplied the % of the year by hours to vest at the next anniversary. CC then multiplied the hours by the straight time hourly rate or base salary rate calculated down to an hourly rate to give the amount earned by FYE. CC determined that the misstatement is approximately $343,000. *See* summary to the left and detail on related tabs (see Appendix L).

Unarco Submission
Exhibit 9
p. 2

PBC
PBCC

| September 30 Vacation Cost | |
|---|---|
| Andes | 27,468.73 |
| Corporate | 133,782.85 |
| Dallas Direct | 114,089.37 |
| Dallas Indirect | 75,890.74 |
| | 351,231.69 |

| October 31 Vacation Cost | |
|---|---|
| Andes | 26,018.71 |
| Corporate | 133,782.85 |
| Dallas Direct | 114,129.99 |
| Dallas Indirect | 77,794.86 |
| | 351,726.41 |

| November 30 Vacation Cost | |
|---|---|
| Andes | 28,204.18 |
| Corporate | 140,606.02 |
| Dallas Direct | 117,299.06 |
| Dallas Indirect | 54,046.29 |
| | 340,155.55 |

| December 31 Vacation Cost | |
|---|---|
| Andes | 28,983.14 |
| Corporate | 107,567.89 |
| Dallas Direct | 98,244.93 |
| Dallas Indirect | 68,308.99 |
| | 303,104.95 |

| (rev) December 31 Vacation Cost | |
|---|---|
| Andes | 25,258.30 |
| Corporate | 107,567.89 |
| Dallas Direct | 93,749.78 |
| Dallas Indirect | 47,607.35 |
| | 274,183.32 |

| January 31 Vacation Cost | |
|---|---|
| Andes | 20,140.22 |
| Corporate | 120,987.27 |
| Dallas Direct | 88,219.27 |
| Dallas Indirect | 55,976.24 |
| | 285,303.00 |

| February 28 Vacation Cost | |
|---|---|
| Andes | 21,614.34 |
| Corporate | 117,255.95 |
| Dallas Direct | 95,538.42 |
| Dallas Indirect | 46,874.38 |
| | 281,283.09 |

| March 31 Vacation Cost | |
|---|---|
| Andes | 18,719.71 |
| Corporate | 138,280.83 |
| Dallas Direct | 69,685.81 |
| Dallas Indirect | 45,996.76 |
| | 270,683.10 |

**Atlanta**

| March 31 Vacation Cost | |
|---|---|
| Direct | 75,174.88 |
| Indirect | 13,497.18 |
| Salary | 15,962.95 |
| Total | 104,635.01 |

**Ohio**

| March 31 Vacation Cost | |
|---|---|
| Direct | 16,459.33 |
| Indirect | 22,061.21 |
| Total | 38,520.54 |

# EXHIBIT 10

Unarco Submission
Exhibit 10
p. 1

Petsmart Claim
March 30, 2007

| Vendor | Invoice # | Amount |
|--------|-----------|--------|
| Uprite Systems, Inc. | 4031 | 4,390.43 |
| B&L Solutions, Inc. | BA2987 | 331.80 |
| AWP industries, Inc. | 110155 | 703.20 |
| AWP industries, Inc. | 110222 | 9,362.68 |
| Unarco/Petsmart | CM#601957 | 4,808.00 |
| | | 19,596.11 |

Total amounts paid related to Petsmart Claim

Unarco Submission
Exhibit 10
p. 2



*Revised*

# Invoice

**BILL TO**

KINGWAY MATERIAL HANDLING
240 NORTHPOINT PARKWAY
ACWORTH, GA 30102
ATTN: TODD RUSSELL
    ACCOUNTS PAYABLE

| DATE | INVOICE # |
|------|-----------|
| 9/4/2007 | 4031 |

| P.O. NO. | TERMS |
|----------|-------|
| 1375 | Net 30 |

| DESCRIPTION | RATE | QTY | AMOUNT |
|-------------|------|-----|--------|
| INSTALLATION AT PETSMART IN NEWNAN, GA | 4,200.00 | | 4,200.00 |
| EXTRA CHARGE FOR PURCHASE OF TEK SCREWS | 190.43 | | 190.43 |

Thank you for your business.

**Total** $4,390.43

P.O. Box 911, Bardstown, KY 40004

*OK TRR*
*9-12-07*

Unarco Submission
Exhibit 10
p. 3

| 4031 | 09/04/07 | 4390.43 | 4390.43 | 0.00 | 4390.43 |
| 4032 | 09/04/07 | 39688.00 | 39688.00 | 0.00 | 39688.00 |

|  |  |  | 44078.43 | 0.00 | 44078.43 |

---

**KINGWAY**

501 E. Purnell
Lewisville, TX  75057 • (972) 436-5581

BANK OF AMERICA    64-1278 / 611 GA    **108690**

| DATE | CHECK AMOUNT |
|------|--------------|
| 10/11/07 | $*******44,078.43 |

PAY    Forty four thousand seventy eight dollars and 43/100 cents

TO
THE
ORDER
OF

UP-RITE SYSTEMS, INC
P.O. BOX 911
BARDSTOWN, KY 40004

VOID AFTER 180 DAYS

TWO SIGNATURES REQUIRED OVER $10,000

⑆108690⑆ ⑈061112788⑈ 329 912 0149⑆

Unarco Submission
Exhibit 10
p. 4



# B & L SOLUTIONS, INC.

## INDUSTRIAL FASTENERS

125 HENSON DRIVE
MONROE, GA 30655
770-267-8376
770-267-5599 Fax

1390-1

## Invoice

| Ship Date | Invoice # | Due Date |
|-----------|-----------|----------|
| 8/15/2007 | BA2987 | 9/14/2007 |

| Sold To | Shipped To |
|---------|-----------|
| UNARCO Material Handling<br>240 Northpoint Parkway<br>Acworth, GA 30102<br><br>Phone     770-917-9700     Fax     770-917-8203 | UNARCO MATERIAL HANDLING<br>240 Northpoint Parkway<br>Acworth, GA 30102 |

| P.O. Number | Job Name | Job # | Terms |
|-------------|----------|-------|-------|
| 1390 | | | Net 30 |

| Quantity | Item Code | Part # | Description | Price Each | Amount |
|----------|-----------|--------|-------------|------------|--------|
| 14,000 | TEK1214200H... | AH37 | 12-14 X 2 HEX WASHER HEAD TEK 3 Z | 0.0237 | 331.80 |

RECEIVED
AUG 2 0 2007

| | Total | |
|---|-------|---|

Remit To:  B & L SOLUTIONS, INC.
125 Henson Drive
Monroe, GA 30655

Unarco Submission
Exhibit 10
p. 5

**Page 1 of 1**

 Bank of America     Higher Standards          **Bank of America Direct**

**KINGWAY**
601 E. Purnell
Lewisville, TX 75057 • (972) 436-9581

BANK OF AMERICA    212808

| DATE | CHECK AMOUNT |
|------|--------------|
| 09/27/07 | $*******1,333.67 |

One-thousand-three-hundred-thirty-three-dollars-and-67/100-cents

VOID AFTER 180 DAYS

PAY
TO THE ORDER OF

B & L SOLUTIONS
125 HENSON DRIVE
MONROE, GA 30655

TWO SIGNATURES REQUIRED OVER $10,000

⑈212808⑈ ⑆061112788⑆ 329 912 0149⑈

B&L Solutions Inc
000L8397

5302732309 10/11/2007 ⑆851160006⑆ EK034200301

| Check Info | |
|-----------|-----|
| Account: | 3299120149 |
| Amount: | 1,333.67 |
| Check #: | 212808 |
| Posted Date: | 10/12/2007 |

Bank of America, N.A. Member FDIC.
©2005 Bank of America Corporation. All rights reserved.

Unarco Submission
Exhibit 10
p. 6

**KINGWAY**
501 E. Pinson
Lewisville, TX 75067 • (972) 436-6062

| DATE | B & L SOLUTIONS | 2389 | 09/27/07 | CHECK NO. 212808 | |
|---|---|---|---|---|---|
| INVOICE NO. | INVOICE DATE | INVOICE AMOUNT | AMOUNT PAID | DISCOUNT TAKEN | NET CHECK AMOUNT |
| BA2958 | 08/13/07 | 129.00 | 129.00 | 0.00 | 129.00 |
| BA2987 | 08/15/07 | 331.80 | 331.80 | 0.00 | 331.80 |
| BA2988 | 08/15/07 | 520.00 | 520.00 | 0.00 | 520.00 |
| BA2969 | 08/16/07 | 68.33 | 68.33 | 0.00 | 68.33 |
| BA2970 | 08/16/07 | 45.55 | 45.55 | 0.00 | 45.55 |
| BA2971 | 08/16/07 | 60.13 | 60.13 | 0.00 | 60.13 |
| BA2974 | 08/16/07 | 78.00 | 78.00 | 0.00 | 78.00 |
| BA3009* | 08/20/07 | 100.86 | 100.86 | 0.00 | 100.86 |
| | | | 1333.67 | 0.00 | 1333.67 |

Unarco Submission
Exhibit 10
p. 7

AWP Industries, Inc.

ISO9001/QS-9000 certified
616 Industrial Road, Frankfort, KY 40601
800-656-3938    502-695-0070    Fax: 502-695-0777
www.awpind.com

**Invoice No  110155**
**Customer   270407**

Remit To:   **AWP Industries**
            **PO Box  633368**
            **Cincinnati, OH  45263-3368**

Bill to :

UNARCO MATERIAL HANDLING
240 NORTHPOINT PARKWAY
ACWORTH  GA 30102

RECEIVED

AUG 2 7 2007

Sold to :

UNARCO MATERIAL HANDLING
240 NORTHPOINT PARKWAY
ACWORTH  GA 30102

1781 1342-3

| Phone (770) 917-9700 | | Fax (770) 917-8205 | | | | |
|---|---|---|---|---|---|---|
| Customer PO Number | Invoice Date | Terms | FOB | Ship Via | Pro Number | |
| 1282 | 08/23/2007 | NET 30 PROMPT | DESTINATION | CHROBINSON/PPDABS | LIWAY/8563004 | |

| Item | Part / Rev / Description / Details | Quantity | Unit Price | Discount | Extended Price |
|---|---|---|---|---|---|
| 000001 | AI42X46FA2464F18-381/2" | 1,426.0000 | 0.0000 | 0.00 | 0.00 |
| | Rev NS      U/M EA | | | | |
| | 42 D X 46 W    2000# UDL | | | | |
| | Packing List No/Item No:   120445/000001 | | | | |
| | Sales Order No:        084741 | | | | |
| | Customer PO No:      1282 | | | | |
| 000002 | AI60X46FA2464F18-561/2-P* | 480.0000 | 0.0000 | 0.00 | 0.00 |
| | Rev NS      U/M EA | | | | |
| | 60 D X 46 W    1000# UDL | | | | |
| | Packing List No/Item No:   120445/000002 | | | | |
| | Sales Order No:        084741 | | | | |
| | Customer PO No:      1282 | | | | |
| 000003 | BI42X52NW2463C-38" | 48.0000 | 14.6500 | 0.00 | 703.20 |
| | Rev NS      U/M EA | | | | |
| | 42 D X 52 W    2500# UDL | | | | |
| | Packing List No/Item No:   120445/000003 | | | | |
| | Sales Order No:        084741 | | | | |
| | Customer PO No:      1282 | | | | |

Total Item Price          703.20
Shipping                    0.00
Sales Tax                   0.00
Total Inv Price

SHIPPED TO ADDRESS:
PETSMART
ATTN:  MARVIN OSBORNE, MAINT. MGR.
(PH:  770-254-5583)
570 WALT SANDERS MEMORIAL
NEWNAN  GA 30265

Please pay balance due by Saturday September 22,
2007.

20456
Petsmart GA
CW 8/30/87
CB 81/30/87

ree'd 8/20/07 POOR 8/20/07
+ 8/20/07 rec'd

Page 1

Unarco Submission
Exhibit 10
p. 8



**AWP Industries, Inc.**
ISO9001/QS-9000 certified
616 Industrial Road, Frankfort, KY 40601
800-555-9538   502-695-0079   Fax: 502-695-0777
www.awpind.com

**Invoice No  110222**
**Customer   270407**

Remit To:    **AWP Industries**
             **PO Box  633368**
             **Cincinnati, OH  45263-3368**

Bill to :

UNARCO MATERIAL HANDLING
240 NORTHPOINT PARKWAY
ACWORTH  GA 30102

Sold to :

UNARCO MATERIAL HANDLING
240 NORTHPOINT PARKWAY
ACWORTH  GA 30102

RECEIVED
SEP 0 4 2007

Phone (770) 917-9700          Fax (770) 917-8205

| Customer PO Number | Invoice Date | Terms | FOB | Ship Via | Pro Number |
|---|---|---|---|---|---|
| 1282 | 08/27/2007 | NET 30 PROMPT | DESTINATION | CHROBINSON/PPDABS | 103/WHITE |

| Item | Part / Rev / Description / Details | Quantity | Unit Price | Discount | Extended Price |
|---|---|---|---|---|---|
| 000001 | AI42X46FA2464F18-381/2" | 396.0000 | 0.0000 | 0.00 | 0.00 |
|  | Rev NS     U/M EA |  |  |  |  |
|  | 42 D X 46 W    2000# UDL |  |  |  |  |
|  | Packing List No/Item No:  120529/000001 |  |  |  |  |
|  | Sales Order No:        084741 |  |  |  |  |
|  | Customer PO No:        1282 |  |  |  |  |
| 000002 | AI60X46FA2464F18-561/2-P" | 360.0000 | 0.0000 | 0.00 | 0.00 |
|  | Rev NS     U/M EA |  |  |  |  |
|  | 60 D X 46 W    1000# UDL |  |  |  |  |
|  | Packing List No/Item No:  120529/000002 |  |  |  |  |
|  | Sales Order No:        084741 |  |  |  |  |
|  | Customer PO No:        1282 |  |  |  |  |
| 000003 | BI42X46NW2463C-38" | 320.0000 | 11.1800 | 0.00 | 3,577.60 |
|  | Rev NS     U/M EA |  |  |  |  |
|  | 42 D X 46 W    2500# UDL |  |  |  |  |
|  | Packing List No/Item No:  120529/000003 |  |  |  |  |
|  | Sales Order No:        084741 |  |  |  |  |
|  | Customer PO No:        1282 |  |  |  |  |
| 000004 | AI42X52FA2464D18-381/2" | 72.0000 | 14.1900 | 0.00 | 1,021.68 |
|  | Rev NS     U/M EA |  |  |  |  |
|  | 42 D X 52 W    2500# UDL |  |  |  |  |
|  | Packing List No/Item No:  120529/000004 |  |  |  |  |
|  | Sales Order No:        084741 |  |  |  |  |
|  | Customer PO No:        1282 |  |  |  |  |

**Page  1**

Unarco Submission
Exhibit 10
p. 9



**AWP Industries, Inc.**

ISO9001/QS-9000 certified
818 Industrial Road, Frankfort, KY 40601
800-655-9938    502-695-0070    Fax: 502-695-0777
www.awpind.com

**Invoice No  110222**
**Customer    270407**

Remit To:    AWP Industries
PO Box  633368
Cincinnati, OH  45263-3368

**Bill to :**

UNARCO MATERIAL HANDLING
240 NORTHPOINT PARKWAY
ACWORTH  GA 30102

**Sold to :**

UNARCO MATERIAL HANDLING
240 NORTHPOINT PARKWAY
ACWORTH  GA 30102

1282 — 4

Phone (770) 917-9700          Fax (770) 917-8205

| Customer PO Number | Invoice Date | Terms | FOB | Ship Via | Pro Number |
|---|---|---|---|---|---|
| 1282 | 08/27/2007 | NET 30 PROMPT | DESTINATION | CHROBINSON/PPDABS | 103/WHITE |

| Item | Part / Rev / Description / Details | Quantity | Unit Price | Discount | Extended Price |
|---|---|---|---|---|---|
| 000005 | AI30X46FA2464F18-261/2" | 48.0000 | 0.0000 | 0.00 | 0.00 |
| | Rev  NS        U/M EA | | | | |
| | 30 D X 46 W    2400# UDL | | | | |
| | Packing List No/Item No:  120529/000005 | | | | |
| | Sales Order No:        084741 | | | | |
| | Customer PO No:        1282 | | | | |
| 000006 | AI28X46FA2464F18-241/2" | 12.0000 | 11.7500 | 0.00 | 141.00 |
| | Rev  NS        U/M EA | | | | |
| | 28 D X 46 W    2400# UDL | | | | |
| | Packing List No/Item No:  120529/000006 | | | | |
| | Sales Order No:        084741 | | | | |
| | Customer PO No:        1282 | | | | |
| 000007 | AI42X46FA2464F18-381/2" | 480.0000 | 9.6300 | 0.00 | 4,622.40 |
| | Rev  NS        U/M EA | | | | |
| | 42 D X 46 W    2000# UDL | | | | |
| | Packing List No/Item No:  120529/000007 | | | | |
| | Sales Order No:        084741 | | | | |
| | Customer PO No:        1282 | | | | |

Total Item Price          9,362.68
Shipping          0.00
Sales Tax          0.00
Total Inv Price

**SHIPPED TO ADDRESS:**
PETSMART
ATTN:  MARVIN OSBORNE, MAINT. MGR.
(PH:  770-254-5583)
570 WALT SANDERS MEMORIAL
NEWNAN  GA 30265

Please pay balance due by Wednesday September 26,
2007.

2C456
Petsmart GA

rec'd 9/4/07  PODR 9/4/07          **Page 2**

Unarco Submission
Exhibit 10
p. 10
Page 1 of 1



Bank of America, N.A. Member FDIC.
©2005 Bank of America Corporation. All rights reserved.

KINGWAY
411 E. … Street
Lewisville TX  …

Unarco Submission
Exhibit 10
p. 11

| DATE | AWP INDUSTRIES | | 1781 | 10/04/07 | CHECK NO. 108430 | |
|------|---------|---------|---------|---------|---------|---------|
| INVOICE NO. | INVOICE DATE | INVOICE AMOUNT | AMOUNT PAID | DISCOUNT TAKEN | NET CHECK AMOUNT |
| 109922 | 08/16/07 | 725.00 | 725.00 | 0.00 | 725.00 |
| 110114 | 08/22/07 | 812.64 | 812.64 | 0.00 | 812.64 |
| 110145 | 08/23/07 | 760.80 | 760.80 | 0.00 | 760.80 |
| 110155 | 08/23/07 | 703.20 | 703.20 | 0.00 | 703.20 |
| 110222 | 08/27/07 | 9362.68 | 9362.68 | 0.00 | 9362.68 |
| 110269 | 08/30/07 | 392.54 | 392.54 | 0.00 | 392.54 |
| 110271 | 08/30/07 | 30.00 | 30.00 | 0.00 | 30.00 |
| 110641 | 09/10/07 | 107.14 | 107.14 | 0.00 | 107.14 |
| CM-0004821 | 09/21/07 | -1644.78 | -1644.78 | 0.00 | -1644.78 |
| | | | 11249.22 | 0.00 | 11249.22 |

Unarco Submission
Exhibit 10
p. 12



**UNARCO** *formerly*
**Material Handling, Inc.** **KINGWAY**
240 Northpoint Parkway
Acworth, GA 30102
Phone  770.917.9700
Fax    770.917.8205

REMIT TO:
Unarco Material Handling, Inc.
P.O. Box 930970
Atlanta, GA 31193-0970

| Invoice Date | 09/27/07 |
|---|---|
| Terms | NET 30 DAYS |
| Invoice Number | 502547 |

| Factory Order Date | Shipping Date | Shipping Point | Route | PPD/ADD | 3rd Party | FOB Destin. | Coll. | Quote Nº | Order Nº |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 601957 |

| Distributor Nº | Sold To Purchase Order Number | Customer Nº | Ship To Purchase Order Number | Sales Number | State |
|---|---|---|---|---|---|
| 70915 | 480310181 | 70915 | | 00 | GA |

| BILL TO / SOLD TO | SHIP TO | SHIPPER NUMBER |
|---|---|---|
| % PETSMART - JULIE HAMMAN<br>RE: VENDOR #81052<br>19601 N 27TH AVENUE<br>PHOENIX, AZ 85207 | PETSMART<br>500 WALT SANDER<br>NEWNAN, GA 30265 | 601957 |

| Quantity Ordered | Quantity Shipped | Catalog Number | Description | Dwg/Rev. | Unit | Unit Price | Amount |
|---|---|---|---|---|---|---|---|
| 0 | -1 | SO #601957   CREDIT<br><br>BACK CHARGE FOR LABOR TO<br>UNINSTALL AND REINSTALL<br>WIRE DECKING | | | | 4,808.00 | -4,808.00 |

C R E D I T   M E M O

| Total Weight | 0# | INVOICE TOTAL | -4,808.00 |
|---|---|---|---|

If sales or use tax is not included in invoice amount, we assume the purchaser will remit any applicable tax to the appropriate state or local authority.

PAYMENT DUE ON 10/27/07

We hereby state that the prices for the commodities herein invoiced are not in excess of applicable ceiling prices established by the E.S.A. or other authorized government agencies and are in effect upon the date hereof.

Past due balances will be subject to a service charge of 1.5% per month
Seller represents that with this respect to the production of the articles and/or the performance of the services covered by this invoice; it has fully complied with the Fair Labor Standards Act of 1938, as amended.

No goods to be returned without permission and directions from Sales Department.
Page 1

# EXHIBIT 11

Domestic Wire Transfer Detail

Page 1 of 1

# DOMESTIC WIRE TRANSFER DETAIL

Initiated By: .................... CR199556 On Apr 3 2007 At 3:53:20 PM ET
Last Modified By: .............. CR199557 On Apr 3 2007 At 3:57:15 PM ET
Status: ........................ Completed
Processed: ..................... On Apr 3 2007 At 4:00:50 PM ET
Template Name: .................
Transaction ID: ............... 20001708
Entry Method: .................. User Entry
MTS Advice #: .................. 2007040300057326

Amount: ........................ $ 220,434.90  ✳
Value Date: .................... 04/03/2007
Debit Account: ................. WBNC 2079900097951

## Receiving Financial Institution
ABA #: ......................... 026009593
Name: .......................... BANK OF AMERICA, N.A., NY
City/State/Zip: ................ NEW YORK, NY

## Beneficiary
Account #: ..................... 9369337536
Account Name: .................. Bank of America NA
Address Line 1: ................ 777 Main Street
Address Line 2: ................ Hartford, CT 06115
Address Line 3: ................
Reference: .....................

## Originator to Beneficiary Information
Orig/Ben Info: ................. Bank of America Business Capital and INCA Metal Products Corp.,
                                 Clymer Acquisition, Inc. and Kingway Acquisition, Inc.

## Beneficiary Financial Institution
Account Name: ..................
Address Line 1: ................

© Wachovia Corporation, 2004

Loan Ledger

Unarco Submission
Exhibit 11
p. 2

| | Loan Ledger | Generate Export file |
|---|---|---|

| | | |
|---|---|---|
| **Mar 2007** | **Inca Metal Products Corp.** | **Loan: IMP00** |
| Loan Limit: 19,000,000.00 | - | Today: 04/02/2007 |
| Currency: USD | 501 E. PURNELL | |
| Loan Type: AR | LEWISVILLE TX | Contact: BARBARA PRIDIE |

'+' sign indicates that the transaction is back-dated.

Display:  ☐ Collateral  ☑ Loan

-------- Loan --------

Beginning Balance: 8,632,220.27                    Ending Balance: 8,491,386.53

| Date | Assn# | Coll# | Advances | Adjustments | Net Cash | Loan Balance | Desc. |
|---|---|---|---|---|---|---|---|
| 03/01/07 | IntFr> | IMP0A | 0.00 | 27,336.68 | 0.00 | 8,659,556.95 - | |
| 03/01/07 | ACH | 0301 | 0.00 | 0.00 | 57,484.31 | 8,602,072.64 - | |
| 03/01/07 | T/L001 | PYMT0A | 0.00 | 80,492.50 | 0.00 | 8,682,565.14 - | |
| 03/01/07 | LNINT | IMP0D | 0.00 | 19,664.68 | 0.00 | 8,702,229.82 - | |
| 03/01/07 | IntFr> | IMP00 | 0.00 | 86,277.42 | 0.00 | 8,788,507.24 - | |
| 03/01/07 | ADV | 0301 | 518,036.01 | 0.00 | 0.00 | 9,306,543.25 - | |
| 03/01/07 | LNINT | IMP0C | 0.00 | 52,228.68 | 0.00 | 9,358,771.93 - | |
| 03/01/07 | T/L001 | PYMT0D | 0.00 | 23,674.17 | 0.00 | 9,382,446.10 - | |
| 03/02/07 | ADV | 030207 | 388,245.65 | 0.00 | 0.00 | 9,770,691.75 - | |
| 03/02/07 | BC0228 | 022807 | 0.00 | 0.00 | 0.00 | 9,770,691.75 - | |
| 03/02/07 | ACH | 0302 | 0.00 | 0.00 | 420,321.28 | 9,350,370.47 - | |
| 03/02/07 | BC0301 | 030107 | 0.00 | 0.00 | 0.00 | 9,350,370.47 - | |
| 03/05/07 | ADV | 0305 | 309,143.94 | 0.00 | 0.00 | 9,659,514.41 - | |
| 03/05/07 | ACH | 0305 | 0.00 | 0.00 | 221,117.75 | 9,438,396.66 - | |
| 03/06/07 | BC0305 | 030507 | 0.00 | 0.00 | 0.00 | 9,438,396.66 - | |
| 03/06/07 | ADV | 0306 | 233,371.70 | 0.00 | 0.00 | 9,671,768.36 - | |
| 03/06/07 | BC0302 | 030207 | 0.00 | 0.00 | 0.00 | 9,671,768.36 - | |
| 03/06/07 | ACH | 4759 | 0.00 | 0.00 | 56,480.37 | 9,615,287.99 - | |
| 03/07/07 | ADV | 0307 | 427,734.31 | 0.00 | 0.00 | 10,043,022.30 - | |
| 03/07/07 | ACH | 4746 | 0.00 | 0.00 | 631,528.50 | 9,411,493.80 - | |
| 03/07/07 | BC0306 | 030607 | 0.00 | 0.00 | 0.00 | 9,411,493.80 - | |
| 03/08/07 | ACH | 0308 | 0.00 | 0.00 | 236,692.12 | 9,174,801.68 - | |
| 03/08/07 | ADV | 0308 | 563,847.22 | 0.00 | 0.00 | 9,738,648.90 - | |
| 03/08/07 | BC0307 | 030707 | 0.00 | 0.00 | 0.00 | 9,738,648.90 - | |
| 03/09/07 | BC0308 | 030807 | 0.00 | 0.00 | 0.00 | 9,738,648.90 - | |
| 03/09/07 | ADV | 0309 | 215,578.08 | 0.00 | 0.00 | 9,954,226.98 - | |
| 03/09/07 | ACH | 0309 | 0.00 | 0.00 | 410,205.81 | 9,544,021.17 - | |
| 03/12/07 | BC0309 | 030907 | 0.00 | 0.00 | 0.00 | 9,544,021.17 - | |
| 03/12/07 | ADV | 031207 | 346,878.80 | 0.00 | 0.00 | 9,890,899.97 - | |
| 03/12/07 | ACH | 0312 | 0.00 | 0.00 | 403,969.13 | 9,486,930.84 - | |
| 03/13/07 | ADV | 0313 | 330,428.23 | 0.00 | 0.00 | 9,817,359.07 - | |
| 03/13/07 | ACH | 0313 | 0.00 | 0.00 | 1,216,393.72 | 8,600,965.35 - | |
| 03/14/07 | BC0313 | 031207 | 0.00 | 0.00 | 0.00 | 8,600,965.35 - | |
| 03/14/07 | BC0313 | 031307 | 0.00 | 0.00 | 0.00 | 8,600,965.35 - | |
| 03/14/07 | ADV | 0314 | 580,311.72 | 0.00 | 0.00 | 9,181,277.07 - | |
| 03/14/07 | ACH | 4746 | 0.00 | 0.00 | 178,267.40 | 9,003,009.67 - | |
| 03/15/07 | ADV | 0315 | 333,000.34 | 0.00 | 0.00 | 9,336,010.01 - | |
| 03/15/07 | BC0314 | 031407 | 0.00 | 0.00 | 0.00 | 9,336,010.01 - | |
| 03/15/07 | ACH | 0315 | 0.00 | 0.00 | 64,046.12 | 9,271,963.89 - | |

## Loan Ledger

Unarco Submission
Exhibit 11
p. 3

| Date | Type | Ref | Amount | Amount | Amount | Balance |
|---|---|---|---|---|---|---|
| 03/16/07 | ACH | 4746 | 0.00 | 0.00 | 231,777.54 | 9,040,186.35 - |
| 03/16/07 | ADV | 0316 | 268,526.75 | 0.00 | 0.00 | 9,308,713.10 - |
| 03/16/07 | BC0315 | 031507 | 0.00 | 0.00 | 0.00 | 9,308,713.10 - |
| 03/19/07 | ACH | 4746 | 0.00 | 0.00 | 25,189.74 | 9,283,523.36 - |
| 03/19/07 | BC0316 | 031607 | 0.00 | 0.00 | 0.00 | 9,283,523.36 - |
| 03/19/07 | ADV | 0319 | 104,246.91 | 0.00 | 0.00 | 9,387,770.27 - |
| 03/20/07 | ADV | 0320 | 318,436.78 | 0.00 | 0.00 | 9,706,207.05 - |
| 03/20/07 | ACH | 4746 | 0.00 | 0.00 | 448,131.38 | 9,258,075.67 - |
| 03/21/07 | BC0320 | 032007 | 0.00 | 0.00 | 0.00 | 9,258,075.67 - |
| 03/21/07 | BC0319 | 031907 | 0.00 | 0.00 | 0.00 | 9,258,075.67 - |
| 03/21/07 | ADV | 0321 | 227,485.32 | 0.00 | 0.00 | 9,485,560.99 - |
| 03/22/07 | ACH | 4746 | 0.00 | 0.00 | 299,286.00 | 9,186,274.99 - |
| 03/22/07 | ADV | 032207 | 522,861.60 | 0.00 | 0.00 | 9,709,136.59 - |
| 03/22/07 | BC0321 | 032107 | 0.00 | 0.00 | 0.00 | 9,709,136.59 - |
| 03/23/07 | ACH | 0323 | 0.00 | 0.00 | 13,568.33 | 9,695,568.26 - |
| 03/23/07 | BC0322 | 032207 | 0.00 | 0.00 | 0.00 | 9,695,568.26 - |
| 03/23/07 | ADV | 0323 | 170,706.08 | 0.00 | 0.00 | 9,866,274.34 - |
| 03/26/07 | ADV | 0326 | 210,081.24 | 0.00 | 0.00 | 10,076,355.58 - |
| 03/26/07 | BC0323 | 032307 | 0.00 | 0.00 | 0.00 | 10,076,355.58 - |
| 03/26/07 | ACH | 0326 | 0.00 | 0.00 | 606,943.15 | 9,469,412.43 - |
| 03/27/07 | BC0326 | 032607 | 0.00 | 0.00 | 0.00 | 9,469,412.43 - |
| 03/27/07 | ADV | 032707 | 66,355.94 | 0.00 | 0.00 | 9,535,768.37 - |
| 03/27/07 | ACH | 0327 | 0.00 | 0.00 | 1,120,925.11 | 8,414,843.26 - |
| 03/28/07 | ADV | 0328 | 195,979.92 | 0.00 | 0.00 | 8,610,823.18 - |
| 03/28/07 | BC0327 | 032707 | 0.00 | 0.00 | 0.00 | 8,610,823.18 - |
| 03/28/07 | ACH | 0328 | 0.00 | 0.00 | 653,742.92 | 7,957,080.26 - |
| 03/29/07 | ADV | 0329 | 591,017.91 | 0.00 | 0.00 | 8,548,098.17 - |
| 03/29/07 | ACH | 0329 | 0.00 | 0.00 | 277,146.54 | 8,270,951.63 - |
| 03/30/07 | ADV | 033007 | 463,914.36 | 0.00 | 0.00 | 8,734,865.99 - |
| 03/30/07 | ACH | 4746 | 0.00 | 0.00 | 243,479.46 | 8,491,386.53 - |

> 220,435

Total: 7,386,188.81   289,674.13   7,816,696.68

Unarco Submission
Exhibit 11
p. 4

**Bank of America**
**Inca Metal Products**
**Previous Day Detail with Text Report**

As of 03/30/2007
**Bank of America Accounts**

*Bank of America, Georgia ABA: 061000052, US Dollar (USD) Accounts*

| 3729120140 Inca Metal Products Corporation | | | Last Updated: 03/31/2007 02:40 CST | | |

**Detail Credits**

| Amount | Customer Reference | Bank Reference | Immediate Availability | 1 Day Float | 2+ Day Float |
|---|---|---|---|---|---|
| INDIV CONTROLLED DISBURSEMT CR | | | | | |
| 469,390.73 | 3756424759 | 04510005173 | 469,390.73 | 0.00 | 0.00 |
| | GC CTRL DIS 003758424759 CR | | | | |

| TOTAL | 469,390.73 | # of Items: | 1 | 469,390.73 | |

**TOTAL CREDITS**

| | 469,390.73 | # of Items: | 1 | 469,390.73 | |

**Detail Debits**

| Amount | Customer Reference | Bank Reference | Immediate Availability | 1 Day Float | 2+ Day Float |
|---|---|---|---|---|---|
| INDIV CONTROLLED DISBURSEMT DR | | | | | |
| 720.07 | 0000058090 | 00900111221 | | | |
| 110.11 | 0000058091 | 01000563530 | | | |
| 104.61 | 0000058093 | 00900107632 | | | |
| 9.60 | 0000082571 | 01200968740 | | | |
| 61.80 | 0000082580 | 00700741814 | | | |
| 55.00 | 0000108097 | 01000602996 | | | |
| 671.70 | 0000108118 | 01100781091 | | | |
| 975.54 | 0000108120 | 00600485618 | | | |
| 758.94 | 0000108125 | 09434731302 | | | |
| 51.60 | 0000108126 | 01700341740 | | | |
| 252.50 | 0000164896 | 01100758689 | | | |
| 180.00 | 0000164917 | 01000599648 | | | |
| 15.00 | 0000164918 | 01000599649 | | | |
| 1,169.20 | 0000164927 | 01J00762274 | | | |
| 700.00 | 0000211129 | 00800332226 | | | |
| 1,493.71 | 0000211148 | 01000609234 | | | |
| 376.60 | 0000211166 | 01000604480 | | | |
| 61,422.71 | 0000211172 | 00600644005 | | | |
| 17,611.20 | 0000211190 | 00600473084 | | | |
| 300.29 | 0000211192 | 00200024210 | | | |
| 1,688.02 | 0000211193 | 00400458949 | | | |
| 223.28 | 0000211196 | 00600485617 | | | |
| 238.09 | 0000211198 | 01200968184 | | | |
| 935.00 | 0000211199 | 02394180622 | | | |
| 112.14 | 0000211200 | 01000657187 | | | |
| 60,206.45 | 0000211220 | 00700742182 | | | |
| 19.95 | 0000401400 | 00800485614 | | | |

Unarco Submission
Exhibit 11
p. 5

**Bank of America**
**Inca Metal Products**
**Previous Day Detail with Text Report**

| | | |
|---:|---|---|
| 728.82 | 0000401418 | 00900187378 |
| 709.80 | 0000401419 | 00900187379 |
| 30.50 | 0000401421 | 00700741737 |
| 248.42 | 0000401422 | 01200968765 |
| 69,893.11 | 0000401423 | 00600644004 |
| 23.26 | 0000401430 | 01200968701 |
| 882.50 | 0000401434 | 00600605797 |
| 124.75 | 0000401441 | 08520804117 |
| 399.30 | 0000401442 | 01000657072 |
| 56,476.66 | 0000401457 | 00700742181 |
| 14,623.56 | 0000401460 | 00600651398 |
| 26.00 | 0000507218 | 00900107927 |
| 178.04 | 0000507239 | 00900107130 |
| 92.35 | 0000802349 | 00900105738 |
| 170.00 | 0000802362 | 01100756303 |
| 409.91 | 0000802407 | 08520777601 |
| 2,455.50 | 0000802409 | 08930563287 |
| 4,139.94 | 0000802423 | 00600609976 |
| 89,964.14 | 0000802430 | 00700742183 |
| 74,721.03 | 0000802436 | 08234473860 |
| 1,354.36 | 0000802440 | 00600591568 |
| 1,275.67 | 0000802447 | 00600603449 |

| | | | | |
|---|---:|---|---|---:|
| **TOTAL** | 469,390.73 | # of Items: | | 49 |
| **TOTAL DEBITS** | | | | |
| | 469,390.73 | # of Items: | | 49 |

*Bank of America, Customer Connection  ABA: 111000012, US Dollar (USD) Accounts*

3756424746 Inca Metal FBO FCC                                Last Updated: 03/31/2007 05:50 CST

**Detail Credits**

| Amount | Customer Reference | Bank Reference | Immediate Availability | 1 Day Float | 2+ Day Float |
|---:|---|---|---:|---:|---:|

**LOCKBOX DEPOSIT CREDIT**

| Amount | Customer Reference | Bank Reference | Immediate Availability | 1 Day Float | 2+ Day Float |
|---:|---|---|---:|---:|---:|
| 65,491.75 | 0099631000 | 00052301226 | 0.00 | 61,564.12 | 3,927.63 |

| | | | | | |
|---|---:|---|---|---:|---:|
| **TOTAL** | 65,491.75 | # of Items: | 1 | 61,564.12 | 3,927.63 |
| **TOTAL CREDITS** | | | | | |
| | 65,491.75 | # of Items: | 1 | 61,564.12 | 3,927.63 |

**Detail Debits**

| Amount | Customer Reference | Bank Reference | Immediate Availability | 1 Day Float | 2+ Day Float |
|---:|---|---|---:|---:|---:|

**PREAUTHORIZED ACH DEBIT**

243,479.46          0000000000          00252053166
BOFA BUSINESS CA;DES=CORP PYMNT;ID=30IMP0071501
EFF DATE: 070330;INDN:INCA METAL PRODUCTS CO
PMT INFO:NTE*OTH*COL IMP00 ACH   4746-

Unarco Submission
Exhibit 11
p. 6

**Bank of America**
**Inca Metal Products**
Previous Day Detail with Text Report

| TOTAL | 243,479.46 | # of Items: | 1 | | | |
|---|---|---|---|---|---|---|
| *TOTAL DEBITS* | | | | | | |
| | 243,479.46 | # of Items: | 1 | | | |

**3756424769 Inca Metal Master Operating** | 8 | Last Updated: 03/31/2007 05:50 CST

**Detail Credits**

| | Amount | Customer Reference | Bank Reference | Immediate Availability | 1 Day Float | 2+ Day Float |
|---|---|---|---|---|---|---|
| **PREAUTHORIZED ACH CREDIT** | | | | | | |
| | 5,476.37 | 0000000000 | 00253436395 | 5,476.37 | 0.00 | 0.00 |
| | ADP TX/FINCL SVC;DES=ADP - TAX ;ID=19UGQ 7839126VV | | | | | |
| | EFF DATE: 070330;INDN:KIC HOLDING INC | | | | | |
| TOTAL | 5,476.37 | # of Items: | 1 | 5,476.37 | | |
| **INCOMING INTERNL MONEY TRNSFR** | | | | | | |
| | 463,914.36 | 0000000000 | 00370294527 | 463,914.36 | 0.00 | 0.00 |
| | WIRE TYPE:BOOK IN DATE:070330 TIME:1459 ET | | | | | |
| | TRN:2007033000294527 SNDR REF:30IMP0071617 | | | | | |
| | ORIG:FLEET CAPITAL CE DISB ID:009369337808 | | | | | |
| TOTAL | 463,914.36 | # of Items: | 1 | 463,914.36 | | |
| *TOTAL CREDITS* | | | | | | |
| | 469,390.73 | # of Items: | 2 | 469,390.73 | | |

**Detail Debits**

| | Amount | Customer Reference | Bank Reference | Immediate Availability | 1 Day Float | 2+ Day Float |
|---|---|---|---|---|---|---|
| **CONTROLLED DISB FUNDING DEBIT** | | | | | | |
| | 469,390.73 | 3299120149 | 04510005174 | | | |
| | GC CTRL DIS 003299120149 DR | | | | | |
| TOTAL | 469,390.73 | # of Items: | 1 | | | |
| *TOTAL DEBITS* | | | | | | |
| | 469,390.73 | # of Items: | 1 | | | |

**TOTAL Bank of America Customer Connection ABA# 011000012** | | | | *** US Dollar (USD) *** |

| Description | Amount | # of Items | Immediate Availability | 1 Day Float | 2+ Day Float |
|---|---|---|---|---|---|
| *TOTAL CREDITS* | | | | | |
| | 534,882.48 | 3 | 469,390.73 | 61,564.12 | 3,927.63 |
| *TOTAL DEBITS* | | | | | |
| | 712,870.19 | 2 | | | |

**TOTAL Bank of America Accounts** | | | | *** US Dollar (USD) *** |

Unarco Submission
Exhibit 11
p. 7

**Bank of America**
**Inca Metal Products**
**Previous Day Detail with Text Report**

| Description | Amount | # of Items | Immediate Availability | 1 Day Float | 2+ Day Float |
|---|---|---|---|---|---|
| **TOTAL CREDITS** | | | | | |
| | 1,004,273.21 | 4 | 938,781.46 | 61,564.12 | 3,927.63 |
| **TOTAL DEBITS** | | | | | |
| | 1,182,260.92 | 51 | | | |

| Description | Amount | # of Items | Immediate Availability | 1 Day Float | 2+ Day Float |
|---|---|---|---|---|---|
| *TOTAL US Dollar (USD) Accounts as of 03/30/2007* | | | | | |
| **TOTAL CREDITS** | | | | | |
| | 1,004,273.21 | 4 | 938,781.46 | 61,564.12 | 3,927.63 |
| **TOTAL DEBITS** | | | | | |
| | 1,182,260.92 | 51 | | | |

Unarco Submission
Exhibit 11
p. 8

| Summary | 3/30/2007 |
|---|---|
| Atlanta | 60,829.16 |
| Dallas | 25,223.17 |
| Ohio | 153,447.68 |
| Andes | 3,979.45 |
| Total | 243,479.46 |

30 Jul 2007
17:24:58

Kingway Corporation
A/R Deposit Report
Cash Account 1-00-1075-00
Posted on 03-29-07
For All Company Codes

Page 1
CASH.R2

| Check# | Cash# | Cust | Customer Name | Check Amount |
|---|---|---|---|---|
| 40045 | 30847 | 3701 | GRAFCO INC | 4,456.02 |
| 196590 | 30848 | 903 | M H EQUIPMENT COMPANY | 315.20 |
| 15489 | 30849 | 6564 | SINCLAIR MATERIAL HANDLIN | 56,057.94 |
| | | | | 60,829.16 |

30 Jul 2007
17:26:09

Kingway (TX)
A/R Deposit Report
Cash Account 10000-100
Posted on 03-29-07
For All Company Codes

Page 1
CASH.R2

| Check# | Cash# | Cust | Customer Name | Check Amount |
|---|---|---|---|---|
| 8868 | 30838 | 15681 | Brandt & Hill Inc. | 3,631.56 |
| 7854 | 30839 | 5402 | ALLIED MATERIAL HANDLING | 5,418.87 |
| 3729 | 30840 | 52699 | RED RIVER RACK COMPANY | 16,172.74 |
| | | | | 25,223.17 |

30 Jul 2007
17:26:54

Kingway (OH)
A/R Deposit Report
Cash Account 10000-100
Posted on 03-29-07
For All Company Codes

Page 1
CASH.R2

| Check# | Cash# | Cust | Customer Name | Check Amount |
|---|---|---|---|---|
| 85930 | 30841 | 29 | ANDERSEN & ASSOCIATES | 125,132.06 |
| 115727 | 30842 | 1089 | BASTIAN MATERIAL HANDLING | 1,532.48 |
| 3830 | 30843 | 119 | DONOBROG, INC. | 2,190.96 |
| 91 | 30844 | 136 | FERGUSON ENTERPRISES, INC | 19,516.74 |
| 64080 | 30845 | 321 | TAYLOR MATERIAL HANDLING, | 1,759.15 |
| 344094 | 30846 | | | 3,316.29 |
| | | | | 153,447.68 |

| Andes | | |
|---|---|---|
| 152571 | Metal Span | 2,150.39 |
| 232402 | MacSteel Service | 252.00 |
| ACH | Big O Metals | 1,577.06 |
| | Total | 3,979.45 |

Unarco Submission
Exhibit 11
p. 9

```
26 Jul 2007                      Unarco Material Handling                      Page    1
09:16:06                         A/P Cleared Check Listing                     CHECKS.R6
                               for 03-30-07 through 03-30-07
                                Por all Disbursement Accounts
                                   For All Company Codes


Check#..  Vend#.  Vendor.Name.............  Chk.Date  Clr.Date  Check.Amount  Clear.Amount.  Variance......  St

 802349  431243  AIRTECH SPRAY SYSYTEMS     03-16-07  03-30-07        92.35         92.35          0.00  C
 802362   34767  RUSCO PACKAGING INC        03-16-07  03-30-07       170.00        170.00          0.00  C
 802407   32657  GRAINGER                   03-23-07  03-30-07       409.91        409.91          0.00  C
 802409   31086  WORLDWIDE FREIGHT CORP     03-23-07  03-30-07      2455.50       2455.50          0.00  C
 802423   32480  FT. WORTH BOLT & TOOL CO   03-27-07  03-30-07      4139.94       4139.94          0.00  C
 802430   33367  LAWSON STEEL, INC.         03-27-07  03-30-07     89964.14      89964.14          0.00  C
 802436   34220  NUCOR STEEL CORPORATION    03-27-07  03-30-07     74721.03      74721.03          0.00  C
 802440   34767  RUSCO PACKAGING INC        03-27-07  03-30-07      1354.36       1354.36          0.00  C
 802447   35298  TENNANT FINANCIAL SERVICE  03-27-07  03-30-07      1275.67       1275.67          0.00  C
                                                                -------------  -------------  -------------

                                                                   174582.90      174582.90          0.00

                                                                =============  =============  =============

                                                                   174582.90      174582.90          0.00
```

In re Submission
Exhibit 11
p. 10

```
26 Jul 2007                        Unarco Material Handling                          Page   1
09:17:12                           A/P Cleared Check Listing                         CHECKS.R6
                                   for 03-30-07 through 03-30-07
                                   For all Disbursement Accounts
                                   For All Company Codes


Check#..  Vend#.  Vendor.Name.............  Chk.Date  Clr.Date  Check.Amount  Clear.Amount.  Variance......  St

  82571   99900  SELF INSURANCE PMTS - COR  03-21-07  03-30-07          9.60          9.60            0.00  C
  82580   99900  SELF INSURANCE PMTS - COR  03-21-07  03-30-07         61.80         61.80            0.00  C
 108097  -34204  NC DEPT OF REVENUE         03-14-07  03-30-07         55.00         55.00            0.00  C
 108118   32021  BYRON DANIELS              03-23-07  03-30-07        671.70        671.70            0.00  C
 108120   30440  FEDERAL EXPRESS            03-23-07  03-30-07        975.54        975.54            0.00  C
 108125   33075  ONIT COMMUNICATIONS        03-23-07  03-30-07        758.94        758.94            0.00  C
 108126   35135  STANDARD COFFEE SERVICE    03-23-07  03-30-07         51.60         51.60            0.00  C
 164896   99900  SELF INSURANCE PMTS - COR  03-21-07  03-30-07        252.50        252.50            0.00  C
 164917   99900  SELF INSURANCE PMTS - COR  03-21-07  03-30-07        180.00        180.00            0.00  C
 164918   99900  SELF INSURANCE PMTS - COR  03-21-07  03-30-07         15.00         15.00            0.00  C
 164927   99900  SELF INSURANCE PMTS - COR  03-21-07  03-30-07       1169.20       1169.20            0.00  C
 211129   34987  STRUCTURAL CONCEPTS        03-14-07  03-30-07        700.00        700.00            0.00  C
 211148    2325  PATRIOT CRANE & HOIST INC  03-16-07  03-30-07       1493.71       1493.71            0.00  C
 211166   32615  Vendor not on file         03-21-07  03-30-07        376.60        376.60            0.00  C
 211172     960  JM STEEL CORPORATION       03-21-07  03-30-07      61422.71      61422.71            0.00  C
 211190    1715  STEEL COILS OF TENNESSEE,  03-21-07  03-30-07      17611.20      17611.20            0.00  C
 211192   31065  USF HOLLAND                03-21-07  03-30-07        300.29        300.29            0.00  C
 211193    1040  AEROTEK COMMERCIAL STAFF   03-23-07  03-30-07       1688.02       1688.02            0.00  C
 211196   30440  FEDERAL EXPRESS            03-23-07  03-30-07        223.28        223.28            0.00  C
 211198   30875  R & L CARRIERS, INC.       03-23-07  03-30-07        238.09        238.09            0.00  C
 211199    1947  RELIABLE PAPER, INC        03-23-07  03-30-07        935.00        935.00            0.00  C
 211200     831  ROYAL BRASS AND HOSE       03-23-07  03-30-07        112.14        112.14            0.00  C
 211220   33367  LAWSON'S STEEL, INC        03-27-07  03-30-07      60206.45      60206.45            0.00  C
 507218   99900  SELF INSURANCE PMTS - COR  03-21-07  03-30-07         26.00         26.00            0.00  C
 507239   99900  SELF INSURANCE PMTS - COR  03-21-07  03-30-07        178.04        178.04            0.00  C
                                                                --------------  --------------  --------------

                                                                    149712.41      149712.41            0.00

                                                                ==============  ==============  ==============

                                                                    149712.41      149712.41            0.00
```

Unarco Submission
Exhibit 11
p. 11

```
26 Jul 2007                    Unarco Material Handling                      Page    1
09:17:54                        A/P Cleared Check Listing                    CHECKS.R6
                            for 03-30-07 through 03-30-07
                              For all Disbursement Accounts
                                 For All Company Codes


Check#..  Vend#.  Vendor.Name.............    Chk.Date  Clr.Date  Check.Amount  Clear.Amount.  Variance......  St

  401400    516  GREG CHRISTY                 03-16-07  03-30-07         19.95         19.95           0.00  C
  401418     94  CITY UNIFORMS & LINEN CO     03-21-07  03-30-07        728.82        728.82           0.00  C
  401419    365  ED ROSENBERGER               03-21-07  03-30-07        709.80        709.80           0.00  C
  401421    622  HANCOCK COUNTY LANDFILL      03-21-07  03-30-07         30.50         30.50           0.00  C
  401422    178  HANCOCK GAS SERVICE          03-21-07  03-30-07        248.42        248.42           0.00  C
  401423    960  JM STEEL CORPORATION         03-21-07  03-30-07      69893.11      69893.11           0.00  C
  401430   4023  UNITED STATES PLASTIC COR    03-21-07  03-30-07         23.26         23.26           0.00  C
  401434    541  CHEMTRON  CORPORATION        03-23-07  03-30-07        882.50        882.50           0.00  C
  401441    655  SPRAYING SYSTEMS             03-23-07  03-30-07        124.75        124.75           0.00  C
  401442    888  TENNESSEE GALVANIZING        03-23-07  03-30-07        399.30        399.30           0.00  C
  401457  33367  LAWSON STEEL, INC.           03-27-07  03-30-07      56476.66      56476.66           0.00  C
  401460    834  NUCOR - DARLINGTON           03-27-07  03-30-07      14623.56      14623.56           0.00  C
                                                                 -------------  -------------  -------------

                                                                     144160.63     144160.63           0.00

                                                                 =============  =============  =============

                                                                     144160.63     144160.63           0.00
```

Unatco Submission
Exhibit 11
p. 12

Andes Metal Processors                                09:22:42 07-26-07        PAGE    1
                A C C O U N T S   P A Y A B L E   R E C O N C I L I A T I O N   R E P O R T

| CHK/CLRD DATE | VENDOR NAME............. | INVOICE # | AMOUNT PAID | DISCOUNT TAKEN  TP | CHECK NUMBER | CHECK AMOUNT | DISCOUNT AMOUNT | EXPENSE G/L ACCT. | GL AMOUNT DISTRIBUTED |
|---|---|---|---|---|---|---|---|---|---|
| 03/30/07 | 05518-Equipment Depot | 05309705 | 234.24 | 0.00 M | 58090 | 720.07 | 0.00 | 001*2000*0200 | -234.24 |
|  |  |  |  |  |  |  |  | 001*6305*0250 | 234.24 |
|  |  | 05309783 | 485.83 | 0.00 | 58090 |  |  | 001*2000*0200 | -485.83 |
|  |  |  |  |  |  |  |  | 001*6305*0250 | 485.83 |
| 03/30/07 | 05580-Aerowave Technologi | 30042309 | 72.30 | 0.00 M | 58091 | 110.11 | 0.00 | 001*2000*0200 | -72.30 |
|  |  |  |  |  |  |  |  | 001*6555*0270 | 72.30 |
|  |  | 30042469 | 37.81 | 0.00 | 58091 |  |  | 001*2000*0200 | -37.81 |
|  |  |  |  |  |  |  |  | 001*6555*0270 | 37.81 |
| 03/30/07 | 05658-Aramark Uniform Ser | 5518894450 | 104.61 | 0.00 M | 58093 | 104.61 | 0.00 | 001*2000*0200 | -104.61 |
|  |  |  |  |  |  |  |  | 001*6411*0231 | 104.61 |

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| CLEARED DATE TOTALS | 934.79 | 0.00 |  | 934.79 | 0.00 |  | 0.00 |
| REPORT TOTALS | 934.79 | 0.00 |  | 934.79 | 0.00 |  | 0.00 |

CLEARED - CLEAR DATES: 03/30/07 - 03/30/07

Orrado Submission
Exhibit 11
p. 13

```
03 Aug 2007                        Kingway Corporation                              Page    1
15:27:59                    Detailed General Ledger Report                         GLBAL.R2
                                    Period 3 2007
                                    (March 2007)


Account#....  Description.............  Tr#...  Tr.date.  Jrnl  Debit.Amount..  Credit.Amt....  Balance.......

0-00-2600-00  Current - B of A Revolver                                                          -8,632,220.27
              Bank Activity  account  xxx  10105  03-30-07  102                  -7,386,188.81
              Bank Activity  account  xxx  10108  03-30-07  107  7,816,696.68
              Revolver  activity            10109  03-30-07  108                    -185,507.46
              Revolver  activity            10109  03-30-07  108                     -80,492.50
              Revolver  activity            10109  03-30-07  108                     -23,674.17   -8,491,386.53
```

Tobacco Submission
Exhibit 11
p. 14

```
05 Apr 2007                      Kingway Corporation                          Page    1
15:45:06                       G/L Transaction Listing                        GLTRANS.R4
                          for Transaction 10109 through 10109
```

| Trans# | Date.... | Posted.. | Jnl# | Li#. | Account..... | Acct.Description........ | Notes.................... | Debit.Amt.... | Credit.Amt... |
|--------|----------|----------|------|------|--------------|--------------------------|---------------------------|---------------|---------------|
| 10109  | 03-30-07 | 04-05-07 | 108  |      |              |                          |                           |               |               |
|        | Revolver activity |   |      | 1    | 0-00-2260-00 | Accrued Interest-Current | Interest - Bank of        | 185,507.46    |               |
|        |          |          |      | 2    | 0-00-2600-00 | Current - B of A Revolver | Interest - Bank of       |               | 185,507.46    |
|        |          |          |      | 3    | 0-00-2710-00 | Long - B of A Loan A     | Principal pmt - Term A    | 80,492.50     |               |
|        |          |          |      | 4    | 0-00-2600-00 | Current - B of A Revolver | Principal pmt - Term A   |               | 80,492.50     |
|        |          |          |      | 5    | 0-00-2750-00 | Long - ACAS Loan B-1     | Principal pmt - Term B-1  | 23,674.17     |               |
|        |          |          |      | 6    | 0-00-2600-00 | Current - B of A Revolver |                           |               | 23,674.17     |

```
                                                                     --------------  --------------
                                                                         289,674.13      289,674.13

                                                                     ==============  ==============
                                                                         289,674.13      289,674.13
```

Unarco Submission
Exhibit 11
p. 15

ungway
Detail of Bank of America Revolver Loan Activity
General Ledger Account Number 0-00-2600-00

JE Reference: 108
Prepared MM 04/04/07
Trans # 1 to 9

| Date | ZBA Activity from Lockbox 4746 | ZBA Activity from account 4759 | Interest Payments | Bank of America Principal Payments | ACS Term B-1 Principal Payments | ACS Term C Principal Payments | Fees & Other | Balance |
|---|---|---|---|---|---|---|---|---|
| 02/28/07 | | | | | | | | (8,632,220.27) |
| 03/01/07 | 57,484.31 | (518,036.01) | (52,228.68) | (80,492.50) | (23,674.17) | | | (9,249,167.32) |
| 03/01/07 | | | (19,664.68) | | | | | (9,268,832.00) |
| 03/01/07 | | | (86,277.42) | | | | | (9,355,109.42) |
| 03/01/07 | | | (27,336.68) | | | | | (9,382,446.10) |
| 03/02/07 | 420,321.28 | (388,245.65) | | | | | | (9,350,370.47) |
| 03/05/07 | 221,117.75 | (309,143.94) | | | | | | (9,438,396.66) |
| 03/06/07 | 56,480.37 | (233,371.70) | | | | | | (9,615,287.99) |
| 03/07/07 | 631,528.50 | (427,734.31) | | | | | | (9,411,493.80) |
| 03/09/07 | 238,692.12 | (563,847.22) | | | | | | (9,738,048.90) |
| 03/09/07 | 410,205.81 | (215,578.08) | | | | | | (9,544,021.17) |
| 03/12/07 | 403,969.13 | (346,878.80) | | | | | | (9,486,930.84) |
| 03/13/07 | 1,216,393.72 | (330,428.23) | | | | | | (8,600,965.35) |
| 03/14/07 | 178,267.40 | (580,311.72) | | | | | | (9,003,009.67) |
| 03/15/07 | 64,046.12 | (333,000.34) | | | | | | (9,271,963.89) |
| 03/16/07 | 231,777.54 | (268,526.75) | | | | | | (9,308,713.10) |
| 03/19/07 | 25,189.74 | (104,246.91) | | | | | | (9,387,770.27) |
| 03/20/07 | 448,131.38 | (318,436.78) | | | | | | (9,258,075.67) |
| 03/21/07 | | (227,485.32) | | | | | | (9,485,560.99) |
| 03/22/07 | 299,286.00 | (522,861.60) | | | | | | (9,709,136.59) |
| 03/23/07 | 13,568.33 | (170,706.08) | | | | | | (9,866,274.34) |
| 03/26/07 | 606,943.15 | (210,081.24) | | | | | | (9,469,412.43) |
| 03/27/07 | 1,120,925.11 | (66,355.94) | | | | | | (8,414,843.26) |
| 03/28/07 | 653,742.92 | (195,979.92) | | | | | | (7,957,080.26) |
| 03/29/07 | 277,146.54 | (591,017.91) | | | | | | (8,270,951.63) |
| 03/30/07 | 243,479.46 | (463,914.36) | | | | | | (8,491,386.53) |
| Totals | 7,816,696.68 | (7,386,188.81) | (185,507.46) | (80,492.50) | (23,674.17) | 0.00 | 0.00 | (8,491,386.53) |

|  | Account No. | Amount |
|---|---|---|
| Interest Exp B of A | 0-00-2260-00 | 185,507.46 |
|  | 0-00-2600-00 | (185,507.46) |
|  |  | 0.00 |
| Principal Pmt B of A | 0-00-2710-00 | 80,492.50 |
|  | 0-00-2600-00 | (80,492.50) |
|  |  | 0.00 |

|  | Account No. | Amount |
|---|---|---|
| Principal Pmt Term B-1 | 0-00-2750-00 | 23,674.17 |
|  | 0-00-2600-00 | (23,674.17) |
| Principal Pmt Term C | 0-00-7320-82 | 0.00 |
|  | 0-00-2600-00 | 0.00 |

|  | Account No. | Amount |
|---|---|---|
| Hash Total |  | 289,674.13 |

# EXHIBIT 12



| Check Info | |
|---|---|
| Account: | 3299120149 |
| Amount: | 28,000.00 |
| Check #: | 402089 |
| Posted Date: | 08/01/2007 |

Bank of America, N.A. Member FDIC.
©2005 Bank of America Corporation. All rights reserved.

II(c).          **Disputed Item:**   *Estimated Purchase Price*

**Dispute:**      *Buyer And Seller Used Different Estimated Purchase Prices In The Draft Computation And Objection Notice, Respectively.  The Estimated Purchase Price In Seller's Objection Notice Is Based On Incorrect Information.*

The Estimated Purchase Price on Buyer's Draft Computation is **$5,571,379**.  The Estimated Purchase Price on Seller's Objection Notice is **$3,175,971.60**.  The difference between Buyer and Seller (**$2,395,408**) results from the fact that the Seller used the wrong Estimated Indebtedness Payoff Amount and the wrong amount of the excess of Target Net Working Capital over Estimated Net Working Capital to calculate the Estimated Purchase Price.[4]

Specifically, based upon the Estimated Purchase Price in the Objection Notice, Seller used an Indebtedness Payoff Amount of **$33,659,516** and (**$982,015**) as the amount of the excess of Target Net Working Capital over Estimated Net Working Capital.  These erroneous amounts were apparently taken from a "Flow of Funds" spreadsheet prepared by Seller's counsel on March 27, 2007 (Exhibit 13).  First, with respect to the amount of the excess of Target Net Working Capital over Estimated Net Working Capital, Seller erroneously used the unadjusted Estimated Net Working Capital amount instead of the "Estimated Net Working Capital Amount after adj" in its Estimated Purchase Price calculation.  Second, the Indebtedness Payoff Amount indicated on the March 27, 2007 spreadsheet was subsequently amended by counsel to the Seller on March 30, 2007.  The amended spreadsheet, sent by Seller's counsel on March 30, 2007 (Exhibit 14), contains the correct numbers, **$31,773,462** (Indebtedness Payoff Amount) and (**$472,662**) (+/-Target Net Working Capital/Estimated Net Working Capital).  These are the amounts that were used to derive the actual amount funded at closing and thus are the amounts that must be used to calculated the Estimated Purchase Price.

Attached as Exhibit 15 is a reconciliation of the parties respective calculations of the Estimated Purchase Price.

---

[4] Section 2.04 of the SPA (Appendix C) provides that "Estimated Purchase Price means an amount equal to (A) $40,000,000.00 (the 'Transaction Value'), (B) plus, the Estimated Cash Amount, (C) less the Estimated Indebtedness Payoff Amount, (D) less the Closing Management Bonuses, and (E) plus the excess of the Estimated Net Working Capital Amount over the Target Net Working Capital Amount or minus the excess of the Target Net Working Capital Amount over the Net Working Capital Amount."

# EXHIBIT 13

Unarco Submission
Exhibit 13
p. 1

From: Stovall, Fred [mailto:FStovall@PattonBoggs.com]
Sent: Tuesday, March 27, 2007 9:05 PM
To: Legault, Jeffrey; Ryan [PTN], Mike; rfay@rencogrp.com;
mkoenig@rencogrp.com; arennert@rencogrp.com
Cc: Moore, Craig; O'Brien, Gordon; Fessenden, Elizabeth; Pollack,
Kenneth; Fuller, Ross; Lefkowitz, Joshua; Jim Levine; Walter Cisowski;
Smith, Paul W.; mhowell@downer.com; Edward Raffoni
Subject: Estimated Financial Data


Gentlemen:

Attached is a spreadsheet prepared by the Company that includes the
Estimated Cash Amount, Estimated Indebtedness Payoff Amount and
Estimated Net Working Capital Amount pursuant to Section 2.01 of the
Securities Purchase Agreement. Please be advised that the Estimated
Cash Amount, Estimated Indebtedness Payoff Amount and Estimated Net
Working Capital Amount represent the Company's diligent and good faith
estimates, reasonably compiled from currently available financial
information of the Company. However, the Company believes that there
will be some difference between the estimated amounts and the actual
amounts at closing.

Also included in the attached spreadsheet is draft funds flow
information. The funds flow information is not required to be provided
by the Company pursuant to the Securities Purchase Agreement. The
Company is providing the funds flow information to facilitate the
closing on March 30, but the funds flow information is in draft form and
you should not rely on the funds flow information as final or
conclusive. The funds flow information remains subject to revision in
all respects based on the Company's further review.

Best regards,

Fred Stovall

Unarco Submission
Exhibit 13
p. 2

<<Estimated Fin Data and Funds Flow 03-27-07.xls>>

DISCLAIMER:
This e-mail message contains confidential, privileged information intended
solely for the addressee.  Please do not read, copy, or disseminate it
unless you are the addressee.  If you have received it in error, please call
us (collect) at (202) 457-6000 and ask to speak with the message sender.
Also, we would appreciate your forwarding the message back to us and
deleting it from your system.  Thank you.

This e-mail and all other electronic (including voice) communications from
the sender's firm are for informational purposes only.  No such
communication is intended by the sender to constitute either an electronic
record or an electronic signature, or to constitute any agreement by the
sender to conduct a transaction by electronic means.  Any such intention or
agreement is hereby expressly disclaimed unless otherwise specifically
indicated.  To learn more about our firm, please visit our website at
http://www.pattonboggs.com.

Unarco Submission
Exhibit 13
p. 3

**Kingway - Consolidated**
Estimated Net Working Capital Amount
Estimated Cash Amount
Estimated Indebtedness Payoff Amount

| | 12 Dec-06 Actual | 3 Mar-07 Forecast | Variance from Dec-06 |
|---|---|---|---|
| **Net Estimated Working Capital Amount Calculation** | | | |
| **(in thousands)** | | | |
| Net Accounts Receivable | $ (4,596,077) | $ (11,034,004) | $ (6,390,927) |
| Net Inventory | $ 14,747,323 | $ 16,333,255 | $ 585,932 |
| Prepaid Expenses | $ 7,460,594 | $ 568,000 | $ 107,416 |
| Total Current Assets | $ 19,902,394 | $ 17,155,460 | $ (2,697,525) |
| | | | |
| Accounts Payable-Trade | $ (12,794,212) | $ (11,619,307) | $ (1,170,866) |
| Accrued Expenses & Other Liabilities | $ (2,372,845) | $ (2,301,078) | $ (711,990) |
| Unearned Revenue | $ (792,173) | $ (267,043) | $ 485,130 |
| Total Current Liabilities | $ (16,910,030) | $ (14,187,475) | $ (727,465) |
| | | | |
| **Estimated Net Working Capital Amount** | $ 3,887,964 | $ 2,917,985 | $ (969,970) |
| | | | |
| Working Capital Adjustments | $ 509,354 | $ 509,354 | $ 509,354 |
| | | | |
| **Estimated Net Working Capital Amount after Adj** | $ 3,887,964 | $ 3,427,338 | $ (460,616) |

| **Estimated Working Capital Adjustments** | | |
|---|---|---|
| Downer & Company | $ | 35,285 |
| Patton Boggs Fees | $ | 150,697 |
| Golder Fees | $ | 32,351 |
| BDO Fees | $ | 30,000 |
| ACAS Accrued Interest | $ | 121,400 |
| ACAS Management Fees | $ | 125,000 |
| ACAS Travel expenses accrual | $ | 14,671 |
| | $ | 509,354 |

**Estimated Cash Amount at Closing**   estimate   60,000.00

**Estimated Indebtedness Payoff Amount**   estimate   33,659,516.40

1 of 11

Unarco Submission
Exhibit 13
p. 4

Sources & Uses

### Kingway: Project Steel
### Purchase Price and Flow of Funds Schedule
### Assumes Payoff Date of 03/30/07

## SOURCE of FUNDS

| | | |
|---|---|---|
| Purchase Price or Transaction Value | | 40,000,000.00 |
| | | |
| Adjustments to Purchase Price | | |
| Plus: Estimated Cash Amount at Closing | estimate | 60,000.00 |
| Estimated Change from Target Net Working Capital | estimate | (460,616.07) |
| **Total Adjustments** | | (400,616.07) |
| **TOTAL SOURCE OF FUNDS** | | 39,599,383.93 |

## USE of FUNDS

| Renco Flow of Funds | | | Purpose |
|---|---|---|---|
| Wire to PNC Bank | actual | 4,000,000.00 | Initial and Extended Escrow |
| Wire to Bank of America N.A. | estimate | 13,139,703.90 | Indebtedness payoff |
| Wire to North Texas CDC | actual | 345,722.77 | Indebtedness payoff |
| Wire for Capital Leases | estimate | 76,328.98 | Indebtedness payoff |
| Wire to Downer & Company | actual | 860,235.33 | Transaction investment banker fees & expenses |
| Wire to Patton Boggs | actual | 150,696.90 | Transaction legal fees for Kingway |
| Wire to Golder | actual | 32,351.17 | Transaction environment fees for Kingway |
| Wire to BDO | actual | 30,000.00 | Transaction tax advisory fees |
| Wire to Jim Levine | actual | 781,102.61 | Management incentive bonus |
| Wire to Walter Cisowski | actual | 363,201.35 | Management incentive bonus |
| Wire to Byron Daniels | actual | 303,326.15 | Management incentive bonus |
| Wire to Gregory Christy | actual | 35,918.24 | Management incentive bonus |
| Wire to ADP | actual | 758,948.82 | Withholding taxes on management incentive bonus |
| Wire to American Capital Strategies Ltd | residual | 18,721,847.71 | Indebtedness payoff |
| **Total Renco USE of Funds** | | **39,599,383.93** | |

Unarco Submission
Exhibit 13
p. 5

### Kingway: Project Steel
### Estimated Indebtedness Payoff Amount
### Assumes Payoff Date of 03/30/07

| | | |
|---|---|---|
| RLOC BofA | *estimate* | $9,500,000.00 |
| Senior BofA | *calculated* | $3,639,703.90 |
| SBA Loan | **actual** | $345,722.77 |
| Capital Leases | *estimate* | $76,328.98 |
| ACAS Sr Debt Term Loan B | **actual** | $2,019,181.07 |
| ACAS Sr Debt Note C | **actual** | $5,426,059.04 |
| ACAS Jr Sub Debt Series A | **actual** | $4,214,668.31 |
| ACAS Jr Sub Debt Series B | **actual** | $4,217,506.45 |
| ACAS Jr Sub Debt Series C | **actual** | $4,220,345.89 |
| | | **$33,659,516.40** |

# EXHIBIT 14

Unarco Submission
Exhibit 14
p. 1

Attachments: DALLAS-#414903-v4-Funds_Flow_Spreadsheet_for_Closing.XLS

From: Smith, Paul W. [mailto:PSmith@PattonBoggs.com]
Sent: Friday, March 30, 2007 10:42 AM
To: Legault, Jeffrey; Brewer, Lori; Ilzhoefer, Starr
Cc: Stovall, Fred
Subject: Final Funds Flow

Jeff,

Just to make it clear that the Management Bonus Payments were being made
on behalf of KIC Holdings, LLC, I updated the funds flow spreadsheet in
description of each corresponding entry, which is highlighted.  I also
removed all previous highlights.  No other changes were made.

Can you confirm that you have agreed to use the letter we prepared last
night to attach to the funds flow spreadsheet?

Please call to update on status when you are available.

Thanks,

Paul

Paul W. Smith
Of Counsel
Patton Boggs LLP
2001 Ross Avenue, Ste. 3000
Dallas, Texas  75201
Direct Dial:    214-758-3521
Fax:          214-758-1550
Mobile: 972-689-7229
  <<DALLAS-#414903-v4-Funds_Flow_Spreadsheet_for_Closing.XLS$>>

*Kingway: Project Steel*
*Flow of Funds Schedule*
*Assumes Payoff Date of 03/30/07*

**Kingway: Project Steel**
**Purchase Price**

| | |
|---|---:|
| Target Net Working Capital | 3,900,000.00 |
| Estimated Net Working Capital | 3,427,338.40 |
| | |
| **Purchase Price or Transaction Value** | **40,000,000.00** |
| | |
| Adjustments to Purchase Price | |
| (A) Plus: Estimated Cash at Closing | estimate | 60,000.00 |
| (B) Estimated Change in Target Net Working Capital | estimate | (472,661.60) |
| **Total Adjustments** | | (412,661.60) |
| | |
| **Sources of Funds** | **39,587,338.40** |

**USE of FUNDS**

| Rence Flow of Funds | | | Amount | Purpose |
|---|---|---|---:|---|
| Wire to PNC Bank | actual | | 4,000,000.00 | Initial and Extended Escrow |
| Wire to Bank of America N.A. | actual | | 19,310,275.07 | Indebtedness payoff |
| Wire to Colson Services Corp. - SBA Loan | actual | | 345,722.77 | Indebtedness payoff |
| Wire to American Capital Strategies Ltd | actual | | 12,018,301.09 | Indebtedness payoff |
| Wire to Great American Leasing (Corp) | actual | | 46,896.94 | Indebtedness payoff (Capital Lease) |
| Wire to Citi Capital (Ohio) | actual | | 19,314.45 | Indebtedness payoff (Capital Lease) |
| Wire to NMHG (Atlanta) | actual | | 19,403.84 | Indebtedness payoff (Capital Lease) |
| Wire to Amano Business Credit (Ardes) | actual | | 7,815.89 | Indebtedness payoff (Capital Lease) |
| Wire to FirstCorp (Dallas) | actual | | 5,752.03 | Indebtedness payoff (Capital Lease) |
| Wire to Downer & Company | actual | | 860,235.53 | Transaction investment banker fees & expenses |
| Wire to Patton Boggs | actual | | 150,696.80 | Transaction legal fees for Kingway |
| Wire to Golder | actual | | 32,351.17 | Transaction environment fees for Kingway |
| Wire to BDO | actual | | 30,000.00 | Transaction tax advisory fees |
| Wire to Kingway Inca Clymer Holdings Inc | actual | | 498,095.75 | Remaining Purchase Price |
| Wire to Jim Levine | actual | | 781,102.61 | Management incentive bonus on behalf of KIC Holdings, LLC |
| Wire to Walter Olsowski | actual | | 363,201.35 | Management incentive bonus on behalf of KIC Holdings, LLC |
| Wire to Byron Daniels | actual | | 303,326.15 | Management incentive bonus on behalf of KIC Holdings, LLC |
| Wire to Gregory Christy | actual | | 35,918.24 | Management incentive bonus on behalf of KIC Holdings, LLC |
| Wire to ADP | actual | | 758,948.82 | Withholding taxes on management incentive bonus on behalf of KIC Holdings, LLC |
| | | | | |
| **Total Rence USE of Funds** | | | **39,587,338.40** | |

# EXHIBIT 15

Unarco Submission
Exhibit 15

Unarco Material Handling, Inc.
Reconciliation of Estimated Purchaase Price
March 30, 2007

|   |   | Seller per Objection Notice | Funded at Closing |
|---|---|---|---|
| A | Transaction Value | 40,000,000.00 | 40,000,000.00 |
| B | plus Estimated Cash Amount | 60,000.00 | 60,000.00 |
| C | less Estimated Indebtedness Payoff Amount | (33,659,516.40) | (31,773,462.00) |
| D | less Estimated Closing Management Bonuses | (2,242,497.17) | (2,242,497.17) |
| E | plus/minus Target NWC as Compared to Est NWC | (982,015.35) | (472,661.60) |
| | Estimated Purchase Price | 3,175,971.08 | 5,571,379.23 |

**III.**        **Conclusion**

Based on the above and according to Section 2.04 of the SPA, Seller owes Buyer **$4,712,537**. Attached as Exhibit 16 are calculations of the net post closing adjustment reflecting the amount owed by Seller to Buyer.

# EXHIBIT 16

**Unarco Material Handling, Inc.**
**Buyer's Calculation of Net Post Closing Adjustment, as per § 2.04 (b)**


**Computation Of Actual Purchase Price, as per § 2.04 (see Exhibit 1)**

| | | |
|---|---:|---:|
| Transaction Value | | $ 40,000,000 |
| Plus Cash Amount | | 67,573 |
| Less Indebtedness Payoff Amount | | (31,773,462) |
| Less Closing Management Bonuses | | (2,242,497) |
| Less Net Working Capital Adjustment | | |
| | | |
| Net working capital as computed by Buyer* | -1,292,772 | |
| Targeted net working capital | -3,900,000 | ($5,192,772) |
| | | |
| **Actual Purchase Price** | | **858,842** |


**Computation Of Estimated Purchase Price, as per § 2.04**

| | |
|---|---:|
| Transaction Value | 40,000,000 |
| Plus Estimated Cash Amount | 60,000 |
| Less Indebtedness Payoff Amount | -31,773,462 |
| Less Estimated Closing Management Bonuses | -2,242,497 |
| plus/minus Target NWC as Compared to Est NWC | -472,662 |
| | |
| **Estimated Purchase Price** | **5,571,379** |


**Net Post Closing Adjustment, as per § 2.04(b)(ii)**

| | |
|---|---:|
| Estimated Purchase Price | 5,571,379 |
| Less Actual Purchase Price | 858,842 |
| | |
| **Difference Owed to Buyer** | **4,712,537** |


*see* Exhibit 2

Unarco Submission
Exhibit 16
p. 2

**Unarco Material Handling, Inc.**
**Buyer's Reconciliation of Differences in**
**Calculation of Net Post Closing Adjustment, as per § 2.04 (b)**
**(Note:  See Exhibit 1 for Computation of Actual Purchase Price Amount)**

| | | | |
|---|---|---|---|
| Seller's Calculation of Net working capital, per objection notice | $ | 3,030,510 | |
| Less: Estimated net working capital, per closing statement | | 3,427,338 | |
| | | | $    (396,828) |
| | | | |
| Account receivable | | (134,401) | |
| Prepaid expenses | | (150,457) | |
| Accrued vacation | | (343,639) | |
| Petsmart claim | | (19,596) | |
| Revolver account liability at transaction date | | (220,435) | |
| WISE intallation claim | | (28,000) | |
| Accrued sales tax | | (3,317,608) | |
| Unearned revenue | | (109,146) | |
| Differences in net working capital calculated by buyer | | | (4,323,282) |
| | | | |
| Seller's Calculation of Cash, per objection notice | | 1,148,273 | |
| Less: Estimated Cash, per closing statement | | 60,000 | |
| | | | 1,088,273 |
| | | | |
| Outstanding checks | | | (1,080,700) |
| | | | |
| **Net amount owed to buyer** | | | **$    (4,712,537)** |

# ARNOLD & PORTER LLP

202.942.5000
202.942.5999 Fax

555 Twelfth Street, NW
Washington, DC 20004-1206

October 23, 2007

**<u>Via Federal Express and E-mail</u>**

J. Christopher Forhecz, Partner
PricewaterhouseCoopers LLP
1301 K. Street, N.W. Suite 800W
Washington, DC 20005-3333

   *Re:* *Post-Closing Adjustment*

Dear Mr. Forhecz:

  Enclosed, please find the Statement of Position of Seller Kingway Inca Clymer Holdings Inc., with accompanying exhibits, pursuant to the engagement letter dated October 5, 2007, among PricewaterhouseCoopers LLP, Kingway Inca Clymer Holdings Inc., and Unarco Material Handling, Inc.

  Please do not hesitate to contact me if you have any questions.

     Sincerely,

     John C. Massaro

cc: Josh Weiss
  Cadwalader, Wickersham & Taft LLP
  One World Financial Center
  New York, NY 10281
  (212) 504-6225

Washington, DC New York London Brussels Los Angeles Century City Northern Virginia Denver

**STATEMENT OF POSITION
OF SELLER KINGWAY INCA CLYMER HOLDINGS INC.**

## TABLE OF CONTENTS

SUMMARY COMPARISON ...................................................................... ii

INTRODUCTION............................................................................................ 1

BACKGROUND .............................................................................................. 1

THE POST-CLOSING ADJUSTMENT PROCESS AND THE ROLE OF THE FIRM...... 3

SUMMARY OF ADJUSTMENTS IN DISPUTE ....................................... 9

DISCUSSION OF THE ISSUES ................................................................ 11

I.    NET WORKING CAPITAL AMOUNT – $5,602,671 IN DISPUTE........................... 11

    A.    SALES TAX ACCRUAL – $4,732,213 IN DISPUTE............................... 11
    B.    VACATION ACCRUAL – $344,000 IN DISPUTE.................................... 18
    C.    PETSMART – $200,000 IN DISPUTE .................................................... 21
    D.    ACCOUNTS RECEIVABLE ALLOWANCE – $133,401 IN DISPUTE ................. 22
    E.    PREPAID TRADESHOW EXPENSE – $125,457 IN DISPUTE .................... 23
    F.    OSHA VIOLATION – $39,600 IN DISPUTE ........................................... 25
    G.    WISE INSTALLATION – $28,000 IN DISPUTE ...................................... 26

II.    ESTIMATED PURCHASE PRICE – $2,395,408 IN DISPUTE ................................... 27

CONCLUSION .............................................................................................. 30

## SUMMARY COMPARISON

| Item | Seller's Position | Buyer's Position |
|---|---|---|
| Transaction Value | $40,000,000 | $40,000,000 |
| Cash Amount | $67,573 | $67,573 |
| Indebtedness Payoff Amount | $31,773,462 | $31,773,462 |
| Closing Management Bonuses | $2,242,497 | $2,242,497 |
| Target Net Working Capital | $3,900,000 | $3,900,000 |
| Actual Net Working Capital | $2,675,289 | ($2,927,382) |
| Estimated Purchase Price | $3,175,971.60 | $5,571,379.60 |
| **ACTUAL PURCHASE PRICE** | **$4,826,903** | **($775,768)** |
| **TOTAL POST-CLOSING ADJUSTMENT** | *Seller is owed* **$1,650,932.40 plus interest** | *Buyer is owed* **$6,347,147** |

## NET WORKING CAPITAL RECONCILIATION

**Seller's Claimed Net Working Capital:**          $ 2,675,289

**Buyer's Proposed Adjustments in Dispute:**

|  |  |
|---|---|
| Sales Tax Accrual- | ($4,732,213) |
| Vacation Accrual- | ($  344,000) |
| Petsmart- | ($  200,000) |
| Prepaid Tradeshow Expense | ($  125,457) |
| OSHA Violation- | ($   45,000) |
| WISE Installation- | ($   28,000) |

**Seller's Proposed Adjustments in Dispute:**

|  |  |
|---|---|
| Accounts Receivable Allowance- | $  133,401 |
| OSHA Violation- | ($    5,400) |

**Buyer's Claimed Net Working Capital:**          ($2,927,382)

ii

## INTRODUCTION

This is a post-closing adjustment dispute between Kingway Inca Clymer Holdings Inc. ("Seller") and Unarco Material Handling, Inc. ("Buyer") relating to a transaction involving the sale of all of the membership interests of KIC Holdings, LLC, the successor to KIC Holdings, Inc. ("Company"). This is Seller's initial submission in support of its position.[1]

The parties differ markedly. Buyer has proposed post-closing adjustments to the Company's historical accounting that would have the effect of creating a <u>negative</u> purchase price. In other words, it is Buyer's position that it should not pay any money to Seller for the purchase of the Company and that, in fact, Seller agreed both to give Buyer all of its interests in the Company and also to give Buyer money for having accepted those interests.[2] By contrast, Seller contends that the formula set forth in the parties' agreement – when properly applied and calculated according to the methodology set forth in the agreement – results in an Actual Purchase Price of $4,826,903 plus interest, with Buyer owing Seller $1,650,932.40.

## BACKGROUND

In the winter of 2006/2007, a financial adviser to Seller circulated an information memorandum offering to sell the Company. Buyer and other potential purchasers conducted extensive due diligence in connection with the sale process. Ultimately, Seller, Buyer, and the Company entered into a Securities Purchase Agreement dated March 9, 2007 (the "Agreement") pursuant to which Buyer agreed to purchase all of the membership interests in the Company.[3] The transaction closed 21 days later, on March 30, 2007. In connection with the Closing, and as contemplated by the Agreement, the parties also entered into an Escrow Agreement dated March 30, 2007.[4]

As part of the Agreement, the parties agreed that the Company would determine an "Estimated Purchase Price" and submit that to the parties three days prior to Closing.[5] The Estimated Purchase Price was $3,175,971.60.[6] The Agreement also specifies that the "Actual

---

[1] Throughout this submission we use capitalized terms. When not otherwise defined, we intend to refer to the definitions of these terms contained in the Securities Purchase Agreement dated March 9, 2007 ("Agreement") (Exhibit 1 hereto).

[2] One major issue of contention is Buyer's attempt to collect roughly $4.7 million, which, it asserts, the Company owed in sales and use taxes as of March 29, 2007. As explained herein, that claim as baseless, and, on August 3, 2007, Buyer informed Seller that it had conducted a new analysis of the sales tax issue and that it would be revising its position accordingly. Buyer has not provided that revised position to us as of this writing.

[3] *See generally* Agreement (Ex. 1).

[4] *See* Escrow Agreement (Exhibit 2 hereto).

[5] *See* Agreement at Section 2.01 (Ex. 1).

[6] *See, e.g.,* 3/27/07 E-Mail from Fred Stovall to Jeffrey Legault, *et al.*, (Exhibit 3 hereto); *see also* Agreement at Section 2.01 (Ex. 1).

Purchase Price" must be calculated as of the Closing Date from information determined as part of the post-closing adjustment process.[7]  Actual Purchase Price is defined as:

> (A) the Transaction Value,  (B) plus the Cash Amount,  (C) less the Indebtedness Payoff Amount,  (D) less the Closing Management Bonuses, and (E) plus the excess of Net Working Capital Amount over the Target Net Working Capital Amount or minus the excess of the Target Net Working Capital Amount over the Net Working Capital Amount, in each case as finally determined pursuant to this Section 2.04 [of the Agreement].[8]

The Agreement then calls for a payment to occur:

> . . . If the Actual Purchase Price is greater than the Estimated Purchase Price . . . the Buyer shall pay to the Seller . . . an amount equal to such difference plus simple interest thereon, at an interest rate equal to 8% from the Closing Date to the date of payment, computed on an annual basis using a 360-day year.

> . . . If the Actual Purchase Price is less than the Estimated Purchase Price . . . the Seller shall pay to the Buyer . . . an amount equal to such difference plus simple interest thereon, at an interest rate equal to 8% from the Closing Date to the date of payment, computed on an annual basis using a 360-day year. . . .[9]

The Agreement sets forth strict procedures governing the post-closing adjustment process.  The Buyer was obligated, within 60 days of the Closing, to submit to Seller:

> (i) the Buyer's determination of the Cash Amount, the Indebtedness Payoff Amount and the Net Working Capital Amount, and (ii) the Buyer's calculations of the Actual Purchase Price (as defined [above]) (collectively, the "Draft Computation").[10]

The Buyer was also obligated to:

> Make available to the Seller and its auditors all records and work papers used in preparing the Draft Computation, and [to] prepare

---

[7] *See* Agreement at Section 2.04 (Ex. 1).

[8] Agreement, Section 2.04 (Ex. 1).

[9] Agreement, Section 2.04(b) (Ex. 1).

[10] Agreement, Section 2.04(a) (Ex. 1).

and deliver to Seller a detailed breakdown of the calculations used
to determine the amounts set forth in the Draft Computation.[11]

On May 24, 2007, Buyer sent a statement to Seller that Buyer identified as its Draft
Computation.[12] The statement was accompanied by a compilation report by Buyer's accounting
consultant. While the document does set forth Buyer's determination at that time of the Cash
Amount, the Indebtedness Payoff Amount, the Net Working Capital Amount, and the Actual
Purchase Price, the document also contains other calculations purporting to show the "total
amount owed to buyer." Tellingly, those calculations do not use any of the terms from the
Agreement and do not follow the formula set forth in the Agreement (see above) for determining
the amount owed to either party as a result of the post-closing adjustment process. We discuss in
more detail below the difference between the calculations Buyer has set forth and the actual
calculations that the Agreement expressly requires.

The bottom line was that Buyer took the position that Seller had sold all the shares of the
Company to Buyer for an Actual Purchase Price of negative $775,768.00; in other words,
according to Buyer, Seller had agreed to give Buyer the Company and also to pay Buyer for the
privilege of taking the Company. As a result of the negative purchase price and the off-
Agreement calculations reflected in the "total amount owed to buyer," Buyer claimed that it was
now owed $6,347,147.

Seller asked for the additional information required by the Agreement. Buyer provided
certain items of that information, but failed to provide others. Under the Agreement, following
receipt of this information, Seller was to provide an Objection Notice – identifying its own
determinations of Cash Amount, Indebtedness Payoff Amount, Net Working Capital Amount,
and Actual Purchase Price. On July 9, 2007, Seller provided its Objection Notice.[13] The
Agreement provided that the parties were then to attempt to resolve their disagreement for a
period of 60 days. For reasons that we will not delve into here, the parties did not resolve their
disagreement during that time.

### THE POST-CLOSING ADJUSTMENT PROCESS AND THE ROLE OF THE FIRM

The Agreement provides that the parties shall retain a decision maker to resolve any
disputes that remain after the 60 day negotiation period. The parties have retained
PricewaterhouseCoopers LLP ("Firm") as that decision maker. Under the Agreement:

> The Buyer and Seller shall use reasonable efforts to resolve any
> disagreements as to the Draft Computation and Objection Notice,
> but if they do not obtain a final resolution . . . the Buyer and Seller

---

[11] Agreement, Section 2.04(a).

[12] *See* May 24, 2007 Letter from P. Neal to C. Moore with attachments ("Draft Computation")
(Exhibit 4 hereto)

[13] *See* July 9, 2007 Letter from J. Massaro to Unarco Material Handling, Inc. with attachment
("Objection Notice") (Exhibit 5 hereto).

3

shall jointly retain Price[w]aterhouseCoopers LLP . . . to resolve any remaining disagreements. . . . The Firm may consider only those items and amounts in the Draft Computation or Objection Notice which the Buyer and Seller are unable to resolve. In resolving any disputed item, the Firm will act as an expert and not as an arbitrator in conducting its analysis, and may not assign a value to any item greater than the greatest value for such item claimed by either party or less than the smallest value for such item claimed by either party. The Firm's determination shall be based solely on written submissions by the Buyer and the Seller (i.e., not on independent review) and on the definitions included herein.[14]

The Agreement is clear about what the post-closing adjustment process is and what it is not. The Agreement is also clear about the role of the Firm in that process. Although we trust that the Firm has ample prior experience with similar language in other agreements, the topic is in fact treated differently in different agreements. There are four salient aspects of the parties' Agreement in this case that directly impact our present situation. We discuss each briefly below.

1) <u>The Primacy Of The Agreement</u>: The post-closing adjustment process is not supposed to be the equivalent of a GAAS audit or an attempt to issue GAAP-compliant financial statements for the Company as of the Closing Date. Instead, the post-closing adjustment process is one whereby the parties are to provide each other with their calculations of – and, ultimately, the Firm is to finally determine – something called the "Actual Purchase Price" and the relationship between that "Actual Purchase Price" and the fixed "Estimated Purchase Price" provided by the Company prior to Closing.[15]

The Actual Purchase Price is an artificial construct. It was created, negotiated, and agreed to by the parties. It is defined in Section 2.04 of the Agreement, and a formula is set forth there for how it is to be calculated. Other portions of the Agreement set forth more detail about how certain variables contained within the formula for Actual Purchase Price are to be calculated.[16] The definition of Actual Purchase Price itself includes a number of other defined terms that are spelled out in the Definitions Section and elsewhere in the Agreement.[17] In other words, the post-closing adjustment process is governed – first and foremost – by the terms of the Agreement. It is only by reference to those terms that one can calculate the Actual Purchase Price.

Both the Agreement itself and the retainer agreement signed by the parties and the Firm make clear that the Agreement is the key document that must dictate the answer to the disputes between the parties. For example, the Agreement provides that:

---

[14] Agreement at Section 2.04(a) (Ex. 1).

[15] *See* Agreement at Section 2.04 (Ex. 1).

[16] *See* Agreement at Exhibit A (Ex. 1).

[17] *See* Agreement at Section 1.01 (Ex. 1).

> The Firm's determination shall be based solely on written
> submissions by the Buyer and the Seller (i.e., not on independent
> review) and <u>on the definitions included herein</u>.[18]

The retainer agreement provides similarly.[19]

Buyer's Draft Computation is designed to make the reader believe that the Agreement has little or nothing to say about the parties' disputes. For example, the key comparison that the Agreement provides must occur is a comparison of Estimated Purchase Price to Actual Purchase Price. But nowhere in Buyer's Draft Computation does the phrase "Estimated Purchase Price" appear. Instead of making the comparison called for by the Agreement, Buyer performs a calculation termed "reconciliation of amount owed to buyer," which contains entirely different variables from those set forth in the Agreement. This is not an isolated incident. Buyer repeatedly ignores what the Agreement has to say and instead attempts to justify its proposed post-closing adjustments on grounds other than the terms of the Agreement. As explained below, we believe that, in doing so, Buyer is attempting to use this accounting process to arbitrate various legal grievances against Seller. The Firm has expressed an appropriate reluctance to address issues of that nature. Indeed, the Agreement prohibits it.[20]

We discuss certain of these issues throughout the rest of this submission, but we urge the Firm to bear this issue in mind with regard to each issue in dispute. The parties negotiated a highly specific set of instructions and definitions here, and it is those terms that govern. The Firm should not accept any invitation to disregard the terms of the Agreement in favor of other standards or constructs, or to expand the scope of the engagement beyond a simple comparison of Estimated Purchase Price to Actual Purchase Price.

2) <u>The Post-Closing Adjustment Process As Compared To The Indemnification Process</u>: Many of the adjustments proposed by Buyer derive from Buyer's changes to the Company's historical accounting policies. We believe that these proposed changes are inconsistent with GAAP in certain respects; Buyer contends that the new policies are consistent with GAAP. But that debate, while important, is not the key debate for purposes of the post-closing adjustment process.

The post-closing adjustment process is fundamentally a "true up" in which the financial information which formed the basis for the terms of the Agreement and the Closing is updated to reflect any changed events or facts that existed as of the Closing Date but were not reflected in the financial data at that time for one reason or another. The fundamental comparisons required by the post-closing adjustment process are comparisons of the Estimated Purchase Price with the Actual Purchase Price and comparisons of Target Net Working Capital to Estimated Net

---

[18] *See* Agreement. at Section 2.04 (emphasis supplied) (Ex. 1).

[19] See 10/5/07 Retainer Letter at p. 1 (Ex. 6 hereto).

[20] *See* Agreement at Section 2.04 (Ex. 1) ("In resolving any disputed item, the Firm will act as an expert and not as an arbitrator in conducting its analysis . . . .")

Working Capital and Actual Net Working Capital. All of these comparisons are meant to be "apples to apples" comparisons. If the Estimated Purchase Price was prepared using one set of accounting practices and policies, the Actual Purchase Price should use those same policies. For example, the Agreement's definition of Net Working Capital, one of the variables in the formula for Actual Purchase Price, provides that:

> Net Working Capital shall be determined on a consolidated basis in accordance with the accounting principles and methods used in the preparation of the [December 31, 2005] Reference Balance Sheet and GAAP.[21]

In other words, it is presumed – for purposes of the post-closing adjustment process and the calculation of Net Working Capital – that the prior accounting practices of the Company as reflected in the <u>Reference Balance Sheet</u> are to be used again. To do anything else would change the post-closing adjustment process from the "true up" process that it is supposed to be into something else.

Indeed, the parties explicitly provided for the "something else" in another provision of the Agreement. Section 11.02 of the Agreement sets forth the indemnification rights of the parties. Included among these rights is a right on Buyer's part to seek indemnification from Seller relating to the non-compliance of the financial statements with GAAP.[22] If Buyer believes that information was withheld from it or that the financial statements provided to it were inaccurate or non-compliant with GAAP, the indemnification process of Section 11.02 is the proper mechanism to follow.

This is not an academic point. The parties negotiated a series of contours and conditions surrounding indemnification rights. Much negotiating energy was devoted to this topic. Specific caps and thresholds exist with regard to such rights.[23] Specific defenses to such claims were agreed upon.[24] Mitigation obligations are imposed upon the party seeking indemnification.[25] And, it was contemplated that resolution of any disputes in this area would occur in court, in the U.S. District Court for the Southern District of New York – with the full panoply of rights associated with federal litigation, including rights to documentary discovery, the presentation of witness testimony, and cross examination, to name just a few.[26]

The parties agreed that a lawsuit in federal court is the <u>exclusive</u> remedy for beach of the Agreement's numerous Representations and Warrantees, including the Representation and

---

[21] Agreement at Exhibit A (Ex. 1).

[22] See Agreement at Section 11.02(a) (indemnification rights); Section 3.09 (Financial Statement representation) (Ex. 1).

[23] *See* Agreement, Section 11.02(a)(i)-(iv) (Ex. 1).

[24] *See, e.g.*, Agreement, Section 11.02 (d), (f), (g), (k) (Ex. 1).

[25] *See* Agreement, Section 11.02(h) (Ex. 1).

[26] *See* Agreement, Section 12.07 (Ex. 1).

Warranty that the Company's financial statements have been prepared in accordance with GAAP:

> the indemnification provided by Section 11.02(a) and Section 11.02(k) shall be sole and exclusive remedy for any Losses of the Buyer . . . with respect to any misrepresentation or inaccuracy in, or breach of, any representations or warranties . . . made by the Company . . . in this Agreement . . . .[27]

The post-closing adjustment process is not an indemnification action, and it is not an arbitration proceeding. It is extremely streamlined. It involves only written submissions. There are tight deadlines.[28] There is no formal discovery. It was never designed to be an investigation of "big" issues such as the claims that Buyer is making regarding the Company's prior accounting practices and the represented-to financial statements.

Buyer's proposed adjustments should be rejected – in this context – because they do not reflect "true ups" to the Estimated Purchase Price, but instead reflect fundamental attacks on the Company's prior accounting practices – something that the streamlined post-closing adjustment process was not meant to address and that must instead be raised in the indemnification arena. By attempting to shoehorn into the post-closing adjustment process claims deriving from alleged breaches of the Company's Representations and Warranties, Buyer is inviting the firm to attempt to do more than the limited role provided for in the Agreement.

The purpose of the post-closing adjustment process is a narrow one. The funds available in escrow for indemnification claims are the source of funds for claims of the sort Buyer is making here. Buyer should not be permitted to seek recovery directly from Seller in the streamlined post-closing adjustment process for claims that are really indemnification claims. The Firm is simply not in a position to pass on those issues.

The Firm should resist Buyer's invitation to act as a trial court for its indemnification claims. It should simply follow the Agreement and complete the task of rendering its expert opinion on the required "true ups."

3) <u>Burden</u>: The Agreement's provisions speaking about the Company's prior accounting policies raise another point that has particular relevance in this matter because of the way Buyer has proceeded. With regard to a number of items, Buyer is proposing a post-closing adjustment based on changes to the Company's historical accounting policies. Those historical accounting policies and their application to the very matters that Buyer now proposes to reclassify were fully disclosed in the Company's audited financial statements, in communications with the Buyer prior to Closing, and/or in the due diligence materials provided to Buyer prior to Closing. As we

---

[27] *See* Agreement, Section 11.03(a) (Ex. 1).

[28] *See* Agreement, Section 2.04(a) (Ex. 1) ("In resolving any disputed item, the Firm will act as an expert and not as an arbitrator in conducting its analysis . . . .")

discuss elsewhere, each of these points is reason to reject Buyer's position on these matters out of hand.

But, at the very least, each of these points suggest that Buyer has a burden here. Think about what Buyer is suggesting. Buyer is proposing new accounting that would:

1. retroactively change the Company's historical accounting policies;

2. depart from what Seller and Buyer discussed prior to Closing regarding these items; and

3. supplant the accounting judgments and decisions made by responsible Company officers who were involved at the time of the events in question, and who were fully familiar with the facts and circumstances relating to these matters.

Even if Buyer were allowed to use the post-closing adjustment in this way – and it is clear from the terms of the Agreement that Buyer cannot – it would have some burden to come forward with specific proof and reasons in support of each specific item that it proposed to account for differently. In the absence of proof from either side on a point, it seems clear that the Company's prior accounting – supported by the judgments of all these knowledgeable professionals – should stand. Buyer has not even come close to meeting this burden in most instances.

For example, in the case of the sales tax issue, Buyer is proceeding largely by making incorrect and unsupported assumptions about what the sales tax obligations might be. To our knowledge, Buyer has not contacted its customers to determine if they already paid the tax or if they are exempt or if they are willing to pay it now. And, it has refused to authorize Seller to do any of these things. Buyer has also proceeded on the basis of inappropriate extrapolation – block-sampling some invoices during only one of the years in question and attempting to assert a conclusion about all invoices during all years on the basis of that non-statistical, invalid sample.[29]

In any context, that is not enough. But in this context, it is especially inadequate. Even if Buyer were allowed to use the post-closing adjustment process to revisit the Company's historical accounting policies, it would have to provide specific detailed documentary support identifying the exact matters it was contesting and evidencing exactly why they were being contested. In addition to the many other reasons why Buyer's proposed adjustments should be rejected, Buyer's proposed adjustments as to this item – and as to many others – should be rejected for the simple reason that Buyer has not come forward with affirmative and specific documentary support for its position, and, in the face of such a lack of support, the Company's historical accounting policies should govern.

---

[29] See discussion below at Section I.A.

4) <u>New Issues</u>: The Agreement is clear that Buyer had 60 days after the Closing to provide Seller with its proposed post-closing adjustments and its proposed calculation of Actual Purchase Price.[30] Those 60 days expired in May 2007. The Buyer was also obligated to provide all records and work papers used in preparing the Draft Computation and a detailed breakdown of the calculations used to determine the amounts set forth in the Draft Computation.[31] Seller then had a limited period of time to respond with its Objection Notice, and the parties then had a 60-day window during which they were supposed to be discussing "any disagreements as to the Draft Computation and the Objection Notice."[32]

Notwithstanding this, we understand from Buyer that it has recently completed an entirely new evaluation of the sales tax issue and that that entirely new evaluation will be submitted to the Firm as part of Buyer's submission contemporaneous with this submission by Seller. Since August 3, 2007, when we first learned that Buyer was undertaking this entirely new approach, we have suggested to Buyer that it provide the results to us. Buyer has not done so.

We do not know what the new analysis will say. But one thing is clear. It is too late for Buyer to be attempting any new analysis. Under the Agreement, Buyer had an express 60-day deadline. Buyer conducted an analysis – we believe an extremely flawed analysis – in support of its proposed adjustment that it provided in accordance with the deadline. The Agreement makes clear that the Firm is limited to considering "only those items and amounts in the Draft Computation and Objection Notice" that remain unresolved after the negotiation period.[33] The Agreement requires disclosure of all "records and work papers used in preparing the Draft Computation."[34] And, the entire process described above refers to the Draft Computation and its supporting papers as the universe of materials setting forth Buyer's position. Buyer must live with the rationales and bases for its position set forth in the analysis that it conducted as of the time of the Draft Computation; Buyer cannot now submit an entirely new analysis and rationale for its position. The structure of the Agreement – with its deadlines and procedures discussed above – confirms that this is true, as does the clear language of the Agreement's post-closing adjustment provisions. Finally, even setting aside the contractual provisions agreed to by both parties, this is true as a matter of basic fairness.

## <u>SUMMARY OF ADJUSTMENTS IN DISPUTE</u>

The Agreement provides that the way to ascertain what payments need to be made as a result of the post-closing adjustment process is to determine the difference between Actual Purchase Price and Estimated Purchase Price and then apply an interest factor to that

---

[30] Agreement Section 2.04 (Ex. 1).

[31] Agreement Section 2.04 (Ex. 1).

[32] Agreement Section 2.04 (Ex. 1).

[33] Agreement at Section 2.04(b) (Ex. 1).

[34] Agreement at Section 2.04(b) (Ex. 1).

difference.[35]  The parties have disputes concerning at least two general aspects of this calculation.[36]

The larger of the two general disputes is over the Net Working Capital Amount.  As discussed above, the Net Working Capital Amount is one variable that comprises the Actual Purchase Price.  The parties are disputing seven different items with respect to the Net Working Capital Amount.  These are:

| Item | Amount in Dispute | Party Proposing Adjustment |
|---|---|---|
| Sales Tax Accrual | ($4,732,213) | Buyer |
| Vacation Accrual | ($344,000) | Buyer |
| Petsmart | ($200,000) | Buyer |
| Accounts Receivable Allowance | $133,401 | Seller |
| Prepaid Tradeshow Expense | ($125,457) | Buyer |
| OSHA Violation | ($39,600) | Buyer |
| WISE Installation | ($28,000) | Buyer |

We discuss each item, in order of descending dollar value, below.  The total amount in dispute with regard to the Net Working Capital is $5,602,671.[37]

The other general dispute is over the Estimated Purchase Price.  Without stating so directly, Buyer is effectively attempting to dispute the Estimated Purchase Price.  This attempt on Buyer's part manifests itself in the calculation methodology used by Buyer.  Rather than using the formula set forth in the Agreement – subtracting the smaller of the Estimated Purchase Price or the Actual Purchase Price from the other – Buyer engages in a different calculation.  The practical effect of this different calculation is an attempt by Buyer to change the Estimated Purchase Price.  This is not allowed.  The amount in dispute in connection with this issue is $2,395,408.[38]

Note that the parties resolved several issues during the 60-day negotiation period.  These included disputes concerning three factors in the Net Working Capital Amount – a revolving line

---

[35] Agreement at Section 2.04 (Ex. 1).  Buyer did not seek an interest factor and cannot now be awarded one in the unlikely event that it is determined that Buyer is owed money in this process.  See discussion at pages 3 to 9 above regarding the role of the Firm and the limitations thereon.  Seller did seek an interest factor.  *See* Objection Notice at Page 3.

[36] We do not know for sure what position Buyer will take in its submission and believe it is possible Buyer will take positions with respect to other aspects of the calculation to which Seller would object.  If this does occur, we will object in our responsive submission.

[37] $5,602,671 is the difference between Seller's calculation of $2,675,289 and Buyer's position of ($2,927,382) and also is the sum of items I(A)-(G) below.

[38] *See* Part II, below.  This sum of $2,395,408 reflects Buyer's attempt to collect, through the post-closing adjustment process, $1,886,055 in modifications to Seller's Estimated Indebtedness Payoff Amount and $509,353 Seller's Estimated Net Working Capital.

of credit, the Company's purchases of tools and dyes, and an item denominated "unearned revenue" – as well as the Cash Amount. Set forth below are the remaining items in dispute, which total $7,998,079.[39]

**DISCUSSION OF THE ISSUES**

### I.     NET WORKING CAPITAL AMOUNT – $5,602,671 IN DISPUTE

Buyer contends that the Net Working Capital Amount is $(2,927,382); Seller contends that it is $2,675,289. The difference stems from seven different issues. We discuss these issues in descending dollar value order below. [40]

### A.     SALES TAX ACCRUAL – $4,732,213 IN DISPUTE

As explained below, and in the accompanying Expert Report of Bruce H. Davis ("Davis Expert Report") (Exhibit 7 hereto), no amount of sales tax liability was probable and reasonably estimable as of the Closing Date. Company personnel reached this conclusion in light of all of the available information, including the Company's history with respect to sales tax issues and their evaluation of the Company's then-current situation, and, accordingly, made the reasonable judgment that no accrual was appropriate for this purpose as of March 30, 2007. Buyer second-guesses this judgment in light of consulting services that Buyer procured from Crowe Chizek and Company, LLC ("Crowe"). As explained below, Crowe's work is riddled with errors, baseless assumptions, and methodological bias. No post-closing adjustment should be made on this basis.

Buyer has proposed a massive adjustment of $4,732,213. Buyer retained Crowe to provide it an assessment of sales and use tax liability existing as of March 29, 2007.[41] Crowe purportedly reviewed certain of the Company's sales-revenue information and certain of its exemption certificate documentation from 2006 and then used that information to arrive at an error ratio – *i.e.*, a percentage of its sales on which sales/use taxes should have been paid – and then used that ratio to estimate sales and use tax liability for 2004, 2005, and the first quarter of 2007. A copy of Crowe's analysis in support of Buyer's Draft Computation is attached as Exhibit 4A. Buyer then used the sum of these results to arrive at a total sales and use tax liability of $4,732,213.43 (inclusive of interest).

---

[39] This sum consists of $5,602,671 in disputed Net Working Capital and $2,395,408 in disputed Estimated Purchase Price.

[40] In our Objection Notice, we contested a number of items about which we had not been provided sufficient information as of the time the Objection Notice was due (regarding a revolving line of credit, the Company's purchases of tools and dyes, an item denominated unearned revenue, and the Cash Amount). We have since received additional information with regard to these items. We now do not contest Buyer's proposed figure for the Cash Amount ($67,573) and we and have lowered our Net Working Capital number from $3,030,510 to $2,675,289 to take into account the new information with respect to the revolving line of credit, the Company's purchase of tools and dyes, and the unearned revenue item on which we now agree with Buyer's position.

[41] We do not know why Buyer chose this date rather than the Closing Date of March 30, 2007, and dispute this choice.

11

Buyer's position is contrary to GAAP and to the terms of the Agreement in several respects.

First and foremost, a sales tax accrual as of the Closing Date is, on these facts, inconsistent with FAS 5, which supplies the applicable rules for loss accrual.[42]  Under FAS 5, it is not appropriate to accrue for a loss unless the loss is both probable (and any triggering events probable) and estimable, based on information available at the time of issuance of the financial statements:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if *both* of the following conditions are met:
>
> a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements.  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b. The amount of loss can be reasonably estimated.[43]

An essential requirement for accrual is that a loss be probable, *i.e.*, that the future event is likely to occur.  Here, the Company evaluated all of the available information and made an informed, reasonable judgment that no loss was probable as of the Closing Date.[44]  In addition, to the best of our knowledge, there have been no subsequent events indicating that any such loss is probable.  Further, the Company's judgment, along with the reasons for it, was not hidden from Buyers prior to the Closing.

The details supporting this judgment are set forth below and in the accompanying third-party expert report by Bruce H. Davis.[45]  An abbreviated list of the facts underlying the Company's judgment includes:

- the limited likelihood of a sales tax audit in most instances;

- the Company's long history of success in avoiding liability for sales tax issues through negotiation;

---

[42] *See generally* Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("FAS 5") (Exhibit 8 hereto).

[43] *See* FAS 5 at ¶ 8.

[44] It is also clear that no amount of loss could be reasonably estimated as of that date (see discussion below).

[45] See Davis Expert Report (Ex 7).

- the Company's prior history of success in acquiring exemption information from its customers;

- the Company's actual acquisition of exemption information from some customers;

- the Company's judgment and history concerning its ability to assess its non-exempt customers for any sales tax amounts owed; and

- the Company's industry knowledge enabling it to make accurate judgments about susceptibility of particular sales to taxation.

While Buyer may choose to disagree with this judgment, Buyer has offered no facts to support its conclusion that a loss was probable. Buyer has not only failed to identify additional facts that it believes should have been known to and considered by the Company at March 30, 2007, it has also failed to consider all the facts that were known. Clearly a "chicken little/the sky is falling" approach to assessing the probability of a loss is inappropriate under FAS 5. Just as general contingency reserves are prohibited, so too are reserves for losses that are based on worst case outcomes or invalid assumptions.

But one thing is clear: the judgment reached by Company personnel prior to Closing was fully supported by history and experience and took into account all of the relevant information and factors. Quite frankly, it does not appear that the Buyer's new "judgment" concerning this question is based on all of the available information and the new "judgment" appears to be result-oriented. But the Firm need not focus on motivation. It need not even determine whose judgment is correct. The only question is whether the Company's judgment prior to the Closing Date was reasonable, taking into consideration all known facts. It is clear that the Company's judgment – not hidden from Buyers prior to Closing – was reasonable.

Second, and relatedly, Buyer's claim that Seller essentially owes it $4.7 million for sales and use tax ignores the basic point that, whatever sum the Company might be assessed by any given state for sales and use tax, it also has a right of subrogation, dollar for dollar, against the customer whose purchase gave rise to the liability. As in any sale of goods, the customer is ultimately responsible for any applicable sales tax. According to personnel familiar with the Company's prior operations and accounting, it was the Company's historical practice to attempt to collect certain of these taxes from its customers and the Company was successful in doing so.[46] If, on a going-forward basis, Buyer chooses not to collect these amounts, for customer-relations reasons or otherwise, that is its prerogative, but that change in management philosophy after the Closing does not affect the reasonableness of the Company's judgment reached on March 30, 2007 based on what was known at that time.

---

[46] For example, the Company recently back-billed a customer in Mississippi for back taxes, following a determination of liability.

13

Third, Buyer's sales-tax claim is fundamentally a claim for breach of representations and warrantees, not appropriate for resolution by the Firm in this post-closing adjustment process. Section 3.09 of the Agreement includes representations that the Company's financial statements have been prepared in accordance with GAAP, and Section 3.06 includes a representation that the Company had paid in full all Taxes – including sales and use taxes – due and payable as of the Closing Date. Buyer – relying on a different set of assumptions than those used by the Company in preparing its financial statements – disputes that these representations are true. Under the Agreement, its sole recourse is to seek indemnification pursuant to Section 11.02 of the Agreement.[47]

Fourth, the Firm should have no illusions about what Buyer is doing here. Buyer knew about the Company's judgment regarding the sales tax issues as reflected in the Reference Balance Sheet and consistently throughout the Company's history long prior to the Closing. Buyer received ample information concerning the Company's policies and practices regarding sales tax issues in connection with the due diligence process and in connection with the negotiation of the Agreement and purchase price. In the exercise of ordinary care, Buyer's pre-acquisition due-diligence report should have established whether the Seller had outstanding sales-tax liabilities with any taxing jurisdiction or whether any of its property had been subject to lien for its failure to pay any taxes due. It is fair and logical for the Firm to assume that Buyer incorporated all such information into its offer and, thus, has already factored its assessment of the risk (if such assessment is made in good faith) into the purchase price.[48] Buyer is perfectly within its rights to make its own assessment for that purpose and to account for these items going forward on a different basis than the Company did prior to Closing. But, for purposes of the Closing balance sheet and the post-closing adjustment process, Buyer cannot account for them in a way that departs from the manner set forth in the Reference Balance Sheet.[49] To do so would lead to an "apples to oranges" comparison of the sort that the post-closing adjustment process was not designed to address. This is particularly problematic where, as here, Buyer was fully aware of the sales tax treatment prior to Closing.

For these reasons, the judgment reached by Company personnel concerning whether or not to accrue for a sales tax exposure was a reasonable judgment and should not be disturbed as part of this post-closing adjustment process. Buyer's proposed post-closing adjustment of $4,732,213.43 relating to this item should be rejected in its entirety.

---

[47] See Agreement at Section 11.02(a)(i) (Ex. 1). Of course, an indemnification action would not be successful for the simple reason that none of the claimed liability has, to Seller's knowledge, come to pass. In the event that the Company should be subject to an audit for any period pre-dating the acquisition, that would be the time to discuss indemnification possibilities.

[48] Relatedly, Buyer could have, in connection with the acquisition, taken advantage of state "bulk sales" rules that permit the purchaser of a business to obtain from the state a notice of tax liability due or a tax clearance certificate. Buyers taking advantage of this mechanism will typically hold a portion of the purchase price in escrow pending the sellers' satisfaction of any liability. Buyer failed to do this, further reflecting Buyer's effective agreement with the Company's judgment that no sales tax liability exists here.

[49] See discussion above at pgs. 5-7.

14

Finally, and apart from all of these fundamental points, the amount proposed by Buyer as a "reasonable estimate" is simply wrong. Shortly after the parties exchanged Buyer's Draft Computation and Seller's Objection Notice, Buyer indicated that, indeed, the $4.7 million figure is erroneous and that Buyer intended to submit to Seller a corrected set of calculations producing a reduced estimated sales tax liability. Buyer has, to date, not provided new figures. As explained in detail in the attached Expert Report of Bruce H. Davis (Ex. 7), Crowe and Buyer have made numerous errors in estimating sales and use tax liability, which errors account for all but **$113,051** of Buyer's erroneous sales tax estimate.[50] Moreover, Buyer has not taken into account other unquantifiable issues which likely eliminate even this residual amount.[51]

Buyer's liability estimate is incorrect due to at least the following basic methodological errors and unfounded assumptions:

- **Buyer used a biased sample in its liability-projection methodology.** Buyer assumes, without basis, that its "block sampling" of 2006 sales is representative of all periods included in its estimate. This sampling is not random, nor was it chosen from the entire examination period. There is no explanation of why 2006 was selected, nor has Buyer performed any analysis of why 2006 is a sufficiently representative sample period. The estimate, therefore, cannot be considered valid.[52]

- **Buyer failed to consider the sales tax return filing histories of the various Kingway locations.** The Company's Georgia, Texas, and Ohio locations were, during the relevant period, filing tax returns in their own domiciliary states. In addition, its Georgia location consistently filed in Ohio, North Carolina, Pennsylvania, and Texas and periodically filed in Alabama, Illinois, Louisiana, Massachusetts, Nebraska, and Wisconsin. Moreover, the Texas and Georgia locations were audited through the 2004 year by the Mississippi Department of Revenue.[53] The claimed liability must be reduced to the extent that the Company filed or was subjected to audit by the taxing authorities in any given state.[54]

- **Buyer failed to identify all of Kingway's customers who are distributors.** Buyer erroneously assumes that a number of sales to distributors are 100 percent taxable. In fact, these sales are not taxable at all. The correct information concerning these customers could have been found with a simple internet search and/or in consultation

---

[50] *See* Davis Expert Report at 4 (Ex. 7)

[51] We note that Buyer's estimate of the tax liability is roughly $3.7 million and the additional million dollars derives from Buyer's estimate of the interest component associated with that alleged liability. The expert report attached hereto assesses the $3.7 million figure.

[52] *See* Davis Expert Report at 6 (Ex. 7).

[53] When Mr. Davis's staff visited Kingway, they noted an audit in progress in Louisiana concerning revenue at Kingway's Texas location. To our knowledge, and to the knowledge of Mr. Davis's organization, that audit has not been completed, and no liability has been determined or assessed.

[54] *See* Davis Expert Report at 6 (Ex. 7).

15

with current or former Company personnel. All sales to wholesale distributors must be excluded from the liability calculation.[55]

- **Buyer treated sales to known wholesale distributors incorrectly.** When Buyer managed to identify certain customers as distributors, it treated sales to them as 15-percent taxable. There is no basis whatsoever for this assumption, and it is contrary to accepted practices. Buyer also made incorrect and subjective judgments relative to the buying habits of certain Company customers, or the relative size of certain Company customers, when making decisions about whether these customers' purchases were taxable. For example, Buyer assumed without basis that Wal-Mart self-assessed use tax on its purchases but that large retailers such as Kmart and Iron Mountain did not. Buyer has not documented or explained these assumptions. These unfounded charges must be deducted from the liability calculation.[56]

- **Buyer failed to conduct a proper study of Kingway's sales invoices to certain high-dollar customers.** Buyer treated a number of high-value sales as taxable when, in fact, they were exempt sales for resale or sales upon which tax had already been paid in full. These sales, detailed in the Expert Report of Bruce H. Davis, must be eliminated from the calculation.[57]

- **Buyer improperly included alleged sales-tax liabilities that are "not significant" for purposes of tax reporting and not material GAAP.** Buyer's estimate assumes simultaneous audits occurring in all tax exposure states, including those where tax exposure is immaterial. These hypothetical simultaneous audits would have to lead to liability on all imaginable amounts without regard for the Company's ability to take subsequent steps to reduce the liability or to mount any audit defense. At the very least, all immaterial amounts should be excluded for the reasons stated in the Expert Report of Bruce H. Davis.[58]

- **Buyer failed to consider that any outstanding sales tax is collectible through back-billing.** Buyer's choice (if it has so chosen) to discontinue the practice of back-billing has no bearing on Kingway's Net Working Capital as of March 30, 2007.[59]

- **Buyer's estimate treated all purchasers not considered distributors as taxable, despite the availability of numerous other modes of certified exemption.** Purchases may be exempt based on "self-assessment"; payment of use taxes through state audits; direct-pay permits; manufacturing machinery and equipment exemptions; warehousing, purchasing company, or temporary storage exemptions; agricultural-use exemptions;

---

[55] *See* Davis Expert Report at 6-7 (Ex. 7).

[56] *See* Davis Expert Report at 6-7 (Ex. 7).

[57] *See* Davis Expert Report at 7-8 (Ex. 7).

[58] *See* Davis Expert Report at 8 (Ex. 7).

[59] *See* Davis Expert Report at 9 (Ex. 7).

purchases by tax-exempt entities such as schools, churches or instrumentalities of government; purchases by businesses located within specially designated areas, such as enterprise zones; or installation-service exemptions in states that exempt separately stated charges for services. Any one of these exemptions – along with numerous others not considered at all by Buyer – may apply to the sales in question. Seller is, of course, not in a position to obtain all the information necessary to determine the applicability of these exceptions, and Buyer has refused to explain or document its assumptions about their inapplicability.[60]

- **Buyer disallowed, without any basis, the Company's receipt of certain exemption certificates.** Although unstated, this appears to be the result of an erroneous interpretation of the requirement that the Company receive the certificates in "good faith."[61]

Seller retained an expert, Bruce H. Davis, with extensive experience in the sales tax area. He conducted an extensive investigation of all the information that Buyer was willing to make available to us. His staff made site visits. He and his staff interviewed current and former Company personnel. He conducted independent research concerning the facts and issues relating to the sales tax matter. And, he carefully analyzed Buyer's report and the basis for its conclusion.

Mr. Davis's conclusion, detailed in the accompanying Davis Expert Report, is that Buyer's report is without substantial basis and that the judgment reached by Company personnel concerning this issue prior to Closing was reasonable.[62]

Specifically, Mr. Davis concludes that, even if Buyer's estimates for 2004, 2005, and the first quarter of 2007 were not thrown out due to their unscientific nature *and* we were to ignore alternate grounds for sales tax exemption and the ability of the Company to back-bill its customers for any sales taxes due, the Company's worst case liability would be $151,000. If Buyer's baseless estimates for 2004, 2005, and the first quarter of 2007 are thrown out, the maximum would be $113,051.

Note that, because Buyer prohibited Mr. Davis and his staff from investigating the extent to which the Company's customers were subject to various exemptions and back-billing, this amount does not represent a "reasonable estimate" for purposes of FAS 5 (assuming a loss were probable). It is a maximum. If a loss were indeed probable, further analysis would need to be done to develop an appropriate estimate.

For all of the foregoing reasons, no post-closing adjustment should be made for this item.

---

[60] *See* Davis Expert Report at 9 (Ex. 7).

[61] *See* Davis Expert Report at 9 n.5 (Ex. 7).

[62] *See* Davis Expert Report at 4 (Ex. 7).

17

**B.    VACATION ACCRUAL – $344,000 IN DISPUTE**

The Company's vacation policy was that an employee did not vest in any vacation (or, to use the terminology employed in the Company's written policy, the vacation was not "allocated") until after certain fixed periods. An employee certainly could not take vacation until it was vested. And, importantly, if an employee left the Company prior to his or her vesting date, there was no right to receive payment for unvested vacation amounts. This concept of when the vacation is actually vested – or earned – is critical to the dispute between the parties on this item. Some additional detail follows.

The Company's Vacation Policy: A copy of the Company's vacation policy is attached as Exhibit 9.[63] It makes a critical distinction between the concept of service that may ultimately lead to the acquisition of vacation rights and the actual acquisition of those rights through vesting. Thus, for the first six months of an employee's service, the employee was engaged in service that might ultimately lead that employee to vest in vacation rights. But the vacation was not allocated to the employee – the employee did not vest in any vacation rights at all – until the full first six months were completed.[64] Thus, if an employee left the company's service after 5 1/2 months (i.e., before the vesting occurred) that employee was not entitled to any vacation time at all and was not entitled to any payment for vacation time:

> Employees who leave employment before completing six months of services have not earned any vacation rights and will not receive any paid vacation.[65]

Only after the end of the six month period was the employee allocated – vested in – 40 hours of vacation. The employee was then required to take that vacation, if at all, during the next 6 months (i.e., in the employee's 6th through 12th month of service):

> Leave will be taken during the year in which it is awarded or forfeited upon the anniversary date. There is no "carry over" of vacation hours.[66]

A similar policy existed for periods of service thereafter. If the employee completed the 6th through 12th months of service, then on the employee's one year anniversary date the employee was allocated – vested in – an additional 40 hours of vacation.[67] That vacation had to be taken during the employee's second year of service (i.e., during the year in which it was allocated) or it would be lost.[68]

---

[63] The discussion below quotes from and relies upon the Company's written vacation policy. We have also consulted with personnel familiar with the Company's practices and policies during this time who confirm that the discussion below is accurate.

[64] See Vacation Policy, Paragraph 3 (Ex. 9).

[65] See Vacation Policy, Paragraph 3 (Ex. 9).

[66] See Vacation Policy, Paragraph 5 (Ex. 9).

[67] See Vacation Policy, Paragraph 4 (Ex. 9).

[68] See Vacation Policy, Paragraph 5 (Ex. 9).

Similarly, if the employee completed the second full year of service, then on the employee's two year anniversary date the employee became vested in an additional 80 hours of vacation.[69] Again, that vacation had to be taken during the year in which it was awarded – in this case, the employee's third year of service.[70]

As the foregoing demonstrates, in any specified period of service, employees are awarded vacation, which vests only by virtue of continued employment during the subsequent period of service. In other words, employees are neither entitled to take nor be compensated upon termination for the vacation earned until the subsequent period of service commences. Only then does the Company owe the employee the vacation awarded through their employment in the prior period. For example, vacation time acquired as a result of the completion of a full year's service in year 2, would not actually vest – or therefore produce any liability – until the first day of year three and had to be taken during year three.

The Company's Accounting Policy: Consistent with the foregoing vacation policy, the Company accrued for employee vacation time when it vested. For example, on the second anniversary of an employee's service, that employee vested in 80 hours of service deriving from his or her work during the preceding year. On the day that the vesting occurred and the employee became eligible to take the vacation, the Company accrued for the full amount of the vacation which might be taken any time during the following year.

The Parties' Disagreement: Buyer's position is that the accrual needed to occur during the preceding year – prior to the employee's vesting in the right to receive vacation. Buyer's only support for this assertion is Buyer's position that FAS 43 requires this. Buyer proposes a post-closing adjustment of $344,000, supposedly[71] to accrue for vacation that Buyer says was "earned" – but not yet vested – between the last anniversary date of each employee and the date of the Closing.

Buyer's proposal must be rejected for three reasons.

First, Buyer's proposal is not consistent with the Company's historical accounting policy for accruing vacation and with the policy underlying the Company's preparation of the Reference Balance Sheet, the Target Net Working Capital Amount, and the Estimated Purchase Price. Put another way, Buyer proposes to calculate the Actual Purchase Price using one set of accounting principles and the Estimated Purchase Price using another. As discussed above, the express terms of the Agreement forbid this. Moreover, as discussed above, this form of "apples to oranges" comparison is inconsistent with the fundamental purpose of the post-closing

---

[69] See Vacation Policy, Paragraph 4 (Ex. 9).

[70] See Vacation Policy, Paragraph 5 (Ex. 9).

[71] We say "supposedly" because the calculations that Buyer showed (but did not provide) to us do not appear to in fact consistently implement this theory that Buyer sets forth. We reserve the right to comment further at such time as Buyer provides these calculations as part of its initial submission or otherwise.

adjustment process as described in the Agreement. What this means is that, were Buyer's proposed change in accounting policies to be implemented for purposes of the post-closing adjustment process, Buyer would receive a windfall. The post-closing adjustment process was not designed as a way for Buyer to "game the system" by suggesting changes to accounting policies. Rather it is supposed to be a way of truing up the Closing estimates to reflect events and occurrences that occurred after the estimates were made but before Closing. Buyer's proposal is inconsistent with this purpose.

Second, Buyer's proposal is not, as Buyer suggests, required by GAAP. The essence of Buyer's position is that FAS 43 should be applied and used in calculating the Closing Balance Sheet. But the Company's fiscal year ends on December 31. The Closing Date – March 30, 2007 – was an interim period. As such, FAS 43 is inapplicable on its face:

> *This statement does not address the allocation of costs of compensated absences to interim periods.*[72]

Paragraph 11 repeats this by noting that the Financial Accounting Standards Board agreed that "the statements should specify that it does not change existing interim reporting practices and that the provisions of APB Opinion No. 28 are still appropriate." APB 28, paragraph 15, provides that while the objective of annual financial statements is to achieve a fair measure of operations for the annual period and to present fairly the financial position at the end of the annual period, for interim periods, costs can be expensed as incurred or allocated using estimates.

There is absolutely no requirement in GAAP to compute interim balances in accrued vacation under FAS 43. And, the Company's auditors reviewed and approved all relevant aspects of the Company's accounting for vacation expenses. The Company had a reasonable basis to believe that the upcoming year end balance would not be materially different (the vacation policy was unchanged and the workforce was fairly stable as to the number, tenure, and pay rates of employees). As such, there is no basis under GAAP to apply the requirements of FAS 43 to the Closing Balance Sheet.

Finally, even if Buyer were correct that FAS 43 applies here, that still would not produce the result that Buyer urges. Because the Company had a policy of not permitting payment for "unvested" vacation time as of the time of an employee's departure from employment, any accrual for vacation time as of the Closing Date must also reflect an offset for reasonably estimable amounts of that same vacation time that would be forfeited. In the context of a change of ownership such as this one, such an offset would be significant. Yet, Buyer's proposal contains no such offset. Even accepting Buyer's view that FAS 43 applies, in other words – and it clearly does not apply by its own express terms – Buyer has not conducted the calculation properly.

---

[72] Statement of Financial Accounting Standard No.43 ("FAS 43") at ¶2 (emphasis added) (Exhibit 10 hereto).

## C.    PETSMART – $200,000 IN DISPUTE

In 2006, the Company received an order for a structural rack from Petsmart. Based on the specifications provided by Petsmart, the Company utilized an outside professional structural engineer to assist in the design of the rack. Both Petsmart and the Company ultimately agreed to the engineer's design and, upon completion of the rack, the engineer certified to the Company in writing that the rack conformed to all applicable standards.[73] Petsmart accepted the product in accordance with applicable sales terms.

Subsequent to Closing, however, for reasons unknown, Buyer revisited the issue and obtained a report from an engineer who, allegedly, determined that the rack did not meet building codes for Petsmart's intended use.[74] Thus, Buyer elected to release Petsmart from its earlier agreement to accept the rack and, it claims, agreed to incur $200,000 in additional costs to replace allegedly defective material and workmanship to meet building codes.

Buyer's post-Closing decision to incur these expenses appears motivated by customer relations concerns. However wise or unwise that may have been, this post-Closing decision is not relevant to the determination of liabilities as of March 30, 2007. FAS 5, *Accounting for Contingencies*, provides the applicable rules.[75]

Under FAS 5, this charge would only have been appropriate if, based on "[i]nformation available prior to" March 30, it was "probable that . . . a liability had been incurred" *and* "[t]he amount of loss" could have been "reasonably estimated."[76] Neither of these conditions was present here as of the Closing Date. Indeed, even in hindsight it is clear that the Company was not obligated to make these repairs as of March 30. To the contrary, the parties agreed prior to Closing that the Petsmart would accept the rack and, therefore, that Company was *not* responsible for any changes required by Petsmart, and the Company also had in hand a written certification from an independent third party engineer certifying that the Company had built the rack in compliance with the specifications required by the contract. And, while the cost of building a replacement rack may or may not have been estimable, costs associated with Petsmart's particular installation needs were not. Buyer's subsequent arrangements with Petsmart are not relevant.

Finally, even if the original engineer's certification were deemed flawed, liability would then rest with the engineer, not the Company. Although management may decide to incur the cost of rectifying any error – and no such error has been documented – this is not an appropriate claim for the working capital mechanism.

---

[73] Although we have asked Buyer for a copy of this certification, Buyer has refused to provide it. Nor has Buyer provided any other third party engineering or other documentation to support its claim in this regard.

[74] We do not know if the engineer is an employee of Buyer's or an independent professional.

[75] *See* FAS 5 at ¶ 4(b) (Ex. 8) (specifying that FAS 5 applies to "Obligations related to product warranties and product defects").

[76] *See* FAS 5 at ¶ 8 (Ex. 8).

Buyer's proposed post-closing adjustment relating to this item should be rejected in its entirety.

## D.    ACCOUNTS RECEIVABLE ALLOWANCE – $133,401 IN DISPUTE

This is a proposed adjustment by Seller to bring the Company's Closing balance sheet into compliance with the accounting principles and methods used in the Reference Balance Sheet and GAAP, as required by the Agreement.[77]  Historically, the Company's policy was not to increase its allowance for doubtful accounts for any accounts receivable until some specific event such as a bankruptcy or fee dispute occurred that necessitated an increase.  This historical policy is consistent with GAAP which prohibits general contingency reserves and requires that a loss be accrued when both probable and reasonably estimable.[78]  In fact, paragraph 23 of FAS 5 notes that a "creditor need not consider an insignificant delay or insignificant shortfall in amount of payments" as indicating that a loss is probable.  In the Company's judgment, accounts that were less than 90 days past due were not significantly delayed.

As of the Closing, the allowance for doubtful accounts was $204,240.[79]  However, the accounts receivable over 90 days old totaled only $70,839.[80]  Seller has consulted with personnel familiar with the Company's prior accounting policies and practices, including the former COO and Collections Manager.  Each of these individuals confirms that there was nothing about the amounts under 90 days old that they can identify which would be any cause for instituting an allowance for doubtful accounts as to them.  Each of them confirms that the outstanding allowance amount – to the extent it exceeded the amount of receivables over 90 days old – was likely a mistake and should be reversed in their view.  In the effort to handle the numerous matters leading up to Closing, the task of combing through the allowance for doubtful accounts to ascertain its correctness was apparently overlooked.

This is exactly the sort of matter for which the post-closing adjustment process was designed.  The Company's Closing Date estimate as to these amounts was not correct and not reflective of all of the information available as of the Closing Date.  With the luxury of additional time since the Closing, this is something that we can establish with certitude.  As such, the figure should be corrected.  The allowance for doubtful accounts should be decreased by $133,401 – reflecting the difference between the $204,240 total allowance as of the Closing Date and the $70,839 in accounts receivable aged more than 90 days.

Indeed, events since the Closing have shown that Seller's proposed adjustment is more than fair to Buyer.  Of the $70,839 in accounts receivable aged more than 90 days, approximately $63,000 related to receivables owed by Advanced Material Handling, aged

---

[77] See Agreement Exhibit A (quoted above at pg. 6) (Ex. 1).

[78] FAS 5 at ¶¶ 8, 14 (Ex. 8).

[79] *See* Unarco Trade Accounts Receivable Worksheet (March 30, 2007) (Exhibit 11 hereto).

[80] *See* Unarco AR Aging Worksheet (March 31, 2007) (Exhibit 12 hereto).

roughly 2 years. We understand that during the week of August 7, the Company received payment on this receivable. This is further confirmation that the allowance for doubtful accounts was overstated as of the Closing Date and should be adjusted as Seller suggests.

### E.    PREPAID TRADESHOW EXPENSE – $125,457 IN DISPUTE

Buyer proposes a post-closing adjustment to eliminate $125,457 in prepaid expense related to the 2007 ProMat tradeshow. That proposed adjustment is erroneous because it conflicts with the Company's historical accounting policies, does not comply with GAAP, and fails to reflect consideration of relevant facts.

The Company recorded $116,000 and $45,700 in trade show expense in Q4 2006 and January 2007 respectively, 1/12 amortized (($13,500)) in January 2007.

The ProMat tradeshow is a biennial event sponsored by the Material Handling Industry of America ("MHIA").[81] It is the largest and most comprehensive international material handling and logistics trade event in North America, and the MHIA markets ProMat on a national and global scale through advertising, direct mail, participation in international events and the Internet.[82] In other words, it is the preeminent event in the Company's industry and a major draw for potential and existing Company customers and business partners. ProMat 2007, held January 8-11, 2007 in Chicago, drew more than 35,000 attendees, including 152 members of the press, and featured 736 exhibitors (including 140 first-time exhibitors).[83]

In connection with the trade show, the Company spent approximately $166,000. Seller understands that this included expenses such as booth fees, exhibit construction, photographic displays of equipment, and marketing materials such as brochures, t-shirts and pencils, among other things.

Buyer claims that these expenses cannot be deferred and amortized over 2007, but must be written off in their entirety in January 2007, because, it claims, these expenses were not related to a "future benefit" under Statement of Position 93-7, *Reporting on Advertising Costs* ("SOP 93-7").

However, SOP 93-7 does not apply here because the accounting in question pertains to interim rather than annual statements.[84] Kingway's fiscal year ends on December 31. These calculations are as of the Closing Date, March 30, 2007.

---

[81] *See generally* http://www.promat2007.org/ and http://www.promat2007.org/exhibitors/info.aspx for details.

[82] *See* ProMat 2007 Exhibiting Information, http://www.promat2007.org/exhibitors/info.aspx.

[83] Corrine Kator, *ProMat Starts the Year Off Right; North America's Largest Materials Handling and Logistics Trade Show Boasts Record Attendance and a Diverse Mix of Products*, Modern Materials Handling (Feb. 1, 2007) at 9 (Exhibit 13 hereto).

[84] *See* SOP 93-7 ¶ .06 (Exhibit 14 hereto).

As of December 31, 2006, the Company properly deferred the costs (including prepayment of exhibit fees, as well as tangible items such as t-shirts, brochures and other marketing materials to be consumed during the course of the year) that it had incurred in arranging for its participation in the trade show. Although the broad principle in SOP 93-7 is to expense advertising as incurred, paragraph 44 of SOP 93-7 specifically provides that the costs of communicating advertising should not be reported as expenses until the service has been received. Contracting and prepaying for trade show exhibition space is substantively the same as contracting and prepaying for print media advertising.

Regarding the Company's accounting once the trade show occurred, paragraph 6 of SOP 93-7 expressly states that it *"does not apply to financial statements for interim periods."*[85] Instead, as explained in SOP 93-7, the correct source of GAAP for interim statements is APB 28.[86] Paragraph 16(d) of APB 28 explicitly permits the deferral of advertising costs within a fiscal year if the benefits of those expenditures "clearly extend beyond the interim period in which the expenditure is made." This explicit statement is consistent with the principle in paragraph 15 of APB 28 which states that "when a specific cost or expense item charged to expense for annual reporting purposes benefits more than one interim period, the cost or expense item may be allocated to those interim periods." The deferral and amortization of costs among interim periods that otherwise are expensed "as incurred" is explicitly justified as being necessary to "avoid distortion of interim financial results."[87]

The benefits associated with ProMat 2007 extend far beyond January 2007 and, thus, are appropriately amortized over the course of a twelve-month period. In the Company's industry, participation in a trade show is an expensive endeavor that provides benefits beyond the month in which the trade show occurs. It is common to amortize trade-show costs over the full fiscal year. That treatment is particularly appropriate here. Historically, the Company has derived great benefit from participation in trade shows generally, and from ProMat in particular. On multiple occasions, for example, the Company's participation in ProMat has led directly to coverage of the Company's products in the leading industry publication, Modern Materials Handling.[88]

---

[85] SOP 93-7 ¶ .06 (Ex. 14) (emphasis added); *see also* SOP 93-7 ¶ .06 (Ex. 14) ("This SOP provides financial reporting guidance for . . . annual financial statements").

[86] *See* SOP 93-7 ¶ .06 (Ex. 14) ( "Paragraphs 15 and 16 of Accounting Principles Board (APB) Opinion No. 28, *Interim Financial Reporting*, . . . provide guidance for accounting for advertising in interim periods.").

[87] Accounting Principles Board Opinion No. 28, *Interim Financial Reporting* ("APB 28") ¶4 (Exhibit 15 hereto).

[88] *See Product Showcase*, Modern Materials Handling (Apr. 1, 2005) at 66 (Exhibit 16 hereto) (quoting Kingway as a supplier of the "light-directed picking system" in an article about products introduced at ProMat 2005); David Maloney, *JC Penny Cashes In: JCPenney's New National DC Shows What Good Automation Can Provide-a 40% Reduction in Cost-per-Item Handling Over the Facilities it Replaced*, Modern Materials Handling (January 1, 2001) at 75 (Exhibit 17 hereto) (listing only Kingway as a supplier of "flow racks and pick-to-light systems" in article concerning ProMat 2001).

Moreover, some of the expenses related to ProMat were for tangible objects that the Company retained following the show. In particular, the brochures continued to be provided to customers for marketing and informational purposes.

Accordingly, the Company's historical practice – which was approved by its auditors and is consistent with economic reality – has been to amortize trade show expense, including expenses related to ProMat, over a twelve-month period.

This year, the Company is receiving clear benefits from ProMat 2007 throughout the year. For example, the Company's participation in ProMat led to mention once again in Modern Materials Handling, when, in the issue reporting on ProMat 2007, the reporter who covered the tradeshow listed the Company as one of the "primary pallet rack suppliers."[89] The MHEDA (Material Handling Equipment Distributors Association) Journal Online also discusses systems displayed by the Company at this year's show.[90]

Finally, ProMat 2007 was the best attended ProMat in history. Thirty-five thousand attendees and potential customers had the opportunity to view the Company's systems first hand.[91] The bottom line is that, in the materials handling and logistics industry, it is difficult to convey to a wide audience meaningful information about a company's product – and what separates a given company from its competitors. The most important information for prospective customers is – how will these systems perform in the real world? ProMat is an invaluable opportunity, arising only every two years, to directly demonstrate the Company's products to the market. Along with the *permanent* benefit derived from the Company's mention in industry press and in various online sources, these circumstances clearly support the Company's historical accounting policy with respect to ProMat, and the application of that policy to ProMat 2007, to amortize the expense over the course of the year.

Because Buyer's proposed $125,457 adjustment reflects an incorrect understanding of GAAP, would result in significant distortion to the interim period, and is inconsistent with the Company's prior practices and policies, it must be rejected.

## F.    OSHA VIOLATION – $39,600 IN DISPUTE

Buyer proposes an adjustment of $45,000 as an accrued expense relating to six alleged violations of OSHA regulations at the Company's Ohio location. The $45,000 represents the maximum possible penalty under law ($7,500) for each of the six alleged violations.

---

[89] Corrine Kator, *Pallet Rack Basics, From Traditional Single-Deep Rack to Dynamic, High-Density Rack Systems, Pallet Rack Helps to Maximize Cube Space in the Warehouse*, Modern Materials Handling (Feb. 1, 2007) at 42 (Exhibit 18 hereto).

[90] *See ProMat Exhibitors Forecast 2007*, The MHEDA Journal Online (Winter 2007), *available at* http://www.datakey.org/mhedajournal/1q07/suppliers.php3.

[91] Corrine Kator, *ProMat Starts the Year Off Right; North America's Largest Materials Handling and Logistics Trade Show Boasts Record Attendance and a Diverse Mix of Products*, Modern Materials Handling (Feb. 1, 2007) at 9 (Ex. 13).

Seller has consulted with personnel familiar with the Company's prior operations and accounting. They have confirmed that what is true for many other companies with regard to allegations of OSHA violations was historically true for this Company as well – specifically, it has been the Company's consistent and longstanding historical experience that allegations of OSHA violations are matters that are subject to negotiation and further discussion with the government. In no case in the Company's history that we are aware of was the maximum penalty ever assessed and, in our experience with and knowledge of other companies, it is extremely unlikely that the maximum penalty is assessed. Based on this experience, both of the Company itself and of other companies, it was simply not probable and estimable under FAS 5 that a $45,000 loss/expense would be incurred.

The actual experience of the Company since the Closing bears this out. We understand that the matter was resolved with OSHA for a payment by the Company of $5,400 in total, for all six alleged violations combined. While Seller does not believe that any amount can be said to have been reasonably estimable and probable as of Closing, Seller's Objection Notice objected to only that portion of the proposed adjustment that exceeded the $5,400 actually paid by the Company. In other words, Seller objects to $39,600 of the adjustment proposed by Buyer as to this item.

## G.    WISE INSTALLATION – $28,000 IN DISPUTE

WISE Installation, Inc. is a contractor that performed installation work for the Company in connection with the sale of a rack system to Wal-Mart in Pottsville, PA in or about May 2006. As Buyer acknowledges, following completion of this project, WISE executed a final lien release and unconditional waiver for the job on September 27, 2006.[92]  In that document, WISE agreed to "remise, release and forever discharge Kingway . . . from any and all manner of liens, claims, demands, and causes of action whatsoever . . . upon or by reason of any matter, cause or thing whatsoever arising under or out of the Contract" for installation of the Company's racking system at Wal-Mart in Pottsville.

According to Buyer, subsequent to the Closing Date, WISE contacted the Company claiming that additional work was performed pursuant to an oral modification of the contract.

According to Company policy as of the transaction date, however, and as clearly stated on the back of every purchase order, all change orders were required to be in writing or they would not be paid. Prior management is not aware of, and Buyer has not provided, any facts to indicate that the WISE purchase order is any different. While Buyer now claims that it has agreed to pay WISE $28,000 in contravention of the Company's policy, that is the Buyer's decision and in no way indicative of any claim, liability or probable loss that existed at the March 30, 2007 Closing Date.

---

[92] *See* Contractor's Unconditional Waiver (Sept. 27, 2006) (Exhibit 19 hereto).

Whatever Buyer's reasons for accommodating WISE after the Closing Date, this expense was not probable as of March 30, 2007.  Indeed, the Company had received an explicit release of any liability relating to this.  Buyer's proposed post-closing adjustment should be rejected.

## II.    ESTIMATED PURCHASE PRICE – $2,395,408 IN DISPUTE

The parties have differing ways of calculating the amount owed as a result of the post-closing adjustment process.  Seller has followed the formula outlined in the Agreement.  Buyer uses another formula of its own construction – one that has no support at all in the text of the Agreement.  If it wades into this debate at all, the Firm is bound to follow the formula set forth explicitly in the terms of the Agreement – not the alternate formula suggested by Buyer.

The Agreement could not be more clear.  Section 2.04(b) entitled "Post-Closing Adjustment" provides that:

> . . . If the Actual Purchase Price is greater than the Estimated Purchase Price . . . the Buyer shall pay to the Seller . . . an amount equal to such difference plus simple interest thereon, at an interest rate equal to 8% from the Closing Date to the date of payment, computed on an annual basis using a 360-day year.

> . . . If the Actual Purchase Price is less than the Estimated Purchase Price . . . the Seller shall pay to the Buyer . . . an amount equal to such difference plus simple interest thereon, at an interest rate equal to 8% from the Closing Date to the date of payment, computed on an annual basis using a 360-day year. . . .[93]

Seller followed this formula in its Objection Notice.[94]  We calculated the Actual Purchase Price using the formula set forth in Section 2.04(a) of the Agreement.  We identified the Estimated Purchase Price.  We then identified a line titled "Difference between Actual Purchase Price and Estimated Purchase Price" which reflected the subtraction of one from the other.  Finally, we included a line titled "Amount Owed to Seller As Per Section 2.04(b)," which reflected the previous amount plus the interest component.

Buyer took a completely different approach – one that has no support in the language of the Agreement.  Notably, nowhere in Buyer's "reconciliation of amount owed to buyer" is there any use of the defined terms Actual Purchase Price or Estimated Purchase Price.  Indeed, nowhere in this reconciliation does Buyer use any of the defined terms from the Agreement: each of the variables which come together to form the "Actual Purchase Price" are themselves defined terms, but Buyer does not set forth a statement of those terms either.

---

[93] Agreement at Section 2.04(b) (Ex. 1).

[94] Objection Notice at Page 3 (Ex. 5).

Given the clarity of the Agreement on what must be done, Buyer's failure to do it certainly raises a question. As it turns out, the difference between Buyer's proposed methodology and the methodology required by the Agreement is $2,395,408. Because Buyer has not followed the methodology required by the Agreement, the Firm need go no further. Seller's methodology – the one required by the Agreement – should be used and Buyer's position should be rejected on its face.

Although the Firm need not delve into the reasons for the difference between the parties on this point, for informational purposes we are happy to explain that difference. In effect, Buyer is attempting to cast aside the Agreement's definition of Estimated Purchase Price and substitute its own. The Agreement defines Estimated Purchase Price as follows:

> Section 2.01 Estimated Purchase Price. Not later than three (3) Business Days before the Closing Date, the Company shall diligently and in good faith estimate, on a reasonable basis using the Company's then available financial information, the Cash Amount (such estimate is referred to as the "Estimated Cash Amount"), the Indebtedness Payoff Amount (such estimate is referred to as the "Estimated Indebtedness Payoff Amount"), and the Net Working Capital Amount (such estimate is referred to as the "Estimated Net Working Capital Amount"), and deliver a statement thereof to the Buyer. The "Estimated Purchase Price" means an amount equal to (A) $40,000,000.00 (the "Transaction Value"), (B) plus the Estimated Cash Amount, (C) less the Estimated Indebtedness Payoff Amount, (D) less the Closing Management Bonuses, and (E) plus the excess of the Estimated Net Working Capital Amount over the Target Net Working Capital Amount or minus the excess of the Target Net Working Capital Amount over the Estimated Net Working Capital Amount.

Note one salient feature of this definition: The Estimated Purchase Price is simply the sum of a number of other defined terms and, importantly, each one of those other defined terms is either (1) a fixed amount or (2) the Company's own unilateral estimate – *i.e.*, it is what the Company says it is. To pick one example, under the plain terms of the Agreement, the Estimated Cash Amount is nothing more and nothing less than what the Company, in its statement delivered pursuant to Section 2.01, says it is. There is, therefore, no room for argument over the Estimated Cash Amount. The whole purpose of the post-closing adjustment is to true up the Actual Purchase Price to the Estimated Purchase Price. The Estimated Purchase Price is whatever the Company states it to be in its statement provided pursuant to Section 2.01 – not some moving target to be debated after the fact.

The Company did in fact deliver the required statement to Buyer ("Statement"). A copy is attached as Exhibit 3.[95] The cover letter of the Statement plainly says that it is attaching the materials relevant here:

---

[95] *See* 3/27/07 E-Mail from Fred Stovall to Jeffrey Legault, *et al.*, attaching Statement (Ex. 3).

> Attached is a spreadsheet prepared by the Company that includes the Estimated Cash Amount, Estimated Indebtedness Payoff Amount and Estimated Net Working Capital Amount pursuant to Section 2.01 of the Securities Purchase Agreement.[96]

The attachments are relatively straightforward as well. One line expressly identifies the Estimated Net Working Capital Amount.[97] The Estimated Cash Amount is identified at another.[98] The Estimated Indebtedness Payoff Amount is identified at a third.[99] Under the Agreement, these amounts are not subject to debate or argumentation. When considered together with the fixed Closing Management Bonuses amount[100] and the fixed $40,000,000 Transaction Value defined in the Agreement, these amounts stated by the Company form the Estimated Purchase Price.

> Specifically, the Estimated Purchase Price is

>   $40,000,000.00
> + $        60,000.00 [Estimated Cash Amount]
> - $33,659,516.40 [Estimated Indebtedness Payoff Amount]
> - $ 2,242,497.00 [Closing Management Bonuses]
> - $      982,015.00 [Target Net Working Capital *less* Estimated Net Working Capital]
>
> _____
>
> = $3,175,971.60

Buyer's alternate formulation is designed effectively to argue with the amount of the Estimated Purchase Price. But the Agreement is clear on its face that no argument is possible concerning this topic. First and foremost, as stated above, the Agreement defines Estimated Purchase Price as simply the sum of other variables that are fixed as of the Closing Date. Buyer's attempt to retroactively change the Company's estimate is impermissible on the face of the Agreement and undermines the purpose of the post-closing adjustment process. The entire discussion of the post-closing adjustment process in Section 2.04 of the Agreement makes clear that there is to be no challenge – or alteration by the Firm – to the already-established Estimated Purchase Price. There is no provision for challenging the Estimated Purchase Price in the Draft Computation. There is no provision for doing so in the Objection Notice. The Firm is directed to consider only the unresolved items from the aforementioned Draft Computation and Objection Notice – neither of which are contemplated to include challenges to the Estimated Purchase

---

[96] *See* 3/27/07 E-Mail from Fred Stovall to Jeffrey Legault, *et al.* (Ex. 3).

[97] *See* Statement at page 1 ("$2,917,985") (Ex. 3).

[98] *See* Statement at page 1 ("60,000.00") (Ex. 3).

[99] *See* Statement at page 1 ("33,659,516.40") (Ex. 3).

[100] This amount is not in dispute and is identified expressly by both parties as ($2,242,497). *See* Objection Notice at Page 3 (Ex. 5); Draft Computation at 5 (Ex. 4).

Price. And, the payment provision countenances only dispute as to the Actual Purchase Price – not the Estimated Purchase Price.[101]

Let us speak in practical terms for a moment. The practical effect of Buyer's proposed methodology – a methodology in direct contravention of the express terms of the Agreement – is to change the Estimated Purchase Price by changing the Estimated Indebtedness Payoff Amount and changing the Estimated Net Working Capital Amount. Those two amounts are clearly identified in the Company's Statement as $33,659,516.40 and $2,917,985 respectively.[102] Buyer effectively attempts to define them as $31,773,462 and $3,427,338 respectively.[103] We are not privy to why Buyer proposes this, although we can speculate. But one thing is sure: whatever Buyer's reason, the Agreement is clear that it is impermissible. Buyer's attempt to, in an indirect manner, use the post-closing adjustment process as a way of arguing with the Estimated Purchase Price should be rejected. The Firm should follow the formula set forth clearly in the Agreement and in Seller's Objection Notice and should reject Buyer's Draft Computation on this point because it is non-compliant with the Agreement.

## CONCLUSION

Seller and Buyer have a number of disputes. Some of these disputes are properly before the Firm for resolution pursuant to the post-closing adjustment procedures set forth in Section 2.04 of the Agreement. Others of the disputes are more properly the subject of indemnification claims – claims that, Seller contends, lack merit. The Firm should not accept Buyer's invitation to disregard the plain terms of the Agreement and misuse the post-closing adjustment process. In addition, Buyer's arguments concerning the merits of each of the items in dispute are incorrect – both as a matter of GAAP and as a matter of the Company's historical accounting policies. As such, Buyer's position should be rejected and the Firm should opine that the Actual Purchase Price is, as stated by Seller, $4,826,903. Accordingly, Seller is owed $1,650,932.40 – reflecting the difference between the Actual Purchase Price and the Estimated Purchase Price – plus simple interest at the 8 percent rate set forth in the Agreement.

---

[101] *See* Agreement at Section 2.04(b)(iii) (Ex. 1) ("Dispute. If, pursuant to this Section 2.04, there is a dispute as to the final determination of Actual Purchase Price . . .").

[102] *See* Statement at pages 1 & 5 (Ex. 3).

[103] *See* Draft Computation at 5 (Ex. 4).

**Expert Report of Bruce H. Davis, CPA**

**In re:**

**SECURITIES PURCHASE AGREEMENT**

**by and among**

**KINGWAY INCA CLYMER HOLDINGS INC.**

**KIC HOLDINGS INC.**

**UNARCO MATERIAL HANDLING, INC.**

**and**

**AMERICAN CAPITAL STRATEGIES, LTD.**

**Dated as of March 9, 2007**

September 17, 2007

# TABLE OF CONTENTS

I.      Assignment

II.     Qualifications and Background

III.    Materials Reviewed

IV.     Conclusions

V.      Analysis

VI.     Exhibits
      **A.** Curriculum Vitae
      **B.** Materials Reviewed
      **C.** Crowe's Examination

VII.    Addenda – Critique Adjustments
      **A.**    Biased Sampling
      **B.**    Filing histories
      **C.**    Treatment of distributors in general
      **D.**    Inconsistent treatment of distributors
      **E.**    High-dollar customers
      **F.**    States' liabilities considered immaterial
      **G.**    [Left Blank]
      **H.**    [Left Blank]
      **I.**    Summary Analysis

## I.    <u>Assignment</u>

I have been asked by counsel for Kingway Inca Clymer Holdings, Inc. (the "Seller"), in connection with the Post-Closing Adjustment process set forth in Section 2.04 of the Agreement, to evaluate the calculation of sales and use tax liability on behalf of the Buyer made by Crowe Chizek and Company LLC ("Crowe") and to determine what is the maximum amount of sales and use tax liability, if any, that should be reflected in the Company's Net Working Capital as of March 30, 2007. I conclude that the Company's judgment – that no amount of sale and use tax liability was reasonably estimable and probable as of that time – was an appropriate and reasonable judgment. I further conclude that the maximum amount that could have been considered reasonable to accrue, based on the information known, is $151,425.

## II.    <u>Qualifications and Background</u>

I am a Managing Director at True Partners Consulting LLC, a tax and business advisory firm based in Chicago. I have nearly 25 years of experience in state and local sales and use taxation, focusing on issues relative to transactional analysis, controversies, refund reviews, mergers and acquisitions, municipal incentives, compliance, process reviews, and captive procurement entities. I have assisted large corporations as well as middle-market businesses in such diverse industries as manufacturing, retail, wholesale, utilities, transportation, professional services, not-for-profit, healthcare, and high-tech.

Prior to joining True Partners, I was a tax partner and director at Deloitte & Touche LLP and a tax partner at Arthur Andersen. Before joining Arthur Andersen, I was a sales tax revenue auditor at the Illinois Department of Revenue where I was selected to participate in its audit supervisor training program. At both Deloitte and Andersen, I was a senior member of the firmwide sales tax technical team and was extensively involved in staff, senior, manager, and senior manager technical sales tax training. I am currently part of the sales tax leadership group at True Partners.

I received my undergraduate education (B.A.) at Colgate University and post-graduate training (M.A.) at the University of Chicago. I also hold an MBA from the University of Illinois at Chicago. I am a member of the American Institute of Certified Public Accountants (AICPA) and sit on the State and Local Taxation Committee of the Illinois Certified Public Accountants Society (ICPAS). I have published articles in various professional publications – such as <u>Insight: The Magazine of the Illinois CPA Society</u>, <u>The Civic Federation</u>, and <u>The Corporate Lawyer</u> – and have presented at Deloitte and Andersen client seminars on topics such as sales tax controversies and the streamlined sales tax agreement.

My Curriculum Vitae is attached hereto as Exhibit A.

## III.    Materials Reviewed

A complete list of materials considered, and persons consulted and relied upon, in performing my analysis is attached hereto as Exhibit B.

## IV.    Summary of Conclusions

Crowe's methodology, and the assumptions upon which Crowe relied in executing it, are flawed in several important ways:

A.    Crowe used a biased sample in its liability projection methodology.

B.    Crowe failed to consider the sales tax return filing histories of the various Kingway locations.

C.    Crowe failed to treat Kingway's wholesale distributors correctly.

D.    Crowe failed for tax purposes to identify all of Kingway's distributors.

E.    Crowe failed to do a detailed study of sales invoices that Kingway had issued to certain of its high-dollar customers – consideration of which would have had a significant effect on Crowe's liability calculations.

F.    Crowe included in its estimate certain state tax liabilities which, taken as a whole, should not have been considered material for purposes of tax reporting or GAAP.

G.    Crowe failed to consider alternative grounds for sales tax exemption, such as self-assessment of the use tax by Kingway's customers or the possibility that the customers had paid the sales tax due under subsequent state audit.

H.    Crowe neglected to consider that its estimated liability might be reduced by having Kingway back-bill its customers for any sales taxes due.

## Summary

I have performed the necessary calculations, taking into account proper application of sales and use tax laws relevant to the flaws articulated above, and I conclude that, as of March 30, 2007, Kingway's sales tax liability (taking into account critical points B-F above) was no more than $151,425. Alternatively, if the estimated liability for years 2004, 2005, and first quarter 2007 were thrown out, because of the critique leveled against Crowe's block-sampling methodology, the estimated tax exposure for 2006 only (taking into account critical point A as well as points B-F) would be no more than $113,051. Points G and H have not been included herein because they are not at this juncture quantifiable. Based on this inability, even now, to quantify these important factors, I conclude that the Company's judgment not to accrue any amount for sales and use tax liability, as of March 30, 2007, was reasonable and consistent with GAAP and FAS 5.

4

## V.    Analysis

I began the review process using, as a starting point, Crowe's estimated tax exposure amounts. Based on its memo, dated May 22, 2007, Crowe communicated an estimated exposure of $3,741,317,[1] which was the result of its examination performed over the course of one weekend (i.e., two to three working days) during May 2007.  A breakdown of the exposure is provided in Exhibit C.  My critique of, and adjustments to, its examination are detailed below.

### A.    Biased Sampling

Crowe's liability estimate is derived from a "block sampling" of Kingway's sales for 2006 – namely, the assumption that, for each taxing jurisdiction, there exists a ratio of taxable sales (on which presumably no tax had been paid) to total sales, and the application of the resulting ratios respectively to all sales made into all states during the period of examination (2004-first quarter 2007) to arrive at a magnitude of sales subject to tax.  Block sampling is, however, subject to the bias (whether intended or not) of those persons who choose and evaluate the sample. The sample is chosen neither randomly nor from the population of the entire examination period.  In Crowe's case, the sample chosen reflected its belief that 2006 sales were representative of all sales made during the examination period. That assumption is unsupported.  In block sampling, unlike statistical sampling, the goodness or representativeness of a sample cannot be measured quantitatively through the calculation of a sampling error or confidence level.  Further, the block sample cannot be refined through use of dollar-invoice stratification.  Thus, because block sampling is inherently biased, its objective validity cannot be upheld.

The proper approach would have been for Crowe to have performed a statistical sampling analysis used to calculate a tax liability from sample sales invoices drawn randomly from the entire invoice population covering the years 2004-first quarter 2007.  Absent the use of statistical sampling, the tax liability that Crowe attributed to Kingway for the years 2004-2005 and first quarter 2007 should be rejected as having no basis in fact.  In short, Crowe's reliance upon block sampling undermines the integrity of its overall estimate of Kingway's liability.[2] If Crowe's estimated liability were adjusted solely to limit it to 2006, it would amount to a maximum of $1,121,034.  (See Addendum A.)

---

[1] The breakdown among Kingway's locations for 2004-2006 is:  Georgia – $2,263,713; Ohio – $299,841; Texas – $1,000,701.  (Also included is a first quarter 2007 liability for the Georgia location of $177,061, and a $1 rounding adjustment.)

[2] While I doubt that Crowe has demonstrated the existence of any tax liability for Kingway for years 2004, 2005, and first quarter 2007, we will present our critique of its examination hereafter (i.e., when addressing adjustments B-H) as though it had.

**B.    Filing Histories**

Crowe made no adjustments to its liability estimate for Kingway's sales tax registrations, tax audit histories, or the tax collection information found on the sales invoices issued to its customers. This series of source documents would demonstrate how much sales tax Kingway had in fact paid to various state taxing jurisdictions and constitute the primary source documentation that any tax professional would consider when evaluating whether the taxpayer had a liability or not, and Crowe failed to consider these sources. My fieldwork revealed that Kingway's Georgia, Texas, and Ohio locations were filing tax returns in their own respective domiciliary states. Further, its Georgia location was filing consistently in Ohio, North Carolina, Pennsylvania, and Texas and periodically in Alabama, Illinois, Louisiana, Massachusetts, Nebraska, and Wisconsin. The Texas and Georgia locations were also audited through the 2004 year by the Mississippi Department of Revenue.

As I have found no indication that Kingway's reporting of sales transactions in these states was incorrect, I reduced Crowe's liability estimate by its measure of Kingway's tax due to any state to the extent that Kingway had been a filer or had been subjected to audit by taxing authorities there. The overall effect of these adjustments was to reduce Crowe's estimated liability by $1,198,567 from $3,741,317, leaving a maximum of $2,542,750 remaining from Crowe's initial estimate. (See Addendum B.)

**C.    Treatment of Kingway's Wholesale Distributors in General**

Crowe identified Kingway's customers as wholesale distributors in either one of two ways: First, it reviewed exemption documentation that Kingway had provided. Customers who had provided exemption certificates to Kingway were treated under the resale exemption as 100 percent exempt[3]. Second, Crowe relied on various Kingway employees to identify distributors. While Crowe identified accordingly the customers as "distributors," it treated sales to them as 15 percent taxable, presumably on the assumption that the distributors may also have made purchases from Kingway for their own consumption.

This treatment of distributors is contrary to retailers' practices approved by state taxing authorities. Generally, companies in the business of reselling tangible personal property will buy property for their resale inventory entirely tax-exempt under a "blanket resale exemption certificate." Only when retailers later remove items from inventory and convert them to their own personal use, are they are obligated to remit through self-assessment to the state the use tax due on the

---

[3] Crowe treated facially invalid certificates as valid for purposes of its examination. I agree with this treatment because, in my years of experience defending taxpayers against state audits, I have found certificates that may be invalid for minor technical deficiencies routinely accepted by auditors, and, failing that, taxpayers are routinely given the opportunity during the course of a state audit to update their exemption certificates.

items. Therefore, Crowe had absolutely no grounds for treating as taxable 15 percent of Kingway's sales to its distributors.

In fact, accepting Crowe's assumption in this respect would lead to absurd results, as it would require believing that distributors replaced a significant portion of their capital assets (i.e., their warehouse racking) – durable assets with 5-10 year lives – every time they made purchases from Kingway. Thus, I modified the error ratios by disallowing the 15 percent taxability that Crowe had calculated based on Kingway's sales made to its distributors, and I then recalculated the estimated reduced tax exposure resulting from the adjustments. The overall effect of the adjustments reduced the estimated exposure by an additional $697,561 from $2,542,750, leaving a maximum estimated exposure of $1,845,189. (See Addendum C.)

**D.    Identification and Inconsistent Treatment of Kingway's Distributors**

Crowe performed no independent research to determine whether certain customers, whose purchases it was considering taxable, were also in the business of reselling Kingway products – such as, for example, A.R.S. America (a Kingway Ohio customer represented as "Asset Redistribution Services" in the detailed workpapers provided by Crowe), a company that specifically holds itself out as a reseller of Inca products. In addition, some customers, such as Boston Rack, were treated inconsistently as a distributor in some instances and as end user in others.

I reviewed each customer whom Crowe had treated as taxable. Based on additional research of the customers, we identified additional companies that were in the business of selling racking and other material handling products. I treated the customers in the same manner that distributors had been treated, as discussed above (under C). In addition, I applied consistent treatment to customers that Crowe had already identified as distributors. I adjusted the error ratios that Crowe has calculated based on sales to those distributors and then recalculated the estimated tax exposure based on the adjustments. The overall effect of the adjustments reduced the estimated exposure by an additional $767,241 from $1,845,189, leaving a maximum adjusted estimated exposure of $1,077,949. (See Addendum D.)

**E.    High-Dollar Customers – Specific Review Points**

A detailed review of invoices covering Kingway's sales to certain high-dollar customers, and pertinent discussions with former Kingway personnel, revealed that Crowe scheduled as taxable sales to certain customers when in fact these sales should have been identified as exempt sales for resale or sales upon which sales tax had already been properly paid.

Kingway's Texas location, for example, made a number of sales to Iron Mountain, Inc. The sales were sourced in Crowe's report to both Illinois and

7

Georgia. However, a detailed review of the invoices issued from the sales shows that 1) the sales items were actually shipped to Texas, and 2) the sales invoices included a charge for Texas sales tax. As such, these sales should not have been included in the calculation of the error ratios for either Illinois or Georgia.

Further, Kingway's Georgia location sold materials to two large-dollar customers: Wilson Sporting Goods in Tennessee, and Koch Foods of Mississippi. From discussions with former Kingway personnel, we learned that Kingway had reached an agreement with Wilson Sporting Goods under which Wilson had agreed to self-assess and remit use tax on the purchases. For the Koch Foods' purchases, Kingway was provided with an exemption certificate, pursuant to Mississippi's material purchase exemption [Miss. Code Ann. Sec. 27-65-5(2)]. The contractor, United Insulated Structures Corp., furnished Kingway with such a certificate, and Kingway accepted the tax-exemption certificate in good-faith. (See footnote 6.) With this information, I treated both Wilson Sporting Goods' and Koch Foods' purchases as properly taxed.

Likewise, a review of sales invoices for Scott Equipment Co. (Kingway Ohio), Jetro Cash and Carry (Kingway Georgia), and SunTrust Leasing (Kingway Ohio) strongly suggested that these sales transactions constituted tax-exempt sales for resale.

The overall effect of these adjustments reduced the estimated exposure by an additional $735,933 from $1,077,949, leaving a maximum exposure of $342,016.[4] (See Addendum E.)

**F.     Materiality – Tax and Generally Accepted Accounting Principles ("GAAP")**

Crowe included in its liability estimate the tax that Kingway presumably owed to all states into which it had made sales during the examination period. For many of these states, the liability due is relatively small when considered arguably for both tax and financial reporting purposes. For GAAP, the amounts should be excludable on grounds of immateriality. For tax reporting, the amounts should be excludable because the likelihood is remote that a state would expend its resources to audit Kingway for insignificant tax amounts due and attributable to its very small market and physical presence in the state.

I selected a liability threshold of $25,000 for the 2004-first quarter 2007 period for all three Kingway locations and tested the liability estimated in each state against that threshold. (See Addendum F.) Three states exceeded the level of material exposure, and the total exposure in the three states (California, New York, and Washington State) was $151,425. (The exposure in every other state respectively was well below $25,000 and in sum amounted to $190,591.)

---

[4] By Kingway location the total is broken down as follows: Georgia – $76,256; Ohio - $93,772; Texas – $171,989, and a <$1> rounding adjustment.

### G.    Alternative Grounds for Tax Exemption

Crowe generally failed to determine whether any Kingway customers, whose purchases it was including in its tax liability estimate, might have been exempt from tax on grounds beside the sale for resale exemption – namely, customers' payments of use tax due through self-assessment, state tax audit, or use of direct-pay permits.  Nor did Crowe consider statutory exemptions, such as the ones for temporary storage or manufacturing use of property purchased, which might have applied to Kingway customers.

I would have liked to have ascertained from former Kingway customers, that Crowe had considered taxable, whether their purchases were subject to the aforementioned exemptions such that they be excluded from Crowe's tax liability estimate.  However, Kingway's new management has prohibited me from making inquiry of its customers in this regard.  Accordingly, we could not calculate the effect that this issue would have had upon reducing Crowe's liability estimate.[5]

### H.    Collecting Back-Taxes from Customers

Regarding any estimated sales tax liabilities, Crowe failed to consider that it might be possible for Kingway to request from customers, who should have been charged sales tax, their tax payments in arrears.  While it would be possible to reduce Crowe's liability estimate by Kingway's securing of back-tax collections from its former customers, the approach might not meet the approval of Kingway's new ownership if it meant incurring the risk of souring relations with its former, current, and potentially future customers by requesting back-taxes from them.  Unfortunately, no current estimate could be made of how back-billing might reduce Crowe's estimated liability.  I have been informed by former management at Kingway that it has had success in the past back-billing customers.

---

[5] Good-Faith Argument:  Crowe also misapplied the "good-faith" standard when it refused to honor exemption certificates tendered by several of Kingway's customers.  Crowe assumed in this respect that, if Kingway had accepted a customer's exemption certificate, but the customer was not in the business of reselling the Kingway product purchased, the tax-exempt status of the sale would be disallowed because Kingway had not accepted the exemption certificate "in good-faith."  This is a misapplication of the good-faith standard because states will uphold the good-faith standard provided that the certificate received from the customer was properly completed, and the seller had no knowledge (beyond just the mere suspicion) that the customer was intending to use the certificate improperly.

I excluded from Crowe's liability estimate any tax due on Kingway's sales to which Crowe had misapplied the good-faith standard.  However, the reduction in Crowe's liability estimate resulting from the aforesaid misapplication had no material impact on its liability estimate.

I also applied the good-faith standard as grounds for the nontaxability of Kingway's sales to Koch Foods of Mississippi.  See Section V(E).

To summarize, the maximum exposure of $151,425 is divided among the following states: California – $66,651, New York – $33,759, and Washington State – $51,015.[6] These liabilities could be addressed – to the extent that Kingway is not registered to collect sales tax in any of these states – through Kingway's participation in these states' voluntary disclosure agreements (VDAs), which would limit "look-back" periods of assessment (to usually three years) and waive for Kingway any non-reporting penalties due.[7]

Alternatively, if the estimated liability for years 2004, 2005, and first quarter 2007 were thrown out, based on a critique of Crowe's "block sampling methodology," the residual tax exposure limited only to 2006 would be a maximum of $113,051.[8]  (See Addendum I.)  This dollar amount as presented is exclusive of any materiality threshold and hence does not consider participation in VDAs.


*True Partners Consulting LLC assumes no responsibility with respect to assessing or advising the reader as to tax, legal, or other consequences arising from the reader's particular situation. This memorandum is a summary discussion and is limited to the described facts.  The conclusions and recommendations contained in this memorandum are based on our understanding of the facts, assumptions, information, and documents referenced herein and current tax laws and published tax authorities in effect as of the date of this memorandum, all of which are subject to change.  If the facts and assumptions are incorrect or change or if the relevant tax laws change, the conclusions and recommendations would likewise be subject to change.  True Partners Consulting LLC assumes no obligation to update the memorandum for any future changes in tax law, regulations, or other interpretations and does not intend to do so. Only the specific tax issues and tax consequences described herein are covered by this memorandum, and any other federal, state, or local laws of any kind are expressly outside the scope of this memorandum.*

*We are required by regulation to inform you that any tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of:  (i) avoiding U.S. federal, state, or local tax penalties or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed in this communication (or any attachment).*

---

[6] The liability per Kingway location is broken down by the state to which it applies as follows:  California – Georgia: $1,345, Ohio: $0, Texas: $65,306; New York – Georgia: $26,779, Ohio: $56, Texas: $6,924; Washington State – Georgia: $0, Ohio: $0, Texas: $51,015. (See Addendum F.)

[7] Applying the materiality argument to the VDA approach would reduce the estimated liability to $143,100.  In other words, if Kingway locations were to file under VDAs, they should probably be done by location as follows: California VDA for Kingway Texas for $65,306; New York VDA for Kingway Georgia for $26,779; and Washington State VDA for Kingway Texas for $51,015.  This analysis does not take into account liability deductions which might occur were I allowed to pursue issues G and H as presented above.

[8] The breakdown by Kingway location, with materiality per state not taken into account, is as follows:  Georgia – $15,710; Ohio – $28,856; Texas – $68,485.

**Exhibit A:  Curriculum Vitae**

**BRUCE H. DAVIS**
605 Pheasant Ridge
Lake Zurich, IL 60047
Phone:  312-235-3302
E-Mail:  bruce.davis@TPCtax.com

## EXPERIENCE

| | |
|---|---|
| 2005 to Present | **TRUE PARTNERS CONSULTING LLC**, Chicago, Illinois<br>2005 to Present:  Managing Director |

*Responsibilities Include:*
- Same as at Deloitte and Andersen

| | |
|---|---|
| 2002 to 2005 | **DELOITTE & TOUCHE LLP**, Chicago, Illinois<br>2002 to 2005:  Partner, Multistate Tax, 2002-2004; Director, Multistate Tax, 2004-2005 |

*Responsibilities Included:*
- Same responsibilities as at Andersen
- Midwest Region Innovation Head, 2003-Present
- Member, Illinois Suite Development Team, 2002-Present
- Chicago Multistate Office Head, Staff Training, 2004-Present

*Accomplishments:*
- Growing practice profitability:  Net income of $500K on $1.5 million fees supervised for fiscal year ended May 31, 2004
- During period 6/02 to 12/05 sold 130 engagements to 70 different clients
- Technical achievements:  Developed and co-authored five white papers for Deloitte's firmwide technical database
- Clients served:  Same categories as at Andersen

| | |
|---|---|
| 1989 to 2002 | **ARTHUR ANDERSEN, LLP**, Chicago, Illinois |

| | |
|---|---|
| 2000 to 2002 | National Partner, SALT Group |
| 1998 to 2000 | Senior Manager, SALT Group |
| 1992 to 1998 | Manager, SALT Group |
| 1990 to 1992 | Staff Senior, SALT Group |
| 1989 to 1990 | Experienced Staff, SALT Group |

*Responsibilities Included:*
- Government incentives/credits
- Designing/reengineering sales-tax accounting function
- Contract tax services
- Audit defense/ruling requests
- Reverse audits

A-1

**Exhibit A:  Curriculum Vitae**

- Client Tax seminars
- Transactional analysis
- Nexus studies
- Developing innovative "shelf products"
- Composing manuals
- Staff development and training
- Marketing and public relations
- Publishing articles
- Outside teaching and speaking
- Firmwide sales tax technical team member

*Accomplishments:*

- Growing the practice – Fees supervised:  $1.95 million for fiscal year ended August 31, 2001
- Technical mastery – Leading contributor to firm's SALT research library
- Mentoring – Multi-year winner of the Sequoya Award
- Innovation – Developed and marketed "shelf products"

*Clients:*

- Primarily middle market
- Industries:  Retailing, wholesaling, manufacturing, utilities, service, transportation, printing, banking/finance, healthcare, high-tech, not-for-profit

| | |
|---|---|
| 1983 to 1989 | **ILLINOIS DEPARMENT OF REVENUE**, Chicago, Illinois<br>Revenue Auditor, Sales and Income Taxation |
| 1979 to 1983 | **HIGH SCHOOL SOCIAL SCIENCES INSTRUCTOR** |

**PUBLICATIONS**

- "Uniformity in Sales Tax Compliance," The Corporate Lawyer, December 2001.
- "Workforce Development," The Civic Federation, July/August 1996.
- "Even if the Feds Say You Are Tax Exempt, Don't Assume the State Will Too," Insight:  The Magazine of the Illinois CPA Society, September 1993.
- "The Travenol Case:  Just What the Tax Doctor Ordered for the Healthcare Industry," Insight:  The Magazine of the CPA Society, November 1990.

**ORGANIZATIONS**  AICPA, ICPAS

**EDUCATION**  University of Illinois at Chicago, Chicago, Illinois; M.B.A., June 1984
Major Field:  Accounting, Management Information Systems

University of Illinois at Chicago, Chicago, Illinois; Illinois Standard High School Certificate, 1979
Major Field:  Professional Secondary Education

### Exhibit A: Curriculum Vitae

University of Chicago, Chicago, Illinois; M.A., 1977
Major Field:  History

Colgate University, Hamilton, New York; B.A. 1972
Major Field:  History

Certified Public Accountant 1986 through passage of November 1985 exam

**REFERENCES**:    Available upon request

**Exhibit B: Materials Reviewed**

1) Primary Documents
   a) Memo documenting estimated sales tax exposure, dated May 22nd, 2007, prepared by Crowe and including supporting spreadsheets and calculations;
   b) Memo documenting a nexus study and estimated sales tax exposure, dated February 8th, 2007, prepared by BDO Seidman;
   c) Exemption certification provided by both UNARCO personnel and Crowe for all three Kingway locations (Georgia, Ohio, and Texas);
   d) Tax returns from Kingway Ohio and Kingway Texas which were filed in their respective domiciliary states;
   e) Tax returns from the Kingway Georgia location, filed regularly in the following states:
      i) North Carolina
      ii) Pennsylvania
      iii) Texas
   f) Tax returns from the Kingway Georgia location, filed periodically in the following states
      i) Illinois
      ii) Louisiana
      iii) Nebraska
      iv) Ohio
      v) Wisconsin
      vi) Alabama
   g) Audit history from the state of Mississippi covering both the Kingway Texas and Kingway Georgia locations, with an audit period covering 4/1/01 through 12/31/04.
   h) Sales invoices issued to Kingway customers, with specific emphasis on the following large-dollar purchasers (by Kingway location):
      i) Georgia
         (1) Jetro Cash and Carry (shipped to California);
         (2) Springfield Grocer (shipped to Missouri);
         (3) Koch Foods of Mississippi (shipped to Mississippi);
         (4) Arthur M. Hirsch (shipped to New York);
         (5) Wilson Sporting Goods (shipped to Tennessee);
      ii) Ohio
         (1) American Fresh Foods (shipped to Georgia);
         (2) Scott Equipment Company (shipped to Tennessee);
         (3) Suntrust Leasing Corp. (shipped to Virginia);
         (4) Beacon Systems (shipped to Pennsylvania);
         (5) Disco (shipped to Pennsylvania);
         (6) Fortna, Inc. (shipped to Pennsylvania);
         (7) Frank Calandra, Inc. (shipped to Pennsylvania);
         (8) Graham Architectural (shipped to Pennsylvania);
         (9) Jenmar Corporation (shipped to Pennsylvania);
         (10) Kemmco Sales (shipped to Pennsylvania);

## Exhibit B:  Materials Reviewed

       (11)  Noland Properties (shipped to Pennsylvania);
       (12)  Ryerson (shipped to Pennsylvania);
     iii) Texas
       (1) Iron Mountain (shipped to Georgia and Illinois)
       (2) Pier One Imports (shipped to Washington)
       (3) Jetro Cash and Carry (shipped to California)
       (4) Credit Card Sales (shipped to New York)
       (5) Empire Cheese (shipped to New York)
       (6) Henningsen Cold Storage (shipped to Oklahoma)

2)  Statutory Authority
   a)  Mississippi – Miss. Code Ann. Sec. 27-65-6(2);
   b)  Texas – Sec. 151.330(b) Tax Code.

3)  Interviews
   The following individuals were consulted and provided additional information:
   a.  Kerry L. Strother – Vice President of Finance, UNARCO, Acworth Georgia;
   b.  Christopher Horning – Plant Controller, UNARCO, Lewisville Texas;
   c.  Malena Marshall, CMI – Crowe Chizek and Company, LLC
   d.  Ross Fuller – American Capital
   e.  Walter Cisowski – Kingway, Inc.

4)  Internet Searches
   In addition to information provided from sales invoices, exemption certificates, and
   interviews, True Partners' personnel conducted internet searches of a number of
   customers in order to gather evidence regarding whether a particular customer held
   itself out as being engaged habitually in the business of reselling racking equipment
   of the same kind as Kingway had sold during the period of examination.

Exhibit C
Original Exposure Calculated By Crowe

| Kingway Location | Period | Exposure Estimate |
|---|---|---|
| Georgia | 2004 | 905,700 |
| Georgia | 2005 | 667,899 |
| Georgia | 2006 | 690,114 |
| Georgia | 2007 | 177,061 |
| Ohio | 2004 | 74,979 |
| Ohio | 2005 | 117,743 |
| Ohio | 2006 | 107,119 |
| Texas | 2004 | 274,937 |
| Texas | 2005 | 401,963 |
| Texas | 2006 | 323,801 |
| Total | | 3,741,317 |

Addendum A
Original Exposure Calculated By Crowe Chizek

| Kingway Location | Period | Exposure Estimate | 2006 - V(A) |
|---|---|---|---|
| Georgia | 2004 | 905,700 | |
| Georgia | 2005 | 667,899 | |
| Georgia | 2006 | 690,114 | 690,114 |
| Georgia | 2007 | 177,061 | |
| Ohio | 2004 | 74,979 | |
| Ohio | 2005 | 117,743 | |
| Ohio | 2006 | 107,119 | 107,119 |
| Texas | 2004 | 274,937 | |
| Texas | 2005 | 401,963 | |
| Texas | 2006 | 323,801 | 323,801 |
| Total | | 3,741,317 | 1,121,034 |

Addendum B
Exposure Adjusted for Filing Histories

| Kingway Location | Period | Original Crowe Exposure Estimate | Reduction | Estimated Exposure - V(B) |
|---|---|---|---|---|
| Georgia | 2004 | 905,700 | 266,819 | 638,881 |
| Georgia | 2005 | 667,899 | 230,044 | 437,855 |
| Georgia | 2006 | 690,114 | 221,564 | 468,550 |
| Georgia | 2007 | 177,061 | 86,126 | 90,936 |
| Ohio | 2004 | 74,979 | 12,559 | 62,420 |
| Ohio | 2005 | 117,743 | 14,155 | 103,588 |
| Ohio | 2006 | 107,119 | 22,942 | 84,177 |
| Texas | 2004 | 274,937 | 122,819 | 152,118 |
| Texas | 2005 | 401,963 | 126,343 | 275,620 |
| Texas | 2006 | 323,801 | 95,197 | 228,604 |
| Total | | 3,741,317 | 1,198,567 | 2,542,750 |

**See Addendum B backup supplied electronically**

Addendum C
Exposure Adjusted for Proper
Treatment of Distributors

| Kingway Location | Period | Exposure Estimate - V(B) | Reduction | Estimated Exposure - V(C) |
|---|---|---|---|---|
| Georgia | 2004 | 638,881 | 254,626 | 384,255 |
| Georgia | 2005 | 437,855 | 115,230 | 322,625 |
| Georgia | 2006 | 468,550 | 123,088 | 345,462 |
| Georgia | 2007 | 90,936 | 23,654 | 67,282 |
| Ohio | 2004 | 62,420 | 0 | 62,420 |
| Ohio | 2005 | 103,588 | 0 | 103,588 |
| Ohio | 2006 | 84,177 | 0 | 84,177 |
| Texas | 2004 | 152,118 | 46,729 | 105,389 |
| Texas | 2005 | 275,620 | 68,519 | 207,101 |
| Texas | 2006 | 228,604 | 65,715 | 162,890 |
| Total | | 2,542,750 | 697,561 | 1,845,190 |

See Addendum C backup supplied electronically

Addendum D
Exposure Adjusted for Additional Distributors

| Kingway Location | Period | Exposure Estimate - V(C) | Reduction | Estimated Exposure - V(D) |
|---|---|---|---|---|
| Georgia | 2004 | 384,255 | 232,714 | 151,541 |
| Georgia | 2005 | 322,625 | 200,536 | 122,089 |
| Georgia | 2006 | 345,462 | 194,995 | 150,467 |
| Georgia | 2007 | 67,282 | 33,224 | 34,058 |
| Ohio | 2004 | 62,420 | 23,226 | 39,194 |
| Ohio | 2005 | 103,588 | 45,587 | 58,001 |
| Ohio | 2006 | 84,177 | 36,959 | 47,218 |
| Texas | 2004 | 105,389 | 0 | 105,389 |
| Texas | 2005 | 207,101 | 0 | 207,101 |
| Texas | 2006 | 162,890 | 0 | 162,890 |
| Total | | 1,845,190 | 767,241 | 1,077,949 |

See Addendum D backup supplied electronically

Addendum E
Exposure Adjusted for Review of Large Customers

| State | Period | Exposure Estimate - V(D) | Reduction | Estimated Exposure - V(E) |
|-------|--------|--------------------------|-----------|---------------------------|
| Georgia | 2004 | 151,541 | 116,177 | 35,364 |
| Georgia | 2005 | 122,089 | 98,474 | 23,616 |
| Georgia | 2006 | 150,467 | 134,757 | 15,710 |
| Georgia | 2007 | 34,058 | 32,492 | 1,566 |
| Ohio | 2004 | 39,194 | 8,960 | 30,234 |
| Ohio | 2005 | 58,001 | 23,320 | 34,682 |
| Ohio | 2006 | 47,218 | 18,363 | 28,856 |
| Texas | 2004 | 105,389 | 52,403 | 52,986 |
| Texas | 2005 | 207,101 | 156,584 | 50,518 |
| Texas | 2006 | 162,890 | 94,405 | 68,485 |
| Total | | 1,077,949 | 735,933 | 342,016 |

See Addendum E backup supplied electronically

**Addendum F**
**Adjusted Exposure By Kingway Location**

| State | GA Total | OH Total | TX Total | Overall Total - V(E) | Less States With Immaterial Exposure | States With Material Exposure |
|---|---|---|---|---|---|---|
| ALASKA | - | - | - | - | - | - |
| ALABAMA | 7,550 | 1,425 | 2 | 8,976 | 8,976 | - |
| ARKANSAS | - | 287 | - | 287 | 287 | - |
| ARIZONA | - | - | 5,574 | 5,574 | 5,574 | - |
| CALIFORNIA | 1,345 | - | 65,306 | 66,651 | - | 66,651 |
| COLORADO | - | 961 | 4,391 | 5,352 | 5,352 | - |
| CONNECTICUT | 42 | 1,894 | - | 1,936 | 1,936 | - |
| DIST. COLUMBIA | - | - | - | - | - | - |
| DELEWARE | - | - | - | - | - | - |
| FLORIDA | 1,955 | 2,735 | 2,906 | 7,596 | 7,596 | - |
| GEORGIA | - | 15,788 | - | 15,788 | 15,788 | - |
| HAWAII | - | - | - | - | - | - |
| IOWA | 3,393 | 11 | 305 | 3,708 | 3,708 | - |
| IDAHO | - | - | - | - | - | - |
| ILLINOIS | 219 | 4,593 | 6,751 | 11,564 | 11,564 | - |
| INDIANA | 2,707 | 1,458 | - | 4,165 | 4,165 | - |
| KANSAS | 89 | - | - | 89 | 89 | - |
| KENTUCKY | 420 | 268 | 16 | 704 | 704 | - |
| LOUISIANNA | - | 87 | - | 87 | 87 | - |
| MASSACHUSETS | 179 | 5 | - | 184 | 184 | - |
| MARYLAND | 476 | 3,750 | - | 4,226 | 4,226 | - |
| MAINE | - | 1,080 | - | 1,080 | 1,080 | - |
| MICHIGAN | - | 2,413 | - | 2,413 | 2,413 | - |
| MINNISOTA | - | 8,459 | - | 8,459 | 8,459 | - |
| MISSOURI | 10,954 | 264 | - | 11,218 | 11,218 | - |
| MISSISSIPPI | - | 845 | - | 845 | 845 | - |
| MONTANA | - | - | - | - | - | - |
| NORTH CAROLINA | - | 7,086 | 45 | 7,131 | 7,131 | - |
| NORTH DAKOTA | 112 | 781 | - | 893 | 893 | - |
| NEBRASKA | - | 8 | 3,514 | 3,521 | 3,521 | - |
| NEW HAMPSHIRE | - | - | - | - | - | - |
| NEW JERSEY | - | - | 21 | 21 | 21 | - |
| NEW MEXICO | - | 572 | 4,599 | 5,171 | 5,171 | - |
| NEVADA | 14,753 | 19 | - | 14,773 | 14,773 | - |
| NEW YORK | 26,779 | 56 | 6,924 | 33,759 | - | 33,759 |
| OHIO | - | - | 90 | 90 | 90 | - |
| OKLAHOMA | - | - | 18,698 | 18,698 | 18,698 | - |
| OREGON | - | - | - | - | - | - |
| PENNSYLVANIA | - | 19,240 | - | 19,240 | 19,240 | - |
| RHODE ISLAND | - | - | - | - | - | - |
| SOUTH CAROLINA | 238 | - | - | 238 | 238 | - |
| SOUTH DAKOTA | 1,619 | 277 | - | 1,895 | 1,895 | - |
| TENNESSEE | 758 | 9,271 | - | 10,030 | 10,030 | - |
| TEXAS | 2,668 | 4,890 | - | 7,558 | 7,558 | - |
| UTAH | - | 1,989 | 1,661 | 3,649 | 3,649 | - |
| VIRGINIA | - | - | - | - | - | - |
| VERMONT | - | 1,463 | - | 1,463 | 1,463 | - |
| WASHINGTON | - | - | 51,015 | 51,015 | - | 51,015 |
| WISCONSIN | - | - | - | - | - | - |
| WEST VIRGINIA | - | 1,798 | 32 | 1,830 | 1,830 | - |
| WYOMING | - | - | 139 | 139 | 139 | - |
| Total | 76,256 | 93,772 | 171,989 | 342,016 | 190,591 | 151,425 |

See Addendum F backup supplied electronically

There is no Addendum G

This page intentionally left blank

There is no Addendum H

This page intentionally left blank

Addendum I
Adjusted Exposure Limited to 2006

| Kingway Location | Total Exposure - V(E) | Exposure - V(E) for 2004, 2005, and 2007 | Exposure - V(E) Limited to 2006 |
|---|---|---|---|
| Georgia | 76,256 | 60,546 | 15,710 |
| Ohio | 93,772 | 64,916 | 28,856 |
| Texas | 171,989 | 103,504 | 68,485 |
| Total | 342,016 | 228,966 | 113,051 |

**POST-CLOSING ADJUSTMENT DISPUTE**
**IN CONNECTION WITH THE ACQUISITION OF KIC HOLDINGS, INC., BY**
**UNARCO MATERIAL HANDLING, INC.**

**SUPPLEMENTAL STATEMENT OF POSITION AND SUPPORTING DOCUMENTATION**
**SUBMITTED BY**
**UNARCO MATERIAL HANDLING, INC.**

**NOVEMBER 6, 2007**

# TABLE OF CONTENTS

**PAGE**

A.   Seller's Arguments About "The Post-Closing Adjustment Process And The Role Of The Firm" Are Meritless.................................................................................1

    1.   Buyer Has Fully Complied With The Terms of The SPA .......................................1

    2.   Buyer's Proposed Adjustments Are Not Disguised Claims For Indemnification Nor Are They Improper Attempts To Second-Guess The Accounting Judgments Made By The Company .........................................2

    3.   Buyer Did Not Consent To The Company's Accounting Policies .........................6

    4.   Buyer Has Established The Validity Of The Adjustments It Has Proposed............6

    5.   The Firm Can And Should Consider Buyer's Revised Sales Tax Analysis ...........7

B.   Seller's Arguments Regarding Specific Disputed Items .......................................8

    1.   Estimated Purchase Price.........................................................................8

    2.   Accrued Sales Tax Liability....................................................................10

        a.   The Sample Used By Crowe To Estimate The Company's Sales Tax Liability Was Not Biased.............................................. 12

        b.   Filing Histories...................................................................... 14

        c.   Treatment of Kingway's Wholesale Distributors in General ................... 18

        d.   Identification and Inconsistent Treatment of Kingway's Distributors ........................................................................... 19

        e.   High-Dollar Customers – Specific Review Points ................................... 20

        f.   Materiality – Tax and Generally Accepted Accounting Principles (GAAP)........................................................................... 22

        g.   Alternative Grounds for Tax Exemption ................................. 23

        h.   Collecting Back-Taxes from Customers.................................... 25

        i.   Total Adjustments To Tax Liability Estimate In Response To The Davis Report .................................................................... 26

    3.   Accounts Receivable Allowance ................................................................26

**PAGE**

    4.     Prepaid Advertising Costs (or Prepaid Trade Show Expenses)............................28

    5.     Vacation Accrual ...........................................................................................30

    6.     Petsmart Claim..............................................................................................33

    7.     Wise Installation ...........................................................................................34

C.    Conclusion ...........................................................................................................35

Buyer submits this Supplemental Statement of Position in further support of its claim that it is owed $4,712,537 from the Seller pursuant to Section 2.04 of the SPA,[1] and in reply to Seller's "Statement of Position" ("Seller's SOP"). In its SOP, Seller advances various arguments designed to avoid the post-closing adjustment dispute resolution process set forth in Section 2.04 of the SPA (the "PCA Process") and deny Buyer the remedies provided to it by the SPA. These arguments are designed to obfuscate the issues in the hope that doing so will result in a "no-decision," which Seller expects would effectively relieve it of liability. However, as set forth below, in light of the actual terms of the SPA, Seller's arguments are without merit.

Seller has conceded the Cash Amount Item, the Unearned Revenue Item, Prepaid Expenses (Tools and Dies) and the Revolver Account Liability At Transaction Date Item. Seller advances various arguments addressed to the remaining disputed items. Each of these arguments is contrary to GAAP and the terms of the SPA and should be rejected.

## A.    Seller's Arguments About "The Post-Closing Adjustment Process And The Role Of The Firm" Are Meritless

### 1.    Buyer Has Fully Complied With The Terms of The SPA

Seller contends that Buyer is "inviting" the Firm to "disregard the terms of the Agreement in favor of other standards or constructs, or to expand the scope of the engagement beyond a simple comparison of Estimated Purchase Price to Actual Purchase Price;" and claims that "Buyer repeatedly ignores what the Agreement has to say and instead attempts to justify its proposed post-closing adjustments on grounds other than the terms of the Agreement." Seller's SOP at 5. To the contrary, a review of the Buyer's Draft Computation (Appendix A) reveals that it was prepared in strict compliance with the SPA.

---

[1] Unless separately defined, all capitalized terms have the same meanings ascribed to those terms in the SPA and Buyer's Statement of Position, dated October 23, 2007 ("Buyer's Initial Submission").

Section 2.04 provides that "Buyer and its auditors shall prepare, and deliver to Seller, (i) the Buyer's determinations of the Cash Amount, the Indebtedness Payoff Amount and the Net working Capital Amount, and (ii) the Buyer's calculation of the Actual Purchase Price." Buyer's Draft Computation contains four schedules, one for each item required to be included in the Draft Computation. Further, Buyer's Schedule of Net Working Capital Amount included in the Draft Computation (Appendix A, p. 4) is in the exact same form and is comprised of exactly the same components as the SPA's "Illustrative Example of Calculation of Net Working Capital," (SPA (Appendix C), Annex I to Exhibit A).

Seller's further contention that "[n]owhere in Buyer's Draft Computation does the phrase 'Estimated Purchase Price' appear," (Seller's SOP at 5) is irrelevant – the SPA does not require that phrase to be included in the Draft Computation. In any event, Buyer's Draft Computation included a determination of the Actual Purchase Price of ($775,768) (Appendix A, p. 4), which is all that is necessary to calculate the net post-closing adjustment, since, as Seller admits, the Estimated Purchase Price is already fixed.[2]

### 2.    Buyer's Proposed Adjustments Are Not Disguised Claims For Indemnification Nor Are They Improper Attempts To Second-Guess The Accounting Judgments Made By The Company

Seller contends that Buyer's proposed post-closing adjustments are disguised claims for indemnification and/or improper attempts to revise the Company's prior accounting policies and, as such, are not within the scope of this proceeding. Seller's SOP at 5-7. This argument is belied by simple logic and the plain terms of the SPA.

---

[2] Seller's contention that "it is Buyer's position that it should not pay money to Seller for the purchase of the Company and that, in fact, Seller agreed both to give Buyer all of its interests in the Company and also to give Buyer Money for having accepted those interests," (Seller's SOP at 1) demonstrates either Seller's lack of understanding or purposeful ignorance of the terms of the transaction. It is undisputed that Buyer paid almost $39.6 million at closing to acquire Seller's interest the Company.

Here, as with most acquisitions, the actual net working capital of the company at closing can only be determined post-closing. Accordingly, in connection with the calculation of a purchase price, parties typically estimate the amount of net working capital and agree upon a post-closing process to adjust for the actual net working capital amount. Net working capital is simply the difference between current assets and current liabilities. In order to determine the existence and amount of current liabilities, parties typically apply GAAP.

Accordingly, a contention by Buyer in the context of the PCA Process that a liability existed under GAAP as of the closing date and thus, should have been, but was not, included in the Seller's calculation of Estimated Net Working Capital, is not required to be asserted only as a claim for indemnification as a result of a breach of a representation or warranty. Rather, that contention is precisely the type of issue that is intended to be addressed by the PCA Process, which is intended to resolve disputes between Buyer and Seller over the actual net working capital amount as of closing, an amount that is to be measured in accordance with GAAP.

Seller's contention that Section 11.02 provides the "exclusive remedy" for Buyer to recoup from Seller the amount of the liabilities for which it is seeking a post-closing adjustment is similarly incorrect. Seller's SOP at 6. There is no language in the SPA – and Seller points to none – which provides that the rights and remedies afforded to Buyer in Section 2.04 and the rights and remedies afforded to Buyer in Section 11.02 are mutually exclusive.[3] The fact that Seller also may have breached certain representations and warranties by failing to

---

[3] Similarly, there is no language in the SPA which suggests that the PCA Process "was never designed to be an investigation of 'big' issues such as the claims that Buyer is making regarding the Company's prior accounting practices ...." Seller's SOP at 7. There is no limitation on the scope of the issues that can be resolved through the PCA Process.

include certain liabilities on its Closing Balance Sheet does not preclude Buyer from seeking redress through the PCA Process.[4]

In sum, Seller is asking the Firm to find that, even if it agrees with Buyer that, for example, under GAAP a liability for accrued vacation should have been included in the Company's current liabilities at closing for purposes of the calculation of Net Working Capital, it should not determine that an adjustment should be made to reflect that liability because Buyer could also sue Seller for indemnification with respect to that liability. Simply to articulate that proposition reveals that it is nonsense.

Seller's further contention that the SPA calls for an "apples to apples" comparison of the Estimated Purchase Price to the Actual Purchase Price based on the Company's historical accounting practices is also wrong. Seller's SOP at 6. Seller correctly notes that the SPA provides that "Net Working Capital shall be determined on a consolidated basis in accordance with the accounting principles and methods used in the preparation of the Reference Balance Sheet *and GAAP*." Id. Seller's contention conveniently ignores the *"and GAAP"* proviso in the very language it quotes. This language does not give rise to a "presumption" "that the prior accounting practices of the Company as reflected in the Reference Balance Sheet are to be used again" to calculate Net Working Capital. Rather, that language plainly indicates that the prior accounting practices of the Company are to be used to calculate Net Working Capital *only to the extent that those practices are in accordance with GAAP*. If, as the SPA explicitly requires, the Parties must calculate Net Working Capital in accordance with GAAP, the Parties cannot use

---

[4] Moreover, it makes no sense that Buyer would have agreed to limit its remedies for Seller's failure to properly calculate Net Working Capital to initiating litigation, when the SPA explicitly provides for a much less costly and less time-consuming remedy. This is especially so in light of the fact that indemnification is only available for amounts in excess of the "threshold" set forth in the SPA and, with respect to claims for breach of certain representations and warranties, is capped by the amount of the escrow.

-4-

any of the Company's prior accounting practices that were not compliant with GAAP in connection with that calculation.[5]

In sum, because one purpose of the PCA Process is to correct inaccuracies in the calculation of Estimated Net Working Capital, that purpose would be defeated entirely if the Parties were bound to calculate Net Working Capital by using the same inaccurate accounting policies that caused the calculation of Estimated Net Working Capital to be inaccurate in the first place.

For these same reasons, Buyer's proposed adjustments are not attempts to second-guess the Company's prior accounting practices. To the contrary, as set forth above, the PCA Process explicitly provides that the calculation of Net Working Capital must be based upon GAAP-compliant accounting policies.[6] Therefore, the Firm is not only entitled to reject the Company's prior accounting policies for the purposes of the Net Working Capital Calculation to the extent that they do not comply with GAAP, it is required to do so.

---

[5] As further evidence that the SPA does not require an "apples to apples" comparison of Estimated Net Working Capital to Net Working Capital based on historical accounting practices, we note that the SPA explicitly requires that Net Working Capital be determined in accordance with GAAP, but there is no requirement that Estimated Net Working Capital be calculated in accordance with GAAP. Thus, one purpose of the PCA Process is to ensure that Net Working Capital is calculated in accordance with GAAP.

[6] Accepting Seller's argument would potentially allow Seller to evade liability and render Buyer's remedies under the PCA Process ineffective. For example, Seller could purposefully ignore GAAP and erroneously not include certain liabilities in its calculation of Estimated Net Working Capital – with respect to which it has unfettered discretion. Then, when Buyer includes those liabilities in its calculation of Net Working Capital, Seller can object and force the parties into the PCA Process. In response to Buyer's argument that those purposefully omitted liabilities should be included in the calculation of Net working Capital, Seller, using its purposeful failure to comply with GAAP as both a sword and a shield, could argue, as it does here, that the PCA Process is not designed to address failures by the Seller to comply with GAAP. If that argument were accepted and the liabilities in question either did not meet the indemnification thresholds or exceeded the amount in escrow, which amount is a cap on Losses resulting from the Seller's breach of representations and warranties, Seller could evade significant liability.

### 3.    Buyer Did Not Consent To The Company's Accounting Policies

Seller's contention that Buyer knew of and implicitly consented to Seller's accounting practices and policies and, specifically, to the "Company's judgment regarding the sales tax issues," is baseless. Seller's SOP at 14. In connection with the preparation of the Draft Computation, buyer discovered the BDO Seidman report (Appendix D), which estimated that the Company had outstanding sales tax liability ranging from $271,356 to $11,716,750.[7] Moreover, Buyer had no control over the preparation of the Closing Balance Sheet and the calculation of Estimated Net Working Capital. Seller had complete discretion in this regard and, even if Buyer was aware that there was accrued sales tax liability prior to closing, Buyer reasonably would have assumed that Seller would include that liability in the calculation of Estimated Net Working Capital. The fact that Seller did not do so is precisely why the SPA provides for a post-closing adjustment process to correct the Net Working Capital calculation.

### 4.    Buyer Has Established The Validity Of The Adjustments It Has Proposed

Seller contends that Buyer has the "burden to come forward with specific proof and reasons in support of each specific item that it proposes to account for differently," and that "Buyer has not come forward with affirmative specific documentary support for its position, and, in the face of such a lack of support, the Company's historical accounting policies should govern." Seller's SOP at 7-8. Buyer's Initial Submission, however, contained voluminous and detailed support for each adjustment proposed by Buyer.

More specifically, Seller asserts that with respect to sales tax, "Buyer is proceeding largely by making incorrect and unsupported assumptions about what sales tax

---

[7] This report is dated February 7, 2007. Based upon Seller's representation that it began to market the Company in or about the winter of 2006/2007 (Seller's SOP at 1), it appears that this analysis was specifically prepared in connection with Seller's assessment of the Company's outstanding liabilities for purposes of an intended sale.

obligations might be." Seller's SOP at 8. Buyer's so-called "unsupported assumptions," are actually two detailed sales tax analyses, both prepared by sales tax professionals at nationally recognized accounting firms – one of which was prepared at the Seller's request – which calculated sales tax liability based upon reasonable and accepted methodologies.

### 5. The Firm Can And Should Consider Buyer's Revised Sales Tax Analysis

Seller's contention that the Firm cannot consider the revised sales tax analysis submitted with Buyer's Initial Submission because it was completed outside of the 60 day period within which Buyer must deliver the Draft Computation (Seller's SOP at 9), is based upon yet another misconstruction of the SPA. While Seller is correct that under the SPA, "Buyer had 60 days after the Closing to provide Seller" with the Draft Computation, the SPA plainly contemplates that a Draft Computation could be subject to revision.

Seller ignores the fact that the SPA provides that, after exchange of the Buyer's Draft Computation and the Seller's Objection Notice, the parties have 60 days to attempt to resolve any disputes over the calculation of Net Working Capital. Implicit in the inclusion of a 60-day resolution period is the notion that Buyer can revise the Draft Computation based upon the results of its discussions with the Seller. Then, if items remain in dispute, those disputes can be submitted to the Firm, either as originally postured, or, if narrowed during the resolution period, as revised. That is precisely what happened here.

In any event, Seller's argument elevates form over substance because the end result would be the same regardless of whether the Firm considers the Buyer's initial or revised sales tax analysis. Buyer reduced its estimate of the Company's sales tax liability in response to the points raised by Seller during the 60-day period – the same points raised by Seller in its SOP. Thus, even if the Firm determined that, as a starting point, it must consider the Buyer's initial

sales tax analysis, Buyer has already acknowledged the validity of certain of the points raised by Seller, which reduce Buyer's initial estimate of sales tax liability to the amount set forth in Buyer's revised estimate of sales tax liability.

For the reasons set forth above, each of Seller's arguments regarding the "Post-Closing Adjustment Process And The Role Of The Firm" are meritless and should be rejected.[8]

**B.    Seller's Arguments Regarding Specific Disputed Items**

**1.    Estimated Purchase Price**

As set forth in Buyer's Initial Submission, Seller used the wrong Estimated Indebtedness Payoff Amount and the wrong amount of the excess of Target Net Working Capital over Estimated Net Working Capital to calculate the Estimated Purchase Price. Specifically, Seller used amounts that were provided by Seller on March 27, 2007 (Exhibit 13) that Seller "updated" on the closing date (Exhibit 14).[9]

Next, Seller contends that Buyer used an incorrect methodology to compute the Estimated Purchase Price. Seller is wrong. Buyer used the formula prescribed by the SPA and obtained the inputs to that formula from either the SPA (e.g., "Transaction Value") or from the Seller's final closing statement that was delivered on March 30, 2007 (Exhibit 14), which represents the amount that was actually paid by Buyer at closing, $39,587,338.

Seller is correct that "the Agreement defines Estimated Purchase Price as simply the sum of other variables that are fixed as of the Closing Date." Indeed, Section 2.02 of the SPA effectively defines Estimated Purchase Price as the amount actually paid by the Buyer on the closing date: "[t]he buyer shall pay to Seller at the Closing, by wire transfer of immediately

---

[8] Notably, none of these arguments have previously been raised by Seller in connection with its Objection Notice and, accordingly, should be deemed waived.

[9] Exhibits 13 and 14 are annexed to Buyer's Initial Submission.

available funds to the accounts and in the amounts designated by the Seller, the Estimated Purchase Price less the Escrow Amount (as defined below)." Accordingly, the actual amount paid by Buyer to, or on behalf of, Seller at closing constitutes the Estimated Purchase Price.

The Estimated Purchase Price used by Seller is demonstrably incorrect. According to Seller's purported Estimated Purchase Price, total consideration paid by Buyer would exceed the Transaction Value ($40,000,000), even though Seller concedes that there was a net working capital deficit as compared to Target Net Working Capital. That result is completely contrary to the overall economics of the SPA which provide that the designated "Transaction Value" ($40,000,000) is to be adjusted upward by actual cash on hand at the date of close and, either, adjusted downward if actual net working capital is less than Target working capital ($3,900,000) or adjusted upward if Net Working Capital is greater than Target Net Working Capital. Here, by Seller's own admission, the Net Working Capital Amount was $1,224,711 *less* than Target Net Working Capital and, accordingly, the Transaction Value should be adjusted downward by that amount and the total consideration paid by Buyer for the Company should be less than the Transaction Value, $40,000,000. Indeed, using the numbers contained in Seller's Objection Notice, total consideration paid by Buyer would have been $38,842,862.

| | | |
|---|---|---|
| **Transactional Value as defined,** | | **$40,000,000** |
| **Adjustments to value:** | | |
| **Cash on Hand** | | **$67,573** |
| **Net Working Capital computed by Seller** | **2,675,289** | |
| **Targeted Net Working Capital, as defined** | **(3,900,000)** | |
| | | **(1,224,711)** |
| **Seller's Transaction value as computed** | | **$38,842,862** |

However, if Seller's Estimated Purchase Price were correct and Seller were correct that it is owed $1,650,932 as a post-closing adjustment, the total consideration paid by Buyer for the Company would be $41,238,270 (Buyer cash paid at closing $39,587,338 + Additional amount owed by Buyer $1,650,932).

The difference in Seller's inconsistent transaction values is $2,395,408 ($41,238,270 - $38,842,862) which, not coincidentally, equals the difference between Buyer's Estimated Purchase Price ($5,571,379) and Seller's Estimated Purchase Price ($3,175,971).

In conclusion, the Estimated Purchase Price must be computed based on actual funds paid by Buyer at closing. To the extent that the amount paid at closing is based on estimates, it is to be "trued up" through the post-closing adjustment process. To be an effective "true up," the Actual Purchase Price must be compared against what was actually paid at closing, not against what was estimated to be paid at closing, as Seller proposes. Accordingly, the Estimated Purchase Price is $5,571,379.

### 2.    Accrued Sales Tax Liability

In Buyer's Initial Submission, Buyer established that the Company had known liabilities for accrued sales tax totaling in excess of $3.7 million, which liabilities were not included in Seller's calculation of Net Working Capital. In response, Seller argues that "a sales tax accrual as of the Closing Date is ... inconsistent with FAS 5, which supplies the applicable rules for loss accrual," because no loss was probable or reasonably estimable. Seller's SOP at 12. This argument is without merit and must be rejected – sales taxes are *known liabilities*, not contingencies and, as such, are not subject to FAS 5.

FAS 5, ¶ 1, defines loss contingencies as "an existing condition, situation, or set of circumstances involving uncertainty as to possible gain or loss that will ultimately be resolved when one or more future events occur or fail to occur." In contrast, according to FAS 5, ¶ 70,

-10-

"liabilities are present responsibilities" and "a liability is the result of a transaction of the past, not of the future." Here, the Company has a current legal obligation to pay sales taxes, which obligation arose, as a matter of law, as a result of sales made by the Company in the past.

The view that the Company's current obligation to pay sales tax constitutes a liability, not a loss contingency is confirmed by national accounting experts. In a presentation made at the IPT 2007 Sales and Use Tax Symposium, Stephanie Csan, CMI, Director, Sales and Use Tax Services at Deloitte Tax LLP, opined that "known obligations are liabilities – not contingencies," and that "sales and use taxes are not contingencies if the laws of the taxing jurisdictions clearly apply to the transactions." Copy attached as Exhibit 37.

Seller does not deny that the Company was and remains obligated, as a matter of law, to file tax returns and remit sales taxes in various states, nor that the Company repeatedly failed to do so in the past. In other words, Seller does not contend that the Company is not liable for back-sales taxes in multiple jurisdictions. Rather, Seller disputes the amount of the estimate of back-sales taxes for which the Company is liable and contends that the Company's obligation to pay those taxes is "contingent" on the likelihood of audits by state taxing authorities. However, according to FAS 5, the fact that an estimate is necessary to quantify that liability does not make it a "loss contingency,"[10] and the likelihood of an audit by a state taxing authority has no bearing on the whether an existing liability for sales tax must be recorded.

Accordingly, FAS 5 has no application here and Seller's argument that no accrual should be made for accrued sales tax liability must be rejected.[11]

---

[10] "Not all uncertainties inherent in the accounting process give rise to contingencies as that term is used in this Statement. The mere fact that an estimate is involved does not of itself constitute the type of uncertainty referred to in the definition of a [loss contingency]." FAS 5, ¶ 2.

[11] Even if FAS 5 were applicable here, the accrued sales tax liability would be probable and reasonably estimable. First, as indicated by Seller, the Company has been audited by at least three different state taxing authorities since 2004. In light of that history and the impact of information sharing standards and

In response to Buyer's contentions regarding the amount of accrued sales tax liability, Seller has submitted an "Expert Report of Bruce H. Davis" in which Mr. Davis asserts that the methodology and assumptions utilized by Crowe, Chizek & Co. ("Crowe") to estimate the Company's sales tax liability were flawed and, based upon the supposed correction of those flaws, proposes various reductions in Crowe's sales tax liability estimate.

As set forth below and in the accompanying Expert Report of Dr. Will Yancey (the "Yancey Report"), Crowe's methodology and assumptions were reasonable, appropriate and consistent with the methodology and assumptions used by state taxing authorities to assess sales tax liability. Mr. Davis' report is riddled with errors, unsupported assertions, and opinions that have no basis in fact or law or are contradicted by the well-documented practices of state taxing authorities and provides no legitimate basis to reduce the amount of the net working capital adjustment proposed by Buyer to account for accrued sales tax liability. Each of Mr. Davis' principal assertions is addressed below.[12]

a.     **The Sample Used By Crowe To Estimate The Company's Sales Tax Liability Was Not Biased**

Mr. Davis claims that "Crowe used a biased sample in its liability projection methodology." Specifically, he asserts that Crowe's decision to use 2006 as a non-statistical sample period is *"subject to the bias (whether intended or not) of those persons who choose and evaluate the sample."* Davis Report at 5. This assertion erroneously suggests that all sampling is

---

practices that have become commonplace amongst states through the Multistate Tax Compact and the Streamlined Sales Tax Project, it cannot reasonably be said that further audits are not probable. Second, in light of the fact that two nationally recognized accounting firms have quantified the Company's sales tax liability, it cannot reasonably be said that the liability is not reasonably estimable.

[12] The Crowe professionals who prepared both the initial and revised estimates of sales tax liability, Jeff Greene, Malena Marshall and William Buechler, have reviewed this section of the submission. As set forth in Exhibit 38, they verify the factual statements set forth herein about the conduct of their analysis and agree with the positions taken in response to the assertions made in the Davis Report.

invalid for use in estimating a sales tax liability and "*its objective validity cannot be upheld.*" Id. This is not the case and, not surprisingly, Mr. Davis does not present any literature or other authority to support this claim. In fact, as set forth in the accompanying Yancey Report, block sampling, as well as nonstatistical sampling, are common practices utilized by state taxing authorities in determining the sales tax liability of a taxpayer under audit.

The propriety of using a one-year nonstatistical sample to estimate sales tax liability is explained in *Multistate Sales and Use Tax Audits*:

> Typically, nonstatistical samples are block samples involving one or more time segments. Because accounts payable files generally are maintained for individual fiscal or calendar years, a one-year block often will be chosen for a detailed review. In such cases, the auditor will examine the paid bill files for the selected year, schedule any errors, and project the tax due for the rest of the audit period (the entire population). Occasionally, this auditor will not use a projections base, but will simply multiply the total errors for the year by the number of years in the audit period.[13]

Crowe's decision to use 2006 as its sample was not the product of any bias. That decision was based primarily upon discussions with current management at each Company location which revealed that detailed sales records for 2006 were readily available and maintained in a standardized format. In fact, Crowe specifically analyzed whether the sample was biased and, based upon a detailed analysis of sales data for each of the years included within the estimate (2004, 2005, 2006), concluded that it was not. According to that analysis, sales in 2006 were not materially different from sales in 2005 and 2004. Crowe also analyzed the frequency of the Company's sales to all jurisdictions and determined that use of 2006 as a sample would include sales to most jurisdictions. Company management also represented that

---

[13] Davis, Daniel M. *Multistate Sales and Use Tax Audits,* Aspen Publishers Multistate Taxation Library, 2007.

the primary functions and principles of the organization did not differ materially during the period 2004 through 2007.

The use of a detailed, one-year sample to calculate sales tax liability is an acceptable and widely utilized practice that is consistent with the audit practices of the taxing jurisdictions in which there is liability (Yancey Report at 1-2) and Mr. Davis has presented absolutely no authority or evidence to the contrary.

**b.     Filing Histories**

Mr. Davis asserts that "Crowe failed to consider the sales tax return filing histories of the various Kingway locations" which, if they had been considered, would reduce the estimated sales tax liability. Davis Report at 6. Although Crowe did not consider the tax return filing histories of the Company's various locations in its initial estimate of sales tax liability, it did do so in its revised estimate of sales tax liability that was included with Buyer's Initial Submission to the Firm. In the revised sales tax analysis, Crowe allowed a full credit for the taxes collected by each Company location and remitted to the various states.

Mr. Davis further asserts that, based on his analysis of the filing histories of the various Company locations, Crowe's estimate should be reduced "to the extent that Kingway had been a filer or had been subjected to audit by taxing authorities [in each state]." Davis Report at 6. This assertion is wrong for a number of reasons. First, Mr. Davis bases this assertion on the purported fact that he "found no indication" that Kingway's reporting of sales tax "was incorrect." Id. However, numerous errors in Kingway's reporting of sales tax are evident. For example, although the state of Mississippi Department of Revenue audited the Texas and Georgia locations through 2004, the Company continued to fail to collect sales tax and/or to file tax returns in Mississippi in 2005, 2006 and 2007. Specifically, the detailed sales transaction ledgers reflect that Kingway installed tangible personal property in Mississippi during 2005,

-14-

2006 and 2007, thus maintaining nexus under Mississippi law[14] but did not collect sales tax in Mississippi during that period. Thus even though the Company was audited and assessed for not having paid sales tax in Mississippi for certain years up to 2004, it did not establish processes to collect and remit taxes on sales to customers within Mississippi thereafter.

Second, although Mr. Davis notes that the Company's Georgia location was filing "periodically in Alabama, Louisiana, Massachusetts, Nebraska and Wisconsin," the Crowe review demonstrated that those filings were not sufficient and the Company has outsanding sales tax liabilities in those states.[15] According to Company management, the periodic filing was justified on the Company's practice to acknowledge nexus within a jurisdiction only for the period during which it was executing the installation of tangible personal property within the state or when a customer had specifically requested that Kingway collect the tax for a specific project. This practice of registering and then withdrawing that registration after a job was completed, failed to recognize that the recurring sales solicitations, installations and execution of sales to customers within the state preserved that filing obligation, as defined in each state's nexus standards.

Finally, to the extent that, as Mr. Davis claims, various of the Company's locations remitted taxes in connection with an audit, the payment of those taxes is reflected in Crowe's analysis.

---

[14] MCA § 27-65-17 imposes the privilege tax on "...*every person engaging or continuing within this state in the business of selling any tangible personal property whatsoever...*" Additionally, MCA §27-65-9 clearly includes any person installing personal property in Mississippi as "doing business" within the state.

[15] Mr. Davis' contention that his "fieldwork revealed that Kingway's Georgia, Texas and Ohio locations were filing tax returns in their own respective domiciliary states," and that the "Georgia location was filing consistently in Ohio, North Carolina, Pennsylvania and Texas," has no bearing on the estimate of sales tax liability. Crowe's sales tax liability analysis has already been reduced by all taxes collected and remitted by those locations. Mr. Davis' claim that the Georgia location was audited by the State of Mississippi is incorrect.

There is no question that the Company meets the federal standards for the imposition of sales tax on nonresident sellers under both the Commerce Claus and the Due Process Clause of the U.S. Constitution as a result of its "bright line" physical presence in those states while performing installation services, soliciting business, and accepting orders from consumers within those states.  No adjustment beyond credit for taxes collected and remitted should be made to the estimated sales tax liability.

Each state is discussed in further detail below:

### Alabama

The Georgia location registered, calculated and remitted tax to the State of Alabama from April 2006 through June 2006 (Exhibit 17). However, the sales detail for the Georgia location (Exhibit 18) demonstrates that sales to customers in Alabama were made prior to April 2006 and continued to be made after June 2006.  Thus, while Crowe allowed a credit in its analysis for the taxes remitted in connection with sales made during the period April '06 through June '06, no credit has been allowed for sales made prior to and after this period because Crowe found no evidence that sales tax was paid for those periods.

### Illinois

The Georgia location calculated and remitted tax to the State of Illinois from 2005 through March 31, 2006 (Exhibit 19). However, the sales detail for the Georgia location (Exhibit 18) demonstrates that sales to customers in Illinois were made prior to 2005 and continued to be made after March 31, 2006.  Thus, while Crowe allowed a credit in its analysis for the taxes remitted in connection with sales made during the period 2005 through March 31, 2006, no credit has been allowed for sales made prior to and after this period because Crowe found no evidence that sales tax was paid for those periods.

### Louisiana

The Georgia location calculated and remitted tax to the State of Louisiana from June 1, 2006 through August 10, 2006 (Exhibit 20).  However, the sales detail for the Georgia location (Exhibit 18) demonstrates that sales to customers in Louisiana were made

prior to June 1, 2006 and continued to be made after August 10, 2006. Thus, while Crowe allowed a credit in its analysis for the taxes remitted in connection with sales made during the period June 1, 2006 through August 10, 2006, no credit has been allowed for sales made prior to and after this period because Crowe found no evidence that sales tax was paid for those periods.

**Massachusetts**

The Georgia location calculated and remitted tax to the State of Massachusetts from 2005 through March 31, 2006 (Exhibit 21). However, the sales detail for the Georgia location (Exhibit 18) demonstrates that sales to customers in Massachusetts were made prior to 2005 and continued to be made after March 31, 2006. Thus, while Crowe allowed a credit in its analysis for the taxes remitted in connection with sales made during the period 2005 through March 31, 2006, no credit has been allowed for sales made prior to and after this period because Crowe found no evidence that sales tax was paid for those periods.

**Nebraska**

The Georgia location calculated and remitted tax to the State of Nebraska for the second and third quarters of 2006 (Exhibit 22). However, the sales detail for the Georgia location (Exhibit 18) demonstrates that sales to customers in Nebraska were made prior to the second quarter of 2005 and continued to be made after the third quarter of 2006. Thus, while Crowe allowed a credit in its analysis for the taxes remitted in connection with sale made during the second and third quarters of 2006, no credit has been allowed for sales made prior to and after this period because Crowe found no evidence that sales tax was paid for those periods.

**Wisconsin**

The Georgia location calculated and remitted tax to the State of Wisconsin from June through September of 2006 (Exhibit 23). However, the sales detail for the Georgia location (Exhibit 18) documents that sales to customers in Wisconsin were made prior to June 2006 and continued to be made after September 2006. Thus, while Crowe allowed a credit in its analysis for the taxes remitted in connection with sales made during the period June 2006 through September 2006, no credit has been allowed for sales made prior to and after this period because Crowe found no evidence that sales tax was paid for those periods.

c.    **Treatment of Kingway's Wholesale Distributors in General**

Mr. Davis contends that Crowe erroneously treated sales to customers it identified as distributors as 15% taxable, "presumably on the assumption that the distributors may also have made purchases from Kingway for their own consumption." Davis Report at 6. Crowe did no such thing. Crowe treated all sales to customers it identified as distributors as 100% exempt.

In connection with the preparation of the initial estimate of sales tax liability, Crowe identified wholesale distributors based on the exemption certificates it located in the Company's files. All sales made to customers that presented a valid exemption certificate were treated as 100% exempt. It subsequently became apparent that the Company's exemption certificate files were incomplete and that several wholesale distributors qualified for exemptions but had not provided exemption certificates to the Company. In an attempt to identify all known distributors, Crowe asked Company management to identify all known distributor-customers, notwithstanding the absence of an exemption certification, from a list of customers to whom sales had been made in 2006.

Even though management's representation that a customer is a distributor is not a sufficient basis to exempt a sale to that customer, Crowe initially assumed that management would be able to obtain properly completed exemption certificates for 85% of the distributors it identified. Contrary to Mr. Davis' assertion, Crowe did not treat sales to distributors as 15% taxable, on the assumption that the distributors may also have made purchases from Kingway for their own consumption. Rather, Crowe treated sales to 15% of the customers which management identified as distributors, but which had no exemption certification on file, as non-exempt, on the assumption that management would be unable to obtain exemption certificates for 15% of those customers. Accordingly, Mr. Davis' explanation of why such treatment "is contrary to retailers'

practices approved by state taxing authorities" is irrelevant and no reduction in the estimated sales tax liability on this basis is should be made.

In any event, Company management eventually obtained exemption certificates for 100% of the customers they had previously identified as a distributor (who did not have an exemption certificate on file) and thus, sales to all distributors identified by management were treated as exempt in Crowe's revised sales tax analysis (Exhibit 24).

### d.      Identification and Inconsistent Treatment of Kingway's Distributors

Mr. Davis contends that Crowe either failed to identify certain distributors to whom sales were made or treated multiple sales to the same distributor inconsistently, i.e., some as exempt, some as not exempt.  To the contrary, Crowe identified every distributor who had presented the Company with an exemption certificate and went further, as described above, by identifying customers as distributors based solely on Company management's representations (Exhibit 25).

As an example, Mr. Davis identifies Asset Redistribution Services ("ARS") as a distributor and asserts that Crowe did not treat sales to ARS as exempt.  He is correct that in connection with the preparation of Crowe's initial sales tax liability estimate, management did not identify ARS as a distributor.  However, ARS subsequently supplied an exemption certificate.  Thus, the single sale to ARS in the 2006 sample was revised and is now treated as exempt in the revised sales tax liability estimate (Exhibit 26).

Mr. Davis identifies Boston Rack as a distributor to which the Company made sales that Crowe treated as both exempt and non-exempt.  However, to the extent that Crowe's initial sales tax liability analysis contains such differences, they have been resolved in the revised

sales tax liability analysis.[16]   Accordingly, Mr. Davis' proposed reduction in the estimated sales

tax liability on this basis should be rejected.

        e.      **High-Dollar Customers – Specific Review Points**

Mr. Davis asserts that his review of various Company invoices revealed that

"Crowe scheduled as taxable sales to certain customers when in fact these sales should have been

identified as exempt sales for resale or sales upon which sales tax had already been properly

paid." Davis Report at 7.  As examples he identifies sales to Iron Mountain, Koch Foods, and

Wilson Sporting Goods.  As described below, none of these issues justifies any reduction in the

estimated sales tax liability.

More specifically, Mr. Davis contends that sales made to Iron Mountain by the

Company's Texas location were improperly included in the calculation of the error ratios for

Illinois and Georgia.  In response to this contention, Crowe has adjusted its estimate by including

these invoices in the Texas sample (where the credit was already given for taxes paid) and

removing the same invoices from the Georgia and Illinois samples.  These adjustments caused

the Georgia and Illinois error ratios to decrease and the Texas error ratio to increase.  The net

effect of this adjustment actually creates an additional tax liability of $192,944.33 (Exhibit 27).[17]

Mr. Davis's further assertion that sales to Wilson Sporting Goods should be

considered exempt is based solely on his purported discussions with prior management who

---

[16]   Crowe's initial sales tax liability analysis contained this difference because the Company's files contained exemption certificates for Boston Rack for one location but not for other locations and, whereas some Company locations identified Boston Rack as a distributor, other Company locations did not (Exhibit 25).  In addition, Company management did not initially identify ARS as a distributor (Exhibit 25).

[17] Crowe determined to include the sale to Iron Mountain in the calculation of the error ratios for Georgia and Illinois because the "shipped to" detail line on the Iron Mountain invoices identifies both Illinois and Georgia addresses as shipped to locations.  However, the body of the invoice references a Texas project location (Exhibit 28).

purportedly represented to him that the Company had a verbal agreement with Wilson Sporting Goods that it would "self-assess and remit use tax on the purchases." He has presented no exemption certificates or other documentation to support exemptions or credits for these sales. Indeed, it is clear that in both Tennessee and Mississippi a verbal agreement with a customer is not a basis for an exemption from a sales tax obligation (Exhibit 29).

Mr. Davis' assertion that sales to Koch Foods should be exempt because "Kingway was provided with an exemption certificate, pursuant to Mississippi's material purchase exemption," is likewise incorrect. The exemption certificate relied upon by Mr. Davis was issued by United Insulated Structures Corporation. That certificate would not be sufficient to exempt sales to Koch Foods. Additionally, the validity of Crowe's determination to treat transactions with Koch Foods as taxable is evidenced by the fact that, in connection with the Mississippi Tax Commission's assessment on the Texas location, transactions with Koch Foods were held to be non-exempt in the final assessment (Exhibit 30).

Mr. Davis' assertion that sales invoices to Scott Equipment Company, Jetro Cash & Carry and Sun Trust Leasing "strongly suggested that these sales transactions constituted tax-exempt sales for resale" is also incorrect. Davis Report at 8. Presumably, the "strong suggestion" identified by Mr. Davis is the fact that those invoices indicate that, as a matter of convenience, the products were shipped to installation contractors who were to install the products at the customer locations. However, the sales were made to the customers, not the installers, and the customers in question are not distributors or otherwise exempt.

Accordingly, Mr. Davis' proposed reduction in the estimated sales tax liability on the basis that Crowe did not correctly recognize exempt sales, should be rejected.

**f.    Materiality – Tax and Generally Accepted Accounting Principles (GAAP)**

Mr. Davis asserts that various tax liabilities estimated to be less than $25,000 should be excluded from calculation of the total outstanding tax liability.  Mr. Davis offers no support to suggest that any state would not assess liabilities under $25,000 or for his self-selected $25,000 materiality threshold.

In addition, his assertion is contradicted by the fact that the Mississippi Tax Commission assessed the Company's Texas location for a $19,126 tax delinquency (from 2001) and a total of $12,432 in penalties and interest (Exhibit 30).  In addition, in connection with the same assessment, all sales for 2002 were treated as exempt sales but that did not relieve Kingway from the assessment standards.[18]

Mr. Davis suggests that state taxing authorities would not allocate resources to investigate *"...insignificant tax amounts due and attributable to its very small market and physical presence in the state."*  Davis Report at 8.  This erroneously assumes that state taxing authorities know the amount of a taxpayer's liability before deciding to conduct an audit.  Additionally, Mr. Davis fails to acknowledge the impact of information sharing standards and practices that have become commonplace amongst states through the Multistate Tax Compact and the Streamlined Sales Tax Project.  Any person active in the state and local tax advisory business knows that today, more than ever, state taxing authorities are using information obtained from other states to actively pursue taxpayers with potential nexus qualifying activities.  Accordingly, the likelihood of an audit is especially pronounced where, as here, the Company has recently been audited by three different states.

---

[18]  A taxpayer doing business in a state has an obligation to file a tax return even if the tax liability of the business is zero (See Exhibit 31).

Mr. Davis offers no support for his assertion that taxing jurisdictions have a materiality threshold and it provides no basis to reduce the estimated sales tax liability or to relieve the Company of its obligation to record that liability.

### g.    Alternative Grounds for Tax Exemption

Mr. Davis claims that Crowe failed to identify other potential exemptions that may have applied to purchases by Kingway's customers such as a customers' self-assesment, state tax audit or use of direct-pay permits.[19] This is mere speculation. As a matter of fact, in or about April and May 2007, the Company sent letters to every customer included on the 2006 sample to which a presumably taxable sale was made, requesting that, if any sales made to that customer by the Company are exempt, that it provide an exemption certificate. Multiple customers responded by providing exemption certificates and, in the revised sales tax analysis, Crowe treated all sales to those customers as exempt.

Mr. Davis' claim that Crowe failed to recognize Direct Payment Authority exemptions is false. All exemption certificates that validated a customer's direct payment authority within a given jurisdiction were allowed as exempt transactions. This is documented in the treatment of the Georgia location's sales to Starbucks Coffee Company in Washington State, which is the only direct payment authority documented by an exemption certificate.

In his footnote number 5, Mr. Davis asserts that Crowe incorrectly disallowed exemption certificates under the good faith standard, based on Crowe's belief that those

---

[19] There is an inherent error in Mr. Davis' claim that exemptions exist for self-assessed use tax accruals made by Kingway's customers, as well as claims that a Kingway customer may have been assessed use taxes on these transactions under audit from a taxing jurisdiction. While a state taxing authority may allow credit for these taxes being paid, they are not expressed exemptions with statutory support. When applicable, the states may allow credits, but would require detailed documentation and verification that said customers had remitted the consumer's use tax, including a verification of when payment was remitted.

certificates were being used improperly by the customer. According to Mr. Davis, under the good faith standard, states will recognize an exemption certificate as long as "the certificate received from the customer was properly completed, and the seller had no knowledge (beyond just the mere suspicion) that the customer was intending to use the certificate improperly." Davis Report at 9. However, Crowe's application of the good faith standard was not inconsistent with Mr. Davis' articulation of that standard. Crowe only refused to consider exemption certificates under the good faith standard in circumstances where the Company knew that the customer's business did not include the retail distribution of the Company's products. For example, Crowe refused to consider exemption certificates presented by JC Penney, a well known department store that is not a retailer of the Company's products. The same is true of both ABC Auto Supply and Napa Automotive Products, which retail automotive repair parts and accessories to consumers. Neither of these customers is a distributor of the Company's products.

The disallowance of these exemption certificates is supported (by example) by both Texas and Utah law where good faith standards are defined as follows:

> **Texas - 34 TAC §3.287(d)(2)** A sale is exempt if the exemption certificate is accepted in good faith at the time of the transaction and the seller lacks actual knowledge that the claimed exemption is invalid.

> **Utah – UCA §59-12-106(3)(a)** For the purpose of the proper administration of this chapter and to prevent evasion of the tax and the duty to collect the tax, it shall be presumed that tangible personal property or any other taxable transaction under Subsection 59-12-103(1) sold by any person for delivery in this state is sold for storage, use, or other consumption in this state unless the person selling the property, item, or service has taken from the purchaser an exemption certificate: **(ii)** providing that the property, item, or service was exempted under Section 59-12-104 .

### h.    Collecting Back-Taxes from Customers

Mr. Davis asserts that "Crowe failed to consider that it might be possible for the Kingway to request from customers, who should have been charged sales tax, their tax payments in arrears." Davis Report at 9. While Mr. Davis admits that he cannot estimate how much back-billing would reduce the outstanding sales tax liability, he notes that he has "been informed by former management at Kingway that it has had success in the past back-billing customers." This information is incorrect.

Crowe specifically investigated the extent to which the Company successfully back-billed customers for sales taxes and found that it was very limited. Specifically, an audit by the State of Mississippi was finalized and an assessment of $81,143 plus interest and penalties of $31,569 was paid by the Company on September 29, 2005. Of the four customers involved in the audit, only one customer has made any payment to the Company of their sales tax payments in arrears. After one and one-half years of negotiating with this customer, the Company obtained a settlement of approximately $21,000 (51% of the taxes due from this customer (Merchants Company), not including penalties). More than two years later, the Company has been unable to collect any further taxes due from these customers.

Additionally, there are several states whose sales tax is established as a "seller's privilege tax" where the tax is imposed on the seller's privilege of doing business in the state and the seller is prohibited from attempting to recover taxes from customers after the date of the transaction (Exhibit 33).[20]    Accordingly, there is no basis to reduce the estimated sales tax liability on the basis of the potential to "back-bill" customers.

---

[20]  Kingway submitted a refund claim to the State of Mississippi regarding the Koch Foods portion of this assessment on October 18, 2007. This refund claim references a direct-payment authority that was issued to Koch Foods after the date of the transaction that was subject to this assessment. The State of Mississippi is expected to reject this request for refund based on the timing of the direct-pay authority, which would not cover the charges in question. Additionally, in light of the receipt of this direct-payment

i.    **Total Adjustments To Tax Liability Estimate In Response To The Davis Report**

Crowe made two adjustments in response to points made in the Davis Report: (1) an adjustment for the Iron Mountain invoices (as described in Section B(2)(e)); and (2) an adjustment for the direct-payment authorization identified in footnote 20. As a result of these adjustments, liability now totals $2,350,078.74 in tax, $339,118.63 in interest and $797,753.92 in penalties, for a combined estimated liability of $3,486,951.29 (Exhibit 34).

3.    **Accounts Receivable Allowance**

In Buyer's Initial Submission it established that there was no basis for Seller's proposed adjustment to increase Accounts Receivable based upon Seller's proposed reduction in the Company's allowance for doubtful accounts. Seller claims that such an adjustment should be made because it has been the Company's policy to base the allowance for doubtful accounts on only those accounts over 90 days past due, which amounts to only $70,839 ($133,401 less than the allowance booked on the Closing Balance Sheet), and to not take any general reserve for doubtful accounts. According to the Company's accounting policies, as set forth in its 2005 audited financial statements (Exhibit 35), Seller is wrong. Note B sets forth the Company's policy on Accounts Receivable and Allowance for Doubtful Accounts:

> Accounts receivable are customer obligations due under normal trade terms. The Company generally does not require collateral; however, it periodically performs credit evaluations of its customers' financial condition for purposes of determining the credit levels that can be provided to its customers. The Company does not generally charge interest on outstanding receivables.
>
> The Company reviews accounts receivable on a monthly basis to determine if any receivables will potentially be uncollectible in light of current economic conditions in the Company's market and the Company's historic loss trends. **The Company includes any**

---

authorization, Crowe has adjusted the Georgia location's liability calculation to account for these exempt transactions (Exhibit 34).

**accounts receivable balances that are determined to be uncollectible, along with a general reserve, in the allowance for doubtful accounts.** After all attempts to collect a receivable have failed, the receivable is written off against the allowance.

Based on the information available, **the Company believes its allowance for doubtful accounts as of December 31, 2005 and 2004 are adequate.** However, actual write-offs might exceed the recorded allowance.

This policy is consistent with industry standards, GAAP and supports Buyer's position that no adjustment to Accounts Receivable should be made.[21]

As disclosed in the last paragraph of the note, the Company believed that its allowance for doubtful accounts at December 31, 2005 and 2004 was adequate. In determining accounts receivable allowances under GAAP, estimates are required to support the basic financial statement assertions for valuation. In Buyer's Initial Submission, the valuation allowances were compared to historical accounting practices and overall historical valuation percentages (*see* Exhibit 7 page 2 of Buyer's initial submission). According to Seller's proposed revision to the allowance for accounts receivable, the allowance percentage would be approximately .66%. ($70,839 allowance / $10,740,783 accounts receivable), which is not consistent with historical financial reporting.

In conclusion, Seller's proposed revision to the allowance for doubtful accounts is not warranted. The current allowance provision is comparable to prior periods and is consistent

---

[21] Even if Seller were correct that the allowance for doubtful accounts should be no greater than the amount of the receivables aged greater than 90 days, it's proposed adjustment would be incorrect. Seller has not included three receivables, aged greater than 90 days and recorded by management in its analysis of greater than 90 day receivables. The first receivable for $41,213 relates to a 2005 payment on a failed Mississippi sales tax audit. The second receivable for $53,482 relates to a 2006 overpayment of Texas sales tax on a Walmart project. The third receivable for $5,270 relates to a 2006 overpayment of Texas sales tax on an Emser Tile project. These additional receivables, when added to the $167,000 of receivables that are either specifically identified as uncollectible, or for which credit memos have been issues during the one month period after the Transaction Date (as described in Exhibit 7, p. 1), exceed the $204,000 allowance for doubtful accounts which the Seller is proposing to reduce.

with the company's historical accounting policies that include specific reserves and general reserve estimates for accounts receivable and other receivables that will become impaired in the subsequent period.

### 4.    Prepaid Advertising Costs (or Prepaid Trade Show Expenses)

In Seller's Objection Notice, Seller proposed an upward adjustment to prepaid expenses of $157,457. Based on discussions with Seller, Buyer understood that this upward adjustment was based, in part, on Seller's contention that certain trade show expenses should have been, but were not, capitalized on the Company's Closing Balance Sheet. In Buyer's Initial Submission it established that, according to GAAP, there was no basis to capitalize these expenses. In response, Seller erroneously contends that "Buyer proposes a post-closing adjustment to eliminate $125,457 in prepaid expense related to the 2007 ProMat tradeshow." Seller's SOP at 23. Buyer proposes no such adjustment and could not propose such an adjustment *because the expenses in question were not included on the Closing Balance sheet because they had already been written off by Company management.* This is evidenced by the trial balances (Appendix J) and Company prepared closing balance sheet (Exhibit 3) included in Buyer's Initial Submission.

The Company incurred and properly recorded the tradeshow expenses as an asset in Q4 of 2006 due to the tradeshow not having occurred until Q1 of 2007. Those expenses were properly accounted for as prepaid trade show expenses as of December 2006. In January 2007, the tradeshow occurred. At that point, the expenses could no longer be considered as "prepaid trade show expenses" since the trade show had occurred, but had to be treated as "prepaid advertising costs." As of the Transaction Date, Company management expensed the remaining prepaid advertising costs as a period ending adjustment.

In any event, Seller offers various arguments as to why it would not be appropriate to expense those trade show expenses.  First, Seller contends that, contrary to Buyer's contention, SOP-37 does not require that these expenses "be written off in their entirety in January 2007," because "SOP-37 does not apply here because the accounting in question pertains to interim rather than annual statements."  Seller's SOP at 23.  However, the schedule of net working capital is not an "interim financial statement" and, as such, APB 28, cited by Seller, has no application here.

The concept of interim financial reporting is an income statement concept and, specifically, a measure of results of operations, whereas the statement of net working capital is a financial position concept and, specifically, a measure of short-term liquidity.  The interim period in question relates only to the period from January 1, 2007 to the closing date of March 30, 2007.  Since the company was purchased as of March 30, 2007, the interim period whereby results of operations are measured, has ended.  The Buyer will not include the results of operations from January 1 2007 through March 30, 2007 in its results of operations. Thus by definition of interim reporting, the period has ended.

Second, Seller contends that the Company's historical practice "has been to amortize trade show expense, including expenses related to ProMat, over a twelve-month period."  Seller's SOP at 25.  Once again, according to the Company's stated accounting policies, as set forth in its 2005 audited financial statements (Exhibit 35), Seller is wrong.  Note B sets forth the Company's policy regarding accounting for advertising expenses:

> ### *Advertising*
>
> ***The Company expenses advertising costs as incurred which total $432 and $233 for the years ended December 31, 2005 and 2004, respectively.***

Consistent with Buyer's interpretation of SOP-93-7, the Company's policy has been to expense advertising costs as they are incurred.

Seller's proposed adjustment to prepaid expenses of $125,457 is an incorrect application of GAAP that is inconsistent with the Company's historical accounting policies and should be rejected.

### 5.    Vacation Accrual

As documented in the Buyer's Initial Submission, the Company's vacation policy requires accounting in accordance with FAS 43 (Appendix G). FAS 43 requires a liability to be accrued for future compensated absences if all of the four conditions set forth below are met: (FAS paragraph 6)

1.   The employer's obligation relating to employee's rights to receive compensation for future absences is attributable to employee services already rendered.

2.   The obligation relates to rights that vest or accumulate

3.   Payment of the compensation is probable

4.   The amount can be reasonably estimated.

According to the Company's vacation policy, which was in effect as of the Transaction Date (Appendix H), all of these conditions are met. Seller does not contend otherwise. Rather, Seller responds that no liability for compensated absences should be accrued because the accrued vacation liabilities identified by Buyer represent compensated absences that were earned but not vested. According to Seller, accrued vacation liability should only be recognized at the time of vesting, not at the time it is earned. However, paragraph 12 of FAS 43 states explicitly to the contrary: "a liability for amounts to be paid as a result of employee's rights to compensated absences should be accrued, considering anticipated forfeitures *in the year in which earned*" (emphasis added).

In addition, Seller has asserted three specific reasons to reject Buyer's proposed post closing adjustment for accrued vacation.   A discussion of each reason is set forth below

1.    *Buyer's proposal is not consistent with the Company's historical accounting policy for accruing vacation and with the policy underlying the Company's preparation of its balance sheet. These changes would allow Buyer to receive a windfall and allow Buyer to "game the system"*

Seller correctly contends that historically the Company has not accrued for compensated absences in accordance with FAS 43.   However, as discussed in Section A(2) above, the SPA requires Net Working Capital to be reported on a GAAP basis, which, under these circumstances, requires that a liability for compensated absences be accrued in accordance with FAS 43.   The fact that, historically, the Company chose to ignore FAS 43 is no justification for doing so now, especially when to do so would contradict the explicit terms of the SPA.   The allegation that by accounting for compensated absences in accordance with FAS 43 Buyer is "gaming the system" and will "receive a windfall" is wrong.   To the contrary, Buyer is playing by the rules – rules to which Seller agreed and which require GAAP-compliant accounting to be used to calculate Net Working Capital.

2.    *The statement does not address the allocation of costs of compensated absences to interim periods. There is absolutely no requirement in GAAP to compute interim balances in accrued vacation under FAS 43. The Closing Date – March 30, 2007 – was an interim period. As such, FAS 43 is inapplicable on its face.*

Once again, the Seller has incorrectly characterized the schedule of net working capital as an "interim financial statement" and has incorrectly cited APB 28 as the reason that FAS 43 is not applicable for accruing a liability for purposes of calculating net working capital. As indicated above, the concept of interim financial reporting is an income statement concept, and specifically a measure of results of operations, whereby the statement of net working capital

-31-

is a financial position concept. The interim period in question relates only to the period from January 1, 2007 to the closing date of March 30, 2007. Since the company was purchased as of March 30, 2007, the interim period whereby results of operations are measured, has ended. The Buyer will not include the results of operations from January 1 2007 through March 30, 2007 in its results of operations. Thus by definition of interim reporting, the period has ended.

The schedule of net working capital is not an interim statement and, as such, Seller's argument that FAS 43 is not applicable to interim financial statements is irrelevant.

> 3.    *Even if the Buyer were correct that FAS 43 applies here, an offset for reasonably estimable amounts of that same vacation time that would be forfeited must be reflected in the accrual. This is due to the fact that payment of "unvested" vacation time is not permitted as of the closing date.*

Buyer specifically considered the effect of an offset and, based upon discussions with Company management, determined it to be immaterial as of the closing date. In light of Seller's assertion that "…the workforce was fairly stable as to the number, tenure, and pay rates of employees," Seller would appear to agree with Buyer's determination.

In conclusion, the company's vacation policy meets the criteria for financial reporting in accordance with FAS 43. The adjustment proposed by Buyer is warranted by FAS 43 and is required to properly state the schedule of net working capital in accordance with GAAP.

**6.    Petsmart Claim**

As set forth in Buyer's Initial Submission, the amount of Accrued Liabilities and Other Expenses should be increased to reflect a liability of $19,596, incurred by Buyer in connection with a claim asserted by a customer (Petsmart), regarding defective racks that were

manufactured and/or delivered by the Company prior to the Transaction Date. Although this liability was originally estimated at $200,000, it has been settled for $19,596.

Although the customer ultimately agreed to accept the racks, even though they did not meet the capacity specifications it had ordered and, thus, the Company did not have to replace the racks at the cost originally estimated, the settlement amount of $19,596 covered costs to replace wire decking that was incorrectly ordered by the Company and provided to Petsmart.

Seller responds that that this liability is not appropriately included in the Closing Balance sheet according to FAS 5, *Accounting for Contingencies*, because it was neither probable nor reasonably estimable as of the Transaction Date.

First, Seller contends that the liability was not probable because "the parties agreed prior to Closing that Petsmart would accept the [products] and therefore the Company was not responsible for any changes required by Petsmart, and the Company also had in hand a written certification from an independent third party engineer certifying that the Company had built the rack in compliance with the specifications required by the contract." Seller presents no evidence of this supposed "agreement" with Petsmart. Moreover, even assuming that Petsmart did agree to accept the *racks* manufactured by the Company, the wire decking provided to Petsmart for those racks was incorrect and had to be replaced.[22] Based on these facts, the liability was probable for purposes of FAS 5.

Second, Seller contends that the liability was not reasonably estimable because "the costs associated with Petsmart's particular installation needs were not." In course of its business the Company regularly performs and/or provides estimates of installation costs for customers. Indeed, installation of its products is an integral part of the Company's business and

---

[22] The engineering report did not address the sufficiency of the wire-decking. Thus, Seller's assertion that Buyer might have recourse against the engineer has no merit.

it is more than capable of reasonably estimating installation costs. Seller's contention is the equivalent of a contention that an experienced auto-mechanic cannot reasonably estimate the costs of a repair and should be rejected.

### 7. Wise Installation

As demonstrated in Buyer's Initial Submission, Buyer incurred a liability of $28,000 in connection with a claim by WISE Installation. This claim was known to and had been asserted against the Company prior to the Transaction Date. Specifically, WISE sent an invoice to the Company in connection with the work on which its claim was based in June of 2006 and WISE's attorney sent a demand letter to the Company in February 2007 (Exhibit 36). Nevertheless, Seller contends that this liability should not be included in the calculation of Net Working Capital because WISE supposedly released its claim against the Company in September 2006.[23]

However, Seller does not dispute that, in or about May 2006, representatives of the Company (Byron Daniels) instructed WISE to perform the additional work which gave rise to the liability in question and promised that the Company would pay WISE for such work. This was confirmed to Buyer by two employees of the Company who were present when Mr. Daniels made this promises to WISE. In this light, Seller's argument that no liability exists because the Company's purchase orders provide that "all change orders are required to be in writing," has no merit. This is not a "he said, she said" situation where WISE contends that it was authorized to do the work in question and the Company says that WISE was not authorized to do the work.

---

[23] WISE agreed to sign the lien release at the Company's request because Wal-Mart refused to pay the Company for the products and services unless WISE did so. It is common practice for the Company to receive lien releases from installer in order to get payment from its customers, and it is assumed that notwithstanding the execution of a lien release in order to facilitate payment, the parties will act in good faith if a dispute ever arises between them.

Under those circumstances, the language of the purchase order requiring written change orders would be compelling. Here, however, there is no dispute that Company management, under Seller's regime, made an enforceable agreement on behalf of the Company. Buyer was subsequently compelled to honor that agreement and, thereby, satisfy a liability that existed prior to the Closing Date. As such, that liability should be included in the calculation of Net Working Capital.

## C.    Conclusion

For each of the reasons set forth above and in Buyer's Initial Submission, and in accordance with Section 2.04 of the SPA, Seller owes Buyer $4,712,537.[24]

---

[24] As modified in accordance with the further adjustments described herein.

POST-CLOSING ADJUSTMENT DISPUTE
IN CONNECTION WITH THE ACQUISITION OF
KIC HOLDINGS, INC.,
BY
UNARCO MATERIAL HANDLING, INC.


**EXPERT REPORT OF DR. WILL YANCEY**


SUBMITTED IN SUPPORT OF
UNARCO MATERIAL HANDLING, INC'S
SUPPLEMENTAL STATEMENT OF POSITION


NOVEMBER 6, 2007

I am providing this expert opinion on certain particular issues in the post-closing adjustment dispute involving Kingway Inca Holdings, Inc. ("Kingway") and Unarco Material Handing, Inc. ("Unarco").    The scope of this report is to comment on the methodology used by Crowe Chizek & Co. ("Crowe Chizek") to estimate the state sales and use tax liability of the company acquired by Unarco, as of March 30, 2007, and the extent to which that liability is probable and estimable.

## Qualifications

I am the nationally recognized expert on sampling in sales and use tax audits.  Over the past ten years I have spoken at more conferences than anyone else on the topic of sampling in sales and use tax audits.    Since 1973 I have been a full-time or part-time consultant on various topics.  I began my public accounting career with Peat Marwick in 1983.  In 2000 I began full-time self-employment as a solo practitioner in Dallas.  I consult with large public and private companies across the United States.  See Exhibit 1.

## Independence

I am independent with respect to this case.  I am not paid for my opinion.  I am paid for my time.  Prior to this engagement I was not paid by Unarco or Crowe Chizek.

## Documents Reviewed

See Exhibit 2.

## Crowe Chizek Methodology

I reviewed the methodology used by Crowe Chizek.    My review is limited to the general concepts used by Crowe Chizek.

Crowe Chizek's method was to select a period with readily available records, estimate the ratio of unpaid sales tax to sales for this period, and then apply this ratio onto the entire period of exposure.    I refer to this method as *projecting from the readily available onto the unavailable*.    This method is reasonable and consistent with methods applied by corporate taxpayers to estimate exposure for unpaid sales tax.    In these situations the corporate taxpayers typically use one to two years of recent records because the general ledger detail and supporting documentation are much easier to obtain than for older records.

*Projecting from the readily available onto the unavailable* is not the same as *block sampling*.  Block sampling is most often applied by sales tax auditors who select a sample of one to six months from across an entire audit period.    For example, if the audit period is three years, then the auditor's block sample might consist of a total of three months with one month from each year.  The auditor would project those three months onto the entire audit period.

Yancey Report
November 5, 2007
Page 3 of 6

I disagree with Davis Report page 5's assertion that Crowe Chizek used block sampling. In my opinion Crowe Chizek's method is better than block sampling and likely to yield a more accurate estimate of sales tax liability than block sampling.

I disagree with Davis Report page 5's assertion that Crowe Chizek should have "performed a statistical sampling analysis." In my opinion Crowe Chizek's method was reasonable and consistent with accepted practices for the purpose of estimating sales tax exposure.

## *Applicable Standards for Recognizing Liability*

Before commenting on the extent to which the sale tax liability is probable and estimable, I need to briefly review the applicable standards.

In March 1975 the Financial Accounting Standards Board (FASB) issued *Statement of Financial Accounting Standards No. 5* ("FAS 5"). FAS 5 paragraph 8 states,

> An estimated loss from a loss contingency (as defined in paragraph 1) shall be accrued by a charge to income if *both* of the following conditions are met:
>
> a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b. The amount of loss can be reasonably estimated.

FAS 5 is a "hot issue" among sales tax professionals in 2006 and 2007. Many corporations and consultants are talking about how FAS 5 requires companies to increase the tax liabilities recorded in their financial statements. Deloitte Tax LLP ("Deloitte") has made a series of presentations on this topic at conferences for tax professionals. A copy of Deloitte's presentation as Exhibit 38 of Buyer's Supplemental Statement of Position. Following is slide 9 from Deloitte's presentation.

Yancey Report
November 5, 2007
Page 4 of 6

## Understanding the Difference Between "Liabilities" and FAS 5 "Contingencies"

- Known obligations are "liabilities" – not contingencies. In general, sales and use taxes tend to be liabilities rather than contingencies.
- Sales and use taxes are not contingencies if the laws of the taxing jurisdictions clearly apply to the transactions.
- "Risk detection" should not be considered in reporting loss contingencies regarding taxes.
  - The likelihood of being caught ("audit lottery") if a company does not comply with the law (e.g., – does not file a return, does not collect tax on taxable transactions) is not a valid reason for not recording liabilities as incurred.

I concur with the above comment from Deloitte. In the past some companies justified not recording tax liabilities with the "unlikely to be caught" excuse. That is no longer considered appropriate professional practice for corporate tax departments or financial statement auditors. I disagree with Davis Report page 4's conclusion that Kingway should not accrue any amount for sales and use tax liability.

### *Probability of Liability*

Determination of sales tax liability involves many issues. Any of these issues may have uncertainty of facts and interpretation of law. However, the guiding principal of state government tax administrators is that all sales are subject to sales tax unless specifically exempt.

These issues include but are not limited to the following. My understanding is that Crowe Chizek did consider these issues in their determination of the probability of sales tax liability.

Does the seller have nexus in the state? When a seller or seller's agents deliver or install tangible personal property in a state, the states are aggressive in asserting they have nexus to tax the transaction. Nexus is "sticky" – once a taxpayer has nexus it is difficult to get rid of. The states will ask why a taxpayer that collects sales tax from one sale in the state does not continue to collect sales tax on future sales. The states have increased their nexus detection efforts by searching in-state purchasers for purchases from out-of-state vendors, information sharing between states, searches on building permit databases, and other techniques.

Are installation services taxable? There are many rules and interpretations on installation services. More state sales tax administrators are now taxing all or nearly all services related to the installation of tangible personal property.

When is the expiration of the statute of limitations for assessing sales tax? There is **no** statute of limitations when a taxpayer fails to file a sales tax return. In most states the statute of limitations is three to four years after filing a sales tax return without substantial

Yancey Report
November 5, 2007
Page 5 of 6

understatement.    The statute of limitations is often increased to six years when the state determines the sales tax return had substantial understatement.

Will state tax auditors avoid audits when the sales tax exposure is very small?  The states use tax audits to deter non-compliance.    When they decide to conduct an audit, they do not know how much tax they will assess.    Sometimes the final assessment may be small.  I disagree with Davis Report page 8 that contends states have a specific threshold amount for sales tax audits.

How far back can the state request records?  State tax administrators can ask for records over many years.  If the taxpayer has not filed a sales tax return or the statute of limitations is waived, the auditors may be looking for records that are ten years or more old.    Record requests for sales tax audits often go further back than any other type of audit.

Will the state accept sales tax exemption certificates?    Even if a taxpayer thinks it has exemption certificates, the state auditors may find them deficient.    The tax auditors might allow a limited amount of additional time to seek exemption certificates after the audit begins.  Taxpayers often have trouble obtaining certificates later because the purchaser has a dispute with the seller; the purchaser is no longer in business; or other reasons.  I disagree with the Davis Report pages 6, 7, and 9 that imply sales tax exemptions will be easy to obtain.

Will the auditor accept proof that the customer paid use tax?    Taxpayers can ask if their customers self-assessed use tax, or the customer paid use tax after an audit assessment.  The customers might or might not answer.  If a customer does answer that use tax was paid, the auditor might demand a lot of supporting documentation.

If Kingway back-bills the customers for unpaid sales tax, will those customers pay?    Some customers will pay sales tax when it is back billed, and many will not.    I disagree with Davis Report page 9 that Kingway can readily recover sales tax liabilities by back-billing customers.

## *Estimable Liability*

In my opinion it is possible to estimate Kingway's unpaid sales and use tax liability.  In my opinion Crowe Chizek applied an appropriate estimation methodology.

Yancey Report
November 5, 2007
Page 6 of 6

I reserve the right to revise my report if additional information is made available to me.

Sincerely,

Dr. Will Yancey, CPA

Exhibits
1.  Curriculum Vitae
2.  Documents Relied On

# Dr. Will Yancey, CPA

6848 Midcrest Drive
Dallas, Texas  75254-7944
Office:  972.387.8558
Fax: 972.934.2813
Email: will@willyancey.com
Web site: www.willyancey.com

Revised October 14, 2007

## Contents

- Education
- Accounting Experience
- Teaching Experience
- Consulting
- Publications
- Educational Materials
- Presentations
- Service Activities
- Professional Affiliations
- Grants, Honors and Awards
- Personal Data

## Education

**Doctor of Philosophy** (1993)
University of Texas at Austin
Major Area: Accounting.  Minors:  Statistics and Finance.

**Master of Business Taxation** (1987)
University of Minnesota - Twin Cities

**Bachelor of Accounting** Magna Cum Laude (1983)
University of Minnesota - Duluth

**Master of Forestry** (1980)
Duke University
Major Area: Forest Economics

**Bachelor of Arts** (1978)
Dartmouth College
Special Major: Engineering, Economics, and Environmental Studies

---

## Accounting Experience

- **American Institute of Certified Public Accountants.** CPA exam question author. 2004.
- **Will Yancey, PhD, CPA,** Fort Worth and Dallas, Texas. Consultant. 1993-present
- **Ryan & Company,** Dallas, Texas. National Director, Audit Sampling Practice. 1999-2000
- **W. A. "Tex" Moncrief, Jr., and Montex Drilling Company,** Fort Worth, Texas. Controller. 1998-1999
- **Fred D. Woodside, CPA,** Sacramento, California. Senior Tax Accountant. 1986-1987
- **Bennett Office, Inc.,** Minneapolis, Minnesota. Tax Accountant. 1984-1986
- **Fox and Company,** Bloomington, Minnesota. Tax Accountant. 1984
- **Peat Marwick,** St. Paul, Minnesota. Staff Accountant. 1983-1984

---

## Teaching Experience

### University of Dallas, Graduate School of Management and College of Business

- Adjunct Professor of Accounting, 2006 - present
- Guest lecturer, 2005

### Florida Atlantic University, Masters in Forensic Accounting Program

- Program Advisory Board and Adjunct faculty member, 2003 - present

### Southern Methodist University, Cox School of Business, 2000

- ACCT 6311-0014, Electronic Commerce Accounting and Tax Issues

### Texas Christian University, M. J. Neeley School of Business, 1992-1998

- ACCT 3303, Introduction to Federal Taxation
- ACCT 2163, Principles of Managerial Accounting (undergraduate core)
- ACCT 6023, Accounting for Managerial Planning and Control (MBA core)
- ACCT 4970, Special Problems in Accounting (undergraduate independent study)
- ACCT 7970, Special Problems in Accounting (MBA independent study)

**University of Texas at Austin, Department of Accounting, 1987-1992**

- ACC 312, Managerial Accounting
- ACC 364, Principles of Federal Taxation

**Duluth Area Vocational Technical Institute, Duluth, Minnesota, 1981-1982**

- Logging Business Management Instructor

---

## Consulting

- Expert consultant on audit sampling and audit data analysis for tax audits.
- Expert consultant on unclaimed property holder audits.
- Expert consultant on sampling for Medicare, Medicaid, and health insurance overpayment reviews.
- Expert consultant on recovering overpayments to vendors.
- Expert consultant on tax and accounting malpractice.

---

## Published Articles and Books

- ***Statistical Sampling in the Medicare Program: Challenging its Use, Second Edition***, with Lester J. Perling and Michael D. Intriligator, American Health Lawyers Association, 2008, forthcoming.
- **Unclaimed Property and Open Receivers: What's In Your Warehouse?**, with Brooke Spotswood, *Accounts Payable Now & Tomorrow*, September 2007, pages 9-11.
- Short articles on sampling, sales tax exemption certificates, and other topics for *Lexis Nexis Practice Insights*, 2007, forthcoming.
- **Truth in Billing and Taxes: Titles Tell the Tale**, *Billing World and OSS Today*, online May 4, 2007, http://www.billingworld.com/rev2/newsletter/ads/070504/news-truth.html, and in print Volume 13(4) *Billing World and OSS Today* 12 (July/August 2007).
- **Sampling in sales and use tax audits: Challenges, opportunities for today's tax managers**, *Sale & Use Tax Alert*, Volume 26(13), August 1, 2006, pages 1-3.
- **Sales and Use Tax: Hot Issues for AP**, *Accounts Payable Now & Tomorrow*, March 2006, pages 9-11.
- **WEBrowsing**, with Dennis Schmidt, *The Tax Adviser*, a quarterly series on useful websites for tax practitioners.
  - October 2005, Volume 36(10), page 646.
  - January 2006, Volume 37(1), page 60.
  - April 2006, Volume 37(4), page 250.
  - July 2006, Volume 37(7), page 431.

- o October 2006, Volume 37(10), page 619.
- o January 2007, Volume 38(1), page 54.
- o April 2007, Volume 38(4), page 241.
- o July 2007, Volume 38(7), page 418.
- o October 2007, Volume 38(10), page 620.
- **The Root Causes of Bad Data in AP**, *Accounts Payable Now & Tomorrow*, September 2005, pages 9-12.
- **Geometric Stratification of Accounting Data**, with Patricia Gunning and Jane Horgan, 214 *Contaduría y Administración* 11 (September-December 2004). Published by Universidad Nacional Autonoma de Mexico (UNAM).
- **GIS - A Cornerstone in Understanding Tax Exposure and the MTSA**, with Robert van Wyngaarden, *GeoWorld*, November 2003, www.geoplace.com/gw/2003/0311/0311rdr.asp
- **Web-Based Tax Resources**, with Dennis Schmidt, *The Tax Adviser*, Volume 34(3), March 2003, pp. 140-141.
- ***Statistical Sampling in Sales and Use Tax Audits***, CCH, 2002, http://onlinestore.cch.com/default.asp?ProductID=1898 .
- **A Review of the Streamlined Sales Tax Pilot: Kansas, Michigan, North Carolina, and Wisconsin**, with Christine Bauman, Nancy Foran, Roxanne Spindle, and Ralph Tower, *Journal of State Taxation*, vol. 20(2) Fall 2001, pages 1-17.
- **Tax Resources on the Web: Update 2001**, with Dennis Schmidt, *Tax Ideas*, July 2001, paragraph 877.
- **Web Resources for Tax Professionals: Update 2001,** with Dennis Schmidt, *Practical Tax Strategies*, vol. 66(6), June 2001, pp. 349-360.
- **Tax Resources on the Web: Update 2000**, with Dennis Schmidt, *Tax Ideas*, July 2000, paragraph 877.
- **Website Update: Special Report,** with Dennis Schmidt, *Practical Tax Strategies*, vol. 64(6), June 2000, pp. 346-360.
- ***Guide to Electronic Tax Research, Second Edition,*** Practitioners Publishing Company, 1999.
- <u>**Electronic Commerce Snares Sellers in Multistate Tax Web,**</u> with Gregory W. Mitchell and Dana Lipp, *Practical Tax Strategies*, vol. 63(5), November 1999, pp. 260-269.
- <u>**Sampling in Sales and Use Tax Audits**</u>, *IPT Sales Tax Report*, July-August 1999, pp. 1-2.
- **Tax Professionals' Guide to Navigating Through Cyberspace**, with Dennis Schmidt and Roxanne Spindle, *Tax Ideas*, section 877, July 21, 1999, pp. 8645-8662.  Reprinted from *Practical Tax Strategies*.
- **Tax Professionals' Guide to Navigating Through Cyberspace**, with Dennis Schmidt and Roxanne Spindle, *Practical Tax Strategies*, vol. 62(6), June 1999, pp. 324-339.
- **Web-based Tax Resources**, with Dennis Schmidt, *The Tax Adviser*, vol. 30(2), February 1999, pp. 98-105.
- **Useful Web Sites for Corporate Tax Professionals**, *Computers & Taxation Journal*, Fall 1998, pp. 6-8.

- *Guide to Electronic Tax Research, First Edition*, with Linda Ketter-Craig, Practitioners Publishing Company, 1998.
- **Malpractice Litigation Against Local and National Public Accounting Firms: Empirical Evidence**, *Commentaries on the Law of Accounting & Finance: 1997 Yearbook*, 1998, pp. 74-100.
- **A Framework for International Tax Planning for Managers**, with Karen Cravens, *Journal of International Accounting Auditing and Taxation*, vol. 7, number 2, Fall 1998, pp. 251-272.
- **Tax Resources on the Web**, *Texas Lawyer*, vol. 13, issue 47, February 16, 1998, p. 33.
- *Tax Research on the Net*, a monthly column in *TAXES - The Tax Magazine*, published by CCH.
  - o **Estate Tax Web Sites**, *TAXES*, vol. 76(1), January 1998, p. 6.
  - o **1997 Federal Tax Legislation on the Web**, *TAXES*, vol. 76(2), February 1998, pp. 5-6.
  - o **International Tax on the Web**, *TAXES*, vol. 76(3), March 1998, pp. 5-6.
  - o **State Tax Sites on the Web**, *TAXES*, vol. 76(4), April 1998, pp. 5-6.
  - o **Business Valuation Sites on the Web**, *TAXES*, vol. 76(5), May 1998, pp. 5-6.
  - o **Associations for Tax Professionals on the Web**, *TAXES*, vol. 76(6), June 1998, pp. 5-6.
  - o **Following 1998 Federal Tax Legislation on the Web**, *TAXES*, vol. 76(7), July 1998, pp. 5-6.
  - o **Retirement Planning on the Web**, *TAXES*, vol. 76(8), August 1998, pp. 5-6.
- <u>Use and Abuse of Sampling in Sales and Use Tax Audits</u>, with Roger Pfaffenberger, *State Tax Notes* , vol. 13, December 29, 1997, pp. 1673-1678. Reprinted from *COST State Tax Report*.
- <u>Use and Abuse of Sampling in Sales and Use Tax Audits</u>, with Roger Pfaffenberger, *COST State Tax Report*, vol. 97, issue 6, November 1997, pp. 2-9.
- **Employee or Independent Contractor?** with Brian T. Farrington, *Auto, Inc.*, vol. 45, October 1997, pp. 48-49.
- **Research Sources: Paper, CD or Web?** *Today's CPA*, vol. 24, September/October 1997, p. 16.
- *Instructor's Resource Manual, Ready Shows, and Ready Notes for Accounting for Decision Making and Control, Second Edition*, by Jerold Zimmerman, published by Irwin/McGraw-Hill, 1997.
- **State Tax Information on the World Wide Web**, with Roxanne Spindle and Dennis Schmidt, *Journal of State Taxation*, vol. 15, Winter 1997, pp. 60-66.
- **A Practical Guide to the World Wide Web for Employment Lawyers** , *Employee Relations Law Journal*, vol. 22, Winter 1996: 39-63. Reprinted in *Current Developments in Employment Law, Volume II*, pp. 753-777, ALI-ABA Course of Study Materials, Course SC08, July 17-19, 1997, Santa Fe, New Mexico. Reprinted in *Insurance Coverage Issues in Employment Law*, pp. 1-27, ALI-ABA Course of Study Materials, Course SB96, November 13-15, 1997, Washington, DC.

- <u>Internet Uses for Tax Practice</u>, with Dennis Schmidt and Roxanne Spindle, *The CPA Journal*, vol. 66, November 1996, pp. 16-23.
- **Riding the Educational Assistance Plan Exclusion Roller Coaster**, with Steve Dilley, *Tax Notes*, vol. 73, October 7, 1996, pp. 85-97.
- **Tax Lawyers' Cyberspace Guide: An Update**, with Dennis Schmidt, Roxanne Spindle, and Richard Coppins, *Taxation for Lawyers*, vol. 25, September/October 1996, pp. 103-117.
- **Tapping the World Wide Web**, with Dennis Schmidt and Roxanne Spindle, *Journal of Accountancy*, vol. 182, August 1996, pp. 73-77.
- **Tax Resources in Cyberspace: Update on Worldwide Web**, with Richard Coppins, Dennis Schmidt, and Roxanne Spindle, *Taxation For Accountants*, vol. 57, August 1996, pp. 84-98.
- **Tax Resources in Cyberspace: A Worldwide Web Update**, with Richard Coppins, Dennis Schmidt, and Roxanne Spindle, *Journal of Taxation* , vol. 85, July 1996, pp. 23-35.
- **Under All is the Net: Surfing the Internet for Real Estate Information**, with Mauricio Rodriguez and Joe Lipscomb, *Journal of Real Estate Literature*, vol. 4, July 1996, pp. 207-227.
- **Implementing Electronic Tax Research in a University Environment**, with JoTisa Klemm, *Issues in Accounting Education*, vol. 11, Spring 1996, pp. 95-110.
- <u>Managing a Tax Practice to Avoid Malpractice Claims: Learning from Past Disasters</u>, *The CPA Journal*, vol. 66, February 1996, pp. 12-17.
- **A Tax Lawyer's Guide to the Worldwide Web**, with Dennis Schmidt, Roxanne Spindle, and Richard Coppins, *Taxation for Lawyers*, vol. 24, September/October 1995, pp. 95-112.
- **Worldwide Web is the Latest Source of Tax Information**, with Richard Coppins, Dennis Schmidt, and Roxanne Spindle, *Taxation for Accountants*, vol. 55, August 1995, pp. 93-107.
- **Worldwide Web: The Latest Tax Resource on the Information Superhighway** , with Richard Coppins, Dennis Schmidt, and Roxanne Spindle, *Journal of Taxation*, vol. 83, August 1995, pp. 108-118.
- **Budgets as a Credible Threat: An Experimental Study of Cheap Talk and Forward Induction**, with Stephen Kachelmeier and J. Reed Smith, *Journal of Management Accounting Research*, vol. 6, Fall 1994, pp. 144-174.

---

## Proceedings, Educational Materials and Book Reviews

- "How To Do Tax Research with RIA Checkpoint", for RIA Educational Services Group, November 2001.
- <u>"Web Sites for Employment Law Research"</u>, *Proceedings of the American Law Institute-American Bar Association (ALI-ABA) Advanced Seminar on Current Developments in Employment Law*, Santa Fe, New Mexico, July 1999.

- "Web Sites for Employment Law Research" , *Proceedings of the American Law Institute-American Bar Association (ALI-ABA) Advanced Seminar on Current Developments in Employment Law*, Santa Fe, New Mexico, July 1998.
- "Tax Research on the Net", a monthly column for the *CCH Conference Room Web* reproducing my Tax Research on the Net columns that appeared in print in *TAXES*.
- "Web Sites for Employment Law Research" , *Proceedings of the American Law Institute-American Bar Association (ALI-ABA) Advanced Seminar on Current Developments in Employment Law*, Course SD06, Santa Fe, New Mexico, July 25, 1998.
- "Internet Use for Tax Practice", *Proceedings of the Tax CPE Expo of the Houston Chapter of the Texas Society of CPAs*, January 20, 1998.
- "Web Sites for Employment Law Research" , *Proceedings of the American Law Institute-American Bar Association (ALI-ABA) Course of Study on Insurance Coverage Issues in Employment Law*, Course CB96, Washington, DC, November 15, 1997.
- "Internet Use for Tax Practice", *Proceedings of the Thirteenth Annual Tax Institute of the Fort Worth Chapter of the Texas Society of CPAs* , August 22, 1997.
- "Web Sites for Employment Law Research" , *Proceedings of the American Law Institute-American Bar Association (ALI-ABA) Advanced Seminar on Current Developments in Employment Law*, Course SC08, Santa Fe, New Mexico, July 19, 1997.
- Instructor's Resource Manual, Ready Shows, and Ready Notes for *Accounting for Decision Making and Control, Second Edition*, by Jerold Zimmerman, published by Irwin/McGraw-Hill, 1997.
- Revision of Chapter 15, "Tax Research," for *Concepts in Federal Taxation, 1998 Edition*, by Kevin Murphy, published by West/ITP, 1997.
- "Research on the Internet for Tax Practitioners", *Proceedings of the 43rd Annual Texas CPA Institute of Texas Society of CPAs*, November 19-22, 1996.
- "Research on the Internet for Tax Practitioners", *Proceedings of the Twelfth Annual Tax Institute of the Fort Worth Chapter of the Texas Society of CPAs*, August 22-23, 1996.
- "1996 Federal Income Tax Legislation Update," for *Concepts in Federal Taxation, 1997 Edition*, by Kevin Murphy, published by West.
- "Tax Sites on the Worldwide Web", *American Taxation Association Newsletter*, volume 37, Fall 1995, p. 17.
- Book Review of *Concepts of Taxation, 1995 Edition*, in *Journal of the American Taxation Association*, volume 17, Spring 1995, pp. 112.
- Book Review of *Concepts of Taxation, 1994 Edition*, in *Journal of the American Taxation Association*, volume 16, Fall 1994, pp. 150-151.
- "Tax Court Sessions", *American Taxation Association Newsletter*, volume 33, Summer 1994, p. 5.
- "The New Financial Institution: Audit Challenges I", *Control, Audit and Supervision of the Changing Financial Institution Conference Proceedings*, C.

Aubrey Smith Center for Auditing Education and Research, University of Texas at Austin, November 1989, pp. 12-15.

- Cases and Problems Update, for *Federal Taxes and Management Decisions, 1989-1990 Edition*, by Ray Sommerfeld, published by Irwin.

---

## Presentations

- "Audit & Statistical Sampling: Current & Best Practices", Ohio Tax Conference, Columbus, January 30, 2008.
- "Understanding and Properly Using Sampling", Audimation Services, Inc., Audit Seminar Series, Baton Rouge, Louisiana, November 7, 2007.
- "Industry Consolidation Via M & A - Due Diligence, Tax Department Integration, Bill Systems, ERPs, Compliance, Transition, Synergies, Centralization/Decentralization", Broadband Tax Institute, Annual Conference, Scottsdale, Arizona, October 23, 2007.
- "Applied Sampling", Institute for Professionals in Taxation (IPT), Sales & Use Tax Symposium, Indian Wells, California, October 1, 2007.
- "Computer Audits and Sampling: A Practical Case Study", Louisiana Association of Tax Administrators (LATA), Third Quarter Conference, Shreveport, Louisiana, September 14, 2007.
- "Hot Issues in Transaction Tax Audits", TeleStrategies, Communications Tax '07, Arlington, Virginia, June 13, 2007.
- "Payables Data and Internal Controls", University of Dallas, Graduate School of Management, Accounting Concentration, May 10 and 17, 2007.
- "Sampling Strategies in Sales Tax Audits", Strafford Publications Teleconference, May 3, 2007.
- "Statistical Sampling", Council on State Taxation (COST), Advanced Sales Tax School, Atlanta, May 1, 2007.
- "Auditing Large Data Files", Association of Government Accountants, Dallas Chapter, March 19, 2007.
- "Statistical Sampling – Challenges in Sales & Use Taxes Audit Sampling", Council on State Taxation (COST), Sales Tax Conference, Savannah, February 26, 2007.
- "Sampling: Challenges in Auditing Electronic Records", Ohio Tax Conference, Columbus, January 31, 2007.
- "Why It Matters How Taxes Are Presented on the Bill", TeleStrategies Billing Output Conference, Orlando, January 25, 2007.
- "Sampling Strategies in Sales Tax Audits", Strafford Publications Teleconference, November 14, 2006.
- "Telecom Tax Refund Opportunities", Center for Communications Management Information (CCMI), Total Telecom Auditing, Dallas, November 14, 2006.
- "Statistical Sampling in Tax Audits", Federation of Tax Administrators and Multistate Tax Commission, Statistical Sampling Conference, Denver, October 16-17, 2006.

- "Valuing Service Bundles for Tax Purposes", TeleStrategies, Communications Tax '06, Tysons Corner, Virginia, June 13, 2006.
- "Analysis of 'Messy' Accounting Data: Challenges in Payables Data", University of Dallas, Graduate School of Management, Accounting Concentration, June 1 and 8, 2006.
- "Bundling and Communications Taxation", United States Communications Association (USCA), Atlanta, May 10, 2006.
- "Statistical Sampling", Council on State Taxation (COST), Advanced Sales Tax School, Atlanta, May 3, 2006.
- "Auditing Accounting Data Files", Solutions Training Group, Austin, April 27, 2006.
- "Sampling for Sales and Use Tax Audits", Restaurant Industry Sales Tax Audit Professionals (RISTAP), Dallas, April 25, 2006.
- "Understanding and Properly Using Sampling", Audimation Services, Internal Audit Symposium, Washington DC, April 6, 2006.
- "Sampling for Unclaimed Property", Unclaimed Property Professionals Organization (formerly UPHLC), 2006 Annual Conference, Tampa, March 9, 2006.
- "Streamlined Sales Tax (SST) Audit Issues: Business Taxpayer Response", Streamlined Sales Tax State and Local Advisory Council (SLAC), Atlanta, March 8, 2006.
- "Audit Sampling", Council on State Taxation (COST), Sales Tax Conference, Tucson, March 1, 2006.
- "A Texas Tax Practitioner's Primer on Sampling", University of Texas Law School CLE Program, Dallas, February 9, 2006.
- "Valuing Service Bundles for Tax Purposes", TeleStrategies, Webinar, February 7, 2006.
- "Ohio Audit Sampling and Computer Audits", Ohio Tax Conference, Columbus, January 27, 2006.
- "A Texas Tax Practitioner's Primer on Sampling", University of Texas Law School CLE Program, Houston, January 26, 2006.
- "Streamlined Sales Tax (SST) Audit Issues: Business Taxpayer Response", Streamlined Sales Tax Business Advisory Council (BAC), Phoenix, January 11, 2006.
- "Florida Statistical Sampling Update", Florida Institute of CPAs, State Tax Conference, Orlando, December 8, 2005. [Unable to attend due to ice storm in Dallas - presented by my co-presenter John Keda.]
- "How to Defend Against Medicare Audits by Detecting Flaws in Audit Methods", UCG Decision Health, *Part B News* Audio Conference, December 7, 2005.
- "State Tax Controversies", State Bar of Texas (SBOT), Tax Controversy Conference, Houston, December 2, 2005.
- "Tax Automation: Search for the Grail", Broadband Tax Institute, Sarasota, Florida, November 15, 2005.
- "Accounting Data Quality", University of Dallas, Graduate School of Management, Accounting Concentration, November 9, 2005.

- "When Auditors Attack", Thomson RIA User Conference, Orlando, October 31, 2005.
- "Internal Controls for AP: Best Practices for SOX Compliance", Progressive Business Audio Conference, September 21, 2005.
- "Tax Audit Sampling", Multistate Tax Commission (MTC), Annual Meeting, Boise, Idaho, July 28, 2005.
- "Accounting Data Quality", University of Dallas, Graduate School of Management, Accounting Concentration, June 27, 2005.
- "Understanding the Importance of Correct Tax Situsing", Proxix Solutions, Audio Conference, June 23, 2005.
- "Obtaining Good Data for Tax Audits", TeleStrategies, Telecom Tax Surcharges and Fees 2005, McLean, Virginia, June 17, 2005.
- "Internal Controls for Credit Managers", IOMA Audio Conference, May 20, 2005.
- "Statistical Sampling", Council on State Taxation (COST), Advanced Sales Tax School, Itasca, Illinois, May 17, 2005.
- "How I Use Math and Problem Solving Skills as an Accounting Consultant", Parish Episcopal School Math Club, May 5, 2005.
- "Internal Controls for Accounts Payable: Best Practices for 2005", IOMA Audio Conference, March 24, 2005.
- "Risks and Rewards of Statistical Sampling", Council on State Taxation (COST), Sales Tax Conference, Miami, February 23, 2005.
- "Sampling for Medicaid Overpayments", Florida Attorney General, Medicaid Fraud Control Unit (MFCU), Miami, February 22, 2005.
- "Tax Audits - Evaluation of Differing Audit Sampling Methodologies", Ohio Tax Conference, Columbus, January 27, 2005.
- "Accounts Payable and Sarbanes-Oxley: What Every AP Manager Needs to Know to Comply", IOMA Audio Conference, November 22, 2004.
- "Record Keeping Issues for Business Tax Audits", Tax and Business Forum, Dallas, November 17, 2004.
- "Techniques for Auditing Large Accounting Data Files", Association of Government Accountants (AGA), Dallas Chapter, November 4, 2004.
- "Statistical Sampling in Tax Audits", Federation of Tax Administrators and Multistate Tax Commission, Statistical Sampling Conference, Dallas, October 18-19, 2004.
- "Sales, Use, and Telecommunication Tax Update", Broadband Tax Institute, Kohler, Wisconsin, September 27, 2004.
- "Useful Web Sites for Forensic Accounting", Florida Atlantic University, Masters in Forensic Accounting Program, Forensic Accounting Conference, Fort Lauderdale, June 10, 2004.
- "Audit Roulette: Are You a Player? Then Play to Win", TeleStrategies, Telecom Tax Surcharges and Fees 2004, McLean, Virginia, May 18, 2004.
- "Sampling for Sales and Use Tax Audits", Council on State Taxation (COST), Advanced Sales Tax School, Itasca, Illinois, May 6, 2004.

- "A Simple Method of Setting Stratum Boundaries for Statistical Auditing", American Accounting Association (AAA) Southwest Region, Austin, Texas, March 26, 2004.
- "States' Approach to Sampling in Audits and the Available Taxpayer Responses", Council on State Taxation (COST), Sales Tax Conference, New Orleans, February 25, 2004.
- "FDOR Audit Sampling Procedures", Florida Institute of CPAs, Florida State Tax Conference, Tampa, February 5, 2004.
- "Sales & Use Tax Compliance Agreement Audits - Sampling & Computer-Assisted Audits", Ohio Tax Conference, Columbus, January 20, 2004.
- "Planning Sampling Right the First Time", World Research Group, Corporate Tax Automation Practices Conference, Chicago, October 30, 2003.
- "Defending Local Tax Audits", Broadband Tax Institute, Asheville, North Carolina, October 14, 2003.
- "Statistical Sampling - Case Study", Institute for Professionals in Taxation (IPT), Sales & Use Tax Symposium, Fort Lauderdale, Florida, September 22 and 23, 2003.
- "Internet Uses for Tax Practice", Panhandle Chapter of Texas Society of Certified Public Accountants, Tax Institute, Amarillo, August 28, 2003.
- "Tax Exposure, the MTSA, and the Role of GIS", ESRI International User Conference, San Diego, July 9, 2003. [Presented by co-author Robert van Wyngaarden.]
- "Tax Data Management: Hunting and Gathering Data to Prepare for Business Tax Compliance and Audits", World Research Group, Reengineering Tax Summit, Chicago, May 29, 2003.
- "Sampling for Sales and Use Tax Audits", Council on State Taxation (COST), Advanced Sales Tax School, Itasca, Illinois, May 8, 2003.
- "Getting Good Data and Samples", Vertex Customer Conference Exchange, Orlando, May 7, 2003.
- "Computer-Assisted Audits: Opportunities and Pitfalls", Tax Executives Institute (TEI), Atlanta, April 29, 2003.
- "Update on Sampling and Computer-Assisted Auditing ", Institute for Professionals in Taxation (IPT), Silicon Valley Chapter, Santa Clara, California, April 17, 2003.
- "Analyzing AP Data with IDEA", International Accounts Payable Professionals (IAPP), Open Forum, Seattle, April 15, 2003.
- "Sampling and Computer-Assisted Tax Audits", The SALT Group, Dallas, March 27, 2003.
- "Why Oh Why Do So Many Organizations Suffer from Bad Accounting Data", Dublin City University Business School, Dublin, Ireland, March 10, 2003.
- "States' Approach to Sampling in Audits and the Available Taxpayer Responses", Council on State Taxation (COST) Sales Tax Conference, Savannah, Georgia, March 3, 2003.
- "FDOR Sampling Procedures Update", Florida Institute of CPAs, Florida State Tax Conference, Orlando, January 31, 2003.

- "Computer-Assisted Audit Sampling", International Quality & Productivity Center, Risk-Based Audit Conference, Phoenix, January 28, 2003.
- "Computer Assisted Audits on Business Taxpayers", Tax and Business Forum, Dallas, October 16, 2002.
- "SSTP and Taxation of E-Commerce: The Latest Developments", Tax Executives Institute, State and Local Tax Luncheon, Dallas, July 16, 2002.
- "Sampling for Sales and Use Tax Audits", Council on State Taxation (COST) Advanced Sales Tax School, Stone Mountain, Georgia, June 27, 2002.
- "Planning Sampling Right the First Time", World Research Group, Tax Reengineering Summit, Chicago, May 22, 2002.
- "Statistical Sampling", Council on State Taxation (COST) Sales Tax Conference, Houston, February 20, 2002.
- "Audit Compliance in a Paperless Environment", Florida Institute of CPAs, Florida State Tax Conference, Orlando, February 1, 2002.
- "Useful Web Sites for Tax Practice", Florida International University, Executive Master of Science in Taxation, Miami, January 26, 2002.
- "Planning Sampling Right the First Time", World Research Group, Tax Audits and Refunds Summit, Scottsdale, November 28, 2001.
- "Sampling for Tax Audits", Texas Society of Certified Public Accountants, Texas State Tax Conference, Dallas, October 29, 2001.
- "Litigation Support Internet Resources ", American Institute of Certified Public Accountants, National Litigation Services Conference, Dallas, October 25, 2001.
- "Audit Sampling for Polish National Bank Examiners", Narodowy Bank Polski (National Bank of Poland), Warsaw, Poland, September 4-6, 2001.
- "Sampling for Sales and Use Tax Audits", Committee on State Taxation (COST), Advanced Sales and Use Tax School, Stone Mountain, Georgia, June 14, 2001.
- "The A-Z of Tax Data Management: Hunting and Gathering Data to Prepare for Business Tax Compliance and Audits", World Research Group, Reengineering Tax Summit, Chicago, June 1, 2001.
- "Sampling for Tax Administration: Executive and Management Issues", Federation of Tax Administrators, 69th Annual Meeting, Seattle, May 30, 2001.
- "Finding Useful Tax and Business Information on the Internet", Wichita Falls Chapter of Texas Society of Certified Public Accountants, Wichita Falls, May 22, 2001.
- "Statistical Sampling - It's Not Just for the Nerds", Georgetown University Law Center, State and Local Tax Institute, Washington, DC, May 18, 2001.
- "Tax and Estate Planning Resources on the Web", Tarrant County Bar Association, Tax and Estate Planning Section, Fort Worth, Texas, February 28, 2001.
- "Statistical Sampling", Committee on State Taxation (COST) Sales Tax Conference, Charleston, South Carolina, February 19, 2001.
- "Sampling for Tax Audits", Florida Institute of CPAs, Florida State Tax Conference, Orlando, February 8, 2001.
- "Useful Web Sites for Tax Practice ", Florida International University, Executive Master of Science in Taxation, Miami, January 27, 2001.

- "Sampling for Tax Audits", Ohio Tax Conference, Columbus, Ohio, January 17, 2001.
- "Statistical Sampling in State Tax Litigation," American Bar Association Section of Taxation, Scottsdale, Arizona, January 12, 2001.
- "All You Ever Wanted To Know About Sampling But Were Afraid to Ask", Tax Executives Institute, Carolinas Chapter, Charleston, South Carolina, November 11, 2000.
- "Finding Useful Tax and Business Information on the Internet", Rio Grande Valley Chapter of Texas Society of Certified Public Accountants, Weslaco, Texas, November 3, 2000.
- "Statistical Evidence in Litigation", Society of Louisiana Certified Public Accountants, Litigation Services Conference, Kenner, Louisiana, October 27, 2000.
- "Resources for the Web", Fort Worth Chapter of Texas Society of Certified Public Accountants, Controllers "15 Hats" Seminar, Fort Worth, October 25, 2000.
- "Multi-state Statistical and Nonstatistical Sampling: New Trends", Institute for Professionals in Taxation, Sales Tax Symposium, Kansas City, September 27, 2000.
- "Advanced Statistical Sampling", Institute for Professionals in Taxation, Sales Tax Symposium, Kansas City, September 25, 2000.
- "Internet Uses for Tax Practice", Panhandle Chapter of Texas Society of Certified Public Accountants, Tax Institute, Amarillo, August 31, 2000.
- "Useful Web Sites for Estate Planners ", Texas Society of Certified Public Accountants, Estate Planning Conference, San Antonio, August 25, 2000.
- "Internet Uses for Tax Practice", Fort Worth Chapter of Texas Society of Certified Public Accountants, Tax Institute, Fort Worth, August 18, 2000.
- "Sampling for Sales and Use Tax Audits", Committee on State Taxation (COST) Advanced Sales and Use Tax School, Stone Mountain, Georgia, June 15, 2000.
- "Sampling For Tax Audits", IPT Silicon Valley Luncheon Group, Santa Clara, California, June 1, 2000.
- "Sampling Accounting Data with IDEA", IDEA Users Group, Houston, Texas, April 25, 2000.
- "Sampling in Sales & Use Tax Audits & Managed Compliance", American Bar Association - Institute for Professionals in Taxation Joint Sales Tax Seminar, New Orleans, March 22, 2000.
- "Evaluating the Risks and Rewards of Statistical Sampling", Committee on State Taxation (COST) Sales Tax Conference, San Antonio, February 28, 2000.
- "Electronic Commerce and Other Issues for Tax Practitioners," Florida International University, Executive Master of Science in Taxation, Miami, January 15, 2000.
- "Sampling for Sales and Use Tax Audits", Dallas Area Tax Administrators, Richardson, Texas, January 11, 2000.
- "Audit Sampling", Texas Society of CPAs Technology Exposition, Houston, November 15, 1999.

- "How to Fly Through Large Datasets with the Greatest of Ease:  Applications for Accountants and Auditors," American Society of Women Accountants, Fort Worth, November 9, 1999.
- "Web Sites for State and Local Tax Professionals," Tax Executives Institute, State and Local Tax Luncheon, Dallas, October 12, 1999.
- "Internet Uses for Tax Practice", Fort Worth Chapter of Texas Society of Certified Public Accountants, Tax Institute, Fort Worth, August 20, 1999.
- "Web Sites for State and Local Tax Professionals ", Federation of Tax Administrators Technology Conference, Nashville, August 18, 1999.
- "Employment Law Research in Cyberspace ", American Law Institute-American Bar Association (ALI-ABA) Advanced Seminar on Current Developments in Employment Law, Santa Fe, New Mexico, July 17, 1999.
- "Internet Uses for Tax Practice", Texas Society of Certified Public Accountants Family CPE Conference, Galveston, June 24, 1999.
- "Hot Issues in Sales and Use Tax: Managed Compliance and Sampling", University of Wisconsin-Milwaukee, Multistate Tax Audit Conference, June 10, 1999.
- "Sampling for Sales and Use Tax Audits", Railway State Tax Conference, Charleston, South Carolina, May 7, 1999.
- "Facts, Not Fiction: How Statistical Sampling Should Really Work," Committee on State Taxation (COST) Advanced Sales and Use Tax School, Stone Mountain, Georgia, May 6, 1999.
- "Use and Abuse of Sampling in Texas Sales and Use Tax Audits," Utility Excise Tax Association of Texas, Austin, March 8, 1999.
- "Researching Online: Hidden Treasures", Association for Computers & Taxation, 1999 Winter Conference, New Orleans, February 26, 1999.
- "Internet Uses for Tax Practice", Florida International University, Executive Master of Science in Taxation, Miami, January 30, 1999.
- "Useful Web Sites for Petroleum Accountants ", Fort Worth Petroleum Accounting Society, Fort Worth, January 12, 1999.
- "Web Sites for State and Local Tax Professionals ", PricewaterhouseCoopers State Tax Luncheon, Dallas, December 17, 1998.
- "Statistical Sampling - Practical Issues Explained for the Non-statistician", Paul J. Hartman State and Local Tax Forum, Vanderbilt University School of Law, Nashville, October 23, 1998.
- "Finding Useful Information on the Web for Tax Practice", Fort Worth Chapter of Texas Society of Certified Public Accountants, Tax Institute, Fort Worth, August 21, 1998.
- "Employment Law Research on the Web", American Law Institute-American Bar Association (ALI-ABA) Advanced Seminar on Current Developments in Employment Law, Santa Fe, New Mexico, July 25, 1998.
- "Web Sites for State and Local Tax Professionals ", Dallas Fort Worth State Tax Association, Dallas, June 19, 1998.
- "Audit Sampling Design Issues",  Committee on State Taxation (COST) Advanced Sales and Use Tax School, Evergreen Conference Center, Stone Mountain, Georgia, June 4, 1998.

- "Advanced Technology Workshop", Fort Worth Chapter of Texas Society of Certified Public Accountants, Fort Worth, May 20, 1998.
- "Finding Fun Facts on the Internet", Tax Executives Institute, Advanced Technology Seminar, Irving, Texas, May 18, 1998.
- "Bringing Technology into the Classroom: Some Thoughts for Business School Faculty", University of Texas at Arlington, April 24, 1998.
- "Sampling Issues", Federation of Tax Administrators, EDI Audit and Legal Issues Task Force - Electronic Business Processes Working Group, Dallas, April 21, 1998.
- "Employment Law Research on the Internet," Counsel Connect ALI-ABA Online Seminar, Current Issues in Employment Law: 1998, online, April 6 -10, 1998.
- "Bringing Technology into the Classroom: Some Thoughts for Business School Faculty", Southwestern Accounting Doctoral Students Consortium, San Antonio, March 14, 1998.
- "Web Sites for State and Local Tax Professionals ", Ernst & Young LLP, State and Local Tax Luncheon, Dallas, March 4, 1998.
- "Facts, Not Fiction: How Statistical Sampling Should Really Work!" Committee on State Taxation (COST) Sales Tax Conference, San Antonio, Texas, February 23-24, 1998.
- "Internet Uses for Tax Practice", Tax Executives Institute, Federal Tax Luncheon, Dallas, February 17, 1998.
- "Internet Uses for Tax Practice", Florida International University, Executive Master of Science in Taxation, Miami, February 7, 1998.
- "Web Sites for State and Local Tax Professionals ", Institute for Professionals in Taxation, Professional Designation Continuing Education Seminar, San Diego, California, January 31, 1998.
- "Internet Uses for Tax Practice", Houston Chapter of Texas Society of Certified Public Accountants, Houston, January 20, 1998.
- "Useful World Wide Web Sites for Forensic Economists", National Association of Forensic Economics, National Meeting, Chicago, January 4, 1998.
- "Web Sites for Employment Law Research" , American Law Institute-American Bar Association (ALI-ABA) Seminar of Insurance Coverage Issues in Employment Law, Washington, DC, November 15, 1997.
- "Internet Uses for Tax Practice", Fort Worth Chapter of Texas Society of Certified Public Accountants, Technology Study Group, Fort Worth, October 20, 1997.
- "Web Sites for Sales and Use Tax Professionals ", Institute for Professionals in Taxation, Sales and Use Tax Symposium, Dallas, September 30, 1997.
- "Internet Uses for Tax Practice", Fort Worth Chapter of Texas Society of Certified Public Accountants Tax Institute, Fort Worth, August 22, 1997.
- "Web Sites for Employment Law Research" , American Law Institute-American Bar Association (ALI-ABA) Advanced Seminar on Current Developments in Employment Law, Santa Fe, New Mexico, July 19, 1997.
- "New Frontiers in Employment Law Research," Counsel Connect ALI-ABA Online Seminar, Current Issues in Labor & Employment Law, online, May 27-June 6, 1997.

- "Ideas for Teaching Tax Accounting - panel discussion," Southwestern Federation of Administrative Disciplines/American Taxation Association Southwestern Region Annual Meeting, New Orleans, March 13, 1997.
- "The Current State of Tax Practice: Expectations for Technology Skills of New Hires," and "Hands-on Internet Workshop," panel moderator and organizer, American Taxation Association, San Diego, California, February 28 - March 1, 1997.
- "CPA's Responsibility for Detecting Fraud," Austin Chapter of Association of Certified Fraud Examiners, Fraud Symposium, Austin, Texas, January 16, 1997; Baylor University, Department of Accounting, February 5, 1997.
- "Research on the Internet for Tax Practitioners", Texas Society of Certified Public Accountants, Tax Institutes in Fort Worth, Dallas, Houston, and San Antonio; August and November 1996.
- "Personal Financial Planning For Physicians - Tax Module", Texas Christian University, Charles Tandy American Enterprise Center, Fall 1996.
- "Web Applications for Tax Education and Research," American Institute of Certified Public Accountants Biennial Tax Education Symposium, Seattle, Washington, June 7, 1996.
- "Malpractice Litigation Against Local and National Public Accounting Firms: Empirical Evidence," University of North Texas, Denton, March 1, 1996; University of Houston, University Park, April 12, 1996; Texas Christian University, April 26, 1996; American Accounting Association Annual Meeting, Chicago, August 17, 1996; Southern Methodist University, September 6, 1996.
- "Beyond E-mail: Using the Internet for Tax Teaching and Research," American Taxation Association Mid-Year Meeting, New Orleans, February 24, 1996.
- "Arthur Andersen/ATA Tax Education Workshop: Technology Can Enhance Educational Efficiency," American Accounting Association/American Taxation Association Annual Meeting, Orlando, August 14, 1995.
- "Computers in Tax Education and Tax Practice," Southwestern Federation of Administrative Disciplines/American Taxation Association Southwestern Region Annual Meeting, Houston, March 3, 1995.
- "Technology in Tax Education," American Taxation Association Mid-Year Meeting, San Antonio, February 25, 1995.
- "Electronic Tax Research in the Undergraduate Introductory Tax Course," American Accounting Association/American Taxation Association Annual Meeting, New York City, August 11, 1994.
- "The 1993 Tax Act: How Will It Affect Businesses, Individuals and Nonprofit Organizations," National Association of Black Accountants, Dallas/Fort Worth Chapter, Dallas, Texas, November 11, 1993.
- "A Model of Asset Restructuring Announcements," University of Tulsa, February 24, 1992; Texas Christian University, March 2, 1992; Syracuse University, April 1, 1992.
- "Logging Cost Analysis in Minnesota," Midwest Forest Economists Annual Meeting, Duluth, Minnesota, August 1982.

## Service Activities

- All Saints Catholic School, Finance Committee, 2000-2001
- American Accounting Association, Electronic Materials Dissemination Committee, 1997-1998
- American Institute of Certified Public Accountants, Responsibilities in Tax Practice Committee, 1996-1999
- American Institute of Certified Public Accountants, CPA Exam Question Writer, 2004
- American Taxation Association, Computer Resources Committee, 1995-1997
- American Taxation Association, Midyear Program Committee, 1996-1997
- American Taxation Association, Teaching Innovation Committee, 1997-1998
- Aspen Publishers, *CPA Technology & Internet Advisor*, Editorial Advisory Board, 1998-2002
- Boy Scouts of America, Troop 2150, Assistant Scoutmaster, 2002 - 2004
- Boy Scouts of America, Troop 86, Assistant Scoutmaster, 2004 - 2006
- Boy Scouts of America, Troop 751, Assistant Scoutmaster, 2006 - present
- Boy Scouts of America, Circle 10 Council, Order of the Arrow, Mikanakawa Lodge, Finance Adviser, 2006 - present
- Boy Scouts of America, Circle 10 Council, Order of the Arrow, Yanush Chapter, Administration Adviser, 2006 - present
- Boy Scouts of America, Circle 10 Council, North Trail District, Activities Chair, 2007 - present
- Dartmouth College, Alumni Interviewer of Undergraduate Applicants, 1984 - present
- Decision Sciences Institute, manuscript reviewer, 1997
- Florida Atlantic University, *Forensic Accounting: A Journal of Practice & Theory*, Editorial Board, 2004 - present
- Harcourt Brace Professional Publishing, *CPA Internet Connection*, Editorial Board, 1997-1998
- Institute of Management and Administration (IOMA), IOMA's Report on Managing the General Ledger, Editorial Advisory Board, 2002 - 2004
- Streamlined Sales Tax (SST) Business Advisory Council (BAC), Audit Issues working group, 2005 - present
- Texas Society of Certified Public Accountants, Fort Worth Chapter, Advanced Technology Workshop, 1997-1998
- Texas Society of Certified Public Accountants, Fort Worth Chapter, Ethics Committee, 1997-1998
- Texas Society of Certified Public Accountants, Fort Worth Chapter, Technology Study Group, 1997-1998
- Texas Society of Certified Public Accountants, Fort Worth Chapter, CPE Committee, 1998-1999
- TCU Mary Couts Burnett Library, Full Text Journal Project Committee, 1996-1997
- TCU Neeley School, Undergraduate Curriculum Task Force, 1993-1994
- TCU University Ministries, Faith Explorations Steering Committee, 1995-1998

## Professional Affiliations

Current

- American Institute of Certified Public Accountants (AICPA)
- American Statistical Association (ASA)
- Broadband Tax Institute (BTI)
- Business Advisory Council (BAC) to the Streamlined Sales Tax (SST) Governing Board
- Unclaimed Property Professionals Organization (UPPO)

Previous

- American Accounting Association
- American Taxation Association
- Association for Computers & Taxation
- Association of Government Accountants
- Fort Worth Estate Planning Council
- Institute for Professionals in Taxation
- Institute of Management Accountants
- International Accounts Payable Professionals
- National Association of Forensic Economics
- Minnesota Society of Certified Public Accountants
- Society of American Foresters
- Texas Society of Certified Public Accountants

## Grants, Honors, and Awards

- Web site recognized in *The CPA Journal*, Technology Section, "Website of the Month: WillYancey.com", December 2004, page 60.
- Web site recognized in *The Wall Street Journal*, Technology Report, "Portals for Prying", September 15, 2003, page R6.
- Web site recognized by Carolyn Newman, "A Useful Website", 1(12) *National Litigation Consultants' Review* 10 (May 2002).
- Recognized as a Technology Star by Robert W. Scott, "Technology Stars 2001: An Altered View," 17(8) *Accounting Technology* 18 (September 2001), at pages 22-23.
- *Practical Accountant*, willyancey.com cited by Michael G. Stephens as an outstanding site for accountants, February 2001, pp. 22-28.
- *Library Journal*, March 1, 2000, willyancey.com cited as an outstanding web site for taxes, www.libraryjournal.com/article/CA156563

- *Forbes Interactive Money Guide* willyancey.com cited as one of top 8 web sites for tax planning, September 13, 1999, p. 77, www.forbes.com/bow/b2c/review.jhtml?id=497 and www.forbes.com/bow/b2c/category.jhtml?id=30
- Institute for Professionals in Taxation, Sales Tax Literature Manuscript Award, 1999
- American Institute of Certified Public Accountants, cited willyancey.com in "Smart Stops on the Web," 186 *Journal of Accountancy* 16, (September 1998)
- TCU Mortarboard Honor Society, Preferred Professor, 1996 and 1997
- American Institute of Certified Public Accountants Board of Editorial Advisers, very high praise for "Tapping the World Wide Web" article in 182 *Journal of Accountancy* 73 (August 1996).
- American Taxation Association Teaching Innovation Award, 1994
- TCU Charles Tandy American Enterprise Center Junior Faculty Summer Research Awards, 1994 - 1997
- Arthur Andersen National Tax Challenge Honorable Mention, 1993
- American Institute of Certified Public Accountants Doctoral Dissertation Grant, 1990
- Phi Kappa Phi honorary society, 1989
- University of Texas Continuing Fellowship, 1988
- National Merit Scholar Semi-Finalist, 1974
- Eagle Scout, 1972

## Personal Data

- Birthplace-- Massachusetts
- Family--Married with one son
- Interests--family history, travel, skiing, Boy Scouts

Yancey Report Exhibit 2

## *Documents Relied On*

<u>Kingway Documents</u>
Statement of Position of Seller Kingway Inca Clymer Holdings Inc.
Expert Report of Bruce H. Davis dated September 17, 2007


<u>Crowe Chizek Documents</u>
Provided in electronic form:

- Georgia 2004 through 2007 Sales Summaries.081607.xls
- Georgia 2004 through 2007 sample relevance.xls
- Georgia .xls
- Kingway Georgia 2006 SALES SHIP TO STATE.xls
- Kingway Ohio Sales by State 2006  - Ohio.xls
- Kingway Summary of Sales Tax Calculation.V3.doc
- Kingway Texas Sales by State 2006 - Distrib Walmar.xls
- Memo Prepared by Malena Nov 1 2007.doc
- Ohio 2004 through 2007 Sales Summaries.081607.xls
- Ohio 2004 through 2007 sample relevance.xls
- Ohio Final.xls
- RECAP of Tax Estimate 081907.xls
- RECAPofTaxEstimate.xls
- Texas 2004 through 2007 Sales Summaries.081607.xls
- Texas 2004 through 2007 sample relevance.xls
- Texas New distr walmart BL with Interest.xls
- UNARCO Memo May 22, 2007.doc

**REPLY STATEMENT OF**
**SELLER KINGWAY INCA CLYMER HOLDINGS INC.**

**November 6, 2007**

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................... 1

FOUR FUNDAMENTAL PROBLEMS WITH BUYER'S APPROACH............................... 1

    1) Estimates and Judgments ........................................................................... 1
    2) Lack of Support ......................................................................................... 4
    3) New Issues ................................................................................................. 6
    4) Nature of the Post-Closing Adjustment Process and Authority of the Firm ........... 8

REVISED SUMMARY OF ADJUSTMENTS IN DISPUTE ........................................ 9

SUMMARY COMPARISON ................................................................................. 10

UPDATED NET WORKING CAPITAL RECONCILIATION ................................... 10

DISCUSSION OF THE ISSUES ............................................................................. 10

I.   NET WORKING CAPITAL – $3,967,701 IN DISPUTE.................................... 11

  A.   SALES TAX – $3,317,608 IN DISPUTE................................................... 11

    1.  Buyer Asks the Firm to Overturn the Company's Contemporaneous Accounting
        Judgments Based on No Evidence or Serious Analysis .................................. 11
    2.  Buyer's Reliance on BDO's Work is Faulty................................................ 13
    3.  Buyer's "Estimate" of $2,198,689.44 Million in Liability (Exclusive of Interest) is
        Unfounded ............................................................................................. 16
    4.  Buyer's Proposed Accrual for $825,000 in Penalties Must Be Disregarded ........ 18

  B.   VACATION ACCRUAL – $343,639 IN DISPUTE ....................................... 20

  C.   PETSMART – $19,596 IN DISPUTE ....................................................... 20

  D.   ACCOUNTS RECEIVABLE ALLOWANCE – $133,401 IN DISPUTE ................. 21

  E.   PREPAID TRADESHOW EXPENSE – $125,457 IN DISPUTE ....................... 23

  F.   WISE – $28,000 IN DISPUTE ............................................................... 24

II.   ESTIMATED PURCHASE PRICE – $1,886,054 IN DISPUTE ........................ 25

CONCLUSION ................................................................................................... 27

## INTRODUCTION

On October 23, 2007, Kingway Inca Clymer Holdings Inc. ("Seller") submitted its initial Statement of Position ("Seller SOP") in the post-closing adjustment dispute with Unarco Material Handling, Inc. ("Buyer") relating to a transaction involving the sale of all membership interests in KIC Holdings, LLC, the successor to KIC Holdings, Inc. ("Company"). Buyer submitted its Statement of Position ("Buyer SOP") later that same day. For the most part, Seller's Statement of Position continues to hold in light of Buyer's submission, and we refer the reader to that document for our position on the main issues. This "reply" statement of position addresses certain new issues or points of note raised in Buyer's Statement of Position.[1] Consistent with the schedule agreed to by the Firm and the parties, Seller also stands ready to provide any other assistance or guidance that the Firm may find helpful here.

## FOUR FUNDAMENTAL PROBLEMS WITH BUYER'S APPROACH

As we did in our initial submission, before briefly addressing each issue in dispute on an item-by-item basis, we discuss some of the global problems associated with Buyer's position.

**1) Estimates and Judgments:** The disputed items focus, to a great extent, on estimates and judgments made by Company management based on information known to them as of, or just prior to, the Closing Date. For example, Buyer initially proposed massive retroactive changes to management's estimates and judgments regarding sales tax liability ($4.7 million initial proposed change), Petsmart issues ($200,000 initial proposed change), and OSHA liability ($45,000 initial proposed change). By contrast, Buyer vigorously rejects the proposition that there should be any change to the allowance for doubtful accounts, notwithstanding (1) that subsequent history shows that the allowance was overstated and violative of the Company's historical accounting policies, and notwithstanding (2) that Company management who were responsible for setting that allowance acknowledge that they did not perform a detailed account-by-account analysis prior to Closing and, had they done so, would not have agreed with the balance stated as of Closing.

Estimates and conclusions regarding liabilities and exposure are inherently judgmental. For the most part, the post-closing adjustment process should not be about attempts to second-guess the reasonable judgments and estimates of management based on what they knew as of the Closing Date. Even if Buyer were to make a good faith estimate or judgment after the Closing that was reasonable but that differed from the reasonable good faith estimate or judgment of management as of the Closing Date, management's reasonable estimate would have to prevail. Buyer's second-guess would have to be rejected for two reasons.

First, it would have to be rejected because that approach is not consistent with GAAP. The literature recognizes that estimates are inherently judgmental and that there can be a range of

---

[1] As in Seller's Statement of Position, throughout this submission we use capitalized terms. When not otherwise defined, we intend to refer to the definitions of these terms contained in the Securities Purchase Agreement dated March 9, 2007 ("Agreement") (Seller SOP Ex. 1).

reasonable estimates and judgments regarding an item. So long as management's original estimate was reasonable based on the information known at the time, it was consistent with GAAP at that time.

Under GAAP, an "error" is an inaccuracy "in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of GAAP, or oversight or misuse of facts *that existed at the time the financial statements were prepared.*"[2] By contrast, "[c]hanges in accounting estimates result from new information."[3] Thus, so long as the Company did not omit or misuse facts that existed at the time the closing balance sheet was prepared, its judgments must stand.

Unless Buyer can point to new material information that existed at Closing, and has now come to light, there is absolutely no basis in the Agreement or anywhere else for changing reasonable estimates and judgments made as of the Closing Date – even if there is another judgment or estimate that would also have been consistent with GAAP. If Buyer wants to substitute its estimate for that of prior management – whether based on new information or not – Buyer is absolutely free to do so on the current books and records of the Company. But it cannot import that estimate back in time to the Closing Date and substitute it for the reasonable estimate of management as of that time.[4]

The second reason why Buyer's proposed revisions to management's estimates and judgments would have to be rejected, even if reasonable and consistent with GAAP, is that they are not consistent with the post-closing adjustment process as set forth in the Agreement. As noted in our initial submission, the goal of the post-closing adjustment process is to use the same principles and methods used in putting together the Reference Balance Sheet and the Estimated Purchase Price and simply to "true up" those estimates to reflect additional information gained since that time.[5] The post-closing adjustment process is not the place to achieve windfalls, which is what would occur if an "apples to oranges" comparison were to be implemented. And it is not the place to seek damages that allegedly flowed to Buyer to the extent that Buyer contends the Company's financial statements were inconsistent with GAAP. The estimates and judgments made by management as of the Closing Date were consistent with those made in putting together the Reference Balance Sheet and the Estimated Purchase Price. This means that there is no need for a "true up" of the Actual Purchase Price with regard to these items. It would be unfair – and

---

[2] Financial Accounting Standard 154, *Accounting Changes & Error Corrections* ("FAS 154") at ¶ 2(h) (emphasis added) (Exhibit 20 hereto).

[3] FAS 154 at ¶ 2(d) (Ex. 20).

[4] Note that, on multiple occasions, Buyer is relying upon inapplicable GAAP as the basis for its second-guesses of the Company's estimates. As explained in Seller's Statement of Position, and as the Firm well knows, GAAP provides for interim accounting principles at variance from those used at year end. For example, while FAS 43 and SOP 93-7 govern year end financial statements, those standards and APB 28 explicitly permit alternative principles to be applied on an interim basis. Indeed, GAAP requires this when necessary to avoid distortion of interim periods. *See* Seller SOP at 20, 24.

[5] *See* Seller SOP at 3-7.

2

inconsistent with the Agreement – to use different estimates and judgments in calculating the Actual Purchase Price than were used in calculating the Estimated Purchase Price.

There is a final point. We have explained in general why Buyer's proposed revisions to management's good faith estimates as of the Closing Date would have to be rejected here even if those proposed revisions were reasonable and in good faith. It is clear, however, that they are not. Buyer's estimates are the product of either a "results-oriented" approach or an approach that is so badly flawed that it cannot in any way be relied upon. Both may be true. Either way, that is yet another reason why they must be rejected.

For example, following the Closing, Buyer apparently created a problem that had not previously existed related to the Petsmart account and then "estimated" that the problem would take $200,000 to fix. Buyer proposed a post-closing adjustment based on this $200,000 estimate made after Closing. We dispute the entire approach taken by Buyer on this issue. But one thing even Buyer now admits is clear: Buyer's post-Closing estimate was radically wrong. Even Buyer admits that the "problem" it created did not cost anywhere near $200,000 to fix but, Buyer now says, cost only approximately $19,000.[6] In other words, by Buyer's own admission, Buyer's estimate was wrong (on the high side) by more than 90 percent.

Interestingly, Buyer was wrong – again on the high side – by a similar percentage with regard to the OSHA liability. After Closing, Buyer estimated that this liability would be $45,000 – reflecting what Buyer itself conceded was the maximum conceivable liability under the worst case scenario. In point of fact, Buyer settled the claim for $5,400 – again reflecting that almost 90 percent of the original estimated amount was excessive and wrong.[7]

Finally, on the sales tax issue, Buyer is again radically wrong. Buyer initially proposed a $4.7 million change to management's prior judgment regarding this item.[8] Buyer now estimates that the exposure is $3.5 million.[9] And, effectively signaling that it really believes the exposure is much less, Buyer urges the Firm to rely upon a document by BDO Seidman LLP ("BDO"), which suggests liability to be in the vicinity of $236,385 to $384,335, exclusive of interest.[10] BDO's number is reduced to $163,269 to $247,957, exclusive of interest, once an adjustment is made to eliminate 2004 amounts, which, as explained below, Buyer's analysis requires. Again, this range reflects an effective concession by Buyer that its initial estimate was high by well over 90 percent.

---

[6] Buyer SOP at 9.

[7] Buyer SOP at 9.

[8] *See* May 24, 2007 Letter from P. Neal to C. Moore with attachments ("Draft Computation") at 4 (Seller SOP Ex. 4).

[9] Buyer SOP at II(b)(i).

[10] Buyer SOP at II(b)(i); *see* BDO Seidman LLP, *Sales Tax Nexus and Sales Tax Liability Assessment OF INCA METALS PRODUCT CORP AND CLYMER ACQUISITIONS, INC.* (Feb. 8, 2007) ("BDO Document") at Schedule C (Buyer SOP, Appendix E).

Make no mistake about what we are saying. We are not saying that we agree with Buyer's new estimates and positions on these points. The $19,000 amount with regard to Petsmart is wrong and was not something that reflected a true liability as of Closing. The $3.5 million sales tax amount and the much lower amount reflected in the BDO Document are wrong as well. And, although we are not contesting it here, it is likely that that the OSHA fines of $5,400 were not appropriate for accrual as of March 30, 2007 either. The issue here is not whether Buyer's new estimates are correct but, rather, that, by Buyer's own concession, Buyer is singularly terrible at making estimates and judgments regarding these matters. And, by Buyer's own admission, Buyer is consistently wrong in the same direction – it consistently and substantially <u>over</u>estimates liabilities. In short, even if the post-closing adjustment process did contemplate the sort of second-guessing of estimates and judgments that Buyer urges, and even if GAAP did permit it, the Firm still should not give any credence to Buyer's proposed revisions to the reasonable, good faith estimates and judgments made by management because Buyer systematically and consistently (and ultimately admittedly) is wrong in its judgments and estimates. Indeed, Buyer is consistently wrong by such enormous factors as to call into question the fundamental approach that Buyer is using in making these estimates.

    2) <u>**Lack of Support:**</u> Buyer is proposing retroactive adjustments to the Company's historical accounting policies and judgments. These historical accounting policies and judgments were created and implemented by the Company's long-standing management, who were fully familiar with the facts and circumstances relating to the Company and with the industry more generally. The policies and judgments were also reviewed in most cases by the Company's independent auditors. As Seller explained in its Statement of Position, if Buyer is going to ask the Firm to retroactively adjust the Company's historical accounting practices and judgments, surely Buyer is obliged to document extensively and otherwise provide support for its positions.[11] Buyer must come forward with the specific facts and documents which, it claims, show that the Company's prior judgments were wrong and Buyer must address specifically the reasons and rationales offered by the Company's prior management in support of its position. Buyer had not done any of this as of the time of our Objection Notice and, stunningly enough, Buyer's Statement of Position does not further the ball in this regard.

For example, on the sales tax issue, Buyer has failed to provide a single invoice – not one. We asked for copies of selected invoices on which Buyer had claimed sales tax was owed but had not been paid. Buyer provided some of these invoices to us and failed to provide others. As set forth in the initial report of sales tax expert Bruce Davis, the review of those invoices that Buyer was willing to provide revealed outright errors on Buyer's part.[12] We think it is telling that Buyer continues not to provide the Firm with any invoices on which it claims sales tax was due but not paid.

This does not apply only to invoices. Buyer fails to provide any information about its investigation of potential exemptions relating to customers to which the Company sold product.

---

[11] Seller SOP at 7-8.

[12] *See* Expert Report of Bruce H. Davis, CPA (Sept. 17, 2007) ("Davis Expert Report") at 7-8 (Seller SOP Ex. 7).

Again, Mr. Davis and his staff looked at this question and determined that a number of the sales on which Buyer claims sales tax was due but not paid were sales to exempt customers, who did not have any obligation to pay sales tax.[13]  Again, it is telling the Buyer does not include with its submission a single rejected exemption certificate or any evidence whatsoever of any effort on its part to determine whether particular transactions were exempt from sales tax.

This failure to provide evidence in support of its radical proposed revision to the judgment of prior Company management is not limited to factual issues.  Nowhere does Buyer address the rationale offered by prior management for its judgment.  For example, Buyer nowhere addresses the interpretation of FAS 5 and its applicability to this situation offered by the Company's prior management.[14]  Buyer nowhere addresses any of the flaws identified and points made in Mr. Davis's report[15] – points that were made known to Buyer in communications months ago.

Indeed, we think it is particularly telling that Buyer does not even come forward with an individual who is willing to sign his or her name to the position being offered by Buyer on this issue.  Although Buyer refers obliquely to compilation assistance it received from Crowe Chizek & Co. LLC ("Crowe"), no one at that entity was apparently eager to affirmatively and unqualifiedly opine that the number being offered by Buyer is in fact correct or reasonable or even within the realm of possibility.  Apparently, no individual in the Company's new management was eager to go on record saying so either.  Buyer has offered the Firm literally nothing in support of its radical proposed change to the Company's prior judgment regarding sales tax liability – no invoices, no evidence of any investigation, no analysis of the accounting principles, no opinion from an independent expert, no opinion from current Company management.  Buyer asks the Firm to adopt its proposed $3.5 million adjustment based entirely on a page and a half of text describing the amount of the adjustment and not attributed to any person.[16]  On the merits of Buyer's proposal, this is telling.  More important, for present purposes, this is nowhere near meeting the burden that Buyer must meet here.

Without getting into too much detail here, we will say that it is clear that a similar problem permeates Buyer's entire submission on all issues.  To pick just a few examples:

- In support of its position on accounts receivable, Buyer makes vague reference to credit memos that it created *itself* but does not even attach them.[17]

- On Petsmart, Buyer has provided no support whatsoever to show why the correct liability estimate should have been $19,000 as of the Closing Date – *literally*

---

[13] Davis Expert Report at 7-8 (Seller SOP Ex. 7).

[14] *See* Seller SOP at 12-13.

[15] *See* Davis Expert Report at 4 (Seller SOP Ex. 7).

[16] Buyer SOP at II(b)(i).

[17] *See* Buyer SOP at 6 & Ex. 7 at p.1.

*nothing.*[18]  The mere occurrence of this expense is no support whatsoever for adjusting the Company's books retroactive to March 30, 2007.

- With respect to the Buyer's proposed adjustment concerning Promat Tradeshow expenses, Buyer gives just the bald statement that there is no future benefit and a citation to a standard that, on its face, does not apply.[19]

- On its proposed "WISE Installation" adjustment, Buyer does not provide an explanation of how its post-Closing Date decision to depart from the Company's policy of requiring order changes in writing could *ever* lead to liability on the part of Seller.[20]  Buyer also omits the WISE purchase order from its submission (having also failed to provide it to Seller), and makes no reference whatsoever to the signed unconditional waiver and release from liability held by the Company as of the Closing Date.[21]

Buyer is in complete control of the Company now and has all of the accounting records. Buyer is proposing a series of large retroactive adjustments to the accounting policies and judgments of the Company under prior management.  Rather than produce detailed support from the Company's records for its proposed changes, Buyer says, in essence, "trust me."  Buyer has not come in any way close to meeting the massive burden it has of substantiating – at a detailed level – the specific reasons why a retroactive adjustment should be made to the good faith judgments and accounting decisions reached by prior management.[22]

3) **New Issues:**  In a number of areas, the parties' statements of position show that the post-closing adjustment process is working as it ought to.  As discussed in more detail below, each party has conceded certain points for purposes of this process, thereby limiting certain of the issues or amounts in dispute between the parties.[23]  Unfortunately, Buyer has also, at the same time, attempted to inject new issues of dispute that it had not previously raised.  The parties' Agreement forbids this, and the Firm must reject these attempts by Buyer outright.

---

[18] *See* Buyer SOP at 9.

[19] *See* Buyer SOP at 7.

[20] *See* Buyer SOP at 9-10.

[21] *See* Seller SOP at 26-27; Contractor's Unconditional Waiver (Sept. 27, 2006) (Seller SOP Ex. 19).

[22] Nor is this something that Buyer should be permitted to attempt to change now.  As explained in Seller's SOP, Buyer was required to give Seller all applicable documentation following submission to Seller of Buyer's Draft Computation.  *See* Agreement § 2.04(a) (Seller SOP Ex. 1).  Thus, Buyer had ample opportunity to identify any support for its proposed adjustments and has failed to do so.  Under the agreement, Buyer's failure in this regard is not something that can be cured now, at this late hour.  *See* Seller SOP at 9.

[23] *See* discussion below at page 9-10.

The Agreement is clear that Buyer had 60 days after the Closing to provide Seller with its proposed post-closing adjustments and its proposed calculation of Actual Purchase Price.[24] Those 60 days expired in May 2007.  Buyer was also obligated to provide all records and work papers used in preparing the Draft Computation and a detailed breakdown of the calculations used to determine the amounts set forth in the Draft Computation.[25]  Seller then had a limited period of time to respond with its Objection Notice, and the parties then had a 60-day window during which they were supposed to be discussing "any disagreements as to the Draft Computation and the Objection Notice."[26]

Notwithstanding this, Buyer now attempts to inject two new issues into dispute.  First, as we discuss in more detail at page 18 below, Buyer contends for the first time that a post-closing adjustment should be made in the amount of $825,000 for "penalty liabilities" associated with the sales tax issue.[27]  Buyer and Crowe, which performed the compilation work, had previously affirmatively opined that the proper liability associated with penalties was zero.[28]  Second, Buyer now contends for the first time that the amount owed to it on all issues includes interest;  Buyer had not previously so contended in its Draft Computation.[29]

Whatever arguments Buyer might have for these positions – and Buyer does not set forth any in its statement of position – the Agreement to which Buyer is a signatory is clear that it is too late for Buyer to be injecting new issues.  Under the Agreement, Buyer had an express 60-day deadline.[30]  The Agreement makes clear that the Firm is limited to considering "only those items and amounts in the Draft Computation and Objection Notice" that remain unresolved after the negotiation period.[31]  The Agreement requires disclosure of all "records and work papers used in preparing the Draft Computation."[32]  And, the entire process described above refers to the Draft Computation and its supporting papers as the universe of materials setting forth Buyer's position.[33]

---

[24] Agreement § 2.04(a) (Seller SOP Ex. 1).

[25] Agreement § 2.04(a) (Seller SOP Ex. 1).

[26] Agreement § 2.04(a) (Seller SOP Ex. 1).

[27] Buyer SOP at II(b)(i) & Ex. 5.

[28] *See* May 24, 2007 Letter from P. Neal to C. Moore with attachments ("Draft Computation") at 4 (Seller SOP Ex. 4) (claiming $4,732,213 on this item); *see also* Mem. from B. Buechler, Executive Crowe Chizek and Company LLC, *et al.* to P. Neal (May 22, 2007) ("Crowe 5/22/2007 Memorandum") (attached to Draft Computation) (Seller SOP Ex. 4A) (setting forth, on third page, derivation of $4,732,213 figure, and expressly excluding estimated penalties from total).

[29] *See* Draft Computation at 4 (Seller SOP Ex. 4).

[30] Agreement § 2.04(a) (Seller SOP Ex. 1).

[31] Agreement § 2.04(a) (Seller SOP Ex. 1).

[32] Agreement § 2.04(a) (Seller SOP Ex. 1).

[33] Agreement § 2.04(a) (Seller SOP Ex. 1).

7

The letter and structure of the Agreement are unambiguous that Buyer must live with the position set forth in the analysis that it conducted as of the time of the Draft Computation and cannot now claim it is entitled to new adjustments – adjustments that are inconsistent with its statements made in the Draft Computation. Basic fairness dictates the same result.

**4) <u>Nature of the Post-Closing Adjustment Process and Authority of the Firm</u>:** As Seller predicted, Buyer has based its effort to obtain post-closing adjustments in its favor on an argument that the Company's financial statements were not created in accordance with GAAP and on related arguments that the Company's Representations and Warranties in the Agreement were incorrect.[34] We dispute the truth of these assertions. The Company's financial statements <u>were</u> prepared in accordance with GAAP and there has been no misrepresentation.

But more importantly, this post-closing adjustment process is not a GAAS audit, and it is not an indemnification action. Under the Agreement, Buyer and Seller contracted that some potential disputes would be resolved by an accounting firm.[35] Buyer and Seller also contracted that certain disputes would be resolved exclusively by the Firm.[36] The latter category includes, among other things, whether Seller's Representations and Warrantees have been breached.[37] As explained in Seller's Statement of Position, in the Agreement, Seller made Representations and Warrantees, for example, that the Company's financial statements have been prepared in accordance with GAAP[38] and that the Company had paid in full all Taxes – including sales and use taxes – due and payable as of the Closing Date.[39] As anticipated by Seller, Buyer is now disputing that those Representations and Warrantees were true and correct as of the Closing Date. The Agreement does not provide for the Firm to resolve those issues. Nor did the Parties amend the Agreement in the retainer letter signed with the Firm – the retainer letter makes clear that this proceeding "is governed by Section 2.04, Post Closing Adjustment, of the Securities Purchase Agreement."[40]

What this means is that this is simply not the place for any discussion or inquiry concerning a number of the issues and "adjustments" discussed by Buyer. If Buyer wants to do so, the Agreement requires that Buyer raise these issues in court. These include, for example, Buyer's argument that:

---

[34] *See, e.g.*, Buyer SOP at 9 ("Accordingly, because the [Agreement] requires Net Working Capital to be reported on a GAAP basis (*see* SPA, Exhibit A), this liability must be included in the calculation of Net Working Capital . . . .").

[35] Agreement § 2.04(a) (Seller SOP Ex. 1).

[36] Agreement § 12.07 (Seller SOP Ex. 1).

[37] Agreement § 11.03(a) (Seller SOP Ex. 1).

[38] Agreement § 3.09 (Seller SOP Ex. 1).

[39] Agreement § 3.06 (Seller SOP Ex. 1).

[40] 10/5/07 Retainer Letter at p. 1 (Seller SOP Ex. 6).

- "The Company's Closing Balance Sheet Erroneously Omitted $3,317,608 Of Accrued State Sales Tax Liabilities That Existed As Of The Transaction Date."[41]

- The Company's accounting for $125,000 in trade show expenses failed to conform to GAAP.[42]

- The Company's accounting for accrued vacation failed to conform to GAAP.[43]

None of these are post-closing adjustments. All of these seek an "apples to oranges" result based on the claim – incorrect we contend – that the Company somehow made misrepresentations to Buyer prior to Closing. Under the Agreement, none of these claims are therefore the proper subject of post-closing adjustments and any adjustment based on them must be rejected here.

### REVISED SUMMARY OF ADJUSTMENTS IN DISPUTE

Despite the foregoing, some progress has been made. As Seller stated in its Statement of Position, Buyer did not provide sufficient information prior to the due date for the Objection Notice. And, Buyer was unwilling to agree to an extension of that date. Thus, Seller contested certain items pending the receipt of additional information. In some cases, the additional information was never forthcoming. In others, the additional information validated Seller's dispute of Buyer's proposed adjustments. In still others, Buyer provided information that obviated Seller's need to contest the proposed adjustment – this last category included the revolving line of credit, the Company's purchases of tools and dyes, an item denominated unearned revenue, and the Cash Amount.[44]

Moreover, Buyer's Statement of Position rightly corrects one number – Estimated Net Working Capital, which, pursuant to Section 2.01 of the Agreement, is $3,427,338.[45] We stated in Seller's Statement of Position that it was $2,917,985, but we agree with Buyer that it is $3,427,338. We have adjusted the Estimated Purchase Price accordingly.

By the same token, Buyer's submission reveals for the first time that it has revised its position on one issue – the OSHA penalty – so that Buyer agrees with our position and that it has

---

[41] Buyer SOP at II(b)(i).

[42] Buyer SOP at II(b)(iv)(1).

[43] Buyer SOP at II(b)(v)(1).

[44] In its Statement of Position, Buyer has made arguments concerning these issues, and it has made a number of statements on these subjects with which we do not agree. Nevertheless, there is no sense wasting the Firm's time rebutting these statements because, for purposes of this post-closing adjustment process, Seller does not now contest the adjustments that Buyer is proposing for these items.

[45] *See* Part II, below. As explained in Part II, Buyer is still incorrect about the Estimated Indebtedness Payoff Amount and, therefore, the Estimated Purchase Price.

revised its position on certain other issues – Petsmart and the sales tax issue – in ways that concede part of the amount previously in dispute.[46]

Based on the Parties' Statements of Position, the dispute is summarized as follows:

## SUMMARY COMPARISON

| Item | Seller's Position | Buyer's Position |
|---|---|---|
| Actual Net Working Capital | $2,674,929 | ($1,292,772) |
| Estimated Purchase Price | $3,685,325.60 | $5,571,379.60 |
| **ACTUAL PURCHASE PRICE** | **$4,826,543** | **$858,842** |
| **TOTAL POST-CLOSING ADJUSTMENT** | *Seller is owed* **$1,141,217.40 plus interest** | *Buyer is owed* **$4,712,937 plus interest** |

## UPDATED NET WORKING CAPITAL RECONCILIATION

**Seller's Claimed Net Working Capital:**          $ 2,674,929

**Seller's Proposed Adjustment in Dispute:**

    Accounts Receivable Allowance-          $     133,401

**Buyer's Proposed Adjustments in Dispute:**

    Sales Tax Accrual-          ($3,317,607)
    Vacation Accrual-          ($   343,639)
    Petsmart-          ($     19,596)
    Prepaid Tradeshow Expense          ($   125,457)
    WISE Installation-          ($     28,000)

**Adjustment No Longer in Dispute:**

    OSHA Violation-          ($       5,400)

**Buyer's Claimed Net Working Capital:**          ($1,292,772)

## DISCUSSION OF THE ISSUES

The disputes between the parties fall into two broad categories. There is a $3,967,701 dispute concerning the Net Working Capital amount. This dispute is itself comprised of six "sub-disputes" concerning what the parties refer to as sales tax accrual, vacation accrual,

---

[46] In certain other respects Buyer has revised its numbers so as to raise new issues and further increase the amount purportedly in dispute. As noted above, this is not allowed.

Petsmart, allowance for doubtful accounts, prepaid tradeshow expense, and WISE installation. In addition, there is a dispute in the amount of $1,886,054 concerning Buyer's improper attempt to alter the Estimated Purchase Price. We rely principally upon our initial submission with regard to each of these items but discuss certain aspects of each of these items, in turn, below.

I.    **NET WORKING CAPITAL – $3,967,701 IN DISPUTE**

    A.    **SALES TAX – $3,317,608 IN DISPUTE**

        1.    **Buyer Asks the Firm to Overturn the Company's Contemporaneous Accounting Judgments Based on No Evidence or Serious Analysis**

Given the amount of time that has passed since Buyer first asserted its claim for indemnification of this hypothetical sales-tax liability, the lack of support contained within Buyer's Statement of Position is noteworthy. Although Buyer has long known of the numerous deficiencies in its estimate, Buyer has done nothing to remedy the situation.

One significant omission from Buyer's Statement of Position is that Buyer failed to obtain a report from any accounting firm or tax professional willing to support its proposal to upset the Company's contemporaneous judgments. Where, for example, is Buyer's CPA report attesting that the Company's Closing-Date estimate of tax liability was unreasonable under FAS 5? For that matter, where is Buyer's signed statement from a tax professional opining that $3,317,608 is a reasonable estimate as of March 30, 2007? Buyer refers to Crowe Chizek's work, but where is Crowe's certification that $3.3 million is its position, and that its accountants are standing behind it?

As explained in Seller's Statement of Position, Company personnel made the judgment, as of March 30, 2007, that no sales tax liability could be deemed "probable" or "reasonably estimable" as required for an accrual under FAS 5.[47] Buyer proposes retroactively to substitute its judgment – if that is what Buyer's number can be termed – for those made by Company employees in the course of their contemporaneous pre-Closing work at the Company. It does so, virtually exclusively, in reliance on "nexus" analysis and "block sampling." Based on those techniques, Buyer asserts that the Company should accrue a liability for $3,317,608 in sales tax allegedly owed to state governments throughout the country.

But, as explained in Seller's Statement of Position, a "nexus" is a necessary but not sufficient element of sales and use tax liability for a given transaction. And, block sampling – particularly as utilized here by Buyer – is not a proper methodology for this task in the context of a post-closing adjustment dispute such as this one. Nor is it a proper basis for estimating loss for accrual under FAS 5. In other words, there are many reasons why sales with a "nexus" to a particular state may not cause any sales tax liability. Buyer's use of block sampling produces inaccurate results because it ignores major components of this analysis.

---

[47] *See* Seller SOP at 12.

Buyer has known of these deficiencies for some time now. It is, therefore, surprising that Buyer has failed to support its claim with any documentation whatsoever, and offers so little detail in service of its claim. For example:

- Buyer has provided the Firm with no copies of any of the invoices on which it claims sales tax was due but not paid.

- Buyer does not address, at all, the question of efforts it has made to back-bill customers for the amounts allegedly owed.

- Buyer has provided no copies of disallowed exemption certificates.

- Buyer provides no evidence of any communications with state taxing authorities.

- Buyer provides no evidence whatsoever of any efforts on its part to determine whether particular customers were exempt or to determine whether particular sales were exempt from sales tax for reasons other than those relating to the customer's identity.

- Buyer provides no analysis whatsoever under FAS 5 and no response to the contemporaneous analysis of Company personnel prior to Closing in this regard.

- Buyer claims that it spoke with Company personnel, but does not say *who* it talked to or *what information* they provided.

- Buyer urges the Firm to simply "trust Crowe" – but there is no indication of what specific documents or other specific evidence Crowe reviewed, and there is no written opinion from Crowe or indication that any particular individual from Crowe adopts or agrees with the conclusion Buyer is pressing here.

These eight key deficiencies, and many others, are striking. Buyer owns the Company now. Buyer has access to all of the records and information upon which it supposedly based its proposed revision to the Company's historical estimate and judgment. There is no excuse for failing to provide any of this information.

What's more, Buyer has full responsibility for the Company's conduct and situation right now. Yet, somehow, Buyer provides no evidence that it has actually paid any of the taxes that it claims are owed or otherwise communicated with state taxing authorities concerning this subject. Again, this omission on Buyer's part is telling.

It should be absolutely clear by now that Buyer's "analysis" is not a serious estimate of the Company's liability relating to sales tax, as of March 30, 2007, but is instead a results-oriented attempt to claw back some of the agreed-upon purchase price. As Crowe personnel red-facedly conceded when communicating with Mr. Davis's staff in July 2007, Crowe's original analysis in support of Buyer's Draft Computation on this point was done at the express direction of personnel associated with Buyer's parent company and involved only three days of work over

12

a weekend, almost no investigation whatsoever, and little, if any, involvement by those conversant with sales tax issues. The best that can be said of that initial work by Crowe is that it was simply an exercise in determining a "worst case scenario" that could be used by Buyer to be as aggressive as possible in negotiations. Based on Buyer's latest submission, it appears that no further work of significance has been done since that time. And, amazingly, neither Crowe nor any individual at Buyer stands behind Buyer's latest argumentation on this point. Buyer's Statement of Position is simply an updated version of that weekend session that corrects some, but by no means all, of the initial review's most obvious errors.

In sum, the Firm is faced with two choices. On the one hand there are: (a) the judgment exercised by Company personnel prior to Closing based on their knowledge and expertise and (b) the opinion of a sales tax professional that that judgment was reasonable and appropriate under the circumstances. On the other hand there is an argument made by Buyer after the Closing that the judgment as of Closing was radically wrong. In support of that argument, Buyer offers no detailed documentary support, no explanation for why the rationale supporting the prior judgment was wrong and should be disregarded, no specific individual familiar with the facts who is willing to attest that the new (and ever-changing) number offered by Buyer is correct, no expert willing to stand behind Buyer's number and avow that it is correct, and no evidence that the Buyer has ever acted – in the real world – as though it believed its new number were accurate (such as by paying the taxes allegedly owed, making efforts to collect the taxes allegedly owed from Buyer's customers, or communicating to state taxing authorities concerning the supposed debt). As discussed above, for a variety of reasons, the post-closing adjustment process is not the place for substituting one reasonable judgment for another. It is certainly not the place for substituting one unsupported and incredible argument for the reasoned judgment of knowledgeable professionals.

## 2.    Buyer's Reliance on BDO's Work is Faulty

While Buyer nowhere submits any report from Crowe, which performed the compilation work for Buyer, or from any other source retained by Buyer, it is noteworthy that Buyer does rely heavily on the BDO Document – an analysis created, prior to Closing, by BDO. In its extremely brief discussion of the sales tax issue, Buyer leads-off with a discussion of this document and relies heavily upon it. According to Buyer, BDO performed an "independent sales tax liability analysis," determined that the Company "had sales tax nexus in states in which installation services were performed," that nexus "could also result" from travel into states by independent sales representatives, and that, on that basis, "[t]he analysis estimated the tax liability . . . to range from $271,356 to $11,716,750, including interest but exclusive of potential penalties."[48]

---

[48] Buyer SOP at II(b)(i).

Buyer's heavy reliance on the BDO document is as telling as Buyer's failure to provide any support from its own "consultant"[49] on this topic.  There are three significant points in this regard.

First, Buyer radically mischaracterizes the purpose and nature of the BDO document.  In the BDO Document itself, BDO explained that "[t]ime constraints prevented completion of the nexus study" and that "a detailed analysis of sales personnel activity was impractical," given the constraints.[50]  Even from the narrow perspective of raw sales tax analysis, in other words, BDO did not issue any definitive or final conclusions.  Perhaps more important, however, is the fact that BDO was not charged with considering – and did not at all consider – what the appropriate financial reporting was with regard to the sales tax issue.  That question must take into consideration, among other things:

- Whether a loss is likely and, if so, estimable under FAS 5;

- What the Company's historical experience with state taxing authorities was;

- What success the Company has had in back-billing customers for any amounts owed and, thereby, avoiding any exposure of its own with regard to the taxes in question; and

- The experience and judgment of Company personnel with regard to the Company's customer base, its success in obtaining exemptions from sales tax, and its practices with regard to paying sales taxes in appropriate instances.

Just as Buyer nowhere addresses these subjects, BDO was not hired to – and never did – address these subjects.  In other words, even if one considers the BDO analysis to be final and complete and not impeded by time constraints, it is only a first step in the accounting analysis.  Numbers produced by this analysis do not in any sense translate automatically into liabilities appropriately booked on the Company's records as of the Closing Date.  Quite to the contrary.

Second, Buyer is extremely disingenuous – almost desperately so – in its mischaracterization of BDO's conclusion.  Because of the time constraints and other limitations discussed above, BDO states that its methodology was to develop a "worst case scenario," which assumed nexus and liability in every state in which sales solicitation occurred, and then to use that worst case scenario as a "base case" to develop scenarios of potential liability "pared down

---

[49] "Consultant" must be given in quotes because it is unclear whether Buyer engaged Crowe in a consulting capacity or to do a simple compilation – *i.e.*, presentation of financial statements based on Buyer's own representations rather than any undertaking by Crowe to express any assurance.

[50] BDO Document at 2 (Buyer SOP, Appendix E).

14

based upon more realistic assumptions."[51] For example, "exemptions would be applicable for many sales."[52]

BDO's "worst case scenario" was $11,716,750. But, BDO explained, because of applicable exemptions, which were not considered, this scenario "clearly overstated potential liability."[53] Buyer has the audacity to state in its Statement of Position, without any of this explanation, that BDO's "analysis estimated the tax liability … to range from $271,356 to $11,716,750." That is simply a false characterization of BDO's conclusions.

Rather, once BDO factored in the "more realistic assumptions," it concluded that under "reasonable scenarios," tax exposure would range from $236,385 to $384,335.[54] To be sure, as explained in Seller's Statement of Position, Seller does not agree with that conclusion. For example, as noted by Mr. Davis in his attached Rebuttal Report, there should not be any liability at this stage for 2004 amounts.[55] That adjustment alone would reduce the range to one of $163,269 to $247,957.[56] There are a number of other important adjustments that must be made as well.[57] And, of course, this says nothing about the accounting analysis which must occur and which further reduces the number to zero.[58] But the important point for present purposes is that Buyer's portrayal of BDO's "worst case scenario" as a reasonable estimate is simply a false portrayal of the BDO Document. This is extremely troubling. As the Firm well knows, and as Buyer no doubt knows as well, it is not permitted under GAAP to accrue liabilities based on worst case scenarios. Rather "reasonable" scenarios are the ones that must be considered. In the case of the BDO Document, the reasonable scenarios are not at all like the worst case scenarios Buyer quotes.

This leads to the final point about Buyer's reliance on the BDO Document. Unless it has truly misread the BDO Document or hopes that the Firm will do so, by adopting and relying so heavily upon the BDO Document, Buyer is effectively conceding that its own estimate of the sales tax liability is radically wrong and that the estimate made by BDO – an adjusted range of $163,269 to $247,957 – is correct. While we do not agree with this range and believe that it is demonstrably incorrect for a variety of reasons, we note that Buyer's adoption of the BDO

---

[51] BDO Document at 2-3 (emphases added) (Buyer SOP, Appendix E).

[52] BDO Document at 3 (Buyer SOP, Appendix E).

[53] BDO Document at 3 (Buyer SOP, Appendix E).

[54] BDO Document at 3 & Schedule C (Buyer SOP, Appendix E). The amount we quote reflects the underlying sales tax liability number, exclusive of interest.

[55] See Rebuttal Expert Report of Bruce H. Davis, CPA (November 6, 2007) (Exhibit 21 hereto) ("Davis Rebuttal Report") at 6-7 (Exhibit 21 hereto).

[56] See BDO Document at Schedule C (Buyer SOP, Appendix E).

[57] See Davis Expert Report at 5-10 (Seller SOP Ex. 7).

[58] See Seller SOP at 12-13; Davis Expert Report at 4 (Seller SOP Ex. 7) (concurring that the Company's judgment was reasonable under FAS 5).

Document effectively concedes that the bulk of the adjustment proposed by Buyer is unwarranted.

If the Firm is interested in this issue, it should read the BDO Document itself, taking note of the limitations indicated in the document and of the conclusions actually reached, subject to those limitations.[59]

### 3. Buyer's "Estimate" of $2,198,689.44 Million in Liability (Exclusive of Interest) is Unfounded

As explained in Seller's Statement of Position, Buyer's estimate contains a number of critical errors and omissions. Those errors and omissions were not addressed in Buyer's brief discussion of sales tax in its Statement of Position and we therefore will not repeat them here but simply refer the Firm to our prior discussion on these points.[60] In response to Buyer's brief discussion, however, Seller makes the following additional points, as explained more fully in the attached Rebuttal Expert Report of Bruce H. Davis:

- **The Firm should reject Buyer's use of "block sampling" – chosen for expediency – when more accurate methods were available.** Crowe knew that BDO's work produced starkly differing results, but did nothing to test or explain its own assumptions. More accurate sampling methods were available to it. Crowe chose block sampling because that method could be performed within the two-day timeframe Crowe originally had prior to the Draft Computation. But expediency is no substitute for accuracy – why, for example, did Crowe not go back and check its work against the available data?[61] It would be improper under FAS 5 to estimate a probable loss on this basis.

- **Buyer misrepresents how states have "commonly used" block sampling.** Buyer neglects to mention that states <u>always</u> afford the taxpayer "due process" – in other words, the opportunity to marshal arguments and obtain documentation, after sampling has been executed, to refute or adjust the state's findings. This also includes multiple layers of administrative review. Under no circumstances would a taxpayer be required to simply accept an assessment based on block sampling alone.[62]

- **Buyer did not even carry out correctly the mechanics of block sampling.** Buyer states that its sample period was comprised of 2006 sales invoices, but

---

[59] *See* BDO Document at 2 ("Time constraints prevented completion of the nexus study") ("[I]t was *assumed for expediency* that" the Company "had nexus for sales/use taxes in all states in which sales were made . . . ." (emphasis added)) ("There was not a detailed analysis of salesman activity available by state and by year.") (Buyer SOP, Appendix E).

[60] *See* Seller SOP at 15-17.

[61] Davis Rebuttal Report at 2-3 (Ex. 21).

[62] Davis Rebuttal Report at 2-3 (Ex. 21).

16

Buyer's Statement of Position admits that the Company's Georgia location only submitted invoice detail for May through December 2006.[63] Thus, Buyer compromised its block sampling methodology by not presumably requesting the body of missing invoices from January through April 2006.[64]

- **Buyer's claim makes the dubious assumption that the Company had nexus in all states into which it made sales.** However, this assumption goes far beyond BDO's nexus analysis, which, Buyer admits, "concluded that [the Company] had sales tax nexus in states in which [its] installation services were performed....[and] that sales tax nexus *could* also result from travel into states by independent sales representatives or sale personnel employed by [the Company]."[65] In other words, Buyer's analysis might have included erroneously states in which Seller had sales but no physical presence or states where its physical presence was sporadic, exceedingly infrequent, or where its sales were *de minimus* (the latter point having been taken explicitly into consideration by BDO[66]).[67]

- **Buyer's "consultant" relied entirely on the memories of unidentified employees for the purpose of determining the distributors to whom Company made sales for resale.** There is no way for the Firm to know (1) whether these employees were even competent or qualified to identify all distributors; (2) what questions were asked of them; (3) to whom Crowe did *not* speak; and (4) whether Crowe used other independent means to identify distributors whose identity might have escaped the memory of those persons whom it selected for interviews. And, Buyer would require the Firm to trust the memories of these unidentified individuals.[68] Moreover, as pointed out in Seller's Statement of Position, even when Crowe did obtain names of distributors, it treated their taxability status inconsistently or on the basis of unfounded assumptions or its own limited subjective experience.[69]

- **Buyer failed to give Seller credit for sales taxes paid to Mississippi pursuant to that state's audit of the Company's Georgia and Texas locations, which ran through 2004.** Buyer erroneously omitted these payments from its calculations.[70]

---

[63] Buyer SOP at II(b)(i).

[64] Davis Rebuttal Report at 2 (Ex. 21).

[65] Buyer SOP at II(b)(i) (emphasis added).

[66] BDO Document at 2 (Buyer SOP, Appendix E).

[67] Davis Rebuttal Report at 3-4 (Ex. 21).

[68] Davis Rebuttal Report at 5 (Ex. 21).

[69] Seller SOP at 16.

[70] Davis Rebuttal Report at 6 (Ex. 21).

17

- **Buyer has asserted a liability against Sellers that does not now – and may well never – exist.** From all available information, with one limited exception (Louisiana) no state in which the Company may have nexus, has, since Closing, assessed the Company for unpaid taxes, sent it correspondence indicating its intention to audit the Company, or even sent it a "nexus questionnaire" which might lead a state to decide whether Company has a taxable presence in its state. Buyer's belief in the occurrence of simultaneous tax assessments by means of audits performed virtually at once by all states is highly improbable, and would require the occurrence of a series of contingencies.[71] Accrual under these circumstances would be improper under FAS 5. In any case, Buyer has some protection from this low-probability risk by the Agreement's indemnity provisions.[72]

- **Buyer assumes incorrectly that Seller is liable for the entire 3-year period usually covered by a Voluntary Disclosure Agreement ("VDA").** If, for example, the Company were to enter into a VDA immediately following this post-closing adjustment process – in December 2007, the three-year period would only reach back through January 2005. As time passes, this potential exposure would decrease further. Even under Buyer's flawed methodology, claims based on 2004 must be eliminated from the calculation.[73]

For these reasons, Buyer's analysis is deficient, even on its own terms.

### 4. Buyer's Proposed Accrual for $825,000 in Penalties Must Be Disregarded

The Agreement provides that, in this post-closing adjustment process, the Firm may only consider "those items and amounts in the Draft Computation or Objection Notice."[74] The Firm is expressly forbidden from assigning any value to an item that is greater than the greatest value assigned by either party in the Draft Computation or Objection Notice or less than the least value assigned by either party to that item in the Draft Computation or Objection Notice.[75] The retainer letter among the parties and the Firm provides similarly.[76] In addition, as discussed above and in our initial submission, there are deadlines contained in the Agreement, after which time Buyer is no longer free to propose any additional post-closing adjustments.[77]

---

[71] Davis Rebuttal Report at 5-6 (Ex. 21).

[72] Agreement § 11.02 (Seller SOP Ex. 1); *see also* Davis Rebuttal Report at 5-6 (Ex. 21).

[73] Davis Rebuttal Report at 6-7 (Ex. 21).

[74] Agreement § 2.04(a) (Seller SOP Ex. 1).

[75] Agreement § 2.04(a) (Seller SOP Ex. 1).

[76] 10/5/07 Retainer Letter at p. 1 (Seller SOP Ex. 6) (agreeing that the Firm will follow Section 2.04 of the Agreement).

[77] *See* Agreement §2.04(a) (Seller SOP Ex. 1); *see also* discussion above at pages 6-7.

Buyer's Draft Computation claims that __zero__ is the amount that should be accrued for penalties associated with the sales tax issue. This is not an example of an oversight or inadvertent omission on Buyer's part. Buyer expressly stated that it was assigning a zero value to penalties.[78] Pursuant to the Agreement, Buyer cannot now – at this late hour and in an initial submission to the Firm – change that zero amount and increase it to the $825,000 that it now proposes. Because the Agreement forbids the Firm from considering any such proposal by Buyer,[79] Buyer's attempt should be rejected out of hand.

In any event, Buyer's new claim for penalties is baseless, and the original position taken by Buyer and its "consultants" – that zero is the appropriate number – is entirely correct. As Buyer admits, most states allow "delinquent" taxpayers to enter into VDAs, pursuant to which a state will agree to limit the "look-back" period for assessment. As Buyer has also admitted in previous communications with Seller, VDAs eliminate any applicable penalty.[80] As Buyer further admits, use of a VDA is completely within Buyer's control, and Buyer has based its calculations of tax liability on the assumption that VDAs would be used.[81] Indeed, Buyer has an obligation under the Agreement to mitigate any damage.[82] Thus, there is absolutely no way that Buyer is entitled to collect hypothetical penalties from Seller. It has based its analysis on the assumption that VDAs would exist, it has the power to enter into VDAs, and VDAs eliminate all penalties.

For the same reason, it would be improper under GAAP to accrue for a loss related to these penalties. Not only do they fail to meet the "probable and reasonably estimable" standard applicable under FAS 5 – to the contrary, it is certain that no penalty would be imposed if, as Buyer suggests, the Company followed the voluntary disclosure process.

---

[78] In its Draft Computation, Buyer stated its position that the Company owed $4,732,213 to state taxing authorities. Draft Computation at 4 (Seller SOP Ex. 4). Its attached memorandum from Crowe makes explicit that zero penalties are included. *See* Crowe 5/22/2007 Memorandum (Seller SOP Ex. 4A) (setting forth, on third page, derivation of $4,732,213 figure, and expressly removing estimated penalties from total).

[79] Agreement § 2.04(a) (Seller SOP Ex. 1).

[80] *See* Texas Comptroller of Public Accounts, *Voluntary Disclosure Agreements* (March 2007), http://www.window.state.tx.us/taxinfo/taxpubs/tx96_576.html ("***Statutory penalties will be waived***." (emphasis added)); Ohio Sales & Use Tax Division, *Voluntary Disclosure of Sales and Use Tax Liabilities*, http://tax.ohio.gov/divisions/sales_and_use/documents/voluntarydisclosure.pdf (stating that "in exchange for the taxpayer coming forth voluntarily," Ohio will "***Waive civil and criminal penalties***" (emphasis added)); Georgia Dept. of Revenue, *Voluntary Disclosure Program*, http://www.etax.dor.ga.gov/compliance/index.aspx ("***The Department will agree to waive all penalties***, provided that the tax and interest due is paid." (emphasis added)); *see also* BDO Document at 11 ("For purposes of this report management requested that BDO Seidman assume Voluntary Disclosure Agreements are obtained to limit liability to three years and avoid penalties.").

[81] *See* Buyer SOP at II(b)(i) (noting that Crowe premised its "calculation" on "the assumption that Unarco would successfully negotiate a VDA in each state").

[82] Agreement § 11.02(h) (Seller SOP Ex. 1).

Finally, of course, no penalty is appropriate here because – for all of the reasons we have identified already – there is no underlying liability on which to base that penalty.

## B.    VACATION ACCRUAL – $343,639 IN DISPUTE

For Seller's position on the dispute relating to vacation accrual, we refer the reader to Seller's Statement of Position.[83]  Buyer's discussion of this issue in its Statement of Position suffers from the critical flaws anticipated in Seller's Statement of Position: (1) Buyer is urging the Firm to make an "apples to oranges" comparison that would result in a windfall to Buyer – *i.e.*, Buyer's claim utilizes accounting that breaks with the Company's historical accounting and with the accounting underlying the Reference Balance Sheet, the Target Net Working Capital Amount, and Estimated Purchase Price, thereby skewing the Actual Purchase Price and preventing any meaningful comparison to the Estimated Purchase Price;[84] (2) Buyer relies on inapplicable GAAP – FAS 43;[85] and (3) Buyer's calculation fails to deduct the unvested vacation allotments of departed employees, thereby improperly inflating the accrual.[86]

For these reasons, Buyer's proposed adjustment should not be allowed.

## C.    PETSMART – $19,596 IN DISPUTE

As explained in Seller's Statement of Position, in 2006, the Company received an order for a structural rack from Petsmart; Petsmart provided the specifications; and the Company hired an outside professional structural engineer to assist in the design of the rack.  Both Petsmart and the Company agreed to the engineer's design, and the engineer certified to the Company in writing that the rack conformed to all applicable standards.  Petsmart accepted the product in accordance with applicable sales terms.  Thus, as of March 30, 2007, no information available to the Company indicated any liability to Petsmart related to this account.[87]

Following Closing, however, Buyer apparently created an issue.  According to its Statement of Position, "*Subsequent to the Transaction Date*, the Company *became aware* of a potential deficiency."[88]  After "becoming aware," Buyer effectively demanded $200,000 from Seller, "based on management's estimate" of the remedial costs.[89]  Management's "estimate"

---

[83] Seller SOP at 18-20.

[84] Seller SOP at 19-20.

[85] Seller SOP at 20.  As explained, FAS 43 expressly does not apply to interim financial reporting.  *See* FAS 43 at ¶ 2 (Seller SOP Ex. 10).

[86] Seller SOP at 20.

[87] *See generally* Seller SOP at 21-22.

[88] Buyer SOP at 9 (emphases added).

[89] Buyer SOP at 9.

proved wildly incorrect. As Buyer now admits, whatever the problem was, the Company was able to "resolve the issue" for $19,596.[90] Buyer is not entitled to that either.

Buyer's Statement of Position does not point to any relevant facts that were known as of the Closing Date. Indeed, Buyer admits that, whatever happened – and there is no way to know from Buyer's vague account what transpired – all of the relevant facts came to light "Subsequent to the Transaction Date."[91] Buyer does not dispute that *prior* to the Transaction Date, the Company reasonably relied on the work of an independent engineer (Buyer continues to refuse to provide a copy of the independent engineer's certification).[92] And Buyer does not dispute that *prior* to the Transaction Date, Petsmart accepted the product.[93]

Finally, Buyer does not even attempt to explain why $19,596 would have been a reasonable estimate, under FAS 5, at the Closing Date. This alone demonstrates that management's decision not to accrue for this item was reasonable as of that time.

The Agreement defines "Net Working Capital Amount" as the "Net Working Capital of the Company . . . *as of the close of business on the Closing Date.*"[94] Seller has no liability whatsoever for items based on information not known as of that time and instead occurring "Subsequent to the Transaction Date." Certainly there can be no adjustment to the Company's Closing Date estimate of working capital based on information not known as of that time and based on the raw assertions – unsupported by any documentation or attestation whatsoever – of Buyer in a post-closing adjustment submission. Its proposed adjustment of $19,596 should be rejected.

**D.    ACCOUNTS RECEIVABLE ALLOWANCE – $133,401 IN DISPUTE**

As explained in Seller's Statement of Position, Seller proposes a single adjustment through this process: Seller proposes to bring the Company's accounts receivable allowance, as reflected in the Closing Balance Sheet, into compliance with the accounting principles and methods used in the Reference Balance Sheet in accordance with GAAP, as required by the Agreement.[95] The correct figure – a $70,839 allowance for doubtful accounts – results from application of the Company's historical accounting policy, which was consistent with GAAP's prohibition on general contingency reserves.[96] In the Company's judgment, reflected in that historical accounting policy, accounts that were less than 90 days past due were not significantly

---

[90] Buyer SOP at 9.

[91] Buyer SOP at 9.

[92] Seller SOP at 21.

[93] Seller SOP at 21.

[94] Agreement § 1.01 (emphasis added) (Seller SOP Ex. 1).

[95] *See* Agreement Exhibit A (quoted above at pg. 6) (Seller SOP Ex. 1).

[96] *See* FAS 5 at ¶¶ 8, 14 (Seller SOP Ex. 8).

21

delayed.[97] As of Closing, the accounts receivable over 90 days old totaled only $70,839.[98]

Despite these facts, at Closing, the allowance for doubtful accounts was $204,240.[99] As indicated by specific Company personnel identified in Seller's Statement of Position, this was simply an error, within the meaning of GAAP.[100] In the effort to handle the numerous matters leading up to Closing, the task of combing through the allowance for doubtful accounts to ascertain its correctness was overlooked.[101]

This is exactly the sort of matter for which the post-closing adjustment process was designed. The allowance for doubtful accounts should be decreased by $133,401 – reflecting the difference between the $204,240 total allowance as of the Closing Date and the $70,839 in accounts receivable aged more than 90 days.

Buyer's argument that $204,240 would be reasonable under some hypothetical set of accounting policies is beside the point and should be rejected. As we have emphasized, this is not a GAAS audit, and the Parties have not asked for an opinion on any amount's compliance with GAAP. The Agreement specifically provides that

> Net Working Capital shall be determined on a consolidated basis in accordance with the accounting principles and methods used in the preparation of the [December 31, 2005] Reference Balance Sheet and GAAP.[102]

The Firm's task is simply to apply the Company's historical GAAP accounting principles and methods to the disputed items of Net Working Capital and render an expert opinion on any necessary adjustments. By this principle, an upward adjustment to Net Working Capital of $133,401, reflecting an equal reduction to the Company's allowance for doubtful accounts, is required.

We have attached hereto a chart comparing the accounts receivable aging at the Closing Date as compared to as of the time of the Reference Balance Sheet ("A/R Summary").[103] As the Firm can see, the aging as of Closing was actually more favorable than as of the time of the Reference Balance Sheet.[104] Nonetheless, as the chart labeled "Total AR Allowance"

---

[97] *See* Seller SOP at 22.

[98] *See* Unarco AR Aging Worksheet (March 31, 2007) (Seller SOP Ex. 12).

[99] *See* Unarco Trade Accounts Receivable Worksheet (March 30, 2007) (Seller SOP Ex. 11).

[100] Seller SOP at 22; *see also* FAS 154 at ¶ 2(d) (Ex. 20).

[101] Seller SOP at 22.

[102] Agreement at Exhibit A (Seller SOP Ex. 1).

[103] A/R Summary at 1 (Exhibit 22 hereto).

[104] A/R Summary at 1 (chart labeled "AR Aging") (Ex. 22).

indicates,[105] the allowance for doubtful accounts as of the Closing Date was substantially larger than at any time in the Company's recent history.[106]  This corroborates the statements of Company personnel that the allowance for doubtful accounts was simply not "scrubbed" prior to Closing and that the result was an overstatement of this account which was inconsistent with the principles and methods used in the construction of the Reference Balance Sheet.  As we noted in our initial submission, further corroboration of this can be seen in the actual collections made by the Company since the Closing Date.[107]

In the face of all this, Buyer offers nothing except the raw statement that the Company – under its direction – issued "credit memos" after the Closing Date relating to certain accounts.[108] Buyer does not describe the circumstances surrounding its decision to issue these memos.  It does not describe whether other benefits accrued to the Company based on their issuance.  It does not describe what led the Buyer to issue these memos or to whom they were issued.  And it does not submit a copy of the memos.  Buyer has, in fact, offered no support for its position.

Seller has explained why an adjustment for this item is appropriate.  Under these circumstances, the Firm should adopt the adjustment proposed by Seller.

### E.    PREPAID TRADESHOW EXPENSE – $125,457 IN DISPUTE

As explained in Seller's Statement of Position, the Reference Balance Sheet reflects the Company's recording of $116,000 and $45,700 in trade show expense in Q4 2006 and January 2007 respectively, 1/12 amortized ($(13,500)) in January 2007.[109]  This treatment followed the Company's historical accounting practices, consistent with GAAP, because, as explained in Seller's Statement of Position, the benefits associated with ProMat are realized throughout the year.[110]

Buyer's submission did not address any of the following points, though it has known Seller's position for some time:

- SOP 93-7 does not apply here because the accounting in question pertains to interim rather than annual statements.

- APB 28 applies, and provides that "when a specific cost or expense item charged to expense for annual reporting purposes benefits more than one interim period, the cost or expense item may be allocated to those interim periods."[111]

---

[105] A/R Summary at 2 (chart labeled "Total AR Allowance") (Ex. 22).

[106] A/R Summary at 2 (chart labeled "Total AR Allowance") (Ex. 22).

[107] Seller SOP at 22-23.

[108] Buyer SOP at 6 & Ex. 7 p.1.

[109] *See generally* Seller SOP at 23.

[110] *See generally* Seller SOP at 23-25.

[111] APB 28 ¶ 15 (Seller SOP Ex. 28).

- Some of the expenses related to ProMat were for tangible objects that the Company retained following the show.

- The Company has received significant press coverage from its participation in ProMat, available among other places via a simple internet search.

Instead of addressing any of this, Buyer makes a one-paragraph plea for a $125,457 adjustment in its favor, citing the wrong accounting literature, and containing no explanation for its bald assertion that "the economic rules of 'future benefit'" are "not applicable here."[112] Buyer is not correct, for the reasons stated in Seller's Statement of Position, but, in any case, this is no basis to overturn the contemporaneous accounting judgments made by the Company's employees in the ordinary course of business.

For these reasons, Buyer's proposed $125,457 adjustment, which reflects an incorrect understanding of GAAP, would result in significant distortion to the interim period, and is inconsistent with the Company's accounting principles and methods reflected in the Reference Balance Sheet, must be rejected.

### F.    WISE – $28,000 IN DISPUTE

As explained in Seller's Statement of Position,[113] WISE Installation, Inc. performed certain installation work for the Company and, when the job was complete, executed a final lien release agreeing to "remise, release and forever discharge Kingway . . . from any and all manner of liens, claims, demands, and causes of action whatsoever . . . upon or by reason of any matter, cause or thing whatsoever arising under or out of the Contract" for installation of the Company's racking system at Wal-Mart in Pottsville.[114]

Buyer contends that there was an oral modification of the contract, pursuant to which WISE was owed $28,000,[115] but, as Seller explained, according to Company policy as of the Closing Date, and as clearly stated on the back of every purchase order, all change orders were required to be in writing or they would not be paid.[116] Buyer has yet to produce the WISE purchase order, which, like all other relevant documents, are in Buyer's exclusive control. Indeed, Buyer has not provided any details whatsoever concerning the alleged oral modification to the contract, or any reason to doubt that, like all of the Company's purchase orders, this one was not subject to such modification.

---

[112] *See* Buyer SOP at 7.  Buyer mischaracterizes this as a proposed adjustment by Seller.  In fact, the Estimated Net Working Capital reflects amortization of this expense over 12 months in 2007.

[113] *See* Seller SOP at 26-27.

[114] *See* Contractor's Unconditional Waiver (Sept. 27, 2006) (Seller SOP Ex. 19).

[115] *See* Buyer SOP at 10.

[116] *See* Seller SOP at 26.

Prior management is not aware of, and Buyer has not provided, any facts to indicate that the WISE purchase order is any different. Whatever Buyer's reason for giving WISE $28,000 in contravention of the Company's policy, there is no indication whatsoever of a liability or probable loss that existed at the March 30, 2007 Closing Date. Buyer's proposed post-closing adjustment should be rejected.

## II.    ESTIMATED PURCHASE PRICE – $1,886,054 IN DISPUTE[117]

As anticipated, Buyer is attempting to contest the Estimated Purchase Price as part of the post-closing adjustment process.[118] As explained in Seller's Statement of Position, that is simply not allowed under the Agreement and Buyer has no basis for the position it is urging.[119]

Section 2.01 of the Agreement provides that "[n]ot later than three (3) Business Days before the Closing Date," the Company was required to "deliver a statement . . . to the Buyer" of three amounts: "the Cash Amount . . . , the Indebtedness Payoff Amount . . . , and the Net Working Capital Amount."[120] As the Firm knows, the Closing Date was March 30, 2007. The Company delivered its statement of these estimated amounts ("Statement"), in accordance with Section 2.01, on March 27, 2007.[121] According to the Statement, those amounts were:[122]

| | |
|---|---|
| Estimated Cash Amount: | $60,000.00 |
| Estimated Indebtedness Payoff Amount: | $ 33,659,516.40 |
| Estimated Net Working Capital Amount: | $3,427,338 |

There is no debating this point. The Statement is clear. Under the Agreement there is no opportunity whatsoever for either Buyer or Seller to change these numbers. Under the Agreement, the Estimated Cash Amount is, by definition, whatever number the Company said it

---

[117] As noted above, Seller does not contest for present purposes Buyer's position with regard to the Estimated Net Working Capital Amount and, therefore, $509,353 of the amount listed as "in dispute" with regard to the Estimated Purchase Price in Seller's Statement of Position, *see* Seller SOP at 27, is no longer in dispute.

[118] *See* Seller SOP at 27-30; Buyer SOP at 11.

[119] *See* Seller SOP at 27-30.

[120] Agreement § 2.01 (Seller SOP Ex. 1).

[121] *See* 3/27/07 E-Mail from Fred Stovall to Jeffrey Legault, *et al.* (with attachments) (Seller SOP Ex. 3).

[122] As indicated above, Buyer is correct that Seller's previous submissions mistakenly used the figure 2,917,985. The Estimated Purchase Price is adjusted accordingly.

was in its Statement.[123]   The same is true of the Estimated Indebtedness Payoff Amount and the Estimated Net Working Capital Amount.[124]

Once these amounts were set by the Company in its Statement, the calculation of the Estimated Purchase Price was equally automatic under the terms of the Agreement.  Section 2.01 of the Agreement provides that the "'Estimated Purchase Price' means":

> an amount equal to (A) $40,000,000.00 (the "Transaction Value"), (B) plus the Estimated Cash Amount, (C) less the Estimated Indebtedness Payoff Amount, (D) less the Closing Management Bonuses, and (E) plus the excess of the Estimated Net Working Capital Amount over the Target Net Working Capital Amount [$3,900,000[125]] or minus the excess of the Target Net Working Capital Amount over the Estimated Net Working Capital Amount.

With these two provisions of the Agreement – the provision providing for the Statement submitted by the Company and the provision setting forth what is to be done with the numbers contained in that Statement and others – the calculation of the Estimated Purchase Price is straightforward:

|   | $40,000,000.00 |   |
|---|---|---|
| + $ | 60,000.00 | [Estimated Cash Amount] |
| - $33,659,516.40 |  | [Estimated Indebtedness Payoff Amount] |
| - $ | 2,242,497.00 | [Closing Management Bonuses] |
| - $ | 472,662.00 | [Target Net Working Capital *less* Estimated Net Working Capital] |
|   | $ 3,685,325.60 |   |

Buyer's figure of $5,571,379.60 derives from Buyer's attempt to change the Estimated Indebtedness Payoff Amount.  Buyer provides no evidence that the Company ever disavowed the Estimated Indebtedness Payoff Amount as stated in the Statement or, indeed, that the Company had the power under the Agreement to do so.  The Agreement provides that the Estimated Indebtedness Payoff Amount is, by definition, the amount stated to be the Estimated Indebtedness Payoff Amount in the Company's Statement.  Buyer cannot change this amount or argue with it.  Neither can Seller.  And, the Firm does not have the authority, under the Agreement or otherwise, to change it.  Buyer's attempt to induce the Firm to change the Estimated Indebtedness Payoff Amount, and, therefore, the Estimated Purchase Price, must fail.

---

[123] Agreement § 2.01 (Seller SOP Ex. 1).

[124] Agreement § 2.01 (Seller SOP Ex. 1).

[125] *See* Agreement § 1.01 at 5 (Seller SOP Ex. 1).

26

## **CONCLUSION**

For all the foregoing reasons and for the reasons stated in our initial submission, Buyer's proposed post-closing adjustments should be rejected, and Seller is in fact owed **$1,141,217.40** plus interest. Seller stands ready to assist the Firm in this matter in any way we can going forward.

**POST-CLOSING ADJUSTMENT DISPUTE
IN CONNECTION WITH THE ACQUISITION OF KIC HOLDINGS, INC. BY
UNARCO MATERIAL HANDLING, INC.**

**BUYER'S RESPONSES TO PwC'S
QUESTIONS AND DOCUMENT REQUESTS
AS OF NOVEMBER 16, 2007**

**NOVEMBER 30, 2007**

**SALES TAX ACCRUAL**

1. **In which states and/or localities (hereinafter referred to as state), where a sales/use tax liability has been asserted, has the Company (each Company entity if multiple entities) registered? For each state:**

   a. **What is the registration date?**

   b. **When did Company begin filing sales/use tax returns?**

   c. **If return filings are not continuous, for what periods have returns been filed?**

   - The Company's Ohio and Texas locations have been registered, since September 2002, only in their domiciliary states. The Company's Georgia location has also been registered, since September 2002, in its domiciliary state. In addition, at the specific request of customers, the Company's Georgia location intermittently registered, collected, filed and remitted sales tax in various states. Details of each location's registration date[s], filing history and intermittent filing status is provided in **Exhibit 39, columns F, H, J.**

2. **Was the Statute of Limitations considered for any state where a liability has been asserted and sales/use tax returns have been filed?**

   a. **Please indicate the consideration given for each applicable entity and state, any conclusions reached and the resulting effect on the liability calculation.**

   - The statute of limitations was not only considered for each state where sales tax liability exists, it was the basis for determining the assessment period used to calculate liability in each state. Specifically, for the purposes of calculating sales tax liability, it was assumed that each Company location would be eligible to and would enter into a Voluntary Disclosure Agreement ("VDA") with each state where a liability exists. It was also assumed that, accordingly, the assessment period could not extend beyond the VDA lookback period, which is typically coextensive with the statute of limitations period. As a matter of fact, however, one or more of the Company locations did not register or file in many of the jurisdictions where sales tax liability exists and, as a result, a significant risk exists that the ultimate assessment period will be significantly longer than the assessment period used by the Company to calculate the estimated sales tax liability. The statute of limitations periods for each state set forth in **Exhibit 39, column L.**

3. **For each Company entity and state where a liability has been asserted:**

   a. **What is Buyer's basis or bases for asserting that nexus has been established for the relevant period?**

   b. **Please provide the documentation relied on in support or those determinations.**

   - As detailed in **Exhibit 39, columns C, D, E**, nexus is established through the Company's physical presence within a state, combined with the Company's benefit of doing business within a state. The Company's physical presence in

each state was established through documentation of either installation or repairs of tangible personal property within the state during the calendar year (as represented by invoices comprising **Exhibit 40**) and its continued sales solicitation and physical presence in each state through sales personnel (as represented by documents contained in **Exhibit 40**).[1]

4.    **Which states have contacted the Company pertaining to sales/use tax or generally for the following (indicate timing of the contact):**

    **a.**    **Audit? Please provide the status of each audit, if any.**

    **b.**    **Investigation?**

    **c.**    **Nexus questionnaire?**

    **d.**    **To register?**

- *See* Exhibit 39, columns, G, I, K for a detailed listing by location.

5.    **In the Buyer's Liability Calculation, are the "Total Sales" amounts only the amounts related to tangible personal property ("TPP") that was sold or do such amounts include other charges (e.g., installation service charges)?**

    **a.**    **If other (non-TPP) charges (e.g., installation charges) are included in the "Total Sales" amounts, please explain how such charges are considered and factored into the error ratio and the application of that ratio to earlier periods.**

    **b.**    **For purposes of determining Buyer's asserted error ratios, do the amounts that make up the "taxable sales" for taxable transactions and customers, include only line items on the invoices that relate to the sale of tangible personal property?**

        **i.**    **If other line items, *e.g.*, services, are included, what is the basis for including the additional charges?**

- In Buyer's Liability Calculation the "Total Sales" amounts include both TPP as well as installation service charges, except in certain cases involving the Company's Georgia location only.   In those cases, because installation services charges were exempt in the relevant state[s] and the applicable invoice broke out TPP and installation service charges as separate line items, the installation services charges were excluded from the taxable sales base used to calculate the error ratio.   According to representatives of the Company's Texas and Ohio locations, invoices from those locations do not break out TPP and installation service charges as separate line items.

6.    **In the Buyer's Liability Calculation, a summary of the methodology used to determine the "error ratio" was provided in the documents submitted to the Firm. Since there was a different error ratio for each state, please explain how the error ratios were determined on a state by state basis and provide the supporting calculation schedules.**

---

[1] Because Exhibit 40 is voluminous, it will be delivered separately.

a. **Please provide the detailed customer and invoice level calculation schedules that feed into the liability by state schedules contained in Appendix K of Buyer's original submission and/or Exhibit 34 of Buyer's supplemental submission.**

b. **Please provide examples of the documents reviewed (e.g., invoices reviewed, exemption documentation reviewed) that support the schedules referenced in the immediately preceding sub-part.**

- The "error ratios" were not determined exclusively on a "state by state basis." The error ratios were determined on a "location by location " and "state by state basis." In other words, the Company determined an error ratio for each of the Company's Georgia, Texas and Ohio locations in each of the states where those locations made sales. For example, the Georgia and Texas locations both made sales in Alabama, but they did not collect and remit sales taxes to Alabama to the same extent. Thus, the error ratio for sales made by the Georgia location in Alabama is different from the error ratio for sales made by the Texas location in Alabama.

- The invoice detail utilized in the sample is provided in **Exhibit 41**. Copies of the supporting documentation, including exemption certificates, letters of usage, statements of self-accrual, executed returns and invoices are included in **Exhibit 40**.

7. **The penalty rates applied to the tax liability in the schedules provided range from approximately 10% to 70%.**

   a. **Please explain what types of penalties (e.g., late filing, late payment, negligence, willfulness/gross negligence) were included to determine the penalty rate to be applied.**

   b. **What was the authoritative source from which the penalty rates were derived?**

   - Buyer's estimate of sales tax liability includes only "failure to file penalties." A list of each state's failure to file penalty rate and the statutory authority for each is listed in **Exhibit 39, columns Q, R**.

8. **In the Buyer's Liability Calculation, has the taxability of the tangible personal property and services sold/performed been analyzed on a state-by-state basis?**

   a. **If so, please provide a summary of the conclusions for each state.**

   b. **Do some states consider the installation of the Company's products to be an improvement to real property for sales tax purposes?**

   c. **When installation is included in the sale, does the Company include both installation and TPP in the same contract?**

   - Buyer analyzed the taxability of tangible personal property and services sold/performed on a state-by-state basis. A summary of the conclusions for each state is set forth in **Exhibit 39, column O**.

- Buyer believes that because the Company's products are used for business purposes, have a depreciable life of less than 15 years and are not intended to be permanent, no state would consider them to be an improvement to real property for sales tax purposes.

- When installation is included in a sale, the Company typically includes both installation and TPP in the same contract.

9.  **The Buyer's Liability Calculation in Exhibit 34 (hard copy) was not legible. Please provide electronic copies or complete hard copies of Supplemental Statement of Position and Supporting Documents Exhibit 34 and all detail supporting schedules that feed into or support the summary totals (e.g., taxable sales, in such schedules).**

- Additional electronic and hard copies of Exhibit 34 have been provided. All detail supporting schedules that feed into or support the summary totals are being provided herewith as **Exhibit 41**.

10. **With respect to the Buyer's Liability Calculation/Voluntary Disclosure, what "lookback" period was used in the tax liability calculation for each Company entity and state?**

    a.  **What was the basis for using the lookback period chosen for each state?**

    b.  **For each entity and state where a liability has been asserted, is the relevant entity likely to qualify for a voluntary disclosure agreement? Please provide the basis and any additional support for Buyer's determination.**

    c.  **Assuming each entity qualifies for a standard voluntary disclosure in each state, what are the standard voluntary disclosure lookback periods (e.g., 3 years, 3 years plus current, 4 years) that would be applicable in each state?**

- Buyer used a "lookback" period that was co-extensive with the applicable statute of limitations period. In other words, and as indicated in Buyer's Response to PwC Request #2, Buyer assumed that the assessment period would only be the period that could be assessed under the applicable limitations period, assuming that the Company had filed sales/use tax returns in that state. The limitations periods for each state are set forth in **Exhibit 39, column L**.

- The Company is unlikely to qualify for a VDA in multiple states where a liability for sales tax exists. Specifically, a taxpayer does not qualify for a VDA if that taxpayer (i) has previously been audited by the state from which it seeks a VDA, (ii) has previously registered in the state from which it seeks a VDA or (iii) has been sent a nexus questionnaire by the state from which it seeks a VDA. On these bases, the Georgia location is unlikely to qualify for a VDA in Alabama, California, Florida, Georgia, Illinois, Louisiana, Massachusetts, Mississippi, Nebraska, North Carolina, Ohio, Pennsylvania, Tennessee, Texas and Wisconsin; the Texas location is unlikely to qualify for a VDA in Louisiana, Mississippi and Texas; and the Ohio location is unlikely to qualify for a VDA in Ohio. Accordingly, there is a risk that the "lookback" period and, thus, the ultimate liability for sales tax, could be significantly greater than the amount estimated by the Company for the purposes of this proceeding.

4

- The standard voluntary disclosure lookback periods for each state are the same as the statute of limitations periods listed in **Exhibit 39, column L**.

11. **The Buyer has acknowledged that, in one instance after an audit assessment, the Company attempted to backbill sales tax to customers and had some limited success in collecting sales tax from customers. Buyer however assumes through its liability calculations that no tax will be collected from customers. What is Buyer's basis for excluding this potential reduction in liability to be borne by the Company?**

- The results of the one instance of backbilling by the Company cannot be characterized as a "success." In that case, the Company backbilled four customers and ultimately recovered approximately $20,000 from one of the four customers, an amount representing 51% of the amount backbilled to that customer and 18% of the total taxes backbilled to all four customers. It took the Company almost one and a half years and the expenditure of significant resources to recover that $20,000. Accordingly, the one example of backbilling does not provide any basis to reduce the Company's sales tax liability. First, if the single backbilling episode proves anything it is that any reduction attributable to backbilling is offset by the costs associated with the time and resources necessary to obtain any recovery. Second, a loss of goodwill is inevitably attendant to attempts to backbill customers and Buyer should not be made to suffer that loss of goodwill when it was Seller who failed to pay or collect sales tax. In that regard, since it is apparent that Seller, during its tenure in control of the Company, was unwilling to suffer the loss of goodwill attendant to backbilling customers for sales tax, it should not be heard to argue that Buyer should do so.

12. **The Buyer's position expressly discusses and appears to incorporate into its liability calculations (e.g., the use of limited lookback periods) the potential use of state voluntary disclosure programs to resolve and minimize tax liabilities. Costs associated with performing voluntary disclosures appeared to be incorporated into Buyer's original liability calculations. Buyer's most recent liability schedules, however, include the application of penalties.**

   a. **What is Buyer's basis for the inclusion of penalties where voluntary disclosures appear, from Buyer's representations, to be a potential avenue to resolve the tax liabilities?**

   b. **If there are state specific reasons (e.g., prior filings, tax collected not remitted, will not qualify for voluntary disclosure), state why Buyer believes penalties will apply. Please indicate the reasons on an entity and state-by-state basis and provide supporting documentation.**

- As indicated in Buyer's response to PwC Request # 10, it is unlikely that the Company will qualify for VDAs in various states and, accordingly, will likely be subject to penalties in at least 15 states. The cumulative penalties in those 15 states amount to **$516,484.27**. *See* **Exhibit 42**. Because it took a conservative approach, Buyer assumed that the Company would qualify for a VDA in each state. However, as indicated above, if, as is likely to be the case, Buyer's assumptions about the availability of VDAs proves incorrect, the assessment periods and the ultimate amount assessed in each state are likely to significantly exceed the amounts projected by Buyer and penalties are likely to be assessed. Finally, at any moment, the Company could be notified or audited by any state

thus foreclosing its ability to obtain a VDA and ensuring the application of penalties. Until Seller pays Buyer for the estimated tax liability, Buyer is not in a position to pay the sales taxes and therefore cannot seek VDAs. Accordingly, Seller's refusal to pay only increases the risk that the Company will be forced to pay penalties. A summary and recap of all activities that would prevent Company from qualifying to participate in a VDA with any given state is documented in **Exhibit 39, columns G, I, K.**

## VACATION ACCRUAL

1. **Was a liability for compensated absences recorded in the audited consolidated Balance Sheet as of December 31, 2005? If yes, what amount was recorded?**

   - Yes, $273,013 was recorded as of December 31, 2005 for compensated absences.

2. **What was the accounting policy underlying the computation and recording of the liability as of December 31, 2005?**

   - The vacation policy as of December 31, 2005, allowed for vacation of 10 to 18 days depending on the length of service, and exempt/non-exempt status. The policy allowed for carryover for 10 to 15 days depending on length of service. Unused days were paid to terminating employees who are not discharged, and give two weeks notice. *See* **Exhibit 43** (IncaAndes Vacation Policy.pdf).

3. **Please provide copies of the analysis supporting the liability recorded as of December 31, 2005.**

   - *See* **Exhibit 44** (YEAR END VACATION 2005.xls), that shows a summary of the vacation accrual and Exhibit 45, (Atlanta 2005 vacation accrual support.pdf & Dallas and Andes Vacation Accrual.pdf) which show the detail supporting the calculations.

4. **Did BDO Seidman propose an adjustment to record additional expense for compensated absences as of December 31, 2005? If yes, what was the amount of the adjustment proposed? Was it recorded in the audited financial statements? If not, why not?**

   - BDO Seidman did not propose an adjustment to record additional expense for compensated absences as of December 31, 2005.

5. **Assuming a terminating employee provided more than two weeks notice and was not terminated for cause prior to March 30, 2007, would the terminating employee be paid for the vacation earned but not vested since the last anniversary date?**

   - No. *See* item 9 of the vacation policy (Appendix H). The additional liability calculated by the Buyer is based on guidance in SFAS 43, paragraph 12, "......a liability for amounts to be paid as a result of employees' rights to compensated absences should be accrued, considering anticipated forfeitures, in the year in which earned." As required by the SPA, working capital is required to be reported in

accordance with GAAP, therefore the adjustment was made at the transaction date to comply with SFAS 43 as noted above.

6. **With respect to pages 1 and 2 of Appendix L of the Buyer's Submission dated October 23, 2007:**

    a. **Is vacation capped at 120 hours? Why are employees with 10 or more years of service not allocated 160 hours per year?**

- Pages 1 and 2 of Appendix L are Union employees in Texas. Union employees' vacation is capped at 120 hours. All non-union employees' (all other pages) vacation is capped at 160 hours. *See* **Exhibit 46** (Union Agreement.pdf).

    b. **It appears that certain employees (e.g., Acosta, Bonilla, and Brown) had a vacation balance of zero on March 30, 2007 and were paid for more than 40 hours of accrued vacation in certain weeks. Were these employees still employed by the Company on March 30, 2007? If not, why is an additional accrual proposed as of March 30, 2007 per the PBCC portion of the schedule?**

- Yes, the employees listed above were still employed at March 30, 2007. The vacation policy in place, prior to July 2006, allowed for employees to be paid for their vacation the week before they actually took the time off away from work. In the case of the individuals noted above, each employee opted to receive their vacation pay in a lump sum prior to taking the time off from work.

    c. **It appears that certain employees (e.g., Acosta, Ambriz, Caracheo) had accrued vacation balances in excess of their annual allotments per the Company's policy. The vacation policy states that "leave will be taken during the year in which it is awarded or forfeited upon the anniversary date." Why is the accrual for certain employees in excess of their annual allotment?**

- The vacation policy in place, prior to July 2006, allowed for a carryover of vacation up to 15 days for employees with over 7 years experience (up to 10 days for employees with less than 7 years experience. The accrued balance includes both the vacation carried over, and the annual allotment, to the extent not previously taken.

    d. **Provide us with an electronic copy of the spreadsheets (e.g., Excel file) contained in Exhibit L of the Buyer's Submission dated October 23, 2007.**

- *See* "2007 Vacation Balance Wkst YE Accrual.xls."

## PETSMART CLAIM

1. **Copy of Petsmart's claim, including documentation supporting the assertion that the Petsmart racks were defective as of March 30, 2007.**

- Petsmart has not made a formal, written "claim."

2. **Copy of engineer's certification to the Company that the racks installed at Petsmart**

conformed to the design specifications required by the contract.

- Copy attached as **Exhibit 47**.

3. **Copy of the settlement agreement resolving the Petsmart claim for $ 19,596.**

- There is no written settlement agreement with Petsmart.

4. **Did the Company have a reserve for warranty claims as of March 30, 2007? If yes, what was the amount of the reserve and the underlying accounting policy?**

- The Company had a reserve for warranty claims as of March 30, 2007 in the amount of $196,380.56. That amount had been reduced by over $110,000 between December 2006 and March 2007. Buyer subsequently determined that the reserve should be increased by approximately $200,000, based on the estimated liability associated with the Petsmart or like claims. Although, Buyer successfully settled the Petsmart claim for substantially less than was anticipated ($19k)[2] and therefore reduced the extent of the adjustment in connection with that claim, an additional warranty claim has now been asserted against the Company in respect of products sold prior to the Transaction Date. Specifically, Buyer has learned that approximately 1500 racks sold to a customer (Henkel) in Ohio, do not meet specifications. Based on current estimates, costs to replace these racks, including the costs of the racks themselves and the cost of installation labor, will total in excess of $450,000. Accordingly, any reserve for warranty claims will necessarily be exhausted – even assuming the reserve is increased by $200,000, as originally proposed by Buyer. Buyer is not aware of any underlying accounting policy applicable to the reserve.

## WISE INSTALLATION

1. **Documentation supporting Buyer's assertion that in or about May 2006, representatives of the Company, including Byron Daniels, instructed WISE to perform the additional work giving rise to the liability and promised that the Company would pay WISE for such work.**

- As set forth in Exhibit 36, WISE asserted that Company representatives had instructed it to perform the additional work and promised that the Company would pay WISE for such work. Based on this assertion, Company management contacted Joe Worley and Todd Russell, both of whom participated in the meetings and discussions with WISE. Both Worley and Russell confirmed WISE's assertion. Attached as **Exhibit 48**, is an email chain from Todd Russell confirming the same.

2. **If management obligated the Company in May 2006, why was the claim not paid or recorded before closing?**

---

[2] The Company's initial estimate of the cost of the Petsmart claim was based on its assumption that Petsmart would demand replacement racks. Petsmart, however, agreed to accept reduced capacity rack with proper labeling stating the rack capacity. In contrast, Henkel has demanded replacement racks.

- As far as Buyer is aware, the claim was not paid on the basis that WISE signed a lien release. However, according to Todd Russell and Kerry Strother (current Controller of the Company) WISE signed the lien release at the request of the Company only to facilitate payment from a customer to the Company and it was understood that the lien release would not affect the Company's verbal agreement to pay WISE for the additional work. *See* **Exhibit 48**.

## PREPAID TRADE SHOW EXPENSES

1. **What was the balance of Prepaid Trade Show Expenses recorded in the Reference Balance Sheet as of December 31, 2005 and as of December 31, 2004? How and when was the balance charged to operations in 2006 and 2005?**

   - As of December 31, 2005 there was not a balance of Prepaid Trade Show Expenses recorded. As shown in **Exhibit 49** (Trade Show 2006.pdf), the Company began capitalizing prepaid trade show expenses in August 2006. As of December 31, 2006, the amount capitalized totaled $116k. During January 2007, the Company capitalized another $45k related to the trade show. The trade show was held in January 2007. Subsequent to the actual trade show event, the Company began amortizing the advertising costs of $161k evenly over the following 12 month period (January – December 2007). At the time of sale (i.e. transaction date), the Company management wrote off the remaining unamortized amount in accordance with the Company's accounting policy for advertising. We have no records of any balances as of December 31, 2004.

2. **Copy of the related accounting policy for 2004 – 2007?**

   - There is no formal accounting policy relating to prepaid trade show expenses. However, see page 8, Note B, "Advertising" in the attached December 31, 2005 audited financial statements (**Exhibit 35**) for the accounting policy for advertising.

3. **Detail listing of tangible assets (e.g., marketing supplies – brochures) held and related valuation as of March 30, 2007?**

   - Buyer is not aware of any listing of tangible assets/marketing supplies held as of March 30, 2007. To Buyer's knowledge, there were no amounts recorded on the general ledger at that date. This appears consistent with the accounting treatment at December 31, 2005.

## ACCOUNTS RECEIVABLE

1. **Schedule of the aging of Accounts Receivable as of the Reference Balance Sheet date, December 31, 2005.**

   - *See* **Exhibit 50** (Andes AR 12-31-05.xls; Dallas AR Detail 12312005.pdf; Ohio AR Detail 12312005.pdf; Atlanta AR Detail 12312005.txt)

2. **Footnote B to the audited consolidated financial statements as of December 31, 2005 indicates that the Company reviews accounts receivable on a monthly basis to**

9

determine if any amounts will potentially be uncollectible.  **Provide a copy of this monthly analysis including the impact on the allowance for doubtful accounts for the months of January, February and March 2007.**

- Management does not maintain a documented monthly analysis of accounts receivable.  The allowance for doubtful accounts is adjusted periodically, as deemed necessary, based on decisions by management. (Exhibit 7 of Buyer's initial submission supports the accounts receivable allowance recorded by management)

## ESTIMATED PURCHASE PRICE

1. **Do the Buyer and Seller agree that Exhibit 14 to Buyer's Statement of Position dated October 23, 2007 accurately reflects the actual amounts paid by the Buyer on March 30, 2007?  If not, why not?**

- Exhibit 14 reflects the actual amounts paid by the Buyer on March 30, 2007.

2. **Was Exhibit 14 the final funds flow statement?**

- Yes

## OTHER

1. **Copy of BDO Seidman's summary of unadjusted differences (potential adjustments identified, but not recorded) as of December 31, 2005.**

- Based on a review of the 2005 client representation letter, to which no unadjusted differences were attached and a conversation with BDO personnel, Buyer does not believe there were any unadjusted differences identified by BDO Seidman as of December 31, 2005.  However, this cannot be confirmed, until December 7 at which time BDO will allow Buyer access to its 2005 audit workpapers.

**RESPONSES OF**
**SELLER KINGWAY INCA CLYMER HOLDINGS INC.**
**TO QUESTIONS AND DOCUMENT REQUESTS**
**AS OF NOVEMBER 16, 2007**

**November 30, 2007**

## INTRODUCTION

Set forth below are Seller's responses to the Questions and Document Requests ("Questions") as of November 16, 2007 submitted by PricewaterhouseCoopers LLP (the "Firm").

In accordance with the Firm's instructions, Seller has answered "any and all questions" it has deemed appropriate.[1]  In some instances, Seller is unable to respond to particular Questions because Buyer controls the Company and, therefore, the vast majority of the necessary documentation.  Seller has, in any event, endeavored to answer the Firm's Questions as completely as possible and stands ready to answer any additional questions the Firm may have.[2]

## SALES TAX ACCRUAL

**Questions for Buyer:**

1.  **In which states and/or localities (hereinafter referred to as state), where a sales/use tax liability has been asserted, has the Company (each Company entity if multiple entities) registered?  For each state:**

    a.  **What is the registration date?**

    b.  **When did Company begin filing sales/use tax returns?**

    c.  **If return filings are not continuous, for what periods have returns been filed?**

*Seller's Response:*

*See* Seller's response to Question for Seller #1, below at 11.  Further, Buyer has assumed nexus

---

[1] Where Seller does not have additional information to offer in response to a question directed at Buyer, the Question is not listed below.  The Question numbers, however, are consistent with the Firm's numbering.

[2] In addition, Seller reserves the right to supplement these responses if, in response to the Firm's Questions, Buyer produces any information that, in Seller's judgment, Buyer ought to have produced earlier under the terms of the Agreement.  As the Firm now knows, the Buyer had 60 days from Closing to provide Seller with its Draft Computation, which was to have included all proposed post-closing adjustments, along with "all records and work papers used in preparing the Draft Computation" and a detailed breakdown of the calculations.  *See* Statement of Position of Seller Kingway Inca Clymer Holdings Inc. ("Seller SOP") at 2-3, 9.  As the Firm also now knows, the Firm can only consider "those items and amounts in the Draft Computation and Objection Notice" that remain unresolved after the negotiation period.  *See* Seller SOP at 4, 9.  The Supplemental Statement of Position submitted by Buyer ("Buyer's Reply") indicates that Buyer is now relying on a "Revised Sales Tax Analysis" by Crowe Chizek LLP ("Crowe") performed after the expiration of this specified time period ("Revised Analysis").  *See* Buyer's Reply at 7.  In the event that Buyer should produce the details and related documentation for the Revised Analysis, Seller reserves the right to respond as necessary.

in any state from the moment Seller started making sales into it.  However, the fact that Seller made sales into a state does not, without more, establish nexus.  Rather, nexus is established in a state only at such time as Seller was installing property there or had more than *de minimis* sales solicitation or physical presence there.  Indeed, Buyer asserts the existence of nexus in some years in some states where Seller had not made any sales or where Buyer could not show any nexus-creating activity.[3]

**2.  Was the Statute of Limitations considered for any state where a liability has been asserted and sales/use tax returns have been filed?**

    **a.  Please indicate the consideration given for each applicable entity and state, any conclusions reached and the resulting effect on the liability calculation.**

*Seller's Response:*

No liability assessment can be made after the expiration of a statute of limitations period.  Thus, in those states with three-year statutes of limitation, tax assessments cannot be made currently for any returns filed for the periods November 30, 2004 and before.  For states with four-year statutes of limitation, there cannot be any assessment currently for returns filed for the periods November 30, 2003 and before.  *See* Exhibit 64 hereto (setting forth state statutes of limitations). It does not appear that Buyer took this into account.

**3.  For each Company entity and state where a liability has been asserted:**

    **a.  What is Buyer's basis or bases for asserting that nexus has been established for the relevant period?**

    **b.  Please provide the documentation relied on in support of those determinations.**

*Seller's Response:*

*See* Seller's Response to Question for Buyer # 1, above at 1-2.

Buyer offers no proof for its contention that the Company had a nexus, and therefore should have been filing, in Alabama, Illinois, Louisiana, Massachusetts, Nebraska, and Wisconsin any earlier than it did.  Buyer argues that the Company had outstanding sales tax liabilities in these states from "recurring sales solicitations, installations and . . . sales to customers." and concludes "that no adjustment beyond credit for taxes collected and remitted should be made to the estimated . . . liability."[4]  Buyer purports to show in Buyer's Exhibits 17-23 that the Company had taxable

---

[3] *See* Seller's responses to Question for Buyer # 3, below at 2, and Question for Seller #4(a), below at 19; *see also* Rebuttal Expert Report of Bruce H. Davis, CPA ("Davis Rebuttal Report"), § III (B)(1) (Reply Statement of Seller Kingway Inca Clymer Holdings Inc. ("Seller's Reply") Ex. 21).

[4] Buyer's Reply at 16.

activities in those states before their respective filing periods began.[5]  The Firm should examine these exhibits closely because, in fact, they demonstrate the contrary:

> 1) There is no evidence that sales were made to customers in <u>Alabama</u> before April 2006;[6]
>
> 2) There is no evidence that sales were made to customers in <u>Illinois</u> before 2005;[7]
>
> 3) There is no evidence that sales were made to customers in <u>Louisiana</u> before May 26, 2006;[8]
>
> 4) There is no evidence that sales were made to customers in <u>Massachusetts</u> before 2005;[9]
>
> 5) There is no evidence that sales were made to customers in <u>Nebraska</u> before the second quarter of 2005;[10]
>
> 6) There is no evidence that sales were made to customers in <u>Wisconsin</u> before May 2006.[11]

Buyer offers no explanation for its projection that there is a sales tax liability in those states when it cannot provide any evidence that the Company had nexus there prior to its first filing date.

> **4.  Which states have contacted the Company pertaining to sales/use tax or generally for the following (indicate timing of the contact):**
>
> > **a.      Audit? Please provide the status of each audit, if any.**
> >
> > **b.      Investigation?**
> >
> > **c.      Nexus questionnaire?**
> >
> > **d.      To register?**

---

[5] Buyer's Reply at Ex. 17-23.

[6] Exhibit 17 shows Company filed in Alabama through August 2006, not June 2006 as Buyer alleged.

[7] Buyer Reply at Exhibit 18.

[8] Buyer Reply at Exhibit 18.

[9] Buyer Reply at Exhibit 18.

[10] Buyer Reply at Exhibit 18.  Exhibit 22 shows Company filed in Nebraska through fourth quarter 2006 and not third quarter 2006, as Buyer alleged.

[11] Buyer Reply at Exhibit 18.

*Seller's Response:*

Buyer draws unfounded conclusions about the Company's audit risk. Buyer argues that "the Company has been audited by at least three different state taxing authorities since 2004," and that, therefore, "it cannot reasonably be said that further audits are not probable."[12] That is beside the point. Buyer's liability calculations assume audits in all taxing jurisdictions simultaneously. The facts upon which Buyer relies do not support the argument that such a "worst case scenario" is probable.[13] To the contrary, one state audit on average per year directed against a multistate and multiple-affiliated taxpayer like the Company is not indicative of even modest state tax audit activity directed against it. Moreover, besides frequency of audits, Buyer should also have considered the implications of the audits – namely, whether their results were material or not to Company, and whether they signaled that Company has appropriate tax-reporting controls or not. Finally, Buyer's calculations assume that the Company will capitulate in all respects to all imaginable liability asserted by every state. That is, to say the least, unlikely.

Also, Buyer's arguments obscure the question of whether or not its analysis credits the Company for taxes paid to Mississippi pursuant to its 2004 audit by the state, and Buyer exhibits some confusion about which Company locations were audited by that state at that time. On page 14 of its Reply, Buyer says that "the Mississippi [DOR] audited the Texas and Georgia locations through 2004." In footnote 15 of the same document, however, Buyer says that "Mr. Davis' claim that the Georgia location was audited by the state of Mississippi is incorrect."

For a discussion of the facts of the Mississippi dispute, and one other dispute of which we are aware, see below at 10. These facts are also pertinent to the Firm's application of the relevant accounting principles. *See* below at 20-23.[14]

**5. In the Buyer's Liability Calculation, are the "Total Sales" amounts only the amounts related to tangible personal property ("TPP") that was sold or do such amounts include other charges(e.g., installation service charges)?**

   **a.    If other (non-TPP) charges (e.g., installation charges) are included in the "Total Sales" amounts, please explain how such charges are considered and factored into the error ratio and the application of that ratio to earlier periods.**

   **b.    For purposes of determining Buyer's asserted error ratios, do the amounts that make up the "taxable sales" for taxable transactions and customers, include only line items on the invoices that relate to the sale of tangible personal property?**

---

[12] Buyer's Reply at 11-12 n.11.

[13] For a further discussion of the application of FAS 5 here, see below at 20-23.

[14] *See also* Davis Rebuttal Report § III (B)(3) (Seller's Reply Ex. 21).

4

> i.  If other line items, e.g., services, are included, what is the basis for including the additional charges?

*Seller's Response:*

Seller understands that Buyer has included service charges – such as for installation and/or delivery – in Buyer's claimed taxable sales amounts in calculation of error ratios. However, this is erroneous to the extent that, in many states, delivery charges and/or installation service charges are exempt from tax, and, thus, should not be included.[15]

6.  **In the Buyer's Liability Calculation, a summary of the methodology used to determine the "error ratio" was provided in the documents submitted to the Firm. Since there was a different error ratio for each state, please explain how the error ratios were determined on a state by state basis and provide the supporting calculation schedules.**

   a.  **Please provide the detailed customer and invoice level calculation schedules that feed into the liability by state schedules contained in Appendix K of Buyer's original submission and/or Exhibit 34 of Buyer's supplemental submission.**

*Seller's Response:*

In contravention of the Agreement, Buyer has never afforded Seller access to these schedules – either for Buyer's Draft Computation or Revised Analysis.

   b.  **Please provide examples of the documents reviewed (e.g., invoices reviewed, exemption documentation reviewed) that support the schedules referenced in the immediately preceding sub-part.**

*Seller's Response:*

Buyer's failure to provide Seller or the Firm with the details of the Revised Analysis is critical here. While Buyer's Revised Analysis reflects numerous concessions concerning errors and improper analysis in the Draft Computation, as explained below, Buyer is also attempting to use the Revised Analysis to inflate the Draft Computation amounts in important respects without explaining itself to Seller or the Firm.

Because Buyer has withheld its workpapers, it is very difficult to understand how Buyer arrived at the figure it is claiming in the Revised Analysis vis-à-vis the Draft Computation. The adjustments that Buyer claims to have made in Seller's favor ought to have reduced Buyer's sales-tax claims far below the $3.5 million to which it claims entitlement now.

---

[15] See Exs. 69-70, detailing state practices regarding shipping and installation charges.

It appears that the difference between the reduction in Buyer's estimate that *should* have occurred if Buyer did what it says it did and the reduction that Buyer actually implemented is, at least to some extent, the result of certain undisclosed changes by Buyer to its position on the taxability status of some Company customers that, in Buyer's initial study leading to the Draft Computation, Buyer deemed non-taxable – presumably as a result of customers' self-assessment of use tax on their end-use purchases.[16] Wal-Mart (the Company's largest customer) is the most egregious example. For a detailed breakdown of Buyer's undisclosed revisions related to Wal-Mart (that Seller was able to identify[17]), see Exhibit 65 hereto.

Buyer's calculations for the Kingway Georgia location, for sales made to Arkansas, are illustrative. The original error ratio, reflected in the Draft Computation, was 5.71 percent, which was primarily based on Buyer's erroneous treatment of distributors as 15% taxable, along with one sale to Boston Rack that Buyer deemed taxable. Both of those claimed liabilities were erroneous, and Buyer purports to have corrected those errors.[18] However, Buyer apparently used another, undisclosed method to re-inflate the number in its Revised Analysis. In Buyer's Draft Computation, Crowe's analysis showed a one-time sale to "Wal Mart Logistics Engine" for $184,934 as an 'assume self-assessed' item and therefore not taxable. For some unspecified reason, Buyer has now deemed the Wal-Mart transaction sale taxable. Although it was the only "error" for Arkansas, this manufactured liability led to an error ratio of 68.4 percent in that state. This increased tax, interest, and penalty by roughly $60,000 – with no explanation whatsoever for Buyer's change of heart between the Draft Computation and Revised Analysis.

Buyer made a similar hidden adjustment on sales by the Georgia location into Nebraska. The error rate increased from 1.7 percent to 6.06 percent. Again, no explanation was given, and with

---

[16] Buyer's Revised Analysis is also not a true attempt at reconciling because, while some of the amounts may be "as originally postured," as of the Draft Computation, *see* Buyer's Reply at 7, Buyer had not, as of the Draft Computation, done the work necessary to substantiate any sales tax claim against Seller. As Seller has explained, by Buyer's own admission, Buyer's Draft Computation reflected a hasty effort to create a large claim against Seller with no analysis or documentation whatsoever. *See* Seller's Reply at 12-13. It is too late for Buyer to attempt to build a case now. To the extent that Buyer suddenly produces documentation and analysis in response to the Firm's Questions, Seller reserves the right to respond.

[17] Because Buyer has withheld its workpapers, Seller cannot be sure whether or not Buyer used this or similar tactics in any other instances.

[18] Buyer's Reply at 18-20 & n.16. Buyer takes exception to Mr. Davis's criticism that Crowe improperly granted, in its calculations, only 85 percent non-taxability to distributors whose exemption status was known, stating that "Mr. Davis contends that Crowe erroneously treated sales to customers it identified as distributors as 15 percent taxable, 'presumably on the assumption that the distributors may also have made purchases from Kingway for their own consumption' . . . . Crowe did no such thing." Buyer is wrong. In its "Memorandum" dated May 22, 2007, explaining its approach, Crow stated that "The sales/use tax liability calculation assumed that eighty five percent (85%) distributors purchase for resale [*sic*]. Thus, if Crowe received confirmation that a transaction was a sale to a distributor, Crowe included eighty five percent (85%) of the sale as exempt and fifteen percent (15%) as taxable . . ." Seller SOP Ex. 4A. If Crowe changed its methodology, that is simply one more methodological change hidden from Seller and the Firm by Buyer's non-production of workpapers.

the limited detail provided, it is unclear what changed in the Revised Analysis to increase the error rate.

A third instance of this occurs for sales from the Georgia location made into Ohio. Without the detail from the revised study, it is impossible to pinpoint exactly what was done to alter the numbers, but it appears that, for some reason, all distributors were changed to a 100 percent exempt status, while sales to Wal-Mart, originally deemed self-assessed, were made completely taxable.

In another unexplained instance of Buyer's attempt to inflate the number, Buyer's Revised Estimate projects a 100 percent error ratio to states with zero dollar sales in 2006. Washington, DC is a notable example, but not the only one: Kingway Georgia made no DC sales in 2006. However, Buyer's consultant created a 100 percent error ratio for it and then projected that back to 2004 and 2005. This alone resulted in $23,000 in tax, interest, and penalty liability in Buyer's estimate.

These unjustifiable and secretive adjustments are alarming, to say the least. The Agreement is absolutely clear that Buyer cannot make these kinds of upward revisions to the amounts claimed in the Draft Computation. Buyer's hidden attempts to pump up the number through undisclosed changes in its methodology show that Buyer's estimates cannot be relied upon by the Firm.

Finally, and separately, there is another flaw in the methodology. If Buyer is attempting to accurately calculate an error ratio, it must reduce the error ratio for every 2006 exemption certificate that it acknowledges. Buyer is performing this calculation backwards – calculating the error ratio first, applying it to the 3+ year universe of sales, and reducing its liability estimate in the amount of individual exempted sales it discovers. Buyer's own methodology requires it to apply the exemptions in the opposite order – to the ratio.

7. **The penalty rates applied to the tax liability in the schedules provided range from approximately 10% to 70%.**

   a. **Please explain what types of penalties (e.g., late filing, late payment, negligence, willfulness/gross negligence) were included to determine the penalty rate to be applied.**

   b. **What was the authoritative source from which the penalty rates were derived?**

*Seller's Response:*

No penalty should be assessed, regardless of type or authoritative source, for tax liabilities settled or settleable through VDAs.[19] Similarly, for filing states, no penalty should be assessed because Buyer has never demonstrated that Seller significantly understated its taxes as filed, such that an assessment of penalties (*i.e.*, for substantial underpayment or negligence) could be justified.

---

[19] *See* Davis Rebuttal Report § III (D)(2) (Seller's Reply Ex. 21).

8. **In the Buyer's Liability Calculation, has the taxability of the tangible personal property and services sold/performed been analyzed on a state-by-state basis?**

   a. **If so, please provide a summary of the conclusions for each state.**

*Seller's Response:*

*See* Seller's response to Question for Buyer #5, above at 4.

   b. **Do some states consider the installation of the Company's products to be an improvement to real property for sales tax purposes?**

*Seller's Response:*

*See* Seller's response to Question for Seller # 4(b), below at 19.

   c. **When installation is included in the sale, does the Company include both installation and TPP in the same contract?**

*Seller's Response:*

Buyer has sole possession of these contracts and should provide the Firm with any relevant examples.

10. **With respect to the Buyer's Liability Calculation/Voluntary Disclosure, what "lookback" period was used in the tax liability calculation for each Company entity and state?**

   a. **What was the basis for using the lookback period chosen for each state?**

   b. **For each entity and state where a liability has been asserted, is the relevant entity likely to qualify for a voluntary disclosure agreement? Please provide the basis and any additional support for Buyer's determination.**

   c. **Assuming each entity qualifies for a standard voluntary disclosure in each state, what are the standard voluntary disclosure lookback periods (e.g., 3 years, 3 years plus current, 4 years) that would be applicable in each state?**

*Seller's Response:*

*See* Seller's response to Question for Buyer #12, below at 10.

In addition, Buyer did not consider in assessing VDA look-back periods whether the Company might qualify for and benefit from Streamlined Sales Tax amnesties. These amnesties preclude assessment for uncollected or unpaid sales or use taxes together with interest or penalty for sales

8

made during the period the retailer was not registered in the state, provided registration occurs within a specified time after the effective date of the state's participation in the amnesty agreement. The amnesty will be granted regardless of "nexus" of the seller if all other requirements are met. These amnesties are currently offered in numerous states.[20]

**11. The Buyer has acknowledged that, in one instance after an audit assessment, the Company attempted to backbill sales tax to customers and had some limited success in collecting sales tax from customers. Buyer however assumes through its liability calculations that no tax will be collected from customers. What is Buyer's basis for excluding this potential reduction in liability to be borne by the Company?**

*Seller's Response:*

Buyer's assertion that "there is no basis to reduce the estimated sales tax liability on the basis of the potential to 'back-bill' customers"[21] is specious.[22] For support, Buyer cites a single incident involving just four customers in Mississippi and asserts that "several states whose sale tax is established as a 'seller's privilege tax' . . . [prohibit the seller] from attempting to recover taxes from customers after the date of the [sales] transaction," citing various sales tax imposition statutes.[23] But the label "privilege tax" does not at all prohibit recovery actions by a retailer. A "privilege tax" may be imposed upon a retailer, but the retailer is also charged to collect as an agent of the state use tax from the customer. The retailer in effect reimburses itself with the sales tax (variously called at times "a privilege tax") that it remitted to the DOR with the use tax it collects from its customers. The retailer then is charged with this use tax collection activity, with which buyer must also comply, and is limited in this obligation only by statutes of limitations. For example, the Connecticut privilege tax statute cited by Buyer completely contradicts Buyer's statement:

> Reimbursement for the tax hereby imposed shall be collected by the retailer from the consumer and such tax reimbursement . . . shall be paid by the consumer to the retailer and each retailer shall collect from the consumer the full amount of tax imposed by this chapter or an amount equal as nearly as possible or practicable to the average equivalent thereof. Such tax shall be a debt from the consumer to the retailer, when so added to the original sales price, and shall be recoverable at law in the same manner as other debts except as provided in section 12-432a.[24]

---

[20] *See generally* http://www.streamlinedsalestax.org/.

[21] Buyer's Reply at 25.

[22] *See also* Expert Report of Bruce H. Davis, CPA ("Davis Expert Report") § V (H) ("Collecting Back-Taxes from Customers") (Seller SOP Ex. 7).

[23] Buyer's Reply at 25 & Exhibit 33.

[24] Conn. Gen. Stat. §12-408(2)(A) (Buyer Reply Ex. 33 at Page 4).

And, as Seller has noted in prior submissions, the Company has had success in collecting back taxes. In the 2006 example cited by Buyer, the Company was audited by Mississippi concerning four accounts. The Company was assessed for a total $80,000. The Company will be recouping approximately $50-60,000 through back-billing. This belies buyer's assumption that back-billing is not possible. Moreover, the decision not to recoup the full $80,000 was at least partially a decision of new management under Buyer's direction.

Relatedly, also in 2006, Louisiana assessed the Company for $225,000. The Company contacted its customers in Louisiana, obtained exemption certificates, no-nexus letters, and confirmations of self-assessment. By these methods, the Company reduced the liability to a mere $4,000.

As Seller has explained, the Company's right of subrogation against its customers for sales-tax owed reduces the estimated liability to zero. Moreover, as Seller has shown, under the Agreement, Buyer is required to mitigate any claimed loss.[25]

12. **The Buyer's position expressly discusses and appears to incorporate into its liability calculations (e.g., the use of limited lookback periods) the potential use of state voluntary disclosure programs to resolve and minimize tax liabilities. Costs associated with performing voluntary disclosures appeared to be incorporated into Buyer's original liability calculations. Buyer's most recent liability schedules, however, include the application of penalties.**

   d. **What is Buyer's basis for the inclusion of penalties where voluntary disclosures appear, from Buyer's representations, to be a potential avenue to resolve the tax liabilities?**

   e. **If there are state specific reasons (e.g., prior filings, tax collected not remitted, will not qualify for voluntary disclosure), state why Buyer believes penalties will apply. Please indicate the reasons on an entity and state-by-state basis and provide supporting documentation.**

*Seller's Response:*

As Seller has explained, there is no basis for estimating liability for penalties under these circumstances and, in any event, the Agreement forbids Buyer from changing its position as it has done.[26]

---

[25] *See* Seller SOP at 6; Agreement § 11.02(h) (Seller SOP Ex. 1).

[26] *See* Seller's Reply at 18-20; Davis Rebuttal Report § III (D)(2) (Seller's Reply Ex. 21).

<u>**Questions for Seller:**</u>

    **1. Please provide available documentation pertaining to sales tax registrations, tax filing histories, tax audit histories or tax collected that should be considered.**

*Seller's Response:*

Much of the documentation is in the control of Buyer. However, Seller does have some and has included it as Exhibits 23-52 hereto, Kingway's sales tax returns as originally filed, and Exhibit 53 hereto, the results of the Mississippi audit for 2001-2004.

    **2. For which entities, states and, where necessary, filing periods where Buyer has asserted that a tax liability, and therefore nexus exists, does Seller assert nexus has not been established and therefore a tax collection obligation does not exist?**

*Seller's Response:*

As explained above, there is no evidence of nexus with:

- <u>Alabama</u> before April 2006;[27]

- <u>Illinois</u> before 2005;[28]

- <u>Louisiana</u> before May 26, 2006;[29]

- <u>Massachusetts</u> before 2005;[30]

- <u>Nebraska</u> before the second quarter of 2005;[31]

- <u>Wisconsin</u> before May 2006.[32]

---

[27] Exhibit 17 shows Company filed in Alabama through August 2006, not June 2006 as Buyer alleged.

[28] Buyer Reply at Exhibit 18.

[29] Buyer Reply at Exhibit 18.

[30] Buyer Reply at Exhibit 18.

[31] Buyer Reply at Exhibit 18. Exhibit 22 shows Company filed in Nebraska through fourth quarter 2006 and not third quarter 2006, as Buyer has alleged.

[32] Buyer Reply at Exhibit 18.

   **a.  Please provide, for each entity and state, the basis for that assertion and any supporting documentation to be considered.**

*Seller's Response:*

A summary by entity and state is attached as Exhibit 54 hereto.[33]

   **b.  Without regard to how long nexus, once established, lasts, does Seller agree with Buyer's assertion that the Company established nexus in those states in which it performed installation services?  Why or why not?**

*Seller's Response:*

Seller agrees that the Company established nexus in states when it performed installation services in them.  However, nexus may be extinguished in a state when the taxpayer does not perform installation services in the state for an extended period of time, while concurrently not soliciting sales or evidencing any other physical presence there.  Moreover, having nexus in a state, while generally imposing a filing requirement on the taxpayer, does not necessarily mean that it has made taxable sales there.  Likewise, making sales into a state does not mean by itself that the taxpayer is creating nexus there.

   **3.  Have there been significant changes in the Company's business or the customer base during the period January 1, 2003 through the closing date that may contribute to any bias that may result from the use of a "block sampling" approach to estimate the liability?**

*Seller's Response:*

Yes.

   **a.  If yes, please provide a detailed description of each significant change, including relevant timing, and explain how and to what extent such change contributes to any potential bias in the sampling methodology.  Please include supporting documentation.**

*Seller's Response:*

As indicated in Exhibits 55-58 hereto, the Company's top customers, and the nature of the projects, changed substantially year over year.  Accordingly, the sales tax implications, if any, varied depending on the customer, the state and the nature of the project.[34]  This further negates the validity of the FY06 block sample extrapolation method.

---

[33] Seller is happy to discuss these at more length if the Firm wishes.

[34] The Company engaged in more "quick ship" sales in 2004 and 2005.  In contrast to custom-systems, more common in 2006, these systems were in the Company's inventory and sold to customers on an as-needed basis.  Similarly, installation services varied as a percentage of total

Footnote continued on next page

12

Relatedly, the Company did significantly more business with its largest customer, Wal-Mart, in 2006. Wal-Mart represents that it self-assesses use tax (and is certainly scrutinized by state taxing authorities).[35] Buyer has erroneously assumed liability with respect to sales to Wal-Mart and included those sales in the numerator of its "error ratio." This produces erroneous results not only for 2006, but also seriously distorts the results from applying the erroneous error ratio to 2004 and 2005 because sales to Wal-Mart are overrepresented in the 2006 sample. As explained above, Buyer has manipulated its treatment of Wal-Mart sales to inflate the error ratio.[36] The fact that it has only examined 2006, and sales to Wal-Mart were greater for 2006, creates even more distortion.

> **b. Has Seller performed a statistical sample of the same population for the same period of time? If so, please provide supporting documentation.**

*Seller's Response:*

Buyer has refused to make available the information required to undertake such an analysis. Seller's position is that Buyer's analysis provides no basis to overturn the Company's contemporaneous accounting judgments. Buyer's use of block sampling leads to unreliable results and cannot support an assessment of liability that is "probable" and reasonably "estimable."

While Buyer criticizes Seller's expert for his statements about statistical sampling, Buyer's own "expert," Mr. Yancey, who purports to be *"the* nationally recognized expert on sampling in sales and use tax audits,"[37] has explained in his own writings why statistical sampling is superior to block sampling:

> Sample evaluation methods can be either statistical or nonstatistical. The distinction between statistical and nonstatistical

---

Footnote continued from previous page
revenue from year to year. As noted above at page 5 & n.15, installation and shipping revenue may or may not be treated as taxable, depending on the facts and circumstances.

[35] Buyer states that there is "a inherent error in Mr. Davis' claim that exemptions exist for self-assessed use tax accruals" since "they are not expressed exemptions with statutory support," and even if state DORs did allow them, they would still require "...detailed documentation and verification." Buyer's Reply at 23 n.19. Of course, as the Firm knows, states do recognize self-assessment exemption because sales and use taxes are "complementary" in that, on any given taxable transaction, sales tax or use tax should be imposed – but not both. Imposition of both constitutes double taxation. So, if a customer pays use tax to the DOR, the Company need not pay the complementary sales tax in addition to it. Finally, even if getting this exemption entails complexity (which it virtually never does), this should not prohibit Buyer's pursuit of it, given Buyer's obligation to mitigate damages.

[36] *See* Ex. 65 hereto (details of some of Buyer's hidden adjustments).

[37] *See* Expert Report of Dr. Will Yancey (Nov. 6, 2007) ("Yancey Report") at 2 (emphasis added).

has significant implications for sample planning, selection, evaluation, and review.

**Statistical.** Statistical sample methods provide an objective quantifiable measure of sampling risk. Sampling risk is the chance that another sample of the same size drawn with the same method would reach a different result.

Statistical methods are based on scientific research on probability and statistics, developed over several centuries. Statistical methods have been applied to sales and use tax audits since the 1950's . . . .

**Nonstatistical.** Nonstatistical sampling is based on the judgment of the auditor without an objective quantifiable measure of sampling risk. Inevitably, the auditor and taxpayer clash over the evaluation of nonstatistical samples, because each person has a different judgment about whether the nonstatistical sample is or is not a valid representation of the population from which it was drawn. A sampling method is nonstatistical when all items in the population being projected did not have a known chance of being selected in the sample, the confidence interval is not reported, or both.

A common nonstatistical method in a sales and use tax audit is block sampling, also known as time period sampling. If the audit period is thirty-six months, the auditor might pick six months and look at every transaction in the six selected months. The problem is that none of the transactions in the other thirty months had any chance of selection. If the characteristics of the selected months differ from non-selected months, there is no way to estimate the risk the sample is unrepresentative.

**Judgmental.** Judgmental selection is a nonstatistical sample selection technique where the planner looks at a list of items and selects specific items. Judgmental selection does not use a random number table, mechanical randomization device, or computer-generated random sequence. Examples of judgmental selection applied in sales and use tax are selection by time period blocks, clusters, or alpha sequence. Sometimes the judgment is influenced by the convenience of record retrieval. The auditor and taxpayer rely on their subjective judgment about whether the selected items are representative of the population. When judgmental selection is used, it is not possible to make a valid statistical evaluation of the results.

14

> **Nonstatistical evaluation of sampling risk.** Nonstatistical evaluation does not provide an objective quantified confidence interval. In sales and use tax audits nonstatistical evaluation is often a matter of selecting a sample of a few days or months or a few store locations. If the sample is not selected randomly from the entire population, serious doubts arise as to whether that sample base is representative of the population base. Even more doubts arise as to whether the errors in the sample base are representative of the errors in the population base.[38]

As this excerpt from Buyer's own expert implies, Buyer is misconstruing what is meant by "bias" in this context. Bias in sampling means simply that human choice or judgment is involved in selecting the sample population. This contrasts with "random" sampling, wherein a sample is selected through operation of chance (such as through a computerized random-number generator). Buyer's misunderstanding is manifested in its misattribution to Mr. Davis of the view that "all sampling is invalid for use in estimating a sale tax liability . . . ." Mr. Davis has opined no such thing. Rather, just like Mr. Yancey, Mr. Davis has explained that statistical sampling is more accurate than block sampling because it is able to quantify – and thus measure for evaluation – the validity and reliability of a sample, thereby making more likely agreement between disputing parties, such as Buyer and Seller here.

Here, Buyer's examination bias is evidenced in its tendency to interpret sampling outcomes so that they would lead to an increase overall of Seller's sales tax liability. The approach was clearly results-oriented. This is apparent, for example, when reviewing the state-by-state conclusions on the taxability of services and property set forth in Exhibit 54 hereto, items 1-27. For example:

- Failure to acknowledge statutes of limitation on Items 1-4;

- Assuming nexus for the Company for periods in states before its having completed state tax registrations in them, *see* Item 5;

- Failure to acknowledge correct look-back periods for VDAs at Items 6-8;

- Extrapolation errors brought on by Buyer's taxability-result bias at Items 9-11;

- Refusal to recognize end-user practices of self-assessment of use taxes, credit for tax deemed paid on audit, and payment of back-taxes at Items 12-14, 18-20, and 22;

- Ignoring the "reasonable case scenarios" of the BDO Seidman report which were unfavorable to Buyer at Items 15-16, 21;

---

[38] Will Yancey, Ph.D., CPA, <u>Statistical Sampling in Sales and Use Tax Audits,</u> (2002), §§ 120.04, 120.06, and 140.01 (Ex. 72 hereto).

15

- Including an undisclosed and unexplained add-back of Wal-Mart sales as taxable in Buyer's Revised Analysis, which had been exempted in its Draft Computation, *see* Item 17;

- Denying Seller the right to examine supporting detailed workpapers for both the initial Draft Computation and Revised Analysis or to make inquiry of customers whose purchases appear to be sales for resale, *see* Items 23 & 25;

- Failure to purge from the taxability ratio charges, where applicable, for tax-exempt services (*e.g.*, installation and delivery or sales to tax-exempt entities), *see* Items 26 and 27;

- Failure to adjust its 2006 sample by including therein invoices omitted from the Georgia location for the period 1/06-4/06, *see* Item 24.

In any event, even if one accepts that block sampling is an appropriate shortcut to use for this purpose generally, Buyer's use of this methodology in this particular instance is unjustifiable and erroneously executed even on its own terms. If Mr. Yancey had examined Buyer's work – which he does not purport to have done – he would have to agree, given his statements in his "Expert Report." Note that Mr. Yancey carefully limits his opinion to "the general concepts used by Crowe Chizek."[39] He expresses no opinion whatsoever about Buyer and Crowe's actual calculations. In fact, because of the flaws in Buyer's execution, Mr. Yancey's opinions are not relevant to Buyer's positions.[40]

For example, Mr. Yancey opines that Buyer's espoused methodology involves "projecting from the readily available onto the unavailable."[41] However, Buyer admits that the Company's records for 2004, 2005, and first quarter 2007 were "readily available" and claims that Crowe "specifically analyzed whether the sample was biased, and, based upon a detailed analysis of

---

[39] Yancey Report at 2.

[40] Mr. Yancey's credibility is also seriously undermined by several mischaracterizations of Mr. Davis's opinions. For example, Mr. Yancey states that Mr. Davis "impl[ied] sales tax exemptions [for Company] will be easy to obtain." Yancey Report at 5. To the contrary, the point is that Buyer has made little if any effort to obtain the certificates and prohibited Seller from seeking to obtain them. It is irrelevant whether or not obtaining them would be "easy," whatever that means. Mr. Yancey asserts that Mr. Davis believes that the Company "can readily recover tax liabilities by back-billing customers." Yancey Report at 5. Again, whether an endeavor is easy or hard is beside the point. The Company has a subrogation right against the customers, which, from an accounting perspective, eliminates any liability. And, moreover, Buyer does not give any indication that it is trying to mitigate any of the claimed liabilities by this method – "readily" or otherwise. Similarly, Mr. Yancey hedges in answering his own question of whether a DOR "auditor [will] accept proof that the customer paid use tax" by responding that "the auditor might [still] demand a lot of supporting documentation." Yancey Report at 5. That is not the point – with appropriate substantiation, the auditor will grant credit.

[41] Yancey Report at 2.

sales data for each of the years included within the estimate (2004, 2005, 2006) concluded that it was not."[42] Thus, even under Mr. Yancey's terms, Buyer's methodology is unjustifiable. Mr. Yancey says that taxpayers use this method because one-or-two-year-old "general ledger detail and supporting documentation are much easier to obtain than for older records."[43] But, according to Buyer, that is not the case here. If sales data for 2004 and 2005 were available for "detailed analysis," why were they not available for inclusion in a sample?

Nor does Mr. Yancey comment on how Buyer compromised the integrity of its methodology by excluding from the sample certain 2006 sales, which should have been included.[44]

Buyer further represents that "Company management also represented that the primary functions and principles of the organization did not differ materially during the period 2004-2007."[45] However, as usual, the Firm is given neither the identity of the Company management who made this statement nor a statement of the questions posed to them. In any event, even if organizational "functions and principles" went unchanged, sales patterns – e.g., when and where sales were made and to whom – did change as explained above at 12-13. Thus, Buyer should have sampled from all periods. Mr. Yancey offers no comment on this flaw in Buyer's execution.

As pointed out in Seller's earlier submissions, there are also serious problems with Buyer's calculations related to high-dollar customers. Buyer's Reply highlights some of these, and Mr. Yancey offers no comment. A very serious red flag of which the Firm should take cognizance is that Buyer has blocked Seller from obtaining the necessary documentation, while at the same time arguing to the Firm that Seller has offered "no evidence" in support of certain positions. Note, however, that:

> 1) With respect to <u>Iron Mountain</u>, Buyer has conceded that Mr. Davis was correct and Crowe was wrong, stating that "In response to [Mr. Davis'] contention, Crowe has adjusted its estimate . . . [in the Revised Estimate]."[46]
>
> 2) With respect to <u>Wilson Sporting Goods</u>, Buyer takes exception to Mr. Davis's "purported" discussion with former Company management wherein former management stated that Wilson informed them that Wilson self-assesses use tax on its purchases. Buyer protests that Seller has "presented no exemption certificates or other documentation to support exemptions or credits for [Company's] . . . sales [to Wilson]."[47] However, Buyer makes no mention of the fact that it prohibited Seller from contacting Wilson.

---

[42] Buyer's Reply at 13.

[43] Yancey Report at 2.

[44] Statement of Position & Supporting Documentation Submitted by Unarco Material Handling, Inc. ("Buyer SOP") at II(b)(i).

[45] Buyer's Reply at 13-14.

[46] Buyer's Reply at 20.

[47] Buyer's Reply at 20-21.

3) With respect to <u>Scott Equipment Co.</u>, Buyer manifests confusion, writing that ". . . as a matter of convenience, the [Company's] products were shipped to installation contractors who were to install the products at the [Company's] customer's locations."[48]  That is not, however, what the invoices show.  Rather, they show that the products were drop-shipped to the customer's job site for the convenience of the contractor from whom the sale for resale to the customer was probably made.[49]  Nevertheless, the Buyer has prohibited Seller from verifying with Scott this explanation of the transaction.

4) With respect to <u>Sun Trust Leasing</u>, Buyer does not explain why a "leasing" company would ever purchase a product if not for the purpose of leasing it to its customers, equivalent to a resale, for these purposes.[50]  Again, Buyer prohibited Seller from pursuing with Sun Trust this explanation for the transaction, yet argues disingenuously that Seller has presented insufficient evidence.

5) With respect to <u>Jetro Cash and Carry</u>, Buyer never explains how this transaction could be taxable when, on the face of the invoice, it appears that Jetro purchased Company's product for the purpose of reselling it to another entity – to whose location it was shipped.[51]  Again, Seller was denied access to Jetro to try to substantiate independently our supposition.

Relatedly, Buyer's explanation of Crowe's initial efforts to obtain exemption certificates from Company's customers or other substantiation for nontaxability is misleading.  Buyer calls "mere speculation" the suggestion that some Company customers may be exempt from tax on grounds other than their having made purchases for resale – namely, their having self-assessed use tax or having been under a DOR audit and assures the Firm that, "in or about April and May 2007, the Company sent letters to every customer included on the 2006 sample to which a presumably taxable sale was made, requesting that . . . it provide [Company] an exemption certificate."[52]  Buyer neglects to address, however, whether the letter inquired about whether customer self-assessed use tax or had been audited by DORs during all or part of the 2004 – 2007 first quarter period.  Nor does Buyer state whether or not Company management followed up on the correspondence or had even afforded customers sufficient time to respond.  Note that Crowe's "Memorandum" dated May 27, 2007, explaining its initial examination, never mentions issuing such correspondence.[53]

Finally, we understand that Buyer is operating under new rules with respect to exemption certificates that it does possess, which cannot be applied retroactively to manufacture liability on the part of Seller.  A predecessor of Kingway called Reunion, in Atlanta, held exemption certificates made out to Reunion.  Kingway is now following the policy of paying the tax where

---

[48] Buyer's Reply at 21.

[49] *See* Exhibit 67 hereto.

[50] *See* Exhibit 68 hereto (Sun Trust invoice).

[51] *See* Exhibit 66 hereto.

[52] Buyer's Reply at 23.

[53] *See* Crowe Analysis (Seller SOP Ex. 4A).

the certificate is made out to the predecessor and not Kingway. Whatever the justification for this unusual policy, it cannot be used to inflate Buyer's claim against Seller.

In sum, Seller had suggested that Buyer should have performed a statistical sampling in lieu of its block sampling in light of the significant and numerous flaws made in its execution of the block sampling. These flaws in methodology rendered impossible any fair measure of the Company's supposed sales tax liability. Buyer has admitted that invoices from earlier periods, 2004-2005, were accessible for review – thereby making statistical sampling possible. The decision not to use a reliable method was Buyer's alone and it is Buyer who should suffer the consequences of its own failure to come forward with evidence to support its proposed adjustment to the Company's historical accounting.

In any event, correcting the specific flaws in Buyer's execution of its block sampling methodology, as explained in Seller's previous submissions, results in an answer that supports the Company's historical accounting.[54]

### 4. Has the taxability of the tangible personal property and services sold/performed been analyzed on a state-by-state basis?

*Seller's Response*

Yes, to the extent possible given the limited information made available by Buyer.

### a. If so, please provide a summary of the conclusions for each state.

*Seller's Response*

*See* Exhibit 54 hereto.

### b. Do some states consider the installation of the Company's products to be an improvement to real property for sales tax purposes?

*Seller's Response:*

Not to Seller's knowledge. States would use generally the "intention test" to resolve the issue of whether the installation of the Company's products constitutes an improvement to real property. Under the "intention test," three criteria must be evaluated to decide whether an item of tangible personal property becomes a fixture to realty: First, the property must be annexed to the realty. Second, the property must be applied to the use or the purpose of the realty to which it is connected or appropriated. Third, the party making the annexation must intend to make a permanent accession to the realty.

The racking that Company sold did not meet the intention test. In other words, it was not built into the walls of the structure in which it resided. Nor was it set into a concrete foundation or

---

[54] *See* Davis Expert Report at 4-10 (Seller SOP Ex. 7).

secured by underground cabling there. Rather, it was, for security and safety reasons, anchored with bolts to the floor. The bolts can be removed with only minimal damage to the realty. They leave behind shallow holes that can be filled in with cement. For example, if Company's business customer wants to move the racking to a new location, the customer can remove it for use at the new location. In short, the racking is not left behind, as realty would have to be, after a move. If the business does not pay for the racking, Company may dispossess it. If the customer wants to use its warehouse for a different purpose, for example, the racking would be removable in order to allow the change in the realty's function to come about.

5.  **Please provide detailed calculation schedules supporting the reductions shown on the summary schedules provided in Mr. Bruce Davis' addenda A through F.**

*Seller's Response:*

*See* Exhibit 59 hereto.[55]

*          *          *

Finally, it is necessary to point out some misstatements and inaccuracies in Buyer's submission concerning FAS 5. Buyer has made the assertion that FAS 5 does not apply here *at all*. Buyer relies on a set of slides attributed to Stephanie Csan of Deloitte & Touche. Not only does Buyer misstate Deloitte's position – **PricewaterhouseCoopers has already adopted Seller's position that FAS 5 applies.**

In 2006, the FASB issued a standard called FASB Interpretation No. 48 (FIN 48) that deals with certain tax uncertainties (*i.e.*, tax positions with uncertain outcomes). Prior to FIN 48, accountants generally followed FAS 5 for all tax contingencies. Paragraph 60 of FAS 5 states that "in many cases, the accrual of a loss contingency results in the recording of a liability, for example, accruals for a probable tax assessment."[56] FIN 48 removed income tax liabilities only from the scope of FAS 5 and addressed them discretely. But, all other tax uncertainties remain within the scope of FAS 5.

As explained in the PwC's Frequently Asked Questions on Implementation on FASB Interpretation No. 48:

> FIN 48 is applicable to all income tax positions accounted for under FAS 109 (i.e., taxes based on income). **Uncertain positions** related to other types of taxes, **such as sales taxes,** value-added

---

[55] Seller has provided these items in electronic spreadsheet form on the assumption that this will be most useful to the Firm. If the Firm would like a hard copy or other format, please let us know.

[56] FAS 5, ¶ 60 (Seller SOP Ex. 8).

taxes, and property taxes, **are generally accounted for under FASB Statement No. 5, Accounting for Contingencies (FAS 5)**.

Question 1: Does FIN 48 apply to taxes based on revenue or gross income (e.g., gross receipts, or sales tax) since such taxes are based on a measure derived from the income statement?

Interpretive Response: No. These forms of taxes would not, as a general rule, constitute "taxes based on income" as described in FAS 109. However, while not defined in FAS 109, we believe that the term "taxes based on income" should be interpreted broadly to include virtually any tax system that incorporates a concept of revenue minus some costs. In order to determine if a particular tax is "based on income," the particulars of the tax law for a given jurisdiction would need to be considered. For example, the recently enacted Texas "Margin Tax" was determined to be an income tax accounted for under FAS 109. See DataLine 2006-15, The Financial Reporting Implications of Changes in the Texas Franchise Tax System, and DataLine 2006-16, Additional Guidance on Implementing the New Texas Margin Tax.[57]

Moreover, Buyer and its expert Mr. Yancey are wrong about Deloitte's position, which accords in material respects with PwC's views on this issue. Buyer omits any reference to Ms. Csan's Slide #11 which discusses "certain situations where sales and use taxes represent contingencies under FAS 5,"[58] including situations of "[u]ncertainty about whether certain transactions are subject to the tax (*e.g.*, questions of classification or of nexus)" and "[u]ncertainty about the amount of the outcome" such as situations involving "Negotiated Settlements." [59] Seller agrees with Ms. Csan that these are exactly the kinds of issues that create tax uncertainties under FAS 5.

Deloitte's published literature also clearly states that sales taxes are within the scope of FAS 5 because they are taxes based on revenues:

Question:

What tax positions are within the scope of Interpretation 48?

Answer:

Interpretation 48 applies to all tax positions accounted for in accordance with <u>FASB Statement No. 109, Accounting for Income Taxes</u>, including tax positions in a previously filed tax return or tax

---

[57] PricewaterhouseCoopers LLP, <u>Frequently Asked Questions on Implementation on FASB Interpretation No. 48</u> (May 3, 2007) at ¶ .9 (Exhibit 60 hereto) (emphases added).

[58] Buyer's Reply, Ex. 37 at Page 13.

[59] Buyer's Reply, Ex. 37 at Page 13.

positions expected to be taken in a future tax return. A tax position
can result in a permanent reduction of income taxes payable, a
deferral of income taxes otherwise currently payable to future
years, or a change in the expected realizability of deferred tax
assets.

Paragraph 4 of Interpretation 48 provides the following examples
of tax positions that are within the scope of Interpretation 48:

    1.    A decision not to file a tax return (e.g., a decision not to file a
specific state tax return because nexus was not established).

    2.    An allocation or shift of income between jurisdictions (e.g.,
transfer pricing).

    3.    The characterization of income or a decision to exclude
taxable income in a tax return (e.g., interest income earned on
municipal bonds).

    4.    A decision to classify a transaction, entity, or other position in
a tax return as tax exempt (e.g., decision not to include a foreign
entity in the US federal tax return).

**Uncertainties related to tax positions not within the scope of
Statement 109, such as taxes based on gross receipts, revenue,
or capital, should be accounted for under other applicable
literature (e.g., FASB Statement No. 5, Accounting for
Contingencies). Interpretation 48 amends Statement 5 to
eliminate its applicability to income taxes.**

Deloitte and Touche Accounting Research Tool, TAX POSITIONS WITHIN THE SCOPE OF
INTERPRETATION 48 (October 13, 2006) (emphasis added).

It is, in any event, wrong to argue that FAS 5 does not address liabilities. Liabilities are defined
in Paragraph 35 of Concept Statement 6 as "probable future sacrifices of economic benefits
arising from present obligations of a particular entity to transfer assets . . . to other entities in the
future as a result of past transactions or events." Under FAS 5, a "loss contingency" is recorded
when "information available prior to the issuance of the financial statements indicates that it is
probable . . . that a liability had been incurred at the date of the financial statements."[60] Those
statements describe precisely same thing – probable future payments arising from past
transactions. Paragraph 60 of FAS 5, quoted above, also explicitly refers to a loss contingency
as a liability. [61] Finally, FAS 5 Paragraphs 71 and 73 explicitly refer to Paragraph 8 and say that

---

[60] FAS 5, ¶ 8 (Seller SOP Ex. 8).

[61] FAS 5, ¶ 60 (Seller SOP Ex. 8).

the conditions for a loss accrual in paragraph 8 are "consistent with . . . the liability concept."[62] Thus, FAS 5 clearly applies.

In this context, Buyer's continued reliance on the work of BDO Seidman is bizarre. Buyer claims that there is sales tax liability totaling approximately $3.5 million as of March 30, 2007. BDO Seidman, by contrast, set forth an estimate – before consideration of many other factors that would substantially reduce the number – of liability between $236,385 to $384,335, exclusive of interest.[63] Adjusted to accord with Buyer's own VDA model, BDO's analysis leads to a total of $163,269 to $247,957, exclusive of interest.[64] Oddly, Buyer points to BDO's work and says that "in light of the fact that two nationally recognized accounting firms have quantified the Company's sales tax liability, it cannot reasonably be said that the liability is not reasonably estimable."[65] Given the huge disparity between the BDO and Crowe estimates, both of which Buyer seems to assert are legitimate, it cannot possibly be said that these liabilities were "reasonably estimable."

For these reasons, among others, no accrual for sales tax liability was appropriate as of the Closing Date.

## VACATION ACCRUAL

1. **Was a liability for compensated absences recorded in the audited consolidated Balance Sheet as of December 31, 2005? If yes, what amount was recorded?**

*Seller's Response:*

Yes. *See* Exhibit 61 hereto.

2. **What was the accounting policy underlying the computation and recording of the liability as of December 31, 2005?**

*Seller's Response:*

The underlying policy was the same as the current policy.

3. **Please provide copies of the analysis supporting the liability recorded as of December 31, 2005.**

---

[62] FAS 5, ¶¶ 71, 73 (Seller SOP Ex. 8).

[63] BDO Seidman LLP, Sales Tax Nexus and Sales Tax Liability Assessment OF INCA METALS PRODUCT CORP AND CLYMER ACQUISITIONS, INC. (Feb. 8, 2007) ("BDO Document") at Schedule C (Buyer SOP, Appendix E).

[64] *See* Seller's Reply at 3. Note that this range still does not take into consideration other factors that further reduce the range to zero. *See e.g.*, Davis Expert Report (Seller SOP Ex. 7).

[65] Buyer's Reply at 7.

*Seller's Response:*

Not available to Seller.

4. **Did BDO Seidman propose an adjustment to record additional expense for compensated absences as of December 31, 2005? If yes, what was the amount of the adjustment proposed? Was it recorded in the audited financial statements? If not, why not?**

*Seller's Response:*

No, BDO Seidman did not propose an adjustment.[66]

5. **Assuming a terminating employee provided more than two weeks notice and was not terminated for cause prior to March 2007, would the terminating employee be paid for vacation earned, but not vested since the last anniversary date?**

*Seller's Response:*

No, under the terms of the policy, the employee would not be paid.[67] This was the Company's practice prior to Closing.

6. **With respect to pages 1 and 2 of Appendix L of the Buyer's Submission dated October 23, 2007:**

   c. **It appears that certain employees (e.g., Acosta, Ambriz, Caracheo) had accrued vacation balances in excess of their annual allotments per the Company's policy. The vacation policy states that "leave will be taken during the year in which it is awarded or forfeited upon the anniversary date." Why is the accrual for certain employees in excess of their annual allotments?**

*Seller's Response:*

This Question highlights the flaw in Buyer's method. Under Buyer's method, vacation amounts in excess of the annual allotment per the Company's policy are accrued, directly in contravention of the policy.

---

[66] *See also* Exhibit 62 hereto ("Adjusting journal entries") (reflecting no adjustment for vacation accrual).

[67] *See* Seller SOP Ex. 9.

## PETSMART CLAIM

**2. Copy of engineer's certification to the Company that the racks installed at Petsmart conformed to the design specifications required by the contract.**

*Seller's Response:*

Seller has asked Buyer for this document on numerous occasions. Buyer has never denied the facts that this certification was made by the independent engineer.

**4. Did the Company have a reserve for warranty claims as of March 30, 2007? If yes, what was the amount of the reserve and the underlying accounting policy?**

*Seller's Response:*

Yes. As of March 30, 2007, the Company had a general warranty claims reserve of $196,381.[68] This reserve was based on management's assessment of both specific claims outstanding and a general reserve for contingency claims. A historical warranty claim experience rate was not used in determining the warranty reserve.

## WISE INSTALLATION

**2. If management obligated the Company in May 2006, why was the claim not paid or recorded before closing?**

*Seller's Response:*

The Company was not obligated as of May 2006. As explained in Seller's previous submissions, Company policy through the Closing Date required that all change orders be in writing.[69]

By way of background, before approximately mid-2005, the Company had a persistent problem with contractors performing work that the Company had not ordered and attempting to collect retroactively. Indeed, WISE itself was one of the problem contractors. That prompted the policy change in mid-2005 by which all change orders are now required to be in writing. The Company informed all contractors that this policy would be followed strictly from then on.

WISE apparently attempted to circumvent the policy. If, for some reason, the Company has capitulated subsequent to Closing, that has no bearing on the Company's liability as of March 30, 2007.

---

[68] *See* Schedule of Warranty Accrual (Ex. 61 hereto).

[69] *See* Seller SOP at 26-27; Seller's Reply at 24-25.

## PREPAID TRADE SHOW EXPENSES

1. **What was the balance of Prepaid Trade Show Expenses recorded in the Reference Balance Sheet as of December 31, 2005 and as of December 31, 2004? How and when was the balance charged to operations in 2006 and 2005?**

*Seller's Response:*

Zero balance at December 31, 2005.

The Trade Show is a bi-annual event, occurring most recently in 2005 and 2007. The Company's balance as of December 31, 2004 reflects a $111,000 asset for prepaid trade show expenses. The cost incurred in 2005 for the Promat Show was originally charged to operations by amortizing the expense over the remainder of FY05 and FY06, the period of time in which the Company benefited from the expense incurred. At the end of FY05, the Company's auditors opined that the entire expense should be reflected in the 2005 financial year and proposed and passed an audit adjustment to write off the remaining prepaid asset at year end. The Company carried out the adjustment.[70]

2. **Copy of the related accounting policy for 2004 - 2007.**

*Seller's Response:*

The policy is set forth in the Company's audited financial reports, related to advertising expenses.[71]

3. **Detail listing of tangible assets (e.g., marketing supplies - brochures) held and related valuation as of March 30, 2007.**

*Seller's Response:*

Tangible assets included photos, golf balls, pens and pencils, t-shirts, posters, brochures, hats. Purchase orders in the Company's possession demonstrate these expenses. For every amount that was capitalized, the Company will have a record in the form of purchase orders or other documents. Buyer should provide a schedule of amounts that are capitalized.

## ACCOUNTS RECEIVABLE

1. **Schedule of the aging of Accounts Receivable as of the Reference Balance Sheet date, December 31, 2005.**

---

[70] *See* Ex. 62 hereto at Page 2 ("PAJE 7").

[71] *See* Buyer's Reply Ex. 35 at Page 10 (page 8 of the Company's Consolidated Financial Statements for 2004-2005).

*Seller's Response:*

*See* Exhibit 63 hereto.

> **2. Footnote B to the audited consolidated financial statements as of December 31, 2005 indicates that the Company reviews accounts receivable on a monthly basis to determine if any amounts will potentially be uncollectible. Provide a copy of this monthly analysis including the impact on the allowance for doubtful accounts for the months of January, February and March 2007.**

*Seller's Response:*

Detailed review with substantiated work papers happened annually at year end.[72] It was the Company's practice to review accounts receivable *informally* each month – in other words, without formal documentation – during management's month-end close process. Management's practice was to discuss variance from the prior month allowance and any significant changes therefrom. As indicated in Seller's prior submissions, this was not done properly in the final month before Closing.[73] Seller is unaware of documentation concerning these informal monthly reviews, but Buyer has direct access and, if such documents exist, should provide them.

<u>**ESTIMATED PURCHASE PRICE**</u>

> **1. Do the Buyer and Seller agree that Exhibit 14 to Buyer's Statement of Position dated October 23, 2007 accurately reflects the actual amounts paid by the Buyer on March 30, 2007? If not, why not?**

*Seller's Response:*

Yes.

> **2. Was Exhibit 14 the final funds flow statement?**

*Seller's Response:*

No.

---

[72] *See* Exhibit 73 hereto (review of doubtful accounts).

[73] *See* Seller SOP at 22; Seller's Reply at 22.

**POST-CLOSING ADJUSTMENT DISPUTE**
**IN CONNECTION WITH THE ACQUISITION OF KIC HOLDINGS, INC. BY**
**UNARCO MATERIAL HANDLING, INC.**

**SUPPLEMENTAL REPLY SUBMISSION AND SUPPORTING DOCUMENTATION**
**SUBMITTED BY**
**UNARCO MATERIAL HANDLING, INC.**

**DECEMBER 14, 2007**

## INTRODUCTION

Buyer makes this submission in response to the Seller's Reponses To Questions And Document Requests, dated November 30, 2007 ("Seller's Responses"). As set forth below, Seller advances a number of arguments attempting to challenge the validity of the methodology used by Buyer to estimate sales tax liability and the reliability of the estimate itself. These arguments, as discussed below, have no merit and, in most cases, are explicitly contradicted by undisputed fact or documents in the record. Moreover, they all are based on a false premise – that Buyer is not entitled to a post-closing adjustment to record a liability for accrued sales tax unless it can exactly quantify that liability. There is no such requirement. Buyer has demonstrated that there should be a post-closing adjustment to record a liability for accrued sales tax based on an estimate prepared by reputed sales tax professionals, in good faith and based upon an accepted methodology; a methodology that, as discussed in more detail below, is consistent with the methodologies used by the overwhelming majority of states to conduct audits and assessments.

Having set up its "straw man," Seller attempts to knock it down with picayune arguments regarding isolated aspects of Buyer's estimate. However, these arguments, even assuming that they had any merit or were even relevant to the ultimate issue, do not eliminate or even substantially reduce the amount of the post-closing adjustment for sales tax liabilities. For example, Seller's assertion that Buyer improperly included exempt delivery charges in the taxable sales amounts for purposes of calculating the error ratios upon which the estimate of liability is based, results in a $144 reduction in total sales tax liability. In another example, Seller's assertion that Buyer failed to give credit for taxes paid in connection with an audit by the state of Mississippi would result in a $3,271 reduction in total sales tax liability. Seller's remaining arguments are full of bluster and hyperbole but devoid of substance.

Finally, in light of Seller's focus on the "trees," it is important to keep the "forest" in sight. Ultimately, Seller's argument is that although, during the period 2004 to 2006 the Company had more than *$300 million* in sales, in more than 42 states, and only registered and remitted tax in 12 states, it nevertheless has $0 outstanding sales tax liability in each of those 42 (or more) states. This proposition is untenable on its face.

The fallacy of Seller's position is even more starkly illustrated by comparing the total sales vs. taxes paid by the Company's Georgia location in 2002 – *before the Seller purchased the Company* – and the total sales vs. taxes paid by the Company's Georgia location in 2006. In 2002, the Georgia location paid $1.32 million in sales tax on $44 million in sales. In 2006, under Seller's management, the Georgia location paid $522,561 in sales tax on $48 million in sales (*see* Exhibit 51). In other words, in 2006 the Georgia location paid almost *60% less in taxes* than it paid in 2002, on sales that were approximately 9% higher than they were in 2002. In this light, Seller's contention that the Company has no outstanding sales tax liability cannot be taken seriously.

## BUYER'S RESPONSES TO SELLER'S PURPORTED RESPONSES TO PWC'S QUESTIONS

### Sales Tax Accrual

### PwC Request #1:[1]

Seller contends that Buyer erroneously "assumed nexus in any state from the moment Seller started making sales into it" and states that "the fact that Seller made sales into a state does not, without more, establish nexus." Seller's Responses at 1-2. Buyer made no such assumption. Buyer agrees that sales into a state, alone, are not sufficient to create nexus. As Seller correctly points out, "nexus is established in a state only at such time as Seller was

---

[1] Although there is a discrepancy in the terminology employed by Buyer and Seller, respectively, the parties agree on the filing and registration dates of the various Company locations. Included as Exhibit 52 is a table that summarizes the registration and filing dates from Buyer's previous Exhibits 17, 19, 20, 21, 22 and 23

installing property there or had more than *de minimus* sales solicitation or physical presence there."[2]  *Id.*

In accordance with this formulation of nexus, Buyer has demonstrated that the Company had nexus in every state where a sales tax liability exists during the period 2003 to 2007. Exhibit 40 demonstrates that installations were performed by the following Company locations, in the following years, in the following states:

**Georgia Location 2004:**  Arkansas, California, Florida, Georgia, Iowa, Illinois, Kentucky, Minnesota, Missouri, Ohio and Pennsylvania.

**Georgia Location 2005:**  Alabama, Connecticut, Florida, Georgia, Illinois, Maine, Mississippi, Nebraska, Ohio, Pennsylvania, Texas and Virginia.

**Georgia Location 2006:**  Alabama, Florida, Georgia, Indiana, Louisiana, Maine, Mississippi, Nebraska, Ohio, Pennsylvania, Tennessee, Texas and Wisconsin.

**Georgia Location 2007:**  Georgia, Indiana, Mississippi and Virginia.

**Ohio Location 2004:**  California, Connecticut and Georgia.

**Ohio Location 2005:**  Connecticut

**Ohio Location 2006:**  Georgia, Virginia and Wisconsin

**Texas Location 2004:**  Alabama, Arkansas, Colorado, Connecticut, Illinois, Indiana, Kansas, Kentucky, Louisiana, Massachusetts, Missouri, Mississippi, Nebraska, Nevada, Oklahoma, Texas and Wisconsin.

---

[2] In both *Quill Corp. v. North Dakota* and *National Bellas Hess, Inc. v. Department of Revenue of Illinois* the Supreme Court held that an out-of-state taxpayer is protected under the Commerce Clause only when their communication with customers is limited to that which is facilitated by either the U.S. Postal Service or common carrier.  In both cases, a physical presence within a jurisdiction was held to be sufficient to create nexus.  In *Geographic Society v. California Board of Equalization* and *D.H. Holmes Co. v. MacNamara,* the Supreme Court held that the physical presence within a jurisdiction does not have to be directly related to the activity being taxed.

**Texas Location 2005:**  Arkansas, California, Illinois, Kentucky, Michigan, Missouri, Mississippi, Nebraska, Nevada, New York, Ohio, Oklahoma, Texas, Washington and West Virginia.

**Texas Location 2006:**  California, Georgia, Iowa, Illinois, Kansas, Michigan, New Mexico, New Jersey, Nevada, Oklahoma, Texas, Washington, West Virginia and Wyoming.

**Texas Location 2007:**  California, Virginia and Wyoming.

Appendix M consists of a compilation of expense reports from Company salesman which demonstrates that from 2004 through 2007, Company salesman visited, on multiple occasions, each state where Buyer asserts that a sales tax liability exists.[3]  A chart summarizing the number of visits to each state by year is also provided with Appendix M.  Based on Exhibit 40 and Appendix M, it is beyond dispute that the Company had nexus in each state where Buyer asserts  that a sales tax liability exists, during each year of the assessment period.[4]

**PwC Request #2:**

Seller contends that Buyer did not take into account the fact that, in states where liability has been asserted and sales/use tax returns have been filed, liability cannot be assessed beyond the statute of limitations period.  Seller's Responses at 2.  Seller is wrong.  As indicated in Buyer's Reponses to PwC's Questions and Document Requests ("Buyers Responses") # 2, the

---

[3] Although, in 2002 each location had its own sales force, in 2003 the sales force began to be consolidated into a single sales force such that all salesman from each location could and did cross-sell on behalf of the other locations in any state.  Attached as Exhibit 53 are a letter from the Company Controller describing the restructuring of the sales force that took place in 2003 and supporting detail for journal entries which reflect that salespeople, who were technically employed by one Company location, were paid commissions through inter-company transfers, in connection with sales made by them on behalf of other Company locations.

[4] Of course, Seller, having owned the Company for almost the entire assessment period is no doubt well aware that Company salesman from each location regularly visited each of the states in question and, in this light, its attempt to imply that nexus did not exist suggests that its arguments deserve to be assessed with a high degree of skepticism.

4

assessment period used by Buyer to estimate sales tax liability was coextensive with the limitations period in each state where there is a liability.

To the extent that the statute of limitations period is a moving target, as time moves forward, that would affect the Company's liability in only those states where it has filed returns and only to the extent of approximately $142,556, because, as seller admits in Exhibit 64, "[g]enerally, there is no limitation period for assessment where no return was filed."[5]    In addition, eleven (11) jurisdictions (Alabama, Arizona, Arkansas, Florida, Maine, Minnesota, New Mexico, North Dakota, South Carolina, Texas and Vermont) provide for expanded limitations periods for assessments when a registered and filing taxpayer understates taxes due by a significant amount.[6]

**PwC Request #3:**

According to Seller, "Buyer offers no proof for its contention that the Company had a nexus, and therefore should have been filing, in Alabama, Illinois, Louisiana, Massachusetts, Nebraska and Wisconsin any earlier than it did." Seller's Responses at 2. Again, Seller is wrong. As discussed in response to PwC Request #1, Exhibit 40 and Appendix M

---

[5] The Georgia location filed tax returns in Alabama, Illinois, Louisiana, Massachusetts, Nebraska, Wisconsin Pennsylvania, Texas, North Carolina and Georgia. The Texas location filed tax returns in Texas and the Ohio location filed tax returns in Ohio. The quantification of the purported reduction in liability is based upon the omission of liability for 2004 for those states with a three year statute of limitations and the omission of liability for 2003 for those states with a four year statute of limitations (Ohio and Wisconsin). In any event, no reduction on this basis should be made. As indicated, Buyer has likely significantly understated liability by assuming that the assessment periods in multiple other jurisdictions would be coextensive with the statute of limitations; because Buyer will not be eligible for VDAs in those jurisdictions, the assessment period is likely to be much longer. Moreover, in another attempt to be conservative, Buyer removed almost $250K of professional fees that will be associated with the anticipated VDA filings from the estimate.

[6] Prior to October 2002, the Georgia location filed sales and use tax returns in thirty two (32) states. For no apparent reason, Seller decided to discontinue filing in most of those jurisdictions. Thus, the Georgia location could be found negligent for failing to file sales and use tax returns in those thirty two (32) states, as well as numerous local jurisdictions where it historically filed taxes. A detailed listing of the jurisdictions where the Georgia location has previously filed is included as Buyer's Exhibit 54.

definitively establish that the Company had nexus in each of these jurisdictions, as well as in every other jurisdiction where liability is asserted.

Seller also notes that Exhibits 17-23 do not demonstrate that the Company had taxable activities in Alabama, Illinois, Louisiana, Massachusetts, Nebraska and Wisconsin "before their respective filing periods began." Seller's Responses at 2-3. Seller is correct that Buyer mistakenly referenced Exhibits 17-23. However, there were taxable sales in those six states before their respective filing periods began. As demonstrated in Exhibit 55, which is a compilation of information set forth in Exhibit 34, sales were made in each of those states, from each Company location, at least since 2004 and, in the case of Wisconsin, since 2003.

**PwC Request #4:**

Seller complains that Buyer's arguments "obscure the question of whether or not its analysis credits the Company for taxes paid to Mississippi pursuant to its 2004 audit by the state ...." Seller's Responses at 4. As detailed in Exhibit 30, Mississippi's audit of the Texas location covered a period of April 1, 2001 through December 31, 2004. The assessment for 2004 totaled $29,243 (Exhibit 30). However, Buyer's estimate of sales tax (including penalties and interest) owed by the Texas location in Mississippi for 2004 is only $3,271 (*see* Exhibit 34). Accordingly, because (in keeping with Crowe's conservative methodology) the amount of the taxes actually assessed by the state of Mississippi and paid by the Company vastly exceeds Crowe's comparatively conservative estimate of the amount of sales taxes owed to Mississippi for that same period (by more than $25,000), giving credit for taxes paid in connection with the Mississippi audit would reduce Buyer's estimate by only $3,271.[7]

---

[7] Seller's contentions regarding the Company's audit risk are entirely irrelevant to the subject matter of the question posed by PwC and to the entire subject matter of the Company's liability for sales tax. Even if FAS 5 were applicable under the circumstances and, as discussed infra, it is not, audit risk would not be the measure of whether or not the so-called "loss contingency" is probable. Rather, the test would be the probability that the state taxing authorities would accept Seller's bogus arguments as to why no tax is owed on the sale of taxable property to non-exempt customers in states where the Company has nexus.

**PwC Request #5:**

Seller asserts that Buyer has erroneously "included service charges – such as for installation and/or delivery – in Buyer's claimed taxable sales amounts in calculation of error ratios." Seller's Responses at 5. This is not correct. Buyer has allowed credit for exempt installation and delivery charges where such charges are exempt by law (*see* Exhibits 39 and 41). However, in connection with the review undertaken to confirm this fact, Crowe discovered a single instance where a freight charge was not treated as exempt and has corrected this error. This correction reduced the Georgia location's error ratio in California by .05%, which resulted in a net reduction in total sales tax liability of $140.08.

**PwC Request #6:**

Seller claims that Buyer made revisions to the estimate of liability in a "secretive" or "undisclosed" manner.[8] Buyer has made no attempt to shield its analysis from scrutiny. Indeed, before this proceeding even commenced Buyer produced to Seller all of the sales detail from its initial estimate of liability, and thereafter, from its revised estimate (Exhibit 41). This detail reflects the tax treatment afforded to every sale made from each Company location during 2006 in both the initial and revised estimates.

Seller argues that although Buyer made revisions to the initial estimate that reduced the total liability, "Buyer apparently used [an] undisclosed method to re-inflate" the amount of the liability by increasing the error ratios for sales from the Georgia location to Arkansas, Nebraska and Ohio. Seller's Responses at 6. Buyer made no use of any undisclosed method. Rather, Buyer made revisions to conform the estimate to the facts, as they developed.

Specifically, in connection with the initial analysis Crowe assumed that all sales to Wal-Mart from the Georgia location were self-assessed and therefore not taxable. However, Crowe subsequently obtained the tax returns filed by the Georgia location which revealed that

---

[8] Indeed, many of the so-called "secretive" revisions about which Seller now complains, were made *in response to criticisms raised by Seller* and reduced the overall estimate of sales tax liability.

7

Wal-Mart did not always self assess but, rather, on various occasions the Georgia location registered and collected tax from Wal-Mart in the states where it made sales to, and performed installations for, Wal-Mart (*see* Exhibits 17, 20).[9] Thus, rather than assuming that all sales to Wal-Mart were not taxable, in the revised analysis Crowe treated all sales to Wal-Mart as taxable, but gave credit, based on the tax returns, for taxes paid and for taxes self-assessed by Wal-Mart where there was evidence of self-assessment.

In any event, even if, contrary to the evidence in the record, Seller is correct that Wal-Mart self assessed in connection with every sale by the Georgia location, that would result in only a $106,498.82 reduction in total sales tax liability (*see* Exhibit 56 which reflects the reversal on the Georgia sales detail of the treatment of sales to Wal-Mart and the dollar impact thereof).

**PwC Request #8:**

Seller suggests that Buyer should have considered the extent to which the Company is eligible for Streamlined Sales Tax (SST) amnesties. Seller erroneously implies that Buyer's estimate of liability should be reduced to account for the event that some portion of the liability could be excused in connection with an amnesty. First, there are only nine states in which amnesty will be available in 2008 (in Rhode Island and Vermont the amnesty period expires on December 31, 2007). Second, the Company does not have any liability or has *de minimus* liability in various of those states and/or is not eligible for amnesty in various of those states where it does have liability, either because it has previously registered there or it already has been audited by that state.

Third, seeking amnesty, even to the minimal extent that it is available, would do more harm than good. Once a company applies for amnesty in any SST state, that company

---

[9] In particular, the "one-time sale to 'Wal-Mart Logistics Engine'" noted by Seller was a sale only – in other words, no installation was performed and, accordingly, the Georgia location apparently did not register and collect sales tax from Wal-Mart in connection with this sale.

must register to collect sales tax in all twenty-two SST states, even if amnesty is no longer available in those states (*see* Exhibit 57). Once the Company registers in those twenty-two states it will no longer be eligible for a VDA in those states, thus opening itself up to unlimited assessment periods in each. In addition, registration requires disclosure of past activity in each SST state, which essentially invites an audit by all twenty-two SST states. Accordingly, seeking SST amnesty would likely increase the Company's liability.

**PwC Request #11:**

In response to Seller's contention that Buyer should be able to back-bill customers for sales tax, Buyer cited a Connecticut sales tax statute as an example of certain state statutes that prohibit sellers from attempting to collect sales taxes from customers where the taxes have already been paid on behalf of the customer by the seller. Seller now contends that the Connecticut statute cited by buyer actually provides to the contrary – that sellers *can* collect such sales taxes from customers. Seller, however, has misconstrued the plain language of the statute.

The section Buyer cited and those sections it incorporates by reference specifically provide that sales taxes can be recovered only when the tax was "*so added to the original sales price*, and shall be recoverable at law in the same manner as other debts except as provided in section 12-432a." The referenced Section 12-432a provides:

> No retailer, as defined in subdivision (g) of subsection (12) of section 12-407, who fails to comply with the provisions of this chapter shall maintain any action in law or equity in this state on any sale or transaction included under said subdivision (g) of subsection (12).

A "retailer" is defined in 12-407a(12)(g), as follows:

> every person making retail sales from outside this state to a destination within this state and not maintaining a place of business in this state who engages in regular or systematic solicitation of sales of tangible personal property in this state,

In sum, the statute provides that if a retailer has no place of business inside the State of Connecticut and fails to include sales tax on the original invoice, the retailer cannot recover those taxes from its customer. The Company does not have a place of business within the State of Connecticut. The Company did not charge or collect the tax from its Connecticut customers on the original invoices and, accordingly, the Company would not be allowed under Connecticut law to commence an action to collect taxes from its customers.

Seller also asserts that in connection with its back-billing efforts, the Company will be "recouping approximately $50-$60,000." Seller's Responses at 10. This statement is incorrect. The Company negotiated a recovery of sales tax from one customer for $21,000 (after payment of attorneys' fees). Seller erroneously suggests that Buyer is at fault for not yet having successfully collected the remaining $60,000 that was paid by the Company in connection with an audit by Mississippi. This was no fault of Buyer. The State of Mississippi executed a final assessment on Company on September 23, 2005. Notwithstanding that the Seller owned the Company for eighteen (18) months thereafter, it was unable to collect the $60,000.

Indeed, Seller did not even generate any invoices to its customers for these taxes paid under audit. Rather, Seller booked a miscellaneous receivable for the tax assessed rather than book that amount through the Company's standard customer receivable processes – obviously, because the Seller did not expect to recover the tax dollars from the customers. Seller's Exhibit 63, demonstrates that Seller did not, in fact, book the remaining $59,815.82 in tax as an aged receivable for the Texas location at any time in the year 2005. It was not until June of 2006, nine months after the final assessment, that the Company credit manager, Richard Meyer, first contacted these customers to attempt to recover the taxes (see Exhibit 58). With the limited exception of Merchants Food, Mr. Meyer's attempts were completely unsuccessful.

Seller also references an undocumented assessment by the State of Louisiana (Exhibit 59) which the Texas location was able to significantly reduce from the $225,000 initial

10

assessment to $4,000, by contacting customers to obtain exemption certificates, no-nexus letters and confirmations of self-assessment.  Seller's Responses at 10.  Seller suggests that this demonstrates that Buyer's estimate is overstated and could similarly be reduced.  Rather than demonstrating that Buyer's estimate is overstated, this demonstrates that Buyer's estimate is accurate.  Buyer has done in all states exactly what the Company did in connection with the Louisiana assessment – it contacted customers seeking exemption certificates and, on that basis, was able to reduce the estimated liability.

Moreover, the facts of this assessment demonstrate just how conservative Buyer's estimate actually is.  A comparison of the total sales by the Texas location in the state of Louisiana to the amount of tax finally assessed in connection with the audit reveals that, according to the State of Louisiana, the combined error ratio for sales by the Texas location to Louisiana in 2004 and 2005 was approximately 3%.  Again, in stark contrast to Seller's contention that Buyer's estimate overstates liability, Buyer calculated an error ratio of 0% in connection with its estimate of sales tax liability of the Texas location in Louisiana in 2004 and 2005.  Second, unlike in Buyer's estimate, the Louisiana taxing authority did not exempt several of the distributor purchases in the assessment.  Pursuant to Louisiana code §4311, the Louisiana Department of Revenue refused to accept general exemption certificates and, therefore, sales to distributors in Louisiana who did not provide exemption certificates specifically issued by the Louisiana Department of Revenue, did not qualify as exempt transactions (*see* Exhibit 59). Those distributors, listed on page 9 of Exhibit 59, include Siggins, Material Storage Systems, Parts Warehouse and Clarklift of Orlando.  However, as reflected on pages 13-14, 32-34 of the Buyer's sales detail for the Texas location (Exhibit 41, 2006 Sample Detail, Texas Location, Book 3 of 3), unlike the auditors for the State of Louisiana, Buyer treated sales to these distributors as exempt.

11

The assessment from Louisiana also included a tax deficiency of $2,977.37. Seller has argued that an amount this small would be immaterial and should not be included in the liability calculation. Notably, however, Louisiana did not forgive Company on this small deficiency. Finally, as evidence that the Company will be charged interest, approximately 27% of the Louisiana assessment total comprised interest on the unpaid taxes.

**PwC Request #3(a) To Seller:**

Seller contends that "Buyer has erroneously assumed liability with respect to sales to Wal-Mart," because "Wal-Mart represents that it self-assesses use tax." Seller's Reponses at 13. Wal-Mart's purported and undocumented representations are contradicted by Exhibits 17 and 20 (Company tax returns), which reflect that Wal-Mart in this case did not self-assess, rather the Company collected and remitted use tax in connection with these sales to Wal-Mart.

**PwC Request #3(b) To Seller:**

In response to the Firm's question whether Seller performed a statistical sample to estimate sales tax liability, Seller contends that "Buyer has refused to make available the information required to undertake such an analysis." Seller's Responses at 13. That is entirely false. First, after exchange of the Draft Computation and the Objection Notice, Buyer allowed Seller's representatives to come on site and review all of Crowe's electronic workpapers that formed the basis for its liability estimate.[10] Crowe even provided Seller with electronic copies of all such workpapers. In that connection, Seller's representatives made multiple requests for information. With the limited exception of the Company's master customer list, *Buyer provided all of the information that was requested.* Exhibit 60 contains the information requests from Seller's representatives to Buyer's representatives and the corresponding reply providing such information. Indeed, all of the exemption certificates submitted by Buyer as Exhibit 40 as well

_____

[10] Notably, it was not until July 4, 2007, approximately forty days after service and only *five days before the deadline for service of the Objection Notice*, that Seller first requested any documents in connection with the sales tax issue. Exhibit 60 (page 1).

as multiple invoices requested by Seller were previously provided to Seller's representatives. As demonstrated by Exhibit 60, Seller's representatives never requested the type of information necessary to perform a statistical sample.

Second, after counsel became involved, counsel for Seller sent information requests to counsel for Buyer. ***Buyer again provided all information that was requested***. Exhibit 61 contains the information requests made by Seller's counsel to Buyer's counsel and the corresponding reply from Buyer's counsel providing such information. Again, as demonstrated by Exhibit 61, although Seller's counsel requested specific invoices, Seller never requested sufficient information to conduct a statistical sample. Seller's claim that it has been denied information is frivolous.[11]

Also in response to the question of whether Seller performed a statistical sample, Seller took the opportunity to launch into a six page critique of Buyer's methodology and the expert report of Dr. Will Yancey. According to Seller, "Buyer's use of block sampling leads to unreliable results and cannot support an assessment of liability that is 'probable' and reasonable 'estimable.'" Seller's Responses at 13. This argument is based on the erroneous assumption that FAS 5 determines whether or not the Company should have recorded a liability for sales tax. As discussed *infra*, FAS 5 governs "loss contingencies" not "liabilities," and has no application to sales tax liabilities arising out of sales that have already occurred where tax liability is established.

---

[11] Indeed, Seller's hyperbolic assertion that "[a] very serious red flag of which the Firm should take cognizance is that Buyer has blocked Seller from obtaining the necessary documentation ...." has no merit. Seller's Responses at 17. Seller is referring to the fact that Buyer refused to allow Seller to approach Buyer's customers to request information. While Seller casts this as part of a nefarious scheme to hamstring Seller in this proceeding, it was nothing of the sort. It goes without saying that no sensible business owner would allow a third-party to contact its customers to request information when that third party has no continuing interest in the business and every interest in harassing those customers to provide information that the customer may or may not have. In any event the Buyer successfully contacted multiple customers to request and obtain exemption certificates.

Moreover, even if, as Seller contends, statistical sampling is "superior to block sampling," (even assuming that Crowe's methodology could properly be described as block sampling), that does not lead to the conclusion that the Company has no liability for sales tax and that the estimate prepared by Crowe is not sufficient for the purposes of recording that liability. As Dr. Yancey has opined, "Crowe Chizek's method was reasonable and consistent with accepted practices for the purpose of estimating sales tax liability" (Yancey Report at 3), an opinion that is not contradicted by Seller's expert, Mr. Davis. Indeed, as pointed out by Dr. Yancey, the methodology used by Crowe is more accurate than the methodology typically used by state sales tax auditors. *Id.* Notably, Mr. Davis does not opine that if and when the Company is audited by state taxing authorities, those authorities will conduct a statistical sample to determine the assessment amount. Rather, those authorities are more likely to use non-statistical sampling.[12]   In fact, according to a survey of state taxing authorities contained in the CCH publication "Multistate Sale and Use Tax Audits," of the 45 states (with a sales tax) that use some form of sampling in connection with audits, 88% (40 states) use non-statistical sampling in connection with audits and assessments, while 46% (21 states) do not use statistical sampling, at all. Exhibit 62.

Indeed, the facts prove that, in "apples to apples" comparisons, Buyer's estimates are routinely lower than the amounts that state taxing authorities have actually assessed against the Company. For example, as discussed above, whereas Mississippi assessed the Texas location for $29,243 in connection with 2004 sales (Exhibit 30), Buyer estimated the same tax liability at only $2,138.92 ($3,271.67, including penalties and interest) (*see* Exhibit 34).   Also, based on Louisiana's assessment of the Texas location in connection with 2005 and 2005 sales, the state found a 3% error ratio.  Buyer found a 0% error ratio.

---

[12] *See* Davis, Daniel M., *Multistate Sales and Use Tax Audits*, Aspen Publishers Multistate Taxation Library, 2007.

14

Seller next criticizes Dr. Yancey's description of Crowe's methodology – the use of 2006 sales to calculate an error ratio to apply to prior years – as "projecting from the readily available onto the unavailable." Seller asserts that this description is inaccurate because "Buyer admits that the Company's records for 2004, 2005, and first quarter 2007 were [also] 'readily available.'" Seller's Responses at 16. Again, Seller is wrong. The only information readily available to Buyer for 2004 and 2005 was the sales totals from each location by state. The line item sales detail for 2004 and 2005, which would be necessary to conduct a statistical sample, was not readily available.

Seller's further contention that "Buyer's examination bias is evidenced in its tendency to interpret sampling outcomes so that they would lead to an increase overall of Seller's sales tax liability," and that Buyer's approach "was clearly results-oriented," crosses the line from advocacy into fiction. Seller's Reponses at 15. The undisputed and indisputable facts make clear that Buyer took a very conservative approach that, if anything, lead to a decrease overall of Seller's sales tax liability. Specifically:

- Buyer based its estimate in each state on an assessment period that is co-extensive with the VDA look-back period even though it is very likely that the Company will not be eligible for VDAs in various states and will be subject to a significantly longer assessment period;

- Buyer treated **millions of dollars** in sales to distributors as exempt even though the Company had no exemption certificates on file or had invalid exemption certificates on file for those distributors;

- Buyer specifically sought out exemption certificates from customers in an effort to reduce the amount of taxable sales;

- Buyer continuously reduced its estimate in light of factors noted by Seller;

Finally, it is true that, as Seller asserts, "Buyer is operating under new rules with respect to exemption certificates that it does possess," (Seller's Reponses at 18) according to which, Buyer is requiring exemption certificates issued to its predecessors (with different names) to be reissued in the Buyer's current name – rules that are necessary to bring the Company into

15

compliance with applicable sales tax law.  However, these "new rules" are not being "applied retroactively to manufacture liability on the part of Seller." *Id.*  In other words, Buyer did not treat exemption certificates issued to predecessor entities as invalid.  Indeed, a review of Exhibit 40 – all of the exemption certificates used by Crowe in its analysis – reveals that there are multiple exemption certificates issued to predecessor entities that Crowe accepted as valid.  For example, Exhibit 40, "Exemption Certifications, Alphabetical, Georgia Location, Book 1 of 3," contains numerous exemption certificates issued to "Auto-Lok, Inc."[13]

## BUYER'S RESPONSES TO CERTAIN MISCELLANEOUS ARGUMENTS

### The BDO Report

In its initial Statement of Position ("SOP"), Buyer noted that an independent sales tax analysis prepared by BDO Seidman, at the request of Seller, estimated sales tax liability of the Company to "range from $271,356 to $11,716,750, including interest but exclusive of potential penalties."  Buyer's SOP at § II(b)(i).  Seller claims that Buyer has mischaracterized of BDO's conclusion because BDO's $11,716,750 estimate was a "worst case scenario," that BDO said "overstated potential liability," and "once BDO factored in the 'more realistic assumptions,'

---

[13] The alleged "serious problems with Buyer's calculations related to high-dollar customers" (which Seller also discusses in response to the Firm's question of whether Seller conducted a statistical sample (Seller's Responses at 17)), do not exist.  The undisputed fact is that for each of the "high-dollar customers" identified by Seller (Wilson Sporting Goods, Scott Equipment Co., Sun Trust Leasing and Jetro Cash and Carry), there is no documentary evidence whatsoever supporting Seller's contentions that these sales were either exempt or that the customers self-assessed.  *Id.*  Moreover, it is Seller who appears to have "serious problems" in connection with its analysis of these sales.  For example, the assertion that the sale to Jetro should be treated as exempt because "on the face of the invoice, it appears that Jetro purchased [the] Company's product for the purposes of reselling it to another entity – to whose location it was shipped" (*Id.* at 18) is not true.  A simple Google search revealed that Restaurant Depot, the entity to which the product was shipped and the entity to which Jetro "purportedly" resold the product, *is a division of Jetro*.  Clearly, Jetro purchased the product on behalf of its division and not for the purposes of reselling it.  Seller also asserts that "Buyer conceded that Mr. Davis was correct and Crowe was wrong," about the treatment of certain invoices to Iron Mountain.  *Id.* Although this is true, the result of Mr. Davis being "correct" about the Iron Mountain invoices was to cause a net increase of over $100,000 in total liability (*see* Buyer's Reply at 20).  Accordingly, the fact that Mr. Davis was "correct," about this issue does not suggest that the total liability should be reduced based on his opinions.

it concluded that under 'reasonable scenarios,' tax exposure would range from $236,385 to $384,335." Seller's Reply at 15.

However, because those "more realistic assumptions," underlying the "reasonable scenarios" have been tested and proven to be largely incorrect, and certain of the assumptions underlying the "worst case scenarios" have been tested and proven to be largely correct, Buyer's recitation of the BDO Report's conclusions was accurate and, under the circumstances here, those conclusions provide compelling support for Buyer's position.

Although BDO did assert that its "worst case scenarios," "overstated potential liability," that was because BDO incorrectly assumed that its assumptions underlying those scenarios were wrong or did not review sufficient information to inform those assumptions. For example, while BDO made "a worst case assumption ... that sales personnel created nexus for Inca Metal and Clymer in all states that each company made sales," it also "recognized that in some states nexus may not exist" BDO Report (Appendix D) at 3. Accordingly, BDO assumed that if it had analyzed the Company's nexus on a state by state basis – which it explicitly did not do – it would have determined that the Company did not have nexus in certain states and, accordingly, there would be no sales tax liability in certain states. BDO Report at 2 ("[t]here was not a detailed analysis of salesman activity available by state and by year. Thus, there may be states in which installations services and sales solicitations were not present").

However, as demonstrated by Appendix M, a state by state analysis of nexus reveals that BDO's "worst case scenarios" correctly posited that nexus existed in every state where the Company made sales. Indeed, the Company irrefutably had nexus in all states where Buyer asserts a sales tax liability for each of 2004, 2005 and 2006. Accordingly, Seller's contention that the "worst case scenarios" in the BDO Report are not reasonable because those scenarios overestimate the number of states in which the Company had nexus and, therefore, sales tax liability, is demonstrably incorrect.

17

Next, BDO based the "worst case scenarios," for Texas and Ohio on the premise that it "fail[ed] to recognize exempt sales other than sales to Wal-Mart," and "instances in which exemptions would be applicable," even though it "recognized that ... exemptions would be applicable for many sales, for example sales to distributors." BDO Report at 13, 15, 2. Thus, BDO assumed that no sales other than those to Wal-Mart were exempt, but BDO expected that if it had reviewed exemption certificates it would have determined that many sales in addition to those made to Wal-Mart would be exempt.

However, while BDO was not correct that only sales to Wal-Mart were exempt, BDO, in contrast to Crowe, did not perform an exhaustive review of the exemption certificates on file with the Company. Crowe's review of those invoices proves that multiple sales which Seller and BDO assumed would likely be exempt, in fact were not exempt because they were not supported by exemption certificates. Crowe's decision to treat such sales as non-exempt is consistent with Seller's understanding which, according to the BDO Report, is that "if properly executed exemption certificates are not obtained, then ... sales to distributors and large end users would be subject to tax." BDO Report at 12.

In contrast, BDO's assumptions underlying the so-called "reasonable scenarios," which Seller claims represent BDO's "true" estimate of accrued sales tax liability, have been proven to be incorrect. For example, for the "reasonable scenarios," BDO assumed that "Inca Metal complied with Texas sales tax reporting rules and obtained properly executed exemptions certificates for sales to distributors and select end users," and that "Clymer complied with Ohio sales tax rules and obtained properly executed exemption certificates for sales to distributors and select end users." BDO Report at 14, 16. According to Crowe's analysis of invoices for 2006 as compared to exemption certificates,[14] neither Inca nor Clymer fully complied with sales tax

---

[14] Or other documents evidencing that no tax was owed in respect of a particular sale, *e.g.*, that a customer self-assessed or that the Company had collected and remitted sales or use tax in respect of the sale.

reporting rules in Texas and Ohio, respectively. Indeed, in 2006 Inca underpaid sales tax in Texas by over $99,000 and Clymer underpaid sales tax in Ohio by over $17,000. Moreover, neither the Texas nor Ohio location obtained properly executed exemption certificates for sales to distributors and select end users. For example, the Company had no exemption certificates or improperly executed exemption certificates on file for multiple customers that management identified as distributors (*see, e.g.,* Exhibit 59: including schedule prepared by Louisiana auditor listing sales to "distributors" for which the Texas location had no exemption certificates).

Finally, the BDO Report only estimated liability for the Texas and Ohio locations and excludes any sales tax liability associated with the Georgia location. From 2004 to 2006, the Georgia location had almost $150 million in total sales (Exhibit 34). Thus, even accepting Seller's demonstrably incorrect contention that the low range of BDO's "reasonable scenario" accurately estimates the Company's sales tax liability associated with the Texas and Ohio locations, the Company's total sales tax liability would increase significantly with the inclusion of the sales tax liability associated with the Georgia location.

In this light, Seller's contention that "by relying ... upon the BDO Document, Buyer is effectively conceding that its own estimate of the sales tax liability is radically wrong," is nonsense. To the contrary, the fact that Buyer's estimate of sales tax liability, based on facts not available to BDO, falls between the low range of BDO's "worst case scenarios" and the high range of BDO's "reasonable scenarios" demonstrates that Buyer's estimate is not inconsistent with BDO's.

In sum, Buyer concurs with Seller that the Firm "should read the BDO Document." And, in addition to "taking note of the limitations indicated in the document and of the conclusions actually reached, subject to those limitations," the Firm should take note of the assumptions on which BDO's "worst case" and "reasonable" scenarios were based and of the subsequently revealed irrefutable facts that now inform those assumptions. Buyer is confident

that, in this light, the Firm will recognize that the BDO Report's conclusions provide further support for the fact that the Company has substantial existing liability for sales tax.

**The Applicability Of FASB 5**

Seller continues to fundamentally misconstrue the applicability of FAS 5 by confusing the concept of "loss contingencies" with the separate concept of "liabilities" and erroneously assuming that FAS 5 applies to established liabilities. Although, as Paragraph 69 of FAS 5 notes, "loss contingencies" may ultimately become "liabilities," a loss contingency is not a liability and vice versa.[15]

Paragraph 1 of FAS 5 defines "loss contingency" as "an existing condition, situation, or set of circumstances involving uncertainly as to possible ... loss ... to an enterprise that will ultimately be resolved when one or more *future events* occur or fail to occur" (emphasis added). In contrast, paragraph 70 of FAS 5 provides that "liabilities are *present* responsibilities" and, as support for that proposition, cites to other literature providing that "liabilities are claims of creditors ... arising out of *past activities*," and that "a liability is the result of a transaction of *the past, not of the future*" (emphasis added). Here, the "events" that give rise to the Company's sales tax obligations are the sales that took place in the past and their existence does not depend on the occurrence of any "future events."

Seller erroneously contends that "PricewaterhouseCoopers has already adopted Seller's position that FAS 5 applies," to sales tax. Seller's Responses at 20. According to Seller this is evidenced by interpretative guidance on FIN 48 issued by PwC which states that: "**Uncertain positions** related to other types of taxes, **such as sales taxes,** value-added taxes, and property taxes, **are generally accounted for under FASB Statement No. 5, Accounting for Contingencies (FAS-5)**." *Id.* at 20-21 (emphasis in original).

---

[15] Paragraph 69 of FAS 5, cited by Seller as evidence that sales tax liabilities are covered by FAS 5, actually distinguishes between "loss contingencies" and "liabilities." Specifically, the language quoted by Seller notes that "in many cases, the accrual of a loss contingency results in the recording of a liability."

However, the fact that, in the context of a discussion regarding the relationship between FAS 5 and FIN 48, PwC indicated that FAS 5 continues to apply to *uncertain positions* with respect to sales and use tax, does not mean that PwC has "adopted" Seller's untenable position that the Company's demonstrable sales tax liabilities constitute *uncertain positions* (or loss contingencies). Indeed, PwC did not define *uncertain positions* to include known sales tax liabilities. Buyer is confident that even those with substantially less expertise than PwC would agree that the sale of taxable goods to non-exempt customers in states where the seller of those goods has nexus, does not give rise to an *uncertain [tax] position*. Rather, such sales give rise to *known sales tax liabilities* that must be recorded as such and not treated as "loss contingencies."[16]

\* \* \*

The estimates and much of the work product that has gone into Buyer's submissions in this proceeding were prepared by sales and use tax professionals at Crowe, Chizek & Co. LLP ("Crowe"), each of whom is CMI accredited. Nevertheless, Seller contends that "no one at [Crowe] was apparently eager to affirmatively and unqualifiedly opine that the number being offered by Buyer is in fact correct or reasonable or even within the realm of possibility." Seller's Reply at 5. Seller is wrong. Buyer and Crowe believed that it was obvious from Crowe's continued participation and support to Buyer in these proceedings that Crowe stood behind its work product. However, simply to put one more bogus argument to bed, attached as Exhibit 63 is a statement by Crowe confirming that it stands behind its work product and believes that the estimate of sales tax liability is reasonable; so much so that it intends to use

---

[16] For the same reasons, Seller's citation to and reliance on Deloitte's slide number 11 and the October 13, 2006 publication "Tax Positions Within The Scope of Interpretation 48," is also misplaced. Consistent with the PwC interpretive guidance discussed above, in both instances, Deloitte indicates only that "uncertainties" related to tax positions should be accounted for in accordance with FAS 5.

the same information in connection with the preparation of the tax returns to be filed in connection with the Company's VDA applications in multiple states.

# PRICEWATERHOUSECOOPERS 🏢

**PricewaterhouseCoopers LLP**
1301 K Street NW, Suite 800W
Washington DC 20005-3333
Telephone (202) 414 1000
Facsimile (202) 414 1301

February 12, 2008

**Private and Confidential**

Kingway Inca Clymer Holdings, Inc.                Unarco Material Handling, Inc.
c/o Mr. John Massaro                              c/o Mr. Paul Neal
Arnold & Porter LLP                              701 16th Avenue East
555 Twelfth Street, NW                           Springfield, TN 37172
Washington, DC 20004

**Re: Kingway Inca Clymer Holdings, Inc. and Unarco Material Handling, Inc. (the "Parties") - Post Closing Adjustment Dispute**

To the Parties:

Pursuant to our engagement letter dated October 5, 2007, we are providing the decision on the disputed items summarized in the Statements of Position submitted by the Parties as of October 23, 2007. These disputed items arose out of the Securities Purchase Agreement by and among Kingway Inca Clymer Holdings, Inc., KIC Holdings Inc., Unarco Material Handling, Inc., and American Capital Strategies, Ltd. dated as of March 9, 2007.

**Definition of Terms**

References to the Parties and the underlying transaction between the Parties will be made in the following manner:

- Kingway Inca Clymer Holdings, Inc. shall be referred to as the "Seller."
- Unarco Material Handling, Inc. shall be referred to as the "Buyer."
- Seller and Buyer shall be referred to collectively as the "Parties."
- The Securities Purchase Agreement by and among Kingway Inca Clymer Holdings, Inc., KIC Holdings Inc., Unarco Material Handling, Inc., and American Capital Strategies, Ltd. dated as of March 9, 2007 shall be referred to as the "Agreement."
- Capitalized terms not otherwise defined shall have the meaning set forth in the Agreement.

Our Services were performed and the decision was developed in accordance with our engagement letter dated October 5, 2007, subject to the terms and conditions included therein, and with Standards for Consulting Services established by the American Institute of Certified Public Accountants ("AICPA"). Accordingly, we are providing no attestation or other form of assurance with respect to our work, and we did not verify or audit any information provided to us.



Kingway Inca Clymer Holdings, Inc.
Unarco Material Handling, Inc.
February 12, 2008
Page 2

Our work was limited to the specific procedures and analysis described herein and was based only on the information made available through December 17, 2007. Accordingly, changes in circumstances after this date could affect the findings outlined in this Report.

This information has been prepared solely for the use and benefit of, and pursuant to a client relationship exclusively with, the Parties. PricewaterhouseCoopers LLP ("PwC") disclaims any contractual or other responsibility to others based on its use and, accordingly, this information may not be relied upon by anyone other than the Parties.

Our services did not include the provision of legal advice and PwC makes no representations regarding questions of legal interpretation.

**Summary of Decision**

The Actual Purchase Price is $2,808,691. As of October 23, 2007, the Buyer and the Seller submitted Actual Purchase Price amounts of $858,842 and $4,826,903, respectively. In accordance with Section 2.04 of the Agreement, the Buyer's calculation of the Actual Purchase Price was closest to the final calculation and therefore the Seller is responsible for reimbursing the Buyer for fees and expenses paid to PwC in connection with this matter.

The decisions made were based upon the information provided by the Parties via written submissions and our interpretations thereof. A summary narrative of the rationale supporting the decision is attached as Appendix A.

The decision has been prepared solely in connection with the Post Closing Adjustment Dispute between the Parties and is not intended for reliance in any other context.

There being no other matters to be addressed at this time, this correspondence concludes our performance in this matter. We thank you for allowing PwC to assist you in resolving this dispute.

Sincerely,

J. Christopher Forhecz
Partner

Attachment

**Kingway Inca Clymer Holdings, Inc.**
**and**
**Unarco Material Handling, Inc.**

**Appendix A**

**Decision of PwC**

**February 12, 2008**

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

Appendix A
To the Decision Letter
February 12, 2008

**Background and Context**

PricewaterhouseCoopers LLP ("PwC"), through its partner J. Christopher Forhecz, was selected by the Parties to make a decision with respect to certain unresolved differences regarding the Actual Purchase Price as calculated by the Buyer in the Draft Computation and the Seller in the Objection Notice. The Post Closing Adjustment dispute arises under Section 2.04 of the Agreement dated as of March 9, 2007.

In conducting this effort, Mr. Forhecz, working with the assistance of PwC personnel, received information on the details of this dispute from the Parties. This information included thousands of pages of material submitted by the Parties. Mr. Forhecz and his team also requested additional information from the Parties. After having considered this material, Mr. Forhecz arrived at decisions on each of the items in dispute as indicated below.

**Summary of Unresolved Differences**

The Parties submitted their Statements of Position to PwC on October 23, 2007 describing their unresolved disagreements. Pursuant to Section 2.04 of the Agreement, and having read and analyzed the Parties' submissions, a determination has been made with respect to each of the seven disputed items which the Parties were unable to resolve. These disputed items included six items which affected the calculation of Net Working Capital as detailed below.

| | |
|---|---|
| Allowance for Doubtful Accounts | $133,401 |
| Trade Show Expenses | 125,457 |
| Accrued Vacation | 343,639 |
| Petsmart Claim | 19,596 |
| WISE Installation | 28,000 |
| Accrued Sales Tax, Penalties and Interest | 3,317,608 |
| Total | $   3,967,701[1] |

**Summary of Decision**

Consistent with the issues raised by the Buyer with respect to the Allowance for Doubtful Accounts, Trade Show Expenses, Accrued Vacation, and the WISE Installation accrual, a decision has been reached in favor of the Buyer.

---

[1] Note: The sum of the disputed items is $360 less than the difference between the Parties' calculations of the Actual Purchase Price because the Seller rounded the amount of the disputed Accrued Vacation item in its October 23, 2007 submission.

This Information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

Consistent with the objection raised by the Seller with respect to the PetSmart Claim, a decision has been reached in favor of the Seller.

In addition, a liability for sales taxes and interest in the amount of $1,387,355 should be included in Accrued Expenses and Other Liabilities as of March 30, 2007.

With respect to the dispute regarding the Estimated Purchase Price, the Estimated Purchase Price has been determined to be $5,571,379.

Lastly, it has been determined that the Actual Purchase Price is $2,808,691. The following summarize our calculation of the Actual Purchase Price and information related thereto.

| | |
|---|---:|
| Net Accounts Receivable | $10,536,543 |
| Net Inventory | 5,406,822 |
| Prepaid Expenses | 377,025 |
| Total Current Assets | 16,320,390 |
| | |
| Accounts Payable | 11,814,481 |
| Accrued Expenses & Other Liabilities | 3,739,686 |
| Unearned Revenue | 109,146 |
| Total Current Liabilities | 15,663,313 |
| | |
| Actual Net Working Capital | $657,077 |

| | |
|---|---:|
| Transaction Value | $40,000,000 |
| Plus Cash Amount | 67,573 |
| Less, Indebtedness Payoff Amount | 31,773,462 |
| Less, Closing Management Bonuses | 2,242,497 |
| Less, Excess of Target Net Working Capital over Actual Net Working Capital | 3,242,923 |
| Actual Purchase Price | $2,808,691 |

## Section 2.04 - The Post-Closing Adjustment Process

Section 2.04 of the Agreement contains the framework by which PwC is to assist the Parties in resolving any remaining disagreements that the Buyer and Seller are unable to resolve after submission of the Draft Computation and the Objection Notice. Section 2.04 states in part that "The Firm may consider only those items and amounts in the Draft Computation or Objection Notice which the Buyer and Seller are unable to resolve." PwC addressed the items that were submitted by the Parties where they were not in agreement.

PwC's role is defined as that of an expert and not as an arbitrator in conducting its analysis. The Parties selected PwC, through its partner, Mr. Forhecz, as the expert in this matter. Mr. Forhecz was assisted by other personnel within PwC as stated in our engagement letter.

Section 2.04 limits the expert to assigning a value to an item in dispute to no greater than the greatest value for such item claimed by either party or no less than the smallest value for

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

such item claimed by either party. The determinations made are in compliance with this provision.

The determinations made are based solely on written submissions by the Buyer and the Seller and on the definitions included in the Agreement. An independent review was not conducted and PwC makes no representation as to the accuracy or reliability of the information presented by the Buyer and Seller.

The Actual Purchase Price was determined based on the information provided by the Parties as adjusted for resolution of the items in dispute. The Actual Purchase Price is defined in Section 2.04 as follows:

> " 'The Actual Purchase Price' means an amount equal to (A) the Transaction Value, (B) plus the Cash Amount, (C) less the Indebtedness Payoff Amount, (D) less the Closing Management Bonuses, and (E) plus the excess of the Net Working Capital Amount over the Target Net Working Capital Amount or minus the excess of the Target Net Working Capital Amount over the Net Working Capital Amount, in each case as finally determined pursuant to this Section 2.04."

Until the Actual Purchase Price is determined, the costs and expenses of PwC are to be borne equally by the Buyer and the Seller. Upon final determination of the Actual Purchase Price, any costs and expenses (including costs and expenses previously advanced) of PwC that are allocable to the party whose determination of the Actual Purchase Price (at the time of submission of the respective determinations to PwC for resolution pursuant to Section 2.04 (a) of the Agreement) was closest to final determination of the same shall be paid or reimbursed by the other party.

**General Matters**

There are several general matters that are discussed below in order to avoid repeating such discussion for each relevant objection.

*Consistency v. GAAP*

The following definition of Net Working Capital is included in Exhibit A to the Agreement.

> "For purposes of the Agreement, 'Net Working Capital' means, without duplication and subject to the exclusions set forth below, the book value of the Company's and each Subsidiary's current assets minus the book value of the Company's and each Subsidiary's current liabilities; provided that the following items shall be excluded from (i.e., assigned a value of zero) for purposes of calculating Net Working Capital:
>
> > (i) Cash, and
> >
> > (ii) Indebtedness.
>
> Net Working Capital shall be determined on a consolidated basis in accordance with the accounting principles and methods used in the preparation of the Reference Balance Sheet and GAAP."

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

Section 1.01 to the Agreement states "GAAP means United States generally accepted accounting principles, consistently applied."

Section 1.01 to the Agreement defines Reference Balance Sheet as "'Reference Balance Sheet' means the audited consolidated balance sheet of the Company and the Subsidiaries as of December 31, 2005 contained in the Audited Financial Statements."

Section 3.09 Financial Statements to the Agreement under 3.09(b) contains the following language concerning GAAP and consistency.

> "The Audited Financial Statements have been prepared in accordance with GAAP applied consistently during the periods covered thereby, and present fairly in all material respects the financial condition of the relevant entities at the dates of said statements and the results of their operations and cash flows for the periods covered thereby. The Unaudited Financial Statements have been prepared in accordance with GAAP applied consistently during the period covered thereby, and present fairly in all material respects the financial condition of the Company and the Subsidiaries at the date of such statements and the results of their operations and cash flows for the period covered thereby, except that they do not contain the materials and disclosures to be found in notes to financial statements prepared in accordance with GAAP."

The Parties agreed that the definition of GAAP under the Agreement is United States generally accepted accounting principles consistently applied. As stated above, the Reference Balance Sheet (which is the audited consolidated balance sheet as of December 31, 2005) has been prepared in accordance with GAAP consistently applied.

In situations where elements of Net Working Capital were not prepared in accordance with GAAP, Net Working Capital must be adjusted to comply with GAAP. The Agreement states that GAAP must be consistently applied to both the Reference Balance Sheet and the determination of Net Working Capital as of the Closing Date, March 30, 2007. The Agreement executed by the Parties does not state, however, that the accounting principles and procedures used in preparing the Reference Balance Sheet should be changed when determining any adjustments to Net Working Capital as of March 30, 2007. In evaluating whether any adjustments to Net Working Capital were required, we identified situations in which the treatment of an account in the computation of Net Working Capital appeared to not be in accordance with GAAP. In those situations, the required adjustment is based on a treatment for some accounts that differs from the treatment of the same accounts in the Reference Balance Sheet. While accounts that were recorded in accordance with GAAP in the Reference Balance Sheet must be recorded using the same accounting methods, policies, practices and principles in the determination of Net Working Capital, accounts that were not recorded in accordance with GAAP must be adjusted to reflect appropriate treatment under GAAP. The Parties agreed to use GAAP and GAAP has priority over consistency. Had the Parties agreed to only use the accounting principles and methods used in the preparation of the Reference Balance Sheet in the determination of Net Working Capital, they could have chosen to exclude the words "and GAAP" when agreeing to the criteria for determining Net Working Capital as of the Closing Date.

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

*Materiality*

The determination of whether the Draft Computation has been prepared in accordance with GAAP requires an evaluation of each objection along with an assessment of materiality.

FASB Statement of Financial Accounting Concepts No. 2 defines materiality as:

> "The magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or statement."

The evaluation of materiality involves consideration of both quantitative and qualitative matters.

In evaluating the Draft Computation and the Objection Notice, one of the most significant considerations is that potential misstatements are being evaluated in connection with a buy/sell agreement and that any adjustments granted result directly in a dollar for dollar adjustment to the purchase price. As a result, users of this special purpose computation could be expected to place a lower threshold on matters that may not be considered material for annual financial reporting purposes. Quantitatively, this is evidenced by the Buyer's and the Seller's objections which range from $19,596 to $3,317,608.

The determination was based on an analysis of the individual merits of each of the objections submitted by the Buyer and the Seller. We concluded that all of the objections should be addressed regardless of amount. Consequently, the Actual Purchase Price should be adjusted for the objections granted. In addition, we found no support within the Agreement that there was an agreed upon materiality test or exclusion for any possible adjustments.

*GAAP for Year End Reporting and Interim Reporting*

Interim versus year-end reporting is an issue that is often raised in buy/sell agreements. Because most companies apply more rigorous and in-depth closing procedures at year-end, the question arises as to what procedures will be used in closing the transaction when an audited year-end financial statement is used as the reference point in negotiating deal terms and the closing is at an interim date. Absent specific provisions in a buy/sell agreement, the financial information prepared at an interim date should follow the same principles and practices at year-end (also see discussion of Consistency v. GAAP above).

The period January 1, 2007 to March 30, 2007 is a discrete accounting period for purposes of this transaction. While March 30, 2007 is not a year end date for financial reporting purposes, it is the final closing date for the buy/sell transaction resulting in an exchange of ownership interests for monetary consideration.

An issue has been raised concerning the application of accounting guidance when the guidance contains specific language on non-applicability to interim financial information and refers to Accounting Principles Board Opinion 28 ("APB 28") *Interim Financial Reporting* as the appropriate guidance.

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

APB 28 paragraphs 9 and 10 provide guidance on the use of interim financial information and the relationship to annual financial information.

> "9. Interim financial information is essential to provide investors and others with timely information as to the progress of the enterprise. The usefulness of such information rests on the relationship that it has to the annual results of operations. Accordingly, the Board has concluded that each interim period should be viewed primarily as an integral part of an annual period.

> 10. In general, the results for each interim period should be based on the accounting principles and practices used by an enterprise in the preparation of the latest annual financial statements unless a change in an accounting practice or policy has been adopted in the current year (paragraphs 23-29). However, the Board has concluded that certain accounting principles and practices followed for annual reporting purposes may require modification at interim reporting dates so that the reported results for the interim period may better relate to the results of operations for the annual period. Paragraphs 12-20 set forth the modifications that are necessary or desirable at interim dates in accounting principles and practices followed for annual periods."

The additional paragraphs of ABP 28 referenced in paragraph 10 address the practical aspects of dealing with the complexities of determining and reporting interim financial information. However, the overarching principle is that the results for each interim period should be based on the accounting principles and practices used by an enterprise in the preparation of its latest annual financial statements. APB 28 provides for a reasonable basis of allocation of costs among periods. It does not provide justification for changing accounting principles and practices that are inconsistent with those used in the preparation of the annual financial statements absent a change in accounting principle during the interim period.

## Discussion of Disputed Items

*Accrued Sales Tax*

The Parties disagree over whether a liability for accrued sales tax should have been recorded as of March 30, 2007. The Buyer stated that the Company was required to file and remit sales and use taxes in accordance with state law under certain circumstances. The Seller stated that no amount of sales tax liability was probable and reasonably estimable as of the Closing Date. The Parties have submitted a substantial amount of supporting documentation and analysis on this subject, including submissions by third party professionals experienced in analyzing sales and use tax matters.

The Buyer included an entry not previously recorded by Seller for "Accrued sales tax" in the amount of $4,732,213 in the Draft Computation. This amount represented Buyer's estimate of total sales tax due for all locations for the calendar years 2004 through 2006 in the amount of $3,863,693, plus an estimate of applicable interest in the amount of $624,770 and of professional fees to be paid to its accountants to perform sales tax voluntary disclosures in the amount of $243,750.

Buyer's estimate of total sales tax due as presented in its Draft Computation was based upon several assumptions, including but not limited to the following:

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

1. The Company would perform voluntary disclosures in all states and that, accordingly, the liability period would be limited to a three-year "lookback" period and all penalties would be abated;

2. Several customers were identified as distributors of the Company's products, which were likely to qualify for a resale exemption and, regardless of whether appropriate exemption documentation had been obtained from such customers, 85 percent of all sales to the identified customers were considered exempt;

3. Sales to certain large customers, e.g., Wal-Mart, based on prior experience with those customers, were not considered to have a sales tax liability under the assumption that such customers self-assessed use tax and thereby satisfied the liability.

Buyer calculated an error rate for each location and state. The error rates were then applied to actual sales by state for each year. Buyer then applied simple interest calculations utilizing state tax interest rates obtained from readily available reference materials. Buyer revised its estimate of accrued sales tax liability to $3,317,608 in its October 23, 2007 Statement of Position.

The Seller objected to Buyer's estimated sales tax liability in its entirety and raised the following fundamental points:

1. No amount of sales tax liability was probable and reasonably estimable as of March 30, 2007 ("Closing Date") as required by FAS 5 ("Accounting for Contingencies") and as a result of management's consideration of the facts, circumstances and Company history and experience no accrual is necessary.

2. The Company has a right of subrogation (ability to "backbill") against customers for any sales tax liability ultimately determined to be due.

3. The Buyer made a number of methodological errors in calculating the accrued sales tax liability, including the following:

   • Buyer used a biased sample in its liability-projection methodology and misapplied that methodology when it failed to analyze Georgia location transactions for the first four months of 2006;

   • Buyer failed to consider all customers that are distributors and Buyer should have exempted all sales to known distributors;

   • Where it concluded transactions were taxable, Buyer failed to consider potential exemptions that could be claimed by a customer; or payment and satisfaction of the tax liability by the customer through self-assessment or audit;

   • Buyer failed to conduct a proper study of certain high-dollar customers, including resale and use tax self assessment considerations;

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

- Buyer failed to consider and give credit for sales tax paid on tax returns filed with state jurisdictions;

- Buyer improperly included immaterial sales tax liability amounts;

- Buyer erroneously disallowed certain exemption documentation;

- Buyer's reliance entirely upon the Sales Tax Nexus and Sales Tax Liability Assessment performed by BDO Seidman, LLP ("BDO") is inappropriate to determine that nexus is established in all states, and that BDO's liability range was accurate, given that the report failed to incorporate other liability-reducing factors, including some of Seller's arguments above, and the analysis was incomplete, as BDO stated.

- Buyer incorrectly assumes that the Seller would be liable for the entire "lookback" period under a voluntary disclosure given that the "lookback" period would, based upon the current date, include periods subsequent to the Closing Date;

- Buyer's adjustments to its liability calculation that occurred subsequent to the 60-day deadline for the Draft Computation are improper under the Agreement terms and/or under general sales tax and accounting principles. Such adjustments include the addition of failure to file penalties to all liability amounts and the addition of liability associated with Wal-Mart transactions previously excluded under the assumption that Wal-Mart self-assessed tax;

- Buyer failed to consider the amnesty relief available in several states under the Streamlined Sales Tax program;

- Buyer erred in applying a 100 percent error rate to pre- and post- 2006 years' sales for states where there were no sales in 2006 and Buyer was, consequently, unable to compute an error rate through its chosen sampling procedures; and

- Buyer failed to give credit for tax paid by the Georgia location and the Texas location during Mississippi audits where the audit period ran through 2004.

PwC considered the material that was presented by the Parties and their respective points of view on the matters noted above.

Where sales tax has been collected from customers in trust for a state and not remitted, it is clear that the tax amount due constitutes a liability under GAAP. It is less clear that there is a liability when there is a question of whether sales tax is imposed upon a particular type of transaction (e.g., certain service transactions) or whether a transaction actually qualifies for the claimed exemption. These types of transactions may be appropriately classified as "uncertainties" under FAS 5 depending on the specific facts and circumstances. The application of whether a transaction creates a liability or a loss contingency under GAAP is not always readily determinable.

The Parties agree that the Company's sales should be treated as the sale of tangible personal property. The sale of tangible personal property is generally taxable in all states that impose a sales tax in the absence of an exemption claimed by the customer. In

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

addition, a seller is generally required to collect documentation in support of exemptions claimed by a customer. In the absence of such documentation, the sales are generally presumed taxable by state taxing jurisdictions. Tax due is to be remitted on a voluntarily basis and is subject to further enforcement through audit. When determining the appropriate accounting treatment under GAAP, such an obligation should be considered without regard to audit detection risk.

Under the Company's facts and circumstances as presented by the Parties, an accrual for sales tax liability should be recorded as of the Closing Date. There are a number of ways that the Company can calculate an estimate for the accrued sales tax liability, including performing detailed analyses, projecting liability through sampling, utilizing reasonable assumptions supported by historical business activity, general business/industry considerations, state statutes and voluntary disclosure programs.

The following information addresses the major points raised by the Parties in their submissions:

1. The Buyer performed sufficient diligence in support of its assumption that the Company had established nexus in states where sales were made. Based upon the nature of Company's business, including installation work, the existence of a direct sales force and Buyer's subsequent diligence including review of invoices for installation services performed and sales personnel expense reports, Buyer's nexus assumptions are reasonable. In support of this conclusion, Buyer has also submitted documentation that indicates that, beginning in late 2002 and 2003, the Company's sales force was restructured to cross-sell for the benefit of all Company's locations. Under general sales tax nexus principles, even though expense reports would indicate that sales personnel are being reimbursed by one location, state jurisdictions are likely to assert that the nexus-creating activities of a company's sales force are attributable to all company locations.

2. An Adjustment to the Sales Tax Liability, including complete elimination of such liability, is not warranted under the Company's potential Rights of Subrogation. In our experience, upon failure to collect sales tax from customers at the time of sale and original invoicing, business considerations, including customer relationship concerns, generally control the determination of whether a business will attempt to backbill sales taxes at a point in time, years after the transactions have occurred. Companies rarely are successful in attempts to backbill customers for various commercial reasons. Seller's assertion that the Company engaged in a limited occurrence of backbilling, with limited results and with significant time and effort according to Buyer, does not provide a compelling justification for an expectation that the Company should or would engage in successful backbilling of tax.

3. Buyer utilized a common, reasonable and generally accepted sampling methodology to estimate the liability amount. State taxing authorities often use block sampling to assess tax liabilities and typically will select only two to three monthly periods and project the results over a three to four year period. The sample selected by the Buyer is greater than the sample size likely employed by state auditors to estimate a liability. While block sampling is inherently biased because each transaction does not have an equal chance of being selected and tested at random, in our experience, block sampling does not generally produce unreasonable liability estimates for this

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

purpose.

4.  Buyer initially treated 85% of the Company's sales to "known distributors" as exempt in its liability estimate calculations under the assumption that exemption documentation may not have been obtainable from all distributors.   During the Post Closing Adjustment process Buyer and Seller agreed on certain additional customers being classified as distributors.  All sales to such distributors have been treated as exempt for purposes of the liability calculation.

    *There is apparently still disagreement with respect to whether customers labeled by Seller as "TPC Distributors" are in fact distributors.  Buyer's inclusion of these remaining customers as exceptions in the error-rate calculation, where documentation supporting an exemption has not been provided, is reasonable for purposes of estimating sales tax liability.*

    *The Parties have, through the post closing adjustment process, made adjustments to the estimate calculation involving issues of the sufficiency/validity of certain exemption documentation and no other adjustments on those grounds are necessary.*

5.  Buyer's assumption and Seller's assertions that the liability estimate should be computed based upon the assumption that Wal-Mart self-assessed use tax on its taxable purchase transactions from the Company where the Company did not remit sales tax to the state was reasonable.

    It is apparent that the Buyer and Seller both have considered historical experience with Wal-Mart as support for an assumption that the Company is not likely to be ultimately liable for tax on Wal-Mart transactions because it will either be able to establish that Wal-Mart satisfied the liability or Wal-Mart will reimburse the Company for the amount of tax. Accordingly, such an assumption is reasonable.  Upon review of Buyer's recent detailed liability schedules, Buyer has, in some instances reversed the position of Wal-Mart transactions and, consequently, treated such transactions as errors.  Buyer has not submitted sufficient justification for the reversal of its position pertaining to this assumption to warrant a revision to the estimate.

    Buyer has adjusted its liability calculations to account for sales tax collected by the Company and paid to the various states with its return filings.  It is apparent that a significant amount of the tax paid to the states by the Company relates, in some cases, to Wal-Mart transactions.  Because all Wal-Mart transactions will effectively be treated as a non-error, under the self-assessment assumption, an adjustment *decreasing the credit for taxes paid is necessary to eliminate the double counting of* Wal-Mart transactions, as both a non-error and credit for tax already paid.  In the absence of sufficient detail to determine the amount of tax paid specifically *attributable to Wal-Mart, the adjustment to the credit for taxes paid is made* proportionately, based upon the percentage of total Wal-Mart sales to total taxable sales including Wal-Mart on a location-by-location and state-by-state basis.

    The Parties' have not provided sufficient support for applying the assumption attributable to Wal-Mart to any other customers.  Accordingly, Buyer's consideration of certain transactions as taxable without consideration of whether such customers

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

have self-assessed is reasonable.

6.  Buyer has appropriately applied credit for sales tax paid on returns.  In its Draft
    Computation, Buyer did not account for taxes paid with previously filed sales tax
    returns.  Subsequently, Buyer adjusted its calculation and provided appropriate credit
    for taxes paid.  As explained in the preceding paragraphs, the amount of credit
    applied is revised to account for sales tax likely paid on transactions involving Wal-
    Mart.

7.  Buyer's inclusion of all sales tax liability amounts, regardless of amount, was
    appropriate.  Seller has not provided sufficient justification in its assertion that certain
    state-by-state liability amounts should be excluded on a materiality basis from the
    liability under GAAP to warrant an adjustment to the liability estimate on that basis.

8.  For purposes of the liability estimate, the relevant "lookback" period under a
    Voluntary Disclosure or liability period, as the case may be, is reasonably determined
    under the assumption of Voluntary Disclosure, where possible, the Statute of
    Limitations ("SOL") period, in states where tax returns have been filed continuously
    for several years, or the beginning liability period indicated in Buyer's Draft
    Computation (2004) where it is apparent that the Company locations may not qualify
    in certain states for a Voluntary Disclosure or the relevant SOL does not apply.

In its Draft Computation, Buyer assumed a liability exposure period of three years
comprised of 2004 through 2006.  The assumption was based upon the Company's
general ability to qualify for formal, state-administered Voluntary Disclosure
programs.  Three years is the general Statute of Limitations ("SOL") and Voluntary
Disclosure "lookback" period in most states.  Some states have slightly longer SOL
and "lookback" periods, e.g., four years.  The Parties' submissions identify Company
locations and states where the Company may not qualify for a voluntary disclosure.
In such instances, if a Company location was consistently filing returns, the
appropriate state's SOL would operate to limit liability similar to the terms of a
Voluntary Disclosure.  Where no filings exist, liability can extend back several years
unless otherwise limited in the state statutes.  In such circumstances, it is appropriate
and reasonable to compute the estimate starting with the 2004 liability period used by
the Buyer in its Draft Computation.

Where a specific liability is limited to three years under either an assumption that a
Voluntary Disclosure is possible where the program terms limit the "lookback" period
to three years or based upon the operation of the SOL where returns have been filed
consistently over several years, our analysis is computed starting with January 2005.
Our analysis considers the economic substance of the transactions where there is an
expectation that Buyer will proactively seek to remedy the liability.  If a state's SOL is
applicable or the Company qualifies for a Voluntary Disclosure and the appropriate
"lookback" period is four years, our analysis is computed starting with January 2004.
Where neither the SOL is applicable nor the Company qualifies for a Voluntary
Disclosure, our analysis is computed starting with January 2004, the starting period
contained in the Buyer's Draft Computation.

Subsequent to issuing its Draft Computation, Buyer adjusted its liability calculation by
extending the liability period in all instances back to 2003.  Buyer has not submitted

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

sufficient justification for the reversal of its position pertaining to this assumption to warrant a revision to the estimate on this basis. Accordingly, no liability for the 2003 period is included in the liability calculation.

9. Buyer's position that participation in the Streamlined Sales Tax Amnesty Program ("SST") should not be factored into the liability calculation is reasonable. Seller has correctly asserted that amnesty for all prior tax, penalty and interest is available in several states under the SST. The relevant states are Arkansas, Nevada, Ohio, Tennessee, Utah, and Washington. Based upon the Parties' submissions, we estimate that the potential benefit (tax and interest) associated with SST amnesty for the Georgia location, given all other considerations noted above, is $10,000, related almost entirely to the liability associated with transactions in Nevada. We further estimate that the potential benefit associated with SST amnesty for the Ohio location is $30,000, related almost entirely to the liability associated with transactions in Tennessee. Finally, we estimate that the potential sales tax benefit associated with SST amnesty for the Texas location is $70,000, related almost entirely to the liability associated with transactions in the state of Washington.

Buyer is correct that there are costs associated with registering under the SST that must be considered. Such costs relate to administration costs associated with compliance and managing potential audits for all member states for a three-year period. Participation in SST should not increase the Company's liability. Historical liability, where amnesty is not available, is not impacted by participation in the SST. The collection of tax from customers would eliminate prospective liability. While Buyer is correct that the Company would not likely qualify for a Voluntary Disclosure in SST states if it first registered under the SST, the Company could secure Voluntary Disclosure Agreements from SST states before registering under the SST.

Considering the above-mentioned compliance and other administrative costs of participating in the SST, which would be borne by the Buyer, and the relatively limited potential amnesty benefit, it is not reasonable to compute the liability based upon the assumption that the Company will register under the SST program.

10. The application of a 15% error rate to the Ohio Location's 2004, 2005 and 2007 sales in states where there were no 2006 sales is reasonable. In its liability estimate calculation for the Ohio Location, Buyer assumed a 100% error rate for states that had no 2006 sales (the sample period), but had sales in other years. Seller essentially asserts that, since no testing was done for the relevant states, the error rate for such states for 2004, 2005 and 2007 should be zero. We note that sales in these periods for the relevant states, are relatively insignificant. Given the existence of errors in many states, a reasonable error rate, in the absence of detailed testing, is the average error rate for the Ohio Location (taxable 2006 sales divided by total 2006 sales for states that impose a sales tax), or approximately 15 percent.

11. The inclusion of the Texas location's sales to Iron Mountain that were shipped to the State of Texas should be included in the Texas error rate calculation and eliminated from the Georgia and Illinois error rate calculations. Based upon the Parties' submissions, it is apparent that the Buyer erroneously included some of the Texas location's sales to Iron Mountain in the Georgia and Illinois error calculations. As asserted by the Seller, such sales should be part of the Texas calculation. Seller

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

asserted that sales tax was charged on invoices to Iron Mountain. Buyer has provided credit for sales taxes paid to Texas in its calculation. The credit for sales tax paid is subject to the adjustment discussed above pertaining to Wal-Mart.

12. An adjustment to the Mississippi error rates for 2004 Mississippi sales tax paid under audit is not necessary because of the application of the Voluntary Disclosure "lookback" period for the Ohio location and a zero error rate, i.e., no 2004 liability, for either the Georgia location or the Texas location. Our analysis does not include a 2004 liability associated with Mississippi sales for any of Company's locations as there is a zero error rate associated with the State of Mississippi for the Georgia and Texas locations, and there is a three-year Voluntary Disclosure "lookback" period in Ohio that begins with 2005.

13. The exclusion of failure to file penalties and anticipated expenses associated with performing Voluntary Disclosures from the estimated sales tax liability calculation is reasonable. The support for Buyer's Draft Computation shows that the estimated sales tax liability excluded the application of failure to file penalties under the assumption that the Company could pursue Voluntary Disclosures. State Voluntary Disclosure programs generally provide for the abatement of all failure to file and late filing penalties and this fact was noted by Buyer's accountants. Even where the Company is unable to participate in a Voluntary Disclosure program, negotiations with and formal requests submitted to the state both prior and subsequent to the disclosure of a sales tax liability may result in the abatement of penalties. Buyer has not submitted sufficient justification for the reversal, subsequent to the Draft Computation, of its position pertaining to the application of penalties to warrant a revision to the estimate on this basis. Accordingly, penalties are excluded from the liability calculation. Additionally, in its submissions subsequent to the Draft Computation, Buyer eliminated anticipated Voluntary Disclosure expenses from its liability calculations. Accordingly, such expenses are excluded from the liability calculation.

Decision:

An accrued sales tax liability in the amount of $1,387,355 should be recorded as of March 30, 2007.

*Accrued Vacation*

The Company had historically accrued a liability for vacation time when it vested. The Buyer proposed a post closing adjustment to record a liability in the amount of $343,639 for vacation time that was earned, but not yet vested. The Buyer stated that the Agreement requires *Net Working Capital to be reported on a GAAP basis*. The Buyer also stated that the appropriate GAAP for this matter is Financial Accounting Standard ("FAS") 43: Accounting for Compensated Absences.

The Seller stated that the Company's vacation policy provided for vesting of vacation benefits at the end of the period in which such benefits were earned and the Company historically recorded the liability for vacation benefits at the vesting date.

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

Seller stated that Buyer's assertion that the vacation accrual should have been recorded in accordance with FAS 43 should be rejected because:

1. Buyer would receive a windfall by changing the accounting policy after the closing date. The post closing adjustment process is intended to act as a way of truing up closing estimates.

2. Accruing vacation in accordance with FAS 43 is not required by GAAP because financial information prepared at the Closing Date would be considered interim financial information. FAS 43 does not address the allocation of costs of compensated absences to interim periods. APB 28 is applicable and costs can be expensed as incurred or allocated using estimates.

3. Buyer's estimate did not include an offset for reasonably estimable forfeitures and a change in ownership would result in significant forfeitures.

The relevant accounting guidance for recording compensated absences is FAS 43. Paragraph 6 of FAS 43 states that "An employer shall accrue a liability for employees' compensation for future absences if all of the following conditions are met:

a. The employer's obligation relating to employees' rights to receive compensation for future absences is attributable to employees' services already rendered.

b. The obligation relates to rights that vest or accumulate.

c. Payment of the compensation is probable, and

d. The amount can be reasonably estimated."

FAS 43, Paragraph 12 specifically addresses the question of whether a liability for compensated absences should be limited to those absences for which the right to receive compensation is vested and concludes that "...a liability for amounts to be paid as a result of employees' rights to compensated absences should be accrued, considering anticipated forfeitures, in the year in which earned."

As previously noted under the section entitled Consistency v. GAAP, accounts that were not recorded in accordance with GAAP must be adjusted to reflect appropriate treatment under GAAP. Also as noted under the section entitled GAAP for Year End Reporting and Interim Reporting, the Balance Sheet as of March 30, 2007 is not an interim financial statement for purposes of this transaction.

The Seller raises the point that the Buyer's computation does not include an estimate for anticipated forfeitures. The Buyer stated, in response to the Seller's criticism, that it considered estimated forfeitures and determined them to be immaterial as of the Closing Date based on the assertion by both Parties that "...the workforce was fairly stable as to the number, tenure, and pay rates of employees." However, the Seller also stated that "...In the context of a change in ownership such as this one, such an offset would be significant."

Although an estimate of forfeitures should be made when calculating the liability for compensated absences, neither Party provided an amount for estimated forfeitures. Section

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

2.04 requires the expert to make a determination without conducting an independent review. Since the Parties have not provided an estimate, the decision is based only on the information that has been provided.

Decision:

Based on the information provided by the Parties, the vacation accrual should be increased by $343,639.

*Allowance for Doubtful Accounts*

The Seller proposed that the accounts receivable allowance for doubtful accounts be reduced by $133,401 in the post closing period to be consistent with the accounting principles and methods used in the Reference Balance Sheet and GAAP. The Buyer stated that the allowance for doubtful accounts balance is reasonable on the closing balance sheet and that no adjustment should be made.

The Seller stated that the Company's historic accounting policy was not to increase its allowance for doubtful accounts for individual accounts receivable until some specific event such as a bankruptcy or a fee dispute occurred that necessitated an increase. The Seller stated that the historical policy is consistent with GAAP which prohibits general contingency reserves. *Seller also noted that paragraph 23 of Financial Accounting Standard ("FAS") 5: Accounting for Contingencies states that "a creditor need not consider an insignificant delay or insignificant shortfall in amount of payments" as indicating that a loss is probable. The Seller states that the Company's judgment was that accounts receivable that were less than 90 days past due were not significantly delayed.*

The total allowance for doubtful accounts as of the Closing Date was $204,240. Accounts receivable aged over 90 days totalled $70,839. The Seller stated that both the former COO and Collections Manager believe there was nothing about the amounts under 90 days old at the Closing Date which specifically identifies them as requiring an allowance. The Seller also stated that the allowance for doubtful accounts was overlooked in the period leading up to closing and should have been $133,401 lower as of the Closing Date.

The Seller noted that approximately $63,000 of receivables aged more than 90 days as of the Closing Date were those owed by one customer and that payment was received during the week of August 7, 2007.

*The Buyer stated that it's review of specific Company accounts for collectibility, historical bad debt allowance ratios, credit memos and returns and allowances subsequent to the transaction date indicates that the Company recorded allowance for doubtful accounts is reasonable at 1.94% of total accounts receivable and is comparable with the allowance percentages for the past three calendar year-ends. The Allowance at December 31, 2004 was 1.72% of total accounts receivable, 1.51% at December 31, 2005 and 1.38% at December 31, 2006. The Buyer also noted that the allowance for doubtful accounts would be 0.66% of total accounts receivable if the Seller's use of only the over 90 day category amount of $70,839 was used as the allowance.*

The Buyer noted that approximately $145,000 in credit memos were issued during the period March 30, 2007 through April 30, 2007 for items included in accounts receivable at March

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

30, 2007 and that Company management specifically identified another $23,000 of uncollectible amounts in the greater than 90 day aging category. The $145,000 in credit memos and the $23,000 in uncollectible receivables total $167,000 of the $204,000 allowance balance.

The Company's accounting policy for accounts receivable and the allowance for doubtful accounts is set forth in its 2005 audited financial statements (Footnotes to the Reference Balance Sheet) and states in part:

> "The Company reviews accounts receivable on a monthly basis to determine if any receivables will potentially be uncollectible in light of current economic conditions in the Company's market and the Company's historic loss trends. The Company includes any accounts receivable balances that are determined to be uncollectible, along with a general reserve, in the allowance for doubtful accounts."

FAS 5 paragraph 8 states that loss contingencies should be accrued when such losses are probable and reasonably estimable. FAS 5 paragraph 14 states that general or unspecified business risks do not meet the conditions for accrual and that no such accrual should be recorded for such risks. FAS 5 paragraph 22 contains specific guidance regarding accounts receivable and states that losses from uncollectible receivables shall be accrued when the conditions of paragraph 8 are met and that the conditions of paragraph 8 may be considered in relation to individual receivables or groups of similar types of receivables. In addition, paragraph 22 states that, if the conditions of paragraph 8 are met, accrual shall be made even though the particular receivables which are uncollectible may not be identifiable.

The accounts receivable allowance, as presented by both Parties, does not appear to be a general contingency reserve within the meaning of FAS 5. The footnote to the Reference Balance Sheet clearly disclosed the use of a general reserve for estimated uncollectible accounts in conjunction with the identification of specific accounts receivable that are determined to be uncollectible. Moreover, the guidance contained at paragraph 22 of FAS 5 clearly states that losses shall be accrued even though specifically uncollectible receivables are not identifiable.

Decision:

*An adjustment to the allowance for doubtful accounts balance at March 30, 2007 is not required.*

*Prepaid Trade Show Expenses*

The Parties do not agree on the accounting treatment for prepaid tradeshow expenses in the amount of $125,457. The Seller stated that the prepaid tradeshow expenses have future benefit and should be amortized over the 12 month period from January to December 2007. The remaining unamortized balance at March 30, 2007 is $125,457. The Buyer stated that the remaining $125,457 in unamortized tradeshow expenses were written off at March 30, 2007 in accordance with the Company's stated accounting policy for advertising costs.

The ProMat trade show is a biennial event sponsored by the Material Handling Industry of America. The Company attended the trade show in 2005 and in 2007. The expenses for the 2005 trade show were being amortized monthly over a two year period until the end of

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

2005 when the Company's auditors informed the Seller that the entire amount should be expensed in 2005. The Seller stated that the prepaid trade show expenses for 2007 were properly being amortized over a 12 month period beginning January 2007 when the trade show was held since the benefits associated with ProMat 2007 extend far beyond January 2007.

The Seller stated that Statement of Position 93-7 ("SOP 93-7"): Reporting on Advertising Costs is not applicable because the dispute relates to the accounting treatment of advertising expenses as of the Closing Date which the Seller stated is an interim period and SOP 93-7 states that it is not applicable to interim financial statements. The Seller also states that APB 28 is the applicable source of GAAP and that the deferral of advertising costs within a fiscal year is permitted by APB 28 paragraph 16(d).

The Buyer stated that the prepaid trade show expenses had been written off on the Closing Balance Sheet by Company management as of the transaction date. The Buyer also stated that the schedule of net working capital is not an interim financial statement and therefore APB 28 is not applicable to this matter and SOP 93-7 is the applicable GAAP guidance. The Buyer noted that the Company's stated policy for advertising expenses is to expense them when incurred.

The Company's accounting policy for advertising costs as described in the footnotes to the Reference Balance Sheet states that "The Company expenses advertising costs as incurred which totalled $432 and $233 for the years ended December 31, 2005 and 2004 respectively." [NOTE: amounts are in thousands.]

The relevant GAAP guidance on advertising costs is SOP 93-7. SOP 93-7 paragraph 26 states that the costs of advertising should be expensed either as incurred or the first time the advertising takes place except for direct-response advertising or expenses for advertising costs that are made subsequent to recognizing revenues related to those costs.

The facts presented by the Parties do not characterize the costs in question as "direct response advertising" inasmuch as the primary purpose of the costs does not appear to have been to elicit sales to customers who could be shown to have responded specifically to the advertising. The justification by the Seller in discussing the future economic benefits of the costs do not point to any specific sales of the Company's products, but rather speak generally to the publicity gained by the Company as a result of the trade show.

The Parties disagree as to whether SOP 93-7 or APB 28 is the authoritative guidance for the costs originally recorded as prepaid trade show expenses. The Buyer states that SOP 93-7 is the applicable guidance while the Seller states that it is not applicable because the pronouncement states at paragraph 6 that it "...does not apply to financial statements for interim periods." The Seller states the Closing Date is an interim period because the Company's fiscal year ends on December 31 and, therefore, APB 28 is the applicable guidance. The Buyer maintains that March 30, 2007 is not an interim period in that it is the closing date for the Company and the January 1 to March 30, 2007 results will not be included in the Buyer's results of operations.

Whether or not viewed as an interim period, the accounting for advertising costs should be consistent with SOP 93-7. APB 28 paragraph 15(a) states that:

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

"Costs and expenses other than product costs should be charged to income in interim periods as incurred, or be allocated among interim periods based on an estimate of time expired, benefit received or activity associated with the periods. **Procedures adopted for assigning specific cost and expense items to an interim period should be consistent with the bases followed by the company in reporting results of operations at annual reporting dates.** (Emphasis added). However, when a specific cost or expense item charged to expense for annual reporting purposes **benefits more than one interim period, the cost or expense item may be allocated to those interim periods."** (Emphasis added).

The Company's accounting policy for advertising costs as stated in the footnotes to the Reference Balance Sheet is to expense advertising costs as incurred. The Seller has not shown that the criteria for direct response advertising have been met. The prepaid advertising costs should have been expensed when the trade show occurred in January 2007 even if APB 28 were used as guidance.

Decision:

The prepaid trade show expenses of $125,457 should be expensed as of March 30, 2007.

*PetSmart Claim*

The Buyer stated that a liability in the amount of $19,596 was not recorded in the Company's financial records on the transaction date to account for defective products sold prior to the transaction date. The Seller stated that the products had been accepted by the customer as of the transaction date and a liability should not have been recorded as of March 30, 2007.

The Buyer initially estimated that it would be necessary to replace certain pallet racks and accessories for PetSmart due to a potential deficiency in their structural integrity. An initial accrual of $200,000 was estimated by management and included in the Draft Computation. The Buyer stated that the customer ultimately accepted the racks even though they did not meet specifications and that the $19,596 covered costs to replace wire decking that was incorrectly ordered by the Company.

The Seller stated that PetSmart accepted the product in accordance with applicable sales terms. The Seller also stated that FAS 5 is the applicable GAAP standard for this matter and that it was not probable that a liability had been incurred nor was the amount reasonably estimable at the Closing Date. Seller points out that Buyer's $200,000 estimate "proved wildly incorrect".

Based on submissions by the Parties, PetSmart did not file a formal claim, there is no written settlement agreement, and the Buyer recorded a $200,000 addition to the warranty reserve as of the date of the Draft Computation. The claim was settled for $19,596 after the Draft Computation was submitted and was based on replacement of wire decking as opposed to replacement of the pallet racks.

FAS 5 paragraph 8 states that "An estimated loss from a loss contingency (as defined in paragraph 1) shall be accrued by a charge to income if both of the following conditions are met:

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b. The amount of the loss can be reasonably estimated."

Based on the information submitted by the Parties, it is questionable as to whether sufficient information was available when the Draft Computation was submitted to make a determination that a loss was probable. It is also questionable whether the amount was reasonably estimable based on the settlement amount of $19,596 being 10% of the original amount claimed. In any event, the Buyer stated that this is a warranty claim. However, the adequacy of the reserve for warranty claims was not specifically disputed in the Draft Computation or in the Buyer's October 23, 2007 submission. The PetSmart claim is an item that ordinarily would be covered by the reserve for warranty claims.

Decision:

An additional accrual for the PetSmart claim should not have been made as of March 30, 2007.

*WISE Installation*

The Buyer stated that a liability for $28,000 was not recorded on the Closing Balance Sheet to account for additional work performed by an installer prior to the transaction date. The Seller stated that a final lien release and unconditional waiver was received from the installer prior to the transaction date and no liability should have been recorded as of March 30, 2007.

The Buyer has provided documentation that a claim was filed by WISE in the form of an invoice dated June 19, 2006 as well as a demand letter from WISE's attorney dated February 28, 2007. The Buyer has also provided email correspondence from Company employees dated August 2007 that supports Buyer's position that the Company orally requested the additional work prior to the transaction date.

FAS 5 paragraph 8 states that "An estimated loss from a loss contingency (as defined in paragraph 1) shall be accrued by a charge to income if both of the following conditions are met:

a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b. The amount of the loss can be reasonably estimated."

It is clear that a claim had been asserted by WISE as of March 30, 2007. It is also apparent that Company management orally requested the additional work notwithstanding the Company's policy of requiring written change orders. It appears that this loss contingency was probable and reasonably estimable.

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

Decision:

An accrual for a loss contingency in the amount of $28,000 should be recorded as of March 30, 2007.

*Estimated Purchase Price*

The Buyer stated that the Estimated Purchase Price on Buyer's Draft Computation is $5,571,379 and that the Estimated Purchase Price on Seller's Objection Notice is $3,175,972. The Buyer also stated that the difference between Buyer and Seller ($2,395,407) results from the fact that the Seller used the wrong Estimated Indebtedness Payoff Amount and the wrong amount of excess of Target Net Working Capital over Estimated Net Working Capital to Calculate the Estimated Purchase Price.

The Seller stated that it has followed the formula outlined in the Agreement and that the Buyer has used a formula of its own construction that has no support in the Agreement. Seller stated that the Estimated Purchase Price is simply a sum of defined terms and the purpose of the post-closing adjustment is to true up the Actual Purchase Price to the Estimated Purchase Price. The Seller also stated that the Estimated Purchase Price is whatever the Company states it is pursuant to section 2.01 - not some moving target to be debated after the fact.

Section 2.01 of the Agreement describes the process for establishing the Estimated Purchase Price as follows:

> "Not later than three (3) Business Days before the Closing Date, the Company shall diligently and in good faith estimate, on a reasonable basis using the Company's then available financial information, the Cash Amount (such estimate is referred to as the "Estimated Cash Amount"), the Indebtedness Payoff Amount (such estimate is referred to as the "Estimated Indebtedness Payoff Amount"), and the Net Working Capital Amount (such estimate is referred to as the "Estimated Net Working Capital Amount"), and deliver a statement thereof to the Buyer. The "Estimated Purchase Price" means an amount equal to (A) $40,000,000.00 (the "Transaction Value"), (B) plus the Estimated Cash Amount, (C) less the Estimated indebtedness Payoff Amount, (D) less the Closing Management Bonuses, and (E) plus the excess of Estimated Net Working Capital Amount over the Target Net Working Capital Amount or minus the excess of the Target Net Working Capital Amount over the Estimated Net Working Capital Amount."

Section 2.02 of the Agreement states in part that "The Buyer shall pay to the Seller at the Closing, by wire transfer of immediately available funds to the account(s) and in the amounts designated by the Seller, the Estimated Purchase Price less the Escrow Amount...".

It is clear from the information provided by the Parties that the Estimated Purchase Price determined by the Seller on March 27, 2007 was $3,175,972. It is also clear that the Seller's legal counsel, Patton Boggs, LLP, provided an updated amount to be paid at Closing on March 30, 2007 resulting in a revised Estimated Purchase Price of $5,571,379. The revisions included a reduction of the Indebtedness Payoff Amount from $33,659,516 to $31,773,462 and reduction in the amount of Target Net Working Capital less Estimated Net

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

Working Capital from $982,015 to $472,662 resulting in an increase of $2,395,407 to the Estimated Purchase Price.

Email correspondence from Patton Boggs, LLP to Buyer dated March 27, 2007 transmits the funds flow information used in the initial calculation to the Estimated Purchase Price. The email states in part that "the Company believes that there will be some difference between the estimated amounts and the actual amounts at closing" and that "The Company is providing the funds flow information to facilitate the closing on March 30, but the funds flow information is in draft form and you should not rely on the funds flow information as final or conclusive. The funds flow information remains subject to revision in all respects based on the Company's further review." Email correspondence from Patton Boggs, LLP to Buyer dated March 30, 2007 states in part "...I updated the funds flow spreadsheet in description of each corresponding entry, which is highlighted."

Section 2.02 of the Agreement requires the Buyer to pay the Estimated Purchase Price less the Escrow Amount in the amounts designated by Seller at Closing. There is no dispute between the Parties as to the actual amount paid by the Buyer at Closing which is based on an Estimated Purchase Price of $5,571,379 as designated by Seller.

Decision:

The Estimated Purchase Price is $5,571,379.

This information has been prepared solely for the use and benefit of the Parties and is not intended for reliance by any other person.

# ARNOLD & PORTER LLP

**John C. Massaro**
John_Massaro@aporter.com

202.942.5122
202.942.5999 Fax

555 Twelfth Street, NW
Washington, DC 20004-1206

February 19, 2008

<u>**Via E-mail**</u>

J. Christopher Forhecz, Partner
PricewaterhouseCoopers LLP
1301 K. Street, N.W. Suite 800W
Washington, DC 20005-3333
chris.forhecz@us.pwc.com

Re:    <u>Kingway Inca Clymer Holdings, Inc. and Unarco Material Handling,
       Inc. (the "Parties") Post-Closing Adjustment Dispute</u>

Dear Mr. Forhecz:

We have received your letter dated February 12, 2008 and submitted to the Parties yesterday, February 18, 2008 (the "Letter"). While there are a number of aspects of the Letter that we of course do not agree with, we note that the engagement letter provides that parties may within five days identify any "arithmetic inaccuracy" in the Letter and request a corrected determination. *See* 10/5/07 Retainer Letter at p.2. We write briefly now in order to do so.

As you know, Section 2.04 of the Agreement provides:

> Until the Firm makes its determination, the costs and expenses of the Firm shall be borne equally by the Buyer, on the one hand, and the Seller, on the other hand; <u>provided that</u>, when the Firm makes its determination, any costs and expenses (included costs and expenses previously advanced) of the Firm that are allocable to the party whose determination of the Actual Purchase Price (at the time of the submission of the respective determinations to the Firm for resolution pursuant to this paragraph) was closest to the Firm's determination of the same shall be paid or reimbursed by the other party.

The Letter states that:

> The Actual Purchase Price is $2,808,691. As of October 23, 2007, the Buyer and the Seller submitted Actual

# ARNOLD & PORTER LLP

Mr. J. Christopher Forhecz
February 19, 2008
Page 2

> Purchase Price amounts of $858,842 and $4,826,903,
> respectively. In accordance with Section 2.04 of the
> Agreement, the Buyer's calculation of the Actual Purchase
> Price was closest to the final calculation and therefore the
> Seller is responsible for reimbursing the Buyer for fees and
> expenses paid to PwC in connection with this matter.

This passage makes an inaccurate calculation because it begins with the incorrect numbers. Each side refined its positions on various issues in the Draft Computation, Objection Notice, Statements of Position, and Reply (or "Supplemental") Statements of Position prior to the submission of the respective determinations to PwC for resolution. Therefore, "at the time of the submission of the respective determinations to the Firm for resolution," Agreement Section 2.04, the Actual Purchase Price computations submitted to PwC for resolution were:

|         |                  |
|---------|------------------|
| Seller: | $4,826,543       |
| Buyer:  | $689,499[1]      |

Accepting for purposes of this calculation that the Actual Purchase Price is $2,808,691 as found by PwC, "at the time of the submission of the respective determination to the Firm for resolution," Agreement Section 2.04, Buyer's calculation was off by $2,119,192 ($2,808,691 minus $689,499) while Seller's calculation was off by $2,017,852 ($4,826,543 minus $2,808,691). Thus, Buyer is responsible for reimbursing Seller for fees and expenses paid to PwC in connection with this matter.

---

[1] In its Statement of Position, Buyer claimed sales tax liability in the amount of $3,317,608. In its November 6, 2007 Supplemental Statement of Position, ("Buyer Supp."), however, Buyer increased that calculation to $3,486,951.29, *see* Buyer Supp. at 26, increasing the Buyer's claimed Actual Purchase Price by approximately $169,343. Buyer asserted at that time that the amount owed by Seller to Buyer must be "modified in accordance with the further adjustments described herein," reflecting the new calculation of sales-tax liability and the Actual Purchase Price. BR at 35 n.24.

# ARNOLD & PORTER LLP

Mr. J. Christopher Forhecz
February 19, 2008
Page 3

Thank you in advance for your attention to this matter.  Please do not hesitate to contact me if you have any questions.

Sincerely,

John C. Massaro

cc:    Josh Weiss
       Cadwalader, Wickersham & Taft LLP
       One World Financial Center
       New York, NY 10281
       Joshua.Weiss@cwt.com

# CADWALADER

Cadwalader, Wickersham & Taft LLP
New York  London  Charlotte  Washington  Beijing

One World Financial Center, New York, NY 10281
Tel 212 504 6000  Fax 212 504 6666
www.cadwalader.com

February 20, 2008

**VIA E-MAIL: chris.forhecz@us.pwc.com**

J. Christopher Forhecz
PricewaterhouseCoopers LLP
1301 K. Street, N.W. Suite 800W
Washington, DC 20005

> Re:    **Post-Closing Adjustment Dispute In Connection With The Acquisition of**
> **KIC Holdings, Inc. By Unarco Material Handling, Inc.**

Dear Mr. Forhecz:

We write in response to Mr. Massaro's letter of February 19, 2008 requesting a "corrected determination," regarding which party is responsible to reimburse the other for fees and expenses paid to PwC in connection with this matter.  According to the unambiguous terms of the Engagement Letter, Seller has no right to request or obtain a corrected determination on this issue.

As Mr. Massaro correctly notes, the engagement letter provides that "either party may, within five days of the rendering of [PwC's] determination, call to [PwC's] attention any ***patent arithmetic inaccuracy*** in the determination" (emphasis added).  However, Mr. Massaro's request for a corrected determination is not based on a "patent arithmetic inaccuracy."  To the contrary, it is based upon an apparent disagreement with PwC over the correct construction of contract language in the SPA.

Mr. Massaro asserts that PwC's calculation of the difference between the parties' respective Actual Purchase Prices and PwC's Actual Purchase Price, for purposes of Section 2.04 of the SPA, is "inaccurate," "because it begins with the incorrect numbers."  Seller argues that the "numbers" are "incorrect," however, not because PwC added, multiplied, subtracted or divided incorrectly.  Rather, Seller's assertion is based on its construction of the language of Section 2.04 of the PSA to mean that the "correct numbers" are not the Actual Purchase Prices in the parties' initial submissions, but the Actual Purchase Prices it derived from subsequent submissions.  PwC's construction of the language of Section 2.04 to mean otherwise is not a "patent arithmetic inaccuracy," and, according to the plain terms of the Engagement Letter, cannot be the basis for a corrected determination.

# C A D W A L A D E R

J. Christopher Forhecz
February 20, 2008

Even if Seller were correct that its contract construction argument was a "patent arithmetic inaccuracy," and that what Seller characterizes as Buyer's "refined" Actual Purchase Price should be used for the purposes of determining which party was closest to PwC's Actual Purchase Price, Seller's Actual Purchase Price would still not be closest to PwC's.

Although Seller notes that in Buyer's Supplemental Statement of Position, dated November 6, 2007, Buyer increased the amount of sales tax liability by $169,343 and thereby decreased the Actual Purchase Price by the same amount, Seller ignores the fact that in Buyer's Supplemental Reply Submission, dated December 14, 2007 ("Supp. Reply"), Buyer made additional revisions that decreased the amount of sales tax liability and thereby increased the Actual Purchase Price. In the Supp. Reply, Buyer submitted schedules reflecting a reversal of its treatment of sales to Wal-Mart and decreasing sales tax liability by $106,498 (*see* Exhibit 56). Whereas Buyer previously treated certain sales to Wal-Mart as taxable sales, the new schedules treated those sales as non-taxable, based on Seller's assertion that Wal-Mart self-assessed. Buyer also noted reductions in sales tax liability of: $142,556, based on Seller's contention that Buyer should have used a shorter look-back period; $3271.00 based on Seller's contention that Buyer did not give credit for taxes paid in connection with an audit by the State of Mississippi; and $140.00 based on Seller's contention that Buyer improperly included sales tax on delivery charges (Supp. Reply at 5, 6, 7).

These reversals reduce the amount of sales tax liability by $252,465. A reduction of the amount of sales tax liability by that amount increases Buyer's "refined" Actual Purchase Price to $941,964 ($689,499 + $252,465). Thus, Buyer's Actual Purchase Price differed from PwC's by $1,866,727 ($2,808,691 minus $941,964). Seller's Actual Purchase Price differed from PwC's by $2,017,852 ($4,826,543 minus $2,808,691). According to Seller's logic, Seller is responsible for reimbursing Buyer for fees and expenses paid to PwC in connection with this matter.[1]

Very truly yours,

Joshua R. Weiss

---

[1] It should also be noted that, with respect to the ultimate result of this proceeding, Seller claimed to be owed $1,141,217 and thus was wrong to the extent of ($3,903,905) ( ($2,762,688) (amount due to Buyer) + ($1,141,217)). In light of this fact and the fact that Seller's positions were largely found to be without merit, it would inconsistent with the spirit of the cost shifting provision in Section 2.04 of the SPA for Buyer to be held responsible for the costs of this proceeding.

# CADWALADER

J. Christopher Forhecz
February 20, 2008


cc:    Edward J. Mizerek
       John C. Massaro, Esq.

# ARNOLD & PORTER LLP

**Robert Alexander Schwartz**
Robert_Schwartz@aporter.com

202.942.6219
202.942.5999 Fax

555 Twelfth Street, NW
Washington, DC 20004-1206

February 21, 2008

<u>**Via E-mail**</u>

J. Christopher Forhecz, Partner
PricewaterhouseCoopers LLP
1301 K. Street, N.W. Suite 800W
Washington, DC 20005-3333
chris.forhecz@us.pwc.com

> Re:   <u>**Kingway Inca Clymer Holdings, Inc. and Unarco Material Handling,
> Inc. (the "Parties") Post-Closing Adjustment Dispute**</u>

Dear Mr. Forhecz:

　　We write to correct certain statements made in Mr. Weiss's letter of February 20, 2008. On February 19, 2008, we wrote to notify you that the arithmetic contained in the decision letter was erroneous because it did not use the parties' respective determinations of the Actual Purchase Price "at the time of the submission of the respective determinations to the Firm for resolution." As we explained, this provision refers to the parties' final positions set forth in their respective Reply (or "Supplemental") Statements of Position.

　　Mr. Weiss responded on February 20, 2008, claiming that Buyer "made additional revisions" totaling $252,465, in a December 14, 2007 supplement to its responses to the Firm's November 16, 2006 Questions and Document Requests. Buyer is incorrect because (a) Buyer's December 14, 2007 responses came subsequent to "the submission of the respective determinations to the Firm for resolution" and (b) Buyer made no such "revisions."

　　As you know, in accordance with the Engagement Letter, the parties submitted Statements of Position on October 23, 2007 and Reply Statements of Position on November 6, 2007. At that point, the Firm had discretion either to issue a decision or to submit "interrogatories" or "document requests." *See* Engagement Letter Att. 1 (setting schedule for "interrogatories/document requests, *if any*" (emphasis added)). The Firm chose to present Questions and Document Requests on November 16, 2007.

　　The parties responded with the requested information and documents on November 30, 2007. Buyer then objected to Seller's responses as "inappropriate" and "unauthorized" on the basis that Seller "responded to questions posed to the Buyer with

# ARNOLD & PORTER LLP

Mr. J. Christopher Forhecz
February 21, 2008
Page 2

arguments designed to address the Buyer's Supplemental Submission" and went "so far as to address issues that [we]re not even raised by the Firm's questions." E-mail from J. Weiss (Dec. 3, 2007). The parties and the Firm agreed that Buyer was welcome to give further responses to the interrogatories and to attempt to rebut Seller's responses. On December 14, 2007, Buyer gave those further answers "in response to the Seller's Reponses To Questions And Document Requests, dated November 30, 2007." Buyer 12/14/2007 Supp. at 1.

From the foregoing chronology, and in light of the Engagement Letter, it is obvious that the "submission of the respective determinations to the Firm for resolution" occurred on November 6, 2007. That the firm posed questions based on those submissions, and the parties responded with the requested information (and continued to squabble thereafter), is of no moment.

More importantly, however, Buyer's statement that it made up the difference through "additional revisions" on December 14, 2007 is not correct. The bulk of buyer's claimed $252,465 in "additional revisions" includes primarily (1) a claimed "revision" of $106,498 based on Wal-Mart's status as a self-assessing taxpayer in Georgia and (2) a "revision" of $142,556 to reflect a shorter look-back period based on statutes of limitations. However, Buyer did not concede either point in its submission or at any other time.

With respect to Wal-Mart, Seller had pointed out that Buyer, in its early submissions, correctly treated Wal-Mart as self-assessing, but later erroneously included sales to Wal-Mart in its "error ratios" for certain locations. Buyer responded that Seller was wrong:

> However, Crowe subsequently obtained the tax returns filed by the Georgia location which revealed that Wal-Mart did not always self assess but, rather, on various occasions the Georgia location registered and collected tax from Wal-Mart in the states where it made sales to, and performed installations for, Wal-Mart (*see* Exhibits 17, 20). Thus, rather than assuming that all sales to Wal-Mart were not taxable, in the revised analysis Crowe treated all sales to Wal-Mart as taxable, but gave credit, based on the tax returns, for taxes paid and for taxes self-assessed by Wal-Mart where there was evidence of self-assessment.

# ARNOLD & PORTER LLP

Mr. J. Christopher Forhecz
February 21, 2008
Page 3

Buyer 12/14/2007 Supp. at 7-8. Buyer then added *"even if, contrary to the evidence in the record, Seller is correct that Wal-Mart self assessed in connection with every sale by the Georgia location, that would result in only a $106,498.82 reduction in total sales tax liability." Id.* (emphasis added). That is not a "revision" to Buyer's position.

Similarly, with respect to look-back periods, Seller had pointed out that Buyer erroneously included in its submissions liabilities with respect to which the statute of limitations had expired. Buyer again responded that Seller was wrong:

> Seller contends that Buyer did not take into account the fact
> that, in states where liability has been asserted and sales/use
> tax returns have been filed, liability cannot be assessed
> beyond the statute of limitations period. Seller's Responses
> at 2. *Seller is wrong.* As indicated in Buyer's Reponses to
> PwC's Questions and Document Requests ("Buyers
> Responses") # 2, the assessment period used by Buyer to
> estimate sales tax liability was coextensive with the
> limitations period in each state where there is a liability.

*Id.* at 4-5 (emphasis added). As above, however, Buyer then went on to offer an estimate of the reduction in liability applicable in the event that the Firm should agree with Seller, noting that "that would affect the Company's liability in only those states where it has filed returns and only to the extent of approximately $142,556." *Id.* at 5

Thus, Buyer did not make "additional revisions" as it now claims. Buyer defended its position but, as a fallback, attempted to quantify the reduction in its claims that would result from losing the particular point.

By comparison, when Buyer did indeed make a concession or "revision," it did so clearly. As noted in Mr. Weiss's letter, Buyer did on December 14, 2007, correct a $140.08 error based on improper inclusion of tax on delivery charges. Buyer stated:

> [I]n connection with the review undertaken to confirm this
> fact, Crowe discovered a single instance where a freight
> charge was not treated as exempt and *has corrected this
> error.* This correction reduced the Georgia location's error
> ratio in California by .05%, which resulted in a net
> reduction in total sales tax liability of $140.08.

# ARNOLD & PORTER LLP

Mr. J. Christopher Forhecz
February 21, 2008
Page 4

*Id.* at 7 (emphasis added).

As explained above, all of this occurred subsequent to "the submission of the respective determinations to the Firm for resolution." But Buyer's intention to correct certain small errors and to preserve its other (higher dollar) positions is absolutely clear.[1]

Thus, and for the reasons given in our February 21, 2008 letter, Buyer is responsible for reimbursing Seller for fees and expenses paid to PwC in connection with this matter.[2]

Thank you in advance for your attention to this matter. Please do not hesitate to contact me if you have any questions.

---

[1] In a footnote, Buyer notes that Seller originally claimed to be owed $1.1 million, and was therefore "wrong to the extent of" $3.9 million, and argues that it would be "inconsistent with the spirit of the cost shifting provision" to hold Buyer responsible. That is, of course, not what the Agreement provides. More fundamentally, however, this underscores why the Replies and not the initial Statements of Position control – the "spirit" of the cost shifting provision was the intent to penalize the side that caused the Firm to do more work. In that spirit, the November 6, 2007 Reply Statements are the proper point of reference, because those submissions triggered the Firm's commencement of work and authority to issue a decision.

[2] Buyer also argues that this error cannot be corrected because it is not an "arithmetic inaccuracy," but a "construction of contract language in the SPA." If so, this issue is altogether outside the scope of the Firm's authority under the Agreement and Engagement Letter. To the extent that it is an arithmetic error, the Firm should correct it. To the extent that it is an issue of "construction of the contract language," Seller reserves the right to construe the contract as appropriate.

# ARNOLD & PORTER LLP

Mr. J. Christopher Forhecz
February 21, 2008
Page 5

Sincerely,

Robert Alexander Schwartz

cc:    Josh Weiss
      Cadwalader, Wickersham & Taft LLP
      One World Financial Center
      New York, NY 10281
      Joshua.Weiss@cwt.com

**From:**    chris.forhecz@us.pwc.com
**Sent:**    Tuesday, February 26, 2008 10:12 AM
**To:**      Weiss, Joshua; John_Massaro@aporter.com
**Cc:**      edward.j.mizerek@us.pwc.com; greg.bardnell@us.pwc.com
**Subject:** Kingway / Unarco Seller's Objection to Fee Award


To the Parties:

We have received and considered the letters received from Seller's counsel, dated February 19 and 21, 2008, and from Buyer's counsel, dated February 20, 2008, regarding the award of recovery of our fees to the Buyer. Since Seller's objection does not relate to a patent arithmetic inaccuracy in the determination and five business days have passed since the determination was issued, Seller's request for reconsideration is denied and the determination issued on February 18, 2008 is now final.

Sincerely,
Chris Forhecz

**Chris Forhecz** | PricewaterhouseCoopers LLP | 1301 K Street, NW | Washington, DC 20005 | ☎: **202.414.1310** | 📱: **703.622.6266** | 📠: **813.375.5740**

---

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer. PricewaterhouseCoopers LLP is a Delaware limited liability partnership.