UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNARCO MATERIAL HANDLING, INC.,

                                   Plaintiff,

        -against-

KINGWAY INCA CLYMER HOLDINGS, INC. and
AMERICAN CAPITAL STRATEGIES, Ltd.,

                                   Defendant.

---

**Filed Electronically**

08 CV 2394

 

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
## OF MOTION TO CONFIRM A FINAL ARBITRATION AWARD

CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY 10281
212.504.6000(t)
212.504.6666(f)

*Attorneys for Plaintiff*
*Unarco Material Handling, Inc.*

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ........................................................................ 1

FACTS ............................................................................................................... 3

ARGUMENT ..................................................................................................... 7

    THE PWC DECISION SHOULD BE CONFIRMED UNDER THE
    FEDERAL ARBITRATION ACT ................................................................ 7

        A.    Defendants Waived Any Argument That PwC Exceeded Its
              Authority By Determining The "Arbitrability" Of Unarco's Claims ........ 11

        B.    PwC's Decision On Arbitrability Was Not Made In Manifest
              Disregard Of The Law ............................................................................ 15

             1.    PwC Correctly Concluded That The Sales Tax And
                 Vacation Accrual Claims Are Within The Scope Of Section
                 2.04 ............................................................................................ 16

             2.    Section 2.04 By Its Terms Covers The Sales Tax And
                 Vacation Accrual Claims ......................................................... 18

             3.    Courts In This District Have Routinely Required
                 Arbitration Of Post-Closing Adjustments Claims That May
                 Also Be Characterized As Claims For Indemnification ............... 21

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES:

*Advanstar Commc'ns Inc. v. Beckley-Cardy, Inc.*,
    No. 93 Civ. 4230, 1994 WL 176981 (S.D.N.Y. May 6, 1994)........................................ *passim*

*Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*,
    579 F.2d 691 (2d Cir. 1978)..........................................................................................9

*Barbier v. Shearson Lehman Hutton Inc.*,
    948 F.2d 117 (2d Cir. 1991)..........................................................................................9

*CAE Indus. Ltd. v. Aerospace Holdings Co.*,
    741 F. Supp. 388 (S.D.N.Y. 1989)................................................................................8

*Campeau Corp. v. May Dep't Stores Co.*,
    723 F. Supp. 224 (S.D.N.Y. 1989)............................................................................3, 21

*Cargill Inc. v. Bunge Foods, Ltd.*,
    762 N.Y.S.2d 53 (1st Dep't 2003)..............................................................................8

*Chung v. President Enters. Corp.*,
    943 F.2d 225 (2d Cir. 1991)....................................................................................3, 17, 22

*Concourse Vill., Inc. v. Local 32E, Serv. Empls. Int'l Union*,
    822 F.3d 302 (2d Cir. 1987)........................................................................................17

*D.H. Blair & Co. v. Gottdiener*,
    462 F.3d 95 (2d Cir. 2006)........................................................................................1, 9

*Data-Stream AS/RS Techs., LLC v. China Int'l Marine Containers, Ltd.*,
    No. 02 Civ. 6530, 2003 WL 22519456 (S.D.N.Y. Nov. 6, 2003) ..................................11, 14

*Dean Witter Reynolds, Inc. v. Byrd*,
    470 U.S. 213 (1985)..................................................................................................17

*Dunhill Franchisees Trust v. Dunhill Staffing Sys., Inc.*,
    513 F. Supp. 2d 23 (S.D.N.Y. 2007) (Marrero, J.) ....................................................... *passim*

*Durso Supermkts., Inc. v. D'Urso (In re Durso Supermkts., Inc.)*,
    170 B.R. 211 (S.D.N.Y. 1994)..................................................................................8, 21

*E\*Trade Fin. Corp. v. Deutsche Bank AG*,
    420 F. Supp. 2d 273 (S.D.N.Y. 2006)..........................................................................22

**PAGE(S)**

*Favara, Skahan, Tabaczyk, Ltd. v. Ewing,*
   No. 91 Civ. 7878, 1992 WL 80659 (S.D.N.Y. Apr. 9, 1992)............................................11, 15

*Folkways Music Publ'rs, Inc. v. Weiss,*
   989 F.2d 108 (2d Cir. 1993).......................................................................... *passim*

*Fromm v. ING Funds Distrib., LLC,*
   486 F. Supp. 2d 348 (S.D.N.Y. 2007)..................................................................1, 8

*Gestetner Holdings, PLC v. Nashua Corp.,*
   784 F. Supp. 78 (S.D.N.Y. 1992)...................................................................... *passim*

*Halcot Navig. Ltd. P'ship v. Stolt-Nielsen Transp. Grp., B.V.,*
   491 F. Supp. 2d 413 (S.D.N.Y. 2007) (Marrero, J.) ............................................. *passim*

*Halley Optical Corp. v. Jagar Int'l Mktg. Corp.,*
   752 F. Supp. 638 (S.D.N.Y. 1990)....................................................................15

*In re Allegiance Telecom, Inc.,*
   356 B.R. 93 (Bankr. S.D.N.Y. 2006) ...............................................................7-8

*John T. Brady & Co. v. Form-Eze Sys., Inc.,*
   623 F.2d 261 (2d Cir.), *cert. denied,*
   449 U.S. 1062 (1980)...................................................................................9

*Kim v. Transtar Metals, Inc.,*
   726 N.Y.S.2d 87 (1st Dep't 2001) ..................................................................21

*Luxottica Grp., S.p.A. v Bausch & Lomb Inc.,*
   160 F. Supp. 2d 552 (S.D.N.Y. 2001)......................................................3, 21, 23

*McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.,*
   858 F.2d 825 (2d Cir. 1988).............................................................................7

*Mobius Mgmt. Sys., Inc. v. Technologic Software Concepts, Inc.,*
   No. 02 Civ. 2820, 2002 WL 31106409 (S.D.N.Y. Sept. 20, 2002) ...............................11, 14

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
   460 U.S. 1 (1983)....................................................................................17

*Omni Tech Corp. v. MPC Solutions Sales, LLC,*
   432 F.3d 797 (7th Cir. 2005) ...........................................................................8

*Oxford Med. Grp., P.C. v. Vossoughian,*
   162 F. Supp. 2d 234 (S.D.N.Y. 2001)........................................................ 11, 14-15

<u>PAGE(S)</u>

*Penn Cent. Corp. v. Consolidated Rail Corp.*,
    436 N.E.2d 512 (N.Y. 1982)....................................................................................8

*Pike v. Freeman*,
    266 F.3d 78 (2d Cir. 2001)........................................................................ *passim*

*Porzig  v. Dresdner, Kleinwort, Benson, N. Am. LLC*,
    497 F.3d 133 (2d. Cir. 2007).................................................................................16

*Sands Bros. & Co. v. Zipper*,
    No. 03 Civ. 7731, 2003 WL 22439789 (S.D.N.Y. Oct. 27, 2003) (Marrero, J.) ....................11

*Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc.*,
    269 F. Supp. 2d 356 (S.D.N.Y. 2003) (Marrero, J.) ...............................................17

*Seabury Constr. Corp. v. District Council of N.Y.*,
    461 F. Supp. 2d 193 (S.D.N.Y. 2006).................................................................17

*Talegen Holdings, Inc . v. Fremont Gen. Corp.*,
    No. 98 Civ. 0366, 1998 WL 513066 (S.D.N.Y. Aug. 19, 1998) ................................... *passim*

*United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*,
    484 U.S. 29 (1987)...............................................................................1, 8, 16

*United Steelworkers of Am. v. Warrior & Gulf Navig. Co.*,
    363 U.S. 574 (1960)..............................................................................17

*United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*,
    363 U.S. 593 (1960)................................................................................9

*Wallace v. Buttar*,
    378 F.3d 182 (2d Cir. 2004).................................................................. 15-16

*Walsh v. WOR Radio*,
    531 F. Supp. 2d 623 (S.D.N.Y. 2008) (Marrero, J.) ...............................................17

*Westmoreland Coal Co. v. Entech, Inc.*,
    794 N.E.2d 667 (N.Y. 2003)..................................................................22

*Whirlpool Corp. v. Philips Elecs., N.V.*,
    848 F. Supp. 474 (S.D.N.Y. 1994)..........................................................14, 21

*Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*,
    126 F.3d 15 (2d Cir. 1997), *cert. denied*,
    522 U.S. 1111 (1998)............................................................................. 8-9

**PAGE(S)**

**STATUTES & OTHER AUTHORITIES:**

N.Y. C.P.L.R. 7601 (McKinney 1998 & Supp. 2008)...................................................................8

Plaintiff Unarco Material Handling, Inc. ("Unarco") respectfully submits this memorandum of law in support of its motion, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 6, 9 (the "FAA") and Sections 7601 and 7510 of the New York Civil Practice Law and Rules, to confirm an arbitration award issued by PricewaterhouseCoopers LLP ("PwC"), dated February 12, 2008 (the "PwC Decision").

## PRELIMINARY STATEMENT

This is a motion for confirmation of an arbitration award in favor of Plaintiff under which Defendants owe Plaintiff $2,941,374, plus interest. Defendants refuse to pay the award, notwithstanding their agreement in the underlying contract that the award would be "conclusive and binding." Defendants do not contend that they did not voluntarily submit to the alternative dispute resolution proceedings that resulted in the award or that they did not have a full and fair opportunity to litigate the issues. Rather, Defendants refuse to pay simply because they lost and they claim that they should have prevailed.

By refusing to pay and, thereby, forcing Plaintiff to bring this action, Defendants seek to relitigate the same issues that the parties litigated to conclusion before a partner of PwC, the agreed-upon decision-maker, at a cost of more than $350,000 in PwC fees (not including attorney's fees). Federal courts, however, "do not 'sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts'" (*Fromm v. ING Funds Distrib., LLC*, 486 F. Supp. 2d 348, 350 (S.D.N.Y. 2007) (*quoting United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987))) and, therefore, "[o]nly 'a barely colorable justification for the outcome reached' by the arbitrators is necessary to confirm an award." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (citations omitted).

This action was initiated by a complaint asserting claims for breach of contract. Unarco sued both Kingway, the party against which the PwC Decision was issued, and Amercian Capital, Kingway's parent corporation, which guaranteed Kingway's obligations under the underlying agreement. Defendants asserted a counterclaim for a declaratory judgment that certain of the issues considered and ruled upon by PwC were not within the scope of the dispute resolution clause pursuant to which the parties submitted their disputes to PwC. The counterclaim (and various of Defendants' affirmative defenses) amount to the contention that the PwC Decision should not be confirmed because PwC exceeded the scope of its authority by considering whether certain of Unarco's claims were arbitrable and/or incorrectly interpreted the applicable dispute resolution provision to provide that those claims were arbitrable.[1]

As set forth below, these contentions afford no basis for Defendants to avoid confirmation of the PwC Decision. Defendants never objected to PwC's authority to determine the arbitrability of the claims at issue; indeed, they specifically invited PwC to decide that issue. Defendants also did not seek a stay of the proceeding and a ruling from a court on that issue. For these reasons, they have waived any objection that PwC lacked the authority to determine the arbitrability of the issues before it. *Halcot Navig. Ltd. P'ship v. Stolt-Nielsen Transp. Grp., B.V.*, 491 F. Supp. 2d 413, 418-19 (S.D.N.Y. 2007) (Marrero, J.). Further, Defendants' contention that PwC's determination of arbitrability was erroneous is no basis to deny confirmation of the PwC Decision because Defendants cannot meet their burden to demonstrate that PwC's determination

---

[1]    Unarco's breach of contract claim is based upon Defendant Kingway Inca Clymer Holdings, Inc.'s failure to pay the amount owed to Unarco according to the PwC Decision, as required by the terms of the contract at issue – which payment was guaranteed by Defendant American Capital Strategies, Ltd. Thus, confirmation of the award necessarily establishes Defendants' liability on the breach of contract and guarantee claims, and Defendants' counterclaim will be moot. Accordingly, Plaintiff has separately requested leave of the Court, pursuant to Rule II. A. of the Court's Individual Rules of Practice, to file a motion pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings, granting its claims for breach of contract and guarantee and dismissing Defendants' claim for a declaratory judgment.

was made in "manifest disregard of the law." *Dunhill Franchisees Trust v. Dunhill Staffing Sys., Inc.*, 513 F. Supp. 2d 23, 30 (S.D.N.Y. 2007) (Marrero, J.) ("to vacate an arbitral award . . . requires '"an overt disregard of the law and not merely . . . an erroneous interpretation"'") (*quoting Pike v. Freeman*, 266 F.3d 78, 86 (2d Cir. 2001); *Folkways Music Publ'rs, Inc. v. Weiss,* 989 F.2d 108, 111 (2d Cir. 1993)).  Because (i) "[t]o determine arbitrability [a court] need only consider whether there exists an interpretation of the parties' agreement that covers the disputes at issue" (*Chung v. President Enters. Corp.*, 943 F.2d 225, 230 (2d Cir. 1991)), and (ii) multiple courts in this district have interpreted virtually identical dispute resolution provisions to require arbitration of almost identical issues, Defendants cannot demonstrate that the PwC Decision was made in manifest disregard of the law.[2]

## FACTS

Pursuant to a Securities Purchase Agreement by and among Unarco (a/k/a "Buyer"), Kingway Inca Clymer Holdings, Inc. ("Kingway" or "Seller") and American Capital Strategies, Ltd. ("American Capital"), dated March 9, 2007 (the "Agreement") (copy attached as Exhibit 1 to the accompanying Declaration of Paul Neal In Support of Unarco's Motion to Confirm, dated May 14, 2008 ("Neal Decl.")), Unarco purchased all of the outstanding equity interests in KIC Holdings, Inc and its subsidiaries (the "Company") from Defendant Kingway. Defendant American Capital guaranteed certain of the obligations of its subsidiary, Kingway, under the Agreement.  Neal Decl. ¶ 2.

---

[2]     *See Luxottica Grp., S.p.A. v Bausch & Lomb Inc.*, 160 F. Supp. 2d 552 (S.D.N.Y. 2001); *Talegen Holdings, Inc. v. Fremont Gen. Corp.*, No. 98 Civ. 0366, 1998 WL 513066 (S.D.N.Y. Aug. 19, 1998); *Gestetner Holdings, PLC v. Nashua Corp.*, 784 F. Supp. 78 (S.D.N.Y. 1992); *Advanstar Commc'ns Inc. v. Beckley-Cardy, Inc.*, No. 93 Civ. 4230, 1994 WL 176981 (S.D.N.Y. May 6, 1994); *Campeau Corp. v. May Dep't Stores Co.*, 723 F. Supp. 224 (S.D.N.Y. 1989).

In accordance with the Agreement, as of the March 30, 2007 closing date, Unarco paid an "Estimated Purchase Price." The Estimated Purchase Price was calculated based upon the Company's financial information available immediately prior to closing, which the parties understood was not necessarily complete in all respects. In order to reconcile the Estimated Purchase Price with the "Actual Purchase Price," *i.e.,* one that is based upon the Company's complete financial information as of the closing date (which could only be known in hindsight) Section 2.04 of the Agreement provides for a "Post-Closing Adjustment," procedure to calculate the Actual Purchase Price, post-closing, and compare it to the Estimated Purchase Price. If the resulting Actual Purchase Price is less than the Estimated Purchase Price, Seller must pay Buyer the difference, and vice versa. Neal Decl. ¶ 3.

Pursuant to Section 2.04 of the Agreement, the Buyer was required to prepare and deliver to the Seller, within sixty days of closing, a "Draft Computation," containing Buyer's determinations of the actual "Cash Amount," "Indebtedness Payoff Amount" and "Net Working Capital Amount" as of the closing date, and its calculation, based, in part, on these inputs, of the "Actual Purchase Price." Neal Decl. ¶ 4. If the Seller disagreed with any aspect of the Draft Computation, the Seller was entitled, within forty-five days after receipt thereof, to deliver an "Objection Notice" to the Buyer setting forth Seller's competing determinations of the actual Cash Amount, Indebtedness Payoff Amount and Net Working Capital Amount as of the closing date, and its competing calculation, based, in part, on those items, of the Actual Purchase Price. Neal Decl. ¶ 5. If the Buyer and Seller are unable to resolve the "disagreements" between the Draft Computation and the Objection Notice, the Agreement provides that they should retain an independent accounting firm (the "Firm") to resolve the "disagreements." Section 2.04 explicitly provides that the decision of the Firm will be "conclusive and binding" on the parties. Neal Decl. ¶ 6.

On or about May 24, 2007, Buyer provided seller with its Draft Computation (Neal Decl., Ex. 2).  On or about July 9, 2007, Seller provided Buyer with its Objection Notice (Neal Decl., Ex. 3).  Neal Decl. ¶ 7.  There were a number of disagreements between the Draft Computation and the Objection Notice; most importantly with respect to the parties' respective calculations of "Net Working Capital."  The disagreement over the calculation of Net Working Capital resulted from a dispute over whether the Company had unrecorded liabilities for sales and use taxes (among others).  Neal Decl. ¶¶ 8, 9.  Unable to resolve these disagreements, the parties submitted them to an accounting firm for resolution.  Neal Decl. ¶ 10.

By engagement letter dated October 5, 2007, the parties jointly retained PwC (a/k/a the "Firm") to resolve the disagreements between the Draft Computation and the Objection Notice.  Neal Decl., Ex. 4.  The parties agreed to a schedule for submissions and, according to that schedule, made extensive written submissions to PwC, including expert reports and voluminous materials in support thereof (copies w/out exhibits attached as Exhibits 5-13 to the Neal Decl.).  Neal Decl. ¶ 10.

In the PwC Decision, PwC determined that the Actual Purchase Price was $2,808,691 and that the Estimated Purchase Price was $5,571,379 (Neal Decl., Ex. 14).  Pursuant to Section 2.04(b)(ii) of the Agreement,

> [i]f the Actual Purchase Price is less than the Estimated Purchase Price, then within five (5) Business Days after the determination of the Actual Purchase Price, the Seller shall pay to Buyer … an amount equal to such difference, plus simple interest … at a rate equal to 8% from the Closing Date to the date of Payment, computed on an annual basis using a 360-day year.

Neal Decl., Ex. 1 at 10.  Thus, based on the PwC Decision, Defendants owe Unarco $2,941,374, plus interest, and attorney's fees of this action.  Defendants have refused to pay Unarco.  Neal Decl. ¶¶ 15, 17.

Two of the disagreements submitted to PwC are at issue here.  Both of those disagreements concerned the parties' calculations of Net Working Capital (current assets minus current liabilities) in the Draft Computation and Objection Notice, respectively.  Specifically, according to Unarco's Draft Computation, actual Net Working Capital was less than the Estimated Net Working Capital (used to calculate the Estimated Purchase Price) due to the fact that, as of the closing date, the Company had unrecorded liabilities for unpaid sales and use tax (the "Sales Tax Claim") and for accrued employee vacation (the "Vacation Accrual Claim").  Neal Decl. ¶ 8.  Accordingly, Unarco sought an "adjustment" to record these liabilities on the Company's balance sheet as of the closing date (the "closing balance sheet") and, thereby, include them in the calculation of Net Working Capital and, thereby, in the calculation of the Actual Purchase Price.

Defendant Kingway disagreed that these liabilities existed.  In voluminous submissions to PwC, Defendant Kingway argued, on the merits, that the Company had no liability for sales tax and accrued vacation as of the closing date.  Neal Decl., Exs. 6, 7, 10, 12.  Defendant Kingway argued that, according to Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies," no liability for sales tax needed to have been recorded because that liability was not reasonably "probable and estimable," and that no liability for accrued vacation needed to have been recorded according to GAAP.  *See* Neal Decl., Ex. 6 at 12, 18.

Defendant Kingway also argued that because the Sales Tax and Accrued Vacation Claims could also be characterized as claims for breach of representations and warranties, redress for those claims was limited to indemnification and, as such, those claims were not subject to the post-closing adjustment procedure under Section 2.04.  On that basis, Defendant Kingway expressly requested that PwC find that the Sales Tax and Vacation Accrual Claims

were not within the scope of Section 2.04 and, on that basis, deny the claims. Neal Decl., Ex. 6 at 5-7  Defendant Kingway never argued that PwC could not, should not or did not have authority to determine whether the Sales Tax and Vacation Accrual claims were "arbitrable," *i.e.,* within the scope of Section 2.04.

In the PwC Decision, PwC granted the Sales Tax and Vacation Accrual claims, *i.e.,* it determined that adjustments should be made to record these liabilities and that they should be included in the calculation of Net Working Capital and, thereby, the Actual Purchase Price. Neal Decl., Ex. 14.  Although PwC did not explicitly discuss Defendants' argument that the Sales Tax and Vacation Accrual Claims should be denied because they were outside the scope of Section 2.04, it necessarily rejected Defendants' arguments and held that those claims were within the scope of Section 2.04 by deciding that post-closing adjustments should be made to record these liabilities.

## ARGUMENT

### THE PWC DECISION SHOULD BE CONFIRMED UNDER THE FEDERAL ARBITRATION ACT

A dispute resolution clause in an agreement constitutes an "arbitration" clause for purposes of the FAA, if "the language clearly manifests an intention by the parties to submit certain disputes to a specified third party for binding resolution" and "[i]t is . . . irrelevant that the contract language in question does not employ the word 'arbitration' as such." *McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 830 (2d Cir. 1988). Accordingly, courts have consistently found that purchase price adjustment dispute resolution provisions constitute enforceable arbitration agreements under the FAA; even where, as here, the provision provides that "in resolving any disputed item," the accountant "will act as expert and not as an arbitrator in conducting its analysis." *See In re Allegiance Telecom, Inc.*, 356 B.R. 93,

111 (Bankr. S.D.N.Y. 2006); *Talegen*, 1998 WL 513066, at *3 (*citing Durso Supermkts., Inc. v. D'Urso* (*In re Durso Supermkts., Inc.*), 170 B.R. 211, 215 (S.D.N.Y. 1994); *CAE Indus. Ltd. v. Aerospace Holdings Co.*, 741 F. Supp. 388, 392 (S.D.N.Y. 1989)); *Omni Tech Corp. v. MPC Solutions Sales, LLC*, 432 F.3d 797, 799 (7th Cir. 2005). In *Omni Tech*, the wording of the parties' dispute resolution clause was almost identical to Section 2.04, and the court found that it was an arbitration provision for purposes of the FAA.

> The statement that PricewaterhouseCoopers will act as an expert and not as an arbitrator means that it will resolve the dispute as accountants do – by examining the corporate books and applying normal accounting principles . . . rather than by entertaining arguments from lawyers and listening to testimony. It does not imply that the whole section of the contract committing resolution to an independent private party is hortatory. Thus the provision for the 'final conclusive and binding' resolution of this dispute by someone other than a federal judge must be honored.

*Id.*[3]

An arbitration award is entitled to substantial deference. Federal courts "do not 'sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts.'" *Fromm*, 486 F. Supp. 2d at 350 (*quoting United Paperworkers*, 484 U.S. at 38). Indeed, "[t]he review of arbitration awards 'is very limited . . . in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long

---

[3] Even were there any doubt that Section 2.04 of the Agreement constitutes an "arbitration" clause (and it surely appears to be an arbitration clause despite the reference to the role of the Firm), the PwC Decision would nevertheless be enforceable pursuant to Section 7601 of the New York Civil Practice Law and Rules entitled, "Special proceeding to enforce agreement that issue or controversy be determined by a person to named or to be selected." N.Y. C.P.L.R. 7601 (McKinney 1998 & Supp. 2008); *Cargill Inc. v. Bunge Foods, Ltd.*, 762 N.Y.S.2d 53, 54 (1st Dep't 2003) (affirming order pursuant to Section 7601 directing parties to submit post-closing adjustment dispute to accountants). According to Section 7601, a court "may enforce such an agreement as if it were an arbitration agreement, in which case the proceeding shall be conducted as if brought under article seventy-five." N.Y. C.P.L.R. 7601; *Penn Cent. Corp. v. Consolidated Rail Corp.*, 436 N.E.2d 512, 517-18 (N.Y. 1982) (finding that awards other than those issued by arbitrators can be confirmed pursuant to Section 7510).

and expensive litigation.'" *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.,* 126 F.3d 15, 23 (2d Cir. 1997) (*quoting Folkways*, 989 F.2d at 111), *cert. denied*, 522 U.S. 1111 (1998).

Under this "very limited" standard of review, "[o]nly 'a barely colorable justification for the outcome reached' by the arbitrators is necessary to confirm an award." *D.H. Blair*, 462 F.3d at 110 (citations omitted); *see also Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*, 579 F.2d 691, 703-04 (2d Cir. 1978) (an award must be upheld when the arbitrator offers "even a barely colorable justification for the outcome reached"). In addition, "[t]he arbitrator's rationale for an award need not be explained, and the award should be confirmed '"if a ground for the arbitrator's decision can be inferred from the facts of the case."'" *D.H. Blair*, 462 F.3d at 110 (*quoting Barbier v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 121 (2d Cir. 1991)) (other citations omitted); *see also United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598 (1960) ("Arbitrators have no obligation to the court to give their reasons for an award").

The Court of Appeals "'has generally refused to second guess an arbitrator's resolution of a contract dispute.'" *Toys "R" Us*, 126 F.3d at 23 (*quoting John T. Brady & Co. v. Form-Eze Sys., Inc.*, 623 F.2d 261, 264 (2d Cir.), *cert. denied*, 449 U.S. 1062 (1980)); *see also Andros,* 579 F.2d at 703 (this Court "has not been receptive . . . to invitations to second-guess an arbitrator's resolution of a contract dispute"). For that reason, a party that "simply offers its own contrary interpretation[]" of the contract provisions at issue, as a basis to deny confirmation of an award, "does not advance a convincing argument." *Toys "R" Us*, 126 F.3d at 25. Accordingly, an arbitrator's interpretation of contract terms "will not be overruled simply because [the court] disagree[s] with that interpretation." *Id.*

Although Defendants have not formally moved to vacate the PwC Decision, Defendants have asserted a counterclaim for a declaratory judgment that the Sales Tax and Vacation Accrual Claims were not within the scope of the post-closing adjustment dispute resolution process set forth in Section 2.04 of the Agreement. On this motion to confirm an arbitration award, this counterclaim (and each of Defendants' affirmative defenses) amount to the contention that the PwC Decision should not be confirmed because PwC (1) exceeded the scope of its authority by considering whether the Sales Tax and Vacation Accrual Claims were arbitrable, and/or (2) incorrectly interpreted the Agreement to provide that those claims were arbitrable. These contentions are not a sufficient basis to deny confirmation of the PwC Decision.

First, Defendants never objected to PwC's authority to determine the arbitrability of the Sales Tax and Vacation Accrual Claims; indeed, they specifically invited PwC to do so, and they did not seek a stay of the proceeding and a ruling from a court on that issue. For this reason, they have waived their right to oppose confirmation on that basis (or to seek a declaratory judgment on that issue). *Halcot*, 491 F. Supp. 2d at 419.

Second, PwC's allegedly erroneous interpretation of the Agreement to provide that the Sales Tax and Vacation Accrual Claims were arbitrable is no basis to deny confirmation of the PwC Decision because Defendants cannot meet their burden to demonstrate that PwC's conclusion was made in manifest disregard of the law. *Dunhill*, 513 F. Supp. 2d at 23 ("to vacate an arbitral award . . . requires '"an overt disregard of the law and not merely . . . an erroneous interpretation"'") (*quoting Pike*, 266 F.3d at 86; *Folkways*, 989 F.2d at 111).

**A.      Defendants Waived Any Argument That PwC Exceeded Its Authority By Determining The "Arbitrability" Of Unarco's Claims**

As this Court recently held, a party waives its right to oppose confirmation of an arbitration award on the grounds that the arbitrator exceeded his authority by deciding that a claim was arbitrable when that party participates in the arbitration and does not (1) object to the authority of the decision-maker to decide arbitrability and (2) seek a stay of arbitration and a ruling on the arbitrability of the claim in question. *Halcot*, 491 F. Supp. 2d at 419; *Data-Stream AS/RS Techs., LLC v. China Int'l Marine Containers, Ltd.*, No. 02 Civ. 6530, 2003 WL 22519456, at *3 (S.D.N.Y. Nov. 6, 2003) (finding waiver of right to object to arbitrability); *see also Sands Bros. & Co. v. Zipper*, No. 03 Civ. 7731, 2003 WL 22439789, at **1-3 (S.D.N.Y. Oct. 27, 2003) (Marrero, J.) (same); *Mobius Mgmt. Sys., Inc. v. Technologic Software Concepts, Inc.*, No. 02 Civ. 2820, 2002 WL 31106409, at *2 (S.D.N.Y. Sept. 20, 2002) (same); *Oxford Med. Grp., P.C. v. Vossoughian*, 162 F. Supp. 2d 234, 235 (S.D.N.Y. 2001) (same); *Favara, Skahan, Tabaczyk, Ltd. v. Ewing*, No. 91 Civ. 7878, 1992 WL 80659, at **2-3 (S.D.N.Y. Apr. 9, 1992) (same).

Although, as Defendants contend, they "objected to PwC's consideration of the Sales Tax Claim and the Vacation Accrual Claim . . . because those claims were outside the scope of Section 2.04 of the Agreement" (Answer ¶ 23), Defendants did not argue to PwC that PwC could not, should not and did not have authority to decide whether those claims were within the scope of Section 2.04.  To the contrary, Defendants invited PwC to determine the scope of the Section 2.04.  Defendants argued, *on the merits*, that PwC should deny the Sales Tax and Vacation Accrual Claims because those claims were not within the scope of Section 2.04:

> The post-closing adjustment process is not an indemnification action, and it is not an arbitration proceeding. . . . It was never designed to be an investigation of "big" issues such as the claims that Buyer is making regarding the Company's prior accounting

> practices and the represented-to financial statements. ***Buyer's*** ***proposed adjustments should be rejected*** – in this context – because they do not reflect "true ups" to the Estimated Purchase Price, but instead reflect fundamental attacks on the Company's prior accounting practices. . . . ***Buyer should not be permitted to*** ***seek recovery directly from Seller in the streamlined post-closing*** ***adjustment process for claims that are really indemnification*** ***claims.*** The Firm is simply not in a position to pass on those issues. The Firm should resist Buyer's invitation to act as a trial court for its indemnification claims.

Seller's Statement of Position at 7 (emphasis added) (Neal Decl., Ex. 6). In Seller's Reply Statement of Position, it stated:

> As noted in our initial submission, the goal of the post-closing adjustment process is to use the same principles and methods used in putting together the Reference Balance Sheet and the Estimated Purchase Price and simply to 'true up' those estimates to reflect additional information gained since that time . . . . It would be unfair – and inconsistent with the Agreement – to use different estimates and judgment in calculating the Actual Purchase Price than were used in calculating the Estimated Purchase Price.

Neal Decl., Ex. 10 at 2. As in *Halcot*, this is insufficient to preserve an objection to the authority of PwC to determine "arbitrability."

In *Halcot*, the party opposing enforcement of an arbitration award argued that the arbitrators exceed the scope of their authority by determining arbitrability and that it had preserved this objection, notwithstanding that it litigated both the arbitrability and merits of the allegedly non-arbitrable claims, because it explicitly reserved the right to argue that the claim at issue was not arbitrable. This Court found a waiver and distinguished an objection to an arbitrator's authority to decide arbitrability from an objection to arbitrability itself – finding that an objection to the latter is not a sufficient basis to avoid waiver of objections to the former:

> Halcot never objected to the arbitration panel determining the arbitrability issues it raised. In fact, Halcot urged the panel to do so . . . . Although Halcot invoked its reservation of rights regarding arbitrability, it never indicated that it did not want the arbitrators to decide the arbitrability issue. . . . Halcot's assertion that it was

> proceeding in arbitration without prejudice to its position that the
> claim was not arbitrable does not equate to asserting a position that
> the arbitrators should not decide arbitrability.

491 F. Supp. 2d at 418-19.

The Court found that Halcot had waived an objection to the authority of the

arbitrator to decide arbitrability, and that a party to arbitration should not be allowed to have two

bites of the apple:

> What Halcot's proposition essentially amounts to is enabling it to
> create a win-win outcome for itself, as a means of having it both
> ways, allowing the arbitrability issue to proceed to adjudication by
> the arbitrators and accepting the result if favorable to Halcot, or
> rejecting it if unfavorable and litigating the matter in court.
> Respondents contend that to hold otherwise would impermissibly
> afford Halcot a "second bite at the apple" on the issue of
> arbitrability

*Id.* at 419.

Defendants also seek a prohibited second bite at the apple.  Before PwC, they

engaged in a full examination of both the arbitrability and underlying merits of the Sales Tax and

Vacation Accrual claims, including the submission of extensive written submissions, voluminous

documentation and an expert report.  The parties paid PwC more than $350,000 in PwC fees to

resolve their dispute.  The sales tax claim was, by far, the most complicated and time intensive

issue considered by PwC.

In *Halcot*, this Court held that if a party objects to the authority of a decision-

maker to rule on the scope of his or her authority, that party should seek judicial resolution prior

to commencement of the alternative dispute resolution proceeding:

> If Halcot did not want the arbitrability issue decided by the
> arbitrators it could have refused to appoint an arbitrator and
> proceeded directly to Federal court at that point.  Alternatively . . .
> it could have moved for a stay once respondents began arguing the
> substance of the arbitrability issue to the panel.  Having instead
> fully contested the arbitrability of respondents claim before the

-13-

> arbitrators without indicating any objection to the arbitrators deciding this issue – indeed, while urging that the arbitrators decide it – Halcot cannot now seek independent review of the arbitration panel's unfavorable decision.

*Id.*

In *Data-Stream*, the court similarly rejected a party's attempt to vacate an arbitration award on the grounds that the arbitrator exceeded his authority by determining that the claim in question was arbitrable:

> By participating in the arbitration, CIMC waived its right to claim that it should not be a party to the arbitration . . . . CIMC's inclusion of its belief that it should not be forced to arbitrate in its December 7, 2002 letter to [the arbitrator] is not sufficient to prevent the Court from finding a waiver. If CIMC believed the position it stated in the letter, it should have refused to participate in the arbitration and forced Data-Stream to bring a district court action to compel its participation. CIMC could have then asserted its belief that it should not be made a party to the arbitration in the appropriate forum at the appropriate juncture. The time and manner for CIMC to have raised its objection was prior to the arbitration in response to a motion to compel participation, not after a lengthy arbitration in opposition to a motion to confirm the Award. . . . By actively participating and waiting until an award has been entered against it to complain to a district court, CIMC is essentially seeking a second bite at the apple.

2003 WL 22519456, at *3 (citations omitted); *see also Whirlpool Corp. v. Philips Elecs., N.V.*, 848 F. Supp. 474, 482 (S.D.N.Y. 1994) (finding that reservation of rights regarding arbitrability not effective: "Philips has reached that point of no return in which its active participation in what was known to be a final and binding arbitration has foreclosed its alleged rights of appeal"); *Mobius*, 2002 WL 31106409, at **1-2 (finding that party waived defense that claim against him was not arbitrable because he "did not seek a stay within the 20-day time limit set by CPLR 7503(c)"); *Oxford*, 162 F. Supp. 2d at 235 (denying motion to stay arbitration on basis that party "admitted [that he was party to a valid arbitration agreement] by not timely moving for a stay of the arbitration . . . and by affirmatively invoking the jurisdiction of the arbitrator over certain

-14-

claims"); *Favara*, 1992 WL 80659, at **2-3 (confirming award and rejecting respondent's motion to vacate where respondent failed to move for stay of arbitration); *Halley Optical Corp. v. Jagar Int'l Mktg. Corp.*, 752 F. Supp. 638, 639-40 (S.D.N.Y. 1990).

As the decisions in these cases demonstrate, Defendants are not entitled to re-litigate arbitrability before this Court. Defendants did not object to PwC's authority to decide arbitrability and, even if they had, they were obligated to either refuse to participate in the proceeding before PwC, thus forcing Unarco to bring a motion to compel arbitration or a declaratory judgment action, or bring their claim for a declaratory judgment prior to the commencement of the PwC poceeding. Having failed to do so, Defendants have waived any right to argue that PwC exceeded the scope of its authority, and to seek a declaratory judgment on that issue.

**B.    PwC's Decision On Arbitrability Was Not Made In Manifest Disregard Of The Law**

Even if PwC's conclusion that the Sales Tax and Vacation Accrual Claims were arbitrable was incorrect as a matter of law (and it is not) and, even if this Court were to agree with Defendants in that regard, as a matter of law, that is no basis to deny confirmation of the PwC Decision. Rather, in order to successfully oppose confirmation of the PwC Decision on that basis, Defendants must show that PwC's conclusion was not only erroneous, but that it was made "in manifest disregard of the law." *Dunhill*, 513 F. Supp. 2d at 30 ("to vacate an arbitral award . . . requires '"an overt disregard of the law and not merely . . . an erroneous interpretation"'") (*quoting Pike*, 266 F.3d at 86; *Folkways*, 989 F.2d at 111). This means that Defendants must show "'both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well-

defined, explicit, and clearly applicable to the case.'"  *Id.* (*quoting Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004)).  As applied, this standard dictates that

> [e]ven if [the arbitrator] may have misapplied or made an erroneous interpretation of the law that . . . was presented to him, that circumstance by itself would not justify vacating the award under the manifest disregard doctrine.  That rule may be satisfied not when the arbitrator misunderstands or misapplies the law but where it is clear that he "'understood and correctly stated the law but proceeded to ignore it.'"

*Id.* at 31 (*quoting Pike*, 266 F.3d at 86) (other citations omitted); *see also id.* at 30 (""'[a]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision"'") (*quoting Pike*, 266 F.3d at 86; *United Paperworkers*, 484 U.S. at 38).  Accordingly, "the application of this doctrine 'is highly deferential and such relief is appropriately rare.'"  *Id.* (*quoting Porzig  v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d. Cir. 2007)).

As set forth below, PwC's decision that the Sales Tax and Vacation Accrual Claims were within the scope of section 2.04 cannot, under any circumstances, be construed as being in manifest disregard of the law.  To the contrary, the decision comports with the well-established federal policy to construe arbitration clauses as broadly as possible.  Moreover, PwC's decision on this issue is consistent with several decisions in this court which have construed virtually identical dispute resolution provisions in the same manner.

1.    **PwC Correctly Concluded That The Sales Tax And Vacation Accrual Claims Are Within The Scope Of Section 2.04**

As this Court has repeatedly recognized, "[f]ederal policy promotes arbitration and establishes a strong presumption in favor of arbitration.  Accordingly, an arbitration clause must be read broadly, and any doubts concerning whether its scope encompasses the asserted

dispute should be resolved so as to warrant arbitration." *Dunhill*, 513 F. Supp. 2d at 26; *see also Walsh v. WOR Radio*, 531 F. Supp. 2d 623, 625-26 (S.D.N.Y. 2008) (Marrero, J.) ("the FAA 'establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration,'" and, accordingly, "[i]n deference to this strong federal policy, courts must construe arbitration agreements 'as broadly as possible'") (*quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)) (other citations omitted); *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (same); *Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc.*, 269 F. Supp. 2d 356, 360-61 (S.D.N.Y. 2003) (Marrero, J.) (same).

In this regard, "to determine arbitrability [a court] need only consider whether there exists an interpretation of the parties' agreement that covers the disputes at issue." *Chung*, 943 F.2d at 230; *see also WOR Radio*, 531 F. Supp. 2d at 628 (dispute is arbitrable "'so long as the arbitration clause is susceptible to an interpretation that it covers the dispute'") (*quoting Seabury Constr. Corp. v. District Council of N.Y.*, 461 F. Supp. 2d 193, 196 (S.D.N.Y. 2006)). In other words, "'unless it can be said "with positive assurance that the arbitration clause is not susceptible of a plausible interpretation that covers the asserted dispute," the dispute should be submitted to arbitration.'" *Chung*, 943 F.2d at 230 (*quoting Concourse Vill., Inc. v. Local 32E, Serv. Empls. Int'l Union*, 822 F.3d 302, 304 (2d Cir. 1987); *United Steelworkers of Am. v. Warrior & Gulf Navig. Co.*, 363 U.S. 574, 582-83 (1960)). This means that "even if the claims can also be characterized another way," *i.e.,* as not arbitrable, "arbitration must be compelled." *Gestetner*, 784 F. Supp. at 82; *Talegen*, 1998 WL 513066, at *6 (same); *Advanstar*, 1994 WL 176981, at *3 (same).

Here, not only is Section 2.04 susceptible to an interpretation that the Sales Tax and Vacation Accrual Claims are within its scope, as set forth below, any other interpretation is

unreasonable. Even crediting as plausible Defendants' alternative interpretation of Section 2.04 – that it excludes the Sales Tax and Vacation Accrual claims because they also may be claims for indemnification – this is simply a contention that those Claims can be "characterized another way," and is not a basis to deny confirmation of the PwC Decision. *Gestetner*, 784 F. Supp. at 82; *Talegen*, 1998 WL 513066, at *6.

2.    **Section 2.04 By Its Terms Covers The Sales Tax And Vacation Accrual Claims**

According to the plain language of Section 2.04, the Sales Tax and Vacation Accrual Claims are within the scope of Section 2.04. Section 2.04 provides that, 60 days after closing, Buyer is to provide Seller with the "Draft Computation," setting forth its calculation of, *inter alia*, the Net Working Capital Amount. Agreement at 9 (Neal Decl., Ex. 1). "If the Seller disagrees with *any aspect* of the Draft Computation," the Seller is to provide Buyer with an "Objection Notice" setting forth its objections to the Draft Computation. *Id.* (emphasis added). Thereafter, the Buyer and Seller are to "use reasonable efforts to resolve *any disagreements* as to the Draft Computation and Objection Notice." *Id.* (emphasis added). If they are unable to resolve their disagreements, they are to jointly retain an accounting firm to resolve "*any remaining disagreements*." *Id.* (emphasis added).

In the Draft Computation Unarco included in its calculation of Net Working Capital – which is simply the difference between current assets and current liabilities – certain liabilities for sales tax and accrued employee vacation that had not been included in the closing balance sheet or, therefore, in the calculation of Estimated Net Working Capital (upon which the calculation of the Estimated Purchase Price was based). In the Objection Notice Defendant Kingway omitted these liabilities from its calculation of Net Working Capital. Accordingly, the Draft Computation and the Objection Notice *disagreed* over the calculation of Net Working

Capital.  The parties were unable to resolve this "**_disagreement_**" and, as provided in Section 2.04, this "**_remaining disagreement_**" was submitted to PwC for resolution.[4]

The parties' disagreement over the calculation of Net Working Capital constituted a "remaining disagreement" that PwC was authorized to resolve is buttressed by the fact that there is no language limiting the scope of Section 2.04 in the manner suggested by Defendants. _See Talegen_, 1998 WL 513066, at *4 (finding post-closing adjustment claim arbitrable where "there is no language . . . expressly excluding any particular . . . purchase price adjustment dispute from arbitration.  Hence, the text of the Agreement provides Talegen with no support for its contention that some . . . claims were meant to be excluded from arbitration"); _Gestetner_, 784 F. Supp. at 81 (same: "[the arbitration provision] does not restrict the scope of objections to the Closing Net Book Value that may be brought before Peat Marwick").  The absence of such a limitation is especially indicative of the parties' intent since they expressly limited the scope of Section 2.04 in other respects.  For example, it states that "[t]he Firm may consider **_only_** those items in the Draft Computation and Objection Notice which the Buyer and the Seller are unable to resolve," and that "the Firm's determination shall be based **_solely_** on written submissions by the Buyer and Seller."[5]  Agreement at 9 (Neal Decl., Ex. 1) (emphasis added).

---

[4]    PwC's interpretation of Section 2.04 is entirely consistent with the purpose and intent of a post-closing adjustment – to adjust the purchase price, post-closing, to reflect the actual financial condition of the Company at closing.  During the post-closing sixty day period provided by Section 2.04, Unarco determined that according to GAAP, the Company had unrecorded liabilities for sales tax and employee vacation, which should have been included in the Seller's calculation of Estimated Net Working Capital. These liabilities reduced Net Working Capital.  Thus, pursuant to Section 2.04, Unarco sought a "post-closing adjustment" to account for a reduction in Net Working Capital and to adjust the purchase price accordingly.  This is precisely the type of claim that Section 2.04 was designed to address and the fact that Seller's failure to record (or properly record) these liabilities on the closing balance sheet and, accordingly, in the calculation of Net Working Capital, may give rise to a claim for breach of representations and warranties is irrelevant to whether the Sales Tax and Vacation Accrual Claims are within the scope of Section 2.04.

[5]    Moreover, it makes no sense that Buyer would have agreed to limit its remedies for Seller's failure to properly calculate Net Working Capital to initiating litigation, when the Agreement explicitly provides for

In contrast, Defendants interpret Section 2.04 to exclude disagreements over the inclusion of sales and use tax liabilities in the calculation of Net Working Capital, notwithstanding that Net Working Capital is *an express component of the Draft Computation and Objection Notice,* and the Agreement specifically provides that "*disagreements*" between those documents are to be decided by the Firm.

Further, Defendants' interpretation of the Agreement posits that claims arising from the existence of unrecorded liabilities must be *either* purchase price adjustment claims *or* indemnification claims and that Unarco's purchase price adjustment claims are transformed into indemnification claims by virtue of the fact that both claims share a common factual basis – Seller's failure to record (or properly record) these liabilities.   There is no language in the Agreement to support this interpretation and indeed, it is *contradicted* by Section 11.02(j) of the Agreement.   Section 11.02(j) explicitly recognizes that an unrecorded liability can give rise to **both** a claim for indemnification and a claim for a post-closing adjustment pursuant to Section 2.04:

> Notwithstanding anything to the contrary contained in this Section 11.02, there shall be no recovery for any Loss[6] or alleged Loss by the Buyer under this Section 11.02, and the Loss shall not be included in meeting the stated thresholds hereunder, to the extent such item has been included in the calculation of Net Working Capital Amount or the Indebtedness Payoff Amount as determined pursuant to Section 2.04 hereof [(which describes the Post-Closing Adjustment Process)].

Agreement at 43 (Neal Decl., Ex. 1).

---

a much less costly and less time-consuming remedy.  This is especially so in light of the fact that indemnification is only available for amounts in excess of the "threshold" set forth in the Agreement and, with respect to claims for breach of certain representations and warranties, is capped by the amount of the escrow.  *See* Agreement § 11.02(a) (Neal Decl., Ex. 1 at 39).

[6]   "Loss" is defined as "an actual loss, liability, damage, cost, interest, award, judgment, penalty, fine, assessment or expense . . . ."  Agreement at 3 (Neal Decl., Ex. 1).

This section is meant to ensure that the Buyer does not get a double recovery for an unrecorded liability that should have been included in the calculation of Estimated Net Working Capital if such unrecorded liability is also an indemnifiable loss.  In other words, if a "Loss" has been included in the calculation estimated or actual Net Working Capital pursuant to Section 2.04, the Actual Purchase Price will reflect that Loss.  Thus, if Buyer could also seek indemnification for that same "Loss" it would be entitled to a double-recovery.  Accordingly, contrary to Defendants' interpretation of Section 2.04, the Agreement recognizes that a "Loss" can give rise to more than one type of claim: post-closing adjustment or indemnity.

### 3. Courts In This District Have Routinely Required Arbitration Of Post-Closing Adjustments Claims That May Also Be Characterized As Claims For Indemnification

PwC's decision is consistent with several decisions of this Court.  *Gestetner*, 784 F. Supp. 78; *Luxottica*, 160 F. Supp. 2d 552; *Advanstar*, 1994 WL 176981; *Talegen*, 1998 WL 513066; *Whirlpool*, 848 F. Supp. 474; *In re Durso Supermkts.*, 170 B.R. 211; *Campeau*, 723 F. Supp. 224;  *see also Kim v. Transtar Metals, Inc.*, 726 N.Y.S.2d 87 (1st Dep't 2001).  Accordingly, the PwC Decision plainly was not made in manifest disregard of the law.

For example, in *Gestetner*, a party to a stock purchase agreement brought a proceeding to compel arbitration of a purchase price adjustment dispute under a post-closing adjustment provision almost identical to Section 2.04 of the Agreement.  The parties there had agreed that the purchase price adjustment would be based upon a comparison of an unaudited balance sheet provided at closing with a "Closing Balance Sheet" provided 90 days after closing, and that they would arbitrate any disputes over the Closing Balance Sheet before an accounting firm.

Like Defendants here, the party opposing arbitration in that case argued that certain of the petitioner's objections to the "Closing Balance Sheet" were not within the scope of

the arbitration provision because those objections were "covered by other provisions of the Purchase Agreement;" specifically, an indemnification provision. 784 F. Supp. at 81. The court rejected this argument, finding that the Court of Appeals has "ma[de] it clear that where claims may be understood to raise an arbitrable issue, arbitration must be compelled, even if the claims can also be characterized another way." *Id.* at 82 (*citing Chung*, 943 F.2d at 230). The court also noted that, like Section 2.04, the arbitration provision in question "does not restrict the scope of objections to the Closing Net Book Value that may be brought before [the accounting firm]." *Id.* at 81.[7]

In *Luxottica*, the court similarly rejected a party's contention that certain claims were not within the scope of a post-closing adjustment arbitration provision because those claims were breach of warranty claims. There, Luxottica purchased B&L's sunglasses business. The purchase price was based, in part, on a Baseline Net Operating Assets Statement ("BNOAS"), which valued the assets of the business at or around the date of the closing. Pursuant to a post-closing adjustment provision virtually identical to that in this case, the parties agreed that at some point subsequent to closing, the seller would provide the buyer with a Closing Net Operating

---

[7]    In *Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667 (N.Y. 2003), and *E\*Trade Financial Corp. v. Deutsche Bank AG*, 420 F. Supp. 2d 273 (S.D.N.Y. 2006), the courts decided that the claims there should be litigated as claims for indemnity. However, those cases were decided based on agreements and circumstances entirely different from this case. There is no indication that the stock purchase agreements at issue in those cases contained a provision such as Section 11.02(j), which explicitly recognizes that an unrecorded liability can give rise to **both** a claim for indemnification and a claim for a post-closing adjustment pursuant to Section 2.04. Moreover, *Westmoreland* involved an application under CPLR § 7601 to compel submission of a post-closing adjustment dispute to an independent accountant. 794 N.E.2d at 670. Similarly, in *E\*Trade*, no arbitration proceedings took place and the defendant, who invoked the arbitration clause, did not even do so until after it joined issue in the litigation. 420 F. Supp. 2d at 277. Accordingly, unlike here, those courts were asked to determine "arbitrability" *before* the parties voluntarily submitted that issue to binding arbitration. Thus, the issue before the court was whether, as a matter of law – and applying a *de novo* standard of review – the claims at issue were within the scope of the applicable dispute resolution provision. In contrast, the issue before this court is whether the PwC Decision was made in *manifest disregard of the law, i.e.,* whether Section 2.04 is susceptible to an interpretation that it covers the Sales Tax and Vacation Accrual claims; and the numerous decisions discussed in section I.B.3, amply demonstrate that it is.

Assets Statement ("CNOAS") valuing the assets as of the closing date, which, when compared with the BNOAS, would be the basis for a purchase price adjustment.  If the parties disagreed over the values in the CNOAS, they agreed to submit their dispute to an accounting firm.

The buyer made multiple objections to the CNOAS, including that the seller failed to accrue certain liabilities and losses, failed to record adequate allowances for returns, obsolete inventories, and warranty obligations, and failed to take certain write offs.  The seller responded that these objections were "claims for breach of the [a]greement's warranties and therefore not subject to the purchase price adjustment procedure."  160 F. Supp. 2d at 555.  The court disagreed: "[buyer] simply claims that [seller's] failure to provide for these losses, liabilities, and allowances caused incorrect values to be recorded on the CNOAS.  Section 2.5(c) states unequivocally that disputes over CNOAS valuations shall be submitted to the CPA Firm."  *Id.*

In *Advanstar*, the court similarly rejected a party's attempt to characterize post-closing adjustment dispute claims as indemnity claims and, therefore, not arbitrable.  Specifically, in that case the buyer and the seller to a stock purchase agreement agreed to base the purchase price, in part, on a "Projected Balance Sheet," prepared by the seller before closing, and to subsequently adjust, if necessary, the purchase price according to a comparison of the Projected Balance Sheet with a "Closing Balance Sheet," prepared by the buyer, post-closing.

Seller objected to the Closing Balance Sheet and argued that post-closing adjustments sought by the buyer were not subject to an arbitration provision because they constituted a "dispute regarding the accounting methods used," which disputes were "governed by the indemnity provisions" in the stock purchase agreement.  1994 WL 176981, at *3.  The court disagreed:

> [seller's] interpretation of [post-closing adjustment provision] simply cannot be gleaned from the Agreement's language. [That provision] clearly contemplates that disputes arising from disputes over the Closing Balance Sheet be resolved [by] an independent auditor. More importantly, the Court of Appeals for the Second Circuit has ruled that "to determine arbitrability [courts] need only consider whether there exists an interpretation of the parties' agreement that covers the disputes at issue." [*Chung*, 943 F.2d at 230]. Thus where claims may legitimately be understood to raise an arbitrable issue, arbitration must be compelled even if the claims can also be characterized another way. *Id.* In this case, the question is not even a close one.

*Id.* As the cases cited above make clear, PwC's interpretation of Section 2.04 is consistent with the prevailing law and, *a fortiori*, was not made in manifest disregard of the law.

## CONCLUSION

For the reasons set forth above, Plaintiff's motion to confirm should be granted. Because confirmation of the PwC Decision necessarily moots Defendants' counterclaim and establishes Defendants' liability on Plaintiff's breach of contract and guarantee claims, Defendants' counterclaim should be dismissed and judgment should be granted on Plaintiff's claims.

Dated:    New York, New York
          May 14, 2008

                          Respectfully submitted,

                          CADWALADER, WICKERSHAM & TAFT LLP

                          By: _____/s/ Howard R. Hawkins, Jr._____
                                  Howard R. Hawkins, Jr. (HH-2787)
                                  Joshua R. Weiss (JW-9959)

                          One World Financial Center
                          New York, NY 10281
                          212.504.6000(t)
                          212.504.6666(f)
                          howard.hawkins@cwt.com
                          joshua.weiss@cwt.com

                          *Attorneys for Plaintiff*
                          *Unarco Material Handling, Inc.*